# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CAMPAIGN FOR ACCOUNTABILITY, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 1:16-cv-1068 (KBJ) |
| UNITED STATES DEPARTMENT OF JUSTICE, | ) ) ) ) | |
| Defendant. | ) ) ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Campaign for Accountability ("CfA") has filed an amended complaint that alleges that the Department of Justice's Office of Legal Counsel ("OLC") must make certain specified categories of OLC legal opinions automatically available to the public pursuant to the Freedom of Information Act's ("FOIA's") seldom-litigated reading-room provision. (*See* Am. Compl., ECF No. 22, ¶ 13 (citing 5 U.S.C. § 552(a)(2)).) In the wake of this Court's prior conclusion that not all of OLC's opinions qualify for affirmative disclosure under section 552(a)(2) of Title 5 of the United States Code, *see generally Campaign for Accountability v. Dep't of Justice ("Campaign for Accountability I")*, 278 F. Supp. 3d 303 (D.D.C. 2017), CfA now maintains that the reading-room provision requires affirmative disclosure of at least four types of OLC opinions: those that (1) resolve inter-agency disputes (*see* Am. Compl. ¶¶ 35–38); (2) interpret an agency's non-discretionary legal obligations (*see id.* ¶¶ 41–44); (3) "find[] that particular statutes are unconstitutional and that therefore

1

agencies need not comply with them" (*id.* at 18; *see also id.* ¶¶ 45–46); or (4) adjudicate or determine private rights (*see id.* at ¶¶ 47–49).[1]

Before this Court at present is Defendant OLC's renewed motion to dismiss CfA's amended complaint (*see* Mem. in Supp. of Def.'s Renewed Mot. to Dismiss the Am. Compl. ("Def.'s Mot."), ECF No. 29-1), which invokes Federal Rule of Civil Procedure 12(b)(6) and argues that CfA's amended complaint *still* does not plausibly allege that OLC has a legal obligation to disclose any of these categories of opinions under the FOIA (*see id.* at 19–20), primarily because, in the agency's view, OLC opinions are "legal advice documents [] rather than final agency policy decisions" (*id.* at 22) and do "not regulate private parties[]" (*id.* at 21), so these kinds of agency records do not fall within the ambit of the FOIA's affirmative disclosure provisions (*see id.*).[2]  In response, CfA both reiterates its argument that, due to their "binding" and "controlling" nature, all OLC opinions are subject to affirmative disclosure (Pl.'s Opp'n to Def.'s Mot. ("Pl.'s Opp'n"), ECF No. 30, at 18), and asserts that, in any event, the identified categories of OLC opinions satisfy the statutory requirements, because they qualify as either "statements of policy and interpretations which have been adopted by the agency[,]" 5 U.S.C. § 552(a)(2)(B), or "final opinions . . . made in the adjudication of cases[,]" *id.* § 552(a)(2)(A) (*see* Pl.'s Opp'n at 31–42).

For the reasons explained below, this Court adheres to its prior conclusion that not all—but also not none—of OLC's written opinions must be affirmatively disclosed

---

[1] CfA's amended complaint specifically identified a fifth category of OLC opinions—opinions issued to independent agencies (*see* Am. Compl. ¶ 39)—but CfA subsequently withdrew its claims with respect to that separate category of records (*see infra* n.4).

[2] Page-number citations to the documents that the parties and the Court have filed refer to the page numbers that the Court's Electronic Case Filing System ("ECF") automatically assigns.

pursuant to the FOIA's reading room provision, and it further finds that only *one* of the categories of OLC opinions that CfA has now identified is plausibly included in the classes of records that an agency must affirmatively disclose under section 552(a)(2). In particular, the Court finds that CfA has plausibly alleged that OLC opinions relating to inter-agency disputes are "final opinions . . . made in the adjudication of cases[,]" 5 U.S.C. § 552(a)(2)(A), and such opinions may also plausibly be characterized as "statements of policy and interpretations" that have been adopted *ex ante* by at least one of the disputing agencies, *id.* § 552(a)(2)(B).  The Court considers it implausible that any of the other types of OLC opinions to which CfA points fit into the FOIA's affirmative-disclosure classifications, and thus concludes that CfA has failed to state a claim with respect to those categories of opinions.  Consequently, OLC's motion to dismiss CfA's amended complaint will be **GRANTED IN PART and DENIED IN PART**.  A separate Order consistent with this Memorandum Opinion will follow.

## I.      BACKGROUND

In the initial complaint that was filed in this matter, CfA asserted that *all* of OLC's written legal opinions were uniformly and categorically subject to disclosure under the FOIA's reading-room provision, section 552(a)(2) of Title 5 of the United States Code.  (*See* Compl., ECF No. 1, ¶ 31.)  OLC moved to dismiss CfA's FOIA claim and, in a Memorandum Opinion concerning OLC's motion, this Court held that CfA had not "plausibly alleged that OLC opinions, as a general matter, are subject to the reading-room provision," *Campaign for Accountability I*, 278 F. Supp. 3d at 321 (cleaned up), and CfA also "ha[d] not identified an ascertainable set of OLC opinions that OLC [] withheld from the public and that is also plausibly subject to the FOIA's

reading-room requirement[,]" *id.* at 306.  The relevant background for the parties' FOIA dispute over the characterization and release of OLC opinions is described in detail in this Court's prior Memorandum Opinion, *see id.* at 306–12, and is incorporated into the instant discussion by reference.  This Court will assume familiarity with those background facts moving forward; therefore, only a brief recounting of certain relevant background facts and legal principles is necessary here.

First of all, the reader is reminded that, as a general matter, section 552(a)(2) of Title 5 of the United States Code furthers the FOIA's goal of fostering public access to government records by requiring agencies to act proactively to publish and index certain specified types of documents.  In relevant part, the provision states that

> [e]ach agency, in accordance with published rules, shall make available for public inspection in an electronic format—
>
> > (A) final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases;
> >
> > (B) those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register;
> >
> > (C) administrative staff manuals and instructions to staff that affect a member of the public;
> >
> > (D) copies of all records, regardless of form or format—
> >
> > > (i) that have been released to any person under paragraph (3); and . . .
> >
> > (E) a general index of the records referred to under subparagraph (D)[.]

5 U.S.C. § 552(a)(2).

It is clear beyond cavil that the reading-room provision has as its "primary objective [] the elimination of secret law."  *Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 772 n.20 (1989) (internal quotation marks and

citation omitted).  That is, "[t]he FOIA's reading-room provision 'represents an affirmative congressional purpose to require disclosure of documents which have the force and effect of law.'"  *Campaign for Accountability I*, 278 F. Supp. 3d at 307 (quoting *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 153 (1975)).  And the requirement that certain categories of records be automatically published by the agency that produces them mitigates against the risk of secret law, insofar as it "prevent[s] an agency from subjecting members of the public to a rule that the agency has not publicly announced."  *Id.* (internal citations omitted).

As explained in *Campaign for Accountability I*, in addition to requiring the disclosure of certain agency records, the FOIA permits an agency to withhold covered documents pursuant to certain statutory exemptions, *see* 278 F. Supp. 3d at 308 (citing 5 U.S.C. § 552(b)(1)–(9)), and one of those exemptions—Exemption 5—"correlates with, and sheds light on, the scope of the FOIA's reading-room provision[,]" *id*. Exemption 5 generally authorizes agencies to withhold "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency[.]"  5 U.S.C. § 552(b)(5).  Moreover, and significantly for present purposes, making a determination that an agency can properly withhold a particular record pursuant to the attorney work-product and deliberative-process privileges that Exemption 5 protects means that the record in question is also not subject to automatic disclosure under the FOIA's reading-room provision.  *See Campaign for Accountability I*, 278 F. Supp. 3d at 322.   The reverse is also true: documents that are not properly withheld as privileged under Exemption 5 can be deemed to reflect an agency's working law and, as such, must be affirmatively

disclosed under section 552(a)(2).  In other words, "if a record can be withheld under

Exemption 5, then it is generally not subject to affirmative disclosure under the

reading-room provision and vice versa[.]"  *Id.* at 308.

This Court's previous observations about the OLC's authority to provide legal

advice to the Executive Branch also warrant restating.  This responsibility is "nearly as

old as the Republic itself[,]" *Citizens for Responsibility & Ethics in Washington v.

Dep't of Justice ("CREW II")*, 922 F.3d 480, 483 (D.C. Cir. 2019) (internal quotation

marks omitted), and "[f]or decades, [OLC] has been the most significant centralized

source of legal advice within the Executive Branch[,]" *Citizens for Responsibility &

Ethics in Wash. v. Dep't of Justice ("CREW I")*, 846 F.3d 1235, 1238 (D.C. Cir. 2017)

(internal quotation marks and citation omitted).  OLC advises the rest of the Executive

Branch on behalf of the Attorney General, and it is important to note that "the Attorney

General's legal advice to the President and various executive agencies spans a wide

range of issues and contexts."  *Campaign for Accountability I*, 278 F. Supp. 3d at 309;

*see also* 28 C.F.R. § 0.25(a) (charging OLC with "[p]reparing the formal opinions of

the Attorney General[,] rendering informal opinions and legal advice to the various

agencies of the Government[,] and assisting the Attorney General in the performance of

his functions as legal adviser to the President and as a member of, and legal adviser to,

the Cabinet").

Notably, "[a]lthough the OLC frequently conveys its legal advice to executive

agencies through informal means, it sometimes does so through 'formal written

opinions.'"  *CREW II*, 922 F.3d at 484.  Furthermore, with respect to its written

opinions, OLC "has a longstanding internal process in place for regular consideration

and selection of significant opinions for official publication."  (Memorandum from

David J. Barron, Acting Assistant Attorney General, to Attorneys of the Office, Best

Practices for OLC Legal Advice and Written Opinions at 5 (July 16, 2010) ("Best

Practices Memo"), Ex. 3 to Def.'s Mot. to Dismiss, ECF No. 9-5.)[3]

## II.    PROCEDURAL HISTORY

In *Campaign for Accountability I*, this Court relied on the D.C. Circuit's holding

in *Electronic Frontier Foundation v. Department of Justice ("EFF")*, 739 F.3d 1 (D.C.

Cir. 2014), to conclude that "an OLC opinion does not constitute an agency's working

law merely by virtue of being a controlling and precedential statement of the legal

constraints on an agency's decision[,]" *Campaign for Accountability I*, 278 F. Supp. 3d

at 322 (internal quotation marks omitted), and it further held that a complaint that

alleges that an agency has violated the FOIA's reading-room provision can survive a

Rule 12(b)(6) motion to dismiss only if it "identif[ies] ascertainable records or

categories of records that are plausibly subject to the reading-room requirement and that

the agency has failed to make publicly available[,]" *id.* at 320.  The Court dismissed

CfA's claims in light of this holding, but granted CfA leave "to amend its complaint to

add allegations [concerning] specific, ascertainable categories of records[.]"  *Id.* at 324.

Three weeks after this Court dismissed CfA's initial complaint, CfA filed an

amended complaint that identifies distinct categories of OLC written opinions (out of

the broad range of opinions that OLC typically issues) that CfA maintains are

---

[3] OLC has opted to publish approximately 1,339 opinions, dating from 1934 to the present.  *See* Office of Legal Counsel, *Opinions*, Dep't of Justice (Sept. 11, 2020), https://www.justice.gov/olc/opinions. *Cf.  Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013) (authorizing courts to take judicial notice of the fact that material has been posted to a government website pursuant to Federal Rule of Evidence 201).

indisputably subject to section 552(a)(2) of the FOIA. (*See Am. Compl.* ¶¶ 35–49.)

These categories are: (1) opinions resolving inter-agency disputes (*see id.* ¶¶ 35–38);

(2) opinions interpreting non-discretionary legal obligations (*see id.* ¶¶ 41–44);

(3) opinions finding that particular statutes are unconstitutional (*see id.* at 18; *see also*

*id.* ¶¶ 45–46); and (4) opinions adjudicating or determining private rights (*see id.* at

¶¶ 47–49).[4]  With respect to each of these four categories of records, CfA's amended

complaint alleges that the government has failed to comply with the disclosure

obligations of section 552(a)(2) by not making these opinions automatically available

for public inspection (*see id.* ¶¶ 54–59 (Count I)), and that the government has failed to

comply with the indexing requirement of section 552(a)(2)(E) of the Act (*see id.* ¶¶ 60–

64 (Count II)).

     OLC has once again moved to dismiss CfA's pleading under Federal Rule of

Civil Procedure 12(b)(6), claiming that CfA's amended complaint does not plausibly

allege that OLC has a legal obligation to disclose the specified categories of opinions.

(*See* Def.'s Mot. at 19–20.)  The agency's argument largely echoes its prior position

that *none* of OLC's opinions *ever* satisfies the FOIA's affirmative-disclosure mandates,

because OLC merely generates "legal advice documents [] rather than final agency

policy decisions[.]"  (*Id.* at 22.)  The agency also argues that none of the types of OLC

opinions that CfA specifically identifies is a "final opinion[] . . . made in the

---

[4] As explained previously (*see supra* n.1), CfA's amended compliant makes the same claims with
respect to a fifth category of OLC opinions—opinions issued to independent agencies (*see* Am. Compl.
¶ 39)—but CfA has withdrawn this distinct allegation because "[t]he OLC has now confirmed that the
express agreement that independent agencies make to be bound by the OLC's formal written opinions is
no different than the implied agreement of non-independent agencies to be bound by those opinions[.]"
(Pl.'s Opp'n at 35 n.11; *see also id.* (explaining that CfA "no longer contends that those opinions
constitute [a separate category of] working law under this Court's interpretation of *EFF*").)

adjudication of cases[,]" 5 U.S.C. § 552(a)(2)(A), because OLC opinions "do not finally dispose of any agency action" and none concerns "adversarial disputes involving private parties[.]"  (*Id.* at 22–24.)  Moreover, according to OLC, CfA "does not identify any concrete features of these OLC advice documents that would make them *the recipient agencies'* law or policy" beyond the mere fact that they are considered "precedential" and "controlling[.]"  (*Id.* at 33 (emphasis in original); *see also id.* at 39 (asserting that, "[e]ven when the necessary result of an OLC opinion is to foreclose a particular action or actions, that does not eliminate the need for the agency still to make a policy decision—*i.e.*, to decide how to address the underlying situation").)  OLC further maintains that it "does not purport—nor does it have authority—to adjudicate or determine any private rights" (*id.* at 43 (internal quotation marks and citation omitted)), and that interpreting the FOIA's reading-room provision to include any subset of OLC opinions "would [both] undermine important values within the Government and raise significant constitutional concerns" (*id.* at 44).

In response, CfA holds fast to its prior contention that all of OLC's opinions are subject to disclosure under section 552(a)(2) (*see* Pl.'s Opp'n at 7 ("[R]espectfully[] urg[ing] this Court to reconsider its prior holding.")), and it further insists that the four categories of OLC opinions that its amended complaint has identified are either "statements of policy and interpretations" adopted by the agency, 5 U.S.C. § 552(a)(2)(B), or "final opinions . . . made in the adjudication of cases[,]" *id.* § 552(a)(2)(A), for the purpose of the FOIA's reading-room provision, such that they are subject to automatic disclosure (*see* Pl.'s Opp'n at 30–42).  Additionally, CfA maintains that "[r]equiring the disclosure of the OLC's formal written opinions would

serve, not threaten, important constitutional values." (*Id.* at 48.)

The Court held a hearing on the government's motion to dismiss on July 20, 2018 (*see* Minute Entry of July 20, 2018), at the end of which it took the government's motion, now ripe for review, under advisement.

## III.   LEGAL STANDARDS

"Because the FOIA permits a court to order the production of any agency records improperly withheld from the complainant, a FOIA plaintiff states a claim where it properly alleges that an agency has (1) improperly (2) withheld (3) agency records[.]" *Campaign for Accountability I*, 278 F. Supp. 3d at 312 (cleaned up).  Notably, what qualifies as improper withholding can vary based upon the particular FOIA provision that the plaintiff invokes.  Unlike section 552(a)(3), which requires agencies to produce records in response to a proper request for *any* documents in the agency's possession (subject to specified withholdings), *see Shapiro v. C.I.A.*, 170 F. Supp. 3d 147, 154–56 (D.D.C. 2016), the FOIA's reading-room provision requires the agency's proactive disclosure of specific, statutorily delineated categories of records, *see, e.g.*, 5 U.S.C. §§ 552(a)(2)(A)–(B).  Accordingly, "in order to state a claim that an agency has improperly withheld records that it was obligated to make public under section 552(a)(2), the complaint must identify particular records (or categories of records) that the agency has failed to publicize and that plausibly fit within one of the statutory categories." *Campaign for Accountability I*, 278 F. Supp. 3d at 312.

In the context of a complaint that alleges improper withholding of agency records in violation of section 552(a)(2) the FOIA, a plaintiff states a claim upon which relief can be granted if the records that the complaint identifies as having been withheld

plausibly qualify as, *inter alia*, "final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases[,]" 5 U.S.C. § 552(a)(2)(A), or "statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register[,]" *id.* § 552(a)(2)(B).  And because courts are required to dismiss a complaint that "fail[s] to state a claim upon which relief can be granted" under Federal Rule of Civil Procedure 12(b)(6), Fed. R. Civ. P. 12(b)(6), "[t]o survive a motion to dismiss, [such] a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face[,]'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## IV.   ANALYSIS

The parties in this case have repeatedly asked the Court to adopt an all-or-nothing stance with respect to the OLC's affirmative disclosure obligations: either *all* OLC opinions must be disclosed pursuant to the FOIA's reading-room provision because such opinions are binding on the agencies to which they are issued, as CfA argues (*see* Pl.'s Opp'n at 7), or *none* of OLC's opinions is subject to proactive disclosure, as OLC contends, because OLC is not itself a policymaking authority and instead only advises administrative agencies that regulate private parties (*see* Def.'s Mot. at 22).  This Court persists in rejecting this dichotomy and, as explained fully below, it further finds that one of the four types of OLC opinions that CfA points to— opinions that resolve inter-agency disputes—can plausibly be classified as either "final opinions . . . made in the adjudication of cases[,]" or "statements of policy and interpretations" that one or more of the disputing agencies have adopted, for the

purpose of the FOIA's reading-room provision.  5 U.S.C. §§ 552(a)(2)(A)–(B).  The

Court also concludes that it is not plausible that the remaining types of OLC opinions

that appear in CfA's amended complaint fit into any of the section 552(a)(2)

classifications that CfA has invoked.

### A.  This Court Will Not Reconsider Its Prior Conclusion That OLC's Formal Written Opinions Do Not Necessarily Constitute The Working Law Of The Recipient Agency

In *Campaign for Accountability I*, this Court held that "CfA cannot state a

plausible claim that OLC violated its obligation to make such reading-room documents

publicly available simply by pointing to OLC's failure to publicize all of its opinions

that provide controlling advice to executive branch officials and agencies on questions

of law and that serve as precedent[,]" 278 F. Supp. 3d at 322 (internal quotation marks

and citation omitted), because where "OLC does not speak with authority on the [client

agency]'s policy[,]" *id.* at 321 (internal quotation marks and citation omitted), "an OLC

opinion does not necessarily reflect the adopted policy of the agency that requests it[,]"

*id.* at 323.  In its opposition to the agency's motion to dismiss its second amended

complaint, CfA "respectfully[] urges this Court to reconsider [this] prior holding[]" and

to rule that all of OLC's formal written opinions are subject to section 552(a)(2)'s

affirmative disclosure requirement.  (Pl.'s Opp'n at 7; *see also id.* at 12–34.)  The thrust

of CfA's argument is that this Court was wrong to conclude otherwise.  (*Id.*)  But "it is

well established that such assertions of error, standing alone, are insufficient" for a

court to reconsider a prior ruling.  *Pierce v. District of Columbia*, 146 F. Supp. 3d 197,

201 (D.D.C. 2015).  Indeed, "where litigants have once battled for the court's decision,

they should neither be required, nor without good reason permitted, to battle for it

12

again." *Singh v. George Washington Univ.*, 383 F.Supp.2d 99, 101 (D.D.C. 2005) (internal quotation marks and citation omitted); *see also, e.g.*, *All. of Artists & Recording Companies, Inc. v. Gen. Motors Co.*, 306 F. Supp. 3d 413, 416 (D.D.C. 2016) (denying reconsideration).

CfA does not contend that the Court misunderstood its legal argument, nor does it point to any change in law or facts that might persuade this Court to revisit its prior ruling. *Cf. AFL-CIO v. N.L.R.B.*, No. 20-cv-0675, 2020 WL 3605656, at *3 (D.D.C. July 1, 2020) ("[I]t is clear beyond cavil that justice requires reconsideration when, among other things, a court has patently misunderstood a party or has made an error not of reasoning but of apprehension" (cleaned up)).  To the contrary, if anything, intervening developments strongly suggest that this Court's prior holding was *not* erroneous.  In a recent ruling, a panel of the D.C. Circuit explicitly blessed the reasoning in *Campaign for Accountability I*, by reaffirming that the Circuit's holding in *EFF* precludes a "universal claim" for the proactive publication of all OLC opinions simply because they are "controlling" and "binding[.]"  *CREW II*, 922 F.3d at 486–87 (affirming another district court ruling concerning FOIA's reading-room provision, and noting the overlap between that case and the instant litigation); *see also id.* at 488–89 (explaining that *EFF* "adopted the broader rule that the OLC's formal written opinions are not the 'working law' of an agency simply because they are nominally 'controlling.'" (internal citation omitted)).  Thus, this Court confidently adheres to its rejection of CfA's contention that all OLC opinions are subject to the FOIA's reading-room provision, and it respectfully declines CfA's invitation to reconsider that holding.

**B. OLC Mischaracterizes The Reading-Room Provision And Fails To Accept The Amended Complaint's Allegations Concerning The Nature Of At Least Some Of Its Opinions**

The Court also rejects OLC's contention that its formal written opinions can *never* qualify for affirmative disclosure under section 552(a)(2).  (*See* Def.'s Mot. at 21–23.)  OLC's argument in this regard rests, first, on the much-heralded assertion that the affirmative disclosure requirements of the FOIA's reading-room provision are "limited" to records that pertain to "agency regulation of private citizens' rights and obligations" (*id.* at 23), which effectively excludes OLC because that agency "does not regulate private parties" (*id.* at 21).  OLC also insists that its written opinions are merely "legal advice documents—rather than final agency policy decisions"—and that only the latter are subject to disclosure under the reading-room provision.  (*Id.* at 22.)  Neither of these contentions carries the day, for OLC's cramped characterization of the scope of the reading-room provision does not comport with a plain reading of the statute, and the narrow aperture through which OLC views its own opinions improperly fails to account for the plausible opinion-related facts and circumstances that CfA alleges in its second amended complaint.

1.  The FOIA's Reading-Room Provision Is Not Limited To Agency Records That Regulate Private Parties

The fact that "OLC does not issue any opinions in adversarial disputes involving private parties" (Def.'s Mot. at 22) seems neither here nor there, given that nothing in the plain text or history of section 552(a)(2), or in the few cases that have interpreted that statutory provision, establishes that the FOIA's affirmative obligation to publish certain agency records extends only to agency records that pertain to the regulation of private entities.  In fact, as explained in Part I, *supra*, section 552(a)(2) specifies each

14

kind of document that an agency must "make available for public inspection," 5 U.S.C.
§ 552(a)(2), and none of the relevant categories explicitly states that, to be disclosable
per section 552(a)(2), the record has to have been generated in connection with the
agency's regulation of private parties.  To be sure, section 552(a)(2)(C)—which is not
invoked in the instant case—requires affirmative disclosure of "administrative staff
manuals and instructions to staff *that affect a member of the public*[,]" *id.*
§ 552(a)(2)(C) (emphasis added), but no other subdivision of section 552(a)(2) is
similarly qualified and, as a result, one cannot assume that Congress intended the
public-impact limitation to apply to any of the other listed categories.  *Cf. N.L.R.B. v.
SW Gen., Inc.*, 137 S. Ct. 929, 940 (2017) ("If a sign at the entrance to a zoo says 'come
see the elephant, lion, hippo, and giraffe,' and a temporary sign is added saying 'the
giraffe is sick,' you would reasonably assume that the others are in good health.").
Likewise, it is well established that Congress's primary concern when it enacted section
552(a)(2) was mandating the disclosure of government records that might constitute the
working law of an agency, *see CREW II*, 922 F.3d at 486, and that objective obviously
encompasses more than merely requiring automatic publication and indexing of the
subset of agency records that pertain to the regulation of "private citizens' rights and
obligations" (Def.'s Mot. at 23).

Thus, the Court is genuinely puzzled by OLC's insistence that the text of section
552(a)(2) "makes clear that the covered documents refer to typical adjudicatory and
regulatory contexts involving private individuals, not internal agency documents."  (*Id.*)
Again, neither section 552(a)(2)(A) nor section 552(a)(2)(B) makes any such
distinction.  And the mere fact that section 552(a)(2) subsequently notes that certain

15

covered records—*i.e.*, "[a] final order, opinion, statement of policy, interpretation, or staff manual or instruction that affects a member of the public"—"may be relied on, used, or cited as precedent by an agency against a party other than an agency" only under specified circumstances, 5 U.S.C. § 552(a)(2), does not make OLC's argument (*see* Def.'s Mot. at 23) any less perplexing.  This statutory provision simply prescribes the preclusive impact of an agency's violation of the affirmative disclosure provision in a certain context: a covered document may not be used *against* private parties, *unless* it has first been disclosed pursuant to the reading-room provision (or the private parties have sufficient notice).  It says nothing about whether the statutory list of covered documents must be read to include only records that pertain to private parties.

If OLC's text-based argument for concluding that agency records must pertain to private parties in order to be subject to the reading-room provision (*see id.*) derives from subdivision (A) of section 552(a)(2)—which requires affirmative disclosure of "final opinions, including concurring opinions and dissenting opinions, as well as orders, made in the adjudication of cases[,]" 5 U.S.C. § 552(a)(2)(A)—then OLC has ignored the fact that "the adjudication of cases" is not defined in the statute as the resolution of disputes *involving private parties* (indeed, it is not defined at all), and non-private entities can certainly be involved in adversarial disputes that, when adjudicated, qualify as "cases."  *See Comm. on Judiciary of United States House of Representatives v. McGahn*, 968 F.3d 755, 774 (D.C. Cir. 2020) (en banc) (rejecting the view that there is an Article III case or controversy "only when an individual right is implicated"); *see, e.g.*, *Dep't of Treasury v. F.L.R.A.*, 494 U.S. 922 (1990); *Nevada v. United States*, 463 U.S. 110 (1983); *United States v. Interstate Com. Comm'n*, 337 U.S.

16

426 (1949).  In any event, the opinions that must be disclosed under section

552(a)(2)(A) are but one of the four categories of records that the reading-room

provision covers, which means that, by its plain text, section 552(a)(2) transcends

agency records that opine on the adjudication and regulation of private rights and

responsibilities.  *See, e.g.*, 5 U.S.C. § 552(a)(2)(B)–(C) (requiring affirmative

disclosure of non-adjudicative agency materials, such as "statements of policy and

interpretations which have been adopted by the agency and are not published in the

Federal Register[,]" and "administrative staff manuals and instructions to staff that

affect a member of the public").

The legislative history of the FOIA's reading-room provision does not compel a

different conclusion.  Far from OLC's representation that "Congress's primary concern

in [section] 552(a)(2) was with the adjudication of private rights" (*see* Def.'s Mot. at

23), the House Report to which OLC points demonstrates that Congress enacted section

552(a)(2) to counteract the vague authorization for withholding that existed in a prior

version of the FOIA, which had "permit[ted] an agency's orders and opinions to be

withheld from the public if the material is 'required for good cause found to be held

confidential.'"  H.R. Rep. 89-1497, at 29 (1966).  Section 552(a)(2) was aimed at

eliminating that "undefined authority for secrecy[,]" and the House Report clarified that

the purpose of the provision was to provide an explicit requirement that agencies "make

available statements of policy, interpretations, staff manuals, and instructions that

affect any member of the public."  *Id.*

It is also clear to this Court that OLC's assertion that the Supreme Court and the

D.C. Circuit have embraced a reading of section 552(a)(2) that requires affirmative

disclosure only with respect to records that relate to an agency's adjudication of private rights (*see* Def.'s Mot. at 23–24 (citing cases)) is mistaken.  To the contrary, the cited rulings are consistent with the thrust of Congress's intent in enacting the reading-room provision, which was to ensure that agencies do not develop, in some way, whether through individual adjudications or otherwise, a body of "secret law" through which to "discharge . . . [their] regulatory duties and [to] deal[] with the public."  *Schlefer*, 702 F.2d at 244; *see also Reporters Comm.*, 489 U.S. at 772 (noting that the "basic purpose" of the FOIA is "to open agency action to the light of public scrutiny" (internal quotation marks and citation omitted)).  And it is well established that the "working law" exception to an agency's authority to withhold records derives from more than a mere concern about how an agency has adjudicated private parties' rights; rather, requiring affirmative disclosure of the broad categories of records and information listed in section 552(a)(2) promotes the overarching objective of the FOIA, which is to codify "the citizens' right to be informed about what their government is up to."  *Dep't of Def. v. F.L.R.A.*, 510 U.S. 487, 495 (1994) (internal quotation marks and citation omitted); *see also Elec. Privacy Info. Ctr. v. Dep't of Justice*, 442 F. Supp. 3d 37, 51–52 (D.D.C. 2020) ("The FOIA's policy of broad disclosure of government documents not only gives citizens access to the information on the basis of which government agencies make their decisions, thereby equipping the populace to evaluate and criticize those decisions, but also ensures an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed[.]" (cleaned up)).

   *Public Citizen v. Office of Management and Budget*, 598 F.3d 865 (D.C. Cir.

2010), provides just one example of the D.C. Circuit's consistent holdings in this regard.  In that case, the D.C. Circuit reviewed a legal challenge that sought disclosure of memoranda from the Office of Management and Budget ("OMB") that designated which agencies were permitted to submit their budgetary materials to Congress without first clearing them with OMB.  *Id.* at 867–68.  The court of appeals concluded that, because such memoranda "reflect[] OMB's formal or informal policy how it carries out its responsibilities[,]" *id.* at 875, which has "real-world effects on the behavior of . . . agencies[,]" *id.* at 872, those documents "fit comfortably within the working law framework" and, therefore, could not be withheld, *id.* at 875.

The D.C. Circuit opinion in *Vaughn v. Rosen ("Vaughn II")*, 523 F.2d 1136 (D.C. Cir. 1975) is yet another holding that casts doubt upon the OLC's view that the reading-room provision (and, thus, the working law doctrine) is limited to agency records that concern the rights of private parties.  In *Vaughn*, the D.C. Circuit considered a FOIA request that was submitted by "a law professor doing research into the Civil Service Commission[.]"  *Id.* at 1139.  The professor sought to obtain certain personnel reports that the Civil Service Commission—an administrative agency tasked with "evaluat[ing], oversee[ing], and regulat[ing] the personnel management activities of the various federal agencies[,]" *Vaughn v. Rosen ("Vaughn I")*, 484 F.2d 820, 822 (D.C. Cir. 1973)—had prepared, *see Vaughn II*, 523 F.2d at 1139.  The reports at issue had been created "in furtherance of [the Commission]'s responsibility to inspect agency personnel action and to determine whether that action conforms to applicable rules and regulations[,]" and they consisted of "the Commission's evaluation of the way the agencies' managers and supervisors are carrying out their personnel management

responsibilities." *Id.* (internal quotation marks and citation omitted).  And the D.C. Circuit determined that the agency could not withhold these reports under Exemption 5, *see id.* at 1143–47, notwithstanding the fact that they manifestly concerned agency operations and did not involve any agency's regulation or adjudication of private rights.

Thus, contrary to OLC's representations, it is clear that what matters for FOIA purposes is whether the agency record at issue reflects agency determinations, interpretations, or policies that have the force of law, and not whether it involves the regulation or adjudication of private rights.

> 2.   The D.C. Circuit's *EFF* Opinion Establishes That An OLC Opinion  
> Has The Potential To Become The Working Law Of An Agency

To support its motion to dismiss CfA's amended complaint, OLC also vigorously restates its argument that OLC only "provides legal advice for other agencies, and those agencies in turn make policy decisions within the legal framework articulated by OLC[,]" and, therefore, section 552(a)(2) *never* requires the agency publish any of the legal opinions that it is has provided to other agencies.  (Def.'s Mot. at 26–27.)  OLC relies primarily on the D.C. Circuit's *EFF* ruling as the authority for this contention. But given this Court's explanation in *Campaign for Accountability I*, *EFF* compels a different result.  To recap, "[i]n *EFF*, a FOIA requester sought access to a legal opinion that OLC had prepared for the Federal Bureau of Investigation ('FBI') in connection with an inquiry into the FBI's information-gathering techniques[,]" and "[t]he D.C. Circuit determined that the Department of Justice had properly withheld the OLC opinion pursuant to the deliberative process privilege under FOIA Exemption 5, because it was an advisory opinion, recommendation and deliberation comprising part of a process by which governmental decisions and policies are formulated, instead of a

document reflecting a decision or policy already made." *Campaign for Accountability I*, 278 F. Supp. 3d at 321 (cleaned up). Most notably for present purposes, "the *EFF* court reasoned that the OLC Opinion could not be the working law of the FBI *unless* the FBI adopted what OLC offered, because OLC does not speak with authority on the FBI's policy[.]" *Id.* (quoting *EFF*, 739 F.3d at 9) (cleaned up) (emphasis added).

This Court's primary intention when it described *EFF* in *Campaign for Accountability I* was to respond to CfA's argument that the binding nature of OLC opinions rendered *all* such opinions susceptible to affirmative disclosure pursuant to the FOIA's reading-room provision and, as a result, the Court emphasized both the D.C. Circuit's rejection of the argument that "the OLC opinion at issue constituted the FBI's 'working law' because it was 'controlling' and 'precedential,'" *id.* (quoting *EFF*, 739 F.3d at 9), and the panel's clear holding that "these indicia of a binding legal decision do[] not overcome the fact that OLC does not speak with authority on the FBI's policy[,]" *id.* (quoting *EFF*, 739 F.3d at 9). But this Court's analysis applies equally well to OLC's argument that *no* OLC opinions can ever qualify as an agency's working law, since OLC always and inevitably serves a mere advisory role. (*See* Def.'s Mot. at 22.) To the contrary, properly understood, the D.C. Circuit's decision in *EFF* plainly leaves open the possibility that a client agency (such as the FBI) can "adopt" the OLC's legal advice such that the OLC opinion becomes that agency's working law, or that OLC might, in some cases, "speak with authority" as to the client agency's policies and interpretations. *EFF*, 739 F.3d at 9.

Nor is the mere fact that "*all* of OLC's opinions constitute the opinion of the Attorney General on questions of law[,]" and therefore "OLC's opinions *always* advise

on legal questions, even if the agency that receives an OLC opinion will use it to inform

a policy decision[,]" *Campaign for Accountability I*, 278 F. Supp. 3d at 323 (internal

quotation marks and citations omitted), sufficient to dispose of the question of whether

an OLC opinion can constitute an agency's working law.  The *EFF* panel, too,

characterized the OLC opinion at issue in that case as one that merely "describe[d] the

legal parameters of what the FBI [wa]s *permitted* to do[.]"  *EFF*, 739 F.3d at 10

(emphasis in original).  However, that description of OLC's ubiquitous function does

not establish whether, or to what extent, an OLC opinion can ever speak with authority

on the client agency's policies, or whether a receiving agency's adoption of OLC's

legal advice can trigger the OLC's affirmative disclosure obligations under the FOIA.

In other words, just as the binding or conclusive nature of an OLC opinion is

insufficient to support CfA's contention that all OLC opinions trigger section

552(a)(2)'s affirmative disclosure mandate, so, too, is the fact that all OLC opinions

provide legal advice insufficient to establish that none of the agency's opinions ever

qualify as the working law of the agency to which the opinion is directed.  *See CREW*

*II*, 922 F.3d at 487 n.2 (expressing "skeptic[ism] of the Department of Justice's position

that *none* of the OLC's formal written opinions constitutes the 'working law' of an

agency subject to disclosure under [the] FOIA's reading-room provision").

> 3.  The OLC's Constitutional Avoidance And Rule-Of-Law Concerns
>     With Respect To The Disclosure of OLC Opinions Are Misplaced

Lastly, this Court is unmoved by OLC's argument that mandating the proactive

disclosure of any of its opinions would have unacceptable rule-of-law and constitutional

repercussions that the Court ought to avoid by interpreting section 552(a)(2) to exclude

OLC opinions altogether.  (*See* Def.'s Mot. at 45–46.)  In this regard, OLC frets that if

the FOIA's reading-room provision is applied to OLC opinions, then its client agencies would feel less comfortable seeking OLC's advice, and the "free and candid flow of information between agency decision-makers and their outside legal advisers" will end (*id.*), and it also fears that requiring the disclosure of its opinions might interfere with the agency's obligation to provide confidential and candid legal advice to assist the President in "effectively execut[ing] his duties under Article II" (*id.* at 47).

These assertions are plainly based on sheer speculation about the potential impact of any such mandated disclosure on the operations of the executive branch, and are also not within the province of a Rule 12(b)(6) motion to dismiss.  What is more, given that OLC already routinely releases certain legal opinions voluntarily and without incident (*see* Am. Compl. ¶ 6)—which the agency's website confirms (*see supra* n.2)— these concerns seem largely overblown.  At the very least, it is not implausible that mandatory releases of certain OLC opinions per section 522(a)(2) would have a *de minimis* effect.  And because CfA's amended complaint does not specifically seek OLC opinions that "flow up the chain of command to the president" (Pl.'s Opp'n at 49), its pleading does not fail to state a claim on the grounds that the types of opinions that *are* alleged to be subject to mandatory disclosure *might* include such a record (*see id.* at 49– 50 (arguing that, even if "formal written opinions to the president's closest advisors would implicate [interference] concerns, the government may argue that those opinions are exempt on summary judgment")).

### C. CfA Has Identified Only One Ascertainable Set Of OLC Opinions That Plausibly Constitutes The Working Law Of The Recipient Agency For Section 552(a)(2) Purposes

Notably, CfA's amended complaint invokes only two of the four FOIA

provisions that list categories of agency records that Congress has made subject to affirmative disclosure: "final opinions . . . made in the adjudication of cases[,]" 5 U.S.C. § 552(a)(2)(A), and "statements of policy and interpretations which have been adopted by the agency[,]" *id.* § 552(a)(2)(B).  Moreover, as explained above, CfA's amended complaint alleges that four types of OLC opinions must be provided to the public proactively under these two statutory provisions: opinions that (1) resolve inter-agency disputes (*see* Am. Compl. ¶¶ 35–38); (2) interpret an agency's non-discretionary legal obligations (*see id.* ¶¶ 41–44); (3) find that particular statutes are unconstitutional (*see id.* ¶¶ 45–46); and (4) adjudicate or determine private rights (*see id.* at ¶¶ 47–49).

For the reasons explained below, this Court finds that it is plausible that OLC opinions that resolve disputes between agencies qualify for affirmative disclosure under the FOIA's reading-room provision, but the other types of OLC opinions that CfA identifies do not plausibly fit into the statute's affirmative-disclosure classifications.

1. <u>It Is Plausible That OLC Opinions That Resolve Disputes Between Agencies Qualify For Affirmative Disclosure Under Section 552(a)(2)</u>

According to CfA's amended complaint, "a core function of the OLC is to adjudicate disputes between agencies concerning the law[,]" and, indeed, "Executive Order 12,146 directs executive agencies to submit legal disputes to the OLC for resolution."  (Compl. ¶ 35.)  Pursuant to that executive order, if two or more independent executive agencies "are unable to resolve a legal dispute between them . . . , each agency is encouraged to submit the dispute to the Attorney General[.]" *Executive Order 12146: Management of Federal Legal Resources* ("E.O. 12,146"), 44 Fed. Reg. 42,657, 42,658 at § 1-401 (July 18, 1979).  Moreover, Executive Order 12,146 provides that if two or more non-independent executive agencies—*i.e.*, those

24

"whose heads serve at the pleasure of the President"—reach a similar impasse, "the agencies shall submit the dispute to the Attorney General prior to proceeding in any court, except where there is specific statutory vesting of responsibility for a resolution elsewhere." *Id.* § 1-402. And, by regulation, the Attorney General has delegated to OLC the authority to provide executive agencies with advice on questions of law, including resolving both types of inter-agency legal disputes. *See* 28 C.F.R. § 0.25.

According to CfA's amended complaint, such inter-agency disputes "constitute at least 25% of opinions rendered to outside agencies[.]" (Am. Compl. ¶ 35 (internal quotation marks and citation omitted).) A memorandum from former Acting Assistant Attorney General David Barron expounds upon the OLC's established role in resolving such conflicts; among that agency's many responsibilities, it is apparently "most likely to be necessary" for the OLC to write a formal written opinion "when the legal question is the subject of a concrete and ongoing [inter-agency] dispute[.]" (*Id.* (quoting Best Practices Memo at 2 (internal quotation marks omitted)).) Thus, CfA alleges that OLC opinions adjudicating inter-agency disputes "constitute both 'final opinions . . . made in the adjudication of cases'" and "statements of policy and interpretations which have been adopted by the agency" (*see id.* ¶ 38 (quoting 5 U.S.C. § 552(a)(2)(A)–(B)), and thus must be affirmatively disclosed to the public. For the following reasons, this Court finds that allegation sufficiently plausible to survive OLC's motion to dismiss.

    a.  *OLC Opinions That Resolve Disputes Between Agencies Are Plausibly "Final Opinions . . . Made In the Adjudication Of Cases"*

First of all, given the amended complaint's allegations, OLC opinions that resolve inter-agency disputes are plausibly characterized as "final opinions[.]" 5 U.S.C. § 552(a)(2)(A). It is indisputable that OLC writes formal opinions (*see* Best Practices

25

Memo at 1), and CfA's amended complaint describes OLC's role as the ultimate, authoritative adjudicator of disputes between different entities within the executive branch, such that the opinions that OLC issues in this context are plausibly final (*see* Am. Compl. ¶ 35).  The plausibility of this contention is based, in part, on Article II's vesting of the "executive Power" in one President, U.S. Const. art. II, § 1, cl. 1, and OLC's alleged position as the presidential appointee that serves as "a neutral arbiter to resolve the differing stances" of two agencies, *Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90, 92 (D.C. Cir. 1986).  The formal, written OLC opinions that resolve such inter-agency disputes also plausibly qualify as "final opinions" insofar as they constitute the executive branch's self-professed "final word on the controlling law[.]"  (Best Practices Memo at 2.)  Indeed, there is no indication, at this stage, that such OLC opinions are only *tentative*, as would be the case if OLC's opinions must later be affirmed or reversed by a higher dispute resolution authority within the executive branch.  (*Cf. id.* at 4 (explaining that OLC issues an opinion "only if" OLC receives "an agreement that [the client agency] will conform its conduct to [OLC's] conclusion").)  Accordingly, it is at least plausible that those OLC opinions that resolve inter-agency disputes qualify as "final opinions" within the meaning of the FOIA's reading-room provision.

Such OLC opinions are also plausibly issued in the context of an "adjudication[.]"  5 U.S.C. § 552(a)(2)(A).  The Best Practices Memo indicates that, before accepting a request for an opinion concerning a dispute between agencies, OLC typically requires each side to submit "a detailed memorandum setting forth the agency's own analysis of the question[,]" and OLC further requests that "the agencies

on each side of a dispute [] share their memoranda with the other side . . . so that [OLC]

may have the benefit of reply comments, when necessary."  (Best Practices Memo at 4.)

OLC renders its decisions partly based on this briefing, and it may even "solicit the

views of other agencies not directly involved in the opinion request that have subject-

matter expertise or a special interest in the question presented."  (*Id.*)  Furthermore, the

OLC's decisions derive from that agency's duty to "consider fully and address

impartially the points raised on both sides" (*id.* at 5)*,* which means that its process for

resolving such disputes is adjudicative in nature, such that it is at least plausible that

opinions rendered in this context fall within the scope of the plain meaning of section

552(a)(2)(A).  *See, e.g.*, *Adjudication*, Black's Law Dictionary (11th ed. 2019)

("Adjudication is the effort to identify the rights of the contending parties now by

identifying what were, in law, the rights and wrongs, or validity or invalidity, of their

actions and transactions when entered upon and done." (cleaned up)); *see also* 5 U.S.C.

§§ 551(6)–(7) (defining "adjudication" as the "agency process for the formulation of an

order[,]" which is "the whole or a part of a final disposition, whether affirmative,

negative, injunctive, or declaratory in form, of an agency in a matter other than rule

making").

Finally, this Court finds that OLC's resolution of an inter-agency dispute

concerning a question of law can plausibly be characterized as a "case[]" for section

552(a)(2)(A) purposes.  OLC's insistence that the statute's reference to "cases" can

only mean "adversarial disputes involving private parties" (*see* Def.s' Mot. at 22) is

contrary to both ordinary practice and the common understanding of that term.  *See,*

*e.g.*, *S.E.C. v. F.L.R.A.*, 568 F.3d 990 (D.C. Cir. 2009) (adjudicating a dispute between

two independent agencies); *see also McGahn*, 968 F.3d at 774 (rejecting the view that there is an Article III case or controversy "only when an individual right is implicated").  And, as explained previously in Section IV.B.1, nothing in the text or legislative history of section 552(a)(2)(A) suggests that Congress meant to require affirmative disclosure of only final opinions that are rendered in the context of an agency's adjudication of disputes that involve private parties.

The fact that OLC opinions that resolve inter-agency disputes "do not finally dispose of any agency action" (Def.'s Mot. at 24) is also entirely beside the point.  The reading-room provision does not predicate affirmative disclosure on whether the agency's "final opinions . . . made in the adjudication of cases" have a discernable policy impact.  5 U.S.C. § 552(a)(2)(A).  Regardless, where two disputing agencies submit their disagreement to OLC for resolution consistent with Executive Order 12,146, it is at least plausible that OLC is "speak[ing] authoritatively" with respect to the agencies' legal dispute, *EFF*, 739 F.3d at 9, and as a result, OLC's resolution of that dispute plausibly qualifies as a final opinion made in the adjudication of a case within the meaning of section 552(a)(2)(A) of the FOIA.

> b.  *OLC Opinions Resolving Disputes Between Agencies Plausibly Qualify As "Statements Of Policy And Interpretations" That Are Adopted By OLC's Client Agencies*

OLC opinions arising out of inter-agency disputes also plausibly satisfy section 552(a)(2)(B), which requires affirmative disclosure of "statements of policy and interpretations" that have been "adopted" by the agencies to which they were addressed. 5 U.S.C. § 552(a)(2)(B); *see also CREW II*, 922 F.3d at 486.  Once disputing agencies submit their legal disagreement to OLC, either because they have no other way of resolving their dispute or because they choose to do so pursuant to Executive Order

12,146, it is plausible that the OLC opinion that results from the resolution of an inter-agency disagreement is a statement of policy and/or interpretation adopted by the client agencies *ex ante*.  (*See* Pl.'s Opp'n at 38–39.)  This is because, according to CfA's amended complaint, OLC issues an opinion "only if the OLC has received in writing from that agency an agreement that it will conform its conduct to the OLC's conclusion" (Am. Compl. ¶ 3 (quoting Best Practices Memo at 4) (cleaned up)), and this arrangement suggests that the submission of an inter-agency dispute to OLC pursuant to Executive Order 12,146 is plausibly akin to arbitration within the executive branch: the agencies that resort to OLC as "a neutral arbiter to resolve the[ir] differing stances[,]" *Randolph-Sheppard*, 795 F.2d at 92, accept at the outset that OLC's resolution of their dispute will become the governing interpretation of that legal issue.

Consequently, CfA's allegations are significantly different from the circumstances presented in *EFF*.  In that case, the D.C. Circuit considered whether an OLC opinion had to be disclosed as the working law of the FBI, where the FBI had solicited OLC's opinion regarding whether and to what extent that agency had the legal authority to request certain telephone records from service providers.  *See* 739 F.3d at 4–5, 8.  In holding that OLC's legal opinion did *not* constitute the working law of the FBI, and was thus subject to withholding pursuant to Exemption 5's deliberative-process privilege, the D.C. Circuit emphasized that OLC could not "authoritatively state or determine the agency's policy" with respect to the subject upon which OLC opined, *id.* at 8, and therefore that "the OLC Opinion could not be the 'working law' of the FBI unless the FBI 'adopted' what OLC offered[,]" *id.* at 9.  Not so in the instant case; here, CfA plausibly alleges that, by virtue of a dispute-resolution system in which agencies

submit contested legal issues to OLC for resolution, OLC *does* "speak with authority" concerning those particular policies or legal interpretations, *id.*, and that such disputing agencies seek an authoritative settlement of their own interpretations when they turn to OLC for an adjudication of their conflicting positions.

Put another way, CfA's amended complaint plausibly alleges that OLC essentially serves as an authoritative arbiter of legal disputes that are submitted to it in this particular context, which is quite unlike the circumstance in which a single agency elects to solicit OLC's views as the first step in an anticipated policy-making process. Thus, whether or not the "agencies do something with [OLC's] predecisional legal advice" (Hr'g Tr., ECF No. 33, at 34:5–6), is largely irrelevant; OLC's opinion has *already* done the work of authoritatively resolving a dispute over a contested legal issue under circumstances in which it is plausible that the agencies submitted the dispute for resolution simply and solely for that purpose and with the understanding that OLC's determination would provide the governing interpretation moving forward.  And, indeed, this Court finds it is entirely plausible that, once OLC settles a dispute among two or more agencies over a question of law, the client agencies that have submitted that dispute to OLC for resolution can be deemed to have "adopted" OLC's interpretation with respect to the matter that prompted their request for OLC's views within the meaning of section 552(a)(2)(B).

In sum, this Court concludes that CfA has stated a plausible claim that OLC opinions that resolve inter-agency disputes must be affirmatively disclosed under section 552(a)(2) of the FOIA, either because these types of OLC opinions are final opinions made in the adjudication of cases or because these types of OLC opinions

provide statements of policy and interpretations that have been adopted *ex ante* by the OLC's client agencies within the meaning of the FOIA's reading-room provision.

2. <u>The Three Other Categories Of OLC Opinions That CfA Identifies In Its Amended Complaint Are Not Plausibly Subject To Affirmative Disclosure Under Section 552(a)(2)</u>

In this Court's view, none of the three remaining categories of OLC opinions that appear in CfA's amended complaint—(a) opinions interpreting non-discretionary legal obligations; (b) opinions determining that particular statutes are unconstitutional; and (c) opinions adjudicating or determining private rights (*see* Am. Compl. ¶¶ 41–49)— plausibly qualifies as "final opinions . . . made in the adjudication of [such] cases[,]" or "statements of policy and interpretations which have been adopted by the agency[,]" 5 U.S.C. § 552(a)(2)(A)–(B), and therefore none is subject to affirmative disclosure under the FOIA.  To understand why this is so, it important to clarify exactly what CfA alleges concerning each of these categories of OLC opinions.

With respect to the first category, according to the amended complaint, OLC "issues binding interpretations of statutes and other authorities that impose non-discretionary legal obligations on federal agencies."  (Am. Compl. ¶ 41.)  One of the examples that CfA points to in this regard is a 2007 OLC opinion that "address[es] whether the Defense of Marriage Act affected the obligation of the Social Security Administration to provide 'child's insurance benefits' to children of disabled parents in same-sex unions."  (*Id.* ¶ 42 (referencing *Whether the Defense of Marriage Act Precludes the Nonbiological Child of a Member of a Vermont Civil Union From Qualifying for Child's Insurance Benefits Under the Social Security Act*, 31 Op. O.L.C. 243 (Oct. 16, 2007)).)  OLC's 2007 opinion allegedly "determined that the Defense of

31

Marriage Act did not interfere with the Administration's legal obligation to provide social security benefits" (*id.*), and, according to CfA, this OLC opinion qualifies for affirmative disclosure because (1) it "had the effect of deciding the Social Security Administration's policies and the legal entitlement to social security benefits of the children of same-sex couples" (*id.*; *see also id.* at ¶ 41 (asserting that OLC opinions such as this one "have the effect of directly determining an agency's policies and practices, because the agency is under a non-discretionary obligation to comply with the authority at issue, and because the OLC's interpretation of that authority is binding on the agency")), and (2) it "adjudicated the entitlement to social security benefits of a specific child" (*id.* at ¶ 42).

However, there is no allegation in the amended complaint that any particular regulatory or statutory provision actually bestows upon OLC the authority to adjudicate the underlying dispute, let alone issue a final opinion concerning whether a particular child is or is not entitled to benefits.  Rather, the 2007 OLC opinion simply determined that "[t]he Defense of Marriage Act would not prevent the non-biological child of a partner in a Vermont civil union from receiving child's insurance benefits under the Social Security Act."  31 Op. O.L.C. at 243.  And while the underlying claim for social security benefits that prompted the Social Security Administration ("SSA") to turn to OLC for advice plausibly is most likely a "case" within the meaning of the reading-room provision, *see, e.g.*, *Ely v. Saul*, No. 18-cv-0557, 2020 WL 2744138, at *1–2 (D. Ariz. May 27, 2020) (adjudicating a case concerning a claim for spousal benefits brought by a decedent's same-sex spouse), it is the SSA—not OLC—that has discretion to adjudicate such matters, *see* 42 U.S.C. § 416(h)(2); all that OLC can do, when its

advice on a particular legal interpretation is sought, is opine over how that agency might resolve that particular legal issue within the broader case that the SSA has been tasked with adjudicating.

Moreover, and importantly, nothing in CfA's amended complaint gives rise to a reasonable inference that this first category of OLC opinions *necessarily* announces the client agency's working law from the moment the opinion is issued.  Much like the opinion that OLC rendered to the FBI in *EFF*—where OLC could not speak with authority as to the FBI's policies—the SSA needed to adopt OLC's legal interpretation by acting upon it in the context of its adjudication or policy development in order for that opinion to be plausibly considered the SSA's working law, *see EFF*, 739 F.3d at 9—or, at the very least, CfA's pleading must allege circumstances that suggest that the SSA was constrained with respect to any subsequent decision to adopt and implement OLC's advice, such as a plausible *ex ante* decision to accept whatever OLC decides when the agency solicits OLC's interpretation.  Instead, CfA's allegations amount to little more than the assertion that this category of OLC opinions is "binding" (*see* Am. Compl. ¶ 41), and it is well established that *that* categorization is insufficient to support a plausible claim that such opinions are the working law of the agency subject to disclosure under section 552(a)(2)(B).  *See EFF*, 739 F.3d at 9; *see also CREW II*, 922 F.3d at 488–89.

Similar pleading flaws are evident with respect to CfA's allegations concerning OLC opinions that "determine that a congressional enactment is unconstitutional[.]" (Am. Compl. ¶ 45 (referring to *Constitutionality of the Direct Reporting Requirement in Section 802(e)(l) of the Implementing Recommendations of the 9/11 Commission Act of*

33

*2007*, 32 Op. O.L.C. 27 (Jan. 29, 2008); *see also id.* (alleging that OLC held that "certain reports of the Department of Homeland Security's Chief Privacy Officer be sent directly to Congress [] would be unconstitutional if applied to restrict the president's review of the reports")).)  In this regard, CfA alleges that OLC's written opinions "have the unique effect of freeing agencies from congressional commands, and of essentially editing the text of the U.S. Code itself[,]" and, thus, they are "the OLC's purest expressions of policy, akin to legislative repeals or judicial invalidations of the law." (Pl.'s Opp'n at 45.)  But CfA neither identifies circumstances that plausibly suggest that such opinions, however policy-infused, are "made in the adjudication of cases[,]" 5 U.S.C. § 552(a)(2)(A), nor does CfA allege any facts that support a reasonable inference that such OLC opinions are automatically "adopted" by the agency that solicited them for the purpose of section 552(a)(2)(B).  And, indeed, *EFF* suggests that, even when OLC addresses the constitutionality of a legislative command, its opinions merely "describe[] the legal parameters of what the [client agency] is *permitted* to do," which is different from "stat[ing] or determin[ing] the [client agency]'s policy." *EFF*, 739 F.3d at 10 (emphasis in original).

To the extent that CfA is suggesting that OLC opinions that declare an act of Congress unconstitutional are an expression of OLC's *own* policy—separate and apart from the client agency that requested OLC's opinion (*cf.* Pl.'s Opp'n at 46–47 (asserting that "effectively invalidating congressional enactments determine[s] policy at that point in time, even if an agency later adopts a related policy"))—CfA fails to provide any allegations or arguments that could plausibly distinguish OLC legal opinions that pertain to the constitutionality of a statute from any other legal conclusion

that that agency makes.  In either case, OLC is conceivably setting forth its own policy concerning what the law is or what it requires and, yet, such advice only qualifies as working law for FOIA purposes when it has been adopted by the client agency or is, in some way, authoritatively stating that agency's policy and/or interpretation.  *See EFF*, 739 F.3d at 9; *CREW II*, 922 F.3d at 489–90.

CfA's allegations concerning OLC opinions that "directly or indirectly determine private rights" (Am. Compl. ¶ 47) fare no better.  The amended complaint lists various examples of OLC opinions that concern "the availability of monetary relief for the violation of an agreement settling discrimination claims, the availability of back wages to redress improperly withheld pay, the entitlement to service credit under a federal retirement and disability plan, and the entitlement to social security benefits for the children of same-sex couples" (*id.* ¶ 48), and it alleges that all of these pronouncements by OLC are "similar in effect to administrative or judicial decisions concerning private rights" because "they define, at least in the first instance, the rights and liabilities of private individuals vis-à-vis the government" (*id.* ¶ 47; *see also id.* ¶ 48 (characterizing these kinds of OLC opinions as "decid[ing] the rights of classes of individuals as well as the rights of specific individuals whose claims, entitlements, or benefits the OLC was addressing").)  But, here again, the amended complaint does not allege that OLC has the *authority* to "adjudicat[e]" the rights of the private individuals whom OLC's client agencies regulate.  5 U.S.C. § 552(a)(2)(A).  And there are no facts that support any inference that OLC *controls* its client agencies' own policy-related determinations, such that OLC opinions concerning the rights of individuals necessarily qualify as pronouncements of the client agency's own policies and interpretations with respect to

35

that agency's adjudication of private rights.  *Id.* § 552(a)(2)(B).  At most, such OLC

opinions are plausibly conceived of as "binding" and "controlling" statements of

relevant law that the client agency *may* adopt and apply to a particular case adjudicating

private rights, *EFF*, 739 F.3d at 9; however, as explained above, unless and until that

adoption occurs, this category of OLC opinions is not plausibly within the scope of

section 552(a)(2)(B) of the FOIA in light of *EFF*.

　　CfA's arguments to the contrary are unpersuasive.  CfA's view is that "OLC

opinions in this category conclusively resolve discrete legal questions that have the

effect of resolving an agency's adjudication of private rights[,]" and thus resemble

instances where "a federal court adjudicating private rights certifies a question of law to

a state supreme court," because, "[w]hile the federal court ultimately issues the

judgment in the case, the state court's interpretation of law is an essential component of

that judgment."  (Pl.'s Opp'n at 43.)  This certification analogy misses the mark for at

least two reasons.  First, even if CfA's construct is accepted, it is indisputably the

federal court (*i.e.*, the entity with jurisdiction over the underlying matter) that issues the

final opinion adjudicating the case, not the state court whose opinion was solicited;

thus, it would be the client agency (not OLC) that would have the affirmative disclosure

obligation under section 552(a)(2)(A).  Second, unlike state courts that have ultimate

authority over certified questions of state law, CfA does not allege that any provision of

law makes *OLC* the entity that conclusively determines the client agency's own

interpretation regarding applicable law in a dispute concerning the allocation of private

rights.  In other words, there is no allegation in the amended complaint—short of the

fact that OLC opinions are generally binding and controlling—that suggests that OLC

opinions concerning private rights actually and indisputably establish the client agency's policies or legal interpretations such that those OLC opinions may plausibly be subject to the FOIA's reading-room requirement.

In this regard, CfA would apparently have this Court *assume* that, even in cases where the client agency "ha[s] primary responsibility for adjudicating private rights," the agency's request for OLC's opinion on the matter is, in effect, the invocation of "a higher authority for an authoritative determination of the scope of those rights" such that "the legal determination issued in response to the request constitute[s] the agency's final legal position with respect to the private rights of a class of individuals[.]"  (Pl.'s Opp'n at 43–44.)  But courts need not accept such legal conclusions when evaluating a motion to dismiss under Rule 12(b)(6), *see Kowal v. MCI Commc'ns Corp.,* 16 F.3d 1271, 1276 (D.C. Cir. 1994), and the plain holding of the D.C. Circuit in *EFF* belies CfA's assumption, *see EFF*, 739 F.3d at 9 (concluding that, notwithstanding the fact that the FBI sought OLC's legal advice, "the OLC Opinion could not be the 'working law' of the FBI unless the FBI 'adopted' what OLC offered" or if OLC could "speak with authority on the FBI's policy").  CfA has also failed to provide any precedents that adopt its "higher authority" characterization, given that the two D.C. Circuit cases upon which it relies involved an agency's invocation of a higher authority *within the agency itself.  See Tax Analysts v. I.R.S.*, 117 F.3d 607, 617 (D.C. Cir. 1997) (holding that the FOIA's Exemption 5 did not apply to legal memoranda that the IRS's Office of Chief Counsel had distributed to the agency's field offices, on the ground that the memos amounted to "considered statements of the agency's legal position"); *Tax Analysts v. I.R.S.*, 294 F.3d 71, 81 (D.C. Cir. 2002) (holding that memoranda from the IRS's Office

of Chief Counsel did not qualify for Exemption 5 because the fact that they traveled "horizontally" to individual agency offices indicated that those statements actually represented the agency's "final legal position" on various matters).

*   *   *

In sum, CfA has failed to state a plausible claim that OLC opinions that (a) interpret non-discretionary legal obligations, (b) announce the unconstitutionality of particular statutes, or (c) make pronouncements that are applicable to the adjudication of private rights are subject to affirmative disclosure under the FOIA's reading-room provision. Unlike the allegations concerning OLC opinions that resolve inter-agency disputes, CfA's amended complaint does not allege that client agencies seek OLC's advice with respect to these categories of opinions pursuant to some presidential or congressional mandate, and it does not allege sufficient facts—beyond the general binding and controlling nature of OLC opinions—that could make it plausible that these OLC opinions necessarily amount to either "final opinions . . . made in the adjudication of cases[,]" or "statements of policy and interpretations which have been adopted by the agency" for the purpose of section 552(a)(2). 5 U.S.C. § 552(a)(2)(A)–(B).

## V.   CONCLUSION

Over the span of its prior Memorandum Opinion and the instant one, this Court has now firmly rejected the parties' polarized propositions that either *all* of OLC's opinions are subject to affirmative disclosure under the FOIA's reading-room provision, or *none* of them is required to be made automatically available per that statute. Instead, the Court concludes that one of the ascertainable sets of records that CfA has now identified plausibly qualifies as "final opinions . . . made in the adjudication of

cases[,]" 5 U.S.C. § 552(a)(2)(A), or "statements of policy and interpretations which have been adopted by the agency[,]" *id.* § 552(a)(2)(B): OLC opinions that adjudicate inter-agency disputes.

Notably, at this juncture, the Court's conclusion is based simply and solely on the amended complaint's allegations, and it might eventually determine, in the context of summary judgment, that OLC opinions resolving inter-agency disputes are *not* "statements of policy and interpretations" adopted by those agencies *ex ante*, or that "'adjudications' between two parts of the executive branch are not the kind of 'adjudication of cases' to which that section refers." *CREW II*, 922 F.3d at 491 (Pillard, J., dissenting). But, for now, the Court finds that CfA's amended complaint contains a plausible allegation that OLC is required to make its opinions that resolve inter-agency disputes available for "public inspection" under section 552(a)(2) of the FOIA, for the reasons explained above, and that the other categories of OLC opinions identified in the amended complaint do not plausibly violate the FOIA's reading-room provision. Therefore, as set forth in the accompanying Order, OLC's motion to dismiss is **GRANTED IN PART and DENIED IN PART**.

DATE:  September 11, 2020              *Ketanji Brown Jackson*
                                      KETANJI BROWN JACKSON
                                      United States District Judge

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CAMPAIGN FOR ACCOUNTABILITY, <br><br>                 Plaintiff, <br><br>      v. <br><br> UNITED STATES DEPARTMENT OF JUSTICE, <br><br>                 Defendant. | Civil Action No. 16-1068 (JMC) |

## <u>MEMORANDUM OPINION</u>

This lawsuit arises under the "reading-room" provision of the Freedom of Information Act (FOIA), which requires agencies to affirmatively make certain records available to the public, without the need for a prior request.[1] *See* 5 U.S.C. § 552(a)(2). The Campaign for Accountability (CfA) initiated this litigation seeking an order requiring the Department of Justice, Office of Legal Counsel (OLC) to make certain records available under that provision. Following two orders by this Court dismissing the majority of Plaintiff's claims, the Parties have cross-moved for summary judgment on the limited claims that remain.

Specifically, CfA seeks a judgment that the OLC's formal, written opinions resolving interagency disputes are subject to FOIA's reading-room provision because such opinions are both "final opinions . . . made in the adjudication of cases," § 552(a)(2)(A), and "statements of policy

---

[1] Unless otherwise indicated, the formatting of quoted materials has been modified throughout this opinion, for example, by omitting internal quotation marks and citations, and by incorporating emphases, changes to capitalization, and other bracketed alterations therein. All pincites to documents filed on the docket are to the automatically generated ECF Page ID number that appears at the top of each page.

and interpretations which have been adopted by the agency," § 552(a)(2)(B). The OLC, on the other hand, seeks a judgment that they are not. The Court agrees with CfA that such opinions are subject to disclosure under § 552(a)(2)(A) as "final opinions . . . made in the adjudication of cases," and accordingly does not reach CfA's other argument that these opinions would also be subject to disclosure under § 552(a)(2)(B). The Court DENIES Defendant's motion for summary judgment, ECF 57, and GRANTS Plaintiff's cross-motion for summary judgment, ECF 59.

## I.   BACKGROUND

### A.  The Office of Legal Counsel

The following facts are undisputed. The OLC "is a component of the Department of Justice" charged with "provid[ing] controlling legal advice to executive branch officials on questions of law involving the operations of the executive branch." ECF 56 ¶ 1.[2] Specifically, the OLC's responsibilities include "[p]reparing the formal opinions of the Attorney General; rendering informal opinions and legal advice to the various agencies of the Government; and assisting the Attorney General in the performance of his functions as legal adviser to the President and as a member of, and legal adviser to, the Cabinet." 28 C.F.R. § 0.25(a).

As part of its advice-giving function, the OLC sometimes prepares "formal written opinions" to advise the President and executive agencies on questions of law.[3] The guiding principles for preparing and publishing such opinions are laid out in a 2010 "Best Practices Memo" published by the agency, ECF 56-1, which has been cited as authoritative by both Parties, *see, e.g.,*

---

[2] Prior to filing its motion for summary judgment, the agency submitted a joint stipulation of facts for purposes of the litigation. ECF 56 at 1 & n.1. The Court accepts the facts in the stipulation as undisputed.

[3] The OLC also "frequently conveys its legal advice to executive agencies through informal means." *Citizens for Resp. & Ethics in Washington v. Dep't of Just. (CREW II)*, 922 F.3d 480, 484 (D.C. Cir. 2019); *see also* ECF 56-1 at 2. Such informal opinions are not at issue in this case. *See* ECF 59-1 at 11 n.2.

ECF 56 ¶ 13; ECF 57-1 at 7; ECF 59-1 at 10, as well as the D.C. Circuit, *see Citizens for Resp. & Ethics in Washington v. Dep't of Just. (CREW II)*, 922 F.3d 480, 484 (D.C. Cir. 2019). The Best Practices Memo suggests—and the OLC appears to concede—that the OLC's formal written opinions are legally binding. ECF 56-1 at 1–2; ECF 57-1 at 23.

    "A [formal] written opinion is most likely to be necessary when the legal question is the subject of a concrete and ongoing dispute between two or more executive agencies." ECF 56-1 at 3. In 1979, President Carter formalized the OLC's role as the arbiter of such disputes. *See* Exec. Order No. 12,146, 44 Fed. Reg. 42657 (July 18, 1979), § 1-402. Through Executive Order 12,146, President Carter required that "[w]henever two or more Executive agencies whose heads serve at the pleasure of the President are unable to resolve [] a legal dispute, the agencies shall submit the dispute to the Attorney General." *Id.* That same executive order also "encouraged [independent agencies] to submit the[ir] dispute[s] to the Attorney General." *Id.* § 1-401. By regulation, the Attorney General has in turn delegated the responsibility to resolve such disputes to the OLC. *See* 28 C.F.R. § 0.25(a). Consistent with that responsibility, the OLC is unaware of any time it has declined an agency's request to issue an opinion resolving an interagency dispute. ECF 56 ¶ 7.

    In resolving interagency disputes, the OLC's "general practice" is to "ask" each agency to submit "a detailed memorandum setting forth the agency's own analysis of the question." ECF 56-1 at 3. The OLC then ensures that those memoranda are shared with the opposing agency so that the agency can submit "reply comments, when necessary." *Id*. The OLC sometimes solicits the views of other agencies with subject-matter expertise regarding a dispute, but will only do so after acquiring the consent of the requesting agency. *Id.* In drafting an opinion to resolve an interagency dispute, the OLC strives to address only "concrete and ongoing" disputes that focus on specific legal questions. *Id*. The Best Practices Memo is clear that the OLC should refrain from providing

"unnecessary advice," opining on "broad" or "abstract" legal issues, or making definitive statements about "the legality of past conduct." *Id.* A formal written opinion resolving an interagency dispute "should take care to consider fully and address impartially the points raised on both sides," although the OLC may sometimes also consider arguments that are not raised by a party. *Id.* at 4.[4]

Once finalized, the OLC's formal written opinions become a part of the agency's "system of precedent," from which its attorneys may not "lightly depart." *Id*. at 2. Opinions are printed on bond paper and signed by the drafting attorney. *Id*. at 4. Unclassified opinions are added to the OLC's database and included in its "day books." *Id*. In addition, the OLC maintains a separate file for each opinion, containing a copy of the signed opinion, the opinion control sheet, the original request, the submissions of interested agencies, and any "obscure sources" cited in the opinion, so that future OLC attorneys may refer back to the opinion and its underlying sources. *Id*. at 4–5.

The OLC also has a "longstanding internal process" to select and voluntarily publish "significant opinions" to the public. *Id.* at 5. In deciding which opinions to publish, the OLC "operates from the presumption that it should make its significant opinions fully and promptly available to the public"—a presumption that "furthers the interests of Executive Branch transparency, thereby contributing to accountability and effective government, and promoting public confidence in the legality of government action." *Id*. In some cases, however,

_____

[4] Then-Attorney General William P. Barr described the OLC's role in resolving interagency disputes as follows:

> In this context, the Attorney General's role is much like a court's in an adversarial proceeding. Because each agency has its own staff of lawyers, disputes between them come before the Attorney General with legal positions already well-established. Each agency will usually have legal authority or good arguments to support its view. The [OLC] requires each side to come in with briefs, just as if it were a judicial proceeding. Deciding among the positions being taken requires the Attorney General—or in most cases the [OLC]—to function as a judge.

ECF 59-10 at 8.

"countervailing considerations may lead the Office to conclude that it would be improper or inadvisable to publish an opinion that would otherwise merit publication." *Id.* For example, in some cases "disclosure would reveal classified or other sensitive information relating to national security." *Id.* In others, an agency may "request[] advice regarding a proposed course of action, the Office concludes it is legally impermissible, and the action is therefore not taken." *Id.* at 6. The Best Practices Memo also cautions that, as a matter of policy, if the "OLC routinely published its advice concerning all contemplated actions of uncertain legality, Executive Branch officials would be reluctant to seek OLC advice in the early stages of policy formulation—a result that would undermine rule-of-law interests." *Id.* According to the agency's website, the OLC has published over 1,400 opinions, dating from 1934 to the present, including some that addressed interagency disputes. OLC, *Opinions*, http://www.justice.gov/olc/opinions-main (last visited April 17, 2024).

### B. Procedural History

This case has a somewhat complicated history, which is briefly recounted here. CfA originally filed a complaint seeking an order that the OLC "mak[e] available for public inspection . . . *all past and future final opinions* . . . that provide controlling legal advice to executive branch officials and agencies on questions of law."[5] ECF 1 ¶ 35 (emphasis added). CfA alleged that all such opinions are subject to the reading-room provision of FOIA for two reasons: first, because those documents are "final opinions . . . made in the adjudication of cases," 5 U.S.C. § 552(a)(2)(A); and second, because they qualify as "statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register,"

---

[5] At the time this lawsuit was filed, another court in this jurisdiction had recently ruled that FOIA, and not the Administrative Procedure Act, was the proper vehicle for CfA to pursue the relief it sought. *See Citizens for Resp. & Ethics in Washington v. Dep't of Just.*, 164 F. Supp. 3d 145, 147 (D.D.C. 2016). That decision was subsequently affirmed. *See Citizens for Resp. & Ethics in Washington v. Dep't of Just. (CREW I)*, 846 F.3d 1235 (D.C. Cir. 2017).

§ 552(a)(2)(B). ECF 1 ¶ 31. The Court granted Defendant's motion to dismiss CfA's original complaint for failure to state a claim, finding that Plaintiff had failed to "identif[y] an ascertainable set of OLC opinions that OLC has withheld from the public and that is also plausibly subject to the FOIA's reading-room requirement." *CfA v. Dep't of Just. (CfA I)*, 278 F. Supp 3d 303, 306 (D.D.C. 2017). However, that dismissal was without prejudice; the Court ordered that Plaintiff would be permitted to file an amended complaint to remedy that shortcoming.[6] *Id.*

CfA took the Court up on that offer. In its amended complaint, ECF 22, CfA alleges that FOIA's reading-room provision requires affirmative publication of four, more specific categories of OLC opinions: (1) formal written opinions that resolve interagency disputes, *id.* ¶¶ 35–38; (2) formal written opinions that interpret an agency's non-discretionary legal obligations, *id.* ¶¶ 41– 44; (3) opinions that "find[] that particular statutes are unconstitutional and that therefore agencies need not comply with them," *id.* ¶¶ 45–46; and (4) opinions that adjudicate or determine private rights, *id.* ¶¶ 47–49.[7] With respect to each of those four categories of records, Plaintiff alleges that the agency has failed to comply with the disclosure obligations of § 552(a)(2) by failing to make the documents automatically available for public inspection, *id.* ¶¶ 54–59 (Count I), and has therefore also failed to comply with the indexing requirement of § 552(a)(2), which requires an agency to maintain and make available for public inspection indices of materials that are subject to the reading-room provision, *see id.* ¶¶ 60–64 (Count II). CfA seeks a declaratory judgment that the OLC has failed to comply with its obligations under § 552(a)(2), an order that the OLC disclose

---

[6] The Court also clarified that it lacks the authority under FOIA to order the OLC to publish any materials to the public in general. *CfA I*, 278 F. Supp. 3d at 315–16. Rather, the Court's authority under FOIA is limited to issuing an order that OLC produce materials directly to Plaintiff. *Id.*

[7] The amended complaint also identified a fifth category of OLC opinions—formal written opinions issued to independent agencies. ECF 22 ¶¶ 39–40. Plaintiff has since withdrawn its claims with respect to that category of records. ECF 30 at 35 n.11.

to CfA "all formal written opinions issued by the OLC to executive branch agencies or to executive branch officials other than the president," and an order that the OLC make indices of all such opinions available for public inspection and copying. *Id.* at 23. The OLC moved to dismiss the amended complaint, contending that Plaintiff had still failed to state a claim that the OLC has an affirmative obligation to disclose the specified categories of materials. ECF 29.

While that motion was pending, the D.C. Circuit issued an opinion in a related case, *CREW II*, 922 F.3d 480. In that case, the plaintiff brought claims similar to those made in the original complaint in this case, which were dismissed for substantially the same reasons. *Id.* at 485. However, instead of filing an amended complaint in district court, the plaintiff in *CREW II* appealed the dismissal. *Id.* The D.C. Circuit affirmed. Citing heavily to another case, *Elec. Frontier Found. v. Dep't of Just. (EFF)*, 739 F.3d 1 (D.C. Cir. 2014), the *CREW II* court held that, for a plaintiff to state a claim under 5 U.S.C. § 552(a)(2), it is insufficient to allege merely that the OLC's opinions are "controlling," "authoritative," and/or "binding." 922 F.3d at 486. The court's opinion in *CREW II* also cites to this case (and the motion to dismiss that was pending at the time), suggesting that the *CREW II* plaintiff would have been better off had it followed the same course as CfA has here, filing an amended complaint that identified specific "subcategories of OLC's formal written opinions." *Id.* at 489.

Following the release of *CREW II*, this Court turned to the OLC's motion to dismiss the amended complaint. Citing to both *EFF* and *CREW II*, the Court dismissed CfA's claims as to three of the four categories of opinions at issue: (1) those that interpret an agency's non-discretionary legal obligations; (2) those that announce the unconstitutionality of particular statutes; and (3) those that adjudicate or determine private rights. *CfA v. Dep't of Just. (CfA II)*, 486 F. Supp. 3d 424, 444 (D.D.C. 2020). For each of those three categories of documents, the

Court reasoned that CfA failed to state a claim because the amended complaint alleged only that the OLC's opinions were controlling, authoritative, and binding—not that they were final opinions made in the adjudication of cases, or that a client agency had adopted those opinions as its own. *See id.* at 441–44. As for "the OLC's opinions regarding the unconstitutionality of statutes," the Court determined that CfA did not effectively distinguish those documents from the broader category containing all of the OLC's formal written opinions—a shortcoming that would be fatal to CfA's claims given the D.C. Circuit's holding in *CREW II* that the OLC has no categorical obligation to affirmatively disclose its opinions. *See id.* at 443.

Although this Court dismissed the bulk of CfA's claims, it agreed with CfA that the D.C. Circuit's opinions in *EFF* and *CREW II* had left open the possibility that *some* categories of OLC opinions might be subject to the reading-room provision. *Id.* at 435–36. Indeed, the Court found that the first category of opinions described in the amended complaint—formal written opinions that resolve disputes between agencies—is, at least plausibly, such a category. *Id.* at 441. More specifically, the Court found that CfA had stated a plausible claim regarding those opinions for two reasons—first, OLC opinions that resolve interagency disputes are plausibly "final opinions made in the adjudication of cases," *id.* at 438 (citing § 552(a)(2)(A)); and second, such opinions are plausibly "statements of policy and interpretations" that are adopted *ex ante* by subject agencies when they consent to submit the dispute to the OLC, *id.* at 439–40 (citing § 552(a)(2)(B)). The Court, however, stressed the legal limits of its conclusions:

> [A]t this juncture, the Court's conclusion is based simply and solely on the amended complaint's allegations, and it might eventually determine, in the context of summary judgment, that OLC opinions resolving inter-agency disputes are not "statements of policy and interpretations" adopted by those agencies *ex ante*, or that "'adjudications' between two parts of the executive branch are not the kind of 'adjudication of cases' to which that section refers."

*CfA II*, 486 F. Supp. 3d at 445 (quoting *CREW II*, 922 F.3d at 491 (Pillard, J., dissenting)). The Court addresses those questions today.

## II.     LEGAL STANDARD

FOIA cases are typically decided at summary judgment. *See Laverpool v. Dep't of Hous. & Urban Dev.*, 315 F. Supp. 3d 388, 390 (D.D.C. 2018). A court will grant a motion for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In FOIA cases, it is the defending agency's burden to prove it has complied with its obligations under the statute. *Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989); *see also CREW II*, 922 F.3d at 487 (stating the rule in the context of the reading-room provision). To satisfy its burden, the "agency must prove that each document that falls within the [request] has been produced, is unidentifiable[,] or is wholly exempt from the Act's inspection requirements." *Weisberg v. Dep't of Just.*, 627 F.2d 365, 368 (D.C. Cir. 1980).

## III.    ANALYSIS

Two FOIA provisions are relevant here: the reading-room provision itself, § 552(a)(2), and FOIA's Exemption 5, § 552(b)(5). FOIA's reading-room provision requires an agency to "make available for public inspection" several enumerated categories of records. *See* 5 U.S.C. § 552(a)(2)(A)–(E). Two such categories are "final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases," § 552(a)(2)(A), and "statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register," § 552(a)(2)(B). The "primary objective" of FOIA's reading-room provision is the "elimination of secret law." *Dep't of Just. v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 772 n.20 (1989). Because FOIA's reading-room provision reflects "an affirmative congressional purpose to require disclosure of documents which have the force and effect of law,"

*NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 153 (1975), courts have sometimes referred to the categories of documents that are subject to disclosure under § 552(a)(2) as the "working law" of the agency, *see, e.g.*, *id.*; *CREW II*, 922 F.3d at 486.

"[I]n addition to requiring the disclosure of certain agency records, [] FOIA permits an agency to withhold covered documents pursuant to certain statutory exemptions." *CfA II*, 486 F. Supp. 3d at 427. Where a FOIA exemption applies, the duty to disclose "does not apply," regardless of whether a document would be otherwise disclosable. § 522(b); *see also Sears*, 421 U.S. at 154 n.21. One of these exemptions—Exemption 5—allows an agency to withhold any and all materials that would normally be privileged from discovery in civil litigation, including under the deliberative process privilege, the attorney-client privilege, or the attorney work-product doctrine. *Tax Analysts v. I.R.S.*, 117 F.3d 607, 616 (D.C. Cir. 1997). Exemption 5 is relevant to this opinion not because it may be invoked to protect specific documents from disclosure, but because the Supreme Court has suggested that there is a mutually exclusive relationship between materials protected by that exemption and materials subject to disclosure under § 552(a)(2). *See Sears*, 421 U.S. at 153 ("We should be reluctant, therefore, to construe Exemption 5 to apply to the documents described in 5 U.S.C. § 552(a)(2)."); *see also CfA II*, 486 F. Supp. 3d at 428 ("[I]f a record can be withheld under Exemption 5, then it is generally not subject to affirmative disclosure under the reading-room provision and vice versa."). More specifically, if a document is pre-decisional (i.e., if it "reflect[s] the agency's group thinking in the process of working out its policy and determining what its law shall be"), it cannot be said to constitute the agency's working law for purposes of the reading-room provision. *Sears*, 421 U.S. at 153. On the other hand, "final opinions, which not only invariably explain agency action already taken or an agency decision

10

already made, but also constitute final dispositions of matters by an agency," are "never" protected from disclosure under the deliberative process privilege in Exemption 5. *Id.* at 153–54.

Turning to this case, CfA argues that the OLC's final written opinions resolving interagency disputes are subject to disclosure under both §§ 552(a)(2)(A) and (B). The Court finds that the documents at issue are "final opinions . . . made in the adjudication of cases," § 552(a)(2)(A), and thus subject to affirmative disclosure. Having made this determination, the Court finds it unnecessary to opine whether the documents might also be subject to disclosure under § 552(a)(2)(B).

**A. The OLC's formal written opinions resolving interagency disputes are "final opinions . . . made in the adjudication of cases" and must therefore be affirmatively disclosed under § 552(a)(2)(A).**

To satisfy the requirements of § 552(a)(2)(A), a document must be (1) a final opinion and (2) made in the adjudication of a case. At the motion to dismiss phase, this Court concluded that CfA's amended complaint stated a plausible claim that the OLC's formal opinions resolving interagency disputes satisfy both of those conditions and are therefore subject to disclosure under § 552(a)(2)(A). Now, the Court considers the issue under the summary judgment standard, ultimately concluding that the documents at issue are subject to disclosure under § 552(a)(2)(A). The Court also finds that the OLC has not created a genuine dispute that those opinions are categorically protected by Exemption 5. Accordingly, the Court grants CfA's cross-motion for summary judgment and denies the OLC's motion for summary judgment.

*1. Final Opinion*

Agency opinions are final when they both (1) "serve as law in the specific case to which they are addressed" and (2) "serve as law-like precedent in subsequent cases." *Schlefer v. United States*, 702 F.2d 233, 237, 244 (D.C. Cir. 1983). To be final, an opinion must have legal effect; if it has no effect until it is ratified or adopted by a higher authority, then it is not final until that

occurs. *See Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 867–68 (D.C. Cir. 1980). The mere possibility of legal review (for instance, via discretionary appeal) does not affect the finality of an agency opinion, provided the opinion has "real operative effect" prior to any review. *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 186–87 (1975). In determining whether a document is an opinion, a court may consider whether that document provides legal reasoning to explain its conclusions, *Sears*, 421 U.S. at 158–59, and whether that reasoning is communicated in "straight-forward, objective, and impersonal prose," *Schlefer*, 702 F.2d at 243.

According to the Best Practices Memo, the OLC's formal opinions constitute "controlling legal advice," which represents—short of intervention by the courts—the "final word on the controlling law." ECF 56 ¶ 13 (adopting ECF 56-1); ECF 56-1 at 1. As this Court previously explained, the OLC's authority to issue such controlling advice flows from "Article II's vesting of the 'executive power' in one President," *CfA II*, 486 F. Supp. 3d at 438, and from the agency's position as the presidential appointee that serves as a "neutral arbiter to resolve the differing stances" of two agencies, *Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90, 92 (D.C. Cir. 1986). The OLC does not contest that client agencies treat its opinions as binding. ECF 57-1 at 23. Nor does it dispute that the OLC gives its own opinions precedential effect. ECF 56-1 at 2. The OLC has not suggested that its written opinions are mere "recommendations" that have no effect absent approval by some higher authority. Moreover, looking to the OLC opinions cited and submitted as evidence in this case, the OLC consistently explains its legal reasoning using "straight-forward, objective, and impersonal prose." *Schlefer*, 702 F.2d at 243. In other words, OLC opinions read like legal opinions, not ruminations on government policy. *See, e.g.*, *Scope of the Environmental Protection Agency's Discretion to Adopt Any One of Three Alternative Interpretations of the Mitchell-Conte Amendment to the Clean Air Act*, 13 Op. O.L.C. 105, 105

(1989) ("For the reasons set forth below, we conclude that EPA does possess the authority to adopt either the second or third alternative interpretation, in addition to the first interpretation.").

Despite all that, the OLC argues that its formal written opinions resolving interagency disputes are more like "advice documents" than final opinions. ECF 57-1 at 19. That is because those opinions sometimes "leave agencies with a broad range of potential avenues for action and prospective policy choices," and therefore do not necessarily dispose of any agency action. *Id*. at 23. The OLC cites several opinions that it contends illustrate that point. For example, in *Scope of the Environmental Protection Agency's Discretion to Adopt Any One of Three Alternative Interpretations of the Mitchell-Conte Amendment to the Clean Air Act*, the OLC determined that the EPA could lawfully choose any one of three interpretations of a statute, disagreeing with another agency that took the position there was only one valid interpretation. 13 Op. O.L.C. at 105. According to the OLC, that opinion was not final because it deferred to the EPA on the question of which of those three interpretations it should ultimately adopt. ECF 57-1 at 26. The OLC makes similar arguments regarding two other opinions. *See Whether the Defense of Marriage Act Precludes the Non-Biological Child of a Member of a Vermont Civil Union From Qualifying for Child's Insurance Benefits Under the Social Security Act*, 31 Op. O.L.C. 243 (2007); *Applicability of Government Corporation Control Act to Gain Sharing Benefit Agreement*, 24 Op. O.L.C. 212 (2000). Those opinions, in the OLC's view, only decided whether a client agency had the legal authority to take a proposed action, not whether the agency was required to do so. ECF 57-1 at 27–28.[8] The OLC argues that none of the above opinions are subject to § 552(a)(2)(A) because, like

---

[8] The OLC cites one additional opinion, *Applicability of the Cargo Preference Act to the Transportation of Alaskan Oil to the Strategic Petroleum Reserve*, 7 Op. O.L.C 139 (1983), in which it contends not only that the agency did not dictate the policy of the affected agency, but also that the OLC did not even fully resolve the agencies' dispute when it declined to take a position on two non-legal questions presented by one of the agencies, ECF 57-1 at 25–26. Perhaps.

the opinion in *EFF*, they are each binding only in the legal sense, and do not "speak with authority on the [agency's] policy." 739 F.3d at 9.

That argument misses the mark. As an initial matter, neither *EFF* nor *CREW II* were decided on the basis of § 552(a)(2)(A). Although both of those opinions cite to and discuss § 552(a)(2)(A), the requirement that an agency "adopt" an OLC opinion as its own was developed and has been applied only in the context of § 552(a)(2)(B). *See CREW II*, 922 F.3d at 486 ("An OLC opinion *in the latter category* qualifies as the 'working law' of an agency only if the agency has 'adopted' the opinion as its own." (emphasis added) (citing *EFF*, 739 F.3d at 9)). And that rule makes perfect sense in the context of § 552(a)(2)(B). After all, when it comes to a question of policy or legal interpretation where the agency has discretion to choose its preferred path, the solicitation of an OLC opinion to determine the scope of that discretion may indeed be pre-decisional. For example, in *EFF* the OLC issued an opinion concluding the FBI had the authority to request telephone records "without legal basis or qualifying emergency," 739 F.3d at 5, which the FBI then chose not to do as a matter of policy, *id.* at 10.

Section 552(a)(2)(A) is different. For one thing, it makes no mention of policy. *See CfA II*, 486 F. Supp. 3d at 439 ("The reading-room provision does not predicate affirmative disclosure on whether the agency's 'final opinions . . . made in the adjudication of cases' have a discernable policy impact."). The fact that an OLC opinion does not definitively resolve questions of policy has no bearing on whether it is final as to the legal issue it resolves. Consider the judicial context. Nobody would dispute that the D.C. Circuit's opinion in *CREW II* was a "final opinion." But in that case, despite the court's conclusion that the OLC has no general obligation to publish its

_____

But, to the extent the OLC is correct that the cited opinion does not resolve the agencies' dispute, that opinion would lie outside the category described by the amended complaint and would not be at issue in this case.

opinions, the agency remained perfectly free to voluntarily do so. Indeed, the OLC's website shows it has continued to do just that. *See* OLC, *Opinions*, http://www.justice.gov/olc/opinions-main (including opinions published as recently as March 26, 2024). Similarly, the OLC's opinions—which represent both the "final word" on the matter at hand and are treated as binding precedent in future cases—are also final.

### 2.  Made in the adjudication of cases

Having determined that the OLC's formal opinions resolving interagency disputes are "final opinions," the Court next concludes that such opinions are "made in the adjudication of cases." § 552(a)(2)(A). According to the statute, "adjudication" is an "agency process for the formulation of an order." § 551(7). An "order" is "a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making." § 551(6). An advisory opinion is not a final disposition. *See Int'l Tel. & Tel. Corp., Commc'ns Equip. & Sys. Div. v. Loc. 134, Int'l Bhd. of Elec. Workers*, 419 U.S. 428, 446 (1975).

As detailed in the Best Practices Memo, the OLC diligently avoids issuing advisory opinions—issuing written opinions only for disputes that are "concrete and ongoing." ECF 56-1 at 3. Moreover, the process by which the OLC researches, drafts, and finalizes its opinions that resolve interagency disputes is standardized, thorough, and bears many of the hallmarks of adversarial adjudication. *See generally id.* Before formulating its order, the OLC solicits a "detailed" brief from each of the client agencies laying out its side of the dispute. *Id.* at 3. Those briefs are shared with the opposing agency (or agencies) so that it (or they) may have an opportunity to respond when necessary. *Id*. The OLC functions like a neutral decisionmaker, "tak[ing] care to consider fully and address impartially" all the arguments made by each side, *id.* at 4, applying not only its own precedents, but judicial caselaw and the various tools of statutory interpretation as well, *see, e.g.*, *Payment of Back Wages to Alien Physicians Hired Under H-1B*

*Visa Program*, 32 U.S. Op. O.L.C. 47 (2008). The OLC's formal opinions, once complete, are carefully edited and cite-checked, signed, and filed away for use as precedent in the future. ECF 56-1 at 4–5.

The OLC makes two arguments that the opinions at issue in this case are not "made in adjudications." The first of those arguments is that the OLC's procedures (as described in the Best Practices memo) lack some of the characteristics of a formal adjudication under the Administrative Procedures Act (APA), as described by 5 U.S.C. § 554. Specifically, the OLC asserts that it has "no formal procedures governing how [agency briefs] are submitted, let alone opportunity for an adversarial hearing, prohibitions on *ex parte* communications, or a requirement of a decision that rests solely on a hearing record." ECF 62 at 19 (citing ECF 56 ¶¶ 7–17). The OLC is correct that its procedures do not satisfy all the requirements of § 554. But that provision concerns only the subset of "adjudication[s] required by statute to be determined on the record after opportunity for an agency hearing." 5 U.S.C. § 554(a). That language, as a matter of ordinary meaning, carves out a subcategory of adjudications, which must mean that the term "adjudication" encompasses something broader than only those "formal" adjudications that satisfy the requirements of § 554(a). That proposition finds additional support elsewhere in the statute, *see* 5 U.S.C. § 551(7) (defining "adjudication" broadly as any "agency process for the formulation of an order"); 5 U.S.C. § 551(6) (defining "order" as "a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making"), as well as in myriad opinions that differentiate between "formal" and "informal" adjudications, *see, e.g.*, *Watts v. SEC*, 482 F.3d 501, 506 (D.C. Cir. 2007) (referencing "the broad scope of formal and informal adjudications under the APA"). In other words, even granting that the OLC's decision-making process does not qualify as

a *formal* adjudication under the APA, that has no bearing as to whether the opinions at issue are "made in the adjudication of cases."

Next, the OLC asks the Court to revisit an argument it rejected at the motion to dismiss phase. Specifically, the OLC argues that the phrase "made in the adjudication of cases" cannot apply to the OLC's opinions because the phrase was only intended to encompass "agencies' adjudications of private rights." ECF 62 at 18; *see also id*. at 21 (asking the Court to reconsider). In support of that argument, the OLC points out that the preclusive effect of an agency's failure to disclose documents that are subject to FOIA's reading-room provision is that the undisclosed documents may not be "relied on, used, or cited as precedent by an agency *against a party other than an agency*." 5 U.S.C. § 552(a)(2)(E) (emphasis added). In the OLC's view, the nature of that remedy, considered together with the legislative history of the reading-room provision, confirms that "Congress's primary concern in § 552(a)(2) was with the adjudication of private rights." ECF 57-1 at 21. The OLC goes on to cite several cases in which the D.C. Circuit suggested that § 552(a)(2)'s central focus is to safeguard private rights. *See, e.g.*, *Schlefer*, 702 F.2d at 244 ("A strong theme of our opinions has been that an agency will not be permitted to develop a body of 'secret law,' used by it in the discharge of its regulatory duties and in its dealings with the public."); *Bannercraft Clothing Co. v. Renegotiation Bd*., 466 F.2d 345, 352 (D.C. Cir. 1972) (Congress enacted § 552(a)(2) because it was "troubled by the plight of those forced to litigate with agencies on the basis of secret laws or incomplete information"), *rev'd on other grounds*, 415 U.S. 1 (1974); *see also Fed. Open Mkt. Comm. of the Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 352–53, 360 n.23 (1979) (policy directives are "intra-agency memorandums" exempt from § 552(a)(2) because they "do not establish rules that govern the adjudication of individual rights, nor do they require particular conduct or forbearance by any member of the public").

The Court is unpersuaded and reaffirms its earlier conclusion that the phrase "made in the adjudication of cases" has no such meaning. *See CfA II*, 486 F. Supp. 3d at 432–35, 439. As the Court has explained, there is "nothing in the plain text or history of section 552(a)(2), or in the few cases that have interpreted that statutory provision, [to] establish[] that [] FOIA's affirmative obligation to publish certain agency records extends only to agency records that pertain to the regulation of private entities." *Id.* at 432. Moreover, the Court finds that the overarching purpose of the reading-room provision—to prevent the development of secret law—casts a wider net than the OLC imagines. FOIA embodies the principle that the public has a strong interest in keeping "informed about what their government is up to." *Dep't of Def. v. F.L.R.A.*, 510 U.S. 487, 495 (1994). That purpose encompasses all manner of documents that are not themselves adjudications of private rights. *See, e.g.*, *Pub. Citizen v. Off. of Mgmt. & Budget*, 598 F.3d 865 (D.C. Cir. 2010) (Office of Management and Budget memoranda designating which agencies are permitted to submit budgetary materials to Congress without prior clearance "fit comfortably within the working law framework"); *Vaughn v. Rosen*, 523 F.2d 1136 (D.C. Cir. 1975) (reports evaluating how various federal agencies had been carrying out their personnel management responsibilities not subject to Exemption 5). Even if one accepts that FOIA's drafters were primarily concerned that a "citizen [might] los[e] a controversy with an agency because of some obscure or hidden order or opinion which the agency knows about but which has been unavailable to the citizen," ECF 57-1 at 21 (quoting *Clarifying and Protecting the Right of the Public to Information*, H.R. Rep. No. 89-1497 at 2425 (1966)), that is not decisive because it is easy to imagine scenarios in which many of the opinions cited by the OLC, if undisclosed, could be cited as "secret law" in a subsequent proceeding that directly involves the adjudication of individual rights.

18

In summary, there is no requirement in the APA that an "adjudication" must involve members of the public, and the Court declines to create one based on the legislative history alone. Here, the record shows that the OLC has developed a process to formulate a final disposition of an adversarial dispute that has been submitted to the agency as a neutral decisionmaker. That is an adjudication. Accordingly, the Court finds that the OLC's formal written opinions that resolve interagency disputes are "made in the adjudication of cases." § 552(a)(2).

### 3. Deliberative process

Finally, the OLC argues that, if the Court concludes that even a subset of its opinions are subject to disclosure under § 552(a)(2), the precedent could be invoked to require the publication of all sorts of legal advice throughout the executive branch. ECF 57-1 at 30. The result would be not only to discourage agencies from seeking advice from the OLC itself, but to hamstring agencies' ability to access confidential legal advice in general, even from their own counsel. *Id.* at 31–32. In the OLC's view, that result would fly in the face of the deliberative process privilege and constitute a serious threat to "rule-of-law values," outweighing any interest the public might have in the publication of the narrow category of opinions at issue in this case. ECF 62 at 21–23.

The OLC's argument touches on a real concern. The deliberative process privilege is meant to protect "confidential [] advisory opinions disclosure of which would be injurious to the consultative functions of government." *Taxation With Representation Fund v. IRS*, 646 F.2d 666, 677 (quoting *Sears*, 421 U.S. at 149). It "serves to assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism." *Coastal States*, 617 F.2d at 866. To the extent agencies rely on the OLC's expertise as part of their decision-making process, subjecting its opinions to the harsh and sometimes distorting glare of the public spotlight could affect agencies' ability to think through their decisions. At the very least, that outcome would

create some tension with the Supreme Court's observation in *Sears* that the deliberative process privilege and the reading-room provision are generally mutually exclusive. *See* 421 U.S. at 153.

The Court has carefully considered that argument, but it is unpersuaded for three reasons. First, the Court does not find that there is any ambiguity as to whether § 552(a)(2)(A) applies to the opinions at issue here. Having found that the plain text of § 552(a)(2)(A) encompasses the documents, the Court is "reluctant" to construe § 552(b)(5) to apply to those documents. *Sears*, 421 U.S. at 153. Second, the OLC's predictions as to how agencies will respond to the Court's decision is entirely speculative. There is nothing in the record that can be construed as evidence that agencies would stop turning to the OLC to resolve their disputes—particularly given that many of the OLC's opinions resolving interagency disputes are already published voluntarily under the status quo. *See* ECF 56-1 at 5. Finally, the OLC's argument that today's decision will have serious "rule-of-law" ramifications throughout the executive branch ignores the limited scope of this opinion. All the Court decides today is that the subset of the OLC's formal opinions that resolve interagency disputes are subject to the requirements of § 552(a)(2)(A), and (by implication) that they are not categorically protected by the deliberative process privilege. Any individual document might still be shielded from disclosure under one or more of FOIA's other exemptions. Those exemptions protect, amongst other things, classified materials, § 522(b)(1), materials that pertain to the internal practices of an agency, § 522(b)(2), materials that would be subject to the attorney-client privilege,[9] § 522(b)(5), and materials compiled for law enforcement purposes, § 522(b)(7). The Court makes no ruling as to those exemptions, even with regard to the documents in this case.

---

[9] Although the OLC invoked the attorney-client privilege in its pre-litigation correspondence with CfA, ECF 22-3 at 2, it does not do so now.

In short, the Court finds little reason to conclude that today's opinion will drastically change the process by which the OLC releases its opinions to the public, let alone eviscerate the ability of the executive branch to obtain candid advice. Accordingly, the Court determines that the deliberative process privilege does not categorically protect the OLC's formal written opinions resolving interagency disputes, and that those opinions are therefore subject to the affirmative disclosure requirements of FOIA's reading-room provision.

## IV.    CONCLUSION

The Court DENIES the Department of Justice's motion for summary judgment, ECF 57, and grants CfA's cross-motion for summary judgment, ECF 59. As this Court explained in *CfA I*, FOIA grants the Court the authority to order that documents and indices be *produced* to the Plaintiff individually, not that they be *published* to the public at large. 278 F. Supp. 3d at 315–16; *see also CREW I*, 846 F.3d at 1244 ("CREW may, in a FOIA suit to enforce section 552(a)(2), seek an injunction that would . . . require disclosure of documents and indices only to CREW, not disclosure to the public."). Accordingly, the Court's order requires OLC to produce its responsive, formal written opinions that resolve interagency disputes to CfA, along with an index of those materials. A separate order accompanies this opinion, which includes the date upon which the Parties should submit a status report to propose a schedule for further proceedings.

**SO ORDERED.**

DATE: April 19, 2024

_____
Jia M. Cobb
U.S. District Court Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CAMPAIGN FOR ACCOUNTABILITY,<br><br>      Plaintiff,<br><br>  v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE,<br><br>      Defendant. | Civil Action No. 16-1068 (JMC) |

**<u>ORDER</u>**

For the reasons stated in the accompanying memorandum opinion, it is hereby

**ORDERED** that Defendant's motion for summary judgment, ECF 57, is **DENIED**, and that

Plaintiff's cross-motion for summary judgment, ECF 59, is **GRANTED**.

The Parties are **DIRECTED** to confer and submit a status report by May 17, 2024, with a

proposed schedule for further proceedings, including the release of responsive records.

This is a final appealable Order.

**SO ORDERED.**

             _____
             JIA M. COBB
             United States District Judge

Date: April 19, 2024

1