**[ORAL ARGUMENT NOT SCHEDULED]**

**Nos. 24-5163, 24-5170**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

CAMPAIGN FOR ACCOUNTABILITY,

Plaintiff-Appellee/Cross-Appellant,

v.

U.S. DEPARTMENT OF JUSTICE,

Defendant-Appellant/Cross-Appellee.

On Appeal from the United States District Court
for the District of Columbia

**BRIEF FOR APPELLANTS**

BRIAN M. BOYNTON
  *Principal Deputy Assistant
  Attorney General*

MICHAEL S. RAAB
DANIEL TENNY
  *Attorneys, Appellate Staff
  Civil Division, Room 7215
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 514-1838*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.    Parties and Amici

Plaintiff in the district court, who is appellee/cross-appellant in this Court, is the Campaign for Accountability.  Defendant in the district court, who is appellant/cross-appellee in this Court, is the U.S. Department of Justice.  There have been no amici curiae.

### B.    Rulings Under Review

The rulings under review are the memorandum opinion and accompanying order granting in part and denying in part the government's renewed motion to dismiss [JA 237, 276], issued by then-Judge Ketanji Brown Jackson on September 11, 2020, and the memorandum opinion and accompanying order denying the government's motion for summary judgment and granting plaintiff's cross-motion for summary judgment [JA 602, 623], issued by Judge Jia M. Cobb on April 19, 2024.

**C.     Related Cases**

We are unaware of any related cases within the meaning of Rule

28(a)(1)(C).

/s/ Daniel Tenny
Daniel Tenny

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................iv

GLOSSARY ............................................................................................................vii

STATEMENT OF JURISDICTION ..................................................................... 1

STATEMENT OF THE ISSUE ............................................................................. 2

PERTINENT STATUTES AND REGULATIONS.............................................. 2

STATEMENT OF THE CASE .............................................................................. 3

SUMMARY OF ARGUMENT .............................................................................. 10

STANDARD OF REVIEW ................................................................................... 12

ARGUMENT............................................................................................................ 12

OLC OPINIONS ARE SUBJECT TO THE DELIBERATIVE PROCESS PRIVILEGE
AND ARE NOT SUBJECT TO THE READING-ROOM PROVISION ............................. 12

      A.     This Court's reasoning in *Electronic Frontier Foundation*
           applies to all OLC opinions. ...........................................................12

      B.     The reading-room provisions do not supersede the
           deliberative process privilege and are inapplicable in any
           event. ...............................................................................................23

CONCLUSION ........................................................................................................ 35

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                     **Page(s)**

*Access Reports v. DOJ,*
926 F.2d 1192 (D.C. Cir. 1991) ..........................................................................18

*Afshar v. Department of State,*
702 F.2d 1125 (D.C. Cir. 1983) ................................................................. 31, 33

*Brinton v. Department of State,*
636 F.2d 600 (D.C. Cir. 1980) ..........................................................................13

*Budinich v. Becton Dickinson & Co.,*
486 U.S. 196 (1988) .............................................................................................2

*Citizens for Responsibility & Ethics in Wash. v. U.S. DOJ,*
922 F.3d 480 (D.C. Cir. 2019) ................................................ 4, 5, 19-20, 27, 34

*Cuneo v. Schlesinger,*
484 F.2d 1086 (D.C. Cir. 1973) ........................................................................31

*Electronic Frontier Found. v. U.S. DOJ,*
739 F.3d 1 (D.C. Cir. 2014) ........... 3, 4, 10, 11, 12, 13, 14, 16, 18, 19, 20, 21, 27

*Hudson v. Pittsylvania County,*
774 F.3d 231 (4th Cir. 2014) ...............................................................................2

*Murphy v. Department of the Army,*
613 F.2d 1151 (D.C. Cir. 1979) ........................................................................13

*NLRB v. Sears, Roebuck & Co.,*
421 U.S. 132 (1975) ................................................. 15, 18, 19, 24, 25, 26, 31, 32

*Public Citizen, Inc. v. Office of Mgmt. & Budget,*
598 F.3d 865 (D.C. Cir. 2010) ..........................................................................34

*U.S. DOJ v. Reporters Comm. for Freedom of the Press*,
489 U.S. 749 (1989) ...............................................................................32

**Statutes:**

5 U.S.C. § 551(6) .................................................................................28

5 U.S.C. § 551(7) .................................................................................28

5 U.S.C. § 552(a)(2) ........................................................ 1, 4, 14, 24, 29

5 U.S.C. § 552(a)(2)(A) ................................................................. 9, 28

5 U.S.C. § 552(a)(2)(A)-(B) ........................................................ 14, 30

5 U.S.C. § 552(a)(2)(B) ........................................................................7

5 U.S.C. § 552(a)(2)(C) ............................................................... 6, 29

5 U.S.C. § 552(a)(4)(B) ........................................................................1

5 U.S.C. § 552(b) ...................................................................... 23, 24

28 U.S.C. §§ 511-513 ............................................................................3

28 U.S.C. § 1291 ....................................................................................1

28 U.S.C. § 1292(a)(1) ..........................................................................2

**Regulation:**

28 C.F.R. § 0.25(a) ...............................................................................3

**Rule:**

Fed. R. App. P. 4(a)(1)(B)....................................................................1

**Legislative Materials:**

*Bills to Amend the Administrative Procedure Act: Hearings on S. 1160, S. 1336, S. 1758, and S. 1879 Before the Subcomm. on Admin. Practice and Procedure of the S. Comm. on the Judiciary*, 89th Cong. (1965) ................................. 32-33

H.R. Rep. No. 89-1497 (1966) ................................................................26, 30, 32

S. Rep. No. 89-813 (1965) ........................................................................32

**Other Authorities:**

Kenneth Culp Davis, *The Information Act: A Preliminary Analysis*, 34 U. Chi. L. Rev. 761 (1967)..........................................................................31

Frank H. Easterbrook, *Privacy and the Optimal Extent of Disclosure Under the Freedom of Information Act*, 9 J. Legal Stud. 775 (1980) ..................................32

## GLOSSARY

| | |
|---|---|
| CREW | Citizens for Responsibility & Ethics in Washington |
| DOJ | Department of Justice |
| FBI | Federal Bureau of Investigation |
| First MTD Op. | Opinion resolving motion to dismiss original complaint |
| FOIA | Freedom of Information Act |
| JA | Joint Appendix |
| OLC | Office of Legal Counsel |
| Second MTD Op. | Opinion resolving motion to dismiss amended complaint |
| SJ Op. | Opinion resolving cross-motions for summary judgment |
| SSA | Social Security Administration |

## STATEMENT OF JURISDICTION

Plaintiff invoked the district court's jurisdiction under 5 U.S.C.

§ 552(a)(4)(B).  On April 19, 2024, the district court granted plaintiff's

motion for summary judgment and held that the Department of Justice had

an obligation under 5 U.S.C. § 552(a)(2) to produce the Office of Legal

Counsel's "responsive, formal written opinions that resolve interagency

disputes."  SJ Op. 21 [JA 622].  The district court had previously dismissed

the other counts of plaintiff's complaint, Second MTD Op. 2-3 [JA 238-39],

so the grant of summary judgment on the remaining count resolved all

claims in the case.  The court issued an order, which it styled as a "final

appealable Order," that instructed the parties to confer and submit a status

report "with a proposed schedule for further proceedings, including the

release of responsive records."  Final Order [JA 623].  The court has since

stayed further proceedings, to allow this Court to resolve this appeal before

the government produces any records.  Min. Order [JA 9].  On June 18,

2024, the government filed a timely notice of appeal.  Notice of Appeal

[JA 624]; *see* Fed. R. App. P. 4(a)(1)(B) (60-day time limit).

The district court has issued a final order resolving all claims in this

case.  This Court therefore has jurisdiction under 28 U.S.C. § 1291.  The

court's instruction for the parties to provide a status report pertains only to the execution of the judgment—principally as to the timing of complying with the court's order—and retaining jurisdiction to oversee enforcement of a judgment does not affect the judgment's finality. *See, e.g.*, *Hudson v. Pittsylvania County*, 774 F.3d 231, 234 (4th Cir. 2014); *see also Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 199 (1988) ("A question remaining to be decided after an order ending litigation on the merits does not prevent finality if its resolution will not alter the order or moot or revise decisions embodied in the order."). But in any event, if this Court concluded that the district court's judgment was not final, this Court would still have jurisdiction under 28 U.S.C. § 1292(a)(1) to review the district court's injunction compelling the disclosure of documents.

## STATEMENT OF THE ISSUE

The issue presented in the government's appeal is whether the Office of Legal Counsel has an obligation under the Freedom of Information Act to disclose its formal written opinions insofar as they resolve interagency disputes.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes are reproduced in the addendum to this brief.

### STATEMENT OF THE CASE

This FOIA litigation concerns legal opinions authored by the Office of Legal Counsel (OLC) in the Department of Justice.  The Attorney General has statutory authority to give his opinion on questions of law to the President, heads of executive departments, and heads of military departments.  *See* 28 U.S.C. §§ 511-513.  That authority has been delegated to OLC.  28 C.F.R. § 0.25(a); *see also* Stipulation ¶ 1 [JA 290] ("The core function of OLC . . . is to provide controlling legal advice to executive branch officials on questions of law involving the operations of the executive branch.").

This Court has previously considered a FOIA request for legal advice provided by OLC.  In *Electronic Frontier Foundation v. U.S. DOJ*, 739 F.3d 1 (D.C. Cir. 2014), this Court held that the deliberative process privilege applied to an OLC Opinion that provided advice to the FBI regarding the legality of a particular surveillance technique.  The plaintiff in that case had argued that the OLC Opinion should be treated as the "working law" of an agency that must be disclosed because it announces, rather than precedes, a determination of the agency's policy.  In rejecting that argument, this Court accepted the government's argument that the opinion was a "legal

3

memorand[um] that concern[ed] the *advisability* of a particular policy, but d[id] not authoritatively state or determine the agency's policy." *Id.* at 8 (emphasis in original).  And the Court rejected the plaintiff's reliance on the fact that the opinion was "controlling (insofar as agencies customarily follow OLC advice that they request), precedential, and can be withdrawn." *Id.* at 9.  "Even if the OLC Opinion describes the legal parameters of what the FBI is *permitted* to do," the Court explained, "it does not state or determine the FBI's policy." *Id.* at 10 (emphasis in original).

In *Citizens for Responsibility & Ethics in Washington v. U.S. DOJ* (*CREW*), 922 F.3d 480 (D.C. Cir. 2019), this Court rejected an effort to obtain all of OLC's formal written opinions.  In that case, the plaintiff asserted that such opinions must be disclosed under the FOIA's "reading-room provision," which requires agencies to make certain categories of documents available for public inspection even in the absence of a written request.  *See* 5 U.S.C. § 552(a)(2).  The reading-room provision covers, among other things, "final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases," and "those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register." *Id.*

4

This Court held that, as it had held in *Electronic Frontier Foundation*, the mere fact "that the OLC's formal written opinions are 'controlling,' 'authoritative' and 'binding'" was "insufficient to render an OLC opinion the 'working law' of an agency." *CREW*, 922 F.3d at 486. The court held that the plaintiff had not "allege[d] that all of the OLC's formal written opinions have been adopted by any agency as its own," and thus rejected its "claim that *all* of the OLC's formal written opinions are subject to disclosure under FOIA's reading-room provision." *Id.* at 487 (emphasis in original).

This case, which was brought under the FOIA, proceeded in parallel with some of the proceedings described above. Plaintiff initially sought all OLC opinions. The district court granted the government's motion to dismiss, but authorized plaintiff to file an amended complaint. *See* Order [JA 22]. The court explained that the D.C. Circuit's decision in *Electronic Frontier Foundation* made clear that the "controlling" and "precedential" nature "of an OLC legal opinion *do not* render it subject to the reading-room requirement." First MTD Op. 29 [JA 52] (alteration and quotation marks omitted; emphasis in original). The court thus felt constrained to conclude that the "complaint as currently framed fails to state a claim for

relief." *Id.* The court authorized plaintiff, however, "to amend its complaint to add allegations of specific, ascertainable categories of records that [plaintiff] believes are subject to the reading-room requirement and that OLC has failed to make publicly available." *Id.* at 37 [JA 60].

Plaintiff amended its complaint to identify categories of opinions that it believed to be subject to the reading-room requirement, and ultimately asked the district court to address four of them: (1) those that "resolve inter-agency disputes"; (2) those that "interpret an agency's non-discretionary legal obligations"; (3) those that "find that particular statutes are unconstitutional and that therefore agencies need not comply with them"; and (4) those that "adjudicate or determine private rights." Second MTD Op. 1-2 [JA 237-38] (alteration and quotation marks omitted). The court granted the government's renewed motion to dismiss as to the last three categories, but denied it as to the first. The court rejected the government's view that the "adjudication of cases" referred to in section 552(a)(2)(A) refers only to adjudication of cases involving private parties, noting that section 552(a)(2)(C) refers specifically to materials "that affect a member of the public," 5 U.S.C. § 552(a)(2)(C) while section 552(a)(2)(A) has no such express limitation. *Id.* at 15 [JA 251].

6

The district court concluded that OLC opinions that resolve inter-agency disputes "plausibly qualify as 'final opinions' insofar as they constitute the executive branch's self-professed 'final word on the controlling law.'"  Second MTD Op. 26 [JA 262].  The court further concluded that such opinions "are also plausibly issued in the context of an 'adjudication,'" because the "process for resolving such disputes is adjudicative in nature."  *Id.* at 26-27 [JA 262-63].  The court also concluded that such inter-agency disputes "can plausibly be characterized as a 'case[]' for section 552(a)(2)(A) purposes," reasoning that limiting the term "case" to disputes involving private parties "is contrary to both ordinary practice and the common understanding of that term."  *Id.* at 27 [JA 263] (alteration in original).

The court also held that OLC opinions that resolve inter-agency disputes plausibly fall within the requirement to disclose "'statements of policy and interpretations' that have been 'adopted' by the agencies to which they were addressed."  Second MTD Op. 28 [JA 264] (quoting 5 U.S.C. § 552(a)(2)(B)).  The court concluded that, by submitting their dispute to OLC, the relevant agencies can be thought to have adopted the resulting opinion "*ex ante*," because the agencies must provide written

7

assurances that they "will conform [their] conduct to the OLC's conclusion."  *Id.* at 29 [JA 265] (quotation marks omitted).

The court rejected, however, plaintiff's arguments on the other three categories of documents.  As to an OLC Opinion that stated that the Defense of Marriage Act did not interfere with the obligation to provide social security benefits, the court reasoned that it was Social Security Administration (SSA), and not OLC, that decided whether an individual received benefits and that "all that OLC can do, when its advice on a particular legal interpretation is sought, is opine over how that agency might resolve that particular legal issue within the broader case that the SSA has been tasked with adjudicating."  Second MTD Op. 32–33 [JA 268-69].  For similar reasons, the court concluded that OLC opinions about the constitutionality of statutes merely set the legal guidelines for what agencies are allowed to do, as in *Electronic Frontier Foundation.  Id.* at 34 [JA 270].  And the court likewise rejected the argument that OLC opinions that directly or indirectly determine private rights must be disclosed, because OLC lacks authority to adjudicate private rights and does not control agencies' policy determinations.  *Id.* at 35 [JA 271].

8

After summary-judgment briefing (and after the case was reassigned from then-Judge Jackson to Judge Cobb), the district court held that OLC opinions resolving interagency disputes were subject to disclosure. The court concluded that such opinions are "final opinions" because they are treated as binding and given precedential effect. SJ Op. 11-12 [JA 612-13]. And the court concluded that although OLC opinions do not definitively resolve questions of policy, that consideration is relevant only to section 552(a)(2)(B) (which relates to statements of policy) and not to section 552(a)(2)(A) (which relates to final opinions in the adjudication of cases). SJ Op. 14 [JA 615].

The district court then concluded that OLC opinions are "made in the adjudication of cases," 5 U.S.C. § 552(a)(2)(A). The court stated that OLC engages in a process like an adversarial adjudication and acts as a neutral decisionmaker bound by, and setting, precedent. SJ Op. 15-16 [JA 616-17]. The court rejected the argument that the adjudications are not akin to formal adjudications under the Administrative Procedure Act, noting that the term "adjudication" can be broader than those formal adjudications. And the court declined to revisit its rejection at the motion-to-dismiss stage

of the argument that the relevant question was whether the adjudication decided the rights of private parties.  SJ Op. 17 [JA 618].

Finally, the court rejected the government's reliance on the deliberative process privilege.  The court said that its conclusion that section 552(a)(2)(A) applied made it hesitant to apply the deliberative process privilege, because those categories are normally mutually exclusive.  SJ Op. 20 [JA 621].  And the court found it speculative that releasing this subset of OLC opinions would discourage agencies from turning to OLC to resolve their disputes, especially given that OLC voluntarily releases many of its opinions.  *Id.*  The court also observed that other FOIA exemptions could continue to apply.

The court ordered "OLC to produce its responsive, formal written opinions that resolve interagency disputes to [plaintiff], along with an index of those materials."  SJ Op. 21 [JA 622].  After the government filed a notice of appeal, rather than negotiating a schedule for release of the documents, the parties agreed to stay proceedings.  Min. Order [JA 9].

## SUMMARY OF ARGUMENT

This Court concluded in *Electronic Frontier Foundation v. U.S. DOJ*, 739 F.3d 1 (D.C. Cir. 2014), that a formal opinion by the Office of Legal Counsel

10

was subject to the deliberative process privilege.  Even though such

opinions are "controlling (insofar as agencies customarily follow OLC

advice that they request), precedential, and can be withdrawn," they are

still predecisional rather than constituting final decisions because OLC

does not have authority to set policy.  *Id.* at 9.  Instead, OLC provides legal

advice that helps agencies to formulate their own policies.

       This Court's reasoning in that case applies equally to the category of

opinions that the district court in this case held the government must

disclose unilaterally, even in the absence of a FOIA request.  OLC opinions

that resolve disputes among agencies, like any other OLC opinions,

provide legal advice that one or more agencies can use to formulate their

own policies.  They do not set policies themselves, which OLC lacks

authority to do.

       The district court's contrary conclusion cannot be reconciled with this

Court's analysis in *Electronic Frontier Foundation*.  If documents are subject

to the deliberative process privilege, they are exempt from disclosure

under the FOIA regardless of whether they might otherwise be subject to

mandatory disclosure.  And in any event, the same analysis that led this

Court to conclude that OLC opinions are predecisional makes evident that

11

they are not the sort of final decisions or policies that must be made public

under the FOIA.

## STANDARD OF REVIEW

This Court reviews *de novo* the district court's grant of summary

judgment. *Electronic Frontier Found. v. U.S. DOJ*, 739 F.3d 1, 7 (D.C. Cir.

2014).

## ARGUMENT

### OLC OPINIONS ARE SUBJECT TO THE DELIBERATIVE PROCESS PRIVILEGE AND ARE NOT SUBJECT TO THE READING-ROOM PROVISION

**A.    This Court's reasoning in *Electronic Frontier Foundation* applies to all OLC opinions.**

1.  In *Electronic Frontier Foundation v. U.S. DOJ*, 739 F.3d 1 (D.C. Cir.

2014), this Court concluded that a formal opinion authored by the

Department of Justice's Office of Legal Counsel was protected by the

deliberative process privilege.  That privilege applies to "documents that

are predecisional and deliberative, meaning they reflect advisory opinions,

recommendations, and deliberations comprising part of a process by which

governmental decisions and policies are formulated, or the personal

opinions of the writer prior to the agency's adoption of a policy." *Id.* at 7

(alterations and quotation marks omitted).  The Court explained that OLC

lacks authority to establish the policies of the Executive Branch entities to whom it provides advice (in that case, the FBI), and that its opinion thus "amount[ed] to advice offered by OLC for consideration by officials of the FBI." *Id.* at 8.

The Court distinguished cases in which an "agency was required to disclose a document that represented a conclusive or authoritative statement of its policy, usually a higher authority instructing a subordinate on how the agency's general policy applies to a particular case, or a document that determined policy or applied established policy." *Electronic Frontier Found.*, 739 F.3d at 9. Instead, the OLC Opinion at issue in *Electronic Frontier Foundation* was "more similar to the advice from the Legal Adviser to the Secretary of State pertaining to policy in the Middle East in *Brinton* [*v. Department of State*, 636 F.2d 600 (D.C. Cir. 1980)], or the advice from the Army's General Counsel pertaining to the advisability of a certain contract in *Murphy v.* [*Department of the Army*, 613 F.2d 1151 (D.C. Cir. 1979)]." *Electronic Frontier Found.*, 739 F.3d at 9. Like those legal advisers, OLC provides legal advice but "is not authorized to make decisions about the FBI's investigative policy, so the OLC Opinion cannot be an authoritative statement of the agency's policy." *Id.*

The Court recognized that the OLC Opinion was "controlling (insofar as agencies customarily follow OLC advice that they request), precedential, and can be withdrawn." *Electronic Frontier Found.*, 739 F.3d at 9. But those "indicia of a binding legal decision" were insufficient to "overcome the fact that OLC does not speak with authority on the FBI's policy." *Id.*

As the district court observed in dismissing the original complaint in this case, this Court's analysis precludes the application of 5 U.S.C. § 552(a)(2)—sometimes referred to as the reading-room provision— to OLC opinions. That provision requires agencies to make public, even in the absence of a request, certain categories of documents—most relevant here, "final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases," and "those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register." 5 U.S.C. § 552(a)(2)(A)-(B). As the district court explained, even if a record falls within this provision, "the FOIA permits an agency to withhold the record if it falls within" a FOIA exemption, including Exemption 5, which covers documents protected by the deliberative process privilege. First MTD Op. 6-7 [JA 29-30].

This issue tends not to arise, however, because the categories defined by the reading-room provision do not encompass documents subject to the deliberative process privilege.  The reading-room provision applies to documents that "have the force and effect of law." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 153 (1975) (quotation marks omitted).  Materials covered by the deliberative process privilege, by contrast, "reflect the agency's group thinking in the process of working out its policy and determining what its law shall be."  *Id.* (quotation marks omitted).  The same characteristics that lead a document to be covered by the deliberative process privilege—in particular, the document's predecisional nature—cause the document not to be covered by the reading-room provision.

As recognized in *Electronic Frontier Foundation*, OLC opinions are predecisional documents covered by the deliberative process privilege, and thus are not subject to the reading-room provision.  The district court properly observed that "an OLC opinion does not necessarily amount to an agency's own policy for purposes of Exemption 5 simply by virtue of its being a 'controlling' and 'precedential' statement of the applicable law," and for that reason "those qualities of OLC opinions do not necessarily render them 'final opinions . . . made in the adjudication of cases' or

15

'statements of policy and interpretations which have been adopted by the agency'—*i.e.*, documents embodying the law of the agency—for purposes of the reading-room requirement."  First MTD Op. 32-33 [JA 55-56] (alteration in original).

The district court erred, however, in failing to apply this conclusion to OLC opinions that resolve conflicts between agencies.  The character and binding nature of those opinions are no different from any other.  In each case, one or more agencies seek legal advice from OLC, and in each case OLC has no authority to set any agency's policy.  Instead, the OLC opinion constitutes legal "advice offered by OLC for consideration by officials of the [relevant agency or agencies]."  *Electronic Frontier Found.*, 739 F.3d at 8. The circumstances in which OLC's legal advice was sought—a request by a single agency or by more than one—makes no difference to the predecisional nature of the OLC opinion, and thus makes no difference to the application of the reading-room provisions or the deliberative process privilege.  The district court's contrary conclusion implausibly suggests that *Electronic Frontier Foundation* would have come out the other way if the OLC Opinion at issue was exactly the same, but instead of the FBI's seeking

16

legal advice on its own, another agency had disagreed with the FBI's interpretation and the two agencies had presented the dispute to OLC.

In a related context, plaintiff had recognized that the binding nature of OLC opinions did not depend upon the way in which the question was presented. Plaintiff originally argued that an additional category of documents—"opinions issued to independent agencies"—were subject to the FOIA's reading-room provision, but withdrew that allegation because "'OLC has now confirmed that the express agreement that independent agencies make to be bound by the OLC's formal written opinions is no different than the implied agreement of non-independent agencies to be bound by those opinions.'" Second MTD Op. 8 n.4 [JA 244 n.4] (quoting Dkt. No. 30, at 30 n.11). OLC opinions that resolve interagency disputes are binding in the same sense. The resulting opinion still constitutes "confidential legal advice provided to two agencies within the Executive Branch of the United States," and "does not determine the ultimate policy decisions facing the agencies requesting OLC's advice." OLC Resp. to Am. Compl. 4 [JA 227].

2. The district court stated that this Court had left "open the possibility that a client agency (such as the FBI) can 'adopt' the OLC's legal

advice . . . , or that OLC might, in some cases, 'speak with authority' as to the client agency's policies and interpretations."  Second MTD Order 21 [JA 257] (quoting *Electronic Frontier Found.*, 739 F.3d at 9).  The court misunderstood the import of the first statement (regarding adoption) and was incorrect in the second (regarding OLC's ability to speak with authority on policy matters).

The Supreme Court has made clear that adoption defeats application of Exemption 5 only in very narrow circumstances.  As this Court explained in *Electronic Frontier Foundation*, the Supreme "Court explained that Exemption 5 does not apply 'if an agency chooses *expressly* to adopt or incorporate by reference' a memorandum that would otherwise have been protected by the privilege."  *Electronic Frontier Found.*, 739 F.3d at 10 (quoting *Sears*, 421 U.S. at 161) (Supreme Court's emphasis).  And the Supreme Court has refused to equate adoption with mere "reference to a report's conclusions."  *Id.* (quoting *Access Reports v. DOJ*, 926 F.2d 1192, 1197 (D.C. Cir. 1991)).  Thus, an agency's agreement to abide by the conclusions of an OLC opinion does not constitute adoption as a matter of law.  That is the case for OLC opinions generally, and it is no different for OLC opinions that resolve interagency disputes.

In the unusual circumstance in which an agency not only follows OLC advice, but additionally states that the reasons in an OLC opinion are the agency's own reasons for a final decision, "the reasoning becomes that of the agency and becomes *its* responsibility to defend." *Sears*, 421 U.S. at 161 (emphasis in original), *quoted in Electronic Frontier Found.*, 739 F.3d at 10. That does not mean that the OLC opinion is itself a final decision, but rather that another agency has adopted OLC's reasoning as the agency's own reasoning—and again, that is no more likely to be true for decisions regarding interagency disputes than for any other decision. In all circumstances, the obligation under the reading-room provision to publish the reasoning justifying an agency's decision falls upon the agency that has issued the final decision, though if OLC were aware that its opinion had been adopted such that the privilege had been overcome, it would no longer assert Exemption 5 to withhold that opinion. *See* OLC Resp. to Am. Compl. 5 [JA 228] (noting that "a policymaking agency might take certain actions that waive privilege," such as by "expressly adopt[ing] an OLC opinion's conclusion and reasoning as its own statement of policy or interpretation," but that "[a]t that point, of course, any obligation to publish the document would fall on the adopting agency"); *cf. Citizens for*

19

*Responsibility & Ethics in Wash. v. U.S. DOJ*, 922 F.3d 480, 487 (D.C. Cir. 2019) (suggesting that an agency may have adopted an OLC opinion).

The district court incorrectly suggested that "OLC might, in some cases, 'speak with authority' as to the client agency's policies and interpretations." Second MTD Order 21 [JA 257]. To the contrary, this Court said that "OLC cannot speak authoritatively on the FBI's policy," and that "OLC is not authorized to make decisions about the FBI's investigative policy, so the OLC Opinion cannot be an authoritative statement of the agency's policy." *Electronic Frontier Found.*, 739 F.3d at 9; *see also id.* ("OLC does not purport, and in fact lacks authority, to make policy decisions. OLC's legal advice and analysis may inform the decisionmaking of Executive Branch officials on matters of policy, but OLC's legal advice is not itself dispositive as to any policy adopted." (quoting Declaration of Paul P. Colborn at 1-2, *Electronic Frontier Found. v. DOJ*, No. 11-cv-00939-RJL (D.D.C. Nov. 10, 2011), Dkt. No. 11-4 (Special Counsel in the Office of Legal Counsel))). The sentence quoted by the district court read, in its entirety, as follows: "That the OLC Opinion bears these indicia of a binding legal decision does not overcome the fact that OLC does not speak with authority on the FBI's policy; therefore, the OLC

20

Opinion could not be the 'working law' of the FBI unless the FBI 'adopted' what OLC offered." *Electronic Frontier Found.*, 739 F.3d at 9. The context makes clear that, rather than suggesting that OLC might have authority to set policy in some circumstances, this Court meant, as it had explicitly stated in the previous paragraph, that OLC does not have such authority at all.

The district court also improperly discounted the importance of the policies that underlie the deliberative process privilege (as well as the attorney-client privilege, which also applies to OLC opinions for similar reasons). Executive Branch officials consult with their counsel to obtain confidential legal advice on sensitive policy matters, and receive candid advice on the understanding that it will be kept confidential. The need for such assurances of confidentiality is, if anything, even more pronounced in circumstances in which there is disagreement within the Executive Branch, such that the resulting advice is likely to involve a frank discussion of counterarguments or points that cut against the ultimate legal position. Agencies would be especially loath to solicit such opinions if OLC was required to release them, thus disclosing the disagreement within the

Executive Branch and the strongest arguments against the ultimate legal conclusion.

Though the district court dismissed these concerns as being "plainly based on sheer speculation," Second MTD Op. 23 [JA 259], they are at the heart of the deliberative process privilege.  And the district court's observation that "OLC already routinely releases certain legal opinions voluntarily and without incident," *id.*, ignores the process that OLC undergoes before it does so.  OLC only discloses opinions after consulting with affected agencies, and will "decline to publish opinions when doing so is necessary to preserve internal Executive Branch deliberative processes or protect the confidentiality of information covered by the attorney-client relationship between OLC and other executive offices."  Best Practices Mem. 6 [JA 101].  OLC's practice of waiving the privilege and publishing opinions when disclosure would not improperly compromise these important interests provides no basis for compelling the disclosure of those opinions that OLC, after consulting with interested agencies, concluded would reveal sensitive internal discussions.

**B.    The reading-room provisions do not supersede the deliberative process privilege and are inapplicable in any event.**

The district court largely ignored the possibility that it was compelling OLC to disclose privileged information, instead focusing on whether the category of OLC opinions that it described fell within the terms of the reading-room provision.  That was an analytical error, as the applicability of Exemption 5 would preclude a disclosure order even if the materials at issue would otherwise be subject to the reading-room provision.  And the district court in any event misread the reading-room provision itself.

1.  The statutory text makes clear that Exemption 5 provides an exception to the reading-room provision, rather than the other way around. The FOIA provides that "This section does not apply to matters that are— . . . (5) inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency, provided that the deliberative process privilege shall not apply to records created 25 years or more before the date on which the records were requested."  5 U.S.C. § 552(b).  The "section" referred to is Section 552 of Title 5—the FOIA itself—which encompasses the reading-

room provision codified at 5 U.S.C. § 552(a)(2). *See Sears*, 421 U.S. at 147-48 (If documents "do fall within one of the Act's exempt categories, our inquiry is at an end, for the Act 'does not apply' to such documents."). Thus, if documents are protected by the deliberative process privilege, the reading-room provision does not apply to them. The deliberative process privilege, incorporated by Exemption 5, is no different from any other privilege or exemption in this respect.

The district court purported to recognize the import of Exemption 5. *See* First MTD Op. 6-7 [JA 29-30] ("Notably, even if a record is subject to one of the FOIA's three disclosure requirements, the FOIA permits an agency to withhold the record if it falls within one of nine statutory exemptions."); SJ Op. 10 [JA 611] ("Where a FOIA exemption applies, the duty to disclose 'does not apply,' regardless of whether a document would be otherwise disclosable." (quoting 5 U.S.C. § 552(b)). But it ultimately concluded that "[h]aving found that the plain text of § 552(a)(2)(A) encompasses the documents, the Court is 'reluctant' to construe § 552(b)(5) to apply to those documents." SJ Op. 20 [JA 621] (quoting *Sears*, 421 U.S. at 153).

In addition to giving precedence to the wrong statutory provision, that statement ignored the context in which the Supreme Court had described the relationship between the two provisions.  In the passage of *Sears* on which the district court relied, the Supreme Court explained that the purpose of the deliberative process privilege was "to prevent injury to the quality of agency decisions."  *Sears*, 421 U.S. at 151.  The Court found it "difficult to see how the quality of a decision will be affected by communications with respect to the decision occurring after the decision is finally reached," and thus endorsed "a distinction between predecisional communications, which are privileged, and communications made after the decision and designed to explain it, which are not."  *Id.* at 151-52 (citations and footnote omitted).  In addition to the "lesser injury to the decisionmaking process flowing from disclosure of post-decisional communications," the Court explained that there was an "increased public interest in knowing the basis for agency policy already adopted."  *Id.* at 152.

A subset of those final agency policies, the Court went on to explain, are subject to the reading-room provision.  The reading-room provision, the Court explained, "represents an affirmative congressional purpose to

require disclosure of documents which have 'the force and effect of law.'"

*Sears*, 421 U.S. at 153 (quoting H.R. Rep. No. 89-1497, at 7 (1966)).  That is

why the Supreme Court was "reluctant . . . to construe Exemption 5 to

apply to the documents described in 5 U.S.C. § 552(a)(2)."  *Id.*  "[W]ith

respect at least to 'final opinions,' which not only invariably explain agency

action already taken or an agency decision already made, but also

constitute 'final dispositions' of matters by an agency," the Court stated

that "Exemption 5 can never apply."  *Id.* at 153-54.

Far from suggesting that OLC opinions should not be protected by

the deliberative process privilege, that characterization by the Supreme

Court precludes the treatment of OLC opinions as subject to the reading-

room provision.  OLC opinions—whether in the context of resolving an

agency dispute or otherwise—do not "explain agency action already taken

or an agency decision already made," but rather provide legal advice to

one or more agencies who can then make their own decisions.  OLC

opinions thus lack a feature that final opinions "invariably" have.

2.  The district court's conclusion that OLC opinions could

nonetheless be "final opinions" in the relevant sense cannot be reconciled

with this analysis.  The court stated that "[t]he fact that an OLC opinion

26

does not definitively resolve questions of policy has no bearing on whether it is final as to the legal issue it resolves." SJ Op. 14 [JA 615]. To support the conclusion that OLC opinions can be final in the relevant sense, the district court relied on the fact that opinions provide "controlling legal advice," that "client agencies treat [OLC] opinions as binding," and that "OLC gives its own opinions precedential effect." SJ Op. 12 [JA 613] (quotation marks omitted). Those are the same considerations that this Court held to be inadequate in *Electronic Frontier Foundation* to render OLC opinions final in the sense of the deliberative process privilege, and the same outcome should obtain here. *See Electronic Frontier Found.*, 739 F.3d at 9; *see also CREW*, 922 F.3d at 486-87 (holding that these features of OLC opinions were inadequate to render them subject to the reading-room provisions). Underscoring the point, although "many agencies treat legal advice from their Offices of General Counsel as 'binding,' at least as a matter of custom and practice," such advice is still predecisional and privileged, and could not plausibly be treated as a final opinion in the relevant sense. OLC Resp. to Am. Compl. 3 [JA 226].

The district court was likewise incorrect to suggest that opinions resulting from disputes among agencies within the Executive Branch are

"made in the adjudication of cases," 5 U.S.C. § 552(a)(2)(A).  As the court

recognized, an "adjudication" under the Administrative Procedure Act (of

which the FOIA is a part) "is an 'agency process for the formulation of an

order,'" and "[a]n 'order' is 'a final disposition, whether affirmative,

negative, injunctive, or declaratory in form, of an agency in a matter other

than rule making.'"  SJ Op. 15 [JA 616] (quoting 5 U.S.C. §§ 551(6), (7)).

Those are all ways that agencies can take formal actions of the sort that

they might need to justify with reasons that would need to be made public

(and, relatedly, that would not be subject to the deliberative process

privilege).  The inclusion of "concurring and dissenting opinions, as well as

orders," 5 U.S.C. § 552(a)(2)(A), further emphasizes that the statute is

intended to cover those writings resulting from a true adjudicative process.

That is not what OLC is doing when it provides its legal advice in formal

opinions, whether in response to a dispute among agencies or otherwise.

Context confirms that the reading-room provisions were not

designed to cover legal advice within the Executive Branch.  The FOIA

provides that a final opinion that was not published in accordance with the

terms of the reading-room provision cannot be "relied on, used, or cited as

precedent by an agency against a party other than an agency" unless the

party has actual and timely notice of the opinion's terms.  5 U.S.C.

§ 552(a)(2).  That remedial provision underscores the focus on the policies

or interpretations that an agency is implementing, as opposed to the inputs

to those policies.  Indeed, the entities whose conduct may be affected by

OLC's legal advice are agencies, the very entities expressly excluded from

the remedy.

The district court also drew the wrong inference from a separate

reading-room provision, not at issue here, that applies to "administrative

staff manuals and instructions to staff that affect a member of the public," 5

U.S.C. § 552(a)(2)(C).  *See* Second MTD Op. 15 [JA 251].  The explicit

limitation that only those staff manuals and instructions that affect a

member of the public are subject to the reading-room requirement aligns

with the overall thrust of the reading-room provisions.  Congress needed to

specify that only that subset of staff manuals and instructions was covered

because many staff manuals and instructions are entirely internal and thus

need not be disclosed in order to permit an understanding of the agency's

interactions with the public.  No such specification was necessary for the

reading-room provisions at issue here, which by their terms—"final

29

opinions" and "statements of policy," 5 U.S.C. § 552(a)(2)(A)-(B)—are naturally understood to apply only to decisions that affect the public.

Congress's general desire to subject materials to the reading-room provisions only if they affected members of the public was expressed in the very passage from a House Report on which the district court relied. That report did not suggest any distinction between staff manuals and other types of documents with regard to whether they needed to be published even if they did not affect the public, but rather grouped all types of documents together: "[T]he House Report clarified that the purpose of the provision was to provide an explicit requirement that agencies 'make available statements of policy, interpretations, staff manuals, and instructions that affect any member of the public.'" Second MTD Op. 17 [JA 253] (quoting H.R. Rep. No. 89-1497, at 7).

3. The district court was also mistaken in invoking what it described as "the 'working law' exception to an agency's authority to withhold records." Second MTD Op. 18 [JA 254]. The statute's text does not include the phrase "working law," and there is therefore no freestanding "working law" exception. Although that term has been employed in various contexts—sometimes more loosely than others—its invocation does not

30

alter the relevant questions in this case, which concern the application of the reading-room provision and of Exemption 5.

In any event, the concept of "working law," properly understood, reinforces the principles set forth above.  As this Court has explained, "there is a narrow definition of 'working law' that limits the term to those policies or rules, and the interpretations thereof, that 'either create or determine the extent of the substantive rights and liabilities of a person.'" *Afshar v. Department of State*, 702 F.2d 1125, 1141 (D.C. Cir. 1983) (quoting *Cuneo v. Schlesinger*, 484 F.2d 1086, 1090 (D.C. Cir. 1973)).  "This appears to be the definition understood by all the sources relied upon by the Supreme Court in *Sears* for the proposition that 'working law' is not protected by exemption 5," which "apparently operate under the assumption that the reason 'working law' should be disclosed is that a private party may have cause to rely on it."  *Id.*; *see also* Kenneth Culp Davis, *The Information Act: A Preliminary Analysis*, 34 U. Chi. L. Rev. 761, 797 (1967) (describing "an outrageous system of secret law" formed by "opinions and interpretations . . . that the agency's employees may be instructed to apply . . . in all individual cases" (quotation marks omitted)), *cited in Sears*, 421 U.S. at 153. Indeed, *Sears* itself arose in the context of an agency's disposition of a

31

charge brought by a private party, and its discussion reflects that context. *See Sears*, 421 U.S. at 158 ("The decision to dismiss a charge is a decision in a 'case' and constitutes an 'adjudication' . . . .").

The proper understanding of working law aligns with the FOIA's focus on the need for an agency to "disclose its rules governing relationships with private parties and its demands on private conduct." *U.S. DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 772 n.20 (1989) (quoting Frank H. Easterbrook, *Privacy and the Optimal Extent of Disclosure Under the Freedom of Information Act*, 9 J. Legal Stud. 775, 777 (1980)).  The Committee Reports explained that the reading-room provision was "necessary to afford the private citizen the essential information to enable him to deal effectively and knowledgeably with the Federal agencies," and to "prevent a citizen from losing a controversy with an agency because of some obscure and hidden order or opinion which the agency knows about but which has been unavailable to the citizen simply because he had no way in which to discover it."  S. Rep. No. 89-813, at 7 (1965); H.R. Rep. No. 89-1497, at 8 (similar language); *see also Bills to Amend the Administrative Procedure Act: Hearings on S. 1160, S. 1336, S. 1758, and S. 1879 Before the Subcomm. on Admin. Practice and Procedure of the S. Comm. on*

*the Judiciary*, 89th Cong. 143-45, 187-88 (1965) (testimony of Professor

Kenneth Culp Davis) (urging that "law that affects any private person

should be open to public inspection" and giving as examples orders and

opinions in deportation proceedings, decisions on appeals of visa issues,

and orders allowing rescissions of exchange visitor status for certain

noncitizens).

As this Court has also observed, the FOIA's requirement to produce

documents on request can extend beyond those documents that must be

affirmatively disclosed under the reading-room provision.  A requester can

defeat an agency's invocation of the deliberative process privilege by

demonstrating that the documents are not predecisional and deliberative;

"[n]o affirmative public need for the documents need be shown."  *Afshar*,

702 F.2d at 1142.  But the district court was incorrect in suggesting that a

broad conception of "working law" compelled the disclosure of internal

deliberative government documents that were provided to agencies as part

of the process of formulating their policies that might, depending on what

the agency ultimately decides to do, affect members of the public.

Although the term "working law" has, at times, been used imprecisely to

describe those documents that are not predecisional and deliberative even

33

if they do not govern an agency's relationship with the public, *see Public Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 875 (D.C. Cir. 2010), this Court has never held that such documents must be affirmatively disclosed as opposed to merely being outside the purview of Exemption 5. In any event, as discussed above, OLC opinions are predecisional and deliberative and thus fall outside even this use of the phrase "working law." *Cf. CREW*, 922 F.3d at 486 (noting that an OLC opinion can "qualify as the 'working law' of an agency only if the agency has 'adopted' the opinion as its own").

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed insofar as it requires the disclosure of OLC opinions resolving interagency disputes.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
    *Attorney General*

MICHAEL S. RAAB

 */s/ Daniel Tenny*
DANIEL TENNY
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7215*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-1838*
  *daniel.tenny@usdoj.gov*

OCTOBER 2024

35

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,921 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Book Antiqua 14-point font, a proportionally spaced typeface.

*/s/ Daniel Tenny*

Daniel Tenny

**ADDENDUM**

# TABLE OF CONTENTS

5 U.S.C. § 552 (excerpts) ........................................................................ A1

**5 U.S.C. § 552**

**§ 552. Public information; agency rules, opinions, orders, records, and proceedings**

(a) Each agency shall make available to the public information as follows:

. . .

(2) Each agency, in accordance with published rules, shall make available for public inspection in an electronic format--

(A) final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases;

(B) those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register;

(C) administrative staff manuals and instructions to staff that affect a member of the public;

. . .

(b) This section does not apply to matters that are--

. . .

(5) inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency, provided that the deliberative process privilege shall not apply to records created 25 years or more before the date on which the records were requested;

. . . .

A1