**[ORAL ARGUMENT NOT SCHEDULED]**

**Nos. 24-5163, 24-5170**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

CAMPAIGN FOR ACCOUNTABILITY,

Plaintiff-Appellee/Cross-Appellant,

v.

U.S. DEPARTMENT OF JUSTICE,

Defendant-Appellant/Cross-Appellee.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

**JOINT APPENDIX – VOLUME I**

———————————

ALEX ABDO
ANNA DIAKUN
JAMEEL JAFFER
  *Knight First Amendment Institute*
    *at Columbia University*
  *475 Riverside Drive, Suite 302*
  *New York, NY 10115*
  *(646) 745-8500*
  *alex.abdo@knightcolumbia.org*

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
    *Attorney General*

MICHAEL S. RAAB
DANIEL TENNY
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7215*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-1838*

# TABLE OF CONTENTS

**Page**

**VOLUME 1**

Docket entries .................................................................................JA 1

Complaint, Doc. 1 (June 8, 2016) ....................................................JA 10

Order, Doc. 18 (Sept. 29, 2017) .......................................................JA 22

Memorandum Opinion, Doc. 19 (Oct. 6, 2017) ...............................JA 24

Amended Complaint, Doc. 22 (Oct. 27, 2017)..................................JA 62

    Index of Exhibits ....................................................................JA 86

    FOIA request under 5 U.S.C. § 552(a)(2) ............................JA 88

    Response to FOIA request ......................................................JA 102

    Barron Best Practices Memorandum (omitted here, reproduced as attachment to Doc. 56)

    Bradbury Best Practices Memorandum .........................................JA 105

    *Permissibility of Small Business Administration Regulations Implementing the Historically Underutilized Business Zone, 8(A) Business Development, and Service-Disabled Veteran-Owned Small Business Concern Programs* (2009) .......................................................JA 111

    *The Authority of the Equal Employment Opportunity Commission To Order a Federal Agency To Pay a Monetary Award To Remedy a Breach of a Settlement Agreement* (2008)............................................JA 126

    *Payment of Back Wages to Alien Physicians Hired Under H-1B Visa Program* (2008) (omitted here, reproduced as attachment to Doc. 59)

*Authority of the Equal Employment Opportunity Commission to Impose Monetary Sanctions Against Federal Agencies for Failure to Comply With Orders Issued by EEOC Administrative Judges* (2003) (omitted here, reproduced as attachment to Doc. 59)

*Whether the Defense of Marriage Act Precludes the Nonbiological Child of a Member of a Vermont Civil Union From Qualifying for Child's Insurance Benefits Under the Social Security Act* (2007) ....... JA 141

*Application of 18 U.S.C. § 1913 to "Grass Roots" Lobbying by Union Representatives* (2005) .......................................................... JA 147

*Whether Postal Employees Are Entitled To Receive Service Credit, for Purposes of Their Retirement Annuity Under The Federal Employees' Retirement System, for Periods of Employment during which the United States Postal Service Has Not Made Its Required Employer Contributions* (2011) ............................................................ JA 157

*Responsibility of Agencies to Pay Attorney's Fee Awards Under the Equal Access to Justice Act* (2007) ......................................... JA 174

*Constitutionality of the Direct Reporting Requirement in Section 802(e)(1) of the Implementing Recommendations of the 9/11 Commission Act of 2007* (2008) ............................................. JA 189

*Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize* (2009) ................................................................... JA 210

Attachments to Joint Status Report, Doc. 27 (Jan. 23, 2018)

OLC Response Letter to Amended Complaint .............................. JA 224

*Payment of Attorney's Fees under the Equal Access to Justice Act* (1994) ........................................................................ JA 231

*Applicability of 18 U.S.C. § 1913 to the Provision of Official Time to Employee Union Representatives to Lobby Congress on Representational Issues* (2001) ............................................. JA 233

## VOLUME II

Memorandum Opinion, Doc. 40 (Sept. 11, 2020) ...................................JA 237

Order, Doc. 41 (Sept. 11, 2020) ..........................................................JA 276

Answer to Amended Complaint, Doc. 42 (Sept. 25, 2020).....................JA 277

Stipulation, Doc. 56 (July 15, 2021) ....................................................JA 290

     Barron Best Practices Memorandum ..............................................JA 298

Defendant's Statement of Material Facts Not in Dispute, Doc. 57-2
     (July 15, 2021)...........................................................................JA 304

Exhibits to Plaintiff's Cross-Motion for Summary Judgment, Doc. 59
     (Aug. 12, 2021)

     Plaintiff's Statement of Material Facts Pursuant to Local Civil
     Rule 7(h)(1)...............................................................................JA 307

     Plaintiff's Response to Defendant's Statement Pursuant to Local
     Civil Rule 7(h)(1) .....................................................................JA 315

     Declaration of Stephanie Krent...................................................JA 319

     *Opinions of Attorneys General and Decisions of Auditors* (1849) ......JA 323

     *Office and Duties of Attorney General* (1854)...............................JA 326

     *Comptroller – Solicitor of the Treasury – Attorney General* ...............JA 357

     Letter from then-Assistant Attorney General Peter Kadzik to
     Representatives Jason Chaffetz and Elijah E. Cummings ............JA 364

     *Attorney General's Remarks, Benjamin N. Cardozo School of Law,
     November 15, 1992* ..................................................................JA 375

     Letter from then-Attorney General Richard Thornburgh to
     Representative Don Edwards .......................................................JA 387

*Application of the Endangered Species Act of 1972 to the Sale of Sperm Whale Oil by the General Services Administration* (1974).......JA 397

*Whether Reservists Must Exhaust Available Leave Under 5 U.S.C. § 6323(b) Before Taking Leave Under 5 U.S.C. § 6323(a)* (2012) .......JA 406

*EEOC Authority to Order Federal Agency to Pay for Breach of Settlement Agreement* (2014) ...............................................................JA 431

*Authority of the Department of Labor to Control the Disclosure of Federal Employees' Compensation Act Records Held by the United States Postal Service* (2012) ...............................................................JA 449

*Payment of Back Wages to Alien Physicians Hired Under H-1B Visa Program* (2008) ....................................................................................JA 470

*Administrative Assessment of Civil Penalties Against Federal Agencies Under the Clean Air Act* (1997) ...........................................JA 480

*Authority of the Equal Employment Opportunity Commission to Impose Monetary Sanctions Against Federal Agencies for Failure to Comply With Orders Issued by EEOC Administrative Judges* (2003) ..................................................................................................JA 491

*Obligating Carryover Funds in Violation of OMB Zero-Dollar Apportionment Rule* (2016) ...............................................................JA 502

*Service Credit for Retirement Annuities of USPS Employees When USPS Has Not Made Required Contribution* (2011) ..........................JA 518

*Obligation of Federal Agencies to Pay Stormwater Assessments Under the Clean Water Act* (2011) .......................................................JA 542

*Disposition of Proceeds from the Sale of Government Buildings Acquired with Social Security Trust Funds* (2010).............................JA 562

*Application of the Davis-Bacon Act to Urban Development Projects that Receive Partial Federal Funding* (1987) ........................................JA 576

iv

Defendant's Response to Plaintiff's Statement of Material Facts, Doc. 62-1 (Oct. 11, 2021) ...............................................................................JA 589

Memorandum Opinion, Doc. 67 (Apr. 19, 2024) .....................................JA 602

Order, Doc. 68 (Apr. 19, 2024) .....................................................JA 623

Notice of Appeal, Doc. 70 (June 18, 2024)................................................JA 624

Notice of Cross-Appeal, Doc. 73 (June 28, 2024) .....................................JA 625

APPEAL,STAYED,TYPE I–FOIA

## U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:16–cv–01068–JMC

CAMPAIGN FOR ACCOUNTABILITY v. U.S.
DEPARTMENT OF JUSTICE
Assigned to: Judge Jia M. Cobb
Case in other court:  USCA, 24–05163
            USCA, 24–05170
Cause: 05:552 Freedom of Information Act

Date Filed: 06/08/2016
Jury Demand: None
Nature of Suit: 895 Freedom of
Information Act
Jurisdiction: U.S. Government Defendant

| Date Filed | # | Docket Text |
|---|---|---|
| 06/08/2016 | 1 | COMPLAINT against All Defendants ( Filing fee $ 400 receipt number 0090–4558969) filed by Anne Campaign for Accountability. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons, # 4 Summons)(Weismann, Anne) (Entered: 06/08/2016) |
| 06/08/2016 | 2 | LCvR 7.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by Anne Campaign for Accountability (Weismann, Anne) (Entered: 06/08/2016) |
| 06/08/2016 | | Case ASSIGNED to Judge Ketanji Brown Jackson. (dr) (Entered: 06/08/2016) |
| 06/08/2016 | 3 | SUMMONS (3) Issued Electronically as to U.S. DEPARTMENT OF JUSTICE (U.S. Attorney and U.S. Attorney General) (Attachment: # 1 Consent Forms)(dr) (Entered: 06/08/2016) |
| 06/13/2016 | 4 | GENERAL ORDER AND GUIDELINES FOR CIVIL CASES BEFORE JUDGE KETANJI BROWN JACKSON. The Court will hold the parties and counsel responsible for following these directives, and parties and counsel should pay particular attention to the Courts instructions for briefing motions. Failure to adhere to this Order may, when appropriate, result the imposition of sanctions and/or sua sponte denial of non–conforming motions. Signed by Judge Ketanji Brown Jackson on 6/13/2016. (lckbj1) (Entered: 06/13/2016) |
| 06/22/2016 | 5 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 6–10–2016. (Weismann, Anne) (Entered: 06/22/2016) |
| 06/22/2016 | 6 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. U.S. DEPARTMENT OF JUSTICE served on 6/22/2016 (Weismann, Anne) Modified party served on 6/23/2016 (znmw). (Entered: 06/22/2016) |
| 06/22/2016 | 7 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 6/14/2016. Answer due for ALL FEDERAL DEFENDANTS by 7/14/2016. (Weismann, Anne) Modified dates on 6/23/2016 (znmw). (Entered: 06/22/2016) |
| 06/23/2016 | | Set/Reset Deadlines: Answer due by 7/14/2016, (znmw) (Entered: 06/23/2016) |
| 07/11/2016 | 8 | Joint MOTION for Extension of Time to *Respond to Complaint, and for Entry of Briefing Schedule* by U.S. DEPARTMENT OF JUSTICE (Attachments: # 1 Text of Proposed Order)(Schwei, Daniel) (Entered: 07/11/2016) |
| 07/13/2016 | | MINUTE ORDER granting, for good cause shown, 8 Joint Motion for Extension of Time to Respond to Complaint, and for Entry of Briefing Schedule. Defendant shall file its motion to dismiss on or before 7/21/2016. Plaintiff's reply to the motion to dismiss is due on or before 8/15/2016. Defendant's reply in further support if its motion to dismiss is due on or before 9/1/2016. Signed by Judge Ketanji Brown Jackson on 07/13/2016. (lckbj1) (Entered: 07/13/2016) |
| 07/21/2016 | 9 | MOTION to Dismiss by U.S. DEPARTMENT OF JUSTICE (Attachments: # 1 Memorandum in Support, # 2 Appendix Index of Exhibits, # 3 Exhibit 1 – Letter from |

JA 1

| | | |
|---|---|---|
| | | CFA to OLC, # 4 Exhibit 2 – Response Letter from OLC to CFA, # 5 Exhibit 3 – OLC Best Practices Memo, # 6 Text of Proposed Order)(Schwei, Daniel) (Entered: 07/21/2016) |
| 08/09/2016 | 10 | Unopposed MOTION for Extension of Time to File Response/Reply as to 9 MOTION to Dismiss by CAMPAIGN FOR ACCOUNTABILITY (Attachments: # 1 Text of Proposed Order)(Weismann, Anne) (Entered: 08/09/2016) |
| 08/11/2016 | | MINUTE ORDER granting, for good cause shown, 10 Consent Motion for Extension of Time to File Response and Reply re 9 Motion to Dismiss. Plaintiff's response to 9 is due on or before by 8/22/2016; Defendant's reply re 9 is due on or before 9/8/2016. Signed by Judge Ketanji Brown Jackson on 08/11/2016. (lckbj1) (Entered: 08/11/2016) |
| 08/22/2016 | 11 | Memorandum in opposition to re 9 MOTION to Dismiss filed by CAMPAIGN FOR ACCOUNTABILITY. (Attachments: # 1 Text of Proposed Order)(Weismann, Anne) (Entered: 08/22/2016) |
| 09/08/2016 | 12 | REPLY to opposition to motion re 9 MOTION to Dismiss filed by U.S. DEPARTMENT OF JUSTICE. (Schwei, Daniel) (Entered: 09/08/2016) |
| 11/07/2016 | | MINUTE ORDER. In light of Plaintiff's representation that the D.C. Circuit's resolution of Citizens for Responsibility and Ethics in Washington v. U.S. Department of Justice (D.C. Cir. No. 16–5110) might require dismissal of the instant lawsuit, it is hereby ORDERED that this case is STAYED until further Order of this Court. It is FURTHER ORDERED that the parties shall file a joint status report, no later than 30 days after the D.C. Circuit issues its mandate in Citizens for Responsibility and Ethics in Washington v. U.S. Department of Justice (D.C. Cir. No. 16–5110), describing the parties' respective views regarding any impact of that decision on this case. Signed by Judge Ketanji Brown Jackson on November 7, 2016. (lckbj2) (Entered: 11/07/2016) |
| 03/08/2017 | 13 | NOTICE of Appearance by Scott Allan Hodes on behalf of CAMPAIGN FOR ACCOUNTABILITY (Hodes, Scott) (Entered: 03/08/2017) |
| 03/08/2017 | 14 | NOTICE OF WITHDRAWAL OF APPEARANCE as to CAMPAIGN FOR ACCOUNTABILITY. Attorney Anne L. Weismann terminated. (Weismann, Anne) (Entered: 03/08/2017) |
| 04/26/2017 | 15 | Joint STATUS REPORT by U.S. DEPARTMENT OF JUSTICE. (Schwei, Daniel) (Entered: 04/26/2017) |
| 05/02/2017 | | ORDER LIFTING STAY and setting a hearing on Defendant's 9 Motion to Dismiss for July 18, 2017 at 10:30 AM in Courtroom 17 before Judge Ketanji Brown Jackson. Signed by Judge Ketanji Brown Jackson on May 2, 2017. (lckbj2) (Entered: 05/02/2017) |
| 06/20/2017 | 16 | NOTICE of Appearance by Jameel Jaffer on behalf of All Plaintiffs (Jaffer, Jameel) (Entered: 06/20/2017) |
| 06/20/2017 | 17 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Alex Abdo, :Firm– Knight First Amendment Institute at Columbia University, :Address– 535 West 116th Street, 314 Low Library, New York, NY 10027. Phone No. – 2128549600. Fax No. – 2128547997 Filing fee $ 100, receipt number 0090–4998929. Fee Status: Fee Paid. by CAMPAIGN FOR ACCOUNTABILITY (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Jaffer, Jameel) (Entered: 06/20/2017) |
| 06/20/2017 | | MINUTE ORDER granting 17 Motion for Leave to Appear Pro Hac Vice. It is hereby ORDERED that Alex Abdo is admitted pro hac vice in this matter as counsel for Plaintiff. Signed by Judge Ketanji Brown Jackson on 06/20/2017. (lckbj1) (Entered: 06/20/2017) |
| 07/18/2017 | | Minute Entry for proceedings held before Judge Ketanji Brown Jackson: Motion Hearing held on 7/18/2017, re 9 MOTION to Dismiss. Oral argument heard and motion taken under advisement. (Court Reporter: Barbara DeVico) (gdf) (Entered: 07/18/2017) |
| 09/29/2017 | 18 | ORDER granting 9 Motion to Dismiss. See attached document for details. Signed by Judge Ketanji Brown Jackson on September 29, 2017. (lckbj2) (Entered: 09/29/2017) |

| 10/06/2017 | 19 | MEMORANDUM OPINION granting 9 Motion to Dismiss. See attached document for details. Signed by Judge Ketanji Brown Jackson on October 6, 2017. (lckbj2) (Entered: 10/06/2017) |
| 10/06/2017 | 20 | ORDER. See attached document for details. Signed by Judge Ketanji Brown Jackson on October 6, 2017. (lckbj2) (Entered: 10/06/2017) |
| 10/10/2017 | 21 | TRANSCRIPT OF PROCEEDINGS before Judge Ketanji Brown Jackson held on 7–18–17; Page Numbers: 1–92. Date of Issuance:10–10–17. Court Reporter/Transcriber Barbara DeVico, Telephone number 202–354–3118, Transcripts may be ordered by submitting the <a href="http://www.dcd.uscourts.gov/node/110">Transcript Order Form</a><P></P><P></P>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, PDF or ASCII) may be purchased from the court reporter.<P>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<P></P> Redaction Request due 10/31/2017. Redacted Transcript Deadline set for 11/10/2017. Release of Transcript Restriction set for 1/8/2018.(DeVico, Barbara) (Entered: 10/10/2017) |
| 10/27/2017 | 22 | AMENDED COMPLAINT against U.S. DEPARTMENT OF JUSTICE filed by CAMPAIGN FOR ACCOUNTABILITY. (Attachments: # 1 Exhibit Index of Exhibits, # 2 Exhibit Exhibit A – CfA Request (3/22/16), # 3 Exhibit Exhibit B – OLC Response (5/26/2016), # 4 Exhibit Exhibit C – Barron Best Practices Memo (7/16/10), # 5 Exhibit Exhibit D – Bradbury Best Practices Memo (5/16/05), # 6 Exhibit Exhibit E – OLC Opn (SBA Regulations), # 7 Exhibit Exhibit F – OLC Opn (EEOC Monetary Award), # 8 Exhibit Exhibit G – OLC Opn (Back Wages), # 9 Exhibit Exhibit H – OLC Opn (EEOC Monetary Sanctions), # 10 Exhibit Exhibit I – OLC Opn (DOMA and SSA), # 11 Exhibit Exhibit J – OLC Opn (Lobbying), # 12 Exhibit Exhibit K – OLC Opn (USPS v OPM), # 13 Exhibit Exhibit L – OLC Opn (EAJA Fees), # 14 Exhibit Exhibit M – OLC Opn (Direct Reporting), # 15 Exhibit Exhibit N – OLC Opn (Emoluments))(Abdo, Alexander) (Entered: 10/27/2017) |
| 11/15/2017 | 23 | MOTION to Stay re 22 Amended Complaint,,, *Pending Submission and Exhaustion of a FOIA Request* by U.S. DEPARTMENT OF JUSTICE (Attachments: # 1 Exhibit 1 – Meet and Confer Correspondence, # 2 Text of Proposed Order)(Schwei, Daniel) (Entered: 11/15/2017) |
| 11/16/2017 | 24 | Memorandum in opposition to re 23 MOTION to Stay re 22 Amended Complaint,,, *Pending Submission and Exhaustion of a FOIA Request* filed by CAMPAIGN FOR ACCOUNTABILITY. (Abdo, Alexander) (Entered: 11/16/2017) |
| 11/17/2017 | 25 | REPLY to opposition to motion re 23 MOTION to Stay re 22 Amended Complaint,,, *Pending Submission and Exhaustion of a FOIA Request* filed by U.S. DEPARTMENT OF JUSTICE. (Schwei, Daniel) (Entered: 11/17/2017) |
| 12/01/2017 | | Case reopened. Signed by Judge Ketanji Brown Jackson on 12/1/2017. (lckbj1) (Entered: 12/01/2017) |
| 12/01/2017 | 26 | ORDER granting in part and denying in part 23 Motion to Stay. Signed by Judge Ketanji Brown Jackson on 12/1/2017. (lckbj2) (Entered: 12/01/2017) |
| 12/04/2017 | | Set/Reset Deadlines: Joint Proposed Schedule due by 1/23/2018. (gdf) (Entered: 12/04/2017) |
| 01/23/2018 | 27 | Joint STATUS REPORT by CAMPAIGN FOR ACCOUNTABILITY. (Attachments: # 1 OLC Response Letter, # 2 OLC Response Enclosures)(Abdo, Alexander) (Entered: 01/23/2018) |
| 01/29/2018 | | MINUTE ORDER order adopting the parties' proposed briefing schedule. It is hereby ORDERED that Defendant's motion to dismiss is due on or before 2/13/2018; Plaintiff's opposition is due on or before 3/6/2018; and Defendant's reply is due on or before 3/20/2018. Signed by Judge Ketanji Brown Jackson on 1/29/2018. (lckbj1) |

JA 3

| | | |
|---|---|---|
| | | (Entered: 01/29/2018) |
| 01/31/2018 | 28 | NOTICE of Change of Address by Alexander Abraham Abdo (Abdo, Alexander) (Entered: 01/31/2018) |
| 02/13/2018 | 29 | Renewed MOTION to Dismiss *Amended Complaint* by U.S. DEPARTMENT OF JUSTICE (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Schwei, Daniel) (Entered: 02/13/2018) |
| 03/06/2018 | 30 | Memorandum in opposition to re 29 Renewed MOTION to Dismiss *Amended Complaint* filed by CAMPAIGN FOR ACCOUNTABILITY. (Attachments: # 1 Ex. A – Kadzik Letter)(Abdo, Alexander) (Entered: 03/06/2018) |
| 03/20/2018 | 31 | REPLY to opposition to motion re 29 Renewed MOTION to Dismiss *Amended Complaint* filed by U.S. DEPARTMENT OF JUSTICE. (Schwei, Daniel) (Entered: 03/20/2018) |
| 04/11/2018 | | MINUTE ORDER setting a motion hearing on 29 Defendant's Renewed Motion to Dismiss on 7/3/2018 at 10:00 AM in Courtroom 17 before Judge Ketanji Brown Jackson. Signed by Judge Ketanji Brown Jackson on 4/11/2018. (lckbj2) (Entered: 04/11/2018) |
| 04/11/2018 | | Set/Reset Hearings: Motion Hearing set for 7/3/2018 at 10:00 AM in Courtroom 17 before Judge Ketanji Brown Jackson. (gdf) (Entered: 04/11/2018) |
| 04/12/2018 | 32 | Unopposed MOTION for Scheduling Order *(Motion to Change Hearing Date)* by CAMPAIGN FOR ACCOUNTABILITY (Attachments: # 1 Text of Proposed Order)(Abdo, Alexander) (Entered: 04/12/2018) |
| 04/12/2018 | | MINUTE ORDER granting 32 Motion for Scheduling Order. Signed by Judge Ketanji Brown Jackson on 4/12/2018. (lckbj2) (Entered: 04/12/2018) |
| 04/12/2018 | | MINUTE ORDER setting a motion hearing on 29 Defendant's Renewed Motion to Dismiss on 7/20/2018 at 10:00 AM in Courtroom 17 before Judge Ketanji Brown Jackson. Signed by Judge Ketanji Brown Jackson on 4/12/2018. (lckbj2) (Entered: 04/12/2018) |
| 05/09/2018 | | MINUTE ORDER. It is hereby ORDERED that the Motion Hearing currently set for 7/20/2018 at 10 AM is VACATED and RESET for 7/20/2018 at 10:30 AM in Courtroom 17 before Judge Ketanji Brown Jackson. Signed by Judge Ketanji Brown Jackson on 05/09/2018. (lckbj1) (Entered: 05/09/2018) |
| 07/20/2018 | | Minute Entry for proceedings held before Judge Ketanji Brown Jackson: Motion Hearing held on 7/20/2018, re 29 Renewed MOTION to Dismiss *Amended Complaint*. *Oral argument heard and motion taken under advisement. (Court Reporter: Crystal Pilgrim) (gdf) (Entered: 07/20/2018)* |
| 12/28/2018 | 33 | TRANSCRIPT OF PROCEEDINGS before Judge Ketanji Brown Jackson held on 07/20/2018; Page Numbers: 1–82. Date of Issuance:12/28/18. Court Reporter/Transcriber Crystal M. Pilgrim, Telephone number 202.354.3127, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referen ced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 1/18/2019. Redacted Transcript Deadline set for 1/28/2019. Release of Transcript Restriction set for 3/28/2019.(Pilgrim, Crystal) (Entered: 12/28/2018) |

| 03/18/2019 | 34 | NOTICE OF WITHDRAWAL OF APPEARANCE as to CAMPAIGN FOR ACCOUNTABILITY. Attorney Scott Allan Hodes terminated. (Hodes, Scott) (Entered: 03/18/2019) |
|---|---|---|
| 05/07/2019 | 35 | NOTICE OF SUPPLEMENTAL AUTHORITY by U.S. DEPARTMENT OF JUSTICE (Schwei, Daniel) (Entered: 05/07/2019) |
| 05/10/2019 | 36 | RESPONSE re 35 NOTICE OF SUPPLEMENTAL AUTHORITY filed by CAMPAIGN FOR ACCOUNTABILITY. (Abdo, Alexander) (Entered: 05/10/2019) |
| 04/30/2020 | 37 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Anna Diakun, Filing fee $ 100, receipt number ADCDC–7075967. Fee Status: Fee Paid. by CAMPAIGN FOR ACCOUNTABILITY (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Jaffer, Jameel) (Entered: 04/30/2020) |
| 05/04/2020 | | MINUTE ORDER granting 37 Motion for Leave to Appear Pro Hac Vice. It is hereby ORDERED that Anna Diakun is admitted pro hac vice in this matter as counsel for Plaintiff. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. Signed by Judge Ketanji Brown Jackson on 5/4/2020. (jag) (Entered: 05/04/2020) |
| 05/08/2020 | 38 | NOTICE of Appearance by Anna Diakun on behalf of CAMPAIGN FOR ACCOUNTABILITY (Diakun, Anna) (Entered: 05/08/2020) |
| 05/08/2020 | 39 | NOTICE OF SUPPLEMENTAL AUTHORITY by CAMPAIGN FOR ACCOUNTABILITY (Diakun, Anna) (Entered: 05/08/2020) |
| 09/11/2020 | 40 | MEMORANDUM OPINION, granting in part and denying in part Defendant's 29 Motion to Dismiss Amended Complaint. Signed by Judge Ketanji Brown Jackson on 09/11/2020. (lckbj2) (Main Document 40 replaced on 9/14/2020) (ztnr). (Entered: 09/11/2020) |
| 09/11/2020 | 41 | ORDER, granting in part and denying in part Defendant's 29 Motion to Dismiss Amended Complaint. Signed by Judge Ketanji Brown Jackson on 09/11/2020. (lckbj2) (Entered: 09/11/2020) |
| 09/25/2020 | 42 | ANSWER to 22 Amended Complaint,,, by U.S. DEPARTMENT OF JUSTICE.(Schwei, Daniel) (Entered: 09/25/2020) |
| 11/05/2020 | | MINUTE ORDER. It is hereby ORDERED that the parties shall promptly confer and shall file a joint proposed schedule for further proceedings, if litigation is going to be necessary, on or before 11/19/2020. Signed by Judge Ketanji Brown Jackson on 11/5/2020. (jag) (Entered: 11/05/2020) |
| 11/10/2020 | 43 | NOTICE of Appearance by Brian C. Rosen–Shaud on behalf of All Defendants (Rosen–Shaud, Brian) (Entered: 11/10/2020) |
| 11/18/2020 | 44 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Stephanie Krent, Filing fee $ 100, receipt number ADCDC–7852123. Fee Status: Fee Paid. by CAMPAIGN FOR ACCOUNTABILITY (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Jaffer, Jameel) (Entered: 11/18/2020) |
| 11/18/2020 | 45 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Xiangnong Wang, Filing fee $ 100, receipt number ADCDC–7852153. Fee Status: Fee Paid. by CAMPAIGN FOR ACCOUNTABILITY (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Jaffer, Jameel) (Entered: 11/18/2020) |
| 11/19/2020 | 46 | Joint STATUS REPORT by CAMPAIGN FOR ACCOUNTABILITY. (Abdo, Alexander) (Entered: 11/19/2020) |
| 11/20/2020 | | MINUTE ORDER. In light of the representations in the parties' 46 Joint Status Report, it is hereby ORDERED that, on or before 12/3/2020, the parties shall file a further joint status report, which shall include a proposed schedule for further proceedings if litigation is going to be necessary. Signed by Judge Ketanji Brown Jackson on 11/20/2020. (jag) (Entered: 11/20/2020) |
| 11/20/2020 | | MINUTE ORDER granting 44 , 45 Motion for Leave to Appear Pro Hac Vice. It is hereby ORDERED that Stephanie Krent and Xiangnong Wang are admitted pro hac vice in this matter as counsel for Plaintiff. **Counsel should register for e–filing via** |

JA 5

| | | |
|---|---|---|
| | | **PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. Signed by Judge Ketanji Brown Jackson on 11/20/2020. (jag) (Entered: 11/20/2020) |
| 12/02/2020 | 47 | NOTICE of Appearance by Stephanie Krent on behalf of CAMPAIGN FOR ACCOUNTABILITY (Krent, Stephanie) (Entered: 12/02/2020) |
| 12/02/2020 | 48 | NOTICE of Appearance by Xiangnong Wang on behalf of CAMPAIGN FOR ACCOUNTABILITY (Wang, Xiangnong) (Entered: 12/02/2020) |
| 12/03/2020 | 49 | Joint STATUS REPORT by U.S. DEPARTMENT OF JUSTICE. (Rosen−Shaud, Brian) (Entered: 12/03/2020) |
| 12/29/2020 | | MINUTE ORDER. In light of the representations in the parties' 49 Joint Status Report, it is hereby ORDERED that, on or before 2/12/2021, the parties shall file a further joint status report, which shall include a proposed schedule for further proceedings if litigation is going to be necessary. Signed by Judge Ketanji Brown Jackson on 12/29/2020. (jag) (Entered: 12/29/2020) |
| 01/05/2021 | 50 | Consent MOTION for Extension of Time to *File Joint Status Report* by U.S. DEPARTMENT OF JUSTICE (Rosen−Shaud, Brian) (Entered: 01/05/2021) |
| 01/07/2021 | | MINUTE ORDER granting, for good cause shown, 50 Consent Motion for Extension of Time to File Joint Status Report. It is hereby ORDERED that the parties shall file their joint status report on or before 3/29/2021. Signed by Judge Ketanji Brown Jackson on 1/7/2021. (jag) (Entered: 01/07/2021) |
| 02/19/2021 | 51 | Consent MOTION for Extension of Time to *File Joint Status Report* by U.S. DEPARTMENT OF JUSTICE. (Rosen−Shaud, Brian) (Entered: 02/19/2021) |
| 03/05/2021 | | MINUTE ORDER granting, for good cause shown, 51 Consent Motion for Extension of Time to File Joint Status Report. It is hereby ORDERED that the parties shall file their status report on or before 4/5/2021. Signed by Judge Ketanji Brown Jackson on 3/5/2021. (jag) (Entered: 03/05/2021) |
| 04/05/2021 | 52 | Joint STATUS REPORT by CAMPAIGN FOR ACCOUNTABILITY. (Abdo, Alexander) (Entered: 04/05/2021) |
| 04/27/2021 | | MINUTE ORDER. In light of the representations in the parties' 52 Joint Status Report, it is hereby ORDERED that, on or before 5/24/2021, the parties shall file further joint status report, which shall contain a proposed schedule for further proceedings if litigation is going to be necessary. Signed by Judge Ketanji Brown Jackson on 4/27/2021. (jag) Modified on 4/27/2021 (jag, ). (Entered: 04/27/2021) |
| 05/24/2021 | 53 | Joint STATUS REPORT by CAMPAIGN FOR ACCOUNTABILITY. (Abdo, Alexander) (Entered: 05/24/2021) |
| 06/17/2021 | | MINUTE ORDER adopting the parties' proposed briefing schedule: Defendant shall file its motion for summary judgment on or before 7/9/2021; Plaintiff shall file its opposition and cross−motion for summary judgment on or before 8/6/2021; Defendant shall file its reply and cross−motion opposition on or before 9/2/2021; and Plaintiff shall file its cross−motion reply on or before 9/22/2021. Signed by Judge Ketanji Brown Jackson on 6/17/2021. (jag) (Entered: 06/17/2021) |
| 06/28/2021 | | Judge Ketanji Brown Jackson has been elevated to serve on the U.S. Court of Appeals for the D.C. Circuit. She is therefore no longer assigned to this case, and this matter has been reassigned to the Calendar Committee, which will oversee it until it is assigned to another district judge. Any questions should be directed to Judge Jackson's former deputy clerk, Gwendolyn Franklin, at 202−354−3145 or gwen_franklin@dcd.uscourts.gov. (rj) (Entered: 06/28/2021) |
| 07/08/2021 | 54 | Unopposed MOTION for Extension of Time to File *Motions for Summary Judgment* by U.S. DEPARTMENT OF JUSTICE. (Rosen−Shaud, Brian) (Entered: 07/08/2021) |
| 07/09/2021 | | MINUTE ORDER granting 54 Defendant's Unopposed Motion for Extension of Time: It is hereby ORDERED that Defendant shall file its motion for summary judgment on or before July 15, 2021; Plaintiff shall file its opposition and cross−motion for summary judgment on or before August 12, 2021; Defendant shall file its reply and cross−opposition on or before September 2, 2021; and Plaintiff shall file its |

| | | |
|---|---|---|
| | | cross–reply on or before September 22, 2021. SO ORDERED. Signed by Judge Rudolph Contreras on 7/9/2021. (lcrc1) (Entered: 07/09/2021) |
| 07/12/2021 | | Set/Reset Deadlines: Cross Motions due by 8/12/2021. Response to Cross Motions due by 9/2/2021. Reply to Cross Motions due by 9/22/2021. Summary Judgment motions due by 7/15/2021. Response to Motion for Summary Judgment due by 8/12/2021. Reply to Motion for Summary Judgment due by 9/2/2021. (zgdf) (Entered: 07/12/2021) |
| 07/15/2021 | 55 | ENTERED IN ERROR.....STIPULATION by U.S. DEPARTMENT OF JUSTICE. (Attachments: # 1 Exhibit A – Best Practices Memo)(Rosen–Shaud, Brian) Modified on 7/15/2021 (zjf). (Entered: 07/15/2021) |
| 07/15/2021 | | NOTICE OF CORRECTED DOCKET ENTRY: Document No. re 55 Stipulation was entered in error and counsel was instructed to refile said pleading with signature page. (zjf) (Entered: 07/15/2021) |
| 07/15/2021 | 56 | STIPULATION by U.S. DEPARTMENT OF JUSTICE. (Attachments: # 1 Exhibit A – Best Practices Memo)(Rosen–Shaud, Brian) (Entered: 07/15/2021) |
| 07/15/2021 | 57 | MOTION for Summary Judgment by U.S. DEPARTMENT OF JUSTICE. (Attachments: # 1 Memorandum in Support, # 2 Statement of Facts, # 3 Text of Proposed Order)(Rosen–Shaud, Brian) (Entered: 07/15/2021) |
| 08/05/2021 | 58 | NOTICE OF WITHDRAWAL OF APPEARANCE as to CAMPAIGN FOR ACCOUNTABILITY. Attorney Xiangnong Wang terminated. (Wang, Xiangnong) (Entered: 08/05/2021) |
| 08/12/2021 | 59 | Cross MOTION for Summary Judgment by CAMPAIGN FOR ACCOUNTABILITY. (Attachments: # 1 Memorandum in Support, # 2 Statement of Facts, # 3 Response to Defendant's Rule 7(h)(1) Statement, # 4 Text of Proposed Order, # 5 Declaration of Stephanie Krent, # 6 Exhibit 1, # 7 Exhibit 2, # 8 Exhibit 3, # 9 Exhibit 4, # 10 Exhibit 5, # 11 Exhibit 6, # 12 Exhibit 7, # 13 Exhibit 8, # 14 Exhibit 9, # 15 Exhibit 10, # 16 Exhibit 11, # 17 Exhibit 12, # 18 Exhibit 13, # 19 Exhibit 14, # 20 Exhibit 15, # 21 Exhibit 16, # 22 Exhibit 17, # 23 Exhibit 18)(Abdo, Alexander) Modified on 8/13/2021 (zjf). (Entered: 08/12/2021) |
| 08/12/2021 | 60 | Memorandum in opposition to re 57 MOTION for Summary Judgment filed by CAMPAIGN FOR ACCOUNTABILITY. (Attachments: # 1 Statement of Facts, # 2 Response to Defendant's Rule 7(h)(1) Statement, # 3 Text of Proposed Order, # 4 Declaration of Stephanie Krent, # 5 Exhibit 1, # 6 Exhibit 2, # 7 Exhibit 3, # 8 Exhibit 4, # 9 Exhibit 5, # 10 Exhibit 6, # 11 Exhibit 7, # 12 Exhibit 8, # 13 Exhibit 9, # 14 Exhibit 10, # 15 Exhibit 11, # 16 Exhibit 12, # 17 Exhibit 13, # 18 Exhibit 14, # 19 Exhibit 15, # 20 Exhibit 16, # 21 Exhibit 17, # 22 Exhibit 18)(Abdo, Alexander) (Entered: 08/12/2021) |
| 08/27/2021 | 61 | Consent MOTION for Extension of Time to File Response/Reply as to 57 MOTION for Summary Judgment , 59 Cross MOTION for Summary Judgment by U.S. DEPARTMENT OF JUSTICE. (Attachments: # 1 Text of Proposed Order)(Rosen–Shaud, Brian) (Entered: 08/27/2021) |
| 08/30/2021 | | MINUTE ORDER: granting 61 Defendant's Consent Motion for Extension of Deadlines. It is hereby ORDERED that Defendant shall file its combined opposition and reply by October 11, 2021, and Plaintiff shall file its reply by November 8, 2021. SO ORDERED. Signed by Judge Rudolph Contreras on 8/30/2021. (lcrc2) (Entered: 08/30/2021) |
| 08/30/2021 | | Set/Reset Deadlines: Reply to Motion for Summary Judgment and Response to Cross Motion due by 10/11/2021. Reply to Cross Motion due by 11/8/2021. (zgdf) (Entered: 08/30/2021) |
| 10/11/2021 | 62 | Memorandum in opposition to re 59 Cross MOTION for Summary Judgment filed by U.S. DEPARTMENT OF JUSTICE. (Attachments: # 1 Response to Plaintiff's Rule 7(h)(1) Statement)(Rosen–Shaud, Brian) (Entered: 10/11/2021) |
| 10/11/2021 | 63 | REPLY to opposition to motion re 57 MOTION for Summary Judgment filed by U.S. DEPARTMENT OF JUSTICE. (Attachments: # 1 Response to Plaintiff's Rule 7(h)(1) Statement)(Rosen–Shaud, Brian) (Entered: 10/11/2021) |

| 11/08/2021 | 64 | REPLY to opposition to motion re 59 Cross MOTION for Summary Judgment filed by CAMPAIGN FOR ACCOUNTABILITY. (Abdo, Alexander) (Entered: 11/08/2021) |
| 11/15/2021 | | Case directly reassigned to Judge Jia M. Cobb. Judge Ketanji Brown Jackson has been appointed to the D.C. Circuit and is no longer assigned to the case. (rj) (Entered: 11/15/2021) |
| 09/30/2022 | 65 | ENTERED IN ERROR.....Joint STATUS REPORT by U.S. DEPARTMENT OF JUSTICE. (Rosen−Shaud, Brian) Modified on 9/30/2022 (zed). (Entered: 09/30/2022) |
| 09/30/2022 | | NOTICE OF ERROR regarding 65 Status Report. The following error(s) need correction: Incorrect document or case. Please refile. (zed) (Entered: 09/30/2022) |
| 01/11/2023 | 66 | MOTION to Set a Date for Oral Argument by CAMPAIGN FOR ACCOUNTABILITY. (Attachments: # 1 Text of Proposed Order)(Krent, Stephanie) (Entered: 01/11/2023) |
| 02/14/2023 | | MINUTE ORDER. The Parties are ORDERED to appear for a status conference on March 16, 2023, at 2:00 PM. The meeting will be on the record and conducted via Zoom. The Court's Deputy Clerk will contact the Parties with the information necessary to access the call. Signed by Judge Jia M. Cobb on February 14, 2023. (lcjmc3) (Entered: 02/14/2023) |
| 03/13/2023 | | MINUTE ORDER re 66 Motion to Set a Date for Oral Argument: The Court has now had an opportunity to review the briefing in this case and has determined that an oral argument is not necessary to resolve the case. Accordingly, the Court DENIES the Motion to Set a Date for Oral Argument and VACATES the Status Conference that had been scheduled for March 16, 2023, at 2:00 PM. The Court will work expeditiously to resolve the pending summary judgment motions. Signed by Judge Jia M. Cobb on March 13, 2023. (lcjmc3) (Entered: 03/13/2023) |
| 04/19/2024 | 67 | MEMORANDUM OPINION re 57 Motion for Summary Judgment and 59 Cross Motion for Summary Judgment: See document for details. Signed by Judge Jia M. Cobb on April 19, 2024. (lcjmc3) (Entered: 04/19/2024) |
| 04/19/2024 | 68 | ORDER denying 57 Motion for Summary Judgment; granting 59 Cross Motion for Summary Judgment: See document for details. Signed by Judge Jia M. Cobb on April 19, 2024. (lcjmc3) (Entered: 04/19/2024) |
| 04/30/2024 | 69 | Joint STATUS REPORT by U.S. DEPARTMENT OF JUSTICE. (Rosen−Shaud, Brian) (Entered: 04/30/2024) |
| 05/02/2024 | | MINUTE ORDER: In light of the joint status report 69 , the Court ORDERS the Parties to submit a joint status report by June 20, 2024, with a proposed schedule for further proceedings, including the release of responsive records. Signed by Judge Jia M. Cobb on May 2, 2024. (lcjmc3) (Entered: 05/02/2024) |
| 06/18/2024 | 70 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 68 Order on Motion for Summary Judgment,, Set/Reset Deadlines by U.S. DEPARTMENT OF JUSTICE. Fee Status: No Fee Paid. Parties have been notified. (Rosen−Shaud, Brian) (Entered: 06/18/2024) |
| 06/20/2024 | 71 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 70 Notice of Appeal to DC Circuit Court. (znmw) (Entered: 06/20/2024) |
| 06/20/2024 | | USCA Case Number 24−5163 for 70 Notice of Appeal to DC Circuit Court filed by U.S. DEPARTMENT OF JUSTICE. (znmw) (Entered: 06/20/2024) |
| 06/20/2024 | 72 | Joint STATUS REPORT by U.S. DEPARTMENT OF JUSTICE. (Rosen−Shaud, Brian) (Entered: 06/20/2024) |
| 06/28/2024 | 73 | NOTICE OF CROSS APPEAL as to 18 Order on Motion to Dismiss, 41 Order on Motion to Dismiss, 40 Memorandum & Opinion by CAMPAIGN FOR ACCOUNTABILITY. Filing fee $ 605, receipt number ADCDC−10993884. Fee Status: Fee Paid. Parties have been notified. (Abdo, Alexander) (Entered: 06/28/2024) |

JA 8

| 07/02/2024 | | MINUTE ORDER STAYING CASE: The Court has reviewed the Parties' joint status report 72 . At the Parties' request, this case is STAYED pending the D.C. Circuit's resolution of the appeal, ECF 70, and cross appeal, ECF 73. The Parties are ORDERED to submit a joint status report 14 days after the conclusion of appellate proceedings. Signed by Judge Jia M. Cobb on July 2, 2024. (lcjmc3) (Entered: 07/02/2024) |
|---|---|---|
| 07/03/2024 | 74 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re 73 Notice of Cross Appeal,. (zdp) (Entered: 07/03/2024) |
| 07/05/2024 | | USCA Case Number 24–5170 for 73 Notice of Cross Appeal, filed by CAMPAIGN FOR ACCOUNTABILITY. (znmw) (Entered: 07/08/2024) |
| 08/05/2024 | 75 | NOTICE OF WITHDRAWAL OF APPEARANCE as to U.S. DEPARTMENT OF JUSTICE. Attorney Brian C. Rosen–Shaud terminated. (Rosen–Shaud, Brian) (Entered: 08/05/2024) |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CAMPAIGN FOR ACCOUNTABILITY            )
1201 Connecticut Avenue, N.W.          )
Suite 300                              )
Washington, D.C. 20036                 )
                                       )
            Plaintiff,                 )
                                       )
      v.                               )      Civil Action No.
                                       )
U.S. DEPARTMENT OF JUSTICE             )
950 Pennsylvania Avenue, N.W.          )
Washington, D.C. 20530                 )
                                       )
            Defendant.                 )
_____)

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

1. This is an action under the Freedom of Information Act ("FOIA") challenging

the failure of the U.S. Department of Justice ("DOJ") to comply with its mandatory, non-

discretionary duty under 5 U.S.C. § 552(a), to make publicly available on an ongoing

basis opinions of the Office of Legal Counsel ("OLC") that are statements of policy and

interpretations that have been adopted by the executive branch, final opinions issued by

OLC in the adjudication of disputes involving executive branch agencies, and to provide

an index of such opinions.

2. Through an OLC memorandum, public statements, and written statements filed

in civil litigation before a court in this district, OLC has acknowledged its core function is

to provide controlling legal interpretations to executive branch officials on questions of

law that are centrally important to the functioning of the federal government. Yet despite

this acknowledgement and the mandate of 5 U.S.C. § 552(a), OLC has adopted an official

**JA 10**

policy of making case-by-case individualized decisions about which of its binding,
precedential opinions will be made publicly available based on factors of its own
choosing.

## JURISDICTION AND VENUE

3. The Court has personal and subject matter jurisdiction over this action
pursuant to 28 U.S.C. § 1331, 28 U.S.C. §§ 2201 and 2202, and 5 US.C. § 552(a)(4)(B).

4. Venue lies in this district under 28 U.S.C. § 1391(e).

## PARTIES

5. Plaintiff Campaign for Accountability ("CfA") is a non-profit, non-partisan
project of a tax-exempt entity organized under § 501(c)(3) of the Internal Revenue Code.
CfA uses research, litigation and communications to expose misconduct and malfeasance
in public life. As part of its research, CfA uses government records made available to it
under public information laws as well as government records agencies have made
publicly available.

6. To fulfill this mission, CfA seeks access to OLC opinions. In a letter dated
March 22, 2016, CfA asked OLC to abide by its legal responsibilities pursuant to 5
U.S.C. § 552(a)(2) to make available for public inspection and copying on an ongoing
basis all unpublished OLC opinions that provide controlling interpretations of legal
authority to executive branch agencies and to provide an index of such opinions. CfA did
not make its request pursuant to the FOIA's provisions for requesting individual
documents, 5 U.S.C. § 552(a)(3).

7. OLC responded to this letter on May 26, 2016, making clear its continuing
position it need not comply with the statute, but instead has the discretion to make

2

individualized, case-by-case determinations. The refusal of DOJ and OLC to comply

with their statutory obligations to provide CfA and the public at large, on an ongoing

basis, with OLC opinions that fall within the contours of 5 U.S.C. § 552(a)(2) and an

index of such opinions has harmed, and continues to harm, CfA in carrying out its core

programmatic activities.

8. Specifically, CfA has suffered an informational harm by being deprived of

information the law requires DOJ to affirmatively make available to the public without

any action by CfA or any member of the public. This informational harm establishes

CfA's standing to sue to enforce the provisions of 5 U.S.C. § 552(a)(2). *See Fed.*

*Election Comm'n v. Akins*, 524 U.S. 11 (1998).

9. Defendant DOJ is an agency within the meaning of 5 U.S.C. §§ 551 and 701.

DOJ and its component OLC have possession and control of opinions issued by OLC,

and are responsible for making those records available to the public.

## STATUTORY AND REGULATORY BACKGROUND

10. Section 552(a)(2) of Title 5, which was enacted in 1946, is known as the

"reading room" requirement of the Freedom of Information Act ("FOIA"). It imposes a

number of independent, affirmative obligations on all executive branch agencies,

including the obligation to "make available for public inspection and copying" certain

designated categories of records. Those categories include, *inter alia*,

> (A) final opinions, including concurring and dissenting opinions,
> as well as orders, made in the adjudication of cases;
>
> (B) those statements of policy and interpretations which have
> been adopted by the agency and are not published in the
> Federal Register[.]

5 U.S.C. §§ 552(a)(2)(A) and (B).

3

**JA 12**

11. Section 552(a)(2)(E) of this statute imposes on agencies the additional

requirement to make publicly available:

> current indexes providing identifying information for the
> public as to any matter issued, adopted, or promulgated after
> July 4, 1967, and requested by this paragraph [which includes
> the reading room requirements] to be made available or published.

12. Under 5 U.S.C. §§ 552(a)(2)(A) and (B) agencies must make records that fall

within the enumerated categories publicly available without any action on the part of the

public, including the filing of an individual request for specified records pursuant to 5

U.S.C. § 552(a)(3).

13. OLC generates records within both of these categories based, in part, on

authority derived from the Judiciary Act of 1789. That statute charged the attorney

general with, *inter alia*,

> giv[ing] his advice and opinion upon questions of law when
> required by the President of the United States, or when
> requested by the heads of any of the departments, touching
> any matters that may concern their departments.

Judiciary Act of 1789, ch. 20, § 35, 1 Stat. 73, 93.

14. The current codification of the Judiciary Act of 1789 directs the attorney

general to render opinions when requested by heads of executive departments "on

questions of law arising in the administration of his department." 28 U.S.C. § 512.

Pursuant to 28 U.S.C. § 510, the attorney general has delegated this responsibility to

OLC.

15. Further, Article 2, Section 2 of the Constitution permits the president to

require in writing the opinions of principal officers of each executive department on any

subject relating to the duties of their respective offices.

4

16. By executive order, the president has directed agency heads to submit inter-agency disputes to the attorney general "[w]henever two or more Executive agencies are unable to resolve a legal dispute between them[.]" Exec. Order No. 12,146, § 1-501, 3 C.R.F. § 409 (1979), reprinted as amended in 28 U.S.C. § 509 (1988).

17. Current DOJ regulations define OLC's function as including the preparation of "the formal opinions of the Attorney General," 8 C.F.R. § 0.25(a), and "[r]endering opinions to the Attorney General and to the heads of the various organizational units of the Department on questions of law arising in the administration of the Department." *Id.*, at § 0.25(c).

## FACTUAL BACKGROUND

18. Then Acting Assistant Attorney General David Barron issued a memorandum on July 16, 2010, regarding the best practices for OLC legal advice and written opinions ("Best Practices Memo"). This memo describes OLC's "core function" as "provid[ing] controlling advice to Executive Branch officials on questions of law that are centrally important to the functioning of the Federal Government." Further, according to the Best Practices Memo, the opinions OLC renders in furtherance of its core function "may effectively be the final word on controlling law." This controlling advice serves as precedent for OLC and the executive branch at large under principles of *stare decisis*.

19. At an American Bar Association conference in the fall of 2014, Principal Deputy Assistant Attorney General Karl Remón Thompson – who currently heads OLC -- discussed the variety of ways in which OLC gives advice, including "writing formal opinions" as well as advice "delivered orally or in emails." He went on to characterize all these kinds of advice as "authoritative," and "binding by custom and practice in the

5

executive branch. It's the official view of the office. People are supposed to and do follow it."

20. DOJ's website confirms OLC's core function as providing "authoritative legal advice to the President and all the Executive Branch agencies." http://www.justice. gov/olc.

21. In records schedules OLC submits to the National Archives and Records Administration OLC has referred to the controlling legal advice it renders as either (1) "formal legal opinions" it issues to the president, federal agencies, executive departments, and heads of DOJ components, or (2) "informal opinions" that similarly serve as precedents and constitute a body of executive law on important matters.

22. OLC opinions have profound effects on members of the public, as they determine the lawfulness of a range of conduct from warrantless surveillance to targeted killing of Americans on foreign soil. DOJ generally does not prosecute individuals who relied on OLC opinions, regardless of whether their actions later are believed or determined to be illegal. As a result, OLC opinions confer the functional equivalent of immunity from criminal prosecution.

23. Notwithstanding OLC's public statements about the nature and impact of its decisions, OLC has refused and continues to refuse to comply with its obligations under 5 U.S.C. §§ 552(a)(2)(A), (B) and 552(a)(2)(E).

24. On March 22, 2016, Anne Weismann in her capacity as executive director of CfA wrote to Principal Deputy Assistant Attorney General Thompson requesting that OLC comply immediately with its obligations under 5 U.S.C. § 552(a) to make available for public inspection and copying on an ongoing basis all unpublished OLC opinions that

6

provide controlling legal advice to executive branch agencies and a general index of all such opinions. The letter made clear it was not a request for records under under 5 U.S.C. § 552(b)

25. Deputy Assistant Attorney General John Bies responded to CfA's request by letter dated May 26, 2016. He articulated OLC's continuing position that none of the opinions it issues are covered by the requirements of 5 U.S.C. § 552(a)(2). Rather than complying with its affirmative statutory obligation to make its decisions publicly available, Mr. Bies explained OLC makes individualized, case-by-case determinations regarding publication, exercising discretion based on factors of OLC's own choosing.

26. Mr. Bies' letter was nearly identical to a letter he sent on August 17, 2013, in response to a similar request from Ms. Weismann, then chief counsel of Citizens for Responsibility and Ethics in Washington ("CREW"). In response to DOJ's refusal to comply with its affirmative disclosure obligations under the FOIA, CREW sued DOJ under the Administrative Procedure Act ("APA"), alleging the agency had violated the Freedom of Information Act by failing to make OLC opinions publicly available.

27. In an opinion issued March 7, 2016, the district court dismissed the suit, concluding it was brought under the wrong statute: the APA, rather than the FOIA. *CREW v. U.S. Dep't of Justice*, No. 13-cv-01291, 2016 U.S. Dist. LEXIS 28497 (D.D.C. March 7, 2016). In reaching this conclusion, the court reasoned that "an action to enforce disclosure under *Section 552(a)(2) does* fall within the scope of *Section 552(a)(4)(B)*, and thus the standards of FOIA, not those of the APA, are applicable to this suit." *Id.*, at *21 (emphasis in original). CREW's appeal from this decision currently is before the D.C. Circuit.

7

28. OLC's ongoing refusal to comply with its mandatory obligations under 5

U.S.C. § 552(a) has deprived the public and CfA of valuable information and resulted in

the creation of a body of authoritative controlling secret law.

## PLAINTIFF'S CLAIMS FOR RELIEF

## COUNT ONE

### Failure to Comply With Disclosure Obligations of 5 U.S.C. § 552(a)(2)

29. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as

if fully set forth herein.

30. Section 552(a)(2) of Title 5 requires all agencies, including DOJ and its

component OLC, to make available for public inspection and copying, *inter alia*, final

opinions made in the adjudication of cases and statements of policy and interpretations

that have been adopted by the agency and not published in the Federal Register.

31. OLC issues opinions that fall within the categories of records that 5 U.S.C. §

552(a) requires be made available for public inspection and copying including, *inter alia*,

formal opinions issued pursuant to the practice and policy spelled out in the Best

Practices Memo, and other opinions that bind federal agencies.

32. Notwithstanding the clear, non-discretionary mandate set forth in 5 U.S.C. §

552(a)(2), which requires DOJ to act regardless of whether there has been a request for

specified records pursuant to 5 U.S.C. § 552(a)(3), DOJ has refused for years to make

available for public inspection and copying all final opinions made in the adjudication of

cases and statements of policy and interpretations that have been adopted by the agency.

33. As a result, CfA and the public have been deprived of information the statute

guarantees to them a right of access. This has led to the creation of a body of secret law

8

within OLC and DOJ, the precise danger Congress sought to avoid through the enactment
of 5 U.S.C. § 552(a)(2).

34. Plaintiff is therefore entitled to relief in the form of a declaratory judgment
that defendant has failed to comply with the disclosure obligations of 5 U.S.C. §
552(a)(2).

35. Plaintiff also is entitled to an injunction directing DOJ and its component,
OLC, to comply with the disclosure obligations mandated by 5 U.S.C. § 552(a)(2) by
making available for public inspection and copying, and without a specific request, all
past and future final opinions made in the adjudication of cases and statements of policy
and interpretations that have been adopted by the agency and not published in the Federal
Register. Such injunction shall specify that this includes, *inter alia*, those written
opinions issued by OLC that provide controlling advice to executive branch officials and
agencies on questions of law, whether formal or informal, those opinions that serve as
precedent within OLC and the executive branch, and those opinions that serve as
interpretive guides for the executive branch.

## COUNT TWO

### Failure to Comply With Indexing Requirement of 5 U.S.C. § 552(a)(2)(E)

36. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as
if fully set forth herein.

37. Section 552(a)(2)(E) of Title 5 imposes on agencies the additional
requirement to make publicly available current indexes providing identifying information
for the public as to any matter issued, adopted, or promulgated after July 4, 1967, and

9

requested by this paragraph [which includes the reading room requirements] to be made available or published.

38. Notwithstanding the clear, non-discretionary mandate set forth in 5 U.S.C. § 552(a)(2)(E, which requires DOJ to act regardless of whether there has been a specific request for an index, DOJ has failed for years to make available for public inspection and copying indices of all final opinions made by OLC in the adjudication of cases and statements of policy and interpretations that have been adopted by the agency.

39. As a result, CfA and the public have been deprived of information the statute guarantees them a right to access. This has led to the creation of a body of secret law within OLC and DOJ, the precise danger Congress sought to avoid through the enactment of 5 U.S.C. § 552(a)(2).

40. Plaintiff is therefore entitled to relief in the form of a declaratory judgment that defendant has failed to comply with the indexing and disclosure obligations of 5 U.S.C. § 552(a)(2)(E).

41. Plaintiff also is entitled to an injunction directing DOJ and its component, OLC, to comply with 5 U.S.C. § 552(a)(2(E) by making available for public inspection and copying, and without a specific request, indices of all past and future final opinions issued, adopted, or promulgated after July 4, 1967, made in the adjudication of cases and statements of policy and interpretations that have been adopted by the agency and not published in the Federal Register. Such injunction shall specify that this includes, *inter alia*, indices of those written opinions issued by OLC that provide controlling advice to executive branch officials and agencies on questions of law, whether formal or informal,

10

those opinions that serve as precedent within OLC and the executive branch, and those opinions that serve as interpretive guides for the executive branch.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that the Court:

(1) Declare that defendant has failed to comply with the disclosure obligations of 5 U.S.C. § 552(a)(2) by refusing to make available for public inspection and copying all final opinions made in the adjudication of cases and statements of policy and interpretations that have been adopted by the agency;

(2) Order defendant to make available for public inspection and copying all final opinions made in the adjudication of cases and statements of policy and interpretations that have been adopted by the agency;

(3) Order defendant to make available for public inspection and copying all opinions issued by OLC that provide controlling advice to executive branch officials on questions of law that are centrally important to the functioning of the federal government;

(4) Order defendant to make available for public inspection and copying all opinions issued by OLC that serve as precedent either within the OLC or within the executive branch, whether or not they are formal or informal opinions;

(5) Declare that defendant has failed to comply with the disclosure obligations of 5 U.S.C. § 552(a)(2)(e) by refusing to make available for public inspection and copying indices of all final opinions made in the adjudication of cases and statements of policy and interpretations that have been adopted by the agency;

(6) Order defendant to make available for public inspection and copying indices of all final opinions made in the adjudication of cases and statements of policy and

11

**JA 20**

interpretations that have been adopted by the agency as to any matter issued, adopted, or

promulgated after July 4, 1967;

(7) Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Anne L. Weismann
D.C. Bar No. 298190
Campaign for Accountability
1201 Connecticut Avenue, N.W., Suite 300
Washington, D.C.  20036
(202) 780-5750
aweismann@campaignforaccountability.org

Dated: June 8, 2016          Counsel for Plaintiff

12

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | ) | |
| CAMPAIGN FOR | ) | |
| ACCOUNTABILITY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 16-cv-1068 (KBJ) |
| | ) | |
| U.S. DEPARTMENT OF JUSTICE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>ORDER</u>

This Court has considered Defendant's Motion to Dismiss (ECF No. 9), the

memoranda of law that the parties submitted with respect to that motion, (*see* ECF Nos.

9-1, 11, 12), the Joint Status Report that the parties filed following the D.C. Circuit's

decision in *Citizens for Responsibility and Ethics in Washington v. Department of*

*Justice*, 846 F.3d 1235 (D.C. Cir. 2017) (*see* ECF No. 15), and the parties' arguments at

the Court's motion hearing of July 18, 2017.  The Court has reached the following

conclusion regarding the disposition of Defendant's motion; its reasoning will be set

forth in a Memorandum Opinion to be issued shortly, absent unforeseen circumstances.

It is hereby

**ORDERED** that Defendant's Motion to Dismiss (ECF No. 9) is **GRANTED**, and

that Plaintiff's Complaint (ECF No. 1) is **DISMISSED** without prejudice.  The Court

will permit Plaintiff to file an amended complaint, if it chooses to do so, to attempt to

cure the deficiencies that the Court will explain in its Memorandum Opinion.  The

Court will issue a separate Order, contemporaneously with issuing its Memorandum

**JA 22**

Opinion, that sets a deadline for Plaintiff to file any amended complaint.  Should

Plaintiff fail to file an amended complaint on or before that date, then, on that date, the

case will stand dismissed.

This is not a final, appealable order.  *See Ciralsky v. CIA*, 355 F.3d 661, 666–67

& n.1 (D.C. Cir. 2004).


DATE:  September 29, 2017                          *Ketanji Brown Jackson*
                                                  KETANJI BROWN JACKSON
                                                  United States District Judge

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CAMPAIGN FOR ACCOUNTABILITY, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 16-cv-1068 (KBJ) |
| U.S. DEPARTMENT OF JUSTICE, | ) ) ) | |
| Defendant. | ) ) ) | |

## MEMORANDUM OPINION

This lawsuit arises under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, but it is not the familiar sort of FOIA lawsuit that challenges an agency's failure to produce records in response to a specific request from the plaintiff.  Rather, plaintiff Campaign for Accountability ("CfA") seeks an order requiring the Department of Justice's Office of Legal Counsel ("OLC") to comply with its obligation to make certain records available *affirmatively*, without the need for a prior request, pursuant to the FOIA's seldom-litigated 'reading-room' provision, 5 U.S.C. § 552(a)(2).  CfA alleges that the legal opinions that OLC provides on behalf of the Attorney General to various officials in the Executive Branch are subject to the reading-room provision either because OLC's legal advice documents are "final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases[,]" *id.* § 552(a)(2)(A), or because they qualify as "statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register[,]" *id.* § 552(a)(2)(B).  (*See* Compl., ECF No. 1, ¶ 31.)  OLC has already made

**JA 24**

many of its opinions (more than 1,300 of them) available to the public on its website; however, in the instant lawsuit, CfA seeks an order requiring OLC to make available *all* of its opinions that have precedential effect within the Executive Branch, as well as an index of those opinions.  (*See id.* ¶ 35.)

Before this Court at present is the government's motion to dismiss CfA's complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (*See* Mem. in Supp. of Def.'s Mot. to Dismiss ("Mot."), ECF No. 9-1.)  In its motion, the government argues that this Court lacks subject matter jurisdiction to entertain CfA's complaint because it seeks a type of relief that is beyond the scope of what the FOIA's remedial provision authorizes.  (*See id.* at 19–23 (discussing 5 U.S.C. § 552(a)(4)(B)).)[1] The government also takes various doctrinal tacks under both Rule 12(b)(1) and Rule 12(b)(6) to press the argument that CfA's claim is too broad and abstract for judicial resolution.  Specifically, the government asserts that the FOIA's remedial provision does not authorize broad injunctions that are not tethered to specific documents (*see id.* at 19–21); that FOIA claims that are not presented in a concrete factual setting are constitutionally unripe (*see id.* at 23–27); and that CfA's allegations fail to state a claim upon which relief can be granted, because OLC opinions are not plausibly subject to the reading-room requirement, at least at the level of generality that CfA's complaint identifies them (*see id.* at 29–31).  In this regard, the government's motion—and indeed, CfA's complaint itself—raises novel questions regarding how a plaintiff who seeks to enforce the FOIA's reading-room provision must present its claims.

---

[1] Page-number citations to the documents that the parties have filed refer to the page numbers that the Court's electronic filing system automatically assigns.

JA 25

On September 29, 2017, this Court issued an order that **GRANTED** the government's motion to dismiss, and **DISMISSED** CfA's complaint.  (*See* ECF No. 18.) The instant Memorandum Opinion explains the reasons for that order.  In short, having considered the parties' arguments, and in light of the D.C. Circuit's recent decision in *Citizens for Responsibility and Ethics in Washington v. Department of Justice* (*CREW*), 846 F.3d 1235 (D.C. Cir. 2017), this Court concludes that it does have subject matter jurisdiction to award the type of broad, prospective injunction that CfA seeks, even if the Court can only require that the requested records be produced to CfA rather than made available to the public.  However, in this Court's view, CfA has not identified an ascertainable set of OLC opinions that OLC has withheld from the public and that is also plausibly subject to the FOIA's reading-room requirement.  Accordingly, and for the reasons explained fully below, the Court agrees with the government that CfA's complaint must be dismissed because it fails to state a claim upon which relief can be granted.  The Court will permit CfA to file an amended complaint, if it chooses to do so, as provided in the Order that accompanies this Memorandum Opinion.

## I.      BACKGROUND

Because this case presents the question of whether OLC must make its legal opinions available for public inspection pursuant to the FOIA's reading-room provision, the statutory framework that informs the Court's analysis of that provision appears below.  Following that recitation is a description of the role of OLC opinions within the Executive Branch, and an account of the various efforts—both by Plaintiff and by another similar organization, Citizens for Responsibility and Ethics in Washington ("CREW")—to compel OLC to make its opinions available to the public.

**JA 26**

A.        **Statutory Framework**

Under the FOIA, this Court "has jurisdiction to enjoin [an] agency from withholding agency records and to order the production of records improperly withheld from the complainant."  5 U.S.C. § 552(a)(4)(B).  A FOIA complaint that seeks judicial review of an agency's withholding of records can allege that the government's withholding violates any one of the statute's three disclosure requirements—sections 552(a)(1), (a)(2), or (a)(3).  *See Kennecott Utah Copper Corp. v. U.S. Dep't of the Interior*, 88 F.3d 1191, 1202 (D.C. Cir. 1996).  The vast majority of FOIA lawsuits arise under section 552(a)(3)(A), which mandates that "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person."  5 U.S.C. § 552(a)(3).  The D.C. Circuit has referred to (a)(3) as the FOIA's "reactive" disclosure provision, because it requires an agency to produce records only "in response to specific requests."  *CREW*, 846 F.3d at 1240.

A FOIA lawsuit may also accuse an agency of violating either one of the statute's "two distinct affirmative disclosure obligations[,]" *id.*, which, unlike section 552(a)(3), require agencies to act *proactively* with respect to the publication of certain types of records and information; *i.e.*, the agency must disclose the records without waiting for a request.  One of these two affirmative disclosure provisions, section 552(a)(1), pertains to information that agencies must "publish in the Federal Register for the guidance of the public[.]"  5 U.S.C. § 552(a)(1).  The matters that an agency must publish in the Federal Register include "statements of the general course and method by which [an agency's] functions are channeled and determined," "rules of

4

procedure," and "substantive rules of general applicability[,]" among others.  *Id.*
§ 552(a)(1)(B)–(D).

        This lawsuit arises under the FOIA's *other* affirmative disclosure requirement,
which appears in section 552(a)(2)—the "so-called 'reading room' provision." *Tax
Analysts v. IRS*, 117 F.3d 607, 609 (D.C. Cir. 1997).[2]  Section 552(a)(2) identifies
certain items than each agency must "make available for public inspection in an
electronic format[.]"  *Id.* § 552(a)(2).  The categories of items that agencies must
publicize pursuant to the reading-room provision include "final opinions, including
concurring and dissenting opinions, as well as orders, made in the adjudication of
cases[,]" and "those statements of policy and interpretations which have been adopted
by the agency and are not published in the Federal Register[.]"  *Id.* § 552(a)(2)(A)–(B).
Section 552(a)(2) also contains an indexing requirement, which dictates that "[e]ach
agency shall . . . maintain and make available for public inspection in electronic format
current indexes providing identifying information for the public as to any matter"
covered by the other provisions of the reading-room requirement.  *Id.* § 552(a)(2)(E).

        The FOIA's reading-room provision "represents an affirmative congressional
purpose to require disclosure of documents which have the force and effect of law."
*NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 153 (1975) (internal quotation marks and
citation omitted).  The types of documents that section 552(a)(2) requires agencies to
publicize and index—"final opinions . . . made in the adjudication of cases[,]"

---

[2] Before Congress amended the FOIA in 1996 to transition agencies toward electronic recordkeeping,
*see* Electronic Freedom of Information Act Amendments of 1996, Pub L. No. 104-231, 110 Stat. 3048,
most agencies fulfilled their obligations under section 552(a)(2) by placing records in a literal reading
room—hence the moniker.  *See generally* Office of Information Policy, *FOIA Guide, 2004 Edition:
FOIA Reading Rooms*, U.S. Dep't of Justice (May 2004), https://www.justice.gov/oip/foia-guide-2004-
edition-foia-reading-rooms.

"statements of policy and interpretations which have been adopted by the agency[,]"

and "instructions to staff that affect a member of the public[,]" 5 U.S.C.

§ 552(a)(2)(A)–(C)—collectively "indicate that the primary objective is the elimination

of 'secret law'"; that is, these requirements prevent an agency from subjecting members

of the public to a rule that the agency has not publicly announced. *U.S. Dep't of Justice*

*v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 772 n.20 (1989) (quoting

Frank H. Easterbrook, *Privacy and the Optimal Extent of Disclosure Under the*

*Freedom of Information Act*, 9 J. Legal Studies 775, 777 (1980)); *see also id.* ("Under

the FOIA an agency must disclose its rules governing relationships with private parties

and its demands on private conduct[.]").  In this same vein, any document to which

section 552(a)(2) pertains "may be relied on, used, or cited as precedent by an agency

against a party other than an agency only if" the agency has indexed and publicized it as

the reading-room provision requires (or if the affected party otherwise knows about it).

5 U.S.C. § 552(a)(2)(E).[3]

Notably, even if a record is subject to one of the FOIA's three disclosure

requirements, the FOIA permits an agency to withhold the record if it falls within one

of nine statutory exemptions.  *See* 5 U.S.C. § 552(b)(1)–(9).  Of particular relevance to

this case, the FOIA's Exemption 5 protects from disclosure "inter-agency or intra-

---

[3] When the Supreme Court decided all of the cases cited in this paragraph, the reading-room provision contained only three sub-parts—5 U.S.C. § 552(a)(2)(A)–(C).  *See Sears*, 421 U.S. at 136 n.1.  In the 1996 amendments mentioned above (*see supra* note 2), Congress expanded the reading room requirement to encompass an additional category of records—set forth in 5 U.S.C. § 552(a)(2)(D)—that focuses on the public's *interest* in the records, and not necessarily the records' regulatory impact on the public.  *See* Michael E. Tankersley, *How the Electronic Freedom of Information Act Amendments of 1996 Update Public Access for the Information Age*, 50 Admin. L. Rev. 421, 426–27 (1998) (discussing the addition of 5 U.S.C. § 552(a)(2)(D)).  Nevertheless, the Supreme Court's descriptions of the reading-room requirement in *Sears* and *Reporters Committee for Freedom of the Press* remain pertinent for the portions of the reading-room requirement that pre-date the 1996 amendments, including both provisions that are at issue in this case—sections 552(a)(2)(A) and (a)(2)(B).

agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency[.]" *Id.* § 552(b)(5). To qualify for Exemption 5, a document "must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). "[T]hose privileges include the privilege for attorney work-product and what is sometimes called the 'deliberative process' privilege." *Id.*

Significantly for present purposes, it is well established that Exemption 5 correlates with, and sheds light on, the scope of the FOIA's reading-room provision. Specifically, the Supreme Court has explained that courts generally should construe Exemption 5 and the reading-room provision such that they do not overlap. *See Sears*, 421 U.S. at 153 ("We should be reluctant . . . to construe Exemption 5 to apply to the documents described in 5 U.S.C. § 552(a)(2)[.]"). This means that if a record can be withheld under Exemption 5, then it is generally not subject to affirmative disclosure under the reading-room provision and vice versa, and this principle of mutual exclusion stems from the fact that Exemption 5 is limited to communications within an agency that "reflect the agency's group thinking in the process of working out its policy and determining what its law shall be[,]" and does *not* apply to communications that "embody the agency's effective law and policy[.]" *Id.* (internal quotation marks and citation omitted). In *Sears*, the Court observed that these features of Exemption 5 reveal that it is a kind of mirror image of the reading-room requirement, and that with respect to the latter, Congress sought only "to require disclosure of documents which have the force and effect of law." *Id.* (internal quotation marks and citation omitted).

7

**B.      Legal Opinions Of The Office Of Legal Counsel**

"For decades, [OLC] has been the most significant centralized source of legal advice within the Executive Branch." *CREW*, 846 F.3d at 1238 (internal quotation marks and citation omitted).  This role is, "in some sense, nearly as old as the Republic itself.  In the Judiciary Act of 1789, Congress authorized the Attorney General 'to give his advice and opinion upon questions of law when required by the President of the United States, or when requested by the heads of any of the departments, touching any matters that may concern their departments.'"  *Id.* (quoting Act of Sept. 24, 1789, ch. 20, § 35, 1 Stat. 73, 93 (codified as amended at 28 U.S.C. §§ 511–13)).  As that statutory language suggests, the Attorney General's legal advice to the President and various executive agencies spans a wide range of issues and contexts.  To give one example that CfA highlights, an Executive Order encourages (and in some cases, requires) executive agencies to submit disputes among themselves to the Attorney General for resolution.  *See* Exec. Order No. 12,146, §§ 1-401 to 1-402, 3 C.F.R. 409 (1979).  (*See also* Compl. ¶ 16.)

The Attorney General has delegated his authority to provide legal opinions to other Executive Branch officials to OLC.  *See* 28 C.F.R. § 0.25(a) (charging OLC with "[p]reparing the formal opinions of the Attorney General[,] rendering informal opinions and legal advice to the various agencies of the Government[,] and assisting the Attorney General in the performance of his functions as legal adviser to the President and as a member of, and legal adviser to, the Cabinet").  It is allegedly OLC's "official view" that each of the legal opinions that it issues—whether formal or informal—is an "authoritative" statement of the law and is "binding" on the Executive Branch official to whom OLC issues the opinion "by custom and practice[.]"  (Compl. ¶ 19 (quoting

Karl Remon Thompson, Principal Deputy Assistant Attorney General, Remarks at American Bar Association Conference (2014)); *see also id.* ¶ 21.)

OLC does not make all of its legal opinions available to the public, but with respect to "formal written opinions[,]" which is "one particularly important form of controlling legal advice" that OLC issues to Executive Branch officials, OLC "has a longstanding internal process in place for regular consideration and selection of significant opinions for official publication."  (Memorandum from David J. Barron, Acting Assistant Attorney General, to Attorneys of the Office, Best Practices for OLC Legal Advice and Written Opinions at 1, 5 (July 16, 2010) ("Best Practices Memo"), Ex. 3 to Def.'s Mot. to Dismiss, ECF No. 9-5).[4]  Pursuant to that process, OLC's "internal publication review committee" makes publication decisions after seeking input from the authoring attorneys, from OLC's front office, and from "the requesting Executive Branch official or agency and any other agencies that have interests that might be affected by publication[.]"  (*Id.* at 5.)  Furthermore, when making publication decisions, OLC considers a variety of discretionary factors such as "the potential importance of the opinion to other agencies or officials in the Executive Branch" and "the likelihood that similar questions may arise in the future[.]"  (*Id.*)  OLC has published over 1,300 opinions, dating from 1934 to the present.[5]

---

[4] The Best Practices Memo is discussed in detail in CfA's complaint (*see* Compl. ¶¶ 18, 31), and the Court deems the complaint to "necessarily rel[y]" on that memorandum such that the Court may consider it at the pleadings stage.  *See Abraha v. Colonial Parking, Inc.*, 243 F. Supp. 3d 199, 184 (D.D.C. 2017) ("In deciding a Rule 12(b)(6) motion, a court may consider . . . documents upon which the plaintiff's complaint necessarily relies[.]" (internal quotation marks and citation omitted)).

[5] *See* Office of Legal Counsel, *Opinions*, Dep't of Justice (June 5, 2016), http://www.justice.gov/olc/opinions-main (linking to 1,309 opinions).  This Court can take judicial notice of the fact that material has been posted to a government website.  *See Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013) (citing Fed. R. Evid. 201); *see also Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (noting that "matters of which the court may take judicial notice" are properly considered at the motion-to-dismiss stage (internal quotation marks, alteration and citation omitted)).

JA 32

**C.      Attempts To Get OLC To Publicize Its Legal Opinions**

On July 3, 2013, Anne Weisman, then Chief Counsel of Citizens for

Responsibility and Ethics in Washington, wrote to OLC to "request[] that [OLC]

immediately comply with its obligation under 5 U.S.C. § 552(a)(2) to make available

for public inspection and copying all OLC opinions that are binding on the executive

branch."  (Letter from Anne L. Weisman to Assistant Attorney General Virginia A.

Seitz (July 3, 2013) ("CREW Letter"), Ex. 1 to Def.'s Mot. to Dismiss, ECF 9-3, at 6;

*see also* Compl. ¶ 26.)  The letter quoted OLC's Best Practices Memo, and noted OLC's

practice of publishing only some, but not all, of its opinions.  (CREW Letter at 6–7.)

The letter contended that OLC's opinions must be made available for public inspection

under the FOIA's reading-room provision, because OLC's opinions "function as

binding law on the executive branch."  (*Id* at 7.)  OLC responded that, in its view, FOIA

exempts OLC opinions from disclosure because they are "ordinarily covered by

[FOIA's] attorney-client and deliberative process privileges" and as such are covered

by Exemption 5, and furthermore, OLC opinions are not subject to the reading-room

provision's affirmative disclosure requirements because, "as confidential and

predecisional legal advice, . . . [they] constitute neither 'final opinions . . . made in the

adjudication of cases' nor 'statements of policy and interpretations which have been

adopted by the agency.'"  Letter from John E. Bies, Deputy Assistant Attorney General,

to Anne L. Weisman (Aug. 20, 2013), *quoted in CREW*, 846 F.3d at 1239.

CREW initially sued the Department of Justice under the Administrative

Procedure Act ("APA"), 5 U.S.C. §§ 701–06, seeking to use that statute's judicial

review provision to compel OLC to comply with its obligations under the FOIA.  *See*

*CREW v. Dep't of Justice*, 164 F. Supp. 3d 145, 147 (D.D.C. 2016) (Mehta, J.), *aff'd*,

*CREW*, 846 F.3d 1235 (D.C. Cir. 2017).  CREW brought that initial lawsuit under the

APA, rather than under the FOIA itself, because CREW took the position that the

"FOIA does not provide an adequate remedy to address DOJ's alleged Section 552(a)(2)

violation."  *Id.*  Judge Mehta dismissed the case, reasoning that even if CREW could

not obtain *all* of its requested relief under the FOIA, that statute provides relief of the

"same genre" that CREW was seeking, and thus the FOIA supplies an "adequate

remedy" for CREW's injuries, precluding a lawsuit under the APA.  *Id.* at 155–56; *see*

*also* 5 U.S.C. § 704 (providing that the APA allows for judicial review of "final agency

action for which there is no other adequate remedy in a court").  The D.C. Circuit later

affirmed that ruling in an opinion discussed at length below.  *See CREW*, 846 F.3d

1235.

On March 22, 2016, fifteen days after the district court decision in *CREW*, Ms.

Weisman again wrote to OLC, this time as the Executive Director of Plaintiff Campaign

for Accountability, and she again requested that OLC make its legal opinions available

for public inspection.  (*See* Compl. ¶ 24; Letter from Anne L. Weisman to Principal

Deputy Assistant Attorney General Karl Remon Thompson (Mar. 22, 2016), Ex. 1 to

Def.'s Mot. to Dismiss, ECF No. 9-3, at 1–3.)  This second letter was "similar" to the

previous letter (Compl. ¶ 26), insofar as it specifically requested that OLC make

publicly available "all unpublished OLC opinions that provide controlling legal advice

to executive branch agencies and a general index of all such opinions" (*id.* ¶ 24).  OLC

responded by letter on May 26, 2016, reiterating its "continuing position that none of

the opinions it issues are covered by the requirements of 5 U.S.C. § 552(a)(2)."

(Compl. ¶ 25; *see also* Letter from John E. Bies, Deputy Assistant Attorney General, to

11

Anne L. Weisman (May 26, 2016), Ex. 2 to Def.'s Mot. to Dismiss, ECF No. 9-4, at 1

(asserting that OLC opinions "generally" are not subject to the reading-room provision

and are "ordinarily" exempt from disclosure under the FOIA's attorney-client and

deliberative process privileges).)

### D.  Procedural History

CfA filed its complaint in this lawsuit on June 8, 2016, challenging "OLC's

ongoing refusal to comply with its mandatory obligations under 5 U.S.C. § 552(a)[.]"

(Compl. ¶ 28.)  The complaint contains two counts: in Count One, CfA alleges that

OLC's years-long refusal to publish all of its binding opinions violates the disclosure

provisions of the FOIA's reading-room requirement, 5 U.S.C. § 552(a)(2).  (*See id.*

¶¶ 29–35.)  In Count Two, CfA alleges that OLC has also failed to comply with the

separate indexing requirement of section 552(a)(2)(E), by "fail[ing] for years to make

available for public inspection and copying indices of all final opinions made by OLC

in the adjudication of cases and statements of policy and interpretation that have been

adopted by the agency."  (*Id.* ¶ 38.)  As relief, CfA seeks a declaration that both of

these failures constitute violations of section 552(a)(2) (*see id.*, Prayer for Relief, ¶¶ 1,

5), as well as an injunction requiring OLC to make available for public inspection and

copying: (1) "all final opinions made in the adjudication of cases and statements of

policy and interpretations that have been adopted by the agency"; (2) "all opinions

issued by OLC that provide controlling advice to executive branch officials on

questions of law that are centrally important to the functioning of the federal

government"; (3) "all opinions issued by OLC that serve as precedent either within the

OLC or within the executive branch, whether or not they are formal or informal

opinions"; and (4) "indices of all final opinions made in the adjudication of cases and

statements of policy and interpretations that have been adopted by the agency[.]"  (*Id.*
¶¶ 2–4, 6.)  Finally, the complaint requests "such other and further relief as the Court
may deem just and proper."  (*Id.* ¶ 7.)

The government has moved to dismiss the complaint under Federal Rules of
Civil Procedure 12(b)(1) and 12(b)(6), and that motion is now fully briefed.  (*See* Mot.;
*see also* Pl.'s Opp'n to Def.'s Mot. to Dismiss ("Opp'n"), ECF No. 11; Reply Mem. in
Supp. of Def.'s Mot. to Dismiss ("Reply"), ECF No. 12.)  In its motion, the government
argues, first, that CfA's requested relief is not available because the FOIA's judicial
review provision, 5 U.S.C. § 552(a)(4)(B), only authorizes courts to "order[] disclosure
of specific documents to individuals—not to order[] broad, prospective relief requiring
ongoing publication for the benefit of the broader public."  (Mot. at 21.)  Second, the
government argues that Count One of the complaint must be dismissed on the grounds
that it "is not ripe for adjudication because it is too abstract for judicial resolution."
(*Id.* at 23.)  Third, the government argues that the complaint must be dismissed pursuant
to Rule 12(b)(6) on the grounds that CfA "does not plausibly allege any unlawful
failure to publish by OLC" because CfA's complaint "does not identify any particular
advice documents that it believes fall within 5 U.S.C. § 552(a)(2)(A) or (B), but which
OLC has failed to disclose."  (*Id.* at 29–30.)  In support of this last argument, the
government cites the D.C. Circuit's decision in *Electronic Frontier Foundation v.
Department of Justice* (*EFF*), 739 F.3d 1 (D.C. Cir. 2014), which it argues stands for
the proposition that OLC opinions, as a general matter, are not subject to the reading-
room requirement and are exempt from disclosure under pursuant to Exemption 5.  (*See*
Mot. at 32–41.)  Finally, the government argues that Count Two—the indexing claim—

must be dismissed because it is derivative of Count One, and there is no obligation to publish an index of opinions if the opinions themselves need not be published under section 552(a)(2).  (*See id.* at 48–49.)

CfA responds to each argument in turn, as detailed below.  (*See infra* Part III.) With respect to the government's jurisdictional points, CfA focuses primarily on the fact that the FOIA gives courts broad remedial powers and that CfA is challenging OLC's *policy* of refusing to publish its opinions, not its withholding of any particular opinion.  (*See, e.g.*, Opp'n at 18–20, 22–26.)   CfA also holds fast to its position that the reading-room requirement applies to OLC's controlling opinions because those opinions have binding legal effect.  (*See, e.g.*, *id.* at 9, 34, 39, 41–42.)

After the government's motion was fully briefed, this Court stayed the instant case pending the D.C. Circuit's decision in the *CREW* case.  (*See* Min. Order of Nov. 7, 2016.)  The Circuit released its decision on January 31, 2017, *see CREW*, 846 F.3d 1235, and the parties then filed a Status Report explaining their views on the impact of that decision on this case.  (*See* Joint Status Report, ECF No. 15.)  CfA's portion of the Status Report focuses on the fact that, per the *CREW* decision, the FOIA is indeed the proper avenue for enforcing the reading-room provision, and the relief available under the FOIA encompasses a broad, forward-looking injunction that is not limited to the production of individual documents.  (*See id.* at 1–3.)  DOJ's portion of the Status Report focuses on the fact that the *CREW* decision forecloses using a FOIA lawsuit to secure disclosure of documents to the general public, rather than to the plaintiff alone. (*See id.* at 4.)  DOJ also emphasizes that *CREW* did not change a plaintiff's duty to present a FOIA dispute to the courts in a discrete fashion.  (*See id.* at 4–6.)

## II.    LEGAL STANDARDS

### A.    Motions To Dismiss Pursuant To Rule 12(b)(1) In The FOIA Context

Pursuant to Federal Rule of Civil Procedure 12(b)(1), a defendant may seek dismissal of a complaint due to "lack of subject-matter jurisdiction[.]"  Fed. R. Civ. P. 12(b)(1).  Under the FOIA's judicial review provision, this Court "has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant."  5 U.S.C. § 552(a)(4)(B). Because this provision uses the language of "jurisdiction" in erecting the boundaries of a district court's remedial powers under the FOIA, *id.*, Rule 12(b)(1) is the proper avenue by which a defendant may urge the court to dismiss a complaint on the grounds that it seeks a type of relief that the FOIA does not authorize.  *See United States v. Kwai Fun Wong*, 135 S. Ct. 1625, 1633 (2015) (explaining that a statutory limitation is jurisdictional in nature if the statute "speak[s] in jurisdictional terms or refer[s] in any way to the jurisdiction of the district courts" (internal quotation marks and citation omitted)); *see also, e.g.*, *Kennecott*, 88 F.3d at 1202 (affirming district court's dismissal of a FOIA complaint because the court "lacked jurisdiction" to award the requested type of relief—publication of records).  A court must also dismiss a FOIA complaint pursuant to Rule 12(b)(1) if the plaintiff cannot demonstrate Article III standing to sue or if the case is not ripe for review.  *See, e.g.*, *Matthew A. Goldstein, PLLC v. U.S. Dep't of State*, 153 F. Supp. 3d 319, 330–31 (D.D.C. 2013).

### B.    Motions To Dismiss Pursuant To Rule 12(b)(6) In The FOIA Context

Federal Rule of Civil Procedure 12(b)(6) authorizes a defendant to request dismissal of a complaint if the pleading "fail[s] to state a claim upon which relief can be granted[.]"  Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss, a complaint

must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Because the FOIA permits a court to "order the production of any agency records improperly withheld from the complainant[,]" 5 U.S.C. § 552(a)(4)(B), "[a] FOIA plaintiff states a claim where it properly alleges that 'an agency has (1) improperly (2) withheld (3) agency records.'" *Cause of Action v. Nat'l Archives & Records Admin.*, 926 F. Supp. 2d 182, 185 (D.D.C. 2013) (quoting *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 (1989)).

Notably, it is rare in FOIA cases for a court to grant a Rule 12(b)(6) motion to dismiss that assails the *merits* of the plaintiff's pleading—*i.e.*, a motion that disputes the sufficiency of the allegations underlying the claim for relief—and indeed, "FOIA cases typically and appropriately are decided on motion for summary judgment." *Liberman v. U.S. Dep't of Transp.*, 227 F. Supp. 3d 1, 8 (D.D.C. 2016).[6]  The dearth of merits-based Rule 12(b)(6) dismissals most likely stems from the fact that most FOIA litigation arises under section 552(a)(3)—the FOIA's "reactive" disclosure provision, *CREW*, 846 F.3d at 1240—which is a provision that indicates that an agency's denial of "*any* [procedurally compliant] request for records" is improper, at least as a *prima facie* matter.  5 U.S.C. § 552(a)(3) (emphasis added).  Thus, in the typical FOIA case, it is quite straightforward to make a plausible allegation that an agency's withholding of records was 'improper' at the pleadings stage, and it is also relatively easy to plead the other elements of a FOIA claim—*i.e.*, that an agency has withheld the requested records

---

[6] Rule 12(b)(6) is frequently (and properly) utilized in the FOIA context to seek dismissal for failure to exhaust administrative remedies, *see, e.g.*, *Carroll v. U.S. Dep't of Labor*, 235 F. Supp. 79, 85 (D.D.C. 2017), but Rule 12(b)(6) motions that successfully challenge the plausibility of a plaintiff's claim are unusual.

16

and that the things that the agency withheld were agency records.  *See, e.g.*, *Shapiro v. CIA*, 170 F. Supp. 3d 147, 154–56 (D.D.C. 2016) (denying Rule 12(b)(6) motion because the FOIA request at issue reasonably described the records sought).[7]

By contrast, Rule 12(b)(6) packs a heavier punch in the context of lawsuits that arise under section 552(a)(2)—the reading-room provision—which, as mentioned above, is one the FOIA's affirmative disclosure requirements.  That is, unlike section (a)(3), which requires agencies to produce records in response to *any* proper request, *see id.* § 552(a)(3), the reading-room provision only requires agency action with respect to specific, statutorily delineated categories of records.  *See, e.g.*, *id.* § 552(a)(2)(A) (requiring that agencies make publicly available "final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases").  Consequently, in order to state a claim that an agency has improperly withheld records that it was obligated to make public under section 552(a)(2), the complaint must identify particular records (or categories of records) that the agency has failed to publicize and that plausibly fit within one of the statutory categories.  *See Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").  In other words, if a complaint that asserts a violation of 5 U.S.C. § 552(a)(2) does not allege that certain identified  records (or categories of

---

[7] Of course, an agency may ultimately establish the propriety of the challenged withholding by demonstrating that any of FOIA's nine exemptions applies.  *See* 5 U.S.C. § 552(b)(1)–(9).  But an agency bears the burden of establishing the applicability of an exemption, *see Am. Civil Liberties Union v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011), and because an agency "[t]ypically . . . does so by affidavit[,]" *id.*, the appropriate vehicle for asserting an exemption is usually a motion for summary judgment, not a motion to dismiss.  *See* Fed. R. Civ. P. 12(d) ("If, on a motion [to dismiss] under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.").

**JA 40**

records) plausibly fit the statutory criteria for affirmative disclosure and yet have been

withheld by the agency that maintains them, then such a complaint fails to assert that

the agency has improperly withheld agency records, and as a result, is subject to

dismissal under Rule 12(b)(6).

## III.   ANALYSIS

There are two strands to the argument that the government makes in support of

the dismissal of CfA's complaint:  first, the government invokes Rule 12(b)(1) to

maintain that this Court has no jurisdiction to order the relief sought in the complaint,

and in any event, this Court lacks jurisdiction because CfA's primary claim is too

abstract to be ripe.  (*See* Mot. at 19–27.)  Second, the government relies on Rule

12(b)(6) to assert that CfA has not stated a plausible violation of the reading-room

requirement.  (*See id.* at 27–48.)  Because a federal court is "not free to pretermit the

question" of subject matter jurisdiction, even in a case where the plaintiff's claims

ultimately founder on the merits, *Iqbal*, 556 U.S. at 671, this Court's analysis begins by

addressing its subject matter jurisdiction, and as explained below, the Court concludes

both (1) that the government's remedy-related argument is foreclosed by recent D.C.

Circuit case law holding that the FOIA authorizes district courts to award a type of

relief that CfA's complaint seeks in the instant case, and (2) that the government's

jurisdictional ripeness concern is not properly characterized as such.  By contrast, the

government's Rule 12(b)(6) argument fares much better, because in this Court's view,

the allegations in CfA's complaint are manifestly insufficient to assert a plausible

violation of the FOIA's reading-room provision.

A.  **This Court Has Jurisdiction To Order The Type Of Relief That CfA's Complaint Seeks, And The Government's Challenge To The Complaint's Allegations Do Not Implicate Ripeness**

1.  *CREW* Foreclosed The Argument That This Court Lacks Jurisdiction To Order The Requested Remedy

The government begins with the established proposition that "a court's power to remedy an improper withholding [of records] is limited by FOIA's remedial provision" (Mot. at 20 (citing 5 U.S.C. § 552(a)(4)(B)), and it proceeds to argue that the FOIA's remedial provision does not authorize the type of injunctive relief that CfA is seeking in this case (*see id.* at 19–23).  Specifically, the government contends that CfA's requested injunction exceeds the boundaries of the FOIA in three respects:  (1) it would apply prospectively, "on an ongoing basis[,]" to OLC opinions not yet written (*id.* at 19); (2) it would be "broad-ranging" rather than focused on specific records (*id.* at 22); and (3) it would require "publication" of records to "the broader public[,]" rather than production of records directly to CfA (*id.* at 21).  The D.C. Circuit's recent decision in *CREW*, 846 F.3d 1235, speaks directly to the government's concerns in all three respects, and it makes clear that this Court does have subject matter jurisdiction over CfA's claims, because CfA seeks a type of relief that the Court is authorized to award.

In *CREW*, just as in the instant case, the plaintiff "argued that OLC opinions are subject to disclosure under the reading-room provision" of the FOIA, 846 F.3d at 1239, and as relief, CREW sought an injunction that required OLC to comply with its reading-room obligations by making all of its opinions available to the public, *see id.* at 1240.  As explained above, CREW sought to enforce the reading-room provision by filing its lawsuit under the APA.  *See id.* at 1241.  And insofar as the APA only authorizes review of agency actions "for which there is no other adequate remedy in a court[,]"

5 U.S.C. § 704, the D.C. Circuit evaluated whether the FOIA itself provided the sort of "adequate remedy" that would preclude APA review—*i.e.*, whether CREW's requested relief (or something close enough) would be available in a lawsuit brought directly under the FOIA.  *See CREW*, 846 F.3d at 1241.  To analyze that question, the Circuit panel observed that CREW's requested injunctive relief had "four features":

> First, the injunction would have prospective effect—*i.e.*, it would apply to opinions not yet written.  Second, it would impose an affirmative obligation to disclose on OLC—*i.e.*, without need for a specific prior request.  Third, it would mandate disclosure to the *public*, as opposed to just CREW.  Fourth, it would require OLC to make available to the public an index detailing all documents subject to the reading-room provision.

*Id.* (emphasis in original).  Moreover, the court's analysis specifically addressed whether the FOIA's remedial provision authorizes federal courts to award injunctive relief with those features.  *See id.* at 1241–44.

Given the "broad equitable authority" that is entrusted to district courts under the FOIA, *id.* at 1241, the *CREW* court "ha[d] little trouble concluding that a district court possesses authority to grant" an injunction that contains the first two features of the relief that CREW sought—"a prospective injunction with an affirmative duty to disclose."  *Id.* at 1242.  However, in the Circuit's view, the third and fourth aspects of CREW's requested injunction—a requirement that OLC disclose *to the public* all documents subject to the reading-room requirement and an index of those documents— "present[ed] a trickier problem."  *Id.*  Relying on a prior decision that had addressed the scope of relief available for a claim under section 552(a)(1), the *CREW* court held that because the FOIA's remedial provision is "focus[ed] on 'relieving the injury suffered by the individual complainant[,]'" 846 F.3d at 1243 (quoting *Kennecott*, 88 F.3d at 1203), that provision authorizes courts to "order[] an agency to provide *to the plaintiff*

**JA 43**

documents covered by the reading-room provision[,]" *id.* (emphasis in original), but not "to issue an injunction mandating that an agency 'make [those documents] available for public inspection[,]'" *id.* (quoting 5 U.S.C. § 552(a)(2)).  Similarly, the *CREW* decision held that a court may order an agency to furnish an index of reading-room documents to a plaintiff, but not to the general public.  *See id.*[8]

The *CREW* decision provides a well-marked roadmap for analyzing the government's argument in the instant case that this Court has no jurisdiction to order the relief that CfA seeks.  (*See* Mot. at 19–23.)  As to the government's first quibble with CfA's requested injunction (*see id.* at 19 (complaining that the requested relief would apply prospectively to OLC opinions not yet written)), the *CREW* case unambiguously holds that "a district court possesses authority" under the FOIA to grant "a prospective injunction" of the sort that CfA seeks.  846 F.3d at 1242.  With respect to the government's second concern (*see* Mot. at 22 (maintaining that CfA's requested injunction would be "broad-ranging" rather than focused on specific records)), the *CREW* case clarifies that a court may impose on an agency "an affirmative duty to disclose" categories of records "without need for a specific prior request."  846 F.3d at 1241–42; *see also id.* at 1240–41 (explaining that the requirement to produce reading-room records "is judicially enforceable without further identification under Section 552(a)(3)" (quoting *Irons v. Schuyler*, 465 F.2d 608, 614 (D.C. Cir. 1972))).  In this regard, the *CREW* decision relied on a prior line of D.C. Circuit cases that had endorsed

---

[8] "While it might seem strange for Congress to command agencies to" make certain documents available for public inspection pursuant to the FOIA "without in the same statute providing courts with power" to order that agencies do so, "that is exactly what Congress intended" by "authoriz[ing] district courts to order the 'production' of agency documents, not 'publication.'"  *Kennecott*, 88 F.3d at 1202–03 (quoting 5 U.S.C. § 552(a)(4)(B)); *see also CREW*, 846 F.3d at 1243.

**JA 44**

FOIA "policy or practice" claims, by which a plaintiff may seek an order enjoining an agency practice that applies broadly to a category of records rather than to any specific, individual document.  *See, e.g.*, *Payne Enters., Inc. v. United States*, 837 F.2d 486, 491 (D.C. Cir. 1988) ("[E]ven though a party may have obtained relief as to a *specific request* under the FOIA, this will not moot a claim that an agency *policy or practice* will impair the party's lawful access to information in the future." (emphasis in original)).  Thus, while a FOIA plaintiff—like any other plaintiff—certainly must plead allegations that are specific enough to state a plausible claim for relief (*see* Section II.B, *supra*), the FOIA presents no *jurisdictional* impediment to a court entertaining a request for a broad injunction that is not tethered to specific records.[9]

As for the government's argument that the FOIA does not authorize courts to order that agencies make records available to the public at large (*see* Mot. at 20–21), CfA acknowledges that the *CREW* case vindicates the government's contention (*see* Joint Status Report at 3 (citing *CREW*, 846 F.3d at 1243)).  Per *CREW*, this Court cannot order OLC to "make available for public inspection and copying" all documents that are subject to the reading-room provision, which is one of the remedies that CfA is seeking.  (*See* Compl., Prayer for Relief, ¶¶ 2–4, 6.)  However, this Court *is* authorized to order that OLC produce any documents that it has improperly withheld in violation of the reading-room provision *to CfA*.  *See CREW*, 846 F.3d at 1243 (explaining that "nothing in [the court's prior case law] prevents a district court from, consistent with section 552(a)(4)(B), ordering an agency to provide *to the plaintiff* documents covered

---

[9] Nor does Article III of the Constitution present any such jurisdictional obstacle, for the reasons explained *infra* Part III.A.2.  (*See* Mot. at 23 (arguing that CfA's complaint must be dismissed as unripe under Rule 12(b)(1) on the grounds that it "does not seek to obtain access to or compel publication of any specific OLC advice documents, but instead presents only a broad legal claim").)

by the reading-room provision" (emphasis in original)); *id.* ("We see no obstacle . . . to a district court, in the appropriate case, . . . ordering an agency to furnish [an index of reading-room records] *to a plaintiff*." (emphasis in original)).  (*See also* Joint Status Report at 3 (CfA's position); *id.* at 4 (government's position).)  At the motion hearing that this Court held in this matter, the Court asked counsel for CfA whether it would be willing to amend its complaint so as to request only that the records be produced to CfA, and counsel maintained that such an amendment would not be necessary, because the complaint's reference to "such other and further relief as the Court may deem just and proper" (Compl., Prayer for Relief, ¶ 7) could properly be construed to encompass a request for an order requiring that documents be produced directly to CfA.  (*See* Hrg. Tr. at 19–20.)  This Court agrees, and so construed, the instant complaint seeks an order requiring that OLC produce to CfA any opinions that are subject to the reading-room provision—a type of relief that the D.C. Circuit has found to be available under the FOIA's remedial provision.  *See CREW*, 846 F.3d at 1244.

Of course, the fact that such relief is *available* as a categorical matter does not answer the question of whether CfA is correct on the merits when it argues that such relief is *warranted*.  *See id.* at 1246.  But the fact that the type of relief that CfA seeks is available under the FOIA leads the Court to conclude that it has jurisdiction to consider that merits question, and thus the Court will not dismiss CfA's complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1).

    2.  The Government Identifies A Pleading Failure, Not A Jurisdictional Ripeness Issue, When It Contends That CfA's Primary Claim Is Too Abstract For Judicial Resolution

The government argues that the breadth of CfA's primary claim presents a ripeness defect, which the government frames as follows:  "CFA's lawsuit does not seek

23

to obtain access to or compel publication of any specific OLC advice documents, but instead presents only a broad legal claim—that OLC must publish all of its controlling advice documents, both past and future, pursuant to § 522(a)(2)."  (Mot. at 23.)  The government maintains that this is an "abstract legal question" that CfA has raised "at an exceedingly high level of generality—*i.e.*, whether OLC must affirmatively publish all of its controlling advice documents pursuant to 5 U.S.C. § 552(a)(2)"—and as such, the question "lacks sufficient factual foundation for judicial resolution."  (*Id.* at 23–24.) But in this Court's view, what the government has characterized as a jurisdictional "ripeness" problem is really nothing other than the sort of pleading failure that warrants dismissal under Rule 12(b)(6).

As an initial matter, the government's arguments do not raise constitutional ripeness concerns because there is no question that CfA has suffered an actual injury. The D.C. Circuit has explained that, "if a threatened injury is sufficiently 'imminent' to establish standing, the constitutional requirements of the ripeness doctrine will necessarily be satisfied."  *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1428 (D.C. Cir. 1996); *see also Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 632 (D.C. Cir. 2017) (holding that plaintiffs' claims were ripe because they alleged an actual injury).  Here, there is no question that CfA has suffered an actual, particularized injury sufficient to confer standing—and therefore one that is sufficient to generate a ripe controversy—because it reached out to OLC to request the records at issue and was rebuffed (*see* Compl. ¶¶ 6–7; 24–25), and the government does not argue otherwise. *See Prisology, Inc. v. Fed. Bureau of Prisons*, 852 F.3d 1114, 1117 (D.C. Cir. 2017)

(explaining that an unsuccessful attempt to get an agency to make records public

confers standing to file a reading-room lawsuit).

The Court also concludes that CfA's complaint does not present prudential

ripeness concerns, *see Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012)

(distinguishing between constitutional and prudential ripeness), because when properly

understood, the government's ripeness argument attacks CfA's *pleadings*, and does not

persuasively contend that the underlying dispute is insufficiently concrete.[10]  The

prudential ripeness of a dispute turns on "the fitness of the issues for judicial decision

and the extent to which withholding a decision will cause hardship to the parties."  *Id.*

at 387 (internal quotation marks and citation omitted).  "[T]he fitness of an issue

depends on[,]" *inter alia*, "whether it is purely legal, whether consideration of the issue

would benefit from a more concrete setting, and whether the agency's action is

sufficiently final[,]" *id.* (internal quotation marks and citation omitted)—all factors that

relate to the underlying dispute between the parties, and not the level of generality at

which the plaintiff has *alleged* that the defendant's conduct was illegal.

Here, the thrust of the government's "ripeness" argument is that, due to the

manifest implausibility of CfA's contention that *all* of OLC's controlling legal opinions

must be made available under the reading-room provision, CfA can only proceed if it

provides the Court with a concrete context (*i.e.*, a particular set of documents) that the

Court can evaluate in order to determine whether OLC has, in fact, engaged in unlawful

---

[10] The Supreme Court has recently cast doubt on whether the prudential ripeness doctrine is a viable limitation on the jurisdiction of federal courts.  *See Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2347 (2014).  This Court, like the Supreme Court in *Susan B. Anthony List*, "need not resolve the continuing vitality of the prudential ripeness doctrine" because, in this Court's view, there is no prudential ripeness problem in this case.  *Id.*

25

**JA 48**

withholding.  (*See* Mot. at 24 ("To grant CFA the relief requested in this lawsuit, this

Court would have to determine that *all* of OLC's controlling legal advice documents

fall within § 552(a)(2)(A) or (B), and that *none* of those advice documents are

privileged.  It is difficult to see what basis the Court would have for making such

determinations in the abstract, and in the absence of concrete and granular facts about

the circumstances under which any given OLC legal advice document was prepared or

what role it played in an agency's policymaking process." (emphasis in original)); *see*

*also id.* ("CFA's claim is not ripe because it is not based on a concrete dispute over

particular documents.").)  But to this Court's eye, a true prudential 'ripeness' defect has

a remarkably different appearance.  It occurs, generally speaking, when the alleged

*wrong* is insufficiently concrete—as a *factual* matter—to be capable of legal evaluation,

without regard to how the plaintiff's complaint characterizes it.  This can arise where,

for example, the plaintiff contends that the defendant has adopted an unlawful policy,

but the challenged policy has not been directly applied to the plaintiff or has not yet

come to fruition, and without that crucial context, the court is incapable of assessing

whether the defendant has, in fact, violated the law.  *See, e.g.*, *Nat'l Park Hosp. Ass'n*

*v. Dep't of the Interior*, 538 U.S. 803, 812 (2003) (concluding that "further factual

development would significantly advance our ability to deal with the legal issues

presented" (internal quotation marks and citation omitted)).

    In the instant case, by contrast, there can be no doubt that CfA's dispute with

OLC, while exceedingly broad, is an actual dispute arising from the direct application

of OLC's established policy of making available only certain of its legal opinions, and

only at its own discretion.  (*See* Compl. ¶¶ 18, 25–26.)  CfA reached out to OLC,

asserting that it is obligated under the reading-room provision to make available any opinions that contain interpretations of law that are controlling within the Executive Branch (*see id.* ¶ 24), and OLC refused, citing its established policy (*see id.* ¶¶ 25–26; *see also* Letter from John E. Bies, Deputy Assistant Attorney General, to Anne L. Weisman (May 26, 2016)).  Thus, CfA's legal action presents a question of law that is premised on the alleged fact that OLC has been applying a policy of not affirmatively publishing all of its controlling opinions, which CfA claims is unlawful because all of OLC's controlling opinions are subject to publication under section 552(a)(2).  There is nothing abstract about this allegation.  This Court knows exactly what the alleged wrong is (violation of section 552(a)(2)) and how it is allegedly occurring (through OLC's policy of withholding of records); *i.e.*, no further factual development is needed to ascertain the contours of the dispute.  Moreover, there is nothing that prevents this Court from determining whether CfA is right or wrong when it boldly contends that "all" of the controlling legal opinions that OLC produces fit the (a)(2) criteria and thus are being wrongfully withheld.  *See Susan B. Anthony List*, 134 S. Ct. at 2347 (finding no ripeness issue because the issue presented was "purely legal, and w[ould] not be clarified by further factual development" (internal quotation marks and citation omitted)).

What it appears that OLC is actually saying with its "ripeness" contention is that CfA cannot possibly mean what its complaint suggests—"that *all* of OLC's controlling legal advice documents fall within § 552(a)(2)(A) or (B)" (Mot. at 24 (emphasis in original))—and that if the truth lies somewhere short of that—*i.e.*, that *some* OLC opinions do—this Court cannot possibly identify which opinions must be made public

**JA 50**

"in the absence of concrete and granular facts about the circumstances under which any given OLC legal advice document was prepared" (*id.*).   In this way, the government appears to fault CfA for seeking to advance a claim that is unduly categorical, when OLC's (a)(2) publication duties necessarily involve nuanced, contextual assessments of the various types of legal opinions that OLC renders and the circumstances under which it does so.   (*See id.*)  And *that* argument appears to identify a failure in CfA's pleading rather than the absence of a concrete underlying dispute.  *Cf. Irons*, 465 F.2d at 614 (suppl. op. on pet. for reh'g) (dismissing a reading-room claim as "too broad" because the complaint sought a category of documents that was "broader than the statutory limits of Section 552(a)(2)[,]" with no discussion of ripeness or jurisdiction).   Indeed, ultimately, the ripeness argument that the government seems to advance here hinges on precisely the same pleading failure as the government's Rule 12(b)(6) argument (*compare* Mot. at 23–25, *with id.* at 29–31), and this Court finds the Rule 12(b)(6) formulation persuasive, for the reasons explained below.

**B.     The Complaint Must Be Dismissed For Failure To State A Claim Because It Does Not Plausibly Articulate A Category Of OLC Opinions That Must Be Affirmatively Disclosed**

The Court now turns to the government's argument that CfA's complaint must be dismissed pursuant to Rule 12(b)(6) because CfA "does not identify any particular advice documents that it believes fall within § 552(a)(2)(A) or (B), but which OLC has failed to disclose."  (Mot. at 30.)  In order to survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must allege sufficient facts that, taken as true, permit "the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  As explained in Part II.B above, to meet this standard in the context of a lawsuit seeking records under the FOIA's reading-room provision, a complaint must

identify ascertainable records or categories of records that are plausibly subject to the reading-room requirement and that the agency has failed to make publicly available.

In this case, CfA's complaint alleges that OLC is violating the reading-room requirement by not making available for public inspection "all final opinions made in the adjudication of cases and statements of policy and interpretations that have been adopted by the agency."  (Compl. ¶ 32 (citing 5 U.S.C. § 552(a)(2)(A) and (B)— provisions that require agencies to make publicly available "final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases," and "those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register").)  CfA's complaint gestures to various categories of legal opinions that CfA alleges OLC has consistently failed to make available in violation of the reading-room requirement—e.g., "those written opinions issued by OLC that provide controlling legal advice to executive branch officials and agencies on questions of law, whether formal or informal[;] those opinions that serve as precedent within OLC and the executive branch[;] and those opinions that serve as interpretive guides for the executive branch" (*id.* ¶ 35)—and, notably, CfA maintains that the "controlling" and "precedent[ial]" nature of such opinions are common to all, or virtually all, of the legal opinions that OLC issues to Executive Branch officials.  (*See id.* ¶¶ 18–22.)  But binding D.C. Circuit precedent makes clear that these features of an OLC legal opinion *do not* render it subject to the reading-room requirement, *see EFF*, 739 F.3d at 8–10, and in light of that precedent, CfA's complaint as currently framed fails to state a claim for relief.[11]

---

[11] CfA's indexing claim fails for the same reason, because the Court agrees with the government that that claim is "entirely derivative" of CfA's primary FOIA claim.  (Mot. at 49; *see also* Opp'n at 22

**JA 52**

At the Court's motion hearing, CfA suggested ways in which it could refine its claim, and as noted in Part III.B.2 below, the Court will provide CfA with an opportunity to do so.  However, any amended complaint that CfA chooses to file must identify an ascertainable record or category of records that is plausibly subject to the reading-room requirement and that OLC has failed to make publicly available.

   1. <u>CfA Has Not Plausibly Alleged That OLC Opinions, As A General Matter, Are Subject To The Reading-Room Provision</u>

It is important to keep in mind that the subsections of the reading-room provision that are at issue in this case encompass "(A) final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases[,]" and "(B) those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register[,]" 5 U.S.C. § 552(a)(2)(A)–(B)— in other words, agency documents with "the force and effect of law."  *Sears*, 421 U.S. at 153 (internal quotation marks and citation omitted).  In *Electronic Frontier Foundation v. Department of Justice*, the D.C. Circuit made clear that OLC opinions that contain OLC's legal advice to Executive Branch officials—even "controlling" legal advice—do not necessarily constitute the "working law" of the recipient agency, 739 F.3d at 9, and in light of the Circuit's analysis, it is clear to this Court that CfA has not identified records that OLC has failed to publicize and that plausibly fit within the reading-room provision.

---

(arguing that, "having failed" in its argument about the substantive reading-room provisions, "DOJ *a fortiori* must fail in its defense of why it can ignore entirely the FOIA's indexing requirements").)  That is, just as CfA's complaint fails to identify records that OLC was plausibly required to (but did not) make available to the public, so too has CfA failed to identify records that OLC was plausibly required to (but did not) index.

In *EFF*, a FOIA requester sought access to a legal opinion that OLC had

prepared for the Federal Bureau of Investigation ("FBI") in connection with an inquiry

into the FBI's information-gathering techniques.  *See* 739 F.3d at 3–4.  The D.C. Circuit

determined that the Department of Justice had properly withheld the OLC opinion

pursuant to the "deliberative process privilege" under FOIA Exemption 5, because it

was "an 'advisory opinion, recommendation and deliberation comprising part of a

process by which governmental decisions and policies are formulated[,]'" instead of a

document reflecting a decision or policy already made.  *Id.* at 4 (alterations omitted)

(quoting *Klamath Water Users Protective Ass'n*, 532 U.S. at 8).  In reaching that

conclusion, the *EFF* court invoked a line of previous cases in which the Circuit had

addressed whether agencies were required to produce various inter- and intra-agency

communications, notwithstanding Exemption 5, on the grounds that they effectively

constituted the agency's "working law."  *See id.* at 7–8 (citing, e.g., *Pub. Citizen, Inc.*

*v. Office of Mgmt. & Budget*, 598 F.3d 865 (D.C. Cir. 2010)).

Given those cases, as well as the Supreme Court's decision in *Sears*, 421 U.S.

132, the *EFF* court reasoned that "the OLC Opinion could not be the 'working law' of

the FBI unless the FBI 'adopted' what OLC offered[,]" because "OLC does not speak

with authority on the FBI's policy[.]"  *Id.* at 9; *see also id.* ("OLC does not purport, and

in fact lacks authority, to make policy decisions.  OLC's legal advice and analysis may

inform the decisionmaking of Executive Branch officials on matters of policy, but

OLC's legal advice is not itself dispositive as to any policy adopted." (quoting Decl. of

Paul P. Colborn, Special Counsel, OLC)).  The requester had argued that the OLC

opinion at issue constituted the FBI's "working law" because it was "controlling" and

**JA 54**

"precedential," but the *EFF* court rejected that argument, expressly stating that "these indicia of a binding legal decision do[] not overcome the fact that OLC does not speak with authority on the FBI's policy[,]" and that "[e]ven if the OLC Opinion describes the legal parameters of what the FBI is *permitted* to do, it does not state or determine the FBI's policy." *Id.* at 9–10 (emphasis in original).

The *EFF* court's conclusion that an OLC opinion does not constitute an agency's "working law" merely by virtue of being a "controlling" and "precedential" statement of the legal constraints on an agency's decision for Exemption 5 purposes is fatal to the allegations that CfA makes in the instant complaint.  As the Supreme Court has explained, the reading-room requirement and Exemption 5's deliberative-process privilege are mirror images of each other; therefore, just as Exemption 5 does not encompass records "which embody the agency's effective law and policy," the reading-room provision requires disclosure of a loosely equivalent set of records—those "documents which have the force and effect of law."  *Sears*, 421 U.S. at 153 (internal quotation marks and citation omitted); *see also id.* ("We should be reluctant, therefore, to construe Exemption 5 to apply to the documents described in 5 U.S.C. § 552(a)(2)[.]").  In line with this equivalency principle, *EFF*'s holding that an OLC opinion does not necessarily amount to an agency's own policy for purposes of Exemption 5 simply by virtue of its being a "controlling" and "precedential" statement of the applicable law, *see EFF*, 739 F.3d at 9–10, means that those qualities of OLC opinions do not necessarily render them "final opinions . . . made in the adjudication of cases" or "statements of policy and interpretations which have been adopted by the agency"—*i.e.*, documents embodying the law of the agency—for purposes of the

reading-room requirement.  5 U.S.C. § 552(a)(2)(A)–(B).  Consequently, CfA cannot

state a plausible claim that OLC violated its obligation to make such reading-room

documents publicly available simply by pointing to OLC's failure to publicize all of its

opinions "that provide controlling advice to executive branch officials and agencies on

questions of law" and "that serve as precedent[.]"  (Compl. ¶ 35.)  Put another way, in

order to state a claim that OLC is violating the FOIA, CfA's complaint needs to identify

an ascertainable set of OLC opinions *that plausibly constitute the law or policy* of the

agency to which the opinion is addressed, and thus far, CfA's complaint fails to do so.

CfA attempts to resist the conclusion that the D.C. Circuit's *EFF* decision dooms

its reading-room claims in two primary ways, but neither is persuasive.  First, CfA

suggests that several of the prior D.C. Circuit decisions that the *EFF* opinion

distinguishes are actually more closely analogous to the instant case than *EFF* itself.

(*See* Hrg. Tr. at 62 (referencing *Tax Analysts v. IRS* (*Tax Analysts I*), 117 F.3d 607

(D.C. Cir. 1997); *Tax Analysts v. IRS* (*Tax Analysts II*), 294 F.3d 71 (D.C. Cir. 2002);

and *Pub. Citizen*, 598 F.3d 865).)  But in this regard, CfA glosses over critical aspects

of those cases that make them significantly different than this one.  In *Public Citizen*,

for example, the Court held that Exemption 5 did not protect memoranda of the Office

of Management and Budget ("OMB") that "reflect[ed] OMB's formal or informal policy

on how it carries out its responsibilities[.]"  598 F.3d at 875.  Similarly, in *Tax Analysts

I*, the court held that Exemption 5 did not apply to legal memoranda that the IRS's

Office of Chief Counsel had distributed to the agency's field offices, on the grounds

that they amounted to "considered statements of *the agency's* legal position."  117 F.3d

at 617 (emphasis added).  And in *Tax Analysts II*, the court held that similar memoranda

from the IRS's Office of Chief Counsel did not qualify for Exemption 5 because the fact that they traveled "horizontally" to individual agency offices indicated that those statements actually represented the agency's "final legal position" on various matters. 294 F.3d at 81 (emphasis omitted).

In short, the documents at issue in those cases fell outside the scope of Exemption 5—and likewise qualified as "statements of policy and interpretations which have been adopted by the agency[,]" 5 U.S.C. § 552(a)(2)(B)—because the court determined that they reflected the position of *the agency* itself.  CfA cannot rely on those cases to argue that the same is generally true of OLC opinions, when the D.C. Circuit in *EFF* not only addressed each of those cases, but also specifically held that an OLC opinion does *not* necessarily reflect the adopted policy of the agency that requests it.  *See* 739 F.3d at 9; *cf. Tax Analysts II*,  294 F.3d at 81 (contrasting the memoranda at issue in that case with "documents that represent the final legal position of the [IRS's Office of Chief Counsel] and travel upward—for example, memoranda to the Commissioner of Internal Revenue advising him on legal issues"—which "may still be part of the agency's deliberative process and thus fall within Exemption 5" (emphasis omitted)).

CfA's second effort to sideline the *EFF* decision is also unavailing.  At the Court's motion hearing, CfA appeared to argue that *EFF* was actually a narrow decision that pertained only to situations in which OLC advises agencies on their *policy* decisions, not situations in which OLC provides agencies with *legal interpretations*. (*See* Hrg. Tr. at 90 ("[W]hat was important in the *EFF* case is that they weren't talking about a controlling interpretation of law that was meant to bind the executive.  They

34

were talking about policy advice.").)  This distinction is important, CfA argues, because

OLC's position on legal issues is authoritative within the Executive Branch, even if its

policy advice is not.  (*See id.*)  But in its valiant effort to differentiate the OLC opinion

at issue in *EFF* from the OLC opinions that CfA says it is seeking in the instant case,

CfA perceives a distinction where none exists.  This is because *all* of OLC's opinions

constitute "the opinion of the Attorney General on questions of law[,]" 28 U.S.C. § 512;

*see also id.* §§ 511, 513; therefore, OLC's opinions *always* advise on legal questions,

even if the agency that receives an OLC opinion will use it to inform a policy decision.

To be sure, the *EFF* case itself references OLC's lack of authority to determine the

FBI's "policy," *see e.g.*, 739 F.3d at 9, but that decision also characterized the OLC

opinion at issue in that case as one that "describe[d] the *legal* parameters of what the

FBI [wa]s *permitted* to do," *id.* at 10 (first emphasis added).  Thus, CfA cannot escape

the implications of *EFF* by suggesting that the OLC opinion at issue in that case did not

render legal advice and that the D.C. Circuit's holding somehow only pertains to those

OLC opinions that OLC issues in a diminished, policy-advisory role.

Ultimately, this Court reads the *EFF* decision to foreclose CfA's attempt to point

to the 'controlling' and 'precedential' nature of certain OLC opinions as the identifying

features of the category of records that OLC is wrongfully withholding because they are

subject to the reading-room requirement.  (*See* Compl. ¶ 35.)  To the contrary, the *EFF*

decision establishes that an OLC opinion does not become the "working law" of the

agency that requested it merely by virtue of the fact that it espouses a "controlling"

legal interpretation, 739 F.3d at 9, which, in this Court's view, makes it implausible

that OLC's 'controlling' legal opinions are subject to the reading-room provision on that basis.

    2.    <u>The Sub-Categories Of OLC Opinions That CfA Articulated During The Hearing Are Not Present In Its Complaint</u>

During the Court's motion hearing, CfA deftly refined its contentions regarding OLC's alleged violation of the reading-room requirement by identifying two discrete subsets of OLC opinions that, according to CfA, definitively constitute the recipient agency's final position, and consequently qualify as 'working law' for the purpose of section 552(a)(2), such that they must be made available to the public.  (*See* Hrg. Tr. at 10 ("[T]here are two subsets of those opinions for which it is particularly clear that they are intended to be binding interpretations of law[.]").)  Specifically, CfA highlighted (1) OLC opinions that resolve inter-agency disputes pursuant to an Executive Order that requires agencies to submit such disputes to the Attorney General, *see* Exec. Order No. 12,146, §§ 1-401 to 1-402, 3 C.F.R. 409 (1979), and (2) OLC opinions issued to independent agencies, for which OLC has a practice of requiring an up-front commitment from the agency "that it will conform its conduct to [OLC's] conclusion[,]" (Best Practices Memo at 3).  These delineated categories of records do not appear in CfA's complaint as the basis for CfA's claims.[12]  Therefore, CfA's oral assertion that, despite what the complaint alleges, *these* are the records that satisfy section 552(a)(2) cannot be the means by which CfA alleges a plausible violation of the reading-room provision.  *See Tele-Commc'ns of Key West, Inc. v. United States*, 757

---

[12] The complaint does make a passing reference to OLC's role in resolving inter-agency disputes (*see* Comp. ¶ 16), but nowhere does the complaint suggest that OLC's opinions in such cases are the opinions that must be made available pursuant to section 552(a)(2).

F.2d 1330, 1335 (D.C. Cir. 1985) ("[A] Rule 12(b)(6) disposition must be made on the face of the complaint alone.").

Be that as it may, to the extent that CfA maintains that it will be able to cure the fatal pleading defect that the government and the Court have identified, the Court will permit CfA to amend its complaint to add allegations of specific, ascertainable categories of records that CfA believes are subject to the reading-room requirement and that OLC has failed to make publicly available.  If CfA chooses to amend its pleading, it should keep in mind that it must allege that OLC has *withheld* the records that CfA has identified—it is not clear from the allegations in CfA's complaint as it currently stands, or from the Best Practices Memo, that OLC is not already making available all OLC opinions that have been issued in the context of inter-agency disputes or to independent agencies.  Moreover, any amended complaint should clarify which portion of the reading-room provision OLC allegedly violates by withholding certain OLC opinions from the public.[13]  Notably, this Court's grant of leave to amend the complaint (which is a matter of discretion in this context, *see Brink v. Cont'l Ins. Co.*, 787 F.3d 1120, 1128–29 (D.C. Cir. 2015)) is unrestricted, insofar as it authorizes CfA to tender an amended complaint that alleges that OLC is violating the reading-room requirement with respect to additional discrete subsets of its opinions, aside from the two that CfA has already mentioned.

---

[13] In particular, if CfA chooses to allege that OLC's withholding of its opinions that resolve inter-agency disputes constitutes a violation of section 552(a)(2)(A), CfA should address whether those are opinions issued "in the adjudication of cases[,]" as that phrase is used in the FOIA.  5 U.S.C. § 552(a)(2)(A).  Furthermore, if CfA chooses to allege that OLC's withholding of its opinions issued to independent agencies constitutes a violation of section 552(a)(2)(B), CfA should address whether the up-front commitment that OLC demands from the recipient agency amounts to anything more than a promise to treat OLC's opinion just as it would be treated by a non-independent executive agency.

**JA 60**

## IV.    CONCLUSION

In this lawsuit, CfA seeks to enforce the 'reading-room' provision of the FOIA, which requires agencies to make certain categories of records "available for public inspection[,]" and with respect to those records, to maintain and make available "current indexes[.]" 5 U.S.C. § 552(a)(2).  For the reasons explained above, this Court concludes that it has subject matter jurisdiction to award a type of relief that CfA seeks: a broad, prospective injunction requiring that OLC affirmatively produce to CfA records that are subject to the reading-room requirement.  But the Court also finds that, in order to state a claim that OLC has violated the reading-room provision of the FOIA, CfA needed to identify an ascertainable set of records that plausibly fits within one of the statutory categories and that OLC has failed to make publicly available and index. CfA has failed to do this, and as a result, with its Order of September 29, 2017, the Court both **GRANTED** the government's motion to dismiss, and **DISMISSED** CfA's complaint.  The Order that issues today in conjunction with this Memorandum Opinion permits CfA to file an amended complaint that alleges that discrete subsets of OLC opinions are subject to the reading-room requirement, if it chooses to do so, and sets a deadline for both the submission of a new complaint and the government's response to that amended pleading.


DATE:  October 6, 2017                    *Ketanji Brown Jackson*
                                          KETANJI BROWN JACKSON
                                          United States District Judge

USCA Case #24-5163      Document #2080945          Filed: 10/18/2024      Page 68 of 242

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CAMPAIGN FOR ACCOUNTABILITY,

      Plaintiff,

  v.

U.S. DEPARTMENT OF JUSTICE,

      Defendant.

No. 1:16-cv-1068 (KBJ)

<u>**AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**</u>

**INTRODUCTION**

1.      This is an action under the Freedom of Information Act ("FOIA") challenging the

failure of the U.S. Department of Justice ("DOJ") to comply with its obligation under 5 U.S.C.

§ 552(a) to make publicly available on an ongoing basis (1) the formal written opinions of the

Office of Legal Counsel ("OLC") issued to executive branch agencies or to executive branch

officials other than the president; and (2) an index of those opinions.

2.      The OLC's formal written opinions interpreting the law are controlling on

executive agencies. The OLC treats its opinions as a system of precedent, establishing a coherent

body of law for the executive branch as a whole. The opinions control the OLC's own future

interpretations, and they are binding on all executive branch agencies unless withdrawn or

reconsidered by the OLC, displaced by a judicial ruling, or overruled by the only executive

branch officials with interpretive authority superseding that of the OLC—the attorney general

and the president.

3.      Executive branch agencies likewise consider the OLC's formal written opinions

to be binding. As one former OLC lawyer and now law professor has explained, the norm of

1

**JA 62**

agencies treating OLC opinions as binding is "longstanding and robust."[1] The OLC "protects that tradition today by generally refusing to provide advice if there is any doubt about whether the requesting entity will follow it."[2] When asked for a formal written opinion by an independent agency, for instance, the OLC's practice as described in an internal guide is to issue an opinion "only if [the OLC] has received in writing from that agency an agreement that it will conform its conduct to [the OLC's] conclusion."[3]

4.      In short, the OLC considers its formal written opinions interpreting the law to be binding, and executive branch agencies treat them as binding. As one former senior executive branch official noted, the OLC is the "Supreme Court of the executive branch."[4]

5.      The OLC's formal written opinions are critical to understanding the powers and responsibilities of the government and the private rights of citizens. The OLC's formal written opinions have set out the legal authority of the government to target and kill its own citizens abroad by drone strike; they have interpreted the reach of the anti-torture statute; they have resolved ethical and constitutional disputes over the appointment of family members to certain government positions; they have established the Social Security Administration's obligation to accord social-security benefits to the children of same-sex couples; and much more.

---

[1] Trevor Morrison, *Stare Decisis in the Office of Legal Counsel*, 110 Colum. L. Rev. 1448, 1469 (2010).

[2] *Id.* at 1464.

[3] Memorandum from David J. Barron, Acting Assistant Attorney Gen., to Attorneys of the Office of Legal Counsel (July 16, 2010), http://1.usa.gov/29acGlS [https://perma.cc/8ARY-P7KW].

[4] *Homeland Security Secretary 'Fully Confident' in Legality of Obama's Immigration Action*, PBS NewsHour (Nov. 24, 2014, 6:35 PM), http://www.pbs.org/newshour/bb/homeland-security-secretary-fully-confident-legality-obamas-immigration-action [https://perma.cc/4MSL-2C6Q] (quoting Jeh Johnson, Secretary of the Department of Homeland Security).

6.      Despite the fact that the OLC's formal written opinions interpreting the law are binding, the "OLC's published opinions are only a fraction of all its written opinions."[5] The unpublished remainder, whose titles, subject matters, and even precise number are also largely undisclosed, constitute "secret law"—anathema to our democracy and the primary evil Congress sought to extinguish through FOIA. With the aim of ending secret law, Congress required agencies, through FOIA, to proactively publish their working law, including "final opinions . . . made in the adjudication of cases," 5 U.S.C. § 552(a)(2)(A), and "statements of policy and interpretations which have been adopted by the agency," *id.* § 552(a)(2)(B).

7.      Notwithstanding FOIA's clear command, the OLC views its opinions as effectively exempt from FOIA's affirmative-disclosure provisions. While the OLC has published approximately 1,300 of its formal written opinions, it has done so pursuant to what it believes to be its sole and unreviewable discretion, subject to criteria of its own choosing.

8.      This lawsuit seeks to challenge the OLC's unlawful policy and practice of withholding formal written opinions from the public. Plaintiff seeks, principally, an injunction requiring the OLC to proactively disclose to Plaintiff its formal written opinions and an index thereof so that Plaintiff can make them available to the public.

### JURISDICTION AND VENUE

9.      The Court has personal and subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 2201, and 2202, and 5 U.S.C. § 552(a)(4)(B).

10.      Venue lies in this district under 28 U.S.C. § 1391(e).

---

[5] Morrison, *supra* note 1, at 1476.

**JA 64**

## PARTIES

11.     Plaintiff Campaign for Accountability ("CfA") is a non-profit, non-partisan tax-exempt entity organized under § 501(c)(3) of the Internal Revenue Code. CfA uses research, litigation, and communications to expose misconduct and malfeasance in public life. As part of its research, CfA uses government records made available to it under public information laws as well as government records that agencies have made available to the general public.

12.     Defendant DOJ is an agency within the meaning of 5 U.S.C. §§ 551 and 701. The DOJ and its component the OLC have possession and control of opinions issued by the OLC, and they are responsible for making those records available to the public.

## STATUTORY AND REGULATORY BACKGROUND

13.     Section 552(a)(2) of Title 5, which was enacted in 1946, is known as the "reading room" provision of FOIA. It imposes a number of independent, affirmative obligations on all executive branch agencies, including the obligation to "make available for public inspection and copying" certain designated categories of records. Those categories include, among others,

> (A) final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases; [and]

> (B) those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register[.]

5 U.S.C. § 552(a)(2)(A)–(B).

14.     Section 552(a)(2)(E) of this statute imposes on agencies the additional requirement to make publicly available:

> current indexes providing identifying information for the public as to any matter issued, adopted, or promulgated after July 4, 1967, and required by this paragraph [which includes the reading room requirements] to be made available or published.

**JA 65**

15.     Under section 552(a)(2), agencies must publish records that fall within the enumerated categories even in the absence of any request from a member of the public.

## FACTUAL BACKGROUND

### I.     The Office of Legal Counsel.

16.     The Judiciary Act of 1789 established the position of the attorney general of the United States and charged the attorney general with providing opinions on questions of law to the president and to the heads of executive departments:

> And there shall also be appointed a meet person, learned in the law, to act as attorney-general for the United States, who shall be sworn or affirmed to a faithful execution of his office; whose duty it shall be . . . give his advice and opinion upon questions of law when required by the President of the United States, or when requested by the heads of any of the departments, touching any matters that may concern their departments.

Judiciary Act of 1789, ch. 20, § 35, 1 Stat. 73, 93.

17.     The attorney general's opinion-writing function has, since the early years of our nation, served to centralize interpretation of the law within the executive branch. In a legal opinion authored in 1854, Attorney General Caleb Cushing explained that the opinions of the attorney general "officially define the law" and are "final and conclusive":

> In the discharge of the [opinion-writing function], the action of the Attorney General is quasi judicial. His opinions officially define the law, in a multitude of cases, where his decision is in practice final and conclusive . . . .
>
> Accordingly, the opinions of successive Attorneys General, possessed of greater or less amount of legal acumen, acquirement, and experience, have come to constitute a body of legal precedents and exposition, having authority the same in kind, if not the same in degree, with decisions of the courts of justice.

5

**JA 66**

Office and Duties of the Attorney General, 6 Op. Att'y Gen. 326, 334 (1854).[6] Attorney General

Cushing also described the role of the attorney general's opinions in deciding not just questions

relevant to "the action of public officers in administrative matters," but also "questions of private

right." *Id.*

18.     The Judiciary Act of 1789, as amended, directs the attorney general to render

opinions when requested by heads of executive departments "on questions of law arising in the

administration of his department." 28 U.S.C. § 512. The president has directed agency heads to

submit interagency disputes to the attorney general "[w]henever two or more Executive agencies

are unable to resolve a legal dispute between them." Exec. Order No. 12,146, § 1-4, 44 F.R.

42,657 (1979).

19.     In 1933, the attorney general delegated his opinion-writing function to the office

that would, in 1953, become the OLC.[7] Beginning in 1977 under the direction of President

Carter's attorney general, Griffin Bell, the OLC took on the form in which it persists today.[8]

Responding to the "rise of agency general counsels"[9] throughout the executive branch, Attorney

General Bell sought to establish the OLC as the preeminent expositor of executive branch law—

"a centralized and singular voice of executive branch legality."[10] To that end, Attorney General

Bell increased the volume of the OLC's opinion writing[11]; "directed [the] OLC to compile and

---

[6] *See* Daphna Renan, *The Law Presidents Make*, 103 Va. L. Rev. 805, 815 & nn.24, 27 (2017) (citing and discussing Attorney General Cushing's dominant explanation of the opinion-writing function).

[7] *Id.* at 819.

[8] *Id.* at 819–30.

[9] *Id.* at 819–20.

[10] *Id.* at 821.

[11] *Id.* at 819 & n.47.

begin to publish select opinions"[12]; secured funding for the OLC to professionalize its system of

research[13]; and instituted polices meant to insulate the OLC from political pressures.[14] These

efforts and others cemented Bell's vision of the OLC, in its exercise of the attorney general's

opinion-writing function, "as a singular legal expositor,"[15] with the "unique role of . . . issuing

legal opinions for the executive branch as a whole."[16]

20.    Today, the OLC's formal written opinions continue to establish the binding law of

the executive branch. The DOJ's website confirms that OLC's core function is to provide

"authoritative legal advice to the President and all the Executive Branch agencies."[17]

21.    The OLC has periodically issued memoranda discussing the office's unique role

within the executive branch. On July 16, 2010, then-head of the OLC, Acting Assistant Attorney

General David Barron, issued a memorandum to the attorneys of the OLC describing the office's

"Best Practices."[18] The memo states that OLC's "core function" is to "provide controlling advice

to Executive Branch officials on questions of law that are centrally important to the functioning

of the Federal Government." According to the memo, the OLC's opinions "may effectively be

the final word on controlling law," in part because the OLC "is frequently asked to opine on

issues of first impression that are unlikely to be resolved by the courts." The memo describes the

---

[12] *Id.* at 819–20.

[13] *Id.* at 820–21 & n.54.

[14] *Id.* at 822–23.

[15] *Id.* at 822.

[16] *Id.* at 824.

[17] *See* Dep't of Justice, Office of Legal Counsel, *About the Office*, https://www.justice.gov/olc (last visited Oct. 22, 2017).

[18] David Barron's "Best Practices Memo" memo is attached hereto as **Exhibit C**.

OLC's "system of precedent" as one in which the OLC's prior opinions are accorded "great weight."

22.     According to Barron's memo, the OLC generally does not provide "abstract legal opinions" or "general survey[s]" of the law; it does not offer "unnecessary advice, such as where it appears that policymakers are likely to move in a different direction"; and it typically refuses requests for formal written opinions "on questions likely to arise in pending or imminent litigation involving the United States as a party."

23.     Before accepting a request for an opinion, the OLC typically requires the soliciting agency to submit a "detailed memorandum setting forth the agency's own analysis of the question." If the request concerns an interagency dispute, the OLC "will ask each side for a memorandum" and allow each side to "reply" to the other. Even when there is no manifest dispute between agencies, the OLC "will also solicit the views of other agencies not directly involved in the opinion request that have subject-matter expertise or a special interest in the question presented."

24.     Once the OLC finalizes a formal written opinion, it prints the opinion on bond paper for signature along with a completed opinion control sheet signed by the lawyers responsible for the opinion. The OLC adds all unclassified opinions to an electronic database and to its "unclassified Day Books."

25.     Barron's memo on the OLC's practices followed a similar memo issued on May 16, 2005 by then-head of the OLC, Principal Deputy Assistant Attorney General Steven Bradbury.[19] Like Barron's memo, Bradbury's memo states that "OLC opinions are controlling on

_____

[19] Memorandum from Steven Bradbury, Principal Deputy Assistant Attorney Gen., to Attorneys of the Office of Legal Counsel (May 16, 2005),

JA 69

questions of law within the Executive Branch"; that the opinions "should be focused and concrete"; that they are "more likely to be necessary" when resolving interagency disputes; that the office's past opinions are "given great weight"; and that drafts undergo "rigorous review."

26.     Numerous former OLC lawyers have confirmed that the OLC's formal written opinions constitute the controlling legal views of the executive branch. One former head of the OLC, Randolph Moss, has said in his scholarship that the OLC's "formal, written opinions, constitute[] the legal position of the executive branch,"[20] and that "although the heads of departments are not generally required to seek legal guidance from the Department of Justice, when they do so, it is understood that the opinion provided will become the controlling view of the executive branch."[21] Moss also observed that "executive branch agencies have treated Attorney General (and later the Office of Legal Counsel) opinions as conclusive and binding since at least the time of Attorney General William Wirt[, who served from 1817 to 1829]."[22]

27.     Another former OLC lawyer, Trevor Morrison, has noted in his scholarship that the OLC's opinions are "treated as binding within the Executive Branch until withdrawn or overruled."[23] In combination with the attorney general's opinions, they "comprise the largest body of official interpretation of the Constitution and statutes outside the volumes of the federal court."[24]

---

https://www.justice.gov/sites/default/files/pages/attachments/2014/07/11/olc-best-practices-2005.pdf [https://perma.cc/GNU6-DKKU] (**Exhibit D**).

[20] Randolph D. Moss, *Executive Branch Legal Interpretation: A Perspective from the Office of Legal Counsel*, 52 Admin. L. Rev. 1303, 1305 (2000).

[21] *Id.* at 1318.

[22] *Id.* at 1320.

[23] Morrison, *supra* note 1, at 1464.

[24] *Id.* at 1451 (internal quotation marks omitted) (quoting John O. McGinnis, *Models of the Opinion Function of the Attorney General: A Normative, Descriptive, and Historical*

28.     More recently, Daphna Renan, a former OLC lawyer and now law professor

published a meticulous assessment of the role of the OLC in the development of the law of the

executive branch, noting that

> [the] OLC's role among legal advisors inside the executive branch is
> singular and articulated ex ante, that is, before any particular legal
> question arises. OLC's opinions are distinctively authoritative inside the
> executive branch. While the president (or his attorney general) can
> overrule an OLC opinion, this happens rarely. Barring such a reversal,
> OLC creates the binding law of the executive.[25]

29.     As noted above, the OLC has published only a subset of its formal written

opinions[26]; however, the opinions that have been released underscore that they are meant to be

authoritative and binding on executive agencies. The opening paragraphs of formal OLC

opinions usually describe the legal questions presented in much the same way as judicial

opinions would. Their final paragraphs generally announce their resolution of the question

presented and their legal conclusions in much the same manner as the final paragraphs of many

judicial opinions. The legal analysis within each opinion is grounded in the OLC's own

---

*Prolegomenon*, 15 Cardozo L. Rev. 375, 376 (1993)); *see also* Trevor Morrison, *Constitutional
Alarmism*, 124 Harv. L. Rev. 1688, 1711 (2011) (former OLC lawyer noting that "OLC's legal
opinions are treated as authoritative and binding within the executive branch").

[25] Renan, *supra* note 6, at 816; *see also* McGinnis, *supra* note 24, at 376 (OLC attorney–
advisor from 1985 to 1987 and Deputy Assistant Attorney General from 1987 to 1991); Nelson
Lund, *Rational Choice at the Office of Legal Counsel*, 15 Cardozo L. Rev. 437, 466 (1993)
(OLC attorney–advisor from 1986 to 1987 noting that "Department of Justice legal opinions are
generally treated as binding throughout the executive department"); Renan, *supra* note 6, at 878
("It creates the formal, binding common law of the executive branch); *id.* at 815–22, 834. There
is some academic disagreement over whether the OLC's opinions are binding in a formal sense
or only as a matter of custom; regardless, all agree that they are binding by custom. *See* Moss,
*supra* note 20, at 1320 ("[W]e have been able to go for over two hundred years without
conclusively determining whether the law demands adherence to Attorney General Opinions
because agencies have in practice treated these opinions as binding.").

[26] *See also* Renan, *supra* note 6, at 858 ("While OLC published more opinions under Carter
than under any other president, for example, those opinions still constituted only a small
percentage of the Office's formal opinions.").

precedents. And the opinions state their legal conclusions in mandatory language. They do not

equivocate or confine themselves to presenting the advantages and disadvantages of a particular

legal interpretation. Instead, they conclusively resolve concrete legal questions about the

executive branch's legal obligations.

    30.    The OLC's formal written opinions are always binding, but sometimes the OLC

underscores this. On August 21, 2009, for example, the OLC issued a formal written opinion

affirming the lawfulness of the Small Business Administration's regulations implementing

several federal contracting programs. The OLC wrote that its opinion was "binding on all

Executive Branch agencies," and it explicitly superseded Government Accountability Office

decisions inconsistent with the opinion:

> Our conclusion that the SBA's regulations we have reviewed are
> reasonable is binding on all Executive Branch agencies, notwithstanding
> any GAO decisions to the contrary.
>
> Our Office has on many occasions issued opinions and memoranda
> concluding that GAO decisions are not binding on Executive Branch
> agencies and that the opinions of the Attorney General and of this Office
> are controlling. *See* Bradbury Memo at 1 ("This memorandum is being
> distributed to ensure that general counsels of the Executive Branch are
> aware that the Office of Legal Counsel [] has interpreted this same
> appropriations law in a manner contrary to the views of GAO, and to
> provide a reminder that it is OLC that provides authoritative
> interpretations of law for the Executive Branch.") . . . .[27]

    31.    The OLC's formal written opinions also reflect the law of the executive branch

insofar as an opinion concluding that certain conduct is lawful effectively immunizes that

conduct from criminal liability. The DOJ has declined to investigate or prosecute individuals

---

[27] Office of Legal Counsel, Dep't of Justice, *Permissibility of Small Business Administration Regulations Implementing the Historically Underutilized Business Zone, 8(A) Business Development, and Service-Disabled Veteran-Owned Small Business Concern Programs* 13–14 (2009), https://www.justice.gov/file/18471/download [https://perma.cc/6TVM-TTNQ] (**Exhibit E**).

**JA 72**

who relied on OLC opinions to justify their conduct,[28] and former head of the OLC Jack Goldsmith has called the OLC opinions authorizing the Central Intelligence Agency's "enhanced interrogation techniques" a "golden shield" from prosecution.[29]

32.     In short, the OLC itself considers its formal written opinions to be binding upon all agencies, and the rigorous process it has implemented for the initiation, drafting, review, preservation, and precedential consideration of its formal written opinions reflects that view. As Karl Thompson, the acting head of the OLC in 2014, said at the time: the OLC's formal written opinions are "authoritative" and "binding by custom and practice in the executive branch. It's the official view of the office. People are supposed to and do follow it."[30]

## II.      Specific categories of formal written opinions.

33.     The OLC issues many different types of opinions, memoranda, and advice, including: formal written opinions, informal opinions and advice,[31] advice concerning litigation decisions,[32] reviews of the form and legality of executive orders, advice directly to the president or the attorney general, and letters concerning the constitutionality of pending legislation. This

---

[28] *See* Renan, *supra* note 6, at 832 & n.117 (explaining that the OLC's torture memos effectively conferred immunity from criminal liability on those who relied upon them).

[29] Jack Goldsmith, The Terror Presidency: Law and Judgment Inside the Bush Administration 162 (2007).

[30] The Department of Justice's Office of Professional Responsibility has also said that "OLC opinions are binding on the Executive Branch." Office of Prof'l Responsibility, Dep't of Justice, *Investigation into the Office of Legal Counsel's Memoranda Concerning Issues Relating to the Central Intelligence Agency's Use of "Enhanced Interrogation Techniques" on Suspected Terrorists* 15 (July 29, 2009).

[31] Renan, *supra* note 6, at 847 n.177 (quoting Karl Thompson, an acting head of the OLC under President Obama, as commenting "that '[t]he vast majority of our advice is provided informally'" (alteration in original)).

[32] Samuel A. Alito, Jr., *Change in Continuity at the Office of Legal Counsel*, 15 Cardozo L. Rev. 507, 509–10 (1993) ("it is not uncommon for OLC to express its views on litigation decisions").

JA 73

lawsuit concerns only a single type: formal written opinions issued to executive branch agencies or to executive branch officials other than the president.

34.     All of the OLC's formal written opinions are binding on the executive branch and, for that reason, fall within the scope of FOIA's affirmative-disclosure provisions. Some categories of these opinions fall within the scope of the affirmative-disclosure provisions of FOIA even under this Court's broad reading of *Electronic Frontier Foundation v. Department of Justice* (*EFF*), 739 F.3d 1 (D.C. Cir. 2014), discussed below.

### A.     Opinions resolving interagency disputes.

35.     A core function of the OLC is to adjudicate disputes between agencies concerning the law. Executive Order 12,146 directs executive agencies to submit legal disputes to the OLC for resolution. Exec. Order No. 12,146, § 1-4, 44 F.R. 42,657 (1979). Barron's memo on the OLC's practices explains that a formal written opinion is "most likely to be necessary when the legal question is the subject of a concrete and ongoing dispute between two or more executive agencies." Formal written opinions resolving "interagency disputes constitute at least 25% of opinions rendered to outside agencies."[33]

36.     On August 13, 2014, for example, the OLC issued a formal written opinion adjudicating a dispute between the Social Security Administration ("SSA") and the Equal Employment Opportunity Commission ("EEOC") over whether the EEOC had the authority to order the SSA "to pay a monetary award as a remedy for breach of a settlement agreement entered to resolve a dispute under Title VII of the Civil Rights Act of 1964."[34] The dispute arose

---

[33] McGinnis, *supra* note 24, at 423 n.181.

[34] Office of Legal Counsel, Dep't of Justice, *The Authority of the Equal Employment Opportunity Commission To Order a Federal Agency To Pay a Monetary Award To Remedy a Breach of a Settlement Agreement*, (2008),

after "a group of African–American male employees working in the Baltimore, Maryland headquarters of SSA filed a class complaint alleging that the agency had discriminated against them." The employees ultimately settled their dispute with the SSA, but they later sought monetary relief against the SSA for its breach of the settlement agreement. After administrative proceedings, the EEOC agreed with the employees and ordered the SSA to pay the requested monetary relief. The SSA then submitted the dispute to the OLC, arguing that the monetary relief ordered was precluded by sovereign immunity. The OLC ultimately agreed with the SSA: "We conclude that the doctrine of sovereign immunity precludes the monetary relief ordered in this case."

37.     On February 11, 2008, the OLC issued an opinion resolving a similar interagency dispute between the Department of Veterans Affairs ("VA") and the Department of Labor. The Department of Labor had concluded that the VA had "failed to pay the required prevailing wage to eleven alien physicians employed by VA hospitals pursuant to the H-1B visa program."[35] After the Department of Labor ordered the VA to pay back wages, the VA submitted the dispute to the OLC, which ultimately "conclude[d]" that sovereign immunity barred an award of back wages to the eleven physicians.

38.     OLC opinions adjudicating interagency disputes, such as these, constitute both "final opinions . . . made in the adjudication of cases," 5 U.S.C. § 552(a)(2)(A), and "statements of policy and interpretations which have been adopted by the agency," *id.* § 552(a)(2)(B). Nonetheless, the OLC has not published all formal written opinions adjudicating interagency

---

https://www.justice.gov/opinion/file/833591/download [https://perma.cc/5YX2-TX24] (**Exhibit F**).

[35] Office of Legal Counsel, Dep't of Justice, *Payment of Back Wages to Alien Physicians Hired Under H-1b Visa Program*, 2008 WL 825557, at *1 (2008), https://www.justice.gov/file/482131/download [https://perma.cc/H22V-HUV6] (**Exhibit G**).

JA 75

disputes. At least one published OLC opinion cites an unpublished opinion that appears to resolve an interagency dispute.[36]

### B.    Opinions issued to independent agencies.

39.    Before the OLC issues a formal written opinion to an independent agency—that is, an agency whose head does not serve at the pleasure of the president—the OLC's practice is to require the agency to confirm "in writing . . . that [the agency] will conform its conduct to [the OLC's] conclusion." In other words, the OLC requires independent agencies to adopt the conclusions of the OLC in advance of receiving any formal written opinion. Many of the OLC's published opinions evidence this practice.[37]

40.    OLC opinions adopted in this manner constitute both "final opinions . . . made in the adjudication of cases," 5 U.S.C. § 552(a)(2)(A), and "statements of policy and interpretations which have been adopted by the agency," *id.* § 552(a)(2)(B). Nonetheless, the OLC has not published all formal written opinions issued to independent agencies. At least one published OLC opinion cites an unpublished opinion issued to an independent agency.[38]

---

[36] *See, e.g.*, Office of Legal Counsel, Dep't of Justice, *The Effect of Veterans' Health Administration Nurses' Additional Pay for Sunday and Night Duty on Calculation of Workers' Compensation Benefits* (2001) (unpublished opinion addressed to the Department of Labor and the Department of Veteran Affairs), *cited in* Office of Legal Counsel, Dep't of Justice, *Authority of the Equal Employment Opportunity Commission to Impose Monetary Sanctions Against Federal Agencies for Failure to Comply With Orders Issued by EEOC Administrative Judges* (2003), https://www.justice.gov/file/18906/download [https://perma.cc/S3YB-CZEH] (**Exhibit H**).

[37] *See, e.g.*, Office of Legal Counsel, Dep't of Justice, *Whether the Defense of Marriage Act Precludes the Nonbiological Child of a Member of a Vermont Civil Union From Qualifying for Child's Insurance Benefits Under the Social Security Act* 1 n.1 (2007), https://www.justice.gov/file/451616/download [https://perma.cc/8TW4-UX8D] (**Exhibit I**) ("We are informed that the Commissioner has agreed to be bound by the opinion of this Office.").

[38] *See, e.g.*, Office of Legal Counsel, Dep't of Justice, *Applicability of 18 U.S.C. § 1913 to the Provision of Official Time to Employee Union Representatives to Lobby Congress on Representational Issues* (2001) (unpublished opinion issued to the Social Security Administration, an independent agency), *cited in* Office of Legal Counsel, Dep't of Justice,

### C.    Opinions interpreting non-discretionary legal obligations.

41.     The OLC issues binding interpretations of statutes and other authorities that impose non-discretionary legal obligations on federal agencies. These opinions have the effect of directly determining an agency's policies and practices, because the agency is under a non-discretionary obligation to comply with the authority at issue, and because the OLC's interpretation of that authority is binding on the agency.

42.     For example, on October 16, 2007, the OLC issued a formal written opinion addressing whether the Defense of Marriage Act affected the obligation of the Social Security Administration to provide "child's insurance benefits" to children of disabled parents in same-sex unions.[39] The OLC determined that the Defense of Marriage Act did not interfere with the Administration's legal obligation to provide social security benefits. The opinion had the effect of deciding the Social Security Administration's policies and the legal entitlement to social security benefits of the children of same-sex couples. Moreover, the OLC opinion adjudicated the entitlement to social security benefits of a specific child—Elijah, the son of Karen and Monique, who had entered into a civil union under Vermont law in 2002. In other words, the opinion determined not just the Social Security Administration's non-discretionary legal obligations, but their application to a specific individual.

43.     Similarly, on November 1, 2011, the OLC issued a formal written opinion determining the scope of the Office of Personnel Management's non-discretionary obligation to provide service credit to federal employees under the Federal Employees' Retirement System

---

*Application of 18 U.S.C. § 1913 to "Grass Roots" Lobbying by Union Representatives* 3 (2005), https://www.justice.gov/file/450926/download [https://perma.cc/TVM6-ZYE4] (**Exhibit J**).

[39] *Whether the Defense of Marriage Act Precludes the Nonbiological Child of a Member of a Vermont Civil Union From Qualifying for Child's Insurance Benefits Under the Social Security Act* (2007), *supra* note 37.

**JA 77**

Act.[40] In an interagency dispute with the U.S. Postal Service, the Office of Personnel

Management argued that Postal Service employees were not entitled to service credit for periods

during which the Postal Service had defaulted on its contributions to its employees' retirement

and disability fund. The OLC rejected that view, concluding that "OPM may not address the

Postal Service's failure to make the employer contributions required by FERS by denying postal

employees coverage or creditable service under FERS."  The OLC's legal conclusion had the

effect of determining OPM's policies and practices.

44.     The OLC's opinions interpreting non-discretionary legal obligations of federal

agencies constitute both "final opinions . . . made in the adjudication of cases," 5 U.S.C.

§ 552(a)(2)(A), and "statements of policy and interpretations which have been adopted by the

agency," *id.* § 552(a)(2)(B). Nonetheless, the OLC has not published all such formal written

opinions. At least one published OLC opinion cites an unpublished opinion that appears to

interpret a federal agency's non-discretionary legal obligation.[41]

---

[40] Office of Legal Counsel, Dep't of Justice, *Whether Postal Employees Are Entitled To Receive Service Credit, for Purposes of Their Retirement Annuity Under The Federal Employees' Retirement System, for Periods of Employment during which the United States Postal Service Has Not Made Its Required Employer Contributions*, 2011 WL 7431070 (2011), https://www.justice.gov/file/18331/download [https://perma.cc/K9E7-S7D5] (**Exhibit K**).

[41] *See, e.g.*, Office of Legal Counsel, Dep't of Justice, *Payment of Attorney's Fees Under the Equal Access to Justice Act* (1994) (unpublished OLC opinion concerning the Department of Justice's obligation to pay attorneys' fees under the Equal Access to Justice Act), *cited in* Office of Legal Counsel, Dep't of Justice, *Responsibility of Agencies to Pay Attorney's Fee Awards Under the Equal Access to Justice Act* (2007), https://www.justice.gov/file/451596/download [https://perma.cc/9DVV-R5S6] (**Exhibit L**) (determining which agency is, under the Equal Access to Justice Act, responsible for paying a fee award and citing the 1994 opinion as "acknowledging DOJ's responsibility to pay [an] EAJA fee award where DOJ had intervened in bankruptcy litigation").

**D.      Opinions finding that particular statutes are unconstitutional and that therefore agencies need not comply with them.**

45.      Some OLC opinions determine that a congressional enactment is unconstitutional and that federal agencies may therefore decline to give the statute effect. For example, on January 29, 2008, the OLC issued an opinion holding that the "direct reporting requirement" of the Implementing Recommendations of the 9/11 Commission Act of 2007—which mandated that certain reports of the Department of Homeland Security's Chief Privacy Officer be sent directly to Congress—would be unconstitutional if applied to restrict the president's review of the reports.[42] "In such circumstances," the OLC noted, "the statute must yield to the President's exercise of his constitutional authority."

46.      The OLC's opinions finding congressional statutes unconstitutional constitute both "final opinions . . . made in the adjudication of cases," 5 U.S.C. § 552(a)(2)(A), and "statements of policy and interpretations which have been adopted by the agency," *id.* § 552(a)(2)(B). Nonetheless, the OLC has not published all such formal written opinions. At least one published OLC opinion cites an unpublished opinion that appears to find a congressional enactment unconstitutional.[43]

---

[42] Office of Legal Counsel, Dep't of Justice, *Constitutionality of the Direct Reporting Requirement in Section 802(e)(1) of the Implementing Recommendations of the 9/11 Commission Act of 2007* (2008), https://www.justice.gov/file/477336/download [https://perma.cc/BA7R-2NZ9] (**Exhibit M**).

[43] Office of Legal Counsel, Dep't of Justice, *Legal Authority to Withhold Information from Congress* (1998) (unpublished OLC opinion), *cited in Constitutionality of the Direct Reporting Requirement*, *supra* note 42, at 18–19 (quoting the unpublished opinion of 1998 for the proposition that "the 'application of [statutory] reporting requirements . . . is limited by a constitutional restraint—the executive branch's authority to control the disclosure of information when necessary to preserve the Executive's ability to perform its constitutional responsibilities'" (alterations in original)).

### E.    Opinions adjudicating or determining private rights.

47.    Some OLC opinions directly or indirectly determine private rights. As former OLC lawyer and then–Judge Samuel A. Alito, Jr. commented in a law-review article, "many of the questions on which OLC opines do involve private rights."[44] OLC opinions determining private rights are similar in effect to administrative or judicial decisions concerning private rights: they define, at least in the first instance, the rights and liabilities of private individuals vis-à-vis the government.

48.    Many of the opinions discussed above fall into this category, including the OLC's opinions concerning: the availability of monetary relief for the violation of an agreement settling discrimination claims, the availability of back wages to redress improperly withheld pay, the entitlement to service credit under a federal retirement and disability plan, and the entitlement to social security benefits for the children of same-sex couples. Each of these opinions decided the rights of classes of individuals as well as the rights of specific individuals whose claims, entitlements, or benefits the OLC was addressing.

49.    The OLC's opinions adjudicating or determining private rights constitute both "final opinions . . . made in the adjudication of cases," 5 U.S.C. § 552(a)(2)(A), and "statements of policy and interpretations which have been adopted by the agency," *id.* § 552(a)(2)(B). Nonetheless, the OLC has not published all such formal written opinions. At least one published OLC opinion cites unpublished opinions that determine private rights.[45]

---

[44] Alito, *supra* note 32, at 509–10.

[45] *See, e.g.*, Office of Legal Counsel, Dep't of Justice, *Proposed Award of Honorary British Knighthood to Retiring Military Officer* (1996) (unpublished OLC opinion determining that retired military officers remain subject to the Emoluments Clause), *cited in* Office of Legal Counsel, Dep't of Justice, *Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize*, https://www.justice.gov/file/18441/download [https://perma.cc/E4X2-CA23] (**Exhibit N**); *see*

### III.    Procedural posture.

50.    On March 22, 2016, the executive director of CfA wrote to Principal Deputy

Assistant Attorney General Thompson requesting that the OLC comply immediately with its

obligations under 5 U.S.C. § 552(a)(2) to make available for public inspection and copying on an

ongoing basis all unpublished OLC opinions that provide controlling legal advice to executive

branch agencies and a general index of all such opinions. The letter made clear it was not a

request for records under 5 U.S.C. § 552(a)(3).[46]

51.    Deputy Assistant Attorney General John Bies responded to CfA's request by

letter dated May 26, 2016. He articulated OLC's continuing position that none of the opinions it

issues are covered by the requirements of 5 U.S.C. § 552(a)(2). Mr. Bies asserted that the "OLC

does not have policymaking authority, nor does it enforce laws against or adjudicate the rights of

private individuals. Rather, OLC provides confidential legal advice within the Executive Branch.

As such, OLC's advice is ordinarily covered by the attorney–client and deliberative process

privileges, and is therefore exempt from mandatory disclosure under the FOIA."[47]

52.    The refusal of the DOJ and the OLC to comply with their statutory obligations to

provide CfA and the public at large, on an ongoing basis, OLC opinions that fall within 5 U.S.C.

§ 552(a)(2) and an index of such opinions has harmed, and continues to harm, CfA in carrying

out its core programmatic activities. CfA has suffered an informational harm by being deprived

of information the law requires the DOJ to affirmatively make available to the public. This

---

*also Applicability of the Emoluments Clause* at 8, 11 (citing other unpublished OLC opinions
concerning the applicability of the Emoluments Clause to other classes of individuals).

[46] The CfA's request letter is attached hereto as **Exhibit A**.

[47] The OLC's response letter is attached hereto as **Exhibit B**.

JA 81

informational harm establishes CfA's standing to sue to enforce the provisions of 5 U.S.C.

§ 552(a)(2). *See Fed. Election Comm'n v. Akins*, 524 U.S. 11 (1998).

53.     The CfA filed this lawsuit on June 8, 2016, arguing that the OLC had violated

FOIA's reading-room provision by failing to proactively publish its formal written opinions. On

October 6, 2017, the district court granted the government's motion to dismiss the CfA's original

complaint without prejudice. The district court interpreted the D.C. Circuit's decision in *EFF* as

foreclosing application of FOIA's reading-room provision to the OLC's opinions solely on the

basis of their controlling and precedential nature. The district court permitted CfA to amend its

complaint, and Plaintiff now files this Amended Complaint.

## CAUSES OF ACTION

**I.      Failure to comply with the disclosure obligations of 5 U.S.C. § 552(a)(2).**

54.     Section 552(a)(2) of Title 5 requires all agencies, including the DOJ and its

component the OLC, to make available for public inspection and copying final opinions made in

the adjudication of cases and statements of policy and interpretations that have been adopted by

the agency and not published in the Federal Register.

55.     The OLC issues opinions that fall within the categories of records that 5 U.S.C.

§ 552(a)(2) requires be made available for public inspection and copying, including formal

written opinions issued to executive branch agencies and officials.

56.     Notwithstanding the clear, non-discretionary mandate set forth in 5 U.S.C.

§ 552(a)(2), which requires the DOJ to act regardless of whether there has been a request for

specified records pursuant to 5 U.S.C. § 552(a)(3), the DOJ and the OLC have refused for years

to make available for public inspection and copying all final written opinions made in the

adjudication of cases and statements of policy and interpretations that have been adopted by the

agency.

**JA 82**

57.     As a result, CfA and the public have been deprived of information the statute guarantees them a right to access. This has led to the creation of a body of secret law within the DOJ and the OLC—the precise danger Congress sought to avoid through the enactment of 5 U.S.C. § 552(a)(2).

58.     Plaintiff is therefore entitled to relief in the form of a declaratory judgment that Defendant has failed to comply with the disclosure obligations of 5 U.S.C. § 552(a)(2).

59.     Plaintiff also is entitled to an injunction directing the DOJ and the OLC to redress their failure to comply with the disclosure obligations of 5 U.S.C. § 552(a)(2) by disclosing to Plaintiff, without a specific request, all past and future formal written opinions issued to executive branch agencies or to executive branch officials other than the president, and not published in the Federal Register.

**II.     Failure to comply with the indexing requirement of 5 U.S.C. § 552(a)(2)(E).**

60.     Section 552(a)(2)(E) of Title 5 imposes on agencies the additional requirement to make publicly available current indices providing identifying information for the public as to any matter issued, adopted, or promulgated after July 4, 1967, and required by 5 U.S.C. § 552(a)(2) to be made available or published.

61.     Notwithstanding the clear, non-discretionary mandate set forth in 5 U.S.C. § 552(a)(2)(E), which requires DOJ to act regardless of whether there has been a specific request for an index, the DOJ and the OLC have failed for years to make available for public inspection and copying indices of all formal written opinions issued by the OLC to executive branch agencies or officials.

62.     As a result, CfA and the public have been deprived of information the statute guarantees them a right to access. This has led to the creation of a body of secret law within the

OLC and the DOJ—the precise danger Congress sought to avoid through the enactment of 5

U.S.C. § 552(a)(2).

63.    Plaintiff is therefore entitled to relief in the form of a declaratory judgment that

defendant has failed to comply with the indexing and disclosure obligations of 5 U.S.C.

§ 552(a)(2)(E).

64.    Plaintiff also is entitled to an injunction directing the DOJ and the OLC to redress

their failure to comply with 5 U.S.C. § 552(a)(2)(E) by disclosing to Plaintiff, without a specific

request, indices of all past and future formal written opinions issued by the OLC to executive

branch agencies or to executive branch officials other than the president.

## PRAYER FOR RELIEF

WHEREFORE, the Campaign for Accountability respectfully requests that this Court:

1.    Declare that Defendant has failed to comply with the disclosure obligations of 5

U.S.C. § 552(a)(2) by refusing to make available for public inspection and copying all formal

written opinions issued by the OLC to executive branch agencies or to executive branch officials

other than the president;

2.    Order Defendant to disclose to Plaintiff all formal written opinions issued by the

OLC to executive branch agencies or to executive branch officials other than the president;

3.    Declare that Defendant has failed to comply with the disclosure obligations of 5

U.S.C. § 552(a)(2)(E) by refusing to make available for public inspection and copying indices of

all formal written opinions issued by the OLC to executive branch agencies or to executive

branch officials other than the president;

4.    Order Defendant to make available for public inspection and copying indices of

all formal written opinions issued by the OLC to executive branch agencies or to executive

branch officials other than the president, if issued, adopted, or promulgated after July 4, 1967;

**JA 84**

5.     Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

/s/ Alex Abdo
_____
Alex Abdo
Jameel Jaffer
Knight First Amendment Institute
  at Columbia University
314 Low Library
535 West 116th Street
New York, NY 10027
(212) 854-9600
alex.abdo@knightcolumbia.org

*Counsel for Plaintiff*

October 27, 2017

JA 85

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CAMPAIGN FOR ACCOUNTABILITY,

        Plaintiff,

    v.

U.S. DEPARTMENT OF JUSTICE,

        Defendant.

No. 1:16-cv-1068 (KBJ)

## INDEX OF EXHIBITS
## TO AMENDED COMPLAINT

CfA's request to OLC under 5 U.S.C. § 552(a)(2) (Mar. 22, 2016)..................................A

OLC's response to CfA's request (May 26, 2016) ...........................................................B

Memorandum from David J. Barron, Acting Assistant Attorney Gen., to
Attorneys of the Office of Legal Counsel (July 16, 2010),
http://1.usa.gov/29acGlS [https://perma.cc/8ARY-P7KW]
(**Barron Best Practices Memo**)....................................................................................C

Memorandum from Steven Bradbury, Principal Deputy Assistant Attorney Gen.,
to Attorneys of the Office of Legal Counsel (May 16, 2005),
https://www.justice.gov/sites/default/files/pages/attachments/2014/07/11/olc-best-
practices-2005.pdf [https://perma.cc/GNU6-DKKU]
(**Bradbury Best Practices Memo**) ...............................................................................D

Office of Legal Counsel, Dep't of Justice, *Permissibility of Small Business
Administration Regulations Implementing the Historically Underutilized Business
Zone, 8(A) Business Development, and Service-Disabled Veteran-Owned Small
Business Concern Programs* (2009),
https://www.justice.gov/file/18471/download [https://perma.cc/6TVM-TTNQ]...............E

Office of Legal Counsel, Dep't of Justice, *The Authority of the Equal Employment
Opportunity Commission To Order a Federal Agency To Pay a Monetary Award
To Remedy a Breach of a Settlement Agreement*, (2008),
https://www.justice.gov/opinion/file/833591/download [https://perma.cc/5YX2-
TX24].................................................................................................................................F

Office of Legal Counsel, Dep't of Justice, *Payment of Back Wages to Alien Physicians Hired Under H-1b Visa Program*, 2008 WL 825557, at *1 (2008), https://www.justice.gov/file/482131/download [https://perma.cc/H22V-HUV6]..............G

Office of Legal Counsel, Dep't of Justice, *Authority of the Equal Employment Opportunity Commission to Impose Monetary Sanctions Against Federal Agencies for Failure to Comply With Orders Issued by EEOC Administrative Judges* (2003), https://www.justice.gov/file/18906/download [https://perma.cc/S3YB-CZEH]................................................................H

Office of Legal Counsel, Dep't of Justice, *Whether the Defense of Marriage Act Precludes the Nonbiological Child of a Member of a Vermont Civil Union From Qualifying for Child's Insurance Benefits Under the Social Security Act* (2007), https://www.justice.gov/file/451616/download [https://perma.cc/8TW4-UX8D] ..............I

Office of Legal Counsel, Dep't of Justice, *Application of 18 U.S.C. § 1913 to "Grass Roots" Lobbying by Union Representatives* 3 (2005), https://www.justice.gov/file/450926/download [https://perma.cc/TVM6-ZYE4] ..............J

Office of Legal Counsel, Dep't of Justice, *Whether Postal Employees Are Entitled To Receive Service Credit, for Purposes of Their Retirement Annuity Under The Federal Employees' Retirement System, for Periods of Employment during which the United States Postal Service Has Not Made Its Required Employer Contributions*, 2011 WL 7431070 (2011), https://www.justice.gov/file/18331/download [https://perma.cc/K9E7-S7D5].................K

Office of Legal Counsel, Dep't of Justice, *Responsibility of Agencies to Pay Attorney's Fee Awards Under the Equal Access to Justice Act* (2007), https://www.justice.gov/file/451596/download [https://perma.cc/9DVV-R5S6]..............L

Office of Legal Counsel, Dep't of Justice, *Constitutionality of the Direct Reporting Requirement in Section 802(e)(1) of the Implementing Recommendations of the 9/11 Commission Act of 2007* (2008), https://www.justice.gov/file/477336/download [https://perma.cc/BA7R-2NZ9]..............M

Office of Legal Counsel, Dep't of Justice, *Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize*, https://www.justice.gov/file/18441/download [https://perma.cc/E4X2-CA23] ..........................................................N

# Amended Complaint

# Exhibit A

# C A M P A I G N   F O R
# ACCOUNTABILITY

March 22, 2015

**By Facsimile: (202) 514-0563**

Karl Remón Thompson
Principal Deputy Assistant Attorney General
Office of Legal Counsel
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

Dear Principal Deputy Assistant Attorney General Thompson:

Campaign for Accountability (CfA) hereby requests that the Office of Legal Counsel (OLC) immediately comply with its obligations under 5 U.S.C. § 552(a)(2) to make available for public inspection and copying on an ongoing basis all unpublished OLC opinions that provide controlling legal advice to executive branch agencies and a general index of all such opinions OLC has issued. By failing to date to comply with these legal obligations, OLC has created a body of secret law that contravenes the congressional purpose behind § 552(a)(2) and undermines our democratic system of government.

Nearly three years ago, on behalf of another organization, I made a similar request of then-Assistant Attorney General Virginia A. Seitz. My letter of July 3, 2013,[1] explained the scope of the obligation 5 U.S.C. § 552(a)(2) imposes on all executive branch agencies, including the Department of Justice and its component OLC, to make publicly available certain categories of records including, *inter alia*, "final opinions . . . made in the adjudication of cases" and unpublished "statements of policy and interpretations which have been adopted by the agency[.]" *Id.* at (D) and (A). Yet then, as now, OLC refused to comply with this statutory command.

My current request, at a minimum, encompasses the formal written opinions OLC has issued and will issue using the process outlined in a July 16, 2010 memorandum to OLC attorneys from then-Acting Assistant Attorney General David J. Barron.[2] This is by no means to suggest that these formal written opinions comprise the full body of final opinions subject to 5 U.S.C. § 552(a)(2). Indeed, as you acknowledged during an American Bar Association conference last fall,

> [t]here are a lot of different ways in which OLC gives advice. A very small piece of that is writing formal opinions. The vast majority of our advice is provided

---

[1] For your convenience I am enclosing a copy of this letter as Exhibit A.

[2] For your convenience I am enclosing a copy of this memorandum as Exhibit B.

1201 Connecticut Avenue, N.W. • Suite 300 • Washington, D.C. 20036 • (202) 780-5750
www.campaignforaccountability.org

Karl Remón Thompson
March 22, 2016
Page Two

> informally – is delivered orally or in emails. That is
> still authoritative. It is still binding by custom and
> practice in the executive branch. It's the official view of
> the office. People are supposed to and do follow it.[3]

These OLC opinions, whether produced through OLC's more formal opinion writing
process or instead memorialized in emails and other forms of writing, function as binding
law on the executive branch. Accordingly, they must be made publicly available as either
"final opinions . . . made in the adjudication of cases" or "statements of policy and
interpretations which have been adopted by the agency[.]"  5 U.S.C. § 552(a).

Despite the clarity of the legal obligations 5 U.S.C. § 552(a) imposes and your
own recognition that OLC provides binding and authoritative legal advice that must be
followed, OLC has steadfastly refused requests that it make its written opinions publicly
available. A recent decision of U.S. District Court Judge Amir P. Mehta in *CREW v. U.S.
Dep't of Justice*, Civil No. 113-1291 (D.D.C. March 7, 2016), recognizes that the judicial
review provisions of the Freedom of Information Act confer jurisdiction on district courts
to hear suits challenging an agency's failure to comply with 5 U.S.C. § 552(a). While we
remain hopeful that OLC will immediately make the documents CfA is requesting
publicly available as § 552(a) requires, CfA is prepared to seek relief from the courts to
ensure the public has access to this growing body of secret law.

Sincerely,

Anne L. Weismnn
Executive Director

Encl.

---

[3] *See* Josh Gerstein, Official: FOIA Worries Dampen Requests for Formal Legal Opinions, *Politico*,
November 5, 2015, *available at* http://www.politico.com/blogs/under-the-radar/2015/11/official-foia-
worries-dampen-requests-for-formal-legal-opinions-215567.

# EXHIBIT A

FY- 13 - 061

**CREW** | citizens for responsibility
and ethics in washington

1400 Eye Street N.W., Suite 450
Washington, D.C. 20005
Phone: 202-408-5565
Fax: 202-588-5020

---

### FACSIMILE TRANSMITTAL SHEET

| | |
|---|---|
| TO: | FROM: |
| Virginia A. Seitz, Assistant Attorney General | Anne L. Weismann |
| COMPANY: | DATE: |
| Office of Legal Counsel, U.S. Department of Justice | JULY 3, 2013 |
| RECIPIENT'S FAX NUMBER: | PAGE 1 OF 3 |
| 202-514-0563 | |
| RECIPIENT'S PHONE NUMBER: | RE: |
| | Please see enclosed letter |

NOTES/COMMENTS:

*Pages transmitted are privileged and confidential.*

Case 1:16-cv-01068-KBJ Document 22-2 Filed 10/27/17 Page 6 of 14
USCA Case #24-5163 Document #2080945 Filed 11/13/03 4 Page 2 of 99 of 242
Case 1:13-cv-01291-APM Document 8-2 Filed 11/13/13 Page 2 of 3

**CREW** | citizens for responsibility and ethics in washington

July 3, 2013

**By Facsimile (202) 514-0563**

Virginia A. Seitz
Assistant Attorney General
Office of Legal Counsel
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

Dear Assistant Attorney General Seitz:

Citizens for Responsibility and Ethics in Washington (CREW) hereby requests that the Office of Legal Counsel (OLC) immediately comply with its obligation under 5 U.S.C. § 552(a)(2) to make available for public inspection and copying all OLC opinions that are binding on the executive branch. OLC's failure to comply with this requirement has led to the creation of a body of secret law that undermines our democratic system of government and conflicts with the Department of Justice's legal obligations.

By statute, 5 U.S.C. § 552(a)(2), Congress has imposed on all executive branch agencies the requirement to "make available for public inspection and copying" certain categories of records, which include, *inter alia*, "final opinions . . . made in the adjudication of cases" and "those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register." *Id.* at (D) and (A). Unlike other provisions of the Freedom of Information Act, agencies are subject to this obligation whether or not there is a specific request for a record that falls within the covered categories.

As an executive branch agency, DOJ, and its component OLC, are subject to these requirements. OLC in particular creates documents that unquestionably fall within the categories of records that must be made available for public inspection and copying. Specifically, OLC is tasked with resolving inter-agency disputes, preparing the formal opinions of the attorney general, and "[r]endering opinions to the Attorney General and to the heads of the various organizational units of the Department on questions of law arising in the administration of the Department." 28 C.F.R. § 0.25(a) and (c); *see also* Exec. Order No. 12, 146 § 1-4, 3 C.F.R. § 409 (1979). As OLC itself has acknowledged, the opinions OLC renders resolving these disputes, like all other binding opinions OLC issues, "may effectively be the final word on controlling law." Memorandum from David Barron, Acting Assistant Attorney General, Office of Legal Counsel, U.S. Department of Justice, for Attorneys of the Office 1 (July 16, 2010) (Baron Memo). *See also* U.S. Department of Justice, *Office of Legal Counsel* (March 2013),

1400 Eye Street, N.W., Suite 450, Washington, D.C. 20005 | 202.408.5565 phone | 202.588.5020 fax | www.citizensforethics.org

Assistant Attorney General Seitz
July 3, 2013
Page Two

http://www.justice.gov.olc. OLC opinions are considered *stare decisis* within the executive branch, particularly because the vast majority of executive branch legal issues never reach a court for resolution. Baron Memo at 2.

These OLC opinions, like the attorney general opinions that preceded them,[1] function as binding law on the executive branch. As a result, they constitute either "final opinions . . . made in the adjudication of cases," or "statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register." 5 U.S.C. § 552(a). Accordingly, OLC is subject to the statutory mandate to make them available for public inspection and copying.

Despite this clear mandate, however, OLC has failed to comply with this requirement since receiving the delegated authority from the attorney general to issue binding opinions. Dating back to at least 1840, compilations of attorney general opinions were published and made available to the public. Since taking over this function, OLC has published some of its opinions, but continues to withhold a significant number from public view. For example, the first volume of OLC opinions published in 1980 included 73 opinions, which OLC estimated to constitute approximately one-quarter of the written legal opinions prepared by the office in 1977. Similarly, an analysis by the Sunlight Foundation in 2012 concluded OLC had withheld from online publication 39 percent of the 509 identifiable OLC opinions issued between 1998 and 2012. Because DOJ has never made public the exact number of opinions OLC has issued, it is impossible for the public to know precisely how many opinions exist but have yet to be released. This evidence, however, certainly makes clear a significant number of OLC opinions have not been made available for public inspection and copying, contrary to the requirements of 5 U.S.C. § 552(a).

Accordingly, OLC should immediately begin the process of disclosing all of its opinions, beginning with those issued in the last 20 years, which are likely to be of greatest public interest. If OLC continues to refuse to comply with its legal obligations, we will seek relief from the courts to ensure the public has access to this growing body of secret law.

Very truly ours,

Anne L. Weismann
Chief Counsel

---

[1] The authority conferred on the attorney general by the Judiciary Act of 1789, ch. 20, § 35, 1 Stat. 73, 93, to render opinions on questions of law when required by the president or upon request from executive branch agencies was delegated to OLC in 1950.

# EXHIBIT B

Case 1:16-cv-01068-KBJ  Document 22-2  Filed 10/27/17  Page 9 of 14
USCA Case #24-5163   Document #2080945      Filed: 10/18/2024   Page 102 of 242

Case 1:13-cv-01291-APM  Document 19-4  Filed 10/20/14  Page 1 of 6



**U.S. Department of Justice**

Office of Legal Counsel

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

July 16, 2010

## MEMORANDUM FOR ATTORNEYS OF THE OFFICE

*Re: Best Practices for OLC Legal Advice and Written Opinions*

By delegation, the Office of Legal Counsel (OLC) exercises the Attorney General's authority under the Judiciary Act of 1789 to provide the President and executive agencies with advice on questions of law. OLC's core function, pursuant to the Attorney General's delegation, is to provide controlling advice to Executive Branch officials on questions of law that are centrally important to the functioning of the Federal Government. In performing this function, OLC helps the President fulfill his or her constitutional duties to preserve, protect, and defend the Constitution, and to "take Care that the Laws be faithfully executed." It is thus imperative that the Office's advice be clear, accurate, thoroughly researched, and soundly reasoned. The value of OLC advice depends upon the strength of its analysis. OLC must always give candid, independent, and principled advice—even when that advice is inconsistent with the aims of policymakers. This memorandum reaffirms the longstanding principles that have guided and will continue to guide OLC attorneys in all of their work, and then addresses the best practices OLC attorneys should follow in providing one particularly important form of controlling legal advice the Office conveys: formal written opinions.

### I. Guiding Principles

Certain fundamental principles guide all aspects of the Office's work. As noted above, OLC's central function is to provide, pursuant to the Attorney General's delegation, controlling legal advice to Executive Branch officials in furtherance of the President's constitutional duties to preserve, protect, and defend the Constitution, and to "take Care that the Laws be faithfully executed." To fulfill this function, OLC must provide advice based on its best understanding of what the law requires—not simply an advocate's defense of the contemplated action or position proposed by an agency or the Administration. Thus, in rendering legal advice, OLC seeks to provide an accurate and honest appraisal of applicable law, even if that appraisal will constrain the Administration's or an agency's pursuit of desired practices or policy objectives. This practice is critically important to the Office's effective performance of its assigned role, particularly because it is frequently asked to opine on issues of first impression that are unlikely to be resolved by the courts—a circumstance in which OLC's advice may effectively be the final word on the controlling law.

---

* This memorandum updates a prior memorandum, "Best Practices for OLC Opinions," issued May 16, 2005.

Case 1:16-cv-01068-KBJ   Document 22-2   Filed 10/27/17   Page 10 of 14
USCA Case #24-5163   Document #2080945        Filed: 10/18/2024   Page 103 of 242

Case 1:13-cv-01291-APM   Document 19-4   Filed 10/20/14   Page 2 of 6

In providing advice, the Office should focus intensively on the central issues raised by a request and avoid addressing issues not squarely presented by the question before it. As much as possible, the Office should be attentive to the particular facts and circumstances at issue in the request, and should avoid issuing advice on abstract questions that lack the concrete grounding that can help focus legal analysis. And regardless of the Office's ultimate legal conclusions, it should strive to ensure that it candidly and fairly addresses the full range of relevant legal sources and significant arguments on all sides of a question. To be sure, the Office often operates under severe time constraints in providing advice. In such instances, the Office·should make clear when it needs additional time to permit proper and thorough review of the relevant issues. If additional time is not available, the Office should make clear that its advice has been given with only limited time for review, and thus that more thorough consideration of the issue has not been possible.

On any issue involving a constitutional question, OLC's analysis should focus on traditional sources of constitutional meaning, including the text of the Constitution, the historical record illuminating the text's meaning, the Constitution's structure and purpose, and judicial and Executive Branch precedents interpreting relevant constitutional provisions. Particularly where the question relates to the authorities of the President or other executive officers or the allocation of powers between the Branches of the Government, precedent and historical practice are often of special relevance. On other questions of interpretation, OLC's analysis should be guided by the texts of the relevant documents, and should use traditional tools of construction in interpreting those texts. Because OLC is part of the Executive Branch, its analyses may also reflect the institutional traditions and competencies of that branch of the Government. For example, OLC opinions should consider and ordinarily give great weight to any relevant past opinions of Attorneys General and the Office. The Office should not lightly depart from such past decisions, particularly where they directly address and decide a point in question, but as with any system of precedent, past decisions may be subject to reconsideration and withdrawal in appropriate cases and through appropriate processes.

Finally, OLC's analyses may appropriately reflect the fact that its responsibilities also include facilitating the work of the Executive Branch and the objectives of the President, consistent with the law. As a result, unlike a court, OLC will, where possible and appropriate, seek to recommend lawful alternatives to Executive Branch proposals that it decides would be unlawful. Notwithstanding this aspect of OLC's mission, however, its legal analyses should always be principled, forthright, as thorough as time permits, and not designed merely to advance the policy preferences of the President or other officials.

## II. Opinion Preparation

While the Office frequently conveys its controlling legal advice in less formal ways, including through oral presentations and by e-mail, the best practices for preparing the Office's formal written opinions merit particular attention. These opinions take the form of signed memoranda, issued to an Executive Branch official who has requested the Office's opinion.

**A. *Evaluating opinion requests*.** Each opinion request is assigned initially to at least one Deputy Assistant Attorney General and one Attorney-Adviser, who will review the question

2

Case 1:16-cv-01068-KBJ   Document 22-2   Filed 10/27/17   Page 11 of 14
USCA Case #24-5163    Document #2080945      Filed: 10/18/2024   Page 104 of 242

Case 1:13-cv-01291-APM   Document 19-4   Filed 10/20/14   Page 3 of 6

presented and any relevant primary materials, prior OLC opinions, and leading cases to
determine preliminarily whether the question is appropriate for OLC advice and whether it
appears to merit a signed written opinion. The legal question presented should be focused and
concrete; OLC generally avoids providing a general survey of an area of law or issuing broad,
abstract legal opinions. There should also be a practical need for the written opinion; OLC
should avoid giving unnecessary advice, such as where it appears that policymakers are likely to
move in a different direction. A written opinion is most likely to be necessary when the legal
question is the subject of a concrete and ongoing dispute between two or more executive
agencies. If we are asked to provide an opinion to an executive agency the head of which does
not serve at the pleasure of the President (*e.g.*, an agency head subject to a "for cause" removal
restriction), our practice is to issue our opinion only if we have received in writing from that
agency an agreement that it will conform its conduct to our conclusion. As a prudential matter,
OLC generally avoids opining on questions likely to arise in pending or imminent litigation
involving the United States as a party (although the Office may provide assistance to Justice
Department divisions engaged in ongoing litigation). Finally, the opinions of the Office should
address legal questions prospectively; OLC avoids opining on the legality of past conduct
(though from time to time we may issue prospective opinions that confirm or memorialize past
advice or that necessarily bear on past conduct in addressing an ongoing legal issue).

**B. *Soliciting the views of interested agencies*.** Before we proceed with an opinion, our
general practice is to ask the requesting agency for a detailed memorandum setting forth the
agency's own analysis of the question; in many cases, we will have preliminary discussions with
the requesting agency before it submits a formal opinion request to OLC, and the agency will be
able to provide its analysis along with the opinion request. (A detailed analysis is not required
when the request comes from the Counsel to the President, the Attorney General, or one of the
other senior management offices of the Department of Justice.) In the case of an interagency
dispute, we will ask each side to submit such a memorandum. We expect the agencies on each
side of a dispute to share their memoranda with the other side, or permit us to share them, so that
we may have the benefit of reply comments, when necessary. When appropriate and helpful, and
consistent with the confidentiality interests of the requesting agency, we will also solicit the
views of other agencies not directly involved in the opinion request that have subject-matter
expertise or a special interest in the question presented. We will not, however, circulate a copy
of an opinion request to third-party agencies without the prior consent of the requesting agency.

**C. *Researching, outlining, and drafting*.** A written OLC opinion is the product of a
careful and deliberate process. After reviewing agency submissions and relevant primary
materials, including prior OLC opinions and leading judicial decisions, the Deputy and Attorney-
Adviser should meet to map out a plan for researching the issues and preparing an outline and
first draft of the opinion. The Deputy and Attorney-Adviser should set target deadlines for each
step in the process and should meet regularly to review progress on the opinion. Consultation
with others in the Office is encouraged, as are meetings, as needed, with other Deputies and the
Assistant Attorney General (AAG). An early first draft often will help identify weaknesses or
holes in the analysis requiring greater attention than initially anticipated. As work on the opinion
progresses, it will generally be useful for the Deputy and the Attorney-Adviser to meet from time
to time with the AAG to discuss the status and direction of the draft opinion.

3

Case 1:16-cv-01068-KBJ Document 22-2 Filed 10/27/17 Page 12 of 14
USCA Case #24-5163 Document #2080945 Filed: 10/18/2024 Page 105 of 242

Case 1:13-cv-01291-APM Document 19-4 Filed 10/20/14 Page 4 of 6

The Office must strive in our opinions for clear and concise analysis and a balanced presentation of arguments on each side of an issue. If the opinion resolves an issue in dispute between executive agencies, we should take care to consider fully and address impartially the points raised on both sides. In doing so, we generally avoid characterizing agencies with differing views as the "prevailing" and "losing" parties. OLC's obligation is to provide its view of the correct answer on the law, taking into account all reasonable counterarguments, whether provided by an agency or not.

**D.** *Review of draft opinions.* Before an OLC opinion is signed it undergoes rigorous review within OLC. When the primary Deputy and the Attorney-Adviser responsible for the opinion are satisfied that the draft opinion is ready for secondary review, they should provide the draft opinion to a second Deputy for review. Along with the draft opinion, the Attorney-Adviser should provide to the second Deputy copies of any key materials, including statutes, regulations, important cases, relevant prior OLC opinions, and the views memoranda received from interested agencies. Once the second Deputy review is complete and the second Deputy's comments and proposed edits have been addressed, the primary Deputy should circulate the draft opinion for final review by the AAG, the remaining Deputies (though it is not necessary in each case for each of them to review an opinion), and any other attorneys within the Office with relevant expertise.

Because OLC issues opinions pursuant to the Attorney General's delegated authority, the Office keeps the Office of the Attorney General and the Office of the Deputy Attorney General apprised of its work through regular meetings and other communications. This practice ensures that the leadership offices are kept informed about OLC's work, and also permits OLC to benefit from suggestions about additional interests OLC should consider or views OLC should solicit before finalizing its opinions, which are nevertheless based on its own independent analysis and judgment. The Office also keeps the Office of the Counsel to the President appropriately apprised of its work.

Consistent with its tradition of providing advice that reflects its own independent judgment, OLC does not ordinarily circulate draft opinions outside the Office. However, as part of our process, we may share an aspect of a draft opinion's analysis with the requestor or others who will be affected by the opinion, particularly when their submissions have not addressed issues that arise in the draft. In some other cases, OLC may share the substance of an entire draft opinion or the opinion itself within the Department of Justice or with others, primarily to ensure that the opinion does not misstate any facts or legal points of interest.

**E.** *Finalizing opinions.* Once all substantive work on an opinion is complete, it must undergo a thorough cite-check by our paralegal staff to ensure that all citations are accurate and that the opinion is consistent with the Office's rules of style. After all cite-checking changes have been approved and implemented, the final opinion should be printed on bond paper for signature. Each opinion ready for signature should include a completed opinion control sheet signed by the primary and secondary Deputies and the Attorney-Adviser. If the opinion is unclassified, after it is signed and issued to the requesting agency it must be loaded into our ISYS database and included in the Office's unclassified Day Books. A separate file containing a copy of the signed opinion, the opinion control sheet, and copies of key materials not readily

4

Case 1:16-cv-01068-KBJ Document 22-2 Filed 10/27/17 Page 13 of 14
USCA Case #24-5163 Document #2080945 Filed: 10/18/2024 Page 106 of 242

Case 1:13-cv-01291-APM Document 19-4 Filed 10/20/14 Page 5 of 6

available, such as the original opinion request, the views memoranda of interested agencies, and obscure sources cited in the opinion, should also be retained in our files for future reference.

### III. Opinion Publication and Other Public Disclosure

Pursuant to Executive Order 12146 and directives from the Attorney General, OLC has a longstanding internal process in place for regular consideration and selection of significant opinions for official publication. At the first stage of the process, the attorneys who have worked on an opinion and the front-office personnel who have reviewed it are asked for a recommendation about whether the opinion should be published. After these recommendations are collected, the opinion is forwarded to an internal publication review committee, made up of attorneys from the front office, as well as at least one career attorney. If the committee makes a preliminary judgment that the opinion should be published, the opinion is circulated to the requesting Executive Branch official or agency and any other agencies that have interests that might be affected by publication, to solicit their views on whether there are reasons why the opinion should not be published. Taking this input into account, the publication committee then makes a final judgment about whether the Office should publish the opinion. After the Office makes a final decision to publish an opinion, the opinion is rechecked and reformatted for online publication; a headnote is prepared and added to the opinion; and the opinion is posted to the Department of Justice Web site at www.usdoj.gov/olc/opinions.htm. All opinions posted on the Web site as published opinions of the Office are eventually published in OLC's hardcover bound volumes.

In deciding whether an opinion is significant enough to merit publication, the Office considers such factors as the potential importance of the opinion to other agencies or officials in the Executive Branch; the likelihood that similar questions may arise in the future; the historical importance of the opinion or the context in which it arose; and the potential significance of the opinion to the Office's overall jurisprudence. In applying these factors, the Office operates from the presumption that it should make its significant opinions fully and promptly available to the public. This presumption furthers the interests of Executive Branch transparency, thereby contributing to accountability and effective government, and promoting public confidence in the legality of government action. Timely publication of OLC opinions is especially important where the Office concludes that a federal statutory requirement is invalid on constitutional grounds and where the Executive Branch acts (or declines to act) in reliance on such a conclusion. In such situations, Congress and the public benefit from understanding the Executive's reasons for non-compliance, so that Congress can consider those reasons and respond appropriately, and so that the public can be assured that Executive action is based on sound legal judgment and in furtherance of the President's obligation to take care that the laws, including the Constitution, are faithfully executed.

At the same time, countervailing considerations may lead the Office to conclude that it would be improper or inadvisable to publish an opinion that would otherwise merit publication. For example, OLC will decline to publish an opinion when disclosure would reveal classified or other sensitive information relating to national security. (Declassification decisions are made by the classifying agency, not OLC.) Similarly, OLC will decline to publish an opinion if doing so would interfere with federal law enforcement efforts or is prohibited by law. OLC will also

5

Case 1:16-cv-01068-KBJ Document 22-2 Filed 10/27/17 Page 14 of 14
USCA Case #24-5163 Document #2080945 Filed: 10/18/2024 Page 107 of 242
Case 1:13-cv-01291-APM Document 19-4 Filed 10/20/14 Page 6 of 6

decline to publish opinions when doing so is necessary to preserve internal Executive Branch deliberative processes or protect the confidentiality of information covered by the attorney-client relationship between OLC and other executive offices. The President and other Executive Branch officials, like other public- and private-sector clients, sometimes depend upon the confidentiality of legal advice in order to fulfill their duties effectively. An example is when an agency requests advice regarding a proposed course of action, the Office concludes it is legally impermissible, and the action is therefore not taken. If OLC routinely published its advice concerning all contemplated actions of uncertain legality, Executive Branch officials would be reluctant to seek OLC advice in the early stages of policy formulation—a result that would undermine rule-of-law interests. Some OLC opinions also may concern issues that are of little interest to the public or others besides the requesting agency. OLC's practice of circulating opinions selected for publication to the requesting Executive Branch official or agency and any other agencies that have interests that might be affected by publication helps ensure that the Office is aware of these competing considerations. In cases where delaying publication may be sufficient to address any of these concerns, OLC will reconsider the publication decision at an appropriate time.

OLC also receives a large number of Freedom of Information Act (FOIA) requests for its unpublished legal opinions. The volume of such requests has increased substantially in recent years, particularly with respect to opinions concerning national security matters. By definition, these requests seek disclosure of documents that the Office has not yet chosen to release pursuant to its own internal publication procedures. In responding to these requests, OLC is guided by President Obama's January 21, 2009 FOIA Memorandum and Attorney General Holder's March 19, 2009 FOIA memorandum. As the Attorney General's memorandum observes, various FOIA exemptions protect "national security, . . . privileged records, and law enforcement interests." OLC will consult with relevant agencies in determining whether particular requested documents fall within and should be withheld under any applicable FOIA exemptions. If a requested document does not fall within an exemption, OLC will disclose it promptly. In addition, OLC will consider disclosing documents even if they technically fall within the scope of a FOIA exemption. As the Attorney General also stated in his March 19, 2009 memorandum, "an agency should not withhold information simply because it may do so legally." In particular, consistent with President Obama's directions, the Office will not withhold an opinion merely to avoid embarrassment to the Office or to individual officials, to hide possible errors in legal reasoning, or "because of speculative or abstract fears."

OLC has a unique mission, and a long-established tradition—sustained across many administrations—as to how its work should be carried out. The Office depends not only upon its leadership but also upon each of its attorneys to ensure that this tradition continues.

David J. Barron
Acting Assistant Attorney General

6

# Amended Complaint

# Exhibit B



**U.S. Department of Justice**

Office of Legal Counsel

Office of the Deputy Assistant Attorney General          *Washington, D.C. 20530*

May 26, 2016

Anne L. Weismann
Executive Director
Campaign for Accountability
1201 Connecticut Ave., N.W., Suite 300
Washington, D.C. 20036

Dear Ms. Weismann:

This responds to your letter to the Principal Deputy Assistant Attorney General for the Office of Legal Counsel ("OLC") dated March 22, 201[6], in which you express the view that OLC is required by 5 U.S.C. § 552(a)(2) to "make available for public inspection and copying on an ongoing basis all unpublished OLC opinions that provide controlling legal advice to executive branch agencies and a general index of all such opinions OLC has issued."[1]

As explained to you in response to your prior letter, we are committed to complying with our obligations under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"). OLC does not have policymaking authority, nor does it enforce laws against or adjudicate the rights of private individuals. Rather, OLC provides confidential legal advice within the Executive Branch. As such, OLC's advice is ordinarily covered by the attorney-client and deliberative process privileges, and is therefore exempt from mandatory disclosure under the FOIA, *see id.* § 552(b)(5); *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132 (1975). In addition, as confidential and pre-decisional legal advice, our opinions generally constitute neither "final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases" nor "statements of policy and interpretations which have been adopted by the agency." 5 U.S.C. §§ 552(a)(2)(A) & (B).

Nevertheless, we make an individualized, case-by-case determination with respect to whether each opinion of our Office is appropriate for publication, as described in the memorandum attached to your letter as Exhibit B. *See* Memorandum for Attorneys of the Office, from David J. Barron, Acting Assistant Att'y Gen., Office of Legal Counsel, *Re: Best Practices for OLC Legal Advice and Written Opinions* 5-6 (July 16, 2010) ("Best Practices Memo"), *available at* www.justice.gov/olc/pdf/olc-legal-advice-opinions.pdf. This individualized publication decision process includes consultation with interested Executive Branch agencies and consideration of a number of factors, which are set out in the Best Practices

---

[1] We do not understand your letter to be a "request for records" pursuant to 5 U.S.C. § 552(a)(3), and accordingly we are not treating it as such a request.

Memo. *See id.* Similarly, when we receive a FOIA request under 5 U.S.C. § 552(a)(3) seeking OLC records and an opinion or other document is responsive to that request, we consider whether to waive applicable privileges and release the document as a matter of administrative discretion. *See id.* at 6. If OLC were to conclude during the publication review process, the FOIA response process, or at any other time that the Department had an obligation under 5 U.S.C. § 552(a)(2) to make a particular opinion publicly available, we would do so at that time.

I hope that this information is helpful.

Sincerely,

John E. Bies
Deputy Assistant Attorney General

2

**JA 104**

# Amended Complaint

# Exhibit D



**U.S. Department of Justice**

Office of Legal Counsel

Office of the Principal Deputy Assistant Attorney General            *Washington, D.C. 20530*

May 16, 2005

### MEMORANDUM FOR ATTORNEYS OF THE OFFICE

#### *Re: Best Practices for OLC Opinions*

By delegation, the Office of Legal Counsel exercises the Attorney General's authority under the Judiciary Act of 1789 to advise the President and executive agencies on questions of law. OLC is authorized to provide legal advice only to the Executive Branch; we do not advise Congress, the Judiciary, foreign governments, private parties, or any other person or entity outside the Executive Branch. OLC's primary function is to provide formal advice through written opinions signed by the Assistant Attorney General or (with the approval of the AAG) a Deputy Assistant Attorney General. Our Office is frequently called upon to address issues of central importance to the functioning of the federal Government, and, subject to the President's authority under the Constitution, OLC opinions are controlling on questions of law within the Executive Branch. Accordingly, it is imperative that our opinions be clear, accurate, thoroughly researched, and soundly reasoned. The value of an OLC opinion depends on the strength of its analysis. Over the years, OLC has earned a reputation for giving candid, independent, and principled advice—even when that advice may be inconsistent with the desires of policymakers. This memorandum reaffirms the longstanding principles that have guided and will continue to guide OLC attorneys in preparing the formal opinions of the Office.

*Evaluating opinion requests.* Each opinion request is assigned to a Deputy and an Attorney-Adviser, who will review the question presented and any relevant statutory materials, prior OLC opinions, and leading cases to determine preliminarily whether the question is appropriate for OLC advice and whether it appears to merit a written opinion, as distinct from informal advice. The legal question presented should be focused and concrete; OLC generally avoids undertaking a general survey of an area of law or a broad, abstract legal opinion. There also should be a practical need for the opinion; OLC particularly should avoid giving unnecessary advice where it appears that policymakers are likely to move in a different direction. A formal opinion is more likely to be necessary when the legal question is the subject of a concrete and ongoing dispute between two or more executive agencies. If we are asked to provide an opinion to an executive agency whose head does not serve at the pleasure of the President (i.e., an agency whose head is subject to a "for cause" removal restriction), our practice is to receive in writing from that agency an agreement to be bound by our opinion. As a prudential matter, OLC should avoid opining on questions likely to be at issue in pending or imminent litigation involving the United States as a party (except where there is a need to resolve a dispute within the Executive Branch over a position to be taken in litigation). Finally, the opinions of the Office should address legal questions prospectively; OLC avoids opining on the

JA 106

legality of past conduct (though from time to time we may issue prospective opinions that confirm or memorialize past advice or that necessarily bear on past conduct).

*Soliciting the views of interested agencies.* Before we proceed with an opinion, our general practice is to ask the requesting agency for a detailed memorandum setting forth the agency's own analysis of the question—in many cases, there will be preliminary discussions with the requesting agency before the formal opinion request is submitted to OLC, and the agency will be able to provide its analysis along with the opinion request. (A detailed analysis is not required when the request comes from the Counsel to the President, the Attorney General, or one of the three other Senior Management Offices of the Department of Justice.) In the case of an interagency dispute, we will ask each side to submit such a memorandum. Ordinarily, we expect the agencies on each side of a dispute to share their memoranda with the other side, or permit us to share them, so that we may have the benefit of reply comments, when necessary. When appropriate and helpful, and consistent with the confidentiality interests of the requesting agency, we will also solicit the views of other agencies not directly involved in the opinion request that have subject-matter expertise or a special interest in the question presented. For example, when the question involves the interpretation of a treaty or a matter of foreign relations, our practice is to seek the views of the State Department; when it involves the interpretation of a criminal statute, we will usually seek the views of the Justice Department's Criminal Division. We will not, however, circulate a copy of an opinion request to third-party agencies without the prior consent of the requesting agency.

*Researching, outlining, and drafting.* An OLC opinion is the product of a careful and deliberate process. After reviewing agency submissions and relevant statutes, OLC opinions and leading cases, the Deputy and Attorney-Adviser should meet to map out a plan for researching the issues and preparing an outline and first draft of the opinion. The Deputy and Attorney-Adviser should set target deadlines for each step in the process and should meet regularly to review progress on the opinion. A thorough working outline of the opinion will help to focus the necessary research and the direction of the analysis. An early first draft often will help identify weaknesses or holes in the analysis requiring greater attention than initially anticipated. As work on the opinion progresses, it will generally be useful for the Deputy and the Attorney-Adviser to meet from time to time with the AAG to discuss the status and direction of the opinion project.

An OLC opinion should focus intensively on the central issues raised by a question of law and should, where possible, avoid addressing issues not squarely presented. On any issue involving a constitutional question, OLC's analysis should focus principally on the text of the Constitution and the historical record illuminating the original meaning of the text and should be faithful to that historical understanding. Where the question relates to the authorities of the President or other executive officers or the separation of powers between the Branches of the Government, past precedents and historical practice are often highly relevant. On questions of statutory and treaty interpretation, OLC's analysis will be guided by the text and will rely on traditional tools of construction in interpreting the text. OLC opinions should also consider and apply the past opinions of Attorneys General and this Office, which are ordinarily given great weight. The Office will not lightly depart from such past decisions, particularly where they directly address and decide a point in question. Decisions of the Supreme Court and courts of appeals directly on point often provide guiding authority and should be thoroughly addressed,

2

particularly where the issue is one that is likely to become the subject of litigation. Many times, however, our Office will be asked to opine on an issue of first impression or one that is unlikely to be resolved by the courts; in such instances, court decisions in relevant or analogous areas may serve as persuasive authority, depending on the strength of their analysis.

In general, we strive in our opinions for clarity and conciseness in the analysis and a balanced presentation of arguments on each side of an issue. If the opinion resolves an issue in dispute between executive agencies, we should take care to consider fully and address impartially the points raised on both sides; in doing so, it is best, to the extent practicable, to avoid ascribing particular points of view to the agencies in a way that might suggest that one side is the "winner" and one the "loser." OLC's interest is simply to provide the correct answer on the law, taking into account all reasonable counterarguments, whether provided by an agency or not. It is therefore often not necessary or desirable to cite or quote agencies' views letters.

*Secondary review of draft opinions.* Before an OLC opinion is finalized it undergoes rigorous review by the Front Office within OLC and often by others outside the Office. When the primary Deputy and the Attorney-Adviser responsible for the opinion are satisfied that the draft opinion is ready for secondary review, the opinion is generally assigned to a second Deputy for a "second Deputy read." Along with the draft opinion, the Attorney-Adviser should provide to the second Deputy copies of any key materials, including statutes, regulations, key cases, relevant prior OLC opinions, and the views memoranda received from interested agencies. Once the second Deputy read is complete and the second Deputy's comments have been addressed, the primary Deputy should circulate the draft opinion for final review by the AAG, the remaining Deputies, and any particular attorneys within the Office with relevant expertise.

Once OLC's internal review is complete, a draft of the opinion may be shared outside the Office. In some cases, because of time constraints, OLC may circulate a draft opinion before the internal review is complete. Our general practice is to circulate draft opinions to the Office of the Attorney General and the Office of the Deputy Attorney General for review and comment. When and as warranted, we also circulate an informational copy of the draft opinion to the Office of the Counsel to the President. In addition, in most cases, we will circulate a draft to the requesting agency (or, in cases where we are resolving a dispute between agencies, to those agencies that are parties to the dispute) for review, primarily to ensure that the opinion does not misstate the facts or the legal points of interest to the agencies. On certain occasions, where we determine it appropriate, we may circulate a draft opinion to one or more other agencies that have special expertise or interest in the subject matter of the opinion, particularly if they have offered views on the question.

*Finalizing opinions.* Once all substantive work on the opinion is complete, it must undergo a thorough cite check by our paralegal staff to ensure the accuracy of all citations and consistency with the Office's rules of style. After all cite-checking changes have been approved and made, the final opinion should be printed on bond paper for signature. Each opinion ready for signature should include a completed opinion control sheet signed by the primary Deputy, the Attorney-Adviser, and the Deputy who did the second Deputy read. After it is signed and issued, if the opinion is unclassified, it will be loaded into our ISYS database and included in the Office's unclassified Day Books. A separate file containing a copy of the signed opinion, the

3

opinion control sheet, and copies of key materials not readily available, such as the original opinion request, the views memoranda of interested agencies, and obscure sources cited in the opinion, will also be retained in our files for future reference.

*Opinion publication.* Most OLC opinions consist of confidential legal advice for senior Executive Branch officials. Maintaining the confidentiality of OLC opinions is often necessary to preserve the deliberative process of decisionmaking within the Executive Branch and attorney-client relationships between OLC and other executive offices; in some cases, the disclosure of OLC advice also may interfere with federal law enforcement efforts. These confidentiality interests are especially great for OLC opinions relating to the President's exercise of his constitutional authorities, including his authority as Commander in Chief. It is critical to the discharge of the President's constitutional responsibilities that he and the officials under his supervision are able to receive confidential legal advice from OLC.

At the same time, many OLC opinions address issues of relevance to a broader circle of Executive Branch lawyers or agencies than just those officials directly involved in the opinion request. In some cases, the President or an affected agency may have a programmatic interest in putting other agencies, Congress, or the public on notice of the legal conclusion reached by OLC and the supporting reasoning. In addition, some OLC opinions will be of significant practical interest and benefit to lawyers outside the Executive Branch, or of broader interest to the general public, including historians. In such cases, and when consistent with the legitimate confidentiality interests of the President and the Executive Branch, it is the policy of our Office to publish OLC opinions. This publication program is in accordance with a directive from the Attorney General to OLC to publish selected opinions on an annual basis for the convenience of the Executive, Legislative, and Judicial Branches of the Government, and of the professional bar and the general public.

At the time an opinion is signed, the attorneys responsible for the opinion will make a preliminary recommendation as to whether it may be appropriate for eventual publication. Thereafter, on a rolling or periodic basis, each opinion issued by the Office is reviewed for possible publication by the OLC Publication Review Committee. If the Publication Review Committee decides that the opinion meets the Office's basic criteria for publication, the Committee will solicit the views of the agency or Justice Department component that requested the opinion, and any agency or component likely to be affected by its publication, as to whether the opinion is appropriate for current publication, whether its publication should be deferred, or whether it should not be published. OLC gives due weight to the publication recommendations of interested agencies and components, particularly where they raise specific concerns about programmatic or litigation interests that might be advanced or compromised by publication of the opinion. OLC also generally solicits the views of the Office of the Attorney General and the Office of the Counsel to the President on publication questions, particularly with respect to significant opinions of the Office.

After the final decision is made to publish an opinion, the opinion is rechecked and reformatted for online publication; a headnote is prepared and added to the opinion; and the opinion is posted to the Department of Justice Web site at www.usdoj.gov/olc/opinions.htm. All opinions posted on the Web site are eventually published in OLC's hardcover bound volumes.

JA 109

\*          \*          \*

Please let me know if you have any questions about the principles set forth above or any suggestions for revising or adding to the guidance provided in this memorandum.

Steven G. Bradbury
Principal Deputy Assistant Attorney General

5

JA 110

# Amended Complaint

# Exhibit E

# PERMISSIBILITY OF SMALL BUSINESS ADMINISTRATION REGULATIONS IMPLEMENTING THE HISTORICALLY UNDERUTILIZED BUSINESS ZONE, 8(A) BUSINESS DEVELOPMENT, AND SERVICE-DISABLED VETERAN-OWNED SMALL BUSINESS CONCERN PROGRAMS

*The Small Business Administration's regulations governing the interplay among the Historically Underutilized Business Zone Program, the 8(a) Business Development Program, and the Service-Disabled Veteran-Owned Small Business Concern Program constitute a permissible construction of the Small Business Act.*

*The Small Business Act does not compel the prioritization of awards under the Historically Underutilized Business Zone Program over those under the 8(a) Business Development Program and the Service-Disabled Veteran-Owned Small Business Concern Program. The Small Business Administration's regulations permissibly authorize contracting officers to exercise their discretion to choose among these three programs in setting aside contracts to be awarded to qualified small business concerns.*

*The Office of Legal Counsel's conclusion that the Small Business Administration's regulations are reasonable is binding on all Executive Branch agencies.*

August 21, 2009

## MEMORANDUM OPINION FOR THE GENERAL COUNSEL
## SMALL BUSINESS ADMINISTRATION

The Small Business Act ("Act"), as amended, exempts certain classes of small businesses from the general requirement that federal contracts to procure goods and services be awarded on the basis of full and open competition.[1]  *See* Act of July 30, 1953, Pub L. No. 83-163, 67 Stat. 230 (codified as amended at 15 U.S.C.A. §§ 631-657p (West 2009)).  In particular, the Act establishes various programs, administered by the Small Business Administration ("SBA"), to assist qualifying small businesses in obtaining federal contracts by exempting them, in certain circumstances, from the degree of competition that would otherwise be required.  At issue here is the permissibility of SBA's regulations governing the interplay among three such programs: the Historically Underutilized Business Zone ("HUBZone") Program, the 8(a) Business Development Program, and the Service-Disabled Veteran-Owned ("SDVO") Small Business Concern Program.

Under SBA's regulations, federal contracting officers are given substantial discretion to consider and designate contracts for either the HUBZone, 8(a), or SDVO Program without having to prioritize one program above the others.  This aspect of the regulations – which, according to SBA, effectively establishes "parity" among the three programs – has been called into question by a pair of recent Government Accountability Office ("GAO") bid protest

---

[1] "Full and open competition" in the context of federal procurement means "that all responsible sources are permitted to submit sealed bids or competitive proposals on the procurement."  41 U.S.C. § 403(6) (2006); *see also* 41 U.S.C.A. § 253 (West Supp. 2009) (requiring full and open competition in the conduct of procurements for property or services, except under certain circumstances as provided).

*Opinions of the Office of Legal Counsel in Volume 33*

decisions.[2]  In these decisions, GAO rejected SBA's approach and ruled instead that the Act mandates that priority be given to the HUBZone Program when certain statutory conditions are met.  As a result, according to GAO, contracting officers must set aside federal contracts to qualified HUBZone small businesses, when two or more such businesses can submit fair market bids, before they can set aside such contracts for award to small businesses under the 8(a) or SDVO Programs.

You have asked for our views on whether GAO was correct to conclude that the Act compels such prioritization of the HUBZone Program.  *See* Letter for David Barron, Acting Assistant Attorney General, Office of Legal Counsel, from Sara D. Lipscomb, General Counsel, Small Business Administration at 2 (July 1, 2009) ("Lipscomb Ltr.").  You have further asked whether, if the Act can be read not to require such prioritization, GAO has authority to invalidate SBA's regulations.  *See id.*  Having carefully reviewed the relevant legal materials, including SBA's own views, we conclude that the Act does not compel SBA to prioritize the HUBZone Program in the manner GAO determined to be required.  In our view, SBA's regulations permissibly authorize contracting officers to exercise their discretion to choose among the three programs in setting aside contracts to be awarded to qualified small business concerns.[3]  Further, in accord with this Office's longstanding precedent, GAO's decisions are not binding on the Executive Branch.

## I.

The underlying legal issue ultimately turns on a relatively straightforward question of statutory interpretation, but it arises out of a complicated statutory and regulatory framework.  Accordingly, we first review the key statutory provisions that establish these three programs.

*HUBZone Program*

The term "HUBZone" refers to economically disadvantaged or distressed areas located within one or more qualified census tracts, nonmetropolitan counties, Indian reservations, or base closure areas. *See* 15 U.S.C.A. § 632(p)(1)-(2).  Established by the Small Business Reauthorization Act of 1997, Pub. L. No. 105-135, § 602(b)(1)(B), 111 Stat. 2592, 2627 (codified as amended at 15 U.S.C.A. § 657a(a)), the HUBZone Program provides federal contract assistance to qualified small business concerns operating within a HUBZone through contracts awarded on a sole source basis, contracts awarded on the basis of competition restricted to HUBZone concerns, or a ten-percent bid adjustment for contracts awarded on the basis of full and open competition.  *Id.* § 657a(a)–(b).

The "restricted competition" provision at issue in the GAO decisions states that:

---

[2] *See Mission Critical Solutions*, Comp. Gen. B-401057 (May 4, 2009) ("*MCS*"), *recons. den.*, Comp. Gen. B-4010572 (July 6, 2009); *International Program Group, Inc.*, Comp. Gen. B-400278, B-400308 (Sept. 19, 2008) ("*IPG*"). *recons. den.*, Comp. Gen. B-400278.2, *et al.* (Oct. 24, 2008).  The Comptroller General's authority to review bid protests concerning alleged violations of a procurement statute or regulation is set forth in 31 U.S.C §§ 3551-3557 (2006).

[3] Our conclusion regarding these SBA regulations addresses only whether they constitute a permissible interpretation of the Act.

*Permissibility of SBA Regulations Implementing the HUBZone, 8(a), and SDVO Programs*

> Notwithstanding any other provision of law . . . a contract opportunity
> shall be awarded pursuant to this section on the basis of competition
> restricted to qualified HUBZone small business concerns if the contracting
> officer has a reasonable expectation that not less than 2 qualified
> HUBZone small business concerns will submit offers and that the award
> can be made at a fair market price.

*Id.* § 657a(b)(2)(B).  The conditions set forth in this provision – "a reasonable expectation that not less than 2 qualified HUBZone small business concerns will submit offers" and "that the award can be made at a fair market price" – are commonly referred to as "the rule of two." When the rule of two is met, the statute provides that the award must be made on the basis of competition restricted to qualified HUBZone small businesses.  This provision closely resembles in language and structure the restricted competition provision found in the earlier-enacted 8(a) Program.  *See id.* § 637(a)(1)(D).  The HUBZone Program also provides, in the alternative, that "a contracting officer may award sole source contracts under this section to any qualified HUBZone small business concern" upon a determination, *inter alia*, that there is no "reasonable expectation that two or more qualified HUBZone small business concerns will submit offers for the contracting opportunity."  *Id.* § 657a(b)(2)(A).

### 8(a) Program

The 8(a) Program, established by amendment to the Act on October 24, 1978, Pub. L. No. 95-507, § 202, 92 Stat. 1757, 1761 (codified as amended at 15 U.S.C.A. § 637), "promote[s] the business development of small business concerns owned and controlled by socially and economically disadvantaged individuals," *id*. § 631(f)(2), defined as "those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities," *id.* § 637(a)(5), and "whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged." *Id.* § 637(a)(6).

The 8(a) Program promotes socially and economically disadvantaged small business development by, among other things, reserving certain contracts with federal agencies for administration and award by SBA to eligible 8(a) Program participants.  The 8(a) authorizing statute provides, *inter alia*, that "[i]t shall be the duty of [SBA] and it is hereby empowered, whenever it determines such action is necessary or appropriate," to enter into procurement contracts with the federal Government or any department, agency, or officer thereof, *id*. § 637(a)(1)(A), and then "to arrange for the performance of such procurement contracts" by awarding them to eligible 8(a) participants when certain conditions are met, *id.* § 637(a)(1)(B)-(C).[4]  The statute explicitly states that contracting officers shall retain "discretion to let such procurement contract[s]" to SBA for the 8(a) Program.  *See id.* § 637(a)(1)(A).

The statute further provides that SBA's authority to award an 8(a) contract is conditioned on the requirement that the award be made as a result of an offer submitted in response to a

---

[4] SBA has promulgated regulations that permit it to delegate its 8(a) contract execution and review authority to procuring departments and agencies.  *See* 13 C.F.R. §§ 124.501(a), 124.503, 124.512 (2009).

**JA 114**

*Opinions of the Office of Legal Counsel in Volume 33*

published solicitation about "a competition conducted pursuant to subparagraph (D)."
*Id.* § 37(a)(1)(C)(i).  Subparagraph (D)(i), in turn, provides:

> A contract opportunity offered for award pursuant to this subsection shall
> be awarded on the basis of competition restricted to eligible Program
> Participants if (I) there is a reasonable expectation that at least two eligible
> Program Participants will submit offers and that award can be made at a
> fair market price.

*Id.* § 637(a)(1)(D)(i)(I).

### SDVO Program

The SDVO Program was established by the Veterans Benefits Act of 2003, Pub. L. No.
108-183, § 308, 117 Stat. 2651, 2662 (codified at 15 U.S.C.A. § 657f), and provides for federal
contract assistance to qualified service-disabled veteran-owned small businesses through sole
source and restricted competition awards.  *See id.* § 657f.

The conditions set forth in the SDVO statute for the award of sole source contracts are
the same as in the HUBZone statute.  *Compare id.* § 657f(a), *with id.* § 657a(b)(2)(A).  However,
unlike the HUBZone and 8(a) provisions, the SDVO statute does not mandate the award of
contracts through restricted competition even "if the contracting officer has a reasonable
expectation that not less than 2 small business concerns owned and controlled by service-
disabled veterans will submit offers and that the award can be made at a fair market price." *Id.*
§ 657f(b).  Instead of requiring that a contract opportunity "shall be awarded" through restricted
competition in such circumstances, the SDVO statute provides that the award "may" be made
through such competition if the rule of two is met. *Compare id.* ("a contracting officer may
award"), *with id.* § 637(a)(1)(D)(i) ("a contract opportunity . . . shall be awarded"), *and id.*
§ 657a(b)(2)(B) ("a contract opportunity shall be awarded").

### SBA Regulations

It is against this legislative background that SBA issued its regulations to guide
contracting officers in making the determination whether and when to set aside a contract for the
HUBZone, 8(a), or SDVO Program.  Congress delegated broad authority to SBA to carry out the
policies and purposes of the Act.  *See generally id.* §§ 633(a), 634(b), 644(g).  The relevant parts
of the HUBZone regulations that you have asked us to review in light of the GAO decisions
direct contracting officers first to determine whether the contract is a follow on to one already
being performed by an 8(a) participant, has already been accepted for the 8(a) Program by SBA,
or would be performed by a federal prison workshop or participating non-profit agency for the
blind or severely disabled.[5]  *See* 13 C.F.R. §§ 126.605 and 126.607 (2009).  If the contract is still

---

[5] *See* 18 U.S.C. § 4124 (2006) (requiring purchase of prison-made products by all federal departments and
agencies); 41 U.S.C. § 48 (2006) (requiring governmental purchases from qualified nonprofit agencies for the blind
or severely disabled); *see also* 15 U.S.C.A. § 657a(b)(4) (prioritizing procurement awards to prison, blind, and
severely-disabled entities over HUBZone awards); *id.* § 657f(c) (prioritizing procurement awards to prison, blind,
and severely-disabled entities over SDVO awards).

*Permissibility of SBA Regulations Implementing the HUBZone, 8(a), and SDVO Programs*

available, the regulations state that a contracting officer shall then choose among the HUBZone, 8(a), or SDVO Programs and "set aside the requirement for HUBZone, 8(a) or SDVO [] contracting before setting aside the requirement as a small business set-aside." *Id.* § 126.607.

The SDVO regulations implicated by the GAO decisions are operatively the same as the HUBZone regulations. *Compare id.* §§ 126.605 & 126.607, *with id.* §§ 125.18 & 125.19. A parallel provision also exists in the 8(a) regulations.[6]  *See id.* § 124.503(j).

The SBA's regulations do not expressly provide for parity of treatment among the 8(a), HUBZone, or SDVO Programs.  *See id.* §§ 124.503(j), 125.19(b), and 126.607(b).  Rather, by their plain terms, the regulations require that contracting officers prioritize these programs *collectively* by giving consideration to the group of them before a contracting officer may set aside an opportunity for small businesses generally and before the contracting officer may make the contract otherwise available.  *See* Lipscomb Ltr. at 6-7 ("The regulations themselves do not establish an order of precedence between an award under the HUBZone, SDVO SBC, or 8(a) BD programs.").  The regulations do not, therefore, single out one program for the kind of prioritization over the other two that the GAO decisions conclude is mandated under the HUBZone statute.  It is in this sense that, as the SBA puts it, the regulations "provide[] for parity between the HUBZone, SDVO SBC and 8(a) BD programs." *Id.* at 7.

## II.

Having reviewed the language, context, and history of the relevant portions of the Act, we conclude that SBA's regulations implementing the HUBZone Program are based on a permissible interpretation of the Act.  *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984); *see also Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 740-41 (1996) ("We accord deference to agencies under *Chevron* . . . because of a presumption that Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency.").  The GAO decisions reached the opposite conclusion based on what GAO considered the unambiguous language of the HUBZone Program's restricted competition provision.  *See MCS* at 3-4; *IPG* at 5.  GAO concluded that "the clear language" of this provision in the HUBZone statute, which uses the term "shall" with respect to the award of contracts, stood in marked contrast to the Act's use of the discretionary term "may" in the SDVO Program provision, *IPG* at 5-6 (citing 15 U.S.C. § 657f(b)(2006)), and its use of other discretionary language in the 8(a) Program, which

---

[6] The SDVO and 8(a) regulations provide that the contracting officer "*should consider* setting aside the requirement" for 8(a), HUBZone, or SDVO participation "*before considering*" setting it aside for other small business programs. 13 C.F.R. §§ 125.19(b), 124.503(j) (emphasis added).  Thus, although the SDVO and 8(a) regulations contain discretionary language not found in the corresponding HUBZone regulation, they nevertheless place the three programs on equal footing and prioritize their consideration before small businesses generally.  In this way, they are consistent with the HUBZone regulations and provide uniform guidance to contracting officers regarding the interplay among the programs at issue.  *See* 70 Fed. Reg. 51243, 51245 (Aug. 30, 2005) ("To make the HUBZone regulations consistent with SBA's recently published SDV regulations, SBA is . . . revising § 126.607 to incorporate contracting preferences for HUBZone, 8(a) and SDV over small business set-asides. This change will ensure consistent guidance throughout 13 CFR Chapter 1.").

5

*Opinions of the Office of Legal Counsel in Volume 33*

authorizes a contracting officer "'in his discretion to let such procurement contract to [SBA].'" *MCS* at 3-4 (quoting 15 U.S.C. § 637(a)(1)(A)(2006)). Because Congress used mandatory language with respect to the award of contracts pursuant to the HUBZone Program and discretionary language with respect to the other two programs, GAO reasoned that Congress intended to give the HUBZone Program priority over these other contract assistance programs. The Ninth Circuit, we note, has expressed a similar view of the "mandatory" versus "discretionary" language in the HUBZone and 8(a) Programs. *See Contract Mgmt., Inc. v. Rumsfeld*, 434 F.3d 1145, 1149 (9th Cir. 2006)("*CMI*").[7]

We conclude that the HUBZone provision does not unambiguously direct contracting officers to reserve every available contract opportunity for HUBZone small businesses whenever the rule of two is met. Rather, the text of the HUBZone provision may be fairly read as mandating only that a contract opportunity – already set aside for HUBZone small businesses in the discretion of a contracting officer – be awarded on the basis of restricted competition, and not as a sole source award, if the rule of two is met. So read, the provision, instead of simply permitting restricted competition for qualified HUBZone bidders, actually mandates such competition. In other words, a contracting officer who uses discretion to set aside a contract for the HUBZone Program has no choice but to award a HUBZone contract on the basis of restricted competition once the rule of two is met. But, so read, the HUBZone provision does no more than compel restricted competition rather than a sole source award. It does not go further and require the prioritization of the HUBZone Program itself, leaving contracting officers with no discretion to set aside contracts for the other SBA programs whenever the HUBZone provision's rule of two is met.

The most basic reason we reach this conclusion is that the text of the HUBZone statute, on its own terms, does not clearly direct a contracting officer to reserve any and all procurement contracts for HUBZone small businesses whenever the rule of two is met. *See* 15 U.S.C.A. § 657a(b)(2)(B). The statute uses the mandatory phrase "shall be awarded" after the noun "contract opportunity," but the sentence does not stop there. It goes on to say "pursuant to this section" – *i.e.*, under the HUBZone Program. *Id.* This qualification permits the HUBZone provision to be read as stating that contracts awarded "pursuant to this section" are subject to the enumerated conditions, but it does not compel a reading that all contract opportunities in the

---

[7] *CMI* involved a challenge to an earlier HUBZone regulation, no longer in effect, that directed contracting officers, *inter alia*, to give priority to eligible 8(a) participants over HUBZone concerns. The regulation provided, however, that contracting officers otherwise "must set aside the requirement for competition restricted to qualified HUBZone" small businesses if the rule of two is met. 13 C.F.R. § 126.607(c) (current through Dec. 28, 2005). The appellant, a small business concern that did not qualify for either the 8(a) or HUBZone Program, challenged this last aspect of the old regulation. In defending this regulation, the government advanced a reading of the HUBZone provision as mandatory, but inapplicable to the 8(a) Program. Citing legislative history, the government argued the HUBZone statute is "reasonably read as showing that Congress intended that there be parity between the Section 8(a) Program and the HUBZone Program." Brief for Appellees at 7, *CMI v. Rumsfeld,* (No. 04-15049).

The court ruled in the government's favor. The court compared what it viewed as the "unequivocal" terms of the HUBZone statute with the discretionary terms of the 8(a) set-aside provision and concluded that SBA's old regulation implementing the HUBZone Program "properly accord[ed] with congressional intent under the Small Business Act." 434 F.3d at 1147. The court noted that such a reading of the HUBZone statute was not compelled. *See id.* at 1149 n.8. In 2005, after establishment of the SDVO Program, SBA promulgated the current regulations replacing those reviewed by the *CMI* court. *See* 13 C.F.R. § 126.607.

*Permissibility of SBA Regulations Implementing the HUBZone, 8(a), and SDVO Programs*

government must be awarded to the HUBZone Program whenever the enumerated conditions are met.  Indeed, a contrary reading would implicate the canon of construction that discourages statutory interpretation that would render language mere surplusage.  *See, e.g.*, *Clark v. Arizona*, 548 U.S. 735, 755 n.24 (2006) (recognizing "usual rule of statutory construction" to "giv[e] effect, if possible, to every clause and word of a statute.") (internal quotations and citations omitted).  In GAO's interpretation, it is not clear what independent meaning the "pursuant to this section" language would have.

Our conclusion is also consistent with another important section of the HUBZone statute, which provides that contracting officers "may award sole source contracts under this section" to any qualified HUBZone small business if the rule of two *cannot* be met.  15 U.S.C.A. § 657a(b)(2)(A).  Again, the conditions set forth by this provision need only apply to contracts intended for award "under this section," *i.e.*, under the HUBZone Program.  The mandatory "shall" in the restricted competition provision can fairly be read, in connection with the discretionary "may" in the sole source provision, simply as a direction to contracting officers that within the HUBZone Program there is a clear priority given to competition, albeit restricted, over sole source contract awards.

Such a construction of the HUBZone restricted competition provision is further supported by consideration of still another provision in the HUBZone statute, which expressly prioritizes the award of contracts to prison workshops and nonprofit agencies for the blind and severely-disabled over HUBZone small businesses.  *See id.* § 657a(b)(4) ("A procurement may not be made from a source on the basis of a preference [provided in the HUBZone statute], if the procurement would otherwise be made from a different source under section 4124 or 4125 of title 18, United States Code, or the Javits-Wagner-O'Day Act (41 U.S.C. 46 et seq.)).")  Whereas this provision clearly establishes the priority of these other contracting preferences, the HUBZone statute contains no express reference to the HUBZone Program's priority over SBA's other contract assistance programs.

Of course, the language of the HUBZone provision should be construed in the context of the provisions governing the other two SBA programs at issue.  For that reason, we have considered whether the discretionary language in the 8(a) and SDVO statutes compels the conclusion that the HUBZone statute (with its mandatory language) requires that the HUBZone Program be given priority among the three programs.  In our view, there are several reasons why it does not.

 First, the 8(a) provision actually *does* contain mandatory language.  Indeed, its restricted competition provision employs virtually the same mandatory language as the HUBZone provision.  *Compare* 15 U.S.C.A. § 637(a)(1)(D)(i) ("A contract opportunity offered for award pursuant to this subsection shall be awarded on the basis of competition restricted to eligible Program Participants if . . . ."), *with id.* § 657a(b)(2)(B) ("[A] contract opportunity shall be awarded pursuant to this section on the basis of competition restricted to qualified HUBZone small business concerns if . . . .").[8]  In both instances, a contract opportunity "shall be awarded"

---

[8] The 8(a) restricted competition provision predates the HUBZone provision by nine years.  *Compare* Business Opportunity Development Reform Act of 1988, Pub. L. No. 100-656, § 303, 102 Stat. 3853, 3868, *with* Small Business Reauthorization Act of 1997, Pub. L. No. 105-135, § 602(b)(1)(B), 111 Stat. 2592, 2627.  When the 8(a)

*Opinions of the Office of Legal Counsel in Volume 33*

on the basis of restricted competition if the applicable conditions are met.  Where Congress uses the same language in similarly structured provisions within the same Act, it may be presumed that the language has the same meaning in each instance.  *See, e.g.*, *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 479 (1992) (recognizing "the basic canon of statutory construction that identical terms within an Act bear the same meaning").  At the very least, the use of this mandatory language in both the 8(a) and HUBZone provisions makes it difficult to argue that the HUBZone provision unambiguously mandates that HUBZone awards be given priority over 8(a) awards.

Second, the 8(a) provision clearly applies only to "[a] contract opportunity offered for award pursuant to this subsection" – in other words, under the 8(a) Program.  15 U.S.C.A. § 637(a)(1)(D)(i).  The mandate that such contracts "shall be awarded" on the basis of restricted competition does not extend to contract opportunities that exist outside of the 8(a) Program.  Given the similarity just discussed between the 8(a) and HUBZone provisions, it is reasonable to read the phrase "pursuant to this section" in the HUBZone statute to function the same way as the comparable language contained in 8(a) – to limit the provision's application only to a "contract opportunity" already set aside for award pursuant to the HUBZone Program.

Admittedly, the 8(a) and HUBZone restricted competition provisions are not phrased in exactly the same way.  As noted, the former provides that "[a] contract opportunity *offered for award pursuant to this subsection* shall be awarded on the basis of competition," *Id.* § 637(a)(1)(D)(i) (emphasis added), whereas the latter provides that "a contract opportunity shall be awarded *pursuant to this section* on the basis of competition," *id.* § 657a(b)(2)(B) (emphasis added).  But this slight difference in word order between the two provisions may fairly be read to reflect the fact that the 8(a) statute, unlike the HUBZone statute, explicitly provides for a means by which contracts will be "offered for award pursuant to this subsection," *id.* § 637(a)(1)(D)(i).

Under the 8(a) statute, SBA is "empowered" to approach contracting officers in other agencies and certify that an available contract should be awarded under the 8(a) Program.  *Id.* § 637(a)(1)(A).  The discretionary language included in the 8(a) statute that GAO emphasized appears in this portion of the statute.  Once SBA certifies that it is "competent and responsible" to perform a contract with a particular agency, the agency contracting officer "shall be authorized in his discretion to let such procurement contract" to SBA.  *Id.*  But this language can reasonably be read in a way that is consistent with SBA not having to give the HUBZone Program priority over the 8(a) Program.  Because the 8(a) Program is a business development program to promote the ability of its participants to succeed as small business concerns, one aspect of this program is that the statute empowers SBA affirmatively to procure contracts for award to 8(a) participants.  The discretionary language found in this same provision of the 8(a)

---

Program was originally established in 1978, all 8(a) contracts could be awarded on a sole-source basis.  *See* Amendments to the Small Business Investment Act of 1958, Pub. L. No. 95-507, § 202, 92 Stat. 1757, 1761 (1978).  As part of a comprehensive reassessment of the 8(a) Program in 1988, Congress amended the Act to require that 8(a) contracts be awarded on the basis of restricted competition if certain conditions are met.  *See* Pub. L. No. 100-656, § 303, 102 Stat. at 3868.  Concerned about the success of the 8(a) Program, Congress provided three principal reasons for introducing competition, albeit restricted, to the program: "such competition will advance the business development objectives of the [8(a)] program; improve the distribution of contracts; and help avoid programmatic abuses."  H.R. Rep. No. 100-460, at 28 (1987).

*Permissibility of SBA Regulations Implementing the HUBZone, 8(a), and SDVO Programs*

statute may be read as an offset to this expansive SBA authority by reserving another agency's ability not to accede to SBA's certification.  Because the HUBZone Program provides contract assistance but is not a more comprehensive business development program, there is no such authority provided in the HUBZone statute for SBA to solicit contracts on behalf of HUBZone concerns.  Accordingly, the lack of an express reservation of a contracting officer's discretion to decline a HUBZone designation need not be construed to compel prioritization of the HUBZone Program.

There is also no basis for concluding that the discretionary language in the SDVO provision, *see id.* § 657f(b), requires the conclusion that the HUBZone Program must have priority.  As noted above, the HUBZone provision includes discretionary language as well, in the award of sole source contracts.  The inclusion of the discretionary term "may" in both the sole source and restricted competition provisions of the SDVO statute can reasonably be read, in contrast to the HUBZone statute, not to require the statutory prioritization of restricted competition over sole source awards as the means of contracting assistance to SDVO small business concerns.

Finally, it is true that the HUBZone provision is prefaced with the phrase "Notwithstanding any other provision of law," but the appearance of that phrase does not establish a prioritization of its own force.  *Id.* § 657a(b)(2).  As we have noted previously, such "notwithstanding" phrases are best read simply to qualify the substantive requirement that follows.  *See* Memorandum for Andrew J. Pincus, General Counsel, Department of Commerce, from Randolph D. Moss, Acting Assistant Attorney General, Office of Legal Counsel, *Re: The Effect of 8 U.S.C.A. § 1373(a) on the Requirement Set Forth in 13 U.S.C. § 9(a) That Census Officials Keep Covered Census Information Confidential* at 7 (May 18, 1999).  Here, as we have noted, the HUBZone provision is at least ambiguous as to whether its substantive effect is to mandate that all contracts be set aside for its program and then subject, pursuant to the rule of two, to restricted competition; or whether it is instead intended to subject, pursuant to the rule of two, restricted competition only to those contracts that have been set aside for the HUBZone Program in the exercise of the contracting officer's discretion.  If the latter interpretation is a permissible one, as we believe it is, then the "notwithstanding" clause simply ensures that no other provision of law countermands a contracting officer's discretion to make a sole source, restricted competition, or other contract award by means of assistance to qualified HUBZone small businesses pursuant to the requirements contained in the HUBZone statute.

## III.

We find further support for our position in the larger statutory framework of the Act incorporating all three of the SBA programs at issue.  *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-33 (2000) (in considering the meaning of the statutory text, the particular statutory provision should not be viewed in isolation; "[t]he meaning—or ambiguity—of certain words or phrases may only become evident when placed in context . . . . It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'") (quoting *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809 (1989)); *see also Proposed Agency Interp'n of Federal Means-Tested Public Benefits Under Personal Responsibility and Work Opportunity*

*Opinions of the Office of Legal Counsel in Volume 33*

*Reconciliation Act of 1996*, 21 Op. O.L.C. 21, 23 (1997) ("[I]t is well-established that a provision in one Act of Congress should be read in conjunction with other relevant statutory provisions and not in isolation."). As discussed below, a reading of the HUBZone provision that does not compel prioritization comports with the policies and purposes set forth in the Act and other specific provisions that were amended with and after the 1997 reauthorization establishing the HUBZone Program.

First, a construction of the statute that does not mandate HUBZone Program priority furthers Congress's stated policy that "small business concerns owned and controlled by service-disabled veterans, qualified HUBZone small business concerns, [and] small business concerns owned and controlled by socially and economically disadvantaged individuals . . . shall have the maximum practicable opportunity to participate in the performance of contracts let by any Federal agency." 15 U.S.C.A. § 637(d)(1); *see also id.* §§ 631(f)(1)(E), 637(d)(10). Congress required that a clause stating this policy "shall be included" in virtually every government procurement contract. *See id.* § 637(d)(2). In listing in the policy all of the covered classes of small business concerns, Congress did not in any way distinguish among them. Instead, the text does not disturb the discretion SBA and the agencies have to ensure that all of the covered small business concerns "have the maximum practicable opportunity" to secure federal contracts. Had Congress clearly intended to prescribe some order of priority among these SBA programs, Congress could have more directly adopted such a policy.

Second, this construction of the HUBZone statute furthers achievement of government-wide goals required by the Act. *See id.* § 644(g)(1). The Act prescribes that the "goal for participation by small business concerns shall be established at not less than 23 percent of the total value of all prime contract awards for each fiscal year." *Id.* Furthermore, government-wide participation goals "shall be established" at not less than 3 percent each for HUBZone and SDVO small business concerns and not less than 5 percent for socially and economically disadvantaged small businesses. *Id.* Each agency, in turn, must establish its own goal "that presents . . . the maximum practicable opportunity" for the small business concerns qualified under the various SBA programs "to participate in the performance of contracts let by such agency." *Id.* In total, the "cumulative annual prime contract goals for all agencies" must "meet or exceed" the established minimum annual government-wide goal. *Id.* Congress did not prescribe for HUBZone concerns the highest minimum participation goal among the various SBA programs and it left to agency discretion how to achieve its set goals. An interpretation of the HUBZone statute that does not compel a contract's award to a qualified HUBZone concern whenever the rule of two is met advances the achievement of the goals set forth for the other SBA programs and preserves the balance among the various programs established by the goaling provision of the Act.

## IV.

Such a reading of the HUBZone statute also comports with congressional intent as reflected in legislative history. The legislative history can fairly be interpreted to show that Congress did not intend, through enactment of the HUBZone statute, to require the award of available contracts to qualified HUBZone concerns over 8(a) participants.

*Permissibility of SBA Regulations Implementing the HUBZone, 8(a), and SDVO Programs*

The HUBZone Program was introduced in 1997 as part of the Senate version of the Small Business Reauthorization Act. *See* Small Business Reauthorization Act of 1997, S. 1139, 105th Cong., tit. vi (as reported by S. Comm. on Small Bus., Aug. 19, 1997, S. Rep. No. 105-62). The bill that the Senate Committee on Small Business unanimously voted to report contained an amendment with "parity" language making clear that the HUBZone Program did not interfere with the discretion of a contracting officer to designate a procurement contract for the 8(a) Program.[9] *See* S. 1139, 105th Cong. § 31(b)(5) (as reported by S. Comm. on Small Business, Aug. 19, 1997, S. Rep. No. 105-62). Right after a "Subordinate Relationship" provision setting forth the priority to be afforded to the prison industries, blind, and severely-disabled preference programs, the amendment provided, in a subsection entitled "Parity Relationship," that the HUBZone assistance provisions of the bill "shall not limit the discretion of a contracting officer to let any procurement contract to [SBA] under section 8(a)." 143 Cong. Rec. 18,118 (1997). It further provided that "[n]otwithstanding section 8(a), [SBA] may not appeal an adverse decision of any contracting officer declining to let a procurement contract to the Administration, if the procurement is made to a qualified HUBZone small business concern on the basis of a preference [set forth in the bill]." *Id.* The Committee's report explained that the proposed HUBZone Program was "not designed to compete with SBA's 8(a) Program," and that the "parity" provision was simply intended to "give[] the procuring agency's contracting officer the flexibility to decide whether to target a specific procurement requirement for the HUBZone Program or the 8(a) Program." S. Rep. No. 105-62, at 26 (1997). The bill, with its parity provision intact, passed the Senate. *See* S. 1139, 105th Cong. § 31(b)(5) (as passed by Senate, Sept. 9, 1997).

When the bill reached the House of Representatives, the House struck everything after the enacting clause and substituted the provisions of a competing House version that omitted the entirety of the HUBZone Program. *See* Small Business Reauthorization and Amendments Act of 1997, H.R. 2261, 105th Cong. (as passed Sept. 29, 1997); 143 Cong. Rec. 20, 662 (1997). Following return of the bill to the Senate, as amended by the House, the Senate reinstated the HUBZone Program by unanimous consent, but without the parity provision. *See id.* at 24,094-108. No explanation for the parity provision's omission was provided in the Senate record. *See id.* at 24,106.

The bill then returned to the House, where the issue of the HUBZone Program's relationship to the 8(a) Program was extensively discussed. *See id*. at 25,747-66 (1997). Representative John J. LaFalce, the Ranking Member on the Committee on Small Business, explained that the Senate had struck the parity provision at the insistence of House members who were worried that the parity provision would have permitted contracts to be taken from the 8(a) Program; in other words, that the provision would have precluded the prioritization of 8(a)

---

[9] At the time the bill was reported, the restricted competition provision of the HUBZone Program tracked even more closely the restricted competition provision in the 8(a) Program: "Subject to paragraph 3 [the sole source award provision], a contract opportunity offered for award pursuant to this section shall be awarded on the basis of competition restricted to qualified HUBZone small business concerns, if there is a reasonable expectation that not less than 2 qualified HUBZone small business concerns will submit offers and that award can be made at a fair market price." S. 1139, 143 Cong. Rec. 18,117, § 602(b)(1)(B), sec. 31(b)(B)(2) (1997). There is no explanation in the legislative history for the subsequent edit to this provision. But as discussed *supra*, accounting for the substantive differences between the 8(a) and HUBZone Programs as enacted, the two slightly different formulations can be read functionally to operate the same way.

**JA 122**

*Opinions of the Office of Legal Counsel in Volume 33*

awards. Rep. LaFalce stated that "[a]ny proposals which might place [the 8(a)] program in jeopardy naturally cause concern to those Members who place a high priority on the development of minority small business." *Id*. at 25,760 (1997). Rep. LaFalce indicated that although the Senate prevailed in establishing the HUBZone Program, the final bill "confers considerable discretion on the Administration of the SBA who will implement it." *Id.* (statement of Rep. LaFalce). Indeed, as Rep. LaFalce stated, he resisted the inclusion of the HUBZone Program until he was "specifically prevailed upon by the Small Business Administration," which pledged to him in writing that SBA "will not permit the implementation of the HUBZone's program to negatively affect the 8(a) program." *Id.*[10]

Numerous Representatives who spoke on S. 1139 during the floor debate expressed the same concern – that the new HUBZone Program not harm the existing 8(a) Program. *See id*. at 25,761 (statement of Rep. Velázquez); *id.* (statement of Rep. Talent) ("I yield. . . to say that that is also my understanding, and I have said from the beginning, that I did not want this bill to [a]ffect the 8(a) program, and as far as I am concerned, it is out of this bill, it is not mentioned in this bill"); *id.* at 25,762 (statement of Rep. Wynn) (accepting assurances that HUBZone Program would not harm 8(a) Program); *id.* at 25,763 (statement of Rep. Davis) (commending the protection of the 8(a) program); *id.* at 25,764 (statement of Rep. Weygand) ("Continued oversight and vigilance about this HUBZone program is extremely necessary. I know all of my colleagues are looking to Administrator Alvarez to be sure that she does not diminish the 8(a) program and sacrifice monies because of the HUB program. . . . I am concerned that there may be the unintended consequence of negatively impacting minority small businesses and 8(a) firms."); *id.* at 25,765 (statement of Rep. Jackson-Lee) ("we are not disturbing the 8(a) programs"); *id.* at 25,766 (statement of Rep. Mink) (expressing concern about the HUBZone Program's effect on the 8(a) Program and reliance upon SBA's assurances that "that in administering the HUBZone program, they would take steps necessary to assure that 8(a) was not adversely impacted.").

Accordingly, the legislative history comports with the conclusion reflected in SBA's regulations that the HUBZone statute need not be read to compel the prioritization of awards under the HUBZone Program over those under the 8(a) and SDVO Programs.[11] Our review of

---

[10] Indeed, after enactment of the HUBZone Program without inclusion of the explicit parity provision, SBA originally promulgated regulations directing contracting officers to preserve existing 8(a) contracts; then to prioritize small business concerns qualified under both the 8(a) and HUBZone Programs; and then to consider other 8(a) concerns before being directed to set aside a contract for competition restricted to HUBZone businesses. *See* 13 C.F.R. § 126.607(b), 63 Fed. Reg. 31908 (effective from June 11, 1998 to Aug. 29, 2005). As noted earlier, *see supra*, the regulations were amended in 2005.

[11] Since enactment of the HUBZone Program in 1997, Congress has on other occasions considered whether to prescribe the relationship among the small business programs and has not done so. In 2002, Senator John F. Kerry introduced legislation that would have created a priority for small business concerns that were both 8(a) participants and HUBZone concerns. *See* Combined 8(a) and HUBZone Priority Preference Act, S. 1994, 107th Cong. (as introduced, March 6, 2002). In 2003, when the House considered the Veterans Entrepreneurship and Benefits Improvement Act, which established the SDVO Program, H.R. 1460, 108th Cong. sec. 3, § 37 (as passed, June 24, 2003), an early version of the bill would have prioritized the various SBA assistance programs in the order of 8(a), SDVO, and then HUBZone. *See id.* § 37(a)-(b). After a short debate that did not include any significant discussion of the priority provision, the bill was passed by the House. *See* 108 Cong. Rec. 15,741 (2003). On the Senate side,

*Permissibility of SBA Regulations Implementing the HUBZone, 8(a), and SDVO Programs*

the text, structure and legislative record all support the conclusion that the HUBZone statute may fairly be read to mandate only that contract opportunities set aside for HUBZone concerns be awarded on the basis of restricted competition if the rule of two is met.

## V.

Our conclusion that the SBA's regulations we have reviewed are reasonable is binding on all Executive Branch agencies, notwithstanding any GAO decisions to the contrary.

First, the statute that authorizes the Comptroller General to decide bid protests provides the Comptroller General with the power only to make "recommendations" as to how an Executive Branch agency should resolve bid protests submitted to the Comptroller General. *See* 31 U.S.C. § 3554 (2006); *see also id.* § 3556 (2006) ("This subchapter does not give the Comptroller General exclusive jurisdiction over protests, and nothing contained in this subchapter shall affect the right of any interested party to file a protest with the contracting agency or to file an action in the United States Court of Federal Claims."). Neither that statute nor GAO's regulations implementing it provide GAO with the authority to overrule or invalidate the properly-promulgated regulations of an Executive Branch agency. *See id.* § 3554; 4 C.F.R. § 21.8 (2009) (implementing 31 U.S.C. §§ 3551-3556).

Second, the Comptroller General is an officer of the Legislative Branch. *See Bowsher v. Synar*, 478 U.S. 714, 727-32 (1986) (holding Comptroller General is subject to the control of Congress and therefore may not exercise non-legislative power). "Because GAO is part of the Legislative Branch, Executive Branch agencies are not bound by GAO's legal advice." Memorandum for the General Counsels of the Executive Branch, from Steven G. Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Whether Appropriations May be Used for Informational Video News Releases* at 1 (Mar. 11, 2005) ("Bradbury Memo") (citing *Bowsher*, 478 U.S. at 727-32).

Our Office has on many occasions issued opinions and memoranda concluding that GAO decisions are not binding on Executive Branch agencies and that the opinions of the Attorney General and of this Office are controlling. *See* Bradbury Memo at 1 ("This memorandum is being distributed to ensure that general counsels of the Executive Branch are aware that the Office of Legal Counsel [] has interpreted this same appropriations law in a manner contrary to the views of GAO, and to provide a reminder that it is OLC that provides authoritative interpretations of law for the Executive Branch."); Memorandum for Lois J. Schiffer, Assistant Attorney General, Environment and Natural Resources Division and for John D. Leshy, Solicitor, Department of the Interior, from Todd David Peterson, Deputy Assistant Attorney General, *Re: Administrative Settlement of Royalty Determinations* at n.7 (July 28, 1998) ("Although the opinions and legal interpretations of the GAO and the Comptroller General often provide helpful guidance on appropriations matters and related issues, they are not binding upon departments, agencies, or officers of the executive branch."); *Statutory Authority to Contract with the Private Sector for Secure Facilities*, 16 Op. O.L.C. 65, 68 n.8 (1992) ("We note that while GAO reports are often persuasive in resolving legal issues, they, like opinions of the

---

however, the provision was struck without debate or explanation. *See* Veterans Benefit Act of 2003, Pub. L. No. 108-183, 117 Stat. 2662; 108 Cong. Rec. 29,614-15 (2003).

13

*Opinions of the Office of Legal Counsel in Volume 33*

Comptroller General, are not binding on the Executive branch."); Memorandum for Donald B. Ayer, Deputy Attorney General, from J. Michael Luttig, Principal Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Department of Energy Request to Use the Judgment Fund for Settlement of Fernald Litigation* at 8 (Dec. 18, 1989) ("This Office has never regarded the legal opinions of the Comptroller General as binding upon the Executive.");  Memorandum for Joe D. Whitley, Acting Associate Attorney General, from William P. Barr, Assistant Attorney General, Office of Legal Counsel, *Re: Detail of Judge Advocate General Corps Personnel to the United States Attorney's Office for the District of Columbia and the Requirements of the Economy Act (31 U.S.C. §§ 1301, 1535)* at 2 n.2 (June 27, 1989) ("The Comptroller General is an officer of the legislative branch, and historically, the executive branch has not considered itself bound by the Comptroller General's legal opinions if they conflict with the opinions of the Attorney General and the Office of Legal Counsel.") (internal citation omitted).

We accordingly conclude that SBA's regulations regarding the relationship among the 8(a), HUBZone, and SDVO Programs constitute a permissible construction of the Act.

/s/

JEANNIE S. RHEE
Deputy Assistant Attorney General
Office of Legal Counsel

14

**JA 125**

# Amended Complaint

# Exhibit F

# The Authority of the Equal Employment Opportunity Commission to Order a Federal Agency to Pay a Monetary Award to Remedy a Breach of a Settlement Agreement

Based on principles of sovereign immunity, the Equal Employment Opportunity Commission lacks authority to order the Social Security Administration to pay a monetary award as a remedy for breach of a settlement agreement entered to resolve a dispute under Title VII of the Civil Rights Act of 1964.

August 13, 2014

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
SOCIAL SECURITY ADMINISTRATION

This memorandum responds to your letter of March 28, 2013, requesting our views on the authority of the Equal Employment Opportunity Commission ("EEOC") to order the Social Security Administration ("SSA") to pay a monetary award as a remedy for breach of a settlement agreement entered to resolve a dispute under Title VII of the Civil Rights Act of 1964.[1] We conclude, based on principles of sovereign immunity, that EEOC lacks authority to order SSA to pay such a monetary award for breach of the settlement agreement.

## I.

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination based on race, color, religion, sex, and national origin. 42 U.S.C. § 2000e-2(a) (2012). A provision of Title VII extends this prohibition to employment by the federal government. Title VII's federal-sector provision states that "[a]ll personnel actions affecting employees or applicants for employment . . . in executive

---

[1] Memorandum for Virginia A. Seitz, Assistant Attorney General, Office of Legal Counsel ("OLC"), from David Black, General Counsel, Social Security Administration, *Re: Equal Employment Opportunity Commission's Monetary Award Authority* (Mar. 28, 2013). In considering SSA's request, we received additional views from that agency. *See* E-mail for OLC from Andrew Maunz, Office of the General Counsel, Social Security Administration, *Re: Additional Questions* (June 14, 2013) ("Maunz E-mail"); E-mail for OLC from Jay Ortis, Director, Labor and Employment Division, Office of General Law, Social Security Administration, *Re: Fwd: Solicitation of Views* (July 17, 2013 9:58 AM). We also obtained the views of EEOC and the Civil Division of the Department of Justice. *See* Letter for John E. Bies, Deputy Assistant Attorney General, Office of Legal Counsel, from Peggy R. Mastroianni, Legal Counsel, Equal Employment Opportunity Commission, *Re: Social Security Administration Request for OLC Opinion* (July 2, 2013; E-mail for OLC from Gary Hozempa, Office of Legal Counsel, Equal Employment Opportunity Commission, *Re: EEOC Breach of Settlement Decisions re Social Security Administration* (July 23, 2013 2:16 PM); E-mail for OLC from Kerry A. Bollerman, Civil Division, Department of Justice, *Re: Solicitation of Views* (May 14, 2013 5:20 PM).

1

*Opinions of the Office of Legal Counsel in Volume 38*

agencies . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin." *Id.* § 2000e-16(a). Congress authorized EEOC "to enforce the provisions of [section 2000e-16(a)] through appropriate remedies, including reinstatement or hiring of employees with or without back pay." *Id.* § 2000e-16(b). In addition, Congress authorized EEOC to "issue such rules, regulations, orders and instructions as it deems necessary and appropriate to carry out its responsibilities under [section 2000e-16]." *Id.*

Title VII and EEOC regulations set out a procedure for the filing, processing, and adjudication of complaints of unlawful discrimination in federal employment. The regulations, however, reflect a preference for voluntary settlement of discrimination complaints, *see* 29 C.F.R. § 1614.603 (2013), and treat settlement agreements as binding on the parties, *id.* § 1614.504(a). If a complainant believes that the respondent agency has failed to comply with the agreement, the regulations allow the complainant to "request that the terms of the settlement agreement be specifically implemented or, alternatively, that the complaint be reinstated for further processing from the point processing ceased." *Id.* If EEOC determines that the agency is not in compliance with the settlement agreement, the regulations provide that EEOC may "order . . . compliance with the . . . settlement agreement, or, alternatively, . . . order that the complaint be reinstated for further processing from the point processing ceased." *Id.* § 1614.504(c). The regulations further provide that "allegations that subsequent acts of discrimination violate a settlement agreement shall be processed as separate complaints . . . rather than [through actions to enforce the settlement]." *Id.*

In 1995, a group of African-American male employees working in the Baltimore, Maryland headquarters of SSA filed a class complaint alleging that the agency had discriminated against them with respect to promotions, awards, bonuses, and other personnel decisions. EEOC certified the class in 1998. The parties subsequently decided to settle their dispute and entered into an agreement under which the class members received monetary and non-monetary relief in exchange for dismissing their complaint. *See* Settlement Agreement, *Burden v. Barnhart*, EEOC Case No. 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X (Jan. 11, 2002) ("Settlement Agreement"). The Settlement Agreement made clear that it did not "represent an admission of liability by [SSA]." *Id.* at 20.

Pertinent here, Provision III.D of the Settlement Agreement, which appears under the heading "Non-Monetary Relief," reads in relevant part:

> [SSA] agrees that its policies and practices for granting performance awards and Quality Step Increases will be fair and equitable and consistent with merit principles. [SSA] agrees that it will correct any misapplications of its policies for granting performance awards and Quality Step Increases to ensure fair and equitable distribution of such awards, consistent with merit principles. At [SSA's] discretion,

Case 1:16-cv-01068-KBJ   Document 22-7   Filed 10/27/17   Page 4 of 15
Case #24-5163     Document #2080945      Filed: 10/18/2024     Page 135

*Authority of EEOC to Order Federal Agency to Pay Monetary Award*

> an expert may be retained to recommend ways to assess these poli-
> cies and practices and to ensure compliance with relevant statutes,
> regulations, EEO principles, and applicable collective bargaining
> agreements in [SSA's] awards process. Any corrections [SSA] im-
> plements will be made after providing a 30-day notice and comment
> period to the Oversight Committee. [SSA] will provide a report to
> the Administrative Judge within 6 months of the Effective Date of
> this agreement of the actions it has taken to comply with this para-
> graph.

*Id.* at 10. The Settlement Agreement provided that the Administrative Judge
("AJ") would "retain jurisdiction over this matter for a period of 4 years" to
monitor compliance with the agreement. *Id.* at 6.

In 2005, the class contended that SSA had not fulfilled its obligation to correct
"misapplications of its policies for granting performance awards and Quality Step
Increases." The class accordingly requested that the agency provide a "corrective
action plan." Letter for John E. Bies, Deputy Assistant Attorney General, Office of
Legal Counsel, from Peggy R. Mastroianni, Legal Counsel, Equal Employment
Opportunity Commission, *Re: Social Security Administration Request for OLC
Opinion* at 2 (July 2, 2013) ("EEOC Letter"). SSA responded that the expert
analysis on which the class premised its request was flawed, and promised to hire
another expert. *Id.*

SSA delivered a second expert report to the class in 2006. That report showed
underrepresentation of African-American males in the distribution of Quality Step
Increases ("QSIs"), cash awards, and honor awards in certain SSA offices. In a
September 2006 letter, SSA set forth a plan to address the areas of concern
identified in the report and to prevent future disparities.

The class subsequently requested that the AJ find that SSA was not in compli-
ance with the Settlement Agreement, arguing that the agency had not offered a
plan to correct all of the disparities revealed in the second expert report. *See
Jefferson v. Astrue*, Hearing No. 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X, slip op. at 11 (Apr. 28, 2011)
("OFO Decision"). The judge denied the motion as moot because SSA had
provided the statistical information the class demanded. *Id.* at 12.

The complainants appealed the AJ's decision to EEOC's Office of Federal
Operations ("OFO"). In their appeal, the class members requested specific
implementation of Provision III.D, which, they argued, included retroactive
awards and Quality Step Increases for class members who had been unfairly
denied those benefits. Class Brief in Support of Appeal at 13–14, *Burden v.
Astrue*, EEOC Case No. 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X (May 20, 2008) ("Class Brief in Support
of Appeal"). SSA, on the other hand, took the position that implementation of
Provision III.D did not include retroactive awards and Quality Step Increases. The
Settlement Agreement, the agency contended, did not authorize prospective relief

**JA 129**

Case 1:16-cv-01068-KBJ Document 22-7 Filed 10/27/17 Page 5 of 15
Case #24-5163 Document #2080945 Filed: 10/18/2024 Page 136

*Opinions of the Office of Legal Counsel in Volume 38*

for any alleged breach; while SSA had agreed to ensure that its policies for awarding promotions and other honors would be fair and equitable and to correct any misapplications of its policies, it had not agreed that the distribution of such benefits would be mathematically exact, or that the class members would be entitled to relief in the event they disagreed with the distribution of awards. Agency's Response to Class' Brief on Appeal at 8–10, *Burden v. Astrue*, EEOC Case No. 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X (May 20, 2008) ("Agency's Response to Class' Brief on Appeal").

OFO, acting on behalf of the Commission, reversed the AJ's decision. Relying on the 2006 expert report, OFO found that "the Agency did not ensure that its policies and practices for granting performance awards and QSIs were fair and equitable between April 1, 2003 and September 30, 2005." OFO Decision at 18. OFO further found that SSA had failed to correct misapplications of its policies to ensure fair and equitable distribution of awards. OFO explained that there was no evidence to show that the policies and procedures described in SSA's September 2006 letter had been implemented or that the agency had effectively corrected the misapplication of its policy for granting performance awards and QSIs. *See id.* at 19.

Based on these conclusions, OFO determined that the complaining class members were "entitled to specific enforcement of the class settlement agreement." *Id.* OFO then ordered that "all African-American males working for the Agency's Headquarters Office in Baltimore, Maryland from April 1, 2003, through September 30, 2005, [be] presumptively entitled to the average honor award, monetary award, and QSI received during the relevant time." *Id.* OFO added that "the presumption of entitlement to the average honor award, monetary award, and QSI can be rebutted if the Agency can establish by clear and convincing evidence that an employee is not entitled to this relief." *Id.* OFO remanded the case to an administrative judge to oversee the processing of relief, including calculating the total and individual amounts due. *Id.* at 20.

SSA sought reconsideration of the decision, arguing that the relief awarded exceeded the scope of EEOC's authority. OFO denied the motion. *Jefferson v. Astrue*, Hearing No. 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X (Dec. 18, 2012). SSA then submitted its request for the views of this Office on whether EEOC had authority to order the agency to pay a monetary award for breach of a settlement agreement, contending that the absence of an applicable waiver of sovereign immunity precludes EEOC from ordering SSA to pay such a monetary award.

*Authority of EEOC to Order Federal Agency to Pay Monetary Award*

## II.

### A.

The question whether EEOC has authority to issue a monetary award to remedy a breach of a settlement agreement by a federal agency turns on the doctrine of sovereign immunity, which bars suit against the federal government except to the extent it has consented. *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). Consent to suit must be provided by Congress explicitly, in clear statutory language; ambiguous statements will not suffice. *See Lane v. Pena*, 518 U.S. 187, 192 (1996); *see also United States v. Shaw*, 309 U.S. 495, 500–01 (1940) (explaining that "without specific statutory consent, no suit may be brought against the United States. No officer by his action can confer jurisdiction"). Waivers of sovereign immunity are "strictly construed, in terms of [their] scope, in favor of the sovereign." *Lane*, 518 U.S. at 192. Waivers for one type of relief, such as injunctive relief, do not thereby waive immunity for other forms of relief, such as money damages. *See id.* at 195–96; *United States v. Nordic Village*, 503 U.S. 30, 34–37 (1992) (relying on sovereign immunity principles to construe statutory waiver of sovereign immunity to permit equitable but not monetary claims); *cf. Library of Congress v. Shaw*, 478 U.S. 310, 317–19 (1986) (statutory waiver of immunity from attorney's fees does not thereby waive immunity from interest on those fees). Rather, "[t]o sustain a claim that the Government is liable for awards of monetary damages, the waiver of sovereign immunity must extend unambiguously to such monetary claims." *Lane*, 518 U.S. at 192. We have previously explained that a statutory provision "does not waive sovereign immunity for monetary claims" where the provision can plausibly be read in a manner that would not authorize monetary relief. *Authority of the Equal Employment Opportunity Commission to Impose Monetary Sanctions Against Federal Agencies for Failure to Comply with Orders Issued by EEOC Administrative Judges*, 27 Op. O.L.C. 24, 26–27 (2003) ("Navy Opinion") (citing *Availability of Money Damages Under the Religious Freedom Restoration Act*, 18 Op. O.L.C. 180, 180 (1994)). The rule that suit is permitted only on the terms Congress has authorized extends as well to matters of forum; a waiver of immunity for suits in one forum does not necessarily constitute a waiver in all forums. *See Shaw*, 309 U.S. at 501 ("Even when suits [against the United States] are authorized[,] they must be brought only in designated courts.").

As we observed in a prior opinion, "[a]lthough most of the sovereign immunity case law arises in the context of suits before federal district courts, these principles apply with equal force to agency adjudications." Navy Opinion, 27 Op. O.L.C. at 27. "In our view, there can be no doubt that normal sovereign immunity presump-

**JA 131**

Case 1:16-cv-01068-KBJ   Document 22-7   Filed 10/27/17   Page 7 of 15
Case #24-5163     Document #2080945       Filed: 10/18/2024     Page 138

*Opinions of the Office of Legal Counsel in Volume 38*

tions apply" to the question whether an agency can itself grant a particular form of relief against the government. *Id.* at 28.[2]

In 2003, we considered whether the statute conferring authority on EEOC to enforce Title VII's federal-sector provision through "appropriate remedies," 42 U.S.C. § 2000e-16(b), supplied the requisite waiver of sovereign immunity to support an order of attorney's fees against an agency as a sanction for failure to follow an administrative judge's orders. We concluded that it did not. We observed that section 2000e-16(b) waives federal agencies' immunity from suits seeking remedies for unlawful discrimination, but "[a]ttorney's fees imposed as a sanction for failure to comply with AJ orders relating to the adjudicatory process . . . are not a remedy for any act of discrimination." Navy Opinion, 27 Op. O.L.C. at 29. We further explained that "neither section 2000e-16(b), nor any other statute, contains a provision that even pertains to violations of AJ orders, much less provides an explicit waiver of the government's immunity to monetary sanctions for violations of such orders." *Id.* Finally, we rejected EEOC's argument that the Federal Rules of Civil Procedure supplied the necessary waiver. "[E]ven if Congress had waived sovereign immunity for violations of the Federal Rules of Civil Procedure in federal court," we explained, "it would not follow that it has also waived immunity for arguably analogous (though formally distinct) violations before an entirely different body where these rules do not apply." *Id.* at 31. "Indeed, . . . the doctrine of sovereign immunity requires the exact opposite presumption." *Id.*

## B.

Within this framework, we consider EEOC's authority to award the monetary relief at issue in this case. Our 2003 opinion, SSA argues, compels the conclusion that EEOC may not issue such an award absent an express waiver of sovereign immunity. No such waiver exists, the agency urges, because Title VII waives the government's immunity only for damage awards upon a finding of unlawful discrimination, and the Settlement Agreement included no admission of liability. Memorandum for Virginia A. Seitz, Assistant Attorney General, Office of Legal Counsel, from David Black, General Counsel, Social Security Administration, *Re: Equal Employment Opportunity Commission's Monetary Award Authority* at 3 (Mar. 28, 2013) ("SSA Memorandum").

---

[2] In *West v. Gibson*, 527 U.S. 212 (1999), the Supreme Court suggested in dicta that "ordinary sovereign immunity presumptions" may not apply to the question whether an agency may grant relief against the government when Congress has unambiguously waived sovereign immunity with respect to that form of relief for claims brought in district court. *Id.* at 217. In our 2003 opinion, we disagreed with that suggestion, observing that "'[i]t is settled law that a waiver of sovereign immunity in one forum does not effect a waiver in other forums.'" Navy Opinion, 27 Op. O.L.C. at 27–28 (quoting *West*, 527 U.S. at 226 (Kennedy, J., dissenting)).

Case 1:16-cv-01068-KBJ   Document 22-7   Filed 10/27/17   Page 8 of 15
Case #24-5163   Document #2080945   Filed: 10/18/2024   Page 139

*Authority of EEOC to Order Federal Agency to Pay Monetary Award*

EEOC responds that our 2003 opinion is inapposite because the Commission did not impose sanctions on SSA for failing to comply with an AJ's order. Rather, "the relief awarded . . . pertains only to SSA's breach of an EEOC settlement agreement." EEOC Letter at 10. In the past, EEOC observes, we have held that "an agency can award through a settlement agreement any relief which a court could order if a finding of prohibited discrimination were made." *Id.* (citing *Proposed Settlement of* Diamond v. Department of Health and Human Services, 22 Op. O.L.C. 257, 262 (1998) ("Diamond Opinion")); *see also Authority of USDA to Award Monetary Relief for Discrimination*, 18 Op. O.L.C. 52, 53 (1994) ("USDA Opinion"). In EEOC's view, it follows that, "when an agency breaches an EEO settlement, EEOC can order as relief whatever a court could award upon a finding of a breach." EEOC Letter at 10. Hence, the Commission asserts, if a court may order monetary relief upon finding that an agency has breached a Title VII settlement, so too can EEOC.

EEOC does not appear to dispute that the waiver of sovereign immunity in Title VII applies only to claims of unlawful discrimination and does not extend to monetary claims against the government for breach of a Title VII settlement. *See* EEOC Letter at 5 & n.2. Rather, EEOC argues that courts may award money damages for breach of a settlement agreement under the Tucker Act, which waives the government's sovereign immunity with respect to claims "founded . . . upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2012). EEOC notes that in *Holmes v. United States*, 657 F.3d 1303 (Fed. Cir. 2011), the Federal Circuit determined that the Court of Federal Claims may exercise jurisdiction under the Tucker Act over suits alleging breach of a Title VII settlement, provided that the agreement itself contemplates money damages in the event of a breach. *Id.* at 1311–15. The agreement at issue in this matter, EEOC argues, contemplates money damages in the manner *Holmes* requires. Therefore, in EEOC's view, the Tucker Act's waiver applies, and sovereign immunity poses no bar to the Commission's order of the monetary relief at issue in this matter.

EEOC further contends that "the fact that the waiver [of sovereign immunity]" is found in the Tucker Act rather than Title VII "is not significant vis-à-vis EEOC's authority to award back pay." EEOC Letter at 11. In *West v. Gibson*, 527 U.S. 212 (1999), EEOC notes, the Supreme Court held that EEOC may award compensatory damages as an "appropriate remed[y]" for a violation of Title VII, 42 U.S.C. § 2000e-16(b), even though the provision authorizing that form of relief is found in a 1991 Title VII amendment that expanded the remedial authority of courts without explicitly referring to EEOC proceedings. 527 U.S. at 217. Similarly, here, EEOC argues that the Commission has authority to award money damages for breach of a Title VII settlement agreement because of the waiver of immunity contained in the Tucker Act. A contrary conclusion, EEOC contends, would "strip EEOC's authority to enforce Title VII against agencies through

appropriate remedies, and rob it of the ability to ensure that an agency complies with its Title VII settlement promises." EEOC Letter at 11 (internal quotation marks omitted).

### III.

### A.

We are not persuaded by EEOC's arguments. EEOC's reliance on the Tucker Act is misplaced because the Tucker Act confers jurisdiction only on the Court of Federal Claims to hear contractual claims against the United States exceeding $10,000. *See* 28 U.S.C. § 1491(a)(1) ("The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.").[3] That limited waiver of sovereign immunity does not authorize EEOC to provide a forum for such disputes. *See Shaw*, 309 U.S. at 501 ("Even when suits [against the United States] are authorized[,] they must be brought only in designated courts."); *cf. Minnesota v. United States*, 305 U.S. 382, 388 (1939) ("[I]t rests with Congress to determine not only whether the United States may be sued, but in what courts the suit may be brought.").

### 1.

In *Holmes*, on which EEOC places principal reliance, the Federal Circuit determined that Title VII posed no bar to the Court of Federal Claims' exercise of jurisdiction under the Tucker Act to adjudicate a claim that an agency breached a Title VII settlement agreement, notwithstanding Title VII's comprehensive remedial scheme and its conferral of jurisdiction on federal district courts. 657 F.3d at 1312–13.[4] In so holding, the court relied on the Supreme Court's decision in *Kokkonen v. Guardian Life Insurance*, 511 U.S. 375 (1994), which held that a court with jurisdiction over an underlying dispute does not necessarily also have jurisdiction over claims that parties have breached an agreement settling that dispute. *Id.* at 381. Rather, the Court ruled, an independent basis of jurisdiction is

---

[3] 28 U.S.C. § 1346, known as the "Little Tucker Act," confers jurisdiction on United States district courts for claims founded "upon any express or implied contract with the United States" that do not exceed $10,000.

[4] Neither party challenges this aspect of the Federal Circuit's decision; we therefore assume that it is correct for purposes of this opinion. As it is irrelevant to our resolution of the question presented, we likewise take no position on the parties' dispute over whether the contract at issue contemplates money damages. *Compare* EEOC Letter at 6–8 *with* Maunz E-mail, *supra* note 1.

*Authority of EEOC to Order Federal Agency to Pay Monetary Award*

generally needed for a federal court to adjudicate such breach of settlement claims. *Id.*; *see Holmes*, 657 F.3d at 1312–13. Following *Kokkonen*, the Federal Circuit explained that, "although the [settlement agreement] arose out of Title VII litigation, [the plaintiff's] suit for breach of contract is just that: a suit to enforce a contract with the government." 657 F.3d at 1312. The court therefore held that the case was properly heard in the Court of Federal Claims under the Tucker Act, rather than in the federal district court authorized to hear claims under Title VII.

Conversely, federal courts with jurisdiction over Title VII claims have held that they may *not* adjudicate claims for damages resulting from a federal agency's breach of a Title VII settlement agreement. *See Taylor v. Geithner*, 703 F.3d 328, 334 (6th Cir. 2013); *see also Munoz v. Mabus*, 630 F.3d 856, 861–64 (9th Cir. 2010); *Frahm v. United States*, 492 F.3d 258, 262–63 (4th Cir. 2007); *Lindstrom v. United States*, 510 F.3d 1191, 1194–96 (10th Cir. 2007). Those courts have explained that the waiver of sovereign immunity in Title VII, which authorizes suits against federal agencies for unlawful discrimination, "does not expressly extend to monetary claims against the government for breach of a settlement agreement that resolves a Title VII dispute." *Frahm*, 492 F.3d at 262. And while the waiver of sovereign immunity in the Tucker Act does extend to such claims, "invoking the Tucker Act is a non sequitur" in federal district court, "because where . . . a suit involves a claim for money damages over $10,000, the Act waives the government's immunity only in the Court of Federal Claims." *Franklin-Mason v. Mabus*, 742 F.3d 1051, 1054 (D.C. Cir. 2014); *see id.* at 1056 ("[T]he Tucker Act does not contain a waiver of sovereign immunity *in the district court* for breach of a Title VII settlement agreement seeking damages in excess of $10,000." (emphasis added)); *accord Munoz*, 630 F.3d at 864 ("Because [the plaintiff's] breach of settlement agreement claim is essentially a contract action against the federal government whose resolution requires no interpretation of Title VII itself, his claim cannot seek jurisdictional refuge in Title VII and belongs, if anywhere, in the Court of Federal Claims.").[5]

This case law highlights why, even if we were to accept EEOC's position that it "can order as relief whatever a court could award upon a finding of a breach," EEOC Letter at 10, that standard does not help its case. The waiver of sovereign immunity in the Tucker Act is limited to cases heard in the Court of Federal Claims. It does not waive the federal government's immunity, either in federal district court or in EEOC proceedings, for claims arising from breach of a

---

[5] Notably, "unlike the district courts, . . . the [Court of Federal Claims] has no general power to provide equitable relief against the Government or its officers." *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 313 (2011). And the Federal Circuit has found that "[e]xcept in strictly limited circumstances . . . there is no provision in the Tucker Act authorizing the Court of Federal Claims to order equitable relief." *Massie v. United States*, 226 F.3d 1318, 1321 (2000).

**JA 135**

settlement agreement. As explained above, waivers of sovereign immunity are to be "strictly construed, in terms of [their] scope, in favor of the sovereign." *Lane*, 518 U.S. at 192. Consequently, the Tucker Act provides no authority for EEOC to award money damages to remedy a federal agency's breach of a Title VII settlement.

### 2.

The Supreme Court's decision in *West* does not compel a contrary result. In that case, the Supreme Court construed the provision granting EEOC authority to enforce Title VII "through appropriate remedies," 42 U.S.C. § 2000e-16(b), as including the power to order remedies Congress deemed appropriate for enforcing Title VII's substantive provisions in a later Title VII amendment. 527 U.S. at 218. Because Congress determined that compensatory damages are an appropriate remedy for victims of discrimination by federal agencies in the Civil Rights Act of 1991, the Court concluded, section 2000e-16(b) authorizes EEOC to afford such relief in its enforcement proceedings. *Id.* at 218–19.

*West* provides no support for construing the limited waiver of sovereign immunity in the Tucker Act to apply to breach of settlement proceedings before EEOC. Unlike the Civil Rights Act of 1991, which amended Title VII itself, the Tucker Act is an unrelated statute that predated Title VII by several decades and as such says nothing about the remedies Congress considered suitable to effectuate the aims of Title VII. *Cf. id.* at 218 ("[I]n context the word 'appropriate' most naturally refers to forms of relief that *Title VII itself authorizes*." (emphasis added)). More fundamentally, this matter does not concern the scope of EEOC's authority to award "appropriate remedies" for workplace discrimination, but its authority to award remedies for a federal agency's breach of a settlement agreement. *See Frahm*, 492 F.3d at 262–63 (section 2000e-16(b) waives the government's sovereign immunity with respect to substantive Title VII claims but "does not expressly extend to monetary claims against the government for breach of a settlement agreement that resolves a Title VII dispute"). The Court's interpretation of the term "appropriate remedies" as it appears in Title VII provides no basis for reading the limited waiver of sovereign immunity in the Tucker Act to authorize EEOC to award monetary relief for a federal agency's breach of a Title VII settlement agreement.

### B.

In addition to considering EEOC's argument that the Tucker Act allows it to order a compensatory remedy for breach of a settlement agreement, we have also considered whether EEOC's award of monetary relief is authorized by Title VII itself insofar as the award constitutes an order to perform on promises SSA made in the Settlement Agreement—in particular, promises to "distribute performance

Case 1:16-cv-01068-KBJ   Document 22-7   Filed 10/27/17   Page 12 of 15
Case #24-5163    Document #2080945    Filed: 10/18/2024    Page 143

*Authority of EEOC to Order Federal Agency to Pay Monetary Award*

awards on a fair and equitable basis, consistent with merit principles" and "to take corrective action if it did not keep this promise." *See* EEOC Letter at 12 ("SSA promised to distribute performance awards on a fair and equitable basis, consistent with merit principles. It also promised to take corrective action if it did not keep this promise. OFO found that SSA breached these promises. As relief, EEOC ordered SSA to take corrective action, the very corrective action which SSA promised to, but did not, take.").

As EEOC notes, this Office has repeatedly recognized that Title VII's waiver of sovereign immunity means that an agency may settle an administrative Title VII complaint by awarding monetary relief to a complainant, even without admitting liability for the alleged discrimination. USDA Opinion, 18 Op. O.L.C. at 52–54; *see* Diamond Opinion, 22 Op. O.L.C. at 261 & n.6 (quoting *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 515 (1986)). As long as the intended relief does not exceed the scope of remedies available in court, the government's consent to be sued for violations of Title VII ordinarily permits voluntary settlement of a complaint alleging such violations. *See* Diamond Opinion, 22 Op. O.L.C. at 261–62 & n.6; *see also* USDA Opinion, 18 Op. O.L.C. at 53 (explaining that, under appropriations law, "agencies have authority to provide for monetary relief in a voluntary settlement of a discrimination claim only if the agency would be subject to such relief in a court action regarding such discrimination brought by the aggrieved person").

It might follow from this principle that EEOC has authority in certain circumstances to enforce a settlement agreement by ordering an agency to perform on its promises, even if those promises include a commitment to pay money to a complainant. If, for example, the agency had settled a Title VII claim by promising to provide a particular amount of back pay or other monetary relief and the complainant requested specific performance of that promise, EEOC might be able to order that relief without violating the doctrine of sovereign immunity. In such a circumstance, one could argue that the dispute is not, in essence, a contract dispute with the federal government, but rather a continuation of the same Title VII proceeding that gave rise to the settlement itself. Consequently, the same waiver of sovereign immunity that permitted the agency to resolve the Title VII complaint by voluntary settlement might also permit EEOC to compel the agency to make good on its promise.[6]

But whatever effect the waiver of sovereign immunity in Title VII might have on EEOC's authority to award monetary relief in other circumstances, we do not believe it authorizes the monetary award at issue here. The award at issue was not

---

[6] Editor's Note: The text of this footnote has been redacted. It includes privileged information and addresses an issue not necessary for the discussion here.

an order to perform on an agreement that provided back pay or other specific monetary relief to settle an underlying Title VII claim alleging past misconduct. Rather, it was an order to perform on a promise to take corrective action in the future to remedy any failure to distribute performance awards and QSIs on a "fair and equitable basis." EEOC Letter at 12. Based on two principal considerations, we conclude that, for purposes of the sovereign immunity analysis, the dispute at issue here cannot fairly be characterized as merely a continuation of the same Title VII proceeding that gave rise to the settlement itself. Accordingly, the remedy EEOC awarded is not authorized by the waiver of sovereign immunity that allowed SSA to settle the class complaint and provide relief to the claimants in the first place.

The nature of the present dispute over the meaning and application of Provision III.D illustrates that the dispute was not merely a continuation of the Title VII claim that gave rise to the settlement, but rather a distinct proceeding beyond the scope of the waiver of sovereign immunity upon which the settlement rested. First, the present dispute does not concern a specific settlement term that imposes clear obligations on the SSA—such as an agreement to provide a particular sum in back pay—but instead concerns SSA's alleged failure to comply with a non-specific prospective promise to "correct any misapplications of its policies for granting performance awards and Quality Step Increases to ensure fair and equitable distribution of such awards, consistent with merit principles." Settlement Agreement at 10. As SSA points out, in agreeing to this provision, it neither expressly consented to a particular numerical distribution of awards and QSIs, nor expressly agreed that the class members would be entitled to monetary relief in the event that they were dissatisfied with the number of awards and promotions received. Agency's Response to Class' Brief on Appeal at 8–10. Provision III.D, SSA observes, "contains no discussion of a monetary component and neither memorializes nor evidences a meeting of the minds between the parties that all class members could receive the average monetary award, or any monetary award for that matter, for the oversight period." SSA Memorandum at 3–4. Rather, in SSA's view, the disputed settlement term simply required compliance with merit principles and active oversight of its policies for issuing promotions and performance awards. *See* Maunz E-mail, *supra* note 1 ("[S]pecific enforcement [of Provision III.D] could include an ordered review of the agency's policies, perhaps even by an expert."). As a consequence, the proceedings regarding the enforcement dispute at issue required not only extensive debate over the meaning of SSA's promise to distribute awards and QSIs on a "fair and equitable basis" and to "correct any misapplications of its policies," but also extensive fact-finding

*Authority of EEOC to Order Federal Agency to Pay Monetary Award*

regarding SSA's post-settlement conduct to determine whether the relevant standards had been met. *See* OFO Decision at 16–19.[7]

Second, the present dispute does not concern monetary remedies for the alleged Title VII violations underlying the settlement, but monetary remedies for failure to comply with a settlement term governing SSA's *future* conduct, i.e., SSA's failure to distribute performance awards and QSIs on a "fair and equitable" basis after the settlement was reached. That is apparent from the extensive fact-finding required to determine SSA's compliance with Provision III.D—if the monetary remedy awarded to the class members in the present dispute rested on the conduct that gave rise to their initial Title VII claims, there would have been no need for such additional fact-finding because those claims were resolved by the Settlement Agreement. It is, at a minimum, questionable whether the waiver of sovereign immunity in Title VII that permitted SSA to enter the Settlement Agreement in the first place would also permit SSA to promise to provide a monetary remedy in the event it failed to abide by a promise to refrain from particular conduct in the future. We have previously observed that, consistent with limitations on agencies' ability to compromise or abandon claims made against the United States in litigation, "settlement of a discrimination claim should be based on the agency's good faith assessment of the litigation risk that a court might find complainants entitled to relief" based on the claims raised in their complaint. Diamond Opinion, 22 Op. O.L.C. at 262. An agreement to provide monetary relief in the event of future noncompliance with a term of the settlement agreement would arguably be an impermissible agreement to compensate complainants for injuries not alleged in their complaint. Such conduct would not be at issue if the complainants were to proceed to court on their original claim. As such, an agreement to provide

---

[7] Although OFO characterized its order as "specific enforcement" of the Settlement Agreement, we note that OFO's order appears more akin to a legal remedy for breach than the equitable remedy of specific performance as that term is generally understood in contract law. The Supreme Court has observed that specific performance requires an agreement that is "certain, fair, and just in all its parts." *Dalzell v. Dueber Watch-Case Mfg. Co.*, 149 U.S. 315, 325 (1893). "'The contract which is sought to be specifically executed ought not only to be proved,'" the Court explained, "'but the terms of it should be so precise as that neither party could reasonably misunderstand them.'" *Id.* at 326 (quoting *Colson v. Thompson*, 15 U.S. (2 Wheat) 336, 341 (1817)). Accordingly, "'[i]f the contract be vague or uncertain . . . a court of equity will not exercise its extraordinary jurisdiction to enforce it, but will leave the party to his legal remedy.'" *Id.* (quoting *Colson*, 15 U.S. (2 Wheat) at 341); *see also* Restatement (Second) of Contracts § 368 (1981) ("Specific performance . . . will not be granted unless the terms of the contract are sufficiently certain to provide a basis for an appropriate order.").

In determining that the class members were presumptively "entitled to the average honor award, monetary award, and QSI" (a number unknown at the time of decision), we do not believe that OFO enforced a term "'so precise as that neither party could reasonably misunderstand [it].'" *Dalzell*, 149 U.S. at 326 (quoting *Colson*, 15 U.S. (2 Wheat) at 341); *cf. TAS Distributing Co., Inc. v. Cummins Engine Co., Inc.*, 491 F.3d 625, 637 (7th Cir. 2007) (rejecting claim that district court abused its discretion in refusing to order defendant to specifically perform on its "obligation to make 'all reasonable efforts' to manufacture and market the subject technology").

**JA 139**

monetary compensation for future noncompliance would raise significant questions about whether the agency had acted in a manner consistent with its obligation to provide settlement remedies based on a "good faith assessment" of the complainants' likely recovery from the pending complaint.[8]

For both of these reasons, taken together, we conclude that the dispute at issue was not merely a continuation of the underlying Title VII proceedings that resulted in the Settlement Agreement, and that the waiver of sovereign immunity upon which the settlement rested therefore cannot be said to authorize the award EEOC provided to remedy SSA's alleged failure to comply with Provision III.D of the Settlement Agreement.[9]

### IV.

We conclude that the doctrine of sovereign immunity precludes the monetary relief ordered in this case.

> JOHN E. BIES
> *Deputy Assistant Attorney General*
> *Office of Legal Counsel*

---

[8] We do not suggest that an agency is precluded from including in a settlement its promise not to discriminate in the future. Title VII explicitly authorizes courts to enjoin agencies from engaging in unlawful employment practices. 42 U.S.C. § 2000e-5(g)(1). And we have recognized that "an appropriate remedy under Title VII . . . may include relief, including injunctive relief, that will make the plaintiff whole, prevent future violations of the act, and prevent retaliation against complainants." Diamond Opinion, 22 Op. O.L.C. at 263. Because agencies may settle a discrimination claim and award any relief that would be available in court, a promise to refrain from discriminatory behavior in the future would be entirely proper.

[9] As noted in Part I, EEOC's regulations provide that "allegations that subsequent acts of discrimination violate a settlement agreement shall be processed as separate complaints . . . rather than [through actions to enforce the settlement]." 29 C.F.R. § 1614.504(c). In proceedings before OFO, SSA argued that this provision precluded the class from receiving relief on their claims that the agency's unequal post-settlement distribution of awards violated the Settlement Agreement. We express no view on this question, and do not address the scope of EEOC's regulations. Rather, we consider the fact that EEOC effectively compensated the class members for discrimination that followed the settlement only insofar as that fact informs our view that the Commission's award is barred by the doctrine of sovereign immunity.

# Amended Complaint

# Exhibit I

# Whether the Defense of Marriage Act Precludes the Nonbiological Child of a Member of a Vermont Civil Union From Qualifying for Child's Insurance Benefits Under the Social Security Act

The Defense of Marriage Act would not prevent the non-biological child of a partner in a Vermont civil union from receiving child's insurance benefits under the Social Security Act.

October 16, 2007

MEMORANDUM OPINION FOR THE ACTING GENERAL COUNSEL
SOCIAL SECURITY ADMINISTRATION

The Social Security Act defines a "child" for the purpose of determining eligibility for child's insurance benefits ("CIB") by reference to the inheritance law in the relevant state. 42 U.S.C. § 416(h)(2) (2000). The law provides that a child shall receive CIB on account of a disabled parent when the child would inherit as a son or daughter if the parent were to die intestate. *Id.* Vermont law provides that the parties to a same-sex civil union enjoy the same benefits of parentage laws that would apply to a married couple, and so the natural child of one member of the union may be deemed to be the child of the other member for purposes of intestacy under Vermont law. Vt. Stat. Ann. tit. 15, § 1204; *see also Miller-Jenkins v. Miller-Jenkins*, 912 A.2d 951, 970 (Vt. 2006).

You have asked whether the Defense of Marriage Act ("DOMA"), Pub. L. No. 104-199, 110 Stat. 2419 (1996), would prevent the Commissioner of Social Security (the "Commissioner") from providing the non-biological child of one member of a Vermont civil union with social security benefits on account of that individual's relationship with the child.[1] We conclude that it would not. Although DOMA limits the definition of "marriage" and "spouse" for purposes of federal law, the Social Security Act does not condition eligibility for CIB on the existence of a marriage or on the federal rights of a spouse in the circumstances of this case; rather, eligibility turns upon the state's recognition of a parent-child relationship, and specifically, the right to inherit as a child under state law. A child's inheritance rights under state law may be independent of the existence of a marriage or spousal relationship, and that is indeed the case in Vermont. Accordingly, we conclude that nothing in DOMA would prevent the non-biological child of a

---

[1] *See* Letter for Steven G. Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from Thomas W. Crawley, Acting General Counsel, Social Security Administration (June 6, 2007) ("SSA Letter"). We are informed that the Commissioner has agreed to be bound by the opinion of this Office. *See* E-mail for John P. Elwood, Deputy Assistant Attorney General, Office of Legal Counsel, from Thomas W. Crawley, Acting General Counsel, Social Security Administration (June 29, 2007, 12:16 EST).

Case 1:16-cv-01068-KBJ   Document 22-10   Filed 10/27/17   Page 3 of 6
Case #24-5163      Document #2080945        Filed: 10/18/2024      Page 149

*Opinions of the Office of Legal Counsel in Volume 31*

partner in a Vermont civil union from receiving CIB under the Social Security Act.

## I.

Two women, Karen and Monique, entered into a civil union under Vermont law in 2002, and Monique gave birth to a son, Elijah, in 2003. Karen did not formally adopt Elijah, but she appears on the birth certificate as his "2nd parent" and on other documents as his "civil union parent." *See* SSA Letter at 1. In 2005, the Commissioner found Karen to be eligible for disability benefits, and she then filed an application for CIB on behalf of Elijah. *Id*. At the time of the application, Karen was domiciled in Vermont. *Id*. at 2. In order to determine whether federal law would allow Elijah to qualify as Karen's "child" on account of her civil union with Elijah's natural mother, we first consider whether Elijah would qualify as Karen's "child" under 42 U.S.C. § 416(e)(1). We then consider whether the interpretive principle mandated by DOMA affects Elijah's status under the Social Security Act.

The Social Security Act provides that an applicant may be eligible for CIB if he is the dependent "child" of an individual entitled to disability benefits. 42 U.S.C. § 402(d) (2000). The Act defines "child" to include "the child or legally adopted child of an individual," as well as stepchildren and, in some cases, grandchildren. *Id*. § 416(e)(1). In many, if not most, cases the existence of a parent-child relationship must be established under the provisions of section 416(h) that further define the relationship for CIB purposes.

With respect to Elijah's relationship to Karen, the Act directs the Commissioner to look to how the relevant state would define the parent-child relationship for purposes of inheritance law. Specifically, the Act provides:

> [T]he Commissioner of Social Security shall apply such law as would be applied in determining the devolution of intestate personal property by the courts of the State in which such insured individual is domiciled at the time such applicant files application . . . . Applicants who according to such law would have the same status relative to taking intestate personal property as a child . . . shall be deemed such.

42 U.S.C. § 416(h)(2)(A). The Commissioner has issued regulations tracking this statutory provision, and they provide, in relevant part, that a "natural child" shall be defined based on "the law on inheritance rights that the State courts would use to decide whether [the individual] could inherit a child's share of the insured's personal property if the insured were to die without leaving a will." 20 C.F.R. § 404.355(b)(1) (2007). Where, as here, the insured is living, the Commissioner

**JA 143**

*Nonbiological Child of a Member of a Vermont Civil Union*

"look[s] to the laws of the State where the insured has his or her permanent home." *Id.*

Because Karen was domiciled in Vermont at the time of Elijah's application, we look to Vermont law for guidance. The Vermont statute addressing intestate succession provides that the "estate of a decedent, not devised nor bequeathed and not otherwise appropriated and distributed in pursuance of law, shall descend" in the first instance "to the children of such decedent or the legal representatives of deceased children," but the statute does not otherwise define "children." Vt. Stat. Ann. tit. 14, § 551(1); *see also Miller-Jenkins v. Miller-Jenkins*, 912 A.2d 951, 969 (Vt. 2006) (recognizing that under Vermont law, "the term 'parent' is specific to the context of the family involved" and has been principally defined through judicial precedent). The civil union statute provides broadly that parties to a civil union shall have "all the same benefits, protections and responsibilities under law . . . as are granted to spouses in a marriage," Vt. Stat. Ann. tit. 15, § 1204(a), including "laws relating to . . . intestate succession," *id.* § 1204(e)(1). The statute further provides that parties to a civil union shall enjoy the same rights, "with respect to a child of whom either becomes the natural parent during the term of the civil union," as "those of a married couple." *Id.* § 1204(f).

The Vermont Supreme Court recently relied upon these provisions to hold that a child, like Elijah, who is born to one partner of a civil union during the existence of the civil union, should be deemed the child of the other partner under Vermont law for purposes of determining custodial rights following the dissolution of the civil union. *Miller-Jenkins*, 912 A.2d at 969–70.[2] The court reasoned that in the context of marriage, courts have regularly found that a child born by artificial insemination should be deemed to be the child of the husband, even if there is no biological connection. Such holdings followed the intent of the spouses in the marriage, ensured that the child would have two parents, and avoided the need for requiring adoption proceedings in every case. *Id.* Because section 1204 requires equal treatment of partners in civil unions, the court held that the same result should apply to the non-biological partner in a civil union. *Id.* at 970–71.

Although *Miller-Jenkins* recognized the parent-child relationship in the context of custodial rights, we see no reason why Vermont courts would reach a different result when considering who would constitute a child for purposes of inheritance. The Vermont civil union statute makes clear that a partner in a civil union shall enjoy not merely the "rights" that a married person would enjoy, but more broadly all "benefits, protections and responsibilities under law." Vt. Stat. Ann. tit. 15,

---

[2] In addition, the Vermont Supreme Court identified certain factors to support its conclusion, including the following: the parties to the civil union expected and intended for the non-biological parent to be the child's parent, the non-biological partner participated in the artificial insemination decision, and no other individual had a claim to be the child's parent. *Id.* at 970. In Elijah's case, it is apparent from the birth certificate and other documents that the partners to the civil union intended for Karen to be his parent. *See* SSA Letter at 1.

Case 1:16-cv-01068-KBJ   Document 22-10   Filed 10/27/17   Page 5 of 6
Case #24-5163      Document #2080945          Filed: 10/18/2024      Page 151

*Opinions of the Office of Legal Counsel in Volume 31*

§ 1204(a). With respect to civil union partners, these "benefits, protections and responsibilities" specifically include both bequeathing and inheriting property, should one partner die intestate. *Id*. § 1204(e)(1). Insofar as Vermont law further seeks to place partners in a civil union on equal footing with married couples with respect to children, *see id*. § 1204(f), we believe that Vermont courts similarly would conclude that the property of a partner in a civil union who dies intestate would descend on the same terms as it would for a married person, and in particular, would go to those who would be recognized as his or her children under Vermont law. Accordingly, as applied here, we conclude that Vermont law would recognize Elijah as Karen's child for purposes of his right to inherit, should she die intestate.

## II.

The question remains whether DOMA would prevent the Commissioner from otherwise recognizing Elijah as a beneficiary under the Social Security Act. Congress enacted DOMA in response to the decision of the Hawaii Supreme Court in *Baehr v. Lewin*, 852 P.2d 44 (Haw. 1993), which held that the equal protection guarantee of that state's constitution required the recognition of same-sex marriage. *See* H.R. Rep. No. 104-664, at 3–4 (1996) ("House Report"). DOMA seeks to ensure that neither the federal government nor individual states are forced to give legal effect to same-sex marriages, either on account of one state's recognizing such a marriage or by the judicial interpretation of existing law. *See id.* at 2. At the same time, DOMA respects states' traditional rights in the arena of domestic relations, allowing them to establish their own public policies with respect to same-sex unions. *See id.*[3]

DOMA contains two operative provisions. The first provision, codified at 28 U.S.C. § 1738C (2000), provides that a state need not give full faith and credit to "a relationship between persons of the same sex that is treated as a marriage" under the laws of another state. That provision, which provides that each state may adopt its own public policy with respect to same-sex marriage, is not implicated here. It is the second provision of DOMA, codified at 1 U.S.C. § 7, that arguably might bear upon Elijah's entitlement to CIB under the Social Security Act. This section, 1 U.S.C. § 7, was added to the Dictionary Act, 1 U.S.C. §§ 1 *et seq.*, to

---

[3] The House Report described DOMA as having "two primary purposes":

> The first is to defend the institution of traditional heterosexual marriage. The second is to protect the right of the States to formulate their own public policy regarding the legal recognition of same-sex unions, free from any federal constitutional implications that might attend the recognition by one State of the right for homosexual couples to acquire marriage licenses.

*Id.* at 2.

**JA 145**

*Nonbiological Child of a Member of a Vermont Civil Union*

define "marriage" and "spouse" for purposes of federal statutes and regulations as follows:

> In determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the word "marriage" means *only a legal union between one man and one woman as husband and* wife, and the word "spouse" refers only to a person of the opposite sex who is a husband or a wife.

1 U.S.C. § 7. This section reflects a federal policy against interpreting any federal law, regulation, or other administrative act so as to afford legal consequence to same-sex marriages. The provision defines "marriage" and "spouse" for those purposes so as to exclude reading those terms to extend to same-sex relationships.

By its terms, 1 U.S.C. § 7 does not apply to Elijah's eligibility for CIB under the Social Security Act. As discussed, Elijah's eligibility arises out of his status as Karen's "child" under section 416, and the law provides that he "shall be deemed such" simply because he "would have the same status relative to taking intestate personal property as a child" under Vermont law. 42 U.S.C. § 416(h)(2)(A). That analysis does not require any interpretation of the words "marriage" or "spouse" under the Social Security Act or any other provision of federal law. Nor does the analysis even require interpreting those terms under Vermont law in a way that might have consequence for the administration of federal benefits. An individual may qualify as a "child" under section 416 wholly apart from the existence of any marriage at all, as would be the case of a natural-born child of an unmarried couple, or, as is the case here, where Vermont recognizes a parent-child relationship outside the context of marriage. The fact that Elijah's right of inheritance ultimately derives from Vermont's recognition of a same-sex civil union is simply immaterial under DOMA. Accordingly, DOMA would not preclude Elijah from qualifying for CIB as a child of Karen under the Social Security Act.

<div style="text-align: right">

STEVEN A. ENGEL
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

</div>

**JA 146**

# Amended Complaint

# Exhibit J

# Application of 18 U.S.C. § 1913 to "Grass Roots" Lobbying by Union Representatives

Under 18 U.S.C. § 1913, federal employees who are union representatives may not use official time to engage in "grass roots" lobbying in which, on behalf of their unions, they ask members of the public to communicate with government officials in support of, or opposition to, legislation or other measures.

November 23, 2005

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF COMMERCE

Your office has asked whether federal employees who are union representatives may use their official time to engage in "grass roots" lobbying in which, on behalf of their unions, they ask members of the public to communicate with government officials in support of, or opposition to, legislation or other measures.[1] We conclude that federal employees are barred from doing so by 18 U.S.C. § 1913. As discussed below, whether any particular activity would violate section 1913 will depend on the specific facts.

Central to our analysis is the distinction between direct and "grass roots" lobbying. This distinction has been extensively applied in decisions of our Office and the Government Accountability Office ("GAO") dealing with lobbying by government officials. For example, we have stated that 18 U.S.C. § 1913 "does not apply to direct communications between Department of Justice officials and Members of Congress and their staffs . . . in support of Administration or Department positions," but that the statute "may prohibit substantial 'grass roots' lobbying campaigns . . . designed to encourage members of the public to pressure Members of Congress to support Administration or Department legislative or appropriations proposals." *Constraints Imposed by 18 U.S.C. § 1913 on Lobbying Efforts*, 13 Op. O.L.C. 300, 301 (1989) ("1989 Opinion"). The essence of a "grass roots" campaign is the use of "telegrams, letters, and other private forms of communication expressly asking recipients to contact Members of Congress." Office of Legal Counsel, *Guidelines on 18 U.S.C. § 1913* at 2 (Apr. 14, 1995) ("1995 Guidelines") (attachment to Memorandum for the Heads of All Executive Departments and Agencies, from the Attorney General, *Re: Anti-Lobbying Act Guidelines* (Apr. 18, 1995)). Similarly, GAO has noted that appropriations riders imposing restrictions similar to those in section 1913 "apply primarily to indirect or grass-roots lobbying, and not to direct contact with or appeals to Members of Congress," *Lobbying Activity in Support of China Permanent Normal Trade*

---

[1] *See* Letter for Steven G. Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from Jane Dana, Acting General Counsel, Department of Commerce (June 20, 2005) ("Commerce Letter").

**JA 148**

Case 1:16-cv-01068-KBJ   Document 22-11   Filed 10/27/17   Page 3 of 10
Case #24-5163      Document #2080945      Filed: 10/18/2024      Page 155

*Opinions of the Office of Legal Counsel in Volume 29*

*Relations*, B-285,298, 2000 WL 675585, at *3 (Comp. Gen.) (citations omitted), and that "grass roots" lobbying involves "a clear appeal by the agency to the public to contact congressional members in support of the agency's position," *Social Security Administration—Grassroots Lobbying Allegation*, B-304,715, 2005 WL 991729, at *1 (Comp. Gen.).[2] As explained below, this same distinction is critical to identifying the limits of permissible lobbying by union representatives while they are on official time.

## I.

Section 1913 of title 18 currently provides:

> No part of the money appropriated by any enactment of Congress shall, in the absence of express authorization by Congress, be used directly or indirectly to pay for any personal service, advertisement, telegram, telephone, letter, printed or written matter, or other device, intended or designed to influence in any manner a Member of Congress, a jurisdiction, or an official of any government, to favor, adopt, or oppose, by vote or otherwise, any legislation, law, ratification, policy or appropriation, whether before or after the introduction of any bill, measure, or resolution proposing such legislation, law, ratification, policy or appropriation; but this shall not prevent officers or employees of the United States or of its departments or agencies from communicating to any such Member or official, at his request, or to Congress or such official, through the proper official channels, requests for any legislation, law, ratification, policy or appropriations which they deem necessary for the efficient conduct of the public business, or from making any communication whose prohibition by this section might, in the opinion of the Attorney General, violate the Constitution or interfere with the conduct of foreign policy, counter-intelligence, intelligence, or national security activities. Violations of this section shall constitute violations of section 1352(a) of title 31.

18 U.S.C. § 1913 (Supp. IV 2005). Funds "appropriated by . . . enactment[s] of Congress" within the meaning of section 1913 include funds used to pay the salaries of representatives of federal employees' unions insofar as they devote official time to their representational activities. *See* 5 U.S.C. § 7131(d) (2000). This expenditure of appropriated funds raises a question under 18 U.S.C. § 1913,

---

[2] We note that "the Comptroller General, as the agent of Congress, cannot issue interpretations of the law that are binding on the executive branch," *Comptroller General's Authority to Relieve Disbursing and Certifying Officials from Liability*, 15 Op. O.L.C. 80, 82 (1991), and here we do not endorse the holding of any particular opinion of the Comptroller General or the Government Accountability Office.

**JA 149**

*Application of 18 U.S.C. § 1913 to "Grass Roots" Lobbying*

to the extent that such funds are thus "used directly or indirectly to pay for any personal service, advertisement, telegram, telephone, letter, printed or written matter, or other device, intended or designed to influence in any manner a member of Congress, a jurisdiction, or an official of any government, to favor, adopt, or oppose, by vote or otherwise, any legislation, law, ratification, policy or appropriation."

By its terms, section 1913 applies only "in the absence of express authorization by Congress," and Congress has elsewhere given express authorization for union representatives to use official time for *direct* lobbying on representational issues. Under 5 U.S.C. § 7102(1) (2000), each federal employee has the right

> to act for a labor organization in the capacity of a representative and the right, in that capacity, to present the views of the labor organization to heads of agencies and other officials of the executive branch of the Government, the Congress, or other appropriate authorities.

Section 7131(d) of title 5 states that

> [e]xcept as provided in the preceding subsections of this section [prohibiting the use of official time for activities relating to the internal business of a labor organization] . . . in connection with any other matter covered by this chapter [which includes section 7102], any employee in an appropriate unit represented by an exclusive representative, shall be granted official time in any amount the agency and the exclusive representative involved agree to be reasonable, necessary, and in the public interest.

We previously concluded that sections 7102 and 7131(d) together give "express authorization" under 18 U.S.C. § 1913 for union representatives "to lobby members of Congress on representational issues." Memorandum for Charlotte Hardnett, Acting General Counsel, Social Security Administration, from Daniel L. Koffsky, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Applicability of 18 U.S.C. § 1913 to the Provision of Official Time to Employee Union Representatives to Lobby Congress on Representational Issues* at 1, 3 (Mar. 23, 2001) ("2001 Opinion"). The Federal Labor Relations Authority ("FLRA") has reached the same conclusion about the application of section 1913. *United States Department of the Army Corps of Engineers, Memphis District, Memphis, Tennessee and National Federation of Federal Employees Local 259*, 52 F.L.R.A. 920 (1997) ("*Army Corps of Engineers*").[3] The First Circuit, moreover, has

---

[3] *See also Soc. Sec. Admin., Balt., Md. & Am. Fed'n of Gov't Emps.*, 54 F.L.R.A. 600 (1998); *Ass'n of Civilian Technicians, Old Hickory Chapter, & U.S. Dep't of Defense, N.C. Nat'l Guard Bureau, Raleigh, N.C.*, 55 F.L.R.A. 811 (1999); *Ass'n of Civilian Technicians, Razorback Chapter 117, & U.S. Dep't of Defense, Nat'l Guard Bureau, Ark. Nat'l Guard, Camp Robinson, N. Little Rock, Ark.*, 56 F.L.R.A. 427 (2000) ("*Ark. Nat'l Guard*"); *cf. Dep't of Health & Human Servs., Soc. Sec. Admin., &*

Case 1:16-cv-01068-KBJ   Document 22-11   Filed 10/27/17   Page 5 of 10
Case #24-5163      Document #2080945         Filed: 10/18/2024      Page 157

*Opinions of the Office of Legal Counsel in Volume 29*

strongly suggested the same view about application of the statute. In *Granite State Chapter, Association of Civilian Technicians v. FLRA*, 173 F.3d 25 (1st Cir. 1999), although the court held that an appropriations rider applicable to the Department of Defense barred any use of funds for lobbying, the court assumed that, absent the rider, union representatives could have lobbied Congress on official time. The court noted that the FLRA had found the use of funds for lobbying was consistent with section 1913 but was contrary to the rider. In affirming the FLRA's decision, the court wrote that the rider "repealed the Union's right to lobby Congress on official time as otherwise guaranteed by 5 U.S.C. § 7102." *Id.* at 28. *See also Ass'n of Civilian Technicians, Silver Barons Chapter v. FLRA*, 200 F.3d 590, 592 (9th Cir. 2000) (the rider "repeal[s] sections 7131 and 7102 . . . as they are read to allow [Department of Defense] employees to use official time to lobby Congress"); *Ass'n of Civilian Technicians, Tony Kempenich Mem'l Chapter 21 v. FLRA*, 269 F.3d 1119, 1122 (D.C. Cir. 2001) (agreeing with the First Circuit's decision but not referring to sections 7102 and 7131, except in reciting what the FLRA had decided).

These decisions—whether of this Office, the FLRA, or the courts—concern only direct lobbying. You have requested that we clarify the application of 18 U.S.C. § 1913 in the context of "grass roots" lobbying by union representatives. *See* Commerce Letter at 1.[4]

## II.

In our 2001 Opinion finding that the federal labor laws create an "express authorization" under 18 U.S.C. § 1913 for direct lobbying, we did not decide whether the prohibition in section 1913 is necessarily limited to lobbying by agency officials acting on behalf of their agencies' positions. There, because we concluded that there was "express authorization" for the lobbying at issue, we did not "need [to] decide whether the lobbying activities engaged in by such representatives are exempt from the prohibition of 18 U.S.C. § 1913 on any other ground." *Id.* at 4 n.3. Here, we must first resolve the question whether the

---

*Am. Fed'n of Gov't Emps., Local 3231*, 11 F.L.R.A. 7, 8 (1983) (in a case of direct lobbying, the FLRA finds that no violation of 18 U.S.C. § 1913 has been shown). In some other cases, without considering 18 U.S.C. § 1913, the FLRA has upheld union rights to engage in direct lobbying under some circumstances. *See, e.g., Overseas Fed'n of Teachers, & Dep't of Def. Dependent Schs., Mediterranean Region*, 21 F.L.R.A. 757 (1986); *Nat'l Fed'n of Fed. Emps. Local 122 & U.S. Dep't of Veterans Affairs, Reg'l Office, Atlanta, Ga.*, 47 F.L.R.A. 1118 (1993).

[4] The FLRA declined our invitation to present its views on the question here. The Office of Personnel Management expressed the view that "section 7102 as written does not presently contemplate the use of official time for lobbying that does not meet the direct lobbying standard as stated in Section 7102" and that "any request by a union representative for official time to engage in grass roots lobbying would not be authorized under section 7131 and therefore would be in contravention of the Anti-Lobbying Act, section 1913." Letter for Steven G. Bradbury, Acting Assistant Attorney General, Office of Legal Counsel, from Mark A. Robbins, General Counsel, Office of Personnel Management, *Re: Anti-Lobbying Act* at 2 (Aug. 22, 2005).

**JA 151**

*Application of 18 U.S.C. § 1913 to "Grass Roots" Lobbying*

prohibition in section 1913 extends beyond agency officials' lobbying on behalf of their agencies. We conclude that section 1913 reaches the use of appropriations for "grass roots" lobbying even if not on behalf of an agency's position. We further conclude that Congress has not expressly authorized an exception for such lobbying by union representatives.

### A.

A statement in an FLRA opinion suggests an argument for why the prohibition in section 1913 might not apply to "grass roots" lobbying by union representatives. In *Army Corps of Engineers*, the FLRA wrote that

> when Congress enacted 18 U.S.C. § 1913, it intended to protect its members from indirect lobbying by agency officials. There is no evidence or assertion that the Union representatives in this case were lobbying indirectly on behalf of agency officials.

52 F.L.R.A. at 930 (citation omitted). Although the FLRA did not so hold, its statement that section 1913 was aimed at "agency officials" suggests a possible argument that 18 U.S.C. § 1913 would not apply at all to lobbying by union representatives on behalf of their unions, but only to lobbying on behalf of a federal agency.

We do not believe that section 1913 is limited to lobbying by agency officials as such. The prohibitory portion of section 1913—"[n]o part of the money appropriated by any enactment of Congress shall, in the absence of express authorization by Congress, be used directly or indirectly" for prohibited purposes—is not limited to the communication of agency positions. Rather, its language on its face applies to the use of appropriated funds for any communications designed to influence members of Congress or other officials with respect to any legislation, law, ratification, policy, or appropriation. As noted, relevant appropriations include funds used to pay the salaries of federal employees who are representatives of federal employees' unions, insofar as those employees devote official time to their representational activities. Moreover, amendments to section 1913 enacted in 2002 removed language that had limited the penalties under that section to "an officer or employee of the United States or of any department or agency thereof," Pub. L. No. 107-273, div. A, § 205(b), 116 Stat. 1778 (2002), and thus undermined any argument that only lobbying by persons acting for an agency in an official capacity would be covered.

The only portion of section 1913 that refers to "officers or employees of the United States or of its departments or agencies" who are communicating an agency position is not the prohibition but the exception to the prohibition. There is no reason to read that clause as implying that the prohibition itself is limited to such communications; rather, it is naturally read to do just what it says it does: to create an exception for communications whose prohibition this Office has long

Case 1:16-cv-01068-KBJ   Document 22-11   Filed 10/27/17   Page 7 of 10
Case #24-5163    Document #2080945        Filed: 10/18/2024    Page 159

*Opinions of the Office of Legal Counsel in Volume 29*

believed would raise constitutional concerns. *See, e.g.*, 1989 Opinion, 13 Op. O.L.C. at 305–06.

Furthermore, although the language of section 1913 has been read narrowly to avoid constitutional concerns that would arise from its application to government officials, no such concerns would justify a narrowing construction of the language so as not to apply it to "grass roots" lobbying by federal employees who are union representatives. A broad interpretation of the law, as applied to those speaking for the Executive Branch, could "interfere with the President's constitutionally mandated role in the legislative process," "infringe upon his constitutional obligation to 'take Care that the Laws be faithfully executed,'" and "weaken the constitutional framework established in Article II, which in general imposes on the President the duty to communicate with the American people." 1989 Opinion, 13 Op. O.L.C. at 305. These separation of powers concerns do not apply to lobbying on behalf of unions. *See Office of the Adjutant Gen., N.H. Nat'l Guard, Concord, N.H. & Granite State Chapter, Ass'n of Civilian Technicians*, 54 F.L.R.A. 301, 312 (1998), *aff'd*, *Granite State Chapter*, 173 F.3d 25. Nor does such lobbying raise First Amendment issues that might call for a narrowing construction, because nothing in 18 U.S.C. § 1913 affects what private persons may say while on their own time. *See Tony Kempenich Mem'l Chapter 21*, 269 F.3d at 1122 (addressing First Amendment argument under an appropriations rider). Accordingly, we find no reason to give 18 U.S.C. § 1913, in this context, an interpretation that is narrower than its words would otherwise indicate.[5]

### B.

We therefore turn to the question whether the federal laws, which give "express authorization" for direct lobbying of Congress by federal employees who are union representatives, also offer "express authorization" for "grass roots" lobbying by such employees. We believe that they do not provide such authorization. Section 7102 of title 5 guarantees that union representatives may "present the views of the labor organization to heads of agencies and other officials of the executive branch of the Government, the Congress, or other appropriate authorities." By its terms, this guarantee is confined to direct lobbying and does not mention the presentation of views to members of the public, let alone a request

---

[5] In an analogous situation, an appropriations rider that deals with lobbying and is couched in general language not referring specifically to agencies or their officials—"[n]one of the funds made available by this Act shall be used in any way, directly or indirectly to influence congressional action on any legislation or appropriations matters pending before the Congress"—has been construed to reach expenditures for the salaries of union representatives engaged in lobbying. *See Granite State Chapter*, 173 F.3d at 27–28 (quoting Pub. L. No. 104-61, § 8015, 109 Stat. 636, 654 (1996)). *See also Headquarters, Nat'l Guard Bureau, Washington, D.C., Nev. Air Nat'l Guard, Reno, Nev., & Ass'n of Civilian Technicians, Silver Barons Chapter, Reno, Nev.*, 54 F.L.R.A. 316 (1998), *reaff'd*, 54 F.L.R.A. 595 (1998); *Office of the Adjutant Gen., N.H. Nat'l Guard, Concord, N.H. & Granite State Chapter, Ass'n of Civilian Technicians*, 54 F.L.R.A. 301, *aff'd*, *Granite State Chapter*, 173 F.3d 25.

**JA 153**

Case 1:16-cv-01068-KBJ   Document 22-11   Filed 10/27/17   Page 8 of 10
Case #24-5163      Document #2080945        Filed: 10/18/2024      Page 160

*Application of 18 U.S.C. § 1913 to "Grass Roots" Lobbying*

that the public contact government officials. It therefore does not amount to the "express authorization" that would create an exception to 18 U.S.C. § 1913 for "grass roots" lobbying. And, as noted, section 7131(d) of title 5 is derivative of section 7102.

There is some precedent in this area for finding an "express" authorization even in the absence of clear words, but it does not apply here. *See* 1989 Opinion, 13 Op. O.L.C. at 303 ("We believe that Congress' continued appropriation of funds for positions held by executive branch officials whose duties historically have included seeking support for the Administration's legislative program constitutes 'express authorization by Congress' for the lobbying activities of these officials . . . .").[6] "Grass roots" lobbying is the core of the statutory prohibition. *See* 1995 Guidelines at 2. The conduct now in question is within that core, and there are no constitutional considerations that would demand a flexible understanding of "express authorization" here. *Cf. id.* at 1 (in the context of communications by the Executive Branch, 18 U.S.C. § 1913, "[i]f applied according to its literal terms," would raise concerns about separation of powers and "if so applied, might be unconstitutional").

There would seem to be two additional potential arguments against our reading of section 7102. We do not believe that either argument would be persuasive.

First, the FLRA has stated that "[c]ommunicating *with the public* to encourage others to make common cause with the employees' collective bargaining representative . . . is merely a logical extension of a Union's Section 7102 rights and accordingly . . . such conduct is protected by the Statute." *Dep't of the Air Force, 3d Combat Support Group, Clark Air Base, Republic of the Philippines & Overseas Educ. Ass'n, Pacific Region*, 29 F.L.R.A. 1044, 1062–63 (1987) ("*Clark Air Base*") (conclusion of Administrative Law Judge, which the FLRA adopted) (emphasis added).[7] The FLRA has also indicated that in certain circumstances, section 7102 may protect "the right to publicize matters affecting unit employees' terms and conditions of employment." *Dep't of the Air Force, Scott Air Force Base, Ill. & Nat'l Ass'n of Gov't Emps. Local R7-23, SEIU, AFL-CIO*, 34 F.L.R.A. 1129, 1135 (1990). But, to the extent that these statements might be read to find an express authorization for "grass roots" lobbying, they would go astray from the statutory text. We do not see how the federal labor laws, in guaranteeing a right

---

[6] Even while finding express authorization in congressional appropriations for certain positions whose official duties included well-established lobbying activities, we "caution[ed] . . . against these officials engaging in 'grass-roots' campaigns of the type mentioned in the legislative history to section 1913." 1989 Opinion, 13 Op. O.L.C. at 303 n.5 (citation omitted).

[7] *Accord U.S. Marine Corps Base Camp Smedley D. Butler, Okinawa, Japan, & Overseas Educ. Ass'n, Pacific Region*, 29 F.L.R.A. 1068, 1080 (1987) ("*Camp Smedley T. Butler*") (same); *Dep't of the Air Force, 18th Combat Support Wing, Kadena Air Base, Okinawa, Japan, & Overseas Educ. Ass'n, Pacific Region*, 29 F.L.R.A. 1085, 1097 (1987) ("*Kadena Air Base*") (same). *See generally Bureau of Prisons, Fed. Corr. Inst. (Danbury, Ct.) & Am. Fed'n of Gov't Emps., Council of Prison Locals C-33, Local 1661, AFL-CIO*, 17 F.L.R.A. 696, 696–97 (1985) ("*Bureau of Prisons*").

Case 1:16-cv-01068-KBJ   Document 22-11   Filed 10/27/17   Page 9 of 10
Case #24-5163      Document #2080945         Filed: 10/18/2024      Page 161

*Opinions of the Office of Legal Counsel in Volume 29*

"to present the views of [a] labor organization to heads of agencies and other officials of the executive branch of the Government, the Congress, or other appropriate authorities" can reasonably be said to give an "express authorization" for urging the public to communicate with government officials.

In its decision in *Army Corps of Engineers*, which concerned *direct* lobbying, the FLRA stated that, in enacting 18 U.S.C. § 1913, Congress "intended to protect its Members from *indirect* lobbying by agency officials" and that "there are significant questions whether the Union's lobbying activities are within the definition of items that Congress prohibited in 18 U.S.C. § 1913." 52 F.L.R.A. at 930–31 (emphasis added). It went on to find that it was unnecessary to determine whether section 1913 would otherwise reach the lobbying by the union because 5 U.S.C. §§ 7102 and 7131 gave "express authorization" to the direct lobbying activities at issue there. 52 F.L.R.A. at 930–31. This decision could be read to suggest that, whether union lobbying involves direct communications or indirect "grass roots" efforts, it is within the express authorization of the federal labor laws.[8] But the decision can as easily be read only to preserve the argument, similar to the one that we rejected above, that an appropriations rider applies only to agency officials acting in an official capacity on behalf of their agencies. *See Ark. Nat'l Guard*, 56 F.L.R.A. at 430 (relying on *Army Corps of Engineers* and apparently preserving the argument about application solely to agency officials). Moreover, the FLRA's holding in the case was limited to direct lobbying: "[T]he Statute [enacting the federal labor laws] constitutes 'an express authorization by Congress' for using Federal funds to grant official time to employees *to lobby Congress* on representational matters." *Army Corps of Engineers*, 52 F.L.R.A. at 933 (emphasis added).

Second, it might be argued that section 7102 authorizes "grass roots" lobbying on the ground that such lobbying may enable the public to serve as the conduit by which union representatives present their views to government officials. But any such argument would require a strained and unnatural reading of the phrase "to present the views of the labor organization to heads of agencies and other officials of the executive branch of the Government, the Congress, or other appropriate authorities." In the communications that are intended to result from "grass roots" lobbying, members of the public, not the union representatives, would be making the presentation, and the views that government officials receive would be presented as the public's views, rather than "the views of the labor organization." The purpose of a "grass roots" campaign is to bring public pressure to bear on government officials, not to provide an indirect route for views that are attributed

---

[8] *But see Office of the Adjutant Gen., Ga. Dep't of Def., Atlanta, Ga., & Ga. State Chapter Ass'n of Civilian Technicians*, 54 F.L.R.A. 654, 666 n.9 (1988) (with regard to an appropriations rider, the FLRA found it "unnecessary to address the Respondent's assertion that the activities for which official time was sought in this case are a form of 'grass roots' lobbying, as defined by the GAO, for which the use of appropriated funds is prohibited"); *see also Ark. Nat'l Guard*, 56 F.L.R.A. at 430 (reporting view of Chairman Wasserman).

**JA 155**

Case 1:16-cv-01068-KBJ   Document 22-11   Filed 10/27/17   Page 10 of 10
Case #24-5163      Document #2080945         Filed: 10/18/2024      Page 162

*Application of 18 U.S.C. § 1913 to "Grass Roots" Lobbying*

to the union. Thus, when a union representative engages in "grass roots" lobbying of the sort that 18 U.S.C. § 1913 may bar—an appeal to the public to communicate with government officials—the federal labor laws offer no protection.[9]

### C.

Whether any specific activity amounts to "grass roots" lobbying within the prohibition of section 1913 depends, of course, on the facts of the case, and we cannot determine such issues in the abstract. There may be uncertainty, for example, whether a particular communication urges recipients to communicate with government officials. We address here only your question whether the federal labor laws categorically exclude union representatives' "grass roots" lobbying from the reach of 18 U.S.C. § 1913. We conclude that they do not.

STEVEN G. BRADBURY
*Acting Assistant Attorney General*
*Office of Legal Counsel*

---

[9] In *Clark Air Base*, *Kadena Air Base*, and *Camp Smedley T. Butler*, the FLRA held, outside the context of section 1913, that section 7102 protected union requests for members of the public to write to their Senators and Representatives. *Camp Smedley T. Butler*, 29 F.L.R.A. at 1076. The FLRA, however, did not consider the application of 18 U.S.C. § 1913 to this "grass roots" lobbying. Indeed, at least the version of 18 U.S.C. § 1913 in effect in 1986, when the events at issue in those cases took place, apparently would not have applied in any event to the lobbying there. At the time, 18 U.S.C. § 1913 reached only activities "intended or designed to influence in any manner a Member of Congress, to favor or oppose, by vote or otherwise, any legislation or appropriation by Congress," 18 U.S.C. § 1913 (1982), but the communications to Congress at issue sought action with regard to how the Department of Defense was allocating cuts in spending, including those already mandated by the Gramm-Rudman-Hollings Act, Pub. L. No. 99-177, 99 Stat. 1037 (1985), rather than action on any "legislation or appropriation by Congress." *See Camp Smedley T. Butler*, 29 F.L.R.A. at 1073–74, 1078. In our view, these decisions do not even implicitly suggest that section 7102 gives an "express authorization" for "grass roots" lobbying that 18 U.S.C. § 1913 would otherwise forbid. *Cf. Dep't of the Air Force, Scott Air Force Base, Ill., and Nat'l Ass'n of Gov't Emps., Local R7-23, SIEU, AFL-CIO*, 34 F.L.R.A. 1129 (1990) (agency lawfully refused, on grounds other than restrictions on lobbying, to allow union to place advertisement in base newspaper, urging readers to communicate with Congress on a non-legislative matter). In addition, in these decisions, the FLRA did not mention an earlier case in which it had stated that section 7102 did not apply where a letter drafted by a union "was intended to be adopted and sent by individual employees as a statement of their own individual views and not as their presentation to the Congress of the views of the Union." *U.S. Air Force, Lowry Air Force Base, Denver, Colo., & Am. Fed'n of Gov't Emps., AFL-CIO, Local 974*, 16 F.L.R.A. 952, 964 (1984). The FLRA declared that "[s]ection 7102 protects representatives of labor organizations in their presentation of the views of the labor organization to Congress," *id.*, and therefore did not cover the presentation of individual views that the union was trying to generate. The FLRA did find that communications by employees could be covered by 5 U.S.C. § 7211 (1982), which forbids interference with the "[t]he right of employees, individually or collectively, to petition Congress or a Member of Congress." A grant of official time under 5 U.S.C. § 7131(d), however, appears limited to matters "covered by . . . chapter [71 of title 5]," and section 7211 is in chapter 72. The guarantee of non-interference, therefore, does not convey a right to use official time.

# Amended Complaint

# Exhibit K

# WHETHER POSTAL EMPLOYEES ARE ENTITLED TO RECEIVE SERVICE CREDIT, FOR PURPOSES OF THEIR RETIREMENT ANNUITY UNDER THE FEDERAL EMPLOYEES' RETIREMENT SYSTEM, FOR PERIODS OF EMPLOYMENT DURING WHICH THE UNITED STATES POSTAL SERVICE HAS NOT MADE ITS REQUIRED EMPLOYER CONTRIBUTIONS

*The Office of Personnel Management may not address the United States Postal Service's failure to make statutorily required retirement contributions by denying its employees accrued service credit under the Federal Employees' Retirement System during their periods of qualifying federal employment.*

November 1, 2011

## MEMORANDUM OPINION FOR THE GENERAL COUNSEL
### OFFICE OF PERSONNEL MANAGEMENT
### AND
### THE GENERAL COUNSEL AND EXECUTIVE VICE PRESIDENT
### UNITED STATES POSTAL SERVICE

On June 22, 2011, the United States Postal Service ("USPS" or "Postal Service") notified the Office of Personnel Management ("OPM") that, because of its financial difficulties, the Postal Service, as a cash conservation measure, was suspending its employer contributions to the Civil Service Retirement and Disability Fund ("the Fund") on behalf of those postal employees covered by the Federal Employees' Retirement System Act ("FERS"), 5 U.S.C. §§ 8401-8479 (2006 & Supp. IV 2010).  In light of that suspension, OPM requested an opinion from our Office regarding (1) whether, and to what extent, OPM has discretion to offset the Postal Service's obligation to make employer retirement contributions against a "surplus" the Postal Service asserts that it has accumulated in the Fund; and (2) whether postal employees are entitled to receive service credit, for purposes of determining their eligibility for retirement and calculating the amount of their retirement annuity, for periods of employment during which the Postal Service has not made its required employer contributions.[1]  The Postal Service, an independent agency, joined OPM in the request for an opinion and agreed to be bound by our decision.[2]

In its submission to the Office of Legal Counsel ("OLC"), the Postal Service indicated that, despite earlier disagreement, it now "does not contest OPM's position that the Postal Service is still obligated by the statute to make its employer contribution, despite the existence of the surplus."  USPS Mem. 14; *see also id.* at 4.  The Postal Service, however, also specifically stated that it considers the question "whether the [Postal Service's] Board [of Governors] was

---

[1]  *See* Memorandum for Virginia Seitz, Assistant Attorney General, Office of Legal Counsel, from Elaine Kaplan, General Counsel, Office of Personnel Management (July 14, 2011) ("OPM Mem.").  OPM enclosed with its submission an undated paper it had received from USPS, with the heading "Effect of Suspension of Agency Contribution to FERS on Employees" ("USPS Paper").  OPM has agreed provisionally to provide service credit to postal employees who may retire while the issue is pending before our Office.  OPM Mem. at 2.

[2]  *See* Memorandum for Virginia Seitz, Assistant Attorney General, Office of Legal Counsel, from Mary Anne Gibbons, General Counsel and Executive Vice President, United States Postal Service (Aug. 12, 2011) ("USPS Mem.").

**JA 158**

*Opinions of the Office of Legal Counsel in Volume 36*

justified in its decision to suspend the employer contribution in order to conserve cash so as to avoid a shutdown in mail service" to be outside "the scope of [OLC's] review." *Id.* at 3 n.2. Thus, we do not address (i) whether OPM could offset the Postal Service's required contributions against any surplus it may have in the Fund; (ii) whether the Postal Service's apparent statutory violation may be excused; or (iii) what other avenues of recourse OPM may have against the Postal Service for its failure to make the statutorily required contributions. Instead, this opinion addresses only the question whether, under the relevant provisions of the FERS statute, postal employees are entitled to receive service credit for periods during which the Postal Service has not made the required employer contributions to the Fund. The Postal Service argues that its employees should receive such credit. *Id.* at 2-14. OPM disagrees, maintaining that employees cannot be credited with service for periods in which no employer contributions have been made into the Fund. OPM Mem. at 5-9. For the reasons that follow, we agree with the Postal Service that OPM may not address the Postal Service's failure to make statutorily required contributions by denying its employees accrued service credit under FERS during their periods of qualifying federal employment.

## I.

In 1986, Congress enacted the Federal Employees' Retirement System Act of 1986, Pub. L. No. 99-335, 100 Stat. 514 (codified as amended at 5 U.S.C. §§ 8401-8479 and scattered sections of U.S.C.), a system of retirement and other benefits for federal employees that will gradually supersede the Civil Service Retirement System ("CSRS"), which has been in effect since 1920. *See* Pub. L. No. 66-215, 41 Stat. 614 (1920) (codified as amended at 5 U.S.C. §§ 8331-8351 (2006 & Supp. 2010)). In enacting FERS, Congress set out, among other things, "to establish a Federal employees' retirement plan which is coordinated with title II of the Social Security Act"; "to ensure a fully funded and financially sound retirement benefits plan for Federal employees"; and "to assist in building a quality career work force in the Federal Government." Pub. L. No. 99-335, § 100A(1), (2), & (5), 100 Stat. at 516 (codified at 5 U.S.C. § 8401 note (2006)).[3] With certain exceptions, the Act became effective on January 1, 1987. *Id.* § 702, 100 Stat. at 631 (codified at 5 U.S.C. § 8401 note). Since then, most newly hired federal employees who are covered by Social Security have also been covered by FERS.

FERS is a three-tiered retirement system that consists of Social Security, a basic annuity, and a Thrift Savings Plan ("TSP"). *See* 5 U.S.C. § 8403 (2006) (except as otherwise provided, benefits payable under FERS are in addition to benefits payable under the Social Security Act); *id.* §§ 8410-8425 (2006 & Supp. IV 2010) (basic annuity); *id.* §§ 8431-8440f (2006 & Supp. IV 2010) (TSP).[4] The Postal Service and its employees fall within FERS coverage. 39 U.S.C.

---

[3] From Congress's enactment of the Social Security Act in 1935, Pub. L. No. 74-271, 49 Stat. 620 (1935), until 1983, federal employees were excluded from Social Security coverage. In 1983, the Social Security Act was amended to cover newly hired federal employees. Pub. L. No. 98-21, § 101, 97 Stat. 65, 67-70 (1983) (codified at 42 U.S.C. § 410). That expansion of Social Security was a major impetus behind the adoption of FERS, the new retirement system for federal employees, in 1986. *See generally* S. Rep. No. 99-166, at 1-2 (1985) (providing background on the CSRS and amendment of the Social Security Act to cover federal employees), *reprinted in* 1986 U.S.C.C.A.N. 1405, 1406.

[4] The TSP is a tax-deferred savings plan for federal employees in which employee contributions are matched in part by employer agency contributions.

*Whether Postal Employees Are Entitled to FERS Service Credit When USPS Has Not Made Contributions*

§ 1005(d) (2006 & Supp. III 2009).  The dispute between OPM and the Postal Service concerns the basic annuity.

Under FERS, an "employee," as defined in 5 U.S.C. § 8401(11) (2006), must complete at least five years of creditable civilian service under 5 U.S.C. § 8411 to be eligible for the annuity. 5 U.S.C. § 8410 (2006).  As a general matter, creditable service includes "employment as an employee . . . after December 31, 1986."  *Id.* § 8411(b)(1).  With certain exceptions, the annuity of a retiring employee is 1 percent of that individual's average pay (the highest average pay in effect over any three consecutive years of service) multiplied by that individual's "total [years of] service."  *Id.* §§ 8415(a), 8401(3) (defining "average pay").  The statute establishes different potential retirement ages for employees depending on the number of years of service completed. *Id.* § 8412 (2006 & Supp. IV 2010).  For example, an employee who is separated from service after becoming 62 years old and completing five years of service is entitled to an annuity.  *Id.* § 8412(c).  "[S]ervice," in turn, "means service which is creditable under section 8411."  *Id.* § 8401(26).  As these provisions make clear, the determination whether service is creditable under the statute has important ramifications for an employee's eligibility to receive a basic annuity, the applicable retirement age, and the calculation of the amount of the annuity.[5]

The FERS basic annuity is funded through a combination of employee deductions and employer agency contributions to the Civil Service Retirement and Disability Fund.  *Id.* §§ 8422, 8423, 8401(6) (2006 & Supp. IV 2010).  Under FERS, the employing agency is required to deduct and withhold from each employee's basic pay a percentage that is equal to 7 percent of basic pay (with a different percentage applicable to Members of Congress and certain categories of employees) less the Old Age, Survivors, and Disability Insurance ("OASDI") tax rate in effect, which is now 6.2 percent.  *Id.* § 8422(a), (c) (2006 & Supp. IV 2010); 26 U.S.C. § 3101(a) (2006).  Accordingly, the employer is required by the statute to deduct 0.8 percent of most employees' basic pay for contribution to the Fund.

The employing agency's own contribution to the Fund is much larger and is based on the "normal-cost percentage," which is "the entry-age normal cost of the provisions of [FERS] which relate to the Fund," as computed by OPM "in accordance with generally accepted actuarial practice and standards" and "expressed as a level percentage of aggregate basic pay." 5 U.S.C. § 8401(23) (defining "normal-cost percentage"); *see id.* § 8423(a) (2006 & Supp. IV 2010).[6]  Under the statute, "each employing agency having any employees or Members subject

---

[5] Creditable service is also important to other facets of the retirement system.  For example, an employee is not entitled to retain the employer's contributions to the TSP and earnings attributable to such contributions before completing specific periods of service.  *See* 5 U.S.C. § 8432(g)(2) (2006).

[6] "Entry age normal cost" is

> generally understood as the percentage of every paycheck that should be invested, over the total
> career of each employee in a group of new entrants, to pay fully for all benefits received by that
> group, including all eligible survivors.  Normal cost is formally defined as the present value of
> future benefits divided by the present value of future compensation.  These values are expressed
> as a percentage of payroll, and provide a consistent measure of relative pension costs over time.

S. Rep. No. 99-166, at 35 (1985), *reprinted in* 1986 U.S.C.C.A.N. 1405, 1440.  OPM publishes the "normal cost percentages" for particular categories of employees in the Federal Register.  At the time the Postal Service suspended its employer contributions to the Fund, the government-wide normal cost percentage for most employees was 12.5 percent.  Federal Employees' Retirement System; Normal Cost Percentages, 75 Fed. Reg. 35,098 (June 21,

**JA 160**

to section 8422(a) shall contribute to the Fund an amount" that is the product of the applicable normal-cost percentage and the aggregate amount of basic pay payable by the agency for the period involved. *Id.* § 8423(a)(1). In determining the normal-cost percentage to be applied, the employee deductions required by section 8422 must be taken into account. *Id.* § 8423(a)(2).[7] Thus, for most employees, employing agencies contribute to the Fund an amount equal to 11.9 percent of basic pay—the aggregate normal cost of 12.7 percent minus the 0.8 percent employee deduction—which is more than 93 percent of the normal cost. OPM, which has authority to prescribe regulations under the statute, *id.* § 8461(g) (2006), has construed FERS to require the employing agency to "remit in full the total amount of normal cost (which includes both employee deductions and Government contributions), so that payment is received by the Fund on the day of payment to the employee of the basic pay from which the employee deductions were made." 5 C.F.R. § 841.504(h) (2011); *see also id.* § 841.413 (2011).[8]

## II.

The dispute between OPM and the Postal Service was precipitated by the Postal Service's decision, in light of its current financial crisis, to conserve cash by suspending its employer contributions for the basic annuity, effective June 24, 2011, for those postal employees covered by FERS. OPM Mem. at 1; USPS Mem. at 2. The Postal Service is continuing to withhold employee deductions from basic pay; it also continues to make its automatic and matching contributions to the TSP accounts of FERS employees and to remit those contributions, along

---

2010). For the first pay period commencing on or after October 1, 2011, the normal cost percentage for most employees rose to 12.7 percent. Federal Employees' Retirement System; Normal Cost Percentages, 76 Fed. Reg. 32,242, 32,243 (June 3, 2011).

   [7] Section 8422(a) requires that "[t]he employing agency shall deduct and withhold from basic pay of each employee . . . a percentage of basic pay . . . ." 5 U.S.C. § 8422(a)(1). Thus, so long as the individual is an "employee," *see id.* § 8401(11), and is not otherwise excluded from coverage under the statute, *see id.* § 8402 (2006), the individual is "subject to section 8422(a)," and the employing agency is required to make contributions to the Fund under section 8423. There is no dispute here that the Postal Service's employees for whom the employer contributions have been withheld are "employees" for purposes of FERS. As a general matter, the FERS definition of "employee" refers to the definition of "employee" for CSRS benefits under chapter 83, in 5 U.S.C. § 8331(1) (2006). Section 8331(1), in turn, defines the term by reference to 5 U.S.C. § 2105. Under section 2105(a), an "employee" is an individual who is "appointed in the civil service" by a federal official; "engaged in the performance of a Federal function"; and "subject to the supervision" of a federal official. 5 U.S.C. § 2105(a) (2006); *see Taylor v. OPM*, 82 M.S.P.R. 237, 241 (M.S.P.B. 1999). Employees of the Postal Service, who are generally covered by the retirement statutes by virtue of 39 U.S.C. § 1005(d), must still meet the definition of "employee" to be covered by FERS. *See Taylor*, 82 M.S.P.R. at 241. An "employee" for purposes of FERS must also be covered by title II of the Social Security Act. 5 U.S.C. § 8401(11).

   [8] FERS further requires OPM to compute the amount of the "supplemental liability" of the Fund as of the close of each fiscal year, both with respect to current or former employees of the Postal Service and other individuals. 5 U.S.C. § 8423(b)(1). The "supplemental liability" is the estimated excess of the actuarial present value of all future benefits payable from the Fund based on the service of current or former employees or Members of Congress over the sum of the actuarial present value of employee deductions, employer contributions, and the Fund balance. *Id.* § 8401(27). The amount of any supplemental liability must be amortized in 30 equal annual installments, with interest. *Id.* § 8423(b)(2). At the end of each fiscal year, OPM must notify the Postmaster General of the amount of the required installment computed with respect to current or former postal employees and the Secretary of the Treasury of the amount computed with respect to other individuals. *Id.* § 8423(b)(3). Upon receiving such notifications, the Postal Service is required to pay, and the Secretary of the Treasury is required to credit, to the Fund the amounts specified. *Id.* § 8423(b)(4).

*Whether Postal Employees Are Entitled to FERS Service Credit When USPS Has Not Made Contributions*

with employee TSP contributions.  USPS Mem. at 2.  OPM does not dispute that the Postal Service and its employees continue to satisfy all the requirements of the statute *except* the agency's obligation to make employer contributions to the Fund for the basic annuity.  The question we must address is thus narrow: whether postal employees are entitled to service credit for retirement purposes for the periods in which the Postal Service has suspended its employer contributions under 5 U.S.C. § 8423, but in all other respects has complied with the FERS statute.

OPM states that its "longstanding interpretation of the statute," as codified in its regulations, provides that "in order for an employee to be covered under FERS, an agency must make the periodic contributions to the Retirement Fund that are required by law."  OPM Mem. at 2.  OPM does not claim that FERS expressly provides that employer contributions are a necessary precondition for employee coverage or that employees shall not receive service credit for periods in which their employing agencies fail to make employer contributions.  Instead, OPM points out that section 8423 of FERS mandates that USPS must make contributions to the Fund on behalf of employees covered by FERS.  *See* 5 U.S.C. § 8423(a)(1) ("[e]ach employing agency having any employees . . . subject to section 8422(a) *shall contribute* to the Fund" an amount that is based on the normal-cost percentage set by OPM) (emphasis added)).  And while section 8423 does not expressly make the mandatory employer contributions a precondition to employee eligibility, in OPM's view, the relevant OPM regulation does:

>   To be covered under FERS, an individual must:
>
>   (a) Be an employee, Member, or specifically covered by another provision of law;
>
>   (b) Be covered by social security;
>
>   (c) Have retirement deductions withheld from pay and *have agency contributions made*; and
>
>   (d) Be paid based on units of time.
>
>   Except as provided in § 842.104 and as excluded by § 842.105, an employee or Member is covered by FERS.

5 C.F.R. § 842.103 (2011) (emphasis added); *see also id.* § 842.304(a) (2011) (providing, with exceptions not relevant here, that "an employee . . . is entitled to credit for all purposes under FERS for a period of civilian service with the Government or the U.S. Postal Service—[p]erformed after December 31, 1986, *which is covered service under subpart A of this part*," a reference back to section 842.103) (emphasis added).

As OPM explains, section 842.103 "merges the various statutory requirements applicable to FERS into one regulatory provision that determines whether an individual is covered by FERS."  OPM Mem. at 5.  OPM's basic claim is thus that, "while there is no single provision in the statute which states that each of these requirements is essential to 'coverage,' when read as a whole, it was clearly reasonable for OPM to make coverage dependent upon compliance with all of the statutory requirements."  *Id.* at 6.  In OPM's view, section 842.103 makes "clear" that

**JA 162**

Case 1:16-cv-01068-KBJ   Document 22-12   Filed 10/27/17   Page 7 of 17
USCA Case #24-5163   Document #2080945   Filed: 10/18/2024   Page 169 of 242

*Opinions of the Office of Legal Counsel in Volume 36*

"to be 'covered by FERS' an individual must not only have deductions withheld from their pay—their employing agency must make the necessary contributions" as well.  *Id.* at 5-6.

On its face, section 842.103 is not as free from ambiguity as OPM suggests.  In particular, the last sentence in the provision states that "[e]xcept as provided in § 842.104 and as excluded by § 842.105, an employee or Member is covered by FERS," 5 C.F.R. § 842.103, language that appears to define coverage under FERS without making employer contributions a prerequisite.  We do not think that the ambiguity in this language can be resolved by examining OPM's practice because there does not appear to be any relevant practice:  OPM has pointed us to no instance of an agency refusing to remit the contributions it is statutorily required to pay under CSRS or FERS.  *Cf.* OPM Mem. at 9 (stating that no agency has failed to make employer contributions under CSRS).  Nonetheless, we assume that OPM's interpretation of its own regulation is entitled to deference, and thus that section 842.103 has the meaning OPM suggests.  *See Talk Am., Inc. v. Michigan Bell Tel. Co.*, 131 S. Ct. 2254, 2261 (2011).

In addition to relying on the statutory text and its regulation, OPM also finds support for its view in Congress's purpose.  OPM notes that "Congress created FERS as a fully funded pension system," intending that "the Fund be placed on a firm financial footing by requiring agencies to pay the full 'normal costs' for FERS employees."  OPM Mem. at 6.  In light of Congress's "'interest in sound fiscal and accounting management,'" *id.* at 7 (quoting S. Rep. No. 99-166, at 29 (1985), *reprinted in* 1986 U.S.C.C.A.N. 1405, 1434), OPM contends that it is "highly unlikely that Congress would have provided that employees would be considered 'covered' by FERS and credited for their service if their employing agencies did not make the requisite contribution to the Fund."  *Id.*

The Postal Service, for its part, does not deny that FERS requires it to make its employer contributions, USPS Mem. at 4, 14, or that Congress intended that FERS be placed on a sound financial footing, *id.*  But it points out that Congress chose to further this goal by requiring all employers to contribute to the Fund, not by depriving employees of service credit in the highly unusual situation in which an agency fails to make its required payments.  *Id.* at 2-3.  The Postal Service contends that under the statute, "creditable service is generated so long as employees are performing the required service for the Federal government and are contributing the required amounts to their pension, without regard to whether the employing agency cannot or does not make its employer contribution."  *Id.* at 2.  None of the key statutory provisions, in the Postal Service's view, "indicate[s] that creditable service under FERS is dependent on the employer contribution."  *Id.* at 6.  The Postal Service emphasizes that in enacting the basic annuity, Congress "intended to provide clearly defined and reliable benefits to employees"—a purpose that would be "vitiated by OPM's interpretation, which would predicate the level of employee benefits on the funding decisions of agency officials."  *Id.* at 3; *see also id.* at 12.  Accordingly, the Postal Service argues that OPM's interpretation of FERS, as embodied in its regulations, is at odds with the statute or, at least, unreasonable, *id.* at 5, and that OPM cannot enforce the Postal Service's statutory obligation to contribute by denying service credit to its employees.

We assume that OPM's authority to implement FERS by regulation, 5 U.S.C. § 8461(g), would entitle it, in appropriate circumstances, to deference in its construction of FERS pursuant to *Chevron, U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837 (1984).  However, OPM's construction of the statute is entitled to deference only "if the statute is silent or

*Whether Postal Employees Are Entitled to FERS Service Credit When USPS Has Not Made Contributions*

ambiguous with respect to the specific issue" at hand. *Id.* at 843. If, on the other hand, "Congress has directly spoken to the precise question at issue," and in so doing made its intent clear, "that is the end of the matter." *Id.* at 842. And here, for the reasons set forth below, we conclude that FERS makes clear that postal employees who otherwise qualify for retirement benefits under FERS are both covered by and accrue service credit under the statute notwithstanding the Postal Service's failure to make its employer contributions pursuant to 5 U.S.C. § 8423. Thus, OPM's interpretation of FERS—that OPM can address the Postal Service's failure to remit the required contributions by depriving employees of accrued service credit—is foreclosed by the statute.

## III.

### A.

"We begin with the text of the statute." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325, 1331 (2011). Section 8410 of FERS, which governs eligibility, provides: "Notwithstanding any other provision of this chapter, an employee or Member must complete at least 5 years of civilian service creditable under section 8411 in order to be eligible for an annuity under this subchapter." 5 U.S.C. § 8410. Central to resolving this controversy is section 8411, which governs creditable service. It provides that "[t]he total service of an employee . . . is the full years and twelfth parts thereof, excluding from the aggregate the fractional part of a month, if any." *Id.* § 8411(a)(1). Section 8411 further specifies, in relevant part, that for purposes of FERS, "creditable service of an employee . . . includes . . . employment as an employee . . . after December 31, 1986." *Id.* § 8411(b), (b)(1). These provisions are not vague or unclear. They indicate plainly the category of employees who are eligible for FERS benefits, and Congress's broad, but not unbounded, definition of "creditable service" for FERS purposes.

Section 8401(11) excludes certain categories of individuals from the definition of "employee," and section 8402 excludes certain categories of individuals from coverage under FERS. *Id.* §§ 8401(11), 8402. But these exclusions are irrelevant to the present dispute. As USPS points out, OPM does not argue that "the non-payment of the employer contribution means that Postal Service employees are no longer 'employees' under the FERS statute or that they now fall within one of the exceptions in 5 U.S.C. § 8402 by virtue of such non-payment." USPS Mem. at 6. And the postal employees potentially affected by their employer's non-payment of its contributions are still engaged in "employment." The plain language of FERS, then, supports the view that employees earn creditable service so long as they are employed as "employee[s]" after December 31, 1986, 5 U.S.C. § 8411(b)(1), regardless of whether their employer has suspended its contributions to the Fund.

To be sure, as noted earlier, OPM acknowledges that FERS's definition of "creditable service" does not mention employer contributions. Its argument is that a correct determination of what counts as "creditable service" under FERS does not depend on the wording of section 8411(b)(1) alone, but also on the overall statutory plan—in particular, on the fact that another provision of FERS clearly requires employer contributions as part of the overall FERS scheme.

We agree that section 8423 of FERS requires employers to make contributions to the Fund. We further agree that "[i]nterpretation of a word or phrase depends upon reading the

<center>7</center>

whole statutory text, considering the purpose and context of the statute." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006). However, the mere fact that employer contributions are a mandatory part of the overall FERS scheme does not indicate that OPM is authorized to suspend or eliminate the accrual of employees' service credit as a remedy for an employer's failure to make such contributions. *Cf. Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 247 (2000) (ERISA's "'comprehensive and reticulated' scheme warrants a cautious approach to inferring remedies not expressly authorized by the text" (citations and internal quotation marks omitted)). As noted above, the specific statutory provision that addresses creditable service says nothing that suggests that an employee's accrual of credit depends on the fact or extent of employer contributions. Section 8423 of FERS likewise fails to mandate, or even suggest, that a lapse in an employing agency's contributions should result in a denial of service credit to that agency's employees.

Certainly, as OPM states, section 8423 reflects Congress's goal that "the Fund . . . be placed on a firm financial footing by requiring agencies to pay the full 'normal costs' for FERS employees." OPM Mem. at 6. But it does so not by stipulating that employees will earn service credit (and therefore future benefits) only if their employers make all required contributions, but rather by imposing on agency employers a legal obligation to make the required contributions. OPM itself has suggested no reason to think that in practice this statutory mechanism has proven ineffective in serving Congress's goal. *Cf.* OPM Mem. at 9 ("no agency has ever defaulted on its obligation to make the required contributions" under CSRS).

Moreover, the text of the FERS statute suggests that Congress considered the question of statutory mechanisms to address funding shortfalls and enacted a mechanism to deal with one kind of shortfall, without indicating that the suspension of employee service credit might be used as a solution to that or any other funding deficiency. Specifically, the statute provides that, in the event that OPM determines, on an annual review, that an agency's employer contributions do not in fact satisfy the statute's funding goals, OPM must notify the Postmaster General (or the Secretary of the Treasury, as applicable) of any "supplemental liability" and the amount of the required installment payments, amortized over 30 years. 5 U.S.C. § 8423(b); *see supra* n. 8. The Postal Service must then pay the amount specified in the notification to address the funding shortfall. 5 U.S.C. § 8423(b)(4)(B). The existence of this supplemental liability process does not affirmatively authorize the Postal Service to avoid making its employer contributions as they come due in favor of amortizing such payments over 30 years. But the existence of a supplemental liability remedy for at least one type of funding shortfall shows that Congress was aware of the possibility that the employer contributions remitted under section 8423 might in some circumstances fail to result in agency funding of the full costs of employee benefits. Congress chose nonetheless to provide expressly for only one response to such a possibility. In light of that awareness, the omission of any other mechanism for addressing this or other kinds of shortfalls, such as denying service credit to employees when their employer defaults on its contributions, suggests that "the statute fails to mention [other responses] 'by deliberate choice, not inadvertence.'" *Bruesewitz v. Wyeth LLC*, 131 S. Ct. 1068, 1076 (2011) (citation omitted).

In sum, none of the most clearly relevant provisions of the statute suggests that either employee eligibility or creditable service under FERS depends upon the extent of the employer's contributions to the Fund. As OPM insists, and the Postal Service effectively concedes, the plain

*Whether Postal Employees Are Entitled to FERS Service Credit When USPS Has Not Made Contributions*

language of FERS's key provisions specifies that agency employers must contribute to the Fund the normal cost of their covered employees' basic pay. At the same time, these provisions fail to link an agency's failure to comply with this requirement to the affected employees' eligibility for an annuity or accrual of creditable service. Instead, they appear on their face to provide that an employee is entitled to service credit so long as he or she is employed as an "employee" after December 31, 1986. *See* 5 U.S.C. § 8411(a) & (b). Given the harsh penalty federal employees would suffer if they were denied FERS coverage or service credit for periods of employment during which their agency employers failed to make the required contributions to the Fund—an action over which the employees have no control—the absence of any reference in FERS's key provisions to OPM's authority to impose that particular remedy for an agency's noncompliance strongly suggests that Congress did not intend such authority to exist. As we discuss next, we do not think any of OPM's additional arguments in support of this authority are persuasive.

### B.

OPM offers several other arguments that, in its view, show that the FERS statute requires employer contributions as a condition of employees' coverage and accrual of creditable service under FERS. First, OPM relies heavily on the Postal Service's concession that, to receive service credit under FERS, an employee must have deductions withheld from his or her wages, even though, in the Postal Service's view, the employing agency's contributions are not required for that purpose. OPM Mem. at 7; *see* USPS Mem. at 5-10. OPM insists that these two propositions cannot be reconciled because it is illogical to distinguish between the employee's deduction and the employer's contribution—both of which are statutorily required and neither of which is expressly linked by the statutory text to accrual of service credit—for purposes of determining whether an employee accrues creditable service for periods when employee deductions or employer contributions have not been made. OPM Mem. at 7.

We need not resolve this issue. As a practical matter, the Postal Service has continued to withhold from its employees' basic pay the deductions required under 5 U.S.C. § 8422—including the employee deductions—and to deposit the deductions into the Fund. USPS Mem. at 2. If fulfillment of the Postal Service's obligations under section 8422 is a necessary condition to postal employees receiving credit under FERS, that condition is being met. Furthermore, although OPM and the Postal Service agree that a failure to make these employee deductions would affect employees' ability to earn creditable service, we are unsure that they are correct. In our view, this issue is difficult, particularly in the context of a scheme in which it is the *agency's* legal obligation to effectuate the employee deduction. *See* 5 U.S.C. § 8422(a). In fact, the answer to the question may well depend on the reason that employee deductions have not been made.[9] In any event, even if employee deductions constitute a prerequisite to the accrual

---

[9] For example, if the employer failed to make the employee deduction because the affected employee was not subject to deductions under 5 U.S.C. § 8422, the employee's eligibility for coverage and ability to accrue creditable service under FERS might be implicated. *Cf. Tomboc v. OPM*, 355 Fed. Appx. 422, 424 (Fed. Cir. 2009) (noting that "[w]hile the absence of deductions" under the CSRA "is an indication" regarding whether a position is covered, "it is not necessarily dispositive"). Alternatively, if the employer failed to make the employee deductions because of an agency error, the error may be corrected, *see* 5 C.F.R. § 841.505 (2011); and, in any event, an agency error would not necessarily affect the employee's entitlement to coverage. *Cf. Noveloso v. OPM*, 45 M.S.P.R. 321, 324 n.2 (M.S.P.B. 1990) (noting, in addressing CSRS coverage, that "[i]f no deductions were withheld because of agency error, or because it was not determined until after the fact that such service should have been covered, the employment will still constitute covered service"); *accord Staffney v. OPM*, 54 M.S.P.R. 99, 102-03 (M.S.P.B.

Case 1:16-cv-01068-KBJ   Document 22-12   Filed 10/27/17   Page 11 of 17
USCA Case #24-5163   Document #2080945   Filed: 10/18/2024   Page 173 of 242

*Opinions of the Office of Legal Counsel in Volume 36*

of service credit under FERS—one that does not appear in the FERS eligibility or accrual provisions themselves—that would not necessarily mean that employer contributions likewise would be a prerequisite for the accrual of such credit, because the significance and treatment of employee deductions and employer contributions within the statutory scheme are different. Each argument for linking employee service credit to separate requirements in the statute would have to be considered on its own terms.

Both OPM and the Postal Service cite different subsections of section 8411—some requiring employee deductions as a condition of receiving creditable service and a couple requiring employee deductions *and* employer contributions—to support their respective positions. On the one hand, OPM contends that, where Congress intended to permit service credit to be afforded even if no contributions were made by the agency, it did so explicitly. It cites as an example section 8411(b)(3), which permits employees to receive service credit for periods of employment during which no employing agency contributions or employee deductions were paid into the Fund for certain service performed prior to January 1, 1989. OPM Mem. at 8 n.5. In such instances, the employee must make a deposit into the Fund of 1.3 percent of his or her basic pay, with interest, for that period of service. *Id.* (citing 5 U.S.C. § 8411(f)(2)).[10] However, no employing agency contribution is required for that period. *Id.*[11]

---

1992) (same, under CSRS coverage); *In re Kaltakji*, 1 M.S.P.R. 63, 64 (M.S.P.B. 1978) (same). *But see* 5 U.S.C. § 8339(i) (2006) (providing, for purposes of computing a CSRS annuity, that the total service of an employee "shall not include any period of civilian service . . . for which retirement deductions or deposits [under section 8334] have not been made" unless the employee makes a deposit under section 8334(c) or (d)(1) or no deposit is required for such service as specified under section 8334(g) or another statute). And, for the same reasons that an agency error may not affect the employee's entitlement to coverage, a willful agency refusal to make the required employee deductions likewise may not affect that entitlement. For the reasons stated in the text, however, we need not decide the circumstances, if any, in which an employing agency's failure to make the employee deductions and deposit them into the Fund would affect an employee's coverage and accrual of service under FERS.

[10] Section 8411(b)(3), with the introductory language in section 8411(b), provides:

For the purpose of this chapter, creditable service of an employee or Member includes . . . (3) except as provided in subsection (f) or (h), any civilian service (performed before January 1, 1989, other than any service under paragraph (1) or (2)) which, but for the amendments made by subsections (a)(4) and (b) of section 202 of the Federal Employees' Retirement System Act of 1986, would be creditable under subchapter III of chapter 83 of this title (determined without regard to any deposit or redeposit requirement under such subchapter, any requirement that the individual become subject to such subchapter after performing the service involved, or any requirement that the individual give notice in writing to the official by whom such individual is paid of such individual's desire to become subject to such subchapter) . . . .

5 U.S.C. § 8411(b), (b)(3). Section 8411(f)(2) prohibits an employee from receiving "credit under this chapter for any service described in subsection (b)(3) for which retirement deductions under subchapter III of chapter 83 have not been made, unless such employee or Member deposits an amount equal to 1.3 percent of basic pay for such service, with interest." *Id.* § 8411(f)(2). Section 8411(f)(1) requires an employee who has received a refund of CSRS retirement deductions for service described in subsections (b)(2) or (b)(3) to "deposit[] an amount equal to 1.3 percent of basic pay for such service, with interest," as a condition of receiving credit for such service. *Id.* § 8411(f)(1).

The Senate Committee on Governmental Affairs released a Committee Print in October 1986, four months after the enactment of FERS, that set out a detailed section-by-section analysis of the statute. The committee print explains that section 8411(b) "provides that creditable service includes . . . (3) service before January 1, 1989, which was either non-covered or was not vested under CSRS in which case a contribution must be made under subsection

*Whether Postal Employees Are Entitled to FERS Service Credit When USPS Has Not Made Contributions*

The Postal Service, on the other hand, cites two instances in which the statute expressly requires the payment of an employer contribution to render certain service creditable, arguing that there would have been no reason for Congress to have explicitly required an employer contribution if accrual of service credit is invariably conditioned on an agency's having made employer contributions to the Fund.  USPS Mem. at 8 (citing 5 U.S.C. § 8411(e), (g) (the latter of these added in subsequent amendments to FERS)).[12]

None of these examples, in our view, supports either inference.  As the Postal Service observes, section 8411 sets forth a variety of rules regarding when certain types of service that fall outside the scope of section 8411(b)(1) (the service at issue here) nonetheless may be credited for FERS purposes.  *Id.*  Congress's varying responses to divergent coverage and employee deduction scenarios do not shed light on what it intended as a general matter for employees otherwise covered by FERS.  With respect to section 8411(b)(3), for example, Congress's decision to allow the accrual of service credit for employees in a transitional period during the early implementation of FERS and to address the absence of retirement deductions by

---

(f)."  S. Comm. on Governmental Affairs, 99th Cong., Supplemental Information Regarding the Federal Employees' Retirement System Act of 1986, at 7 (Comm. Print 1986) ("FERS Comm. Print").

[11]  Section 8411(b)(3) is not unique in requiring employees who had not contributed to the Fund (sometimes because they had been covered by other retirement systems) but who seek service credit within the FERS system, to make payments to the Fund equal to the amounts that would have been deducted as FERS employee contributions for that period of service—without any mention of the necessity of an employer contribution.  *See, e.g.*, 5 U.S.C. § 8411(b)(4) & (5) (the latter of these added in subsequent amendments to FERS); USPS Paper at 6.  In still other instances, Congress treated service for which deductions were not paid to the Fund as creditable with no requirement of any kind of employee or employer deposit.  *See* 5 U.S.C. § 8411(c)(1)(A) (military service performed before January 1, 1957); *id.* § 8411(d) (certain periods of leave without pay); USPS Paper at 7.

[12]  Section 8411(e) provides:

> Credit shall be allowed for periods of approved leave without pay granted an employee to serve as a full-time officer or employee of an organization composed primarily of employees . . . , subject to the employee arranging to pay, through the employee's employing agency, within 60 days after commencement of such leave without pay, *amounts equal to the retirement deductions and agency contributions which would be applicable under sections 8422(a) and 8423(a)*, respectively, if the employee were in pay status.  If the election and all payments provided by this subsection are not made, the employee may not receive credit for the periods of leave without pay, notwithstanding the third sentence of subsection (d).

5 U.S.C. § 8411(e) (emphasis added).  Section 8411(g), in turn, provides that "[a]ny employee who—

> "(1) served in a position in which the employee was excluded from coverage under this subchapter because the employee was covered under a retirement system established under section 10 of the Federal Reserve Act; and

> "(2) transferred without a break in service to a position to which the employee was appointed by the President, with the advice and consent of the Senate, and in which position the employee is subject to this subchapter,

"shall be treated for all purposes of this subchapter as if any service that would have been creditable under the retirement system established under section 10 of the Federal Reserve Act was service performed while subject to this subchapter *if any employee and employer deductions, contributions or rights with respect to the employee's service are transferred from such retirement system to the Fund*."  *Id.* § 8411(g) (emphasis added).

**JA 168**

*Opinions of the Office of Legal Counsel in Volume 36*

requiring that the employee deposit an amount compensating for those missing employee deductions, 5 U.S.C. § 8411(f)(2), suggests, at most, that Congress viewed employee deductions as more significant to coverage requirements than employer contributions.  By the same token, that Congress required employer contributions to be made as a condition of receiving service credit in the examples cited by the Postal Service, *id.* § 8411(e), (g), shows little more than that Congress chose to impose that additional requirement in those instances and explicitly provided for employer contributions to make the requirement clear.[13]

    What these examples reveal is that, even where there was no other statutory commitment to treat service as creditable under FERS or where employees were covered under other federal retirement systems, Congress sometimes extended FERS service credit in exchange for the payment of specified employee deductions—or the payment of employer contributions, or the relinquishment of service credit under other retirement systems, or without imposing any conditions—to serve some other policy goal, such as increased portability of retirement benefits. *See* Pub. L. No. 99-335, § 100A(3), 100 Stat. at 516 (codified at 5 U.S.C. § 8401 note) (one purpose of FERS was "to enhance portability of retirement assets earned as an employee of the Federal Government").  In our view, the discrete scenarios addressed in section 8411 provide little assistance, one way or another, in the assessment whether Congress intended to authorize OPM to deny service credit to employees otherwise subject to the FERS retirement plan for periods of employment under that plan if agencies violated the statutory requirement that they make employer contributions to the Fund.

    Finally, as noted above, OPM argues that, in light of Congress's creation of FERS as a "fully funded pension system," OPM Mem. at 6, and its purpose to ensure "sound fiscal and accounting management," *id.* at 7 (citing S. Rep. No. 99-166, at 29, *reprinted in* 1986 U.S.C.C.A.N. at 1434), "it is highly unlikely that Congress would have provided that employees be considered 'covered' by FERS and credited for their service if their employing agencies did not make the requisite contribution[s] to the Fund." *Id.*  But, of course, Congress did require employing agencies to make specified contributions to the Fund, and the Postal Service is legally obligated to do so.  *See supra* pp. 3-4, 7-8.  The question here is only whether Congress intended

---

[13]  For similar reasons, we do not find Congress's treatment of reemployed annuitants in 5 U.S.C. § 8468, on which the Postal Service relies, *see* USPS Mem. at 6-7, particularly illuminating.  In language added to that section after the enactment of FERS, the statute provides that, with certain exceptions, if the annuitant becomes reemployed, "deductions for the Fund shall be withheld from the annuitant's pay under section 8422(a) and contributions under section 8423 shall be made."  5 U.S.C. § 8468(a) (2006).  The Postal Service makes much of the fact that a subsequent subsection provides that if an annuitant "*subject to deductions* under the second sentence of subsection (a)" serves for at least 5 years, the annuitant may elect to have his or her rights redetermined under FERS.  *Id.* § 8468(b)(2)(A) (emphasis added).  The Postal Service finds it significant that this subsection mentions "deductions" and not employer "contributions."  But an employee subject to "deductions" under the second sentence of section 8468(a) would also be subject to "contributions," and so there was no need for Congress to repeat the full phrase in section 8468(b)(2)(A) to indicate the employees to whom it was referring.  Moreover, contrary to the Postal Service's assertion that Congress made clear that reemployed annuitants earn service credit "so long as 'deductions' are being made from their basic pay," USPS Mem. at 7, Congress merely referred to reemployed annuitants who were "subject to deductions," without regard to whether the deductions were actually "being made." *See* 5 U.S.C. § 8468(b)(2)(A).  More importantly, however, we believe again that Congress's policy determination about the coverage of reemployed annuitants tells us little about whether Congress intended generally to condition coverage and accrual of service credit for FERS employees on the agency's deposit of its employer contributions into the Fund.

*Whether Postal Employees Are Entitled to FERS Service Credit When USPS Has Not Made Contributions*

that the remedy for the Postal Service's failure to meet its obligations would be to deny employees the service credit that the statute contemplates they will earn.

We agree with OPM that Congress was concerned with the fiscal management of the Fund. But "ensur[ing] a fully funded and financially sound retirement benefits plan for Federal employees," Pub. L. No. 99-335, § 100A(2), 100 Stat. at 516 (codified at 5 U.S.C. § 8401 note), was only one of several congressional purposes in enacting FERS. Among other things, Congress also enacted FERS to establish a new retirement plan "to assist in building a quality career work force in the Federal Government." *Id.* § 100A(5). That goal could well be subverted if Congress were to create a retirement system in which employees' retirement benefits could be diminished or stripped away by their agencies' failure to pay the statutorily required contributions into the Fund. Even recognizing that a fully funded pension system was an important congressional objective, "no legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular object is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law." *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987).

Further, although we do not "resort to legislative history to cloud a statutory text that is clear," *Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994), we believe that, to the extent that the legislative history of FERS is illuminating, it undermines, rather than supports, the view that Congress intended to deny employees eligibility and creditable service under FERS for periods of employment in which their employing agencies fail to make their required employer contributions to the Fund.

The legislative history makes clear that Congress intended the basic annuity in FERS to operate as a defined benefit plan. *See, e.g.*, S. Rep. No. 99-166, at 6, 9, 30, 42, *reprinted in* 1986 U.S.C.C.A.N. at 1410, 1413-14, 1435, 1447; FERS Comm. Print at 7. Such a plan consists of "a general pool of assets" out of which an employee, "upon retirement, is entitled to a fixed periodic payment." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999) (citation omitted). "A defined benefit plan promises a participant a specific amount of pension benefits at retirement determined under a formula based on years of participation in the plan, and in most nonbargained plans, based on an average of compensation." Stephen R. Bruce, *Pension Claims: Rights and Obligations* 17-18 (1988) ("Bruce"); *see also* James E. Burk, *Pension Plan Management Manual: Administration and Investment* ¶ 1.01[8], at 1-8 (1987) ("Burk") (benefits in a defined benefits plan determined "by a formula that is generally related to service and compensation"); H.R. Comm. on Post Office and Civil Serv., 98th Cong., Designating a Retirement System for Federal Workers Covered by Social Security 6 (Comm. Print 1984) (prepared by the Congressional Research Service) ("CRS Comm. Print") ("A defined benefit plan determines benefit amount by a formula. Upon reaching the terms specified in the definition of eligibility (usually a combination of age and years of service), the worker receives the benefit computed from the application of the formula to the employee's years of service and salary.").[14]

---

[14] By contrast, under a "defined contribution plan," the promise is that "certain contributions will be made and credited to an employee's individual account. Contribution rates are fixed, usually as a percentage of the

**JA 170**

*Opinions of the Office of Legal Counsel in Volume 36*

The FERS basic annuity follows this model.  FERS promises participants a specific level of benefits by application of a formula that is generally dependent on the employee's average pay and total service, 5 U.S.C. § 8415(a), and that bases the employing agencies' contributions on the "normal-cost percentage" of benefits, *id.* § 8423(a), which is actuarially computed by OPM.  *Id.* § 8401(23); *cf.* Burk ¶ 2.01, at 2-4 (employer's contribution in a defined benefit plan is actuarially computed).  The benefit formula in a defined benefit plan "is geared to providing a specific retirement benefit rather than based on the rate of contributions made by the employer to the pension fund."  Burk ¶ 2.01, at 2-5.  A pension plan covered by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461 (2006 & Supp. III 2009), for example, "is liable for benefits without regard to whether the employer has made required contributions."  ABA Section of Labor and Employment Law, *Employment Benefits Law* 279 (1991).  Thus, it was well established by the time Congress enacted FERS, *see* USPS Mem. at 9, that a multiemployer pension plan covered by ERISA, which is analogous in many respects to the multi-agency approach of FERS, must award credit based on the service performed for a participating employer regardless of whether the employer made the required contributions for such service.  As the Supreme Court recognized a year before the enactment of FERS:

> The consistent view of the Secretary of Labor is that, under ERISA's minimum participation, vesting, and benefit accrual standards for pension plans . . . a pension plan covered by ERISA *must* award credit "solely on the basis of service performed for a participating employer, regardless [of] whether that employer is required to contribute for such service or has made or defaulted on his required contributions."  In the Secretary's judgment, "[a]ny plan term or Trustees' resolution to the contrary is . . . unlawful and unenforceable."

*Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 567 n.7 (1985) (citations omitted).[15]

---

employee's earnings.  Such plans do not guarantee an employee any fixed level of benefits at retirement.  An employee's benefit will vary, depending on the amount of the contributions and the interest and capital appreciation accumulated on them."  Burk ¶ 1.02[8], at 1-8 to 1-9; *see also Hughes*, 525 U.S. at 439; Bruce at 18.  "Under defined contribution plans, employers know exactly what the pension obligation is and the benefits are fully funded at the time of the contribution.  Employees bear the risk of variable market performance . . . ."  CRS Comm. Print at 6-7.

[15]  *Accord Cent. States, Se. & Sw. Areas Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148, 1151 (7th Cir. 1988) ("Multi-employer plans are defined-contribution in, defined-benefits out.  Once they promise a level of benefits to employees, they must pay even if the contributions they expected to receive do not materialize . . . ."); Bruce at 135-36 ("[H]ours of service for use in determining [years of work] are determined solely on the basis of hours of work, or hours for which payment is due the employee from the employer, without reference to the delinquency or nondelinquency of the employer's contributions to the [multiemployer] plan.").  As the Supreme Court noted, the longstanding position of the Secretary of Labor at the time of the enactment of FERS was that ERISA required that credit for hours worked "must be given solely on the basis of service performed for a participating employer, regardless whether that employer is required to contribute for such service or has made or defaulted on his required contributions.  Any plan term or Trustees resolution to the contrary is, in our judgment, unlawful and unenforceable."  Dep't of Labor Advisory Op. No. 76-89 (Aug. 31, 1976); *accord* Dep't of Labor Advisory Op. No. 78-28A (Dec. 5, 1978); Dep't of Labor Advisory Op. 78-21A (Oct. 16, 1978); Dep't of Labor Advisory Op. No. 78-20A (Oct. 6, 1978); *see also* Rules and Regulations for Minimum Standards for Employee Pension Benefit Plans, 41 Fed. Reg. 56,462, 56,464 (Dec. 28, 1976) (explaining, with respect to 29 C.F.R. § 2530.200b-2, regarding accrual of hours of service, that employee hours "must be credited to an employee

*Whether Postal Employees Are Entitled to FERS Service Credit When USPS Has Not Made Contributions*

Given this backdrop, it would be reasonable to expect some indication in the text of FERS, or at least in its legislative history, if Congress had intended to depart from these principles and make accrual of employee benefits contingent on employer contributions. Instead, the legislative history underlines that Congress intended to establish a new retirement plan for federal employees that would "provid[e] employees with financial security through a retirement program that compares favorably with those found in the private sector." S. Rep. No. 99-166, at 38, *reprinted in* 1986 U.S.C.C.A.N. at 1443.[16] It is unlikely, in light of this goal, that Congress would have incorporated into FERS an arrangement that would have been unlawful in the private sector without saying so.

Finally, OPM argues that construing FERS to give employees an entitlement to service credit without the employer's contribution "would be inconsistent with the Director's fiduciary responsibilities to the Fund." OPM Mem. at 7. But, as set forth above, OPM is obligated under the statute to award service credit to employees who satisfy the statutory conditions set forth, *supra* pp. 7-9, and to "pay all benefits that are payable under subchapter II, IV, V, or VI of this chapter from the Fund." 5 U.S.C. § 8461(a). As we read the statute, OPM is required to pay those benefits without regard to whether the employing agency—here, the Postal Service—has made its employer contributions to the Fund. The Director's fiduciary obligations thus include awarding service credit and paying benefits in accordance with the statute, and he would not violate those obligations by doing so.

## IV.

"If, upon examination of 'the particular statutory language at issue, as well as the language and design of the statute as a whole,' . . . it is clear that [the agency's] interpretation is incorrect, then we need look no further . . . ." *Fort Stewart Sch. v. F.L.R.A.*, 495 U.S. 641, 645 (1990) (quoting *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291 (1988)). In our view, FERS has "directly spoken to the precise question at issue," *Chevron*, 467 U.S. at 842, and OPM may

---

regardless of whether contributions are required to be made to the plan on account of such hours or whether such contributions, even though required, have not in fact been made"). Before the passage of FERS, the IRS had also issued a Revenue Ruling explaining that a multiemployer plan that did not credit all years of service because of an employer's failure to make the required contributions failed to meet the requirements of "a qualified pension plan" that it provide "definitely determinable benefits" to its employees and violated the minimum participation and vesting standards of the Internal Revenue Code. Rev. Ruling 85-130, 1985-2 C.B. 137.

[16] *See also, e.g.*, 132 Cong. Rec. 11,912 (1986) (statement of Rep. Myers) (conference report includes "many of the concepts that a great many of the better private retirement programs have"); *id.* at 11,909 (1986) (statement of Rep. Ford) (Congress had an opportunity "to create a new pension system with the best features found in the private sector"); *id.* at 11,304 (1986) (statement of Sen. Gore) ("The retirement system which we have developed employs a three-tier design that combines Social Security with a defined benefit tier that focuses on providing a reliable base pension benefit . . . ."); *id.* at 11,303 (1986) (statement of Sen. Glenn) (FERS "provides Government employees with a three-part program which is comparable to plans widely used in private industry" and "one that helps to recruit and maintain an excellent and skilled work force"); *id.* at 11,301 (1986) (statement of Sen. Stevens) (praising the new retirement plan as "a top notch, economical retirement system for the Federal workforce which is on part with the best in the private sector," providing "solid retirement benefits" and "offering financial security to Federal retirees"); S. Rep. No. 99-166, at 4 (emphasizing that "the Federal Government must have the ability to attract and retain highly qualified individuals in all occupations" and that "[a]n attractive, flexible retirement plan can assist the government in meeting these objectives . . . to build a career workforce" and "to assist in recruiting midcareer employees"), *reprinted in* 1986 U.S.C.C.A.N. at 1408-09.

**JA 172**

*Opinions of the Office of Legal Counsel in Volume 36*

not address the Postal Service's failure to make the employer contributions required by FERS by denying postal employees coverage or creditable service under FERS.  We do not address the propriety of any other action OPM might take to address the Postal Service's failure to make the required contributions to the Fund.


/s/

VIRGINIA A. SEITZ
Assistant Attorney General

**JA 173**

# Amended Complaint

# Exhibit L

# Responsibility of Agencies to Pay Attorney's Fee Awards Under the Equal Access to Justice Act

The judgment of attorney's fees and expenses entered against the United States in *Cienega Gardens v. United States* cannot be paid out of the Judgment Fund because the Equal Access to Justice Act provides for payment.

Pursuant to EAJA, the Department of Housing and Urban Development must pay the award. HUD would be the "agency over which the [plaintiffs] prevail[ed]" under EAJA because it administered the federal program that was the subject of the litigation.

October 16, 2007

MEMORANDUM OPINION FOR THE ASSISTANT ATTORNEY GENERAL
CIVIL DIVISION

You have asked for our opinion on which agency, if any, must pay the judgment of attorney's fees and expenses entered against the United States in *Cienega Gardens v. United States*, No. 02-5050 (Fed. Cir. Mar. 5, 2004). In particular, you have asked whether the award may be paid out of the Judgment Fund, under 31 U.S.C. § 1304 (2000), or whether it must be paid out of the appropriations of an agency responsible for the award under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412 (2000).

On December 9, 2005, we advised that the award could not be paid out of the Judgment Fund, because the Judgment Fund is available only when "payment is not otherwise provided for." 31 U.S.C. § 1304(a)(1). EAJA provides for payment, by directing that a fee award "be paid by any agency over which the party prevails from any funds made available to the agency by appropriation or otherwise." 28 U.S.C. § 2412(d)(4). We further advised that the Department of Housing and Urban Development ("HUD") would be the "agency over which the [plaintiffs] prevail[ed]" under EAJA, because HUD administered the federal program that was the subject of the litigation. This opinion confirms our previous advice and provides additional analysis of these questions.

## I.

The Federal Circuit imposed the fee award in *Cienega Gardens* at the close of a protracted lawsuit challenging amendments to a HUD program designed to subsidize low- and moderate-income multifamily housing. After almost a decade of litigation and three rounds of appeals, the United States Court of Appeals for the Federal Circuit ruled that the amendments constituted a regulatory taking of the plaintiffs' property and ordered the United States to pay just compensation. The court of appeals further ordered that the United States pay the plaintiffs the attorney's fees and expenses incurred during their third appeal, the stage of the litigation during which the plaintiffs prevailed on their takings claims. Before

**JA 175**

Case 1:16-cv-01068-KBJ   Document 22-13   Filed 10/27/17   Page 3 of 15
Case #24-5163      Document #2080945      Filed: 10/18/2024      Page 182

*Opinions of the Office of Legal Counsel in Volume 31*

considering which instrumentality of the federal government must pay this fee award, we discuss the relevant events in the *Cienega Gardens* litigation.

### A.

The plaintiffs in *Cienega Gardens* were the owners of housing constructed in the 1970s under the National Housing Act, Pub. L. No. 73-479, 48 Stat. 1246 (1934) (codified as amended at 12 U.S.C. §§ 1701–1750g (2000 & Supp. V. 2005)), and financed with HUD-insured low-interest mortgages. As a condition of receiving the HUD-insured mortgages, the plaintiffs incorporated into their mortgage contracts with private lenders a variety of restrictions on the properties, including restrictions on income levels of tenants, allowable rental rates, and the rate of return on initial equity that the owners could receive. By their terms, these restrictions remained in effect for the duration of the mortgage contracts. Under HUD regulations then in effect, developers retained the right to prepay their loans and satisfy their mortgage obligations after twenty years. 24 C.F.R. §§ 221.524(a), 236.30(a) (1970). Owners who prepaid the mortgages would be released from the regulatory restrictions.

As the twenty-year mark for many HUD-insured mortgages approached, Congress became concerned that large numbers of owners would exercise their prepayment rights and remove their properties from the low-income housing pool. Congress found that such an event "would precipitate a grave national crisis in the supply of low income housing that was neither anticipated nor intended when contracts for these units were entered into." Emergency Low Income Housing Preservation Act of 1987, Pub. L. No. 100-242, tit. II, § 202(a)(4), 101 Stat. 1877, 1877 (1988) ("ELIHPA"); *see also* S. Rep. No. 101-316, at 105 (1990).

Congress chose to forestall such an outcome by enacting ELIHPA, which blocked the owners from exercising their prepayment rights without first obtaining HUD approval. In order to obtain that approval, the owners were required to submit a "plan of action" informing HUD of how the developers would use the property following prepayment. ELIHPA § 223, 101 Stat. at 1879. HUD could only approve prepayment upon finding that the plan would "not materially increase economic hardship for current tenants or involuntarily displace current tenants (except for good cause) where comparable and affordable housing is not readily available." *Id.* § 225(a)(1), 101 Stat. at 1880. In 1988, HUD issued an interim rule implementing these prepayment restrictions, 53 Fed. Reg. 11,224 (Apr. 5, 1988) (codified at 24 C.F.R. pt. 248 (1989)), and issued instructions to its field offices detailing the procedures for filing and reviewing plans of action. In 1990, HUD issued a final rule implementing the prepayment restrictions imposed under the interim rule. 55 Fed. Reg. 38,944 (Sept. 21, 1990) (codified at 24 C.F.R. pt. 248 (1991)).

The ELIHPA restrictions would have expired after two years, but Congress extended them before their expiration, Pub. L. No. 101-494, 104 Stat. 1185 (1990),

*Responsibility of Agencies to Pay Attorney's Fee Awards Under EAJA*

and then made them permanent under the Low-Income Housing Preservation and Resident Homeownership Act of 1990, Pub. L. No. 101-625, tit. VI, 104 Stat. 4249 ("LIHPRHA"). HUD continued to issue regulations implementing ELIHPA and LIHPRHA.[1] The plaintiffs were effectively prohibited from prepaying their mortgages until Congress enacted the Housing Opportunity Program Extension Act of 1996, which permitted owners to exercise their prepayment rights and be free from the affordability restrictions if they agreed not to increase their rents until sixty days after prepayment. *See* Pub. L. No. 104-120, § 2(b), 110 Stat. 834, 834.

**B.**

In 1994, the *Cienega Gardens* plaintiffs brought suit in the Court of Federal Claims challenging their inability to prepay the HUD-insured mortgages under ELIHPA and LIHPRHA. *Cienega Gardens v. United States*, 33 Fed. Cl. 196 (1995). Throughout the litigation, the United States was represented by attorneys from the Civil Division of the Department of Justice ("DOJ"), with attorneys from HUD appearing on the briefs as "of counsel." We understand that the Civil Division and HUD had no significant disagreement over the positions asserted during the course of the litigation.

Pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1) (2000), the plaintiffs named the United States as the only defendant. Plaintiffs' complaint charged that the government had violated several duties allegedly owed to the plaintiffs by implementing the prepayment restrictions that Congress had imposed through ELIHPA and LIHPRHA. First, plaintiffs claimed that the government had breached express contracts with the plaintiffs in the form of the regulatory agreements that incorporated the prepayment right. Second, plaintiffs claimed that the government had violated certain statutory directives in the manner in which it had administered the programs under sections 221(d)(3) and 236 of the National Housing Act. Finally, plaintiffs claimed that the government had taken their

---

[1] *See* Prepayment of a HUD-Insured Mortgage by an Owner of Low Income Housing, 56 Fed. Reg. 20,262 (May 2, 1991) (proposed rule); Guidelines for Determining Appraisals of Preservation Value Under the Low-Income Housing Preservation and Resident Homeownership Act of 1990, 56 Fed. Reg. 64,932 (Dec. 12, 1991) (notice and request for public comment); Prepayment of a HUD-Insured Mortgage by an Owner of Low Income Housing, 57 Fed. Reg. 11,992 (Apr. 8, 1992) (interim rule); Preservation of Multifamily Assisted Rental Housing: Interim Guidelines for the Section 222(e) Windfall Profits Test, 57 Fed. Reg. 12,064 (Apr. 8, 1992) (notice of interim guidelines and request for public comment); Final Guidelines for Determining Appraisals of Preservation Value Under the Low-Income Housing Preservation and Resident Homeownership Act of 1990, 57 Fed. Reg. 19,970 (May 8, 1992) (notice); Delegation of Authority for the Emergency Low Income Housing Preservation Act of 1987, as Amended by the Low Income Housing Preservation and Resident Homeownership Act of 1990, and as Further Amended by the Housing and Community Development Act of 1992, 58 Fed. Reg. 63,384 (Dec. 1, 1993) (notice of delegation of authority).

**JA 177**

Case 1:16-cv-01068-KBJ   Document 22-13   Filed 10/27/17   Page 5 of 15
Case #24-5163   Document #2080945   Filed: 10/18/2024   Page 184

*Opinions of the Office of Legal Counsel in Volume 31*

property without just compensation, in violation of the Fifth Amendment, by denying them the right to put their property to a more profitable use after twenty years.

In the initial round of litigation, the Court of Federal Claims granted summary judgment in the plaintiffs' favor on the contract claim, held that plaintiffs could maintain a claim for a regulatory taking, and ruled in the government's favor on all other claims. *Cienega Gardens v. United States*, 33 Fed. Cl. 196 (1995). The court then held a trial to determine contract damages for four model plaintiffs. *Cienega Gardens v. United States*, 38 Fed. Cl. 64 (1997). On appeal, the Federal Circuit upheld the rulings in the government's favor but reversed on the contract claim, holding that HUD was not in privity with plaintiffs under the regulatory agreements. *Cienega Gardens v. United States*, 194 F.3d 1231 (Fed. Cir. 1998).

The case returned to the Court of Federal Claims to address plaintiffs' remaining claim for a regulatory taking. The trial court dismissed that claim on the ground that plaintiffs had failed to exhaust their administrative remedies by not filing a plan of action with HUD seeking a release from the affordability restrictions. The Federal Circuit reversed on appeal, however, holding that the plaintiffs had "set forth uncontested facts demonstrating that it would be futile for them to file prepayment requests with HUD." *Cienega Gardens v. United States*, 265 F.3d 1237, 1248 (Fed. Cir. 2001).

Following another remand, the trial court rejected the regulatory taking claim on the merits. The plaintiffs filed a third appeal, and the Federal Circuit again reversed, ruling that the four model plaintiffs had suffered a regulatory taking and that the other plaintiffs should be given the opportunity to prove the facts underlying their claims before the trial court. *Cienega Gardens v. United States*, 331 F.3d 1319 (Fed. Cir. 2003).[2]

## C.

Following their success on the third appeal, the plaintiffs moved for an award of attorney's fees and expenses from the United States under EAJA, 28 U.S.C. § 2412(d). In relevant part, section 2412(d)(1)(A) provides:

> Except as otherwise specifically provided by statute, a court shall award to a prevailing party . . . fees and other expenses . . . incurred by that party in any civil action (other than cases sounding in tort) . . . brought by or against the United States . . . , unless the court

---

[2] The *Cienega Gardens* litigation has continued, although the subsequent developments are not relevant to the issues addressed in this opinion. *See, e.g.*, *Cienega Gardens v. United States*, 503 F.3d 1266 (Fed. Cir. 2007); *Independence Park Apts. v. United States*, 449 F.3d 1235, *on reconsideration*, 465 F.3d 1308 (Fed. Cir. 2006).

Case 1:16-cv-01068-KBJ   Document 22-13   Filed 10/27/17   Page 6 of 15
Case #24-5163      Document #2080945      Filed: 10/18/2024      Page 185

*Responsibility of Agencies to Pay Attorney's Fee Awards Under EAJA*

finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A). In a brief order, the Federal Circuit granted the motion for fees and expenses under section 2412(d), but limited the award to those incurred during the plaintiffs' third appeal, when the court of appeals reversed the trial court's denial of the regulatory taking claim:

> The application is granted in part. The court allows reasonable attorney fees and expenses pursuant to the EAJA for *Cienega III*, in the amount of $147,373.24 as reasonable attorney fees and $9,386.16 in expenses, for a total of $156,759.40.

Order, *Cienega Gardens v. United States*, No. 02-5050, at 2 (Mar. 5, 2004). To award fees under this provision, the Federal Circuit was obliged to find that the efforts of the United States to defend the Court of Federal Claims' ruling on the regulatory takings question in the third appeal were not "substantially justified" and that no "special circumstances" made the award of fees unjust. The Federal Circuit's conclusion provided no explanation for why the United States was not justified in seeking to defend the trial court decision, and on its face, such a ruling would appear questionable. The United States did not seek further review of that decision, however.

## II.

In light of the Federal Circuit's judgment, you have asked which federal agency, if any, bears responsibility under EAJA to pay the award of attorney's fees and expenses in the *Cienega Gardens* case. EAJA provides that "[f]ees and other expenses awarded under this subsection to a party shall be paid by any agency over which the party prevails from any funds made available to the agency by appropriation or otherwise." 28 U.S.C. § 2412(d)(4). In most cases, which federal agency must pay the award is not likely to be an issue. The defendant in the case will be a federal agency or an officer acting on behalf of a federal agency, and the plaintiff's suit will directly challenge the action or inaction of the government defendant. In such a case, the "agency over which the party prevails" would be clearly identified.

The circumstances of this case, however, have engendered some disagreement over which agency, or whether in fact any agency, should be responsible for the award of attorney's fees and expenses. The plaintiffs did not sue any one agency but rather brought suit against the United States. Furthermore, the primary issue in the litigation was whether two statutes enacted by Congress, ELIHPA and LIHPRHA, had effected an uncompensated taking of plaintiffs' property. You and HUD therefore have expressed the view that *Cienega Gardens* constitutes the rare case in which no agency bears responsibility for the fee award and in which

Case 1:16-cv-01068-KBJ   Document 22-13   Filed 10/27/17   Page 7 of 15
Case #24-5163    Document #2080945      Filed: 10/18/2024    Page 186

*Opinions of the Office of Legal Counsel in Volume 31*

payment should be made out of the Judgment Fund, 31 U.S.C. § 1304, which Congress established to cover judgments against the United States for which no appropriation is otherwise available. *See* Letter for Debra Diener, Chief Counsel, Financial Management Service, Department of the Treasury, from Carole W. Wilson, Associate General Counsel for Litigation, Department of Housing and Urban Development, *Re: Cienega Gardens, et al. v. United States, United States Court of Appeals for the Federal Circuit, Award of Attorneys' Fees* (May 12, 2004) ("HUD Letter"), and attached Memorandum of Law (May 11, 2004) ("HUD Memo"); Memorandum for Steven Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from Peter D. Keisler, Assistant Attorney General, Civil Division, *Re: Request for New Opinion Concerning Payment of Judgments under the Equal Access to Justice Act* at 10-12 (May 4, 2005) ("DOJ Letter").

The Department of the Treasury, which administers the Judgment Fund, disagrees. Treasury notes that the Judgment Fund is available only when "payment is not otherwise provided for" by federal law, 31 U.S.C. § 1304(a)(1). Letter for Stuart E. Schiffer, Deputy Assistant Attorney General, Civil Division, Department of Justice, from Margaret Marquette, Chief Counsel, Financial Management Service, Department of the Treasury, *Re: Cienega Gardens, et al. v. United States, No. 02-5050 (Fed. Cir.)* at 2 (Feb. 1, 2005). Treasury contends that EAJA does provide for payment of "fees and other expenses" by "any agency over which the party prevails" and that HUD is the responsible agency under the statute. Treasury notes that "the cause of action was based upon a statute within HUD's purview (12 U.S.C. § 4122), DOJ consulted with HUD as the client agency, and HUD attorneys were listed on the court briefs as 'of counsel.'" *Id.* Based on this understanding, Treasury has declined payment absent an opinion to the contrary from this office.

Accordingly, you have asked for this office's view as to whether the Judgment Fund is authorized to pay EAJA judgments entered against the United States, when no agency has been named as a defendant in the litigation. As both Treasury's response and your memorandum suggest, this question also requires consideration of whether Congress deemed a particular agency to be responsible under EAJA for the fee award. For the reasons discussed below, we conclude that the Judgment Fund is not available to satisfy the fee award, because HUD constitutes the "agency over which the party prevail[ed]" under EAJA.

## A.

The Judgment Fund is available "to pay final judgments, awards, compromise settlements, and interest and costs specified in the judgments" against the United States only when "payment is not otherwise provided for." 31 U.S.C. § 1304(a)(1). If Congress has made an appropriation that is reasonably interpreted to cover a liability incurred by the government, the liability must be satisfied out of that

*Responsibility of Agencies to Pay Attorney's Fee Awards Under EAJA*

appropriation. "The fact that it might be necessary to do some statutory interpretation to determine if a particular appropriation is available to pay a judgment or compromise settlement does not preclude use of that appropriation." *Matter of: S.S. Silberblatt, Inc. v. East Harlem Pilot Block—Payment of Judgment*, 62 Comp. Gen. 12, 16 (1982) (rejecting HUD's argument that a settlement should be paid out of the Judgment Fund).[3]

Here, Congress did provide a statutory mechanism for the payment of EAJA awards by specifically providing that fee awards "shall be paid by any agency over which the party prevails from any funds made available to the agency by appropriation or otherwise." 28 U.S.C. § 2412(d)(4). Congress, in other words, intended to ensure that, to the extent possible, fee awards should be paid by whichever agency, or agencies, may be described as having been prevailed over in an action against the United States. Congress did not intend for agencies to turn to the Judgment Fund to pay a fee award under EAJA, unless it can be said that the plaintiffs did not prevail over "any agency."

The history of EAJA confirms this interpretation. The original version of the statute provided:

> Fees and other expenses awarded under this subsection *may* be paid by any agency over which the party prevails from any funds made available to the agency, by appropriation or otherwise, for such purpose. If not paid by any agency, the fees and other expenses shall be paid in the same manner as the payment of final judgments is made in accordance with sections 2414 and 2517, of this title.

Pub. L. No. 96-481, tit. II, § 204(a), 94 Stat. 2325, 2329 (1980) (emphasis added) (codified at 28 U.S.C. § 2412(d)(4)(A) (Supp. V 1981)).[4] In 1982, this office opined that Congress had not intended to give the losing agency unfettered discretion to seek payment from the Judgment Fund, but rather "a reasonable amount from the unrestricted appropriations of an agency *must* be allocated to the payment of awards for fees and expenses" under EAJA. *Funding of Attorney Fee Awards Under the Equal Access to Justice Act*, 6 Op. O.L.C. 204, 205 (1982). We concluded that an agency could seek payment from the Judgment Fund "only when making an award out of agency funds would be a very heavy financial blow to the agency[.]" *Id.* at 211. This office therefore recognized that the previous

---

[3] Although the Executive Branch is not bound by the legal opinions of the Comptroller General, in resolving appropriation issues we consider them for what persuasive value they may have. *See, e.g.*, *Submission of Aviation Insurance Program Claims to Binding Arbitration*, 20 Op. O.L.C. 341, 343 n.3 (1996).

[4] Sections 2414 and 2517(a) of title 28 set forth the standard procedures for obtaining disbursements from the Treasury to satisfy a judgment against the United States.

**JA 181**

*Opinions of the Office of Legal Counsel in Volume 31*

version of EAJA would permit an agency to turn to the Judgment Fund for the payment of fee awards only under very narrow circumstances.

Congress eliminated even this narrow agency discretion by amending EAJA in 1985. Rather than providing that an agency "may" pay a fee award from available funds, Congress declared that the agency "shall" pay the award from agency funds. Pub. L. No. 99-80, § 2(d), 99 Stat. 183, 185 (1985). Congress also eliminated the second sentence of the former section 2412(d)(4)(A) that permitted the agency to treat a fee award like other judgments. EAJA now provides simply that "[f]ees and other expenses awarded under this subsection to a party *shall* be paid by any agency over which the party prevails from any funds made available to the agency by appropriation or otherwise." 28 U.S.C. § 2412(d)(4) (emphasis added). These amendments confirm that Congress did not intend that the Judgment Fund be used to pay fee awards under EAJA. The Judgment Fund is available to pay a fee award only if there is *no* agency over which the plaintiffs can be said to have prevailed under EAJA.

## B.

We therefore turn to the question whether "any agency" may be held responsible for the *Cienega Gardens* fee award. As a general rule, the "agency over which the party prevails" under EAJA will be the agency whose regulatory interest was at stake in the litigation and whose actions or policies are successfully challenged in the court action. This interest may be identified by the fact that the agency took affirmative action against the prevailing party, in the form of a regulation or administrative ruling, or it may be identified by the fact that the agency had statutory authority over the regulatory program that the prevailing party successfully challenged. In a typical case, that agency may be named as the plaintiff or the defendant, but EAJA does not require that the agency itself be specifically named as a party. These considerations, as we explain, point towards the conclusion that HUD is the agency responsible under EAJA.

EAJA provides that a court shall award fees upon finding that the "position of the United States" is not "substantially justified." 28 U.S.C. § 2412(d)(1)(A). EAJA defines the "position of the United States" to mean "in addition to the position taken by the United States in the civil action, *the action or failure to act by the agency upon which the civil action is based*." *Id.* § 2412(d)(2)(D) (emphasis added). It further provides that "[w]hether or not the position of the United States was substantially justified shall be determined on the basis of the record *(including the record with respect to the action or failure to act by the agency upon which the civil action is based)* which is made in the civil action for which fees and other expenses are sought." *Id.* § 2412(d)(1)(B) (emphasis added). Congress added these latter two provisions in the same 1985 amendment in which it clarified that agencies could not use the Judgment Fund to pay fee awards assessed against them under EAJA. Pub. L. No. 99-80, §§ 2(b), 2(c)(2), 99 Stat. 183, 184–85. Before the

Case 1:16-cv-01068-KBJ   Document 22-13   Filed 10/27/17   Page 10 of 15
Case #24-5163      Document #2080945         Filed: 10/18/2024     Page 189

*Responsibility of Agencies to Pay Attorney's Fee Awards Under EAJA*

1985 amendment, several courts had interpreted EAJA to prohibit consideration of the actions of the agency that preceded the lawsuit.[5] Congress thus made clear through the 1985 amendment that EAJA predicates responsibility for the fee award not simply on the litigating position of the United States, but on the course of regulatory action, or inaction, giving rise to the position of the United States over which the private litigants prevailed.

This definition of the "position of the United States" is consistent with the purpose underlying EAJA. As the Supreme Court has explained, "Congress passed the EAJA in response to its concern that persons 'may be deterred from seeking review of, or defending against, unreasonable governmental action because of the expense involved in securing the vindication of their rights.'" *Sullivan v. Hudson*, 490 U.S. 877, 883 (1989) (quoting Pub. L. No. 96-481, § 202(a), 94 Stat. 2321, 2325 (1980)). Through EAJA, Congress sought "to diminish the deterrent effect of seeking review of, or defending against, governmental action by providing in specified situations an award of attorney fees, expert witness fees, and other costs against the United States." Pub. L. No. 96-481, § 202(b)(1), 94 Stat. at 2325. Congress sought therefore to reduce the cost, and consequent deterrent effect, of challenging or defending against unreasonable government action. *Hudson*, 490 U.S. at 883 ("When the cost of contesting a Government order, for example, exceeds the amount at stake, a party has no realistic choice and no effective remedy. In these cases, it is more practical to endure an injustice than to contest it.") (quoting S. Rep. No. 96-253, at 5 (1979)). By the same token, by transferring the costs of litigation to the agency responsible for the subject matter of the litigation and whose actions or policies are under challenge, EAJA would deter the "unreasonable governmental action" that gave rise to litigation in the first place.

EAJA further recognizes that the agency responsible for the fee award need not be a named party to the lawsuit. EAJA provides that a "prevailing party" may win fees, but the statute contains no corresponding requirement that the agency "over which the party prevails" have been a named party to the litigation. *See* 28 U.S.C. § 2412(d)(1)(A), (d)(4). Indeed, EAJA recognizes that fees may be awarded in any action "brought by or against *the United States*," *id.* § 2412(d)(1)(A) (emphasis added), which is defined to include not only the government as a named party but also "any agency and any official of the United States acting in his or her official capacity." *Id.* § 2412(d)(2)(C). In assigning responsibility for the payment of fee

---

[5] *See Spencer v. NLRB*, 712 F.2d 539, 546–57 (D.C. Cir. 1983) (concluding that "'the position of the United States,' for the purposes of the Act, means the arguments relied upon by the government in litigation," not the underlying action of the government); *Gava v. United States*, 699 F.2d 1367, 1371 (Fed. Cir. 1983) ("In determining an application for attorney's fees under the Act, the inquiry is directed to the justification for the government's litigating position before the court, not the justification for the government's administrative action that prompted the suit."). *But see Natural Res. Def. Council v. EPA*, 703 F.2d 700, 707 (3d Cir. 1983) ("We hold that the word 'position' refers to the agency action which made it necessary for the party to file suit.").

awards, however, Congress stated that the fees shall be paid by "any agency over which the party prevails," *id.* § 2412(d)(4), and not by "the United States" or by one of its officials. This difference in language confirms that the "agency over which the party prevails" will include the agency whose conduct led to "the position of the United States," even if the agency was not named as a party to the litigation.

Applying these principles to the case at hand, we believe that EAJA assigns responsibility for the fee award in the *Cienega Gardens* case to HUD, the agency charged with administering the federal statutory scheme in question. HUD issued the regulations in 1970 that were incorporated into plaintiffs' mortgage notes and initially gave them the right to prepay their HUD-insured loans after twenty years and be released from the affordability restrictions. Following Congress's enactment of ELIHPA and LIHPRHA, HUD again issued regulations that implemented those statutes and recognized what the Federal Circuit held to be the loss of plaintiffs' prepayment rights. Plaintiffs' successful takings claims were predicated on the uncompensated deprivation of property rights created and rescinded under this HUD-administered regulatory scheme. Under these circumstances, we believe that the plaintiffs are most reasonably said to have prevailed over HUD.

In opposition to this conclusion, HUD maintains, and you agree, that HUD should not be deemed the agency responsible for the fee award, because HUD lacked any institutional interest in the litigation surrounding plaintiffs' takings claim. HUD Memo at 4; DOJ Letter at 7. HUD took no direct action against any of the plaintiffs, who did not file any petition with HUD, but instead brought suit in the Court of Claims following the enactment of ELIHPA and LIHPRHA. In addition, plaintiffs' takings claims did not challenge any HUD regulation or administrative decision, and the outcome of the litigation—a monetary award compensating the plaintiffs for their losses—did not affect or alter any existing HUD program. HUD Memo at 4; DOJ Letter at 7. HUD acknowledges that it had an institutional interest in the earlier stages, where the plaintiffs asserted claims for breach of contract and administrative violations. HUD Memo at 7. The agency maintains, however, that once the dismissal of those claims was upheld on appeal, HUD had no remaining interest in the litigation, and specifically had no institutional interest in the third appeal that was the subject of the fee award. At that point, "the plaintiffs' only remaining claim . . . was that the enactment of LIHPRHA constituted a temporary regulatory taking of a property right." *Id.* The governmental entity that effectuated the unconstitutional taking was Congress, which enacted the statutes that of their own force deprived the plaintiffs of their property interests. DOJ Letter at 10. Under this view, HUD itself lacked any institutional interest in the litigation by the time of the fee award, and therefore, it should not be deemed to be the agency over which the plaintiffs prevailed.

We disagree, however, with the suggestion that HUD lacked a regulatory interest in plaintiffs' takings claims. HUD acknowledges its "institutional interest" in

*Responsibility of Agencies to Pay Attorney's Fee Awards Under EAJA*

the breach of contract and administrative law claims that arose out of its actions in granting the prepayment rights and then in restricting prepayment under ELIHPA and LIHPRHA. HUD Memo at 7. We see no reason why this institutional interest would not extend to the takings claims that arose out of the very same actions.[6] The *Cienega Gardens* litigation directly challenged the constitutionality of the HUD-administered changes to the low-income housing program. HUD issued the regulations that originally set the terms of plaintiffs' prepayment rights, and when Congress enacted ELIHPA and LIHPRHA, HUD was not a passive observer to events. Rather, HUD issued regulations and other guidance recognizing the loss of the plaintiffs' prepayment rights and setting the terms under which HUD would approve prepayment in the future. By the time of the Federal Circuit's judgment, Congress may have relaxed the restrictions on prepayment through a 1996 statute, *see supra* p. 231, but that was merely a fortuity. Had Congress not altered the statutory scheme, the Federal Circuit decision likely would have led HUD to alter its regulatory policies to prevent the United States from being exposed to continuing liability based on regulatory takings claims.

It is true that the *Cienega Gardens* plaintiffs brought suit against the United States in the Court of Claims without first petitioning HUD for the right to prepay the mortgages in question. HUD Memo at 7. The Federal Circuit found that such an action would have been futile, however. *Cienega Gardens*, 265 F.3d at 1248. HUD's regulations provided that plaintiffs could only exercise their prepayment right if HUD was satisfied that the plaintiffs' plan of action would not unduly diminish the availability of low-income housing.[7] Plaintiffs contended that they could not meet that standard, and the Federal Circuit found the facts underlying this contention to be undisputed. *Cienega Gardens*, 265 F.3d at 1248. Plaintiffs' successful takings claim amounted to a declaration that the existing HUD regulations reflected an uncompensated taking of their prepayment rights. The fact that the remedy in the case was compensation, rather than injunctive relief directed at

---

[6] Indeed, as HUD notes, the agency's attorneys appeared "of counsel" on the government's briefs throughout the litigation, including on the third appeal. HUD Memo at 7. We do not regard the participation of counsel as a basis *ipso facto* for assigning responsibility to HUD, but the participation of HUD attorneys does confirm that HUD constituted the agency with the specific regulatory interest in the *Cienega Gardens* litigation.

[7] HUD states that it "never promulgated regulations to enforce the restrictions on prepayment contained in ELIHPA and LIHPRHA. HUD's regulations permitting prepayment after twenty years remained in effect throughout the time when prepayment was restricted by those statutes." HUD Memo at 2. HUD, however, issued multiple sets of regulations to implement ELIHPA and LIHPRHA, *see supra* p. 218 & n. 1, including regulations to implement the "plan of action" restriction on prepayment. *See* 24 C.F.R. § 248.221(b)(1)(i) (1993) ("The [Federal Housing] Commissioner may approve a plan of action that involves termination of the low income affordability restrictions only upon a written finding that . . . [t]he supply of vacant, comparable housing is sufficient to ensure that the prepayment will not materially affect . . . [t]he availability of decent, safe and sanitary housing affordable to lower income and very low income families in the area . . . .").

**JA 185**

the agency, does not alter the fact that HUD's actions and policies were at issue in the litigation.

In addition to suggesting that HUD lacked a regulatory interest in the takings claim, you and HUD suggest that HUD should not be held responsible for the fee award on the ground that the agency itself did not engage in any unreasonable action to cause plaintiffs' loss. HUD Memo at 7; DOJ Letter at 9. The Federal Circuit described Congress as the responsible actor in taking plaintiffs' property through the enactment of ELIHPA and LIHPRHA. *See, e.g.*, *Cienega Gardens*, 331 F.3d at 1328 (describing the questions on the appeal as whether plaintiffs' property interest was "taken by the enactment of ELIHPA and LIHPRHA" and whether "the regulatory restriction in the statutes" was significant enough to require compensation). Under this view, HUD's regulatory actions amounted to nothing more than implementing the directives of ELIHPA and LIHPRHA. HUD did not add to plaintiffs' injury, and HUD lacked any statutory authority to determine whether those federal laws constituted a taking or to provide the plaintiffs with payment for any lost property interest. Because HUD took no wrongful action, you maintain that "making HUD pay EAJA fees, under the circumstances, would not promote Congress's primary reason for making agencies liable for EAJA fees: to penalize unreasonable agency action." DOJ Letter at 8.

We do not disagree that HUD did nothing more than carry out its statutory obligations in this case, yet that fact does not relieve HUD of its responsibilities under EAJA for fees and costs incurred by plaintiffs who successfully challenged the HUD-administered program. Congress may be the entity most responsible for the regulatory takings recognized by the Federal Circuit, but Congress clearly cannot be the "agency over which the plaintiffs prevailed." *See* 5 U.S.C. § 551(1)(A) (excluding Congress from the definition of "agency" under the Administrative Procedure Act). It is no doubt true that "Congress's primary reason for making agencies liable for EAJA fees" is "to penalize unreasonable agency action." DOJ Letter at 8. Yet EAJA does not require a specific finding of fault before an agency may be held responsible for the award; it requires only a showing that the "position of the United States" was not "substantially justified." 28 U.S.C. § 2412(d)(1)(A). Upon finding that the "position of the United States" is not "substantially justified," EAJA requires payment from the "agency over which the plaintiffs prevailed" without regard to whether the agency properly or improperly exercised its discretion.

For the above reasons, we conclude that HUD does constitute the agency over which the plaintiffs prevailed in *Cienega Gardens*. The agency responsible to pay a fee award against the United States under EAJA is the agency whose regulatory interest is at stake in the litigation. This interest may be identified by the fact that the agency took affirmative action against the prevailing party, in the form of a regulation or administrative ruling, or it may be identified by the fact that the agency had statutory authority over the regulatory program that the prevailing

Case 1:16-cv-01068-KBJ  Document 22-13  Filed 10/27/17  Page 14 of 15
Case #24-5163      Document #2080945      Filed: 10/18/2024    Page 193

*Responsibility of Agencies to Pay Attorney's Fee Awards Under EAJA*

party successfully challenged. By either measure, HUD would constitute the agency responsible to pay the fee award to the *Cienega Gardens* plaintiffs.

### C.

Our conclusion that HUD bears responsibility for the fee award does not end our analysis, because EAJA provides for payment by "*any* agency over which the party prevails," suggesting that more than one agency may bear responsibility. Accordingly, we must consider whether another agency, namely DOJ, should be deemed jointly responsible. HUD suggests that if the plaintiffs prevailed over any agency, it was DOJ, because "DOJ, not HUD, was entirely responsible for the arguments made and briefs filed in the third appeal" for which the plaintiffs were awarded fees. HUD Memo at 7. HUD further points out that DOJ, not HUD, had the ability to settle the litigation. *Id.*; *see* 28 U.S.C. § 2414 (2000). This would be true in most cases involving the federal government, however. With the exception of independent agencies that have their own litigating authority, the Attorney General has the statutory authority to control the course of any litigation brought by or against the United States or one of its agencies. 28 U.S.C. § 516 (2000). We do not believe that Congress intended for DOJ to be deemed the "agency over which the party prevails" under EAJA merely by virtue of its statutorily mandated role as litigating counsel.[8] If we were to adopt such an interpretation, DOJ would become responsible for all fee awards under EAJA (except those involving independent agencies), even when the plaintiff has named an agency like HUD as the defendant and has clearly challenged a specific agency action as unreasonable. This interpretation would render largely superfluous the 1985 amendment, in which Congress made clear that the "position of the United States" includes more than the arguments advanced in the briefs; it includes also the "action or failure to act . . . upon which the civil action is based." 28 U.S.C. § 2412(d)(2)(D).

Our view that the regulating agency, and not DOJ, would constitute the agency subject to a fee award is consistent with fee-shifting principles and fee-shifting statutes that govern private litigation, which generally impose fee awards on the parties to the lawsuits, not on the lawyers who represent them.[9] Indeed, parties

---

[8] We need not address whether our conclusion would be any different in a case in which DOJ attorneys engaged in acts of litigation misconduct or advanced a legal argument contrary to the views of the agency involved. We understand that there was no such disagreement or misconduct in this case.

[9] Some fee-shifting statutes specifically identify the party responsible for the fee award. *See, e.g.*, 29 U.S.C. § 2617(a)(3) (2000) (Family and Medical Leave Act) ("The court in such an action shall, in addition to any judgment awarded to the plaintiff, allow a reasonable attorney's fee, reasonable expert witness fees, and other costs of the action *to be paid by the defendant*.") (emphasis added); 42 U.S.C. § 2000e-5(k) (2000) (Title VII) ("In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee (including expert fees) as part of the costs, and *the Commission and the United States shall be liable for costs the same as a private person*.") (emphasis added). Others speak

Case 1:16-cv-01068-KBJ   Document 22-13   Filed 10/27/17   Page 15 of 15
Case #24-5163     Document #2080945        Filed: 10/18/2024     Page 194

*Opinions of the Office of Legal Counsel in Volume 31*

bear responsibility for fee awards in the same manner that they do for judgments. It is the exceptional circumstance when a statute or rule specifically identifies that counsel, in addition to the litigant, may be responsible for sanctions or fees.[10] DOJ's authority to direct litigation in the federal courts may provide it with somewhat greater control over the "position of the United States" than a typical attorney would have over the position of the client, yet we see no basis in EAJA to suggest that Congress intended to adopt a novel rule, where counsel would be subject to liability based upon a good faith defense of the position of their clients. Rather, we believe that EAJA, by providing that the fees shall be paid by the "agency over which the party prevails," provides that the responsible agency— whether or not named as a party adverse to the prevailing party—would be the agency that functions as the relevant adversary for fee-shifting purposes, because the litigation implicates its regulatory interests and challenges the agency's actions or policies.[11]

### III.

For the reasons given, we conclude that HUD constitutes the agency over which the *Cienega Gardens* plaintiffs prevailed under EAJA. Because EAJA provides for payment, the Judgment Fund is not available and, therefore, the award must come out of HUD appropriations.

STEVEN A. ENGEL
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

in terms of the "prevailing party," but the fee judgment falls on the losing party, not the losing party's counsel. *See, e.g.*, 15 U.S.C. § 1117(a) (2000) (Lanham Act) ("The court in exceptional cases may award reasonable attorney fees to the prevailing party.").

[10] *See, e.g.*, Fed. R. Civ. P. 37(a)(4)(A) (providing in discovery that "the court shall, after affording an opportunity to be heard, require the party or deponent whose conduct necessitated the motion or the party or attorney advising such conduct or both of them to pay to the moving party the reasonable expenses incurred in making the motion, including attorney's fees").

[11] We note that our view does not mean that DOJ could never be the "agency over which the party prevails." A different case would be presented if DOJ's own actions or policies were challenged in the litigation. *See* Memorandum for Stephen R. Colgate, Assistant Attorney General, Justice Management Division, from Richard Shiffrin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Payment of Attorney's Fees Under the Equal Access to Justice Act* (Aug. 25, 1994) (acknowledging DOJ's responsibility to pay EAJA fee award where DOJ had intervened in bankruptcy litigation to challenge, unsuccessfully, the constitutionality of the Bankruptcy Amendments and Federal Judgeship Act of 1984).

# Amended Complaint

# Exhibit M

# Constitutionality of the Direct Reporting Requirement in Section 802(e)(1) of the Implementing Recommendations of the 9/11 Commission Act of 2007

Section 802(e)(1) of the Implementing Recommendations of the 9/11 Commission Act of 2007 does not prohibit DHS or OMB officials from reviewing, in accordance with established Executive Branch review and clearance procedures, the DHS Chief Privacy Officer's draft section 802 reports before the reports are transmitted to Congress.

Section 802(e)(1) is best interpreted not to prohibit DHS and OMB officials from commenting on a draft CPO report where the CPO is permitted to, and in fact does, transmit to Congress a final report that does not reflect the comments or amendments from such officials.

Section 802(e)(1)'s direct reporting requirement need not be enforced in circumstances where its application would require the CPO to ignore the results of the President's review, through DHS and OMB, of a particular report. In such circumstances, the statute must yield to the President's exercise of his constitutional authority to supervise subordinate Executive Branch officers and their communications with Congress.

January 29, 2008

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
OFFICE OF MANAGEMENT AND BUDGET
AND THE ACTING GENERAL COUNSEL
DEPARTMENT OF HOMELAND SECURITY

You have asked for our opinion regarding the constitutionality of section 802(e)(1) of the Implementing Recommendations of the 9/11 Commission Act of 2007, Pub. L. No. 110-53, 121 Stat. 266, 360 (2007) (codified at 6 U.S.C. § 142 (Supp. I 2007)) (the "Act" or "9/11 Act"). Section 802(e)(1) provides, in relevant part, that the Chief Privacy Officer ("CPO") of the Department of Homeland Security ("DHS" or "the Department") must submit reports "directly to the Congress . . . without any prior comment or amendment by the Secretary, Deputy Secretary, or any other officer or employee of the Department or of the Office of Management and Budget" ("OMB"). 6 U.S.C. § 142(e)(1). Specifically, you have asked whether we read section 802(e)(1) to prohibit DHS and OMB personnel from reviewing, commenting upon, or amending the CPO's reports and, if so, whether such prohibitions are constitutional.[1]

We conclude, first, that section 802(e)(1) does not prohibit DHS or OMB personnel from reviewing, in accordance with established Executive Branch review

---

[1] *See* Letter for Steven G. Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from Gus P. Coldebella, Acting General Counsel, Department of Homeland Security (Nov. 6, 2007); Letter for Steven G. Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from Jeffrey A. Rosen, General Counsel, Office of Management and Budget (Sept. 25, 2007).

**JA 190**

Case 1:16-cv-01068-KBJ Document 22-14 Filed 10/27/17 Page 3 of 21
Case #24-5163 Document #2080945 Filed: 10/18/2024 Page 197

*Opinions of the Office of Legal Counsel in Volume 32*

and clearance procedures, the CPO's section 802 reports before the reports are finalized and transmitted to Congress. The plain text of section 802(e)(1) concerns only the transmittal of reports that have been commented upon or amended by DHS or OMB officials; it does not purport to bar "review" of draft reports by such officials. Furthermore, any reading of the statute that would foreclose such review must be avoided if at all possible because of the serious constitutional issue that would arise if the statute were interpreted to interfere with the President's ability to supervise the work of the CPO through review of the CPO's draft reports by the Secretary of Homeland Security and the Director of OMB. Based upon the same principle of constitutional avoidance, we conclude, second, that the statute must be read not to prohibit DHS and OMB officials from commenting upon a draft report where, consistent with the supervisory review process, the CPO is permitted to, and in fact does, transmit to Congress a final report that does not reflect the comments or amendments suggested by those officials. Third, we conclude, however, that where supervisory review by the President, through the Secretary or the Director of OMB, results in comments or amendments on a draft report by DHS or OMB personnel, the CPO must be allowed to consider and incorporate those comments and amendments in the final report in the manner contemplated by the review. If section 802(e)(1) were applied to prevent the CPO from doing so, the statute would substantially frustrate the President's exercise of his constitutional authority to supervise the actions of a subordinate executive officer (the CPO) and to supervise the content, and particularly any classified or privileged content, of official Executive Branch communications with Congress. To the extent section 802(e)(1)'s application would purport to require that result, section 802(e)(1) would be unconstitutional.

As discussed more fully below, the constitutional grounds for these conclusions are well settled and have been long recognized by all three branches. For decades, the Executive Branch has consistently objected to direct reporting requirements similar to the one at issue here on the ground that such requirements infringe upon the President's constitutional supervisory authority over Executive Branch subordinates and information. The Supreme Court and Congress have also acknowledged and respected this supervisory authority as a fundamental part of our system of government. These precedents from all three branches, and the constitutional principles they recognize, inform our conclusion that the terms of section 802(e)(1) must yield to the extent their application would interfere with the President's constitutional authority to comment upon or amend, through his subordinates at DHS or OMB, a CPO report before the report is transmitted to Congress.[2]

---

[2] If DHS establishes a policy of declining to enforce section 802(e)(1) on the constitutional grounds set forth in this opinion, DHS should report that decision to Congress as required by statute. *See* 28 U.S.C. § 530D(a)(1)(A)(i), (b), (e) (Supp. V 2005) (establishing a 30-day deadline for Executive

Case 1:16-cv-01068-KBJ   Document 22-14   Filed 10/27/17   Page 4 of 21
Case #24-5163     Document #2080945        Filed: 10/18/2024     Page 198

*Constitutionality of Direct Reporting Requirement in Section 802(e)(1) of 9/11 Act*

## I.

Congress created the position of the DHS Chief Privacy Officer in the Homeland Security Act of 2002, Pub. L. No. 107-296, § 222, 116 Stat. 2135, 2155 (2002) (codified as amended at 6 U.S.C. § 142 (Supp. V 2005)) ("HSA"). The HSA established the CPO as a "senior official" with significant operational and policy responsibilities who is appointed by, and reports directly to, the Secretary. 6 U.S.C. § 142(a)(1)–(5) (Supp. I 2007).

The 9/11 Act expands the CPO's policymaking authority and permits the CPO to investigate possible violations of privacy laws and programs in a manner consistent with the CPO's status as a senior Executive Branch official who is accountable to the President. 6 U.S.C. § 142(a)–(d) (Supp. I 2007). The provisions of the Act granting the CPO investigative authority contemplate that the CPO will have access to internal Department and Executive Branch information. *Id.* § 142(b)(1)(A). The Act also provides that in reviewing such information and in discharging his investigative and policymaking responsibilities, the CPO "shall report to, and be under the general supervision of, the Secretary." *Id.* § 142(c)(1)(A). Further, the Act states that the CPO's exercise of the statute's new grant of subpoena authority is "subject to the approval of the Secretary," *id.* § 142(b)(1)(C), and that the CPO's investigative authority is subordinate to that of the Department's Inspector General, *id.* § 142(c)(2)(B)(i).

The reporting requirements in section 802(e) were enacted as part of the 9/11 Act provisions that expanded the CPO's statutory authority as outlined above. The House version of the bill (H.R. 1, 110th Cong.) included the direct reporting provision in section 802(e)(1) as part of a broader amendment that would have permitted the CPO to issue and enforce subpoenas without the Secretary's approval, and that would have given the CPO a five-year term of office. The Administration specifically objected to these and other provisions of H.R. 1 in its comments on the bill. *See* Statement of Administration Policy on H.R. 1 (Jan. 9, 2007). The Senate subsequently amended H.R. 1 to remove the provisions granting the CPO independent subpoena authority and a five-year term, but did not alter the direct reporting language. *See* S. 4, 110th Cong. § 503 (as reported in Senate, Mar. 13, 2007). Emphasizing the Senate bill's recognition of the CPO as a senior Executive Branch policy officer, the Administration reiterated its constitu-

---

Branch departments to submit to "Congress a report of any instance in which" they "establish[] or implement[] a formal or informal policy to refrain from enforcing, applying, or administering any provision of any Federal statute . . . on the grounds that such provision is unconstitutional").

Editor's Note: On March 4, 2008, the Secretary of Homeland Security sent a letter report to Congress pursuant to 28 U.S.C. § 530D in which the Department of Homeland Security disclosed and explained its decision to implement a non-enforcement policy regarding section 802(e)(1) of the 9/11 Act based on the legal advice in this memorandum.

Case 1:16-cv-01068-KBJ   Document 22-14   Filed 10/27/17   Page 5 of 21
Case #24-5163     Document #2080945          Filed: 10/18/2024      Page 199

*Opinions of the Office of Legal Counsel in Volume 32*

tional objection to the bill's direct reporting provision, which was then designated as section 503 of S. 4. *See* Statement of Administration Policy on S. 4 (Feb. 28, 2007). The Senate did not amend the provision, however, and the Senate-passed version was included in the enrolled bill as section 802(e)(1). The President signed the Act on August 3, 2007.[3]

As provided in section 802, the CPO is responsible for investigating and ensuring departmental compliance with federal privacy laws and programs, and has policymaking authority over departmental policies as well as regulatory and legislative proposals for the collection, use, and disclosure of personal information by the federal government generally. *See* 6 U.S.C. § 142(a)–(d). Section 802(e) requires the CPO to prepare an annual report to Congress that addresses the CPO's areas of statutory and policymaking responsibility, including "activities of the Department that affect privacy, complaints of privacy violations, implementation of the Privacy Act of 1974, internal controls, and other matters." *Id.* § 142(a)(6), (e). The direct reporting provision at issue here, section 802(e)(1), provides that the CPO "shall":

> submit reports directly to the Congress regarding performance of the responsibilities of the senior official under this section [the CPO], without any prior comment or amendment by the Secretary, Deputy Secretary, or any other officer or employee of the Department or the Office of Management and Budget[.]

*Id*. § 142(e)(1).

You have asked whether section 802(e)(1) must be interpreted, and, if so, whether it may constitutionally be applied, (1) to prohibit DHS and OMB officials from reviewing a draft report before it is finalized and transmitted to Congress, (2) to prohibit those officials from offering comments upon a draft report even if the comments will not be incorporated or reflected in the final report to Congress, and (3) to prohibit the CPO from considering and actually incorporating into the final report DHS or OMB comments and amendments in the manner contemplated by the President's supervisory review process.

---

[3] It is well settled that Presidents may "'approve legislation containing parts which are objectionable on constitutional grounds.'" *Presidential Authority to Decline to Execute Unconstitutional Statutes*, 18 Op. O.L.C. 199, 202 (1994) (quoting *INS v. Chadha*, 462 U.S. 919, 942 n.13 (1983), and citing authorities dating back to the 1940s for the proposition that "the President's signing of a bill does not affect his authority to decline to enforce constitutionally objectionable provisions thereof").

*Constitutionality of Direct Reporting Requirement in Section 802(e)(1) of 9/11 Act*

## II.

### A.

Section 802(e)(1) is not fairly read to prohibit the CPO from submitting his draft reports for review by DHS and OMB officials before the reports are finalized and transmitted to Congress. The statute refers only to "prior comment or amendment by" DHS and OMB officials; it does not by its terms address any "review" of the draft reports by these officials. Thus, the plain language of the statute permits the CPO to share his draft report with others at DHS, including the Secretary, and to submit it for prior review to OMB, including in accordance with the established OMB clearance process that applies to Executive Branch communications to Congress relating to legislation or legislative proposals. *See* OMB Circular No. A-19, *Legislative Coordination and Clearance* (Sept. 20, 1979).[4]

Interpreting section 802(e)(1) consistent with its text to permit review of draft CPO reports by DHS and OMB officials is also compelled by the principle that statutes must be construed whenever reasonably possible to avoid raising a serious constitutional question. *See Solid Waste Agency of N. Cook Cty. v. Army Corps of Eng'rs*, 531 U.S. 159, 160 (2001). Article II of the Constitution vests the executive power in the President, and makes clear that he may rely upon, and bears responsibility for the conduct of, executive officers who stand subordinate to him. The President cannot fully and effectively discharge his constitutional responsibilities if Congress may, by statute, interfere with his ability to supervise the actions of such officers, especially their communications with Congress. Accordingly, we have long recognized that statutes that interfere with the President's ability to supervise, directly or through subordinate officials, the Executive Branch's communications with Congress raise serious constitutional concerns. *See, e.g.*, *Authority of the Special Counsel of the Merit Systems Protection Board to Litigate*

---

[4] We understand that reports to Congress like those contemplated by section 802(e) ordinarily would be submitted to OMB for review and clearance, and that both OMB and DHS agree that the CPO's reports are subject to the requirements of Circular A-19. Circular A-19 applies, among other things, to "any comment or recommendation on pending legislation included in an agency's annual or special report," *id.* ¶ 5(e), and the CPO's reports must address the CPO's responsibilities under the Act, which include "evaluating legislative and regulatory proposals involving collection, use, and disclosure of personal information by the Federal Government," 6 U.S.C. § 142(a)(3) (Supp. I 2007). Although Circular A-19 excepts from the OMB clearance process "agencies that are specifically required by law to transmit their legislative proposals, reports, or testimony to the Congress without prior clearance," *id.* ¶ 4, this exception applies only to particular independent regulatory agencies that are subject to an agency-wide statutory exemption from Executive Branch clearance procedures, not to subordinate officers within a department or agency like the CPO. *See, e.g.*, 2 U.S.C. § 437d(d) (2000) (requiring Federal Election Commission to transmit budget estimates, legislative proposals, and testimony to Congress concurrently with their submission to the President or OMB); 7 U.S.C. § 2(a)(10) (Supp. V 2005) (same for Commodity Futures Trading Commission); 15 U.S.C. § 2076(k) (2000) (same for Consumer Product Safety Commission).

*Opinions of the Office of Legal Counsel in Volume 32*

*and Submit Legislation to Congress*, 8 Op. O.L.C. 30, 31 (1984) ("*MSPB*") (legislation requiring an Executive Branch officer to submit budget proposals and bill comments directly to Congress represents an "unconstitutional intrusion by the Legislative Branch into the President's exclusive domain of supervisory authority over subordinate officials in the performance of their executive functions"). We therefore read statutes to avoid such interference "unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. and Constr. Trades Council*, 485 U.S. 568, 575 (1988); *see generally MSPB*, 8 Op. O.L.C. at 34–38 (invoking this principle and the President's constitutional authority to supervise both Executive Branch subordinates and their communications with Congress in refusing to construe a statutory provision to "preclude Presidential review of [a subordinate executive officer's] proposed legislative recommendations prior to their submission to Congress"). We see nothing in section 802(e)(1)'s text, or in the legislative history of the CPO provisions of the 9/11 Act, that reveals a clear and unambiguous intent by Congress to preclude simple review of the CPO's draft reports by officials in DHS or OMB (as distinct from the transmittal to Congress of reports that reflect comments or amendments by such officials).

**B.**

Having concluded that section 802(e)(1) does not prevent DHS or OMB from reviewing the CPO's reports before they are transmitted to Congress, we next consider whether the statute is best interpreted to prohibit DHS or OMB officials from commenting upon a draft report even where, at the end of the supervisory review process, the CPO is permitted to, and in fact does, transmit a final report to Congress that does not reflect any comments or amendments by such officials. Based upon the same principle of constitutional avoidance discussed above, we conclude that section 802(e)(1) is best read not to prohibit DHS and OMB from offering comments on a draft report where those comments are not reflected in the final report as transmitted.

It appears reasonably clear from the face of the statute that Congress was most concerned in section 802(e)(1) with preventing the CPO from transmitting to Congress reports that have been revised pursuant to comments and suggestions made by officials in DHS and OMB. That intent is suggested by the statute's focus on the requirement to "submit" the report "directly" to Congress without any "prior comment or amendment" by such officials. Although the statute could be read more broadly to prohibit the transmittal of any report that has been the subject of any comment by DHS or OMB officials, even where the final report itself does not in any way reflect those comments, such a broad reading is not compelled by the plain text of the statute. We take it that Congress is most interested in the substance of the report submitted by the CPO, and the central purpose of the

**JA 195**

*Constitutionality of Direct Reporting Requirement in Section 802(e)(1) of 9/11 Act*

statute is attempting to ensure that the substance of the report reflects the views of the CPO, rather than the views of other officials in DHS or at OMB.

In light of the ambiguity in the statute, we believe the canon of constitutional avoidance requires an interpretation that will avoid raising a serious conflict with the President's constitutional authority to supervise, through review and comment by the President's subordinates at DHS and OMB, the work of the CPO and the content of his communications to Congress. *See MSPB*, 8 Op. O.L.C. at 34–38; *Solid Waste Agency*, 531 U.S. at 160. Accordingly, where the President's supervisory review permits the CPO to transmit a final report to Congress that does not reflect suggested comments or amendments by DHS or OMB personnel, we believe that the statute is best interpreted to permit both the review and the suggested comments.

## C.

The remaining question is whether section 802(e)(1) would be constitutional if applied to prohibit the CPO from incorporating into his report comments and amendments made by DHS and OMB officials, acting in the exercise of the President's supervisory authority, where their supervisory review contemplates that the CPO will accommodate their comments and amendments in the final version of the report to Congress. We conclude that applying section 802(e)(1) to require the CPO to reject the results of the President's review of a report in such circumstances would substantially conflict with two aspects of the President's constitutional authority: the President's authority to supervise subordinate Executive Branch officers and the President's authority to protect against the unauthorized disclosure of constitutionally privileged information. This Office has for decades consistently advised that where applying a statutory provision would give rise to one or both of these serious constitutional conflicts, the Executive Branch need not enforce the provision.

## 1.

If applied in the manner described above, section 802(e)(1)'s directive that the CPO submit reports to Congress "without any prior comment or amendment" by DHS or OMB would interfere directly with the President's constitutional authority to supervise subordinate Executive Branch officers. The Supreme Court recognized the Constitution's vesting of this power in the President more than two centuries ago. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 165–66 (1803) (recognizing that the President has constitutional authority to exercise certain executive powers without interference from other branches whether he exercises those powers directly or through subordinate "officers, who act by his authority and in conformity with his orders"). Since *Marbury*, all three branches have recognized the President's constitutional authority to supervise certain Executive

**JA 196**

*Opinions of the Office of Legal Counsel in Volume 32*

Branch officers without interference from the other branches. These precedents, which we discuss below, include the Supreme Court's 1988 decision in *Morrison v. Olson* as well as decades of congressional and Executive Branch decisions. These precedents support the conclusion that statutory reporting requirements cannot constitutionally be applied to interfere with presidential supervision and control of the communications that Executive Branch officers such as the CPO send to Congress.

The constitutional authority in question was first recognized by the Supreme Court in cases involving statutory attempts to limit the President's supervision of executive officers by restricting his ability to remove them. In 1926, the Supreme Court, citing *Marbury*, elaborated on the President's constitutional authority to exercise the ultimate form of supervision—at will removal—over certain Executive Branch officers without legislative interference. *See Myers v. United States*, 272 U.S. 52 (1926). *Myers* held that a statutory "provision of the law of 1876, by which the unrestricted power of removal of first class postmasters is denied to the President, is in violation of the Constitution and invalid." *Id.* at 176. The Court based this conclusion on Article II, which "grants to the President the executive power of the Government, i.e., the general administrative control of those executing the laws." *Id.* at 163–64. The Court explained:

> If there is a principle in our Constitution, indeed in any free Constitution, more sacred than another, it is that which separates the Legislative, Executive and Judicial powers. If there is any point in which the separation of the Legislative and Executive powers ought to be maintained with great caution, it is that which relates to officers and offices.
>
> . . . .
>
> The ordinary duties of officers prescribed by statute come under the general administrative control of the President by virtue of the general grant to him of the executive power, and he may properly supervise and guide their construction of the statutes under which they act in order to secure that unitary and uniform execution of the laws which Article II of the Constitution evidently contemplated in vesting general executive power in the President alone.
>
> . . . .
>
> [T]o hold otherwise would make it impossible for the President, in case of political or other difference with the Senate or Congress, to take care that the laws be faithfully executed.

*Id.* at 116, 135, 164.

**JA 197**

Case 1:16-cv-01068-KBJ   Document 22-14   Filed 10/27/17   Page 10 of 21
Case #24-5163      Document #2080945         Filed: 10/18/2024      Page 204

*Constitutionality of Direct Reporting Requirement in Section 802(e)(1) of 9/11 Act*

Since the Court decided *Myers* in 1926, it has, on a case-by-case basis, upheld some legislative limits (specifically, statutory removal restrictions) on the President's ability to supervise certain types of officers. *See, e.g.*, *Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935); *Wiener v. United States*, 357 U.S. 349 (1958); *Morrison v. Olson*, 487 U.S. 654 (1988). Importantly, however, none of these cases involved an effort by Congress to constrain the President's ability to supervise—through removal or otherwise—Executive Branch officers who, like the CPO, possess broad operational and policymaking responsibility for core Executive Branch functions.

*Humphrey's Executor* and *Wiener* upheld legislative limits on the President's ability to supervise, through removal, officers who served on "independent" commissions and performed, in the Court's words, "quasi-judicial" and "quasi-legislative" functions. *Humphrey's Ex'r*, 295 U.S. at 624, 628 (upholding removal restrictions on members of an independent agency (the Federal Trade Commission) that could not "be characterized as an arm or eye of the executive"); *Wiener*, 357 U.S. at 352 (1958) (upholding removal restrictions on War Claims Commission members charged with "adjudicatory" functions). The Court has since declared that these decisions do not undermine the constitutional analysis in *Myers* of the President's supervisory authority over Executive Branch officers such as the CPO. *See, e.g.*, *Bowsher v. Synar*, 478 U.S. 714, 725 (1986) (in upholding "the power of Congress to limit the President's powers of removal of a Federal Trade Commissioner" in *Humphrey's Executor*, the Court "distinguished *Myers*, reaffirming its holding that congressional participation in the removal of executive officers is unconstitutional").

The same is true of the Court's decision in *Morrison v. Olson*. Although *Morrison*, unlike *Humphrey's Executor* and *Wiener*, upheld removal restrictions on an officer (the independent counsel then authorized by the independent counsel provisions of the Ethics in Government Act, which are no longer in effect) who did perform a clearly executive function (the investigation and prosecution of unlawful conduct), the decision makes clear that its analysis does not extend to the President's supervisory authority over Executive Branch officers who, like the CPO, have policymaking and other broad operational responsibility for Executive Branch functions. In upholding the relevant statute's "for cause" limits on the President's ability to remove an independent counsel, the Court emphasized that the independent counsel in question occupied a unique office characterized by "limited jurisdiction and tenure and lacking [the] policymaking or significant administrative authority" typically associated with Executive Branch officials. *Morrison*, 487 U.S. at 691. Having thus distinguished an independent counsel under the Ethics in Government Act from officers such as the CPO, the Court expressly reaffirmed the "undoubtedly correct" determination in *Myer*s that "there are some 'purely executive' officials who must be removable by the President at will if he is to 'be able to accomplish his constitutional role." *Id.* at 690 (quoting *Myers*, 272 U.S. at 132–34).

Case 1:16-cv-01068-KBJ   Document 22-14   Filed 10/27/17   Page 11 of 21
Case #24-5163    Document #2080945    Filed: 10/18/2024    Page 205

*Opinions of the Office of Legal Counsel in Volume 32*

Although the Court has not had occasion (presumably for justiciability reasons) to opine on the constitutionality of statutory direct reporting requirements per se, the political branches have long recognized that statutes imposing such requirements merit the same constitutional analysis as statutes that impose removal restrictions on Executive Branch officers. The reason is that both types of statutes interfere with the President's constitutional authority to supervise the Executive Branch subordinates he relies upon to discharge his Article II functions. We have consistently cited this constitutional authority before and after *Morrison* in objecting to statutory reporting requirements functionally identical to section 802(e)(1).

In 1977, for example, the Department objected to a draft bill that would have required inspectors general to submit reports "directly to Congress without clearance or approval by the agency head or anyone else in the executive branch" as an impermissible legislative interference with the President's Article II right of "general administrative control" over executive officials, a presidential power that necessarily "includes the right to coordinate and supervise all replies and comments from the executive branch to Congress." *Inspector General Legislation*, 1 Op. O.L.C. 16, 17–18 (1977). Congress responded by deleting the offending provision, and acknowledged the Administration's separation of powers concerns in the bill's legislative history. *See Establishment of Offices of Inspector and Auditor General in Certain Executive Departments and Agencies*, S. Rep. No. 95-1071, at 9, *reprinted in* 1978 U.S.C.C.A.N. 2676, 2684 ("[T]he Committee has deleted certain features of the earlier inspector general legislation which carried the greatest potential for tension between the inspector general and the agency head, and the executive and legislative branches.").

In 1982, we raised the same constitutional objection to a statutory provision that purported to require the Administrator of the Federal Aviation Administration to submit budget estimates and comments on legislative proposals concurrently to Congress and the President. *See Constitutionality of Statute Requiring Executive Agency to Report Directly to Congress*, 6 Op. O.L.C. 632, 641 (1982) ("*Constitutionality of Direct Reporting*"). Although we acknowledged that the text of the relevant provision "could be read to require the Administrator to submit any budget information or legislative comments directly to Congress prior to any approval or even review by the Administrator's superiors," *id.* at 639, we explained that such reporting would be "entirely inconsistent with the separation of powers" and with "the corollary right of the President to control his subordinates within the Executive Branch." *Id.* at 639–40. Accordingly, in keeping with the canon of constitutional avoidance, we interpreted the statute to apply only to final documents, thereby permitting the Administrator's superiors in the Executive Branch to review and edit preliminary drafts of the relevant reports and proposals. *See id.* at 640–41.

**JA 199**

*Constitutionality of Direct Reporting Requirement in Section 802(e)(1) of 9/11 Act*

In 1984, we similarly advised that a statute authorizing the Special Counsel of the Merit Systems Protection Board—"an Executive Branch officer subject to the supervision and control of the President"—to submit budget proposals and bill comments directly to Congress represented an "unconstitutional intrusion by the Legislative Branch into the President's exclusive domain of supervisory authority over subordinate officials in the performance of their executive functions." *MSPB*, 8 Op. O.L.C. at 31, 35–36 (concluding that legislation that would "require an Executive Branch officer to submit budget information and legislative recommendations directly to Congress, prior to their being reviewed and cleared by the President or another appropriate reviewing official, would constitute precisely the kind of interference in the affairs of one Branch by a coordinate Branch which the separation of powers was intended to prevent").

In 1988, we reiterated this constitutional analysis in objecting (as we did in 1977) to a proposal to add a direct reporting requirement in the Inspector General Act. *See* Memorandum for Thomas M. Boyd, Acting Assistant Attorney General, Office of Legislative Affairs, from John O. McGinnis, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: H.R. 3049; H.R. 3285; H.R. 2126* (Apr. 22, 1988) (enclosing draft letters for Representative Morris K. Udall, Chairman, Subcommittee on Energy and the Environment, Committee on Interior and Insular Affairs). As in 1977, Congress deleted the offending provision from the bill, which was enacted four months after the Supreme Court decided *Morrison v. Olson*. *See* Inspector General Act Amendments of 1988, Pub. L. No. 100-504, § 102(f), 102 Stat. 2515 (Oct. 18). At approximately the same time we objected to the Inspector General Act proposal, we concluded that a "[s]tatutory provision requiring the Director of the Centers for Disease Control to distribute an AIDS information pamphlet to the public 'without necessary clearance of the content by any official, organization or office' violate[d] the separation of powers by unconstitutionally infringing upon the President's authority to supervise the executive branch." *Statute Limiting the President's Authority to Supervise the Director of the Centers for Disease Control in the Distribution of an AIDS Pamphlet*, 12 Op. O.L.C. 47, 47 (1988).

We continued to apply the constitutional analysis underlying the foregoing precedents after the Supreme Court decided *Morrison* in June 1988 because we concluded that *Morrison* does not affect the analysis of constitutional limits on statutory restrictions of the President's ability to supervise—through removal or otherwise—Executive Branch officers like the CPO. *See, e.g.*, *The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124, 169 (1996) ("*Constitutional Separation of Powers*") (concluding that "restrictions on the President's power to remove officers with broad policy responsibilities" should continue to "be deemed unconstitutional" after *Morrison* because the "*Morrison* Court had no occasion to consider the validity of removal restrictions affecting principal officers, officers with broad statutory responsibilities, or officers involved in executive branch policy formulation," and *Morrison* expressly

Case 1:16-cv-01068-KBJ   Document 22-14   Filed 10/27/17   Page 13 of 21
Case #24-5163    Document #2080945        Filed: 10/18/2024    Page 207

*Opinions of the Office of Legal Counsel in Volume 32*

affirmed that *Myers* "was undoubtedly correct . . . in its broader suggestion that there are some 'purely executive' officials who must be removable by the President at will if he is to be able to accomplish his constitutional role").

In 1989, we advised the general counsels of the Executive Branch that concurrent reporting requirements offend the separation of powers and "infringe upon the President's authority as head of a unitary executive to control the presentation of the executive branch's views to Congress." *Common Legislative Encroachments on Executive Branch Authority*, 13 Op. O.L.C. 248, 255 (1989) ("*Common Legislative Encroachments*").

In 1996, we similarly advised that "concurrent reporting requirements" clearly implicate "the President's performance of his constitutionally assigned functions" and "impair the Constitution's great principle of unity and responsibility in the Executive department." *Constitutional Separation of Powers*, 20 Op. O.L.C. at 174–75 (internal quotation marks and citations omitted).[5]

In 1998, the Department notified Congress that a proposed reporting requirement virtually identical to section 802(e)(1) should be removed from a bill because the provision "would interfere with the President's control over the executive branch and with his legitimate interest in overseeing the presentation of the executive branch's views to Congress." Letter for William V. Roth, Chairman, Committee on Finance, United States Senate, and Bill Archer, Chairman, Committee on Ways and Means, United States House of Representatives, from L. Anthony Sutin, Acting Assistant Attorney General, Office of Legislative Affairs at 4 (June 8, 1998).

In 2000, we raised similar separation of powers objections to a direct reporting requirement in the Medicare Rx Act, *see* Memorandum for Robert Raben, Assistant Attorney General, Office of Legislative Affairs, from Evan H. Caminker, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: H.R. 4680—Medicare Rx 2000 Act* (June 26, 2000), and Congress ultimately removed the provision from the legislation, *see* Pub. L. No. 108-173, 117 Stat. 2066 (2003).[6]

---

[5] Some might argue that our conclusions with respect to section 802(e)(1) are inconsistent with the suggestion in our 1996 opinion that "courts . . . might uphold the validity of a concurrent reporting requirement imposed for a legitimate congressional purpose on a specific agency with limited, domestic, and purely statutory duties." 20 Op. O.L.C. at 175. We disagree. In making this statement, the 1996 opinion was making an observation about how courts "might" view such a requirement with respect to agencies whose duties differ substantially from those of DHS. The opinion did not endorse the constitutionality of concurrent reporting requirements with respect to these or any other agencies. To the contrary, the opinion concluded, quoting *Myers*, that direct reporting requirements "impair the Constitution's 'great principle of unity and responsibility in the Executive department.'" *Id.*

[6] The original bill to which the Administration objected died in the Senate, but the legislation was reconsidered in the 107th Congress, *see Medicare Modernization and Prescription Drug Act of 2002*, H.R. Rep. No. 107-539 (2002), and was enacted without the objectionable provision, *see* Pub. L. No. 108-173, 117 Stat. 2066 (2003).

Case 1:16-cv-01068-KBJ   Document 22-14   Filed 10/27/17   Page 14 of 21
Case #24-5163     Document #2080945          Filed: 10/18/2024      Page 208

*Constitutionality of Direct Reporting Requirement in Section 802(e)(1) of 9/11 Act*

And, in 2004, we issued two opinions in which we concluded that two different statutory provisions, if construed or enforced to permit Executive Branch officers to communicate directly with Congress without appropriate supervision by the President or his subordinates, would violate the constitutional separation of powers and, specifically, the President's Article II authority to supervise Executive Branch personnel. *See Authority of HUD's Chief Financial Officer to Submit Final Reports on Violations of Appropriations Laws*, 28 Op. O.L.C. 248, 252–53 (2004) ("*Authority of HUD's CFO*"); *Authority of Agency Officials to Prohibit Employees from Providing Information to Congress*, 28 Op. O.L.C. 79, 80–82 (2004) ("*Authority of Agency Officials*"). These opinions, like their predecessors, applied the same settled reasoning we follow here:

> The [judicial] decisions and the long practical history concerning the right of the President to protect his control over the Executive Branch are based on the fundamental principle that the President's relationship with his subordinates must be free from certain types of interference from the coordinate branches of government in order to permit the President effectively to carry out his constitutionally assigned responsibilities. The executive power resides in the President, and he is obligated to take care that the laws are faithfully executed. In order to fulfill those responsibilities, the President must be able to rely upon the faithful service of subordinate officials. To the extent that Congress or the courts interfere with the President's right to control or receive effective service from his subordinates within the Executive Branch, those other branches limit the ability of the President to perform his constitutional function.

*Authority of HUD's CFO*, 28 Op. O.L.C. at 252 (internal quotation marks and citations omitted).

**2.**

The constitutional authorities outlined above lead to the conclusion that section 802(e)(1) would be unconstitutional if applied to prevent the CPO from incorporating into his final report comments and amendments suggested by the President's review of the report through the President's subordinates at DHS and OMB. The very statute that contains section 802(e)(1) establishes the CPO as a subordinate officer accountable to the Secretary and ultimately to the President, and vests the CPO with a broad range of policymaking and operational authority within the Executive Branch. 6 U.S.C. § 142(a)–(c) (Supp. I 2007). Section 802 expressly designates the CPO as the "senior official in the Department" who has "primary responsibility for privacy policy," which includes responsibility for "assuring" departmental compliance with "privacy protections," particularly those contained in the information handling requirements of the Privacy Act of 1974, as well as

Case 1:16-cv-01068-KBJ   Document 22-14   Filed 10/27/17   Page 15 of 21
Case #24-5163      Document #2080945         Filed: 10/18/2024      Page 209

*Opinions of the Office of Legal Counsel in Volume 32*

responsibility for "evaluating legislative and regulatory proposals involving collection, use, and disclosure of personal information by the Federal Government." 6 U.S.C. § 142(a)(1)–(3). Additional provisions in section 802 further vest the CPO with broad authority to coordinate the implementation of "programs, policies, and procedures involving civil rights, civil liberties, and privacy considerations," *id*. § 142(a)(5), and with authority to investigate and report on, with "access to all records, reports, audits, reviews, documents, papers, recommendations, and other materials available to the Department," *id.* § 142(b)(1)(A), the "activities of the Department that affect privacy, including complaints of privacy violations, implementation of the Privacy Act of 1974, internal controls, and other matters," *id.* § 142(a)(5); *see also id.* § 142(a)(6), (b)–(c).

The CPO's responsibilities establish the CPO as the kind of Executive Branch officer with "broad statutory responsibilities" and "executive branch policy" authority that the Supreme Court "had no occasion to consider" in *Morrison*, *Constitutional Separation of Powers*, 20 Op. O.L.C. at 169, but who clearly falls within the class of "'purely executive' officials" over whom *Myers* concluded the President must be able to exercise full supervision in order to "accomplish his constitutional role." *Morrison*, 487 U.S. at 689 (quoting *Myers*, 272 U.S. at 132–34). The CPO is an executive officer who assists the President in performing functions—most notably the execution of statutes and the formulation of Executive Branch policy and legislative recommendations, *see* 6 U.S.C. § 142(a), (c)(1)(A), (d)—that lie at the core of the President's constitutional duties under Article II. *See Morrison*, 487 U.S. at 689–90; *Constitutional Separation of Powers*, 20 Op. O.L.C. at 169. For this reason, the Constitution requires that the President be able to supervise the CPO's activities, including and especially the CPO's communications with Congress, without legislative interference. *See, e.g.*, *Constitutionality of Direct Reporting*, 6 Op. O.L.C. at 633 ("The separation of powers requires that the President have ultimate control over subordinate officials who perform purely executive functions and assist him in the performance of his constitutional responsibilities. This power includes the right to supervise and review the work of such subordinate officials, *including the reports issued either to the public or to Congress*.") (emphasis added).

Section 802(e)(1) substantially interferes with the President's ability to exercise this constitutional authority to the extent it purports to bar the CPO from revising his report to reflect comments from the DHS or OMB officials through whom the President supervises the CPO and his reports. The fact that section 802(e)(1) expressly prohibits only comments or amendments by DHS and OMB officials, not comments by the President or other Executive Branch officials, does not change the constitutional analysis. It is well settled that the President must rely upon Executive Branch subordinates in order to "accomplish his constitutional role." *Morrison*, 487 U.S. at 690; *Myers*, 272 U.S. at 133; *Williams v. United States*, 42 U.S. (1 How.) 290, 297 (1842); *Constraints Imposed by 18 U.S.C. § 1913 on Lobbying Efforts*, 13 Op. O.L.C. 300, 306 n.12 (1989); *Opinion on*

Case 1:16-cv-01068-KBJ   Document 22-14   Filed 10/27/17   Page 16 of 21
Case #24-5163     Document #2080945          Filed: 10/18/2024     Page 210

*Constitutionality of Direct Reporting Requirement in Section 802(e)(1) of 9/11 Act*

*Relation of the President to the Executive Departments*, 7 Op. Att'y Gen. 453, 479 (1855). And it is similarly well settled that frustrating the President's ability to rely on his subordinates unconstitutionally interferes with the President's authority under Article II. *See Myers*, 272 U.S. at 132–34; *Morrison*, 487 U.S. at 689–90.

The President relies upon DHS and OMB not only to assist him in supervising the CPO and the CPO's reports to Congress, but also in exercising his constitutional authority over the matters the CPO's report addresses, most notably the execution of privacy laws and policies. In purporting to prohibit the CPO from incorporating DHS or OMB comments in his report, section 802(e)(1) directly interferes with the President's ability to supervise the manner in which the CPO— a subordinate who qualifies as the type of "purely executive officer" over whom the Supreme Court has said the President must retain full supervisory authority— reports to Congress on the Executive Branch's handling of matters (most notably the execution of privacy laws and the development of privacy policy and legislative proposals) for which the President is constitutionally responsible. Such interference is impermissible regardless of its purported oversight or other justifications. Broad though Congress's powers are, Congress may not exercise those powers "in ways that violate constitutional restrictions on its own authority or that invade the constitutional prerogatives of other branches." *Constitutionality of Proposed Statutory Provision Requiring Prior Congressional Notification For Certain CIA Covert Actions*, 13 Op. O.L.C. 258, 261 (1989). Because section 802(e)(1) would effect precisely such an invasion if applied to require the CPO to exclude from his report comments that the President's review, through DHS or OMB, contemplates be incorporated, we conclude that the Executive Branch need not enforce the provision in such circumstances.

**3.**

For the reasons set forth above, the conclusion that certain applications of section 802(e)(1) would interfere with the President's ability to supervise the CPO is constitutionally problematic regardless of Congress's justifications for the provision. We note, however, that even if it were appropriate for us to balance Congress's purported need for an unedited report against the degree to which section 802(e)(1)'s prohibition on editing would impair the President's Article II functions, we would conclude that Congress's asserted interest fails to justify the restrictions that section 802(e)(1) places on the President's authority. *Cf. Morrison*, 487 U.S. at 695 (balancing Congress's interest in restricting the President's ability to remove an independent counsel against the degree to which the re-

Case 1:16-cv-01068-KBJ   Document 22-14   Filed 10/27/17   Page 17 of 21
Case #24-5163   Document #2080945        Filed: 10/18/2024   Page 211

*Opinions of the Office of Legal Counsel in Volume 32*

strictions would "prevent the Executive Branch from accomplishing its constitutionally assigned functions").[7]

The 9/11 Act's text and legislative history do not establish any congressional need for direct reporting, much less that direct reporting "is demonstrably critical to the responsible fulfillment of [the requesting committee's] functions." *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974); *compare Morrison*, 487 U.S. at 693 (emphasizing that the challenged statutory limits on the President's removal authority were determined to be "essential, in the view of Congress, to establish the necessary independence of the office"). But even were we to assume that section 802(e)(1) serves a compelling congressional oversight need, applying the provision to preclude the CPO from incorporating DHS or OMB comments on a report would "unduly trammel[] executive authority" under the kind of balancing framework the Court employed in *Morrison*. The reason is that applying the provision in this manner would, unlike the removal restrictions in *Morrison*, interfere with the "President's need to control the exercise of" a subordinate Executive Branch officer's authority

---

[7] We do not read *Morrison* to require such balancing here because, as we explained in Part II.C.1, *supra*, the Court's opinion in *Morrison* does not affect the analysis of the constitutional problem with legislative provisions that, like section 802(e)(1), interfere with the President's authority to supervise traditional Executive Branch officers like the CPO. *See Morrison*, 487 U.S. at 691.

Nor do we read the *Nixon* cases cited in our 1982 opinion as requiring us to evaluate section 802(e)(1)'s constitutionality in light of Congress's "need" for the unedited report the provision purports to require. It is true that our 1982 opinion analyzed the constitutionality of imposing a concurrent reporting obligation on the FAA in terms of whether the requirement was supported by a "very compelling and specific [legislative] need." 6 Op. O.L.C. at 633, 641–42. This approach was, however, a departure from the Office's prior opinions objecting to direct reporting requirements regardless of their oversight value. *See, e.g.*, *Inspector General Legislation*, 1 Op. O.L.C. at 17–18. Since 1982, our opinions and advice regarding the constitutionality of direct and concurrent reporting requirements have returned to the approach we employed in 1977. *See, e.g.*, *Common Legislative Encroachments*, 13 Op. O.L.C. at 255 (concluding, without considering oversight or other justifications, that concurrent reporting requirements should be opposed on constitutional grounds if proposed in legislation, and that "if enacted," these provisions should be "construed as applying only to 'final' recommendations that have been reviewed and approved by the appropriate superiors within the Executive Branch, including OMB"); Letter for William V. Roth, Chairman, Committee on Finance, United States Senate, and Bill Archer, Chairman, Committee on Ways and Means, United States House of Representatives, from L. Anthony Sutin, Acting Assistant Attorney General, Office of Legislative Affairs at 4 (June 8, 1998) (raising constitutional objections to direct reporting provisions without considering their oversight or other legislative value); *Authority of Agency Officials*, 28 Op. O.L.C. 79 (explaining that a direct reporting provision posed constitutional problems without regard to whether the provision served legitimate oversight or other needs); *Authority of HUD's CFO*, 28 Op. O.L.C. 248 (same). That is also the approach we apply here, because the relevant portion of the 1982 opinion rests on authorities that balance Congress's need for information with the "practical need for confidentiality in Executive Branch deliberations," not with the constitutional principles that have long been held to preclude legislative interference with the President's authority to supervise traditional Executive Branch officers. *See* 6 Op. O.L.C. at 638–41; *see also id.* at 640 n.3 (emphasizing that this Office knew of no instance in which Congress had imposed the type of concurrent reporting requirement at issue in the opinion "upon a purely executive agency that is under the President's direct supervision and control").

Case 1:16-cv-01068-KBJ Document 22-14 Filed 10/27/17 Page 18 of 21
Case #24-5163 Document #2080945 Filed: 10/18/2024 Page 212

*Constitutionality of Direct Reporting Requirement in Section 802(e)(1) of 9/11 Act*

on issues (the execution of federal statutes, Executive Branch policy formulation, and the protection of privileged information) that are "central to the functioning of the Executive Branch." *Id*. at 691.

As noted, the President cannot effectively perform his constitutional functions without the aid of Executive Branch agencies and officers. *See, e.g.*, *Myers*, 272 U.S at 133. The CPO is such an officer, and DHS and OMB are such agencies. Indeed, they are the agencies best able (and, in DHS's case, uniquely able, because the report pertains largely to DHS activities) to assist the President in discharging his constitutional authority to supervise not just the CPO and his reports, but also the Executive Branch's handling of the matters addressed in those reports. The statute requires that the CPO's reports address DHS's implementation of federal privacy laws, as well as Executive Branch privacy policy and legislative recommendations on privacy issues. *See* 6 U.S.C. § 142(a), (e). Section 802(e)(1)'s prohibition on the incorporation of DHS or OMB comments into the report would deprive the President of his ability to ensure that a report to Congress on privacy matters on behalf of the Executive Branch reflects the input of the Executive Branch officers on whom the President relies to discharge his constitutional authority over the report, the officer who transmits it, and the substantive matters that the report addresses. Section 802(e)(1)'s prohibition on incorporating OMB comments in the CPO's report to Congress would also deprive the President of the benefits of the OMB review process that Presidents have relied upon for decades to ensure that a single officer's or department's communications to Congress do not conflict with the President's policy program or legal obligations, and also do not compromise constitutionally privileged information or otherwise undermine the President's ability to exercise his constitutional authority. *See* OMB Circular No. A-19, ¶¶ 3–4, 8 (1979). Because certain applications of section 802(e)(1) would impose these substantial burdens on the President's ability to exercise his constitutional supervisory authority, we would consider those applications of the provision constitutionally objectionable even if we were to balance the degree to which they burden the President's Article II authority against the provision's oversight or legislative value.

**4.**

Certain applications of section 802(e)(1) would also conflict with the President's constitutional authority to protect against the unauthorized disclosure of classified and other types of constitutionally privileged information.

We have long concluded that statutory provisions that purport to authorize Executive Branch officers to communicate directly with Congress without appropriate supervision by the President or his subordinates violate the separation of powers because such provisions infringe upon the President's constitutional authority to protect against the unauthorized disclosure of constitutionally privileged information, most notably classified national security information. As

Case 1:16-cv-01068-KBJ   Document 22-14   Filed 10/27/17   Page 19 of 21
Case #24-5163      Document #2080945        Filed: 10/18/2024      Page 213
*Opinions of the Office of Legal Counsel in Volume 32*

the Clinton Administration explained in a 1998 Statement of Administration Policy ("SAP") on S. 1668, a bill that purported to give employees in the intelligence community a right to disclose certain types of privileged information to Congress without Presidential authorization:

> This provision is clearly contrary to the Supreme Court's explicit recognition of the President's constitutional authority to protect national security and other privileged information. Congress may not vest lower-ranking personnel in the Executive branch with a "right" to furnish national security or other privileged information to a member of Congress without receiving official authorization to do so. By seeking to divest the President of his authority over the disclosure of such information, S. 1668 would unconstitutionally infringe upon the President's constitutional authority.

This Office further developed the position stated in the SAP in testimony before Congress. *See Whistleblower Protections for Classified Disclosures*, 22 Op. O.L.C. 92 (1998) (reproducing the relevant testimony).

The President's constitutional authority to protect against the unauthorized disclosure of privileged information is not "limited to classified information, but extends to all deliberative process or other information protected by executive privilege." *Authority of Agency Officials*, 28 Op. O.L.C. at 81. "Because [a] statute[] may not override the constitutional doctrine of executive privilege, [it] may not act to prohibit the supervision of the disclosure of any privileged information, be it classified, deliberative process or other privileged material." *Id.* Applying this principle, we have consistently advised that the President's ability to protect against the unauthorized disclosure of information potentially protected by executive privilege may not be restricted by statute. *See, e.g.*, Memorandum for Peter J. Wallison, Counsel to the President, from Charles J. Cooper, Assistant Attorney General, Office of Legal Counsel at 3 n.6 (Sept. 8, 1986) ("Consistent with our view that Congress cannot override executive privilege by statutory enactment, we do not believe the 'whistleblower' provisions allow an employee to escape sanctions for disclosure of material covered by executive privilege."). More importantly here, we have concluded in the specific context of statutory reporting requirements that "the Constitution compels that the head of [a] department must have the authority to direct" subordinates preparing reports to Congress to "make whatever modifications are deemed necessary" to prevent the unauthorized disclosure in those reports of sensitive law enforcement or executive privileged information. *Legislation to Establish Offices of Inspector General—H.R. 8588*, Hearings before the Subcomm. on Governmental Efficiency and the District of Columbia of the S. Comm. on Governmental Affairs, 95th Cong. 141 (1978) (testimony of Lawrence A. Hammond, Deputy Assistant Attorney General, Office of Legal Counsel) ("Hammond Testimony"); *see also* Memorandum for Robert M.

*Constitutionality of Direct Reporting Requirement in Section 802(e)(1) of 9/11 Act*

McNamara, Jr., General Counsel, Central Intelligence Agency, from Todd D. Peterson, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Legal Authority to Withhold Information from Congress* at 3 (Sept. 9, 1998) (the "application of [statutory] reporting requirements . . . is limited by a constitutional restraint—the executive branch's authority to control the disclosure of information when necessary to preserve the Executive's ability to perform its constitutional responsibilities"). As we explained 30 years ago:

> This conclusion springs, first, from the President's duty to see that the laws are faithfully executed. His immediate subordinates are charged with carrying out that constitutional duty. If a department head discovers in a report that, for instance, grand jury or tax return information has been . . . included, it is his duty to see that it is deleted. This is the simplest and clearest case. In each case an enactment having the force of law prohibits disclosure—even to Congress—and for the department head to allow a report to go out without alteration would be to disregard those enactments and fail in the faithful execution of the laws.
>
> . . . .
>
> In addition . . . , there are some limited circumstances in which it has been recognized that the President may restrict the disclosure of confidential information and information relating to national security, diplomatic and military secrets . . . . [I]f an [Executive Branch subordinate] decides to disclose confidential information, the head of the department should have the opportunity to review that intended disclosure and initiate the process of internal Executive Branch scrutiny to determine whether the President should be asked to make the decision to withhold that document or portions of it from Congress. Any law which interferes with the President's power to make these sorts of deliberative judgments would, in the Department's opinion, offend the core concept of separation of powers upon which the Supreme Court based its recognition of a Presidential privilege.

Hammond Testimony at 141–43. Congress acknowledged the foregoing constitutional principles in the Senate report on the legislation (the Inspector General Act) addressed in the Department's testimony. S. Rep. No. 95-1071, at 32, 1978 U.S.C.C.A.N. at 2707 ("Insofar as [executive privilege] is constitutionally based, the committee recognizes that section 5(b) cannot override it.").

There is no question that section 802(e)(1) would interfere with the President's ability to protect against the unauthorized disclosure of privileged information if applied to preclude the CPO from accepting DHS or OMB amendments made to protect such information. If section 802(e)(1) were so applied, it would substan-

**JA 208**

*Opinions of the Office of Legal Counsel in Volume 32*

tially constrain the President's ability to protect against the unauthorized disclosure of privileged information by limiting the Executive Branch subordinates and processes on which the President may rely, and typically does rely, to exercise his constitutional authority over such information. To that extent, as well, the statute as so applied would be unconstitutional.

### III.

In summary, we conclude that section 802(e)(1) does not prohibit DHS or OMB officials from reviewing, in accordance with established Executive Branch review and clearance procedures, the CPO's draft section 802 reports before the reports are submitted to Congress. We further conclude that section 802(e)(1) is best interpreted not to prohibit DHS or OMB officials from commenting upon a draft CPO report where the CPO is permitted to, and in fact does, transmit to Congress a final report that does not reflect comments or amendments from such officials. Finally, we conclude that section 802(e)(1)'s direct reporting requirement need not be enforced in circumstances where its application would require the CPO to ignore the results of the President's review, through DHS and OMB, of a particular report. In such circumstances, the statute must yield to the President's exercise of his constitutional authority to supervise subordinate Executive Branch officers and their communications with Congress. In the event DHS were to implement this conclusion by adopting a policy not to enforce section 802(e)(1) in the circumstances described above, DHS should report the policy to Congress as required by 28 U.S.C. § 530D.

STEVEN G. BRADBURY
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*

**JA 209**

# Amended Complaint

# Exhibit N

# APPLICABILITY OF THE EMOLUMENTS CLAUSE AND THE FOREIGN GIFTS AND DECORATIONS ACT TO THE PRESIDENT'S RECEIPT OF THE NOBEL PEACE PRIZE

*The Emoluments Clause of the Constitution does not apply to the President's receipt of the Nobel Peace Prize.*

*The Foreign Gifts and Decorations Act does not bar the President from accepting the Peace Prize without congressional consent.*

December 7, 2009

## MEMORANDUM OPINION FOR
## THE COUNSEL TO THE PRESIDENT

This memorandum concerns whether the President's receipt of the Nobel Peace Prize would conflict with the Emoluments Clause of the Constitution, which provides that "no Person holding any Office of Profit or Trust under [the United States], shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State." U.S. Const. art. I, § 9, cl. 8. As we previously explained in our oral advice and now explain in greater detail, because the Nobel Committee that awards the Peace Prize is not a "King, Prince, or foreign State," the Emoluments Clause does not apply. You have also asked whether the Foreign Gifts and Decorations Act, 5 U.S.C. § 7342 (2006), bars the President from receiving the Peace Prize. Here, too, we confirm our previous oral advice that it does not.

## I.

On October 9, 2009, the Norwegian Nobel Committee (the "Peace Prize Committee" or the "Committee"), headquartered in Oslo, Norway, announced that the President will be this year's recipient of the Nobel Peace Prize. The 2009 Peace Prize, which will consist of ten million Swedish Kroner (or approximately $1.4 million), a certificate, and a gold medal bearing the image of Alfred Nobel, is expected to be awarded by the Nobel Committee to the President on December 10, 2009—the anniversary of Nobel's death. *See Statutes of the Nobel Foundation* § 9, *available at* http://nobelprize.org/nobelfoundation/statutes.html (last visited Nov. 24, 2009) ("Nobel Foundation Statutes"); *see also The Nobel Prize Amounts*, *available at* http://nobelprize.org/nobel_prizes/amounts.html (last visited Nov. 24, 2009).

The Peace Prize is a legacy of Swedish chemist Alfred Bernhard Nobel. In his will, Nobel directed that a portion of his wealth be used to establish a set of awards, one of which, the Peace Prize, was intended to honor the person or entity that "shall have done the most or the best work for fraternity between nations, for the abolition or reduction of standing armies and for the holding and promotion of peace congresses." Nobel Foundation Statutes § 1 (setting forth the pertinent provision of Nobel's will). The relevant assets of the Nobel estate have been managed since 1900 by the Nobel Foundation, a private institution based in Stockholm, Sweden. *See* Birgitta Lemmel, *The Nobel Foundation: A Century of Growth and Change* (2007), *available at* http://nobelprize.org/nobelfoundation/history/lemmel (last visited Nov. 24, 2009). The

Foundation is responsible for managing the assets of the bequest in such a manner as to provide for the annual award of the Nobel prizes and the operation of the prize-awarding bodies, including the Nobel Committee that selects the Peace Prize.  Nobel Foundation Statutes § 14; *see also* Lemmel, *supra* ("One vital task of the Foundation is to manage its assets in such a way as to safeguard the financial base of the prizes themselves and of the prize selection process.").  Unlike the other Nobel prizes, for accomplishments in fields such as literature and physics, which are awarded by committees appointed by Swedish institutions, Nobel specified in his will that the recipient of the prize "for champions of peace" was to be selected "by a committee of five persons to be elected by the Norwegian Storting [i.e., the Norwegian Parliament]."  Nobel Foundation Statutes § 1.

On April 26, 1897, the Storting formally agreed to carry out Nobel's will and, in August of that year, elected the first members of the Nobel Committee that would award the prize funded by Nobel's estate.  That Committee—not the Storting itself, or any other official institution of the Norwegian government, or the Nobel Foundation—has selected the Peace Prize recipients since 1901.  To be sure, in its nascent years, the Nobel Committee was more "closely linked not only to the Norwegian political establishment in general, but also to the Government," than it is today.  *See* Øyvind Tønnesson, *The Norwegian Nobel Committee* (1999), *available at* http://nobelprize.org/nobel_prizes/peace/articles/committee (last visited Nov. 24, 2009).  Indeed, until 1977, the Committee's official title was the Nobel Committee of the Norwegian Storting.  Nevertheless, it has long been recognized that the "[C]ommittee is formally independent even of the Storting, and since 1901 it has repeatedly emphasized its independence."  Tønnesson, *supra*.  In 1936, for instance, the Norwegian Foreign Minister and a former Prime Minister recused themselves from the Committee's deliberations out of concern that bestowing the award on the German pacifist Carl von Ossietzky would be perceived as an act of Norwegian foreign policy.  *Id.*; *see also Berlin Protests Ossietzky Award*, N.Y. Times, Nov. 26, 1936, at 22 (noting that "Norway [d]enies [r]esponsibility for Nobel [d]ecision").  To make clear the independent nature of the Committee's decisions, moreover, the Storting in the very next year, 1937, barred government ministers from sitting on the Nobel Committee.  *See Special Regulations for the Award of the Nobel Peace Prize and the Norwegian Nobel Institute, etc., adopted by the Nobel Committee of the Norwegian Storting on the 10th day of April in the year 1905 (including amendments of 1977, 1991, 1994, 1998 and 2000)* § 9, *available at* http://nobelprize.org/nobelfoundation/ statutes-no.html (last visited Nov. 24, 2009) ("Nobel Peace Prize Regulations") ("If a member of the [Nobel] Committee is appointed a member of the Government during his period of office, or if a member of the Government is elected a member of the Committee, he shall resign from the Committee for as long as he continues in office as a Minister").  Furthermore, for more than 30 years, no member of the Committee has been permitted as a general matter to continue serving in the Storting.  *See* Tønnesson, *supra* ("[I]n 1977 . . . the Storting decided that its members should not participate in nonparliamentary committees appointed by the Storting itself.").[1]  That said, an appointment to the Committee does not appear to require a sitting member of the Storting to resign immediately from his or her government position, and thus two of the current members, who joined the Nobel Committee in 2009, appear to have served on the Storting during much, if not all, of the period during which this year's

---

[1]  To further emphasize the Committee's independence from the Norwegian government, including the monarchy, "[u]nlike the prize award ceremony in Stockholm [for the other Nobel Prizes], it is the Chairperson of the Nobel Committee, and not the King [of Norway]" who formally presents the Peace Prize.  Tønnesson, *supra*.

*Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's
Receipt of the Nobel Peace Prize*

Prize recipient was selected.  *See* List of Nobel Committee Members, *available at*
http://nobelpeaceprize.org/en_GB/nomination_committee/members/ (last visited Dec. 4, 2009).
The other three members of the Committee were private individuals.  *Id.*

Apart from the Storting's role in selecting the members of the Nobel Committee, the
Norwegian government has no meaningful role in selecting the Prize recipients or financing the
Prize itself.  In addition to fully funding the Prize, the Sweden-based private Nobel Foundation,
established pursuant to Alfred Nobel's will, is responsible for the Committee's viability and the
administration of the award.  Specifically, your Office has informed us that the Committee's
operations, including the salaries of the various Committee members and of the staff, are funded
by the Foundation and not by the Norwegian or Swedish governments.  *See* E-mail from Virginia
R. Canter, Associate Counsel to the President, to David J. Barron, Acting Assistant Attorney
General, Office of Legal Counsel (Nov. 2, 2009, 19:11 EST) ("E-mail to Barron") (summarizing
telephonic interview with Geir Lundestad, Secretary to the Nobel Committee and Director of the
Nobel Institute); *see also* Nobel Foundation Statutes § 11 ("The Board of the Foundation shall
establish financial limits on the work that the prize-awarding bodies perform in accordance with
these statutes"); *id.* § 6 ("A member of a Nobel Committee shall receive remuneration for his
work, in an amount to be determined by the prize-awarding body [i.e., the Nobel Committee].").
The Committee also deliberates and maintains staff in the Nobel Institute building, which is
owned by the private Nobel Foundation rather than by the government of Sweden or Norway.
*See The Nobel Institute*, *available at* http://nobelpeaceprize.org/en_GB/institute/ (last visited
Dec. 4, 2009) (noting that Nobel Institute building is also where the recipient of the Peace Prize
is announced); *see also* Description of Nobel Institute Building, *available at*
http://nobelpeaceprize.org/en_GB/institute/nobel-building/ (last visited Dec. 4, 2009).  Although
the Nobel Foundation plays a critical role in sustaining the Nobel Committee and the Peace
Prize, it is the Nobel Committee that independently selects the Prize recipients.  *See*
Organizational Structure of the Nobel Entities, *available at* http://nobelprize.org/
nobelfoundation/org_structure.html (last visited Nov. 24, 2009) ("The Nobel Foundation does
not have the right or mandate to influence the nomination and selection procedures of the Nobel
Laureates."); *see also* Lemmel, *supra* ("[T]he Prize-Awarding Institutions are not only entirely
independent of all government agencies and organizations, but also of the Nobel Foundation.").

## II.

The Emoluments Clause provides that "no Person holding any Office of Profit or Trust
under [the United States], shall, without the Consent of the Congress, accept of any present,
Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State."
U.S. Const. art. I, § 9, cl. 8.  Adopted unanimously at the Constitutional Convention, the
Emoluments Clause was intended to recognize the "necessity of preserving foreign Ministers &
other officers of the U.S. independent of external influence," specifically, undue influence and
corruption by foreign governments.  *See* 2 *The Records of the Federal Convention of 1787*, at
389 (Max Farrand ed., rev. ed. 1966) (notes of James Madison); *see also* 3 *id.* at 327 ("It was
thought proper, in order to exclude corruption and foreign influence, to prohibit any one in
office from receiving or holding any emoluments from foreign states." (remarks of Governor
Randolph)); *Applicability of the Emoluments Clause to Non-Government Members of ACUS*,

3

*Opinions of the Office of Legal Counsel in Volume 33*

17 Op. O.L.C. 114, 116 (1993) ("*ACUS*"); *President Reagan's Ability to Receive Retirement Benefits from the State of California*, 5 Op. O.L.C. 187, 188 (1981) (discussing the background of the ratification of the Clause).

The President surely "hold[s] an[] Office of Profit or Trust," and the Peace Prize, including its monetary award, is a "present" or "Emolument . . . of any kind whatever." U.S. Const. art I, § 9, cl. 8. The critical question, therefore, concerns the status of the institution that makes the award. Based on the consistent historical practice of the political branches for more than a century with respect to receipt of the Peace Prize by high federal officials, as well as our Office's precedents interpreting the Emoluments Clause in other contexts, we conclude that the President in accepting the Prize would not be accepting anything from a "foreign State" within the Clause's meaning. Accordingly, we do not believe that the President's acceptance of the Peace Prize without congressional consent would violate the Emoluments Clause.

## A.

None of our Office's precedents concerning the Emoluments Clause specifically considers the status of the Nobel Committee (or the Nobel Foundation), but there is substantial and consistent historical practice of the political branches that is directly relevant. The President would be far from the first government official holding an "Office of Profit or Trust" to receive the Nobel Peace Prize. Rather, since 1906, there have been at least six federal officers who have accepted the Prize while serving in their elected or appointed offices. The Peace Prize has been received by two other sitting Presidents—Theodore Roosevelt and Woodrow Wilson—by a sitting Vice President, Secretary of State, and Senator, and by a retired General of the Army,[2] with the most recent of these acceptances having occurred in 1973. Throughout this history, we have found no indication that either the Executive or the Legislative Branch thought congressional approval was necessary.

The first instance of the Nobel Committee awarding the Peace Prize to a sitting officer occurred only five years after the Committee began awarding the Prize. In 1906, President Theodore Roosevelt received the Peace Prize.[3] On December 10 of that year, United States Minister to Norway Herbert H.D. Pierce accepted the "diploma, medal, and order upon the Nobel trustees [of the Nobel Foundation] for the amount of the prize" on Roosevelt's behalf. *See "Emperor Dead" and Other Historic American Diplomatic Dispatches* 336-37 (dispatch from Pierce to Secretary of State Elihu Root) (Peter D. Eicher ed., 1997) ("Pierce Dispatch"). Not only did Roosevelt accept the Peace Prize while President, he also chose as President to use the award money (roughly $37,000) to establish a foundation for the promotion of "industrial peace." *See* Oscar S. Straus, *Under Four Administrations: from Cleveland to Taft* 239-40 (1922) (noting that Roosevelt transferred the draft of the monetary award to Chief Justice Fuller in January of 1907 to initiate efforts to establish the Foundation).

---

[2] *See* Memorandum to File from Richard L. Shiffrin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Proposed Award of Honorary British Knighthood to Retiring Military Officer* (Aug. 27, 1996) (retired military officers continue to "hold[] [an] Office of Profit or Trust" under the United States and hence remain subject to the Emoluments Clause); *see also* 53 Comp. Gen. 753 (1974) (same).

[3] *See* List of Nobel Peace Prize Laureates, *available at* http://nobelprize.org/nobel_prizes/peace/laureates (last visited Nov. 19, 2009).

*Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's
Receipt of the Nobel Peace Prize*

We have found no indication that the President or Congress believed that receipt of the Prize, including its award money, required legislative approval.  Although Congress passed legislation to establish Roosevelt's foundation, *see* Act of Mar. 2, 1907, ch. 2558, 34 Stat. 1241 (1907), it did so some months *after* he accepted the Peace Prize, and we think it clear that neither the President nor Congress thought this law necessary to satisfy the Emoluments Clause.[4]  The bill that established the trust said nothing about consent even though Congress assuredly knew how to express such legislative approval for Emoluments Clause purposes.  For instance, the same Congress that established the foundation at Roosevelt's request also "authorized [Professor Simon Newcomb, a retired Naval Officer] to accept the decoration of the order 'Pour le Mérite, für Wissenschaftern und Kunste,' conferred upon him by the German Emperor," Act of Mar. 30, 1906, ch. 1353, 34 Stat. 1713, and granted "[p]ermission . . . to [a Navy Rear-Admiral] . . . to accept the China war medal, with Pekin clasp, tendered to him by the King of Great Britain, and the Order of the Red Eagle, with swords, tendered to him by the Emperor of Germany," S.J. Res. 98, 59th Cong., 34 Stat. 2825 (1907).[5]

Perhaps most importantly, the statute that established the foundation to administer the prize money that Roosevelt had accepted does not address at all Roosevelt's receipt of the gold medal and diploma.  Yet the medal and the diploma have always constituted elements of the Peace Prize, *see* Pierce Dispatch at 337 (noting receipt of Nobel medal); *see also* Nobel Lecture of President Roosevelt (May 5, 1910), *available at* http://nobelprize.org/nobel_prizes/peace/ laureates/1906/roosevelt-lecture.html (last visited Nov. 23, 2009) ("The gold medal which formed part of the prize I shall always keep, and I shall hand it on to my children as a precious heirloom."), and they constitute a "present" or "Emolument . . . of any kind whatever" within the meaning of the Emoluments Clause.  Thus, if the law establishing the trust to be funded by the award money had been intended to provide congressional consent for President Roosevelt's receipt of the Prize, it would presumably have encompassed these elements of the Prize as well.

---

[4]  Consistent with this understanding of the congressional action, the bill establishing the foundation was modeled after documents creating trusts, *see* Straus, *supra*, at 239, and not statutes conferring legislative consent to officers' receipt of gifts from foreign states.  Further, the statute's legislative history contains no indication that the bill was intended to ratify Roosevelt's acceptance of a gift from a foreign power; nor does it indicate that his acceptance of the Prize without congressional consent was inappropriate.  *See* S. Rep. No. 59-7283 (1907); *see also* 41 Cong. Rec. 4113 (1907) ("There can be no possible objection [to the bill].  It establishes trustees, who are to receive from the President the Nobel prize for the foundation of a society for the promotion of industrial peace." (statement of Sen. Lodge)).  Ultimately, the Foundation never expended any funds, and in July of 1917, Congress dissolved the trust.  *See* H.J. Res. 313, 65th Cong., 40 Stat. 899 (1918) ("Joint Resolution Providing for the disposition of moneys represented in the Alfred Bernard Nobel peace prize, awarded in nineteen hundred and six").  Roosevelt then distributed the Nobel Prize money, along with the interest it had accrued, to various charities in the United States and Europe.  *See* Straus, *supra*, at 241.

[5]  *See also*, *e.g.*, J. Res. 39, 54th Cong., 29 Stat. 759 (1896) ("authoriz[ing]" President Harrison "to accept certain medals presented to him by the Governments of Brazil and Spain during the term of his service as President of the United States"); J. Res. 4, 42d Cong., 17 Stat. 643 (1871) ("[C]onsent of Congress is hereby given to . . . [the] secretary of the Smithsonian Institution, to accept the title and regalia of a commander of the Royal Norwegian Order of St. Olaf, conferred upon him for his distinguished scientific service and character by the King of Sweden and Norway"); J. Res. 39, 38th Cong., 13 Stat. 604 (1865) (Navy Captain "authorized to accept the sword of honor recently presented to him by the government of Great Britain"); J. Res. 14, 33d Cong., 10 Stat. 830 (1854) ("authoriz[ing] . . . accept[ance of ] a gold medal recently presented . . . by His Majesty the King of Sweden").

JA 215

*Opinions of the Office of Legal Counsel in Volume 33*

The example more than a decade later of President Wilson also clearly reflects an understanding by the political branches that receipt of the Peace Prize does not implicate the Emoluments Clause. When, in December of 1920, President Wilson received the Peace Prize, he, unlike President Roosevelt, did not seek to donate the Prize proceeds to a charitable cause or enlist Congress's aid in accomplishing such a charitable purpose. Instead, he simply accepted the Prize and deposited the award money in a personal account in a Swedish bank, apparently hoping for a favorable movement in the Kroner/dollar exchange rate. *See* 67 *The Papers of Woodrow Wilson* 51-52 (Arthur S. Link ed., 1992) (diary of Charles Lee Swem). President Wilson does not appear to have sought congressional approval for his acceptance, nor does it appear that Congress thought its consent was required.

These Presidents are not, as indicated above, the only federal officers who have received the Peace Prize. Senator Elihu Root in 1913, Vice President Charles Dawes in 1926, retired General of the Army George Marshall in 1953, and Secretary of State Henry Kissinger in 1973 each received the Nobel Peace Prize. *See* List of Nobel Peace Prize Laureates, *supra*. As was the case with Presidents Roosevelt and Wilson, none of these recipients, as far as we are aware, received congressional consent prior to accepting the Prize or congressional ratification of such receipt at any time thereafter.

This longstanding treatment of the Nobel Peace Prize is particularly significant to our analysis because several of the Prizes were awarded when the Nobel Committee—then known as the Nobel Committee of the Norwegian Storting—lacked some of the structural barriers to governmental control that are present today, such as rules generally barring government ministers and legislators from serving on the Committee. If anything, then, these prior cases arguably would cause more reason for concern than would be present today, and yet the historical record reveals no indication that either the Congress or the Executive believed receipt of the Prize implicated the Emoluments Clause at all. The absence of such evidence is particularly noteworthy since the Clause was recognized as a bar to gifts by foreign states without congressional consent throughout this same period of time, such that the Attorney General and this Office advised that various gifts from foreign states could not be accepted, *see, e.g.*, *Gifts from Foreign Prince*, 24 Op. Att'y Gen. 116, 118 (1902), and Congress passed legislation specifically manifesting its consent to some gifts bestowed by foreign states on individuals covered by the Clause. *See supra* n.5. To be sure, this long, unbroken practice of high federal officials accepting the Nobel Peace Prize without congressional consent cannot dictate the outcome of our constitutional analysis. But we do think such practice strongly supports the conclusion that the President's receipt of the Nobel Peace Prize would not conflict with the Emoluments Clause, as it may fairly be said to reflect an established understanding of what constitutes a gift from a "foreign State" that would trigger application of the Clause's prohibition. *Cf. American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 415 (2003) (analyzing President's foreign affairs power under the Constitution in light of "longstanding practice" in Executive Branch and congressional silence); *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981) (noting that a "'systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned . . . may be treated as a gloss on'" the Constitution); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610-11 (1952) (Frankfurter, J., concurring) ("Deeply embedded traditional ways of conducting government cannot supplant the

*Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's
Receipt of the Nobel Peace Prize*

Constitution or legislation, but they give meaning to the words of a text or supply them.");
*McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 315, 401 (1819) (where "the great principles of
liberty are not concerned . . . [a doubtful question,] if not put at rest by the practice of the
government, ought to receive a considerable impression from that practice").

**B.**

The precedents of our Office reinforce the constitutional conclusion that the historical
practice recounted above strongly suggests.  Indeed, our Office's numerous opinions on the
Emoluments Clause have never adverted to the receipt of the Peace Prize by government
officials and certainly have never suggested that the numerous acceptances of the Prize were
contrary to the Clause.  That is not surprising.  Under these same opinions, it is clear that, due to
the unique organization of the Nobel Committee (including its reliance on the privately endowed
Nobel Foundation), Nobel Peace Prize recipients do not receive presents or emoluments from a
"foreign State" for purposes of the Emoluments Clause.

The precedents of the Office do establish that the Emoluments Clause reaches not only
"foreign State[s]" as such but also their instrumentalities.  *ACUS*, 17 Op. O.L.C. at 122;
*Applicability of Emoluments Clause to Employment of Government Employees by Foreign
Public Universities*, 18 Op. O.L.C. 13, 18 (1994) ("*Public Univ.*").  Quite clearly, the Nobel
Committee is not itself a foreign state in any traditional sense.  The issue, therefore, is whether
the Committee has the kind of ties to a foreign government that would make it, and by extension
the Nobel Foundation in financing the Prize, an instrumentality of a foreign state under our
precedents.  Our past opinions make clear that an entity need not engage specifically in
"political, military, or diplomatic functions" to be deemed an instrumentality of a foreign state.[6]
*See Public Univ.*, 18 Op. O.L.C. at 19; *see also ACUS*, 17 Op. O.L.C. at 122 ("[T]he language of
the Emoluments Clause does not warrant any distinction between the various capacities in which
a foreign State may act.").  Thus, for example, we have determined that entities such as
corporations owned or controlled by a foreign government and foreign public universities may
fall within the prohibition of the Clause.  *ACUS*, 17 Op. O.L.C. at 121-22.

To determine whether a particular case involves receipt of a present or emolument from a
foreign state, however, our Office has closely examined the particular facts at hand.  Specifically,
we have sought to determine from those facts whether the entity in question is sufficiently
independent of the foreign government to which it is arguably tied—specifically with respect to
the conferral of the emolument or present at issue, e.g., hiring an employee or bestowing an
award, *Public Univ.*, 18 Op. O.L.C. at 20—that its actions cannot be deemed to be those of that

---

[6]   Accordingly, we have explained that corporations owned or controlled by a foreign government are
presumptively foreign states under the Emoluments Clause, even though the Act of State doctrine suggests that
"when foreign governments act in their commercial capacities, they do not exercise powers peculiar to sovereigns,"
and thus are not entitled to the immunity from suit that might be available.  *ACUS*, 17 Op. O.L.C. at 120 ("[N]othing
in the text of the Emoluments Clause limits its application solely to foreign governments acting *as sovereigns*.").

7

**JA 217**

*Opinions of the Office of Legal Counsel in Volume 33*

foreign state.  In short, our opinions reflect a consistent focus on whether an entity's decision to confer a particular present or emolument is subject to governmental control or influence.[7]

The factors we have considered include whether a government is the substantial source of funding for the entity, *e.g.*, *Applicability of Emoluments Clause to Proposed Service of Government Employee on Commission of International Historians*, 11 Op. O.L.C. 89, 90 (1987) ("*International Historians*"); whether a government, as opposed to a private intermediary, makes the ultimate decision regarding the gift or emolument, *e.g.*, Memorandum for John G. Gaine, General Counsel, Commodity Futures Trading Commission, from Leon Ulman, Deputy Assistant Attorney General, Office of Legal Counsel, *Re:  Expense Reimbursement in Connection with Trip to Indonesia* (Aug. 11, 1980) ("Indonesia Op."); and whether a government has an active role in the management of the entity, such as through having government officials serve on an entity's board of directors, *e.g.*, *Public Univ.*, 18 Op. O.L.C. at 15.  No one of these factors has proven dispositive in our prior consideration of Emoluments Clause issues.  Rather, we have looked to them in combination to assess the status of the entity for purposes of the Clause, keeping in mind at all times the underlying purpose that the Clause is intended to serve. *See*, *e.g.*, Memorandum for H. Gerald Staub, Office of Chief Counsel, NASA, from Samuel A. Alito, Jr., Deputy Assistant Attorney General, Office of Legal Counsel, *Re:  Emoluments Clause Questions raised by NASA Scientist's Proposed Consulting Arrangement with the University of New South Wales* (May 23, 1986) ("given [foreign public university's] functional and operational separation and independence from the government of Australia and state political instrumentalities . . . . [t]he answer to the Emoluments Clause question . . . must depend [on] whether the consultancy would raise the kind of concern (viz., the potential for 'corruption and foreign influence') that motivated the Framers in enacting the constitutional prohibition").

Consistent with this analysis, we have concluded in the past that Emoluments Clause concerns are raised where the "ultimate control" over the decision at issue—e.g., an employment decision or a decision to bestow an award—resides with the foreign government.  For instance, an employee of the Nuclear Regulatory Commission ("NRC") sought authorization to work for a consulting firm that was retained by the Mexican government.  *Application of the Emoluments Clause of the Constitution and the Foreign Gifts and Decorations Act*, 6 Op. O.L.C. 156, 158 (1982).  Because we concluded that the "ultimate control, including selection of personnel, remains with the Mexican government," *id.* ("the retention of the NRC employee by the consulting firm appears to be the principal reason for selection of the consulting firm by the Mexican government"), we determined that the Emoluments Clause barred the arrangement. Similarly, we concluded that an invitation to join a commission of international historians that was established and funded entirely by the Austrian government constituted an invitation from the Austrian government itself.  *International Historians*, 11 Op. O.L.C. at 90.

By contrast, although we have previously opined that foreign public universities are presumptively instrumentalities of a foreign state for the purposes the Emoluments Clause, we determined that two NASA scientists on leave without pay could be employed by the University

---

[7]  Where a foreign state indisputably and directly confers a present or emolument, such considerations of autonomy and control may be relevant, but not decisive.  *See ACUS*, 17 Op. O.L.C. at 119.  Here, however, the critical issue is whether the Nobel Committee, and by extension the Nobel Foundation, is an instrumentality of a foreign government for purposes of awarding the privately endowed Peace Prize.

Case 1:16-cv-01068-KBJ   Document 22-15   Filed 10/27/17   Page 10 of 14
USCA Case #24-5163   Document #2080945   Filed: 10/18/2024   Page 225 of 242

*Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize*

of Victoria in British Columbia, Canada, without triggering that constitutional restraint.  *Public Univ.*, 18 Op. O.L.C. at 13.  We came to this conclusion because the evidence demonstrated that the University acted independently of the Canadian (or the British Columbian) government when making faculty employment decisions.  *Id.* at 15 ("[T]he University of Victoria should not be considered a foreign state.").  To be sure, as we acknowledged, the University was under the formal control of the British Columbia government.  *Id.* at 20 (noting that the government had "ultimate" control of the University); *see also id.* at 15 (noting that the faculty was "constituted" by the University's Board of Governors, the majority of whom were appointed by the provincial government).  Nevertheless, it was critical to our analysis that the specific conduct at issue—the University's selection of faculty—was not made by the University "under statutory compulsion" or pursuant to the "dictates of the government."  *Id.* at 20-21 (quoting *McKinney v. University of Guelph*, [1990] 3 S.C.R. 229, 269 (Can.) (plurality op.)).

Similar considerations of autonomy informed our view that a federal officer could serve as a consultant to Harvard University on a project funded by the government of Indonesia.  *See* Indonesia Op. at 5.  Although the consulting services were to be rendered for the benefit of Indonesia and the individual consultant's expenses were to be reimbursed by Harvard from funds paid by Indonesia, we identified no violation of the Emoluments Clause.  We reached this conclusion in significant part because, under the consulting arrangement, Harvard had the sole discretion over the consultants it chose, and Indonesia had no veto power over those choices.  *Id.* ("Since . . . the foreign government neither controls nor even influences the selection and payment of consultants, the Emoluments Clause is not implicated.").

In light of these precedents, we believe that it is significant that the Nobel Committee's selection of the Peace Prize recipient is independent of the dictate or influence of the Norwegian government.  As far as we are aware, the Norwegian government has no authority to compel the Committee to choose the Prize recipient; nor does it have any veto authority with respect to the selection by the Committee members, who, in any event, are not appointed by a single official to whom they are accountable, but are instead elected by the multimember Storting.  *See* Nobel Foundation Statutes § 1.  To be sure, Norwegian government officials may submit nominations to the Committee, but that opportunity is shared by any "[m]embers of national assemblies and governments of states," along with "University rectors" and "professors of social sciences, history, philosophy, law and theology."  Nobel Peace Prize Regulations § 3.  Indeed, the formal process of nomination and selection of a Prize recipient is not guided by the government, but by the private, Sweden-based Nobel Foundation and the Nobel Committee.[8]  For example, pursuant to the Foundation's rules, no prize-awarding body, including the Peace Prize Committee, may reveal the details of its deliberations "until at least 50 years have elapsed after the date on which the decision in question was made."  Nobel Foundation Statutes § 10.  We have found no

---

[8]  The Storting appears to have the limited authority only to approve "[i]nstructions concerning the election of members of the Nobel Committee" itself.  *See* Nobel Foundation Regulations § 9.  Any other amendments to the Committee's rules of operation, including its award selection guidelines, are decided upon by the Committee itself, after views are solicited from the Nobel Foundation.  *Id.* ("Proposals for amendments to other provisions of these regulations may be put forward by members of the Norwegian Nobel Committee or by members of the Board of Directors of the Nobel Foundation.  Before the Norwegian Nobel Committee makes a decision concerning the proposal, it shall be submitted to the Board of Directors of the Nobel Foundation for an opinion.").

JA 219

*Opinions of the Office of Legal Counsel in Volume 33*

indication that the Norwegian government or its officials, if requesting such information, would be exempt from this restraint on disclosure.  Other aspects of the selection process, including guidelines on nominations and supporting materials, are either provided in the private Foundation's statutes or delegated by the Foundation—not by the Norwegian government— to the prize-awarding bodies, including the Peace Prize Committee.  *E.g.*, *id.* § 7 ("To be considered eligible for an award, it is necessary to be nominated in writing by a person competent to make such a nomination.").  These formal limits on the capacity of the Norwegian government to influence, let alone control, the Committee's decision, are consistent with the Committee's own repeated assertions of its independence.  *See* Tønnesson*, supra*.

The Government of Norway's financial connection to the Nobel Committee is even more attenuated.  It appears that the members of the Nobel Committee are compensated for their services by the privately funded Nobel Foundation, *see* E-mail to Barron, and the precise amount of the remuneration is set by the Nobel Committee, not the Norwegian government.  *See* Nobel Foundation Statutes § 6.  The Peace Prize itself, including its cash award and other elements, is funded by the Nobel Foundation, which alone is responsible for ensuring that all of the Nobel prize-awarding bodies can accomplish their purposes and which is itself financed by private investments and not government funding.  *Id.* § 14 ("The Board [of the Foundation] shall administer the property of the Foundation for the purposes of maintaining good long-term prize-awarding capacity and safeguarding the value of the Foundation's assets in real terms."); *see also* The Nobel Foundation's Income Statement (2008), *available at* http://nobelprize.org/ nobelfoundation/incomes.html (last visited Dec. 7, 2009); Lemmel, *supra* (describing Nobel Foundation's investment strategies to ensure financial base of Nobel Prizes).

Thus, in our view, the only potentially relevant tie to the Norwegian government is that, in accordance with Alfred Nobel's will, the Storting elects the Nobel Committee's five members.  Further, we are aware that, notwithstanding the rules generally barring sitting members of the Storting from the Nobel Committee, two members of the Storting served on the Committee for several months before leaving their parliamentary seats.  However, in light of the strong basis for the Committee's autonomy, both as to the decision it makes and the finances upon which it draws, we do not view the Storting's appointment authority, or a minority of the Committee members' short-term overlap with parliamentary service, as having dispositive significance.

Nor has our Office done so in the past in analogous cases.  In determining that an award to a Navy scientist from the Alexander von Humboldt Foundation was from the German government for the purposes of the Emoluments Clause, for example, we noted that the "awards are made by a 'Special Committee,' on which the Federal Ministries for Foreign Affairs and Research and Technology are represented."  *See* Letter for Walter T. Skallerup, Jr., General Counsel, Department of the Navy, from Robert B. Shanks, Deputy Assistant Attorney General, Office of Legal Counsel at 2 (Mar. 17, 1983).  But we did not indicate that the presence of the government ministers on the award committee was the decisive factor in our analysis.  Instead, we also noted that the Foundation was reestablished (because it had once been dissolved) by the Federal Republic of Germany, specifically by its Ministry of Foreign Affairs.  In addition, we noted that the Foundation that administered the award was financed mainly through annual payments from the West German government.  *See id.*  By contrast, the Nobel Committee is financed by the private Nobel Foundation, and although the Norwegian government may have

10

*Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize*

formally established the Committee (as the "Nobel Committee of the Norwegian Storting"), it did so pursuant to a private individual's will, which assigned the Storting the limited role of electing the Committee's members, who would be charged with exercising their independent judgments.

Likewise, we concluded that the University of British Columbia in hiring faculty was not acting as a foreign state for the purposes of the Emoluments Clause—notwithstanding the provincial government's power to appoint a majority of the members of the University's board of governors. *Public Univ.*, 18 Op. O.L.C. at 14, 22 (citing *Harrison v. University of British Columbia*, [1990] 3 S.C.R. 451, 459 (Can.) (plurality op.)). We also determined that the Prince Mahidol Foundation was not an instrumentality of the Government of Thailand for the purposes of the Emoluments Clause, although several officials of the Thai government and the Royal Princess of Thailand sat on the Foundation's board. Memorandum to File from Daniel L. Koffsky, *Re: Application of the Emoluments Clause to a U.S. Government Employee Who Performs Services for the Prince Mahidol Foundation* (Nov. 19, 2002) ("Mahidol Op.").[9] In each case, we found countervailing indications of autonomy to be more significant. As noted above, we concluded that the University of British Columbia's faculty decisions, including contract negotiations and collective bargaining, were not subject to governmental compulsion. *Public Univ.*, 18 Op. O.L.C. at 20-21 (noting University's "'legal autonomy'"). And despite the presence of the Thai government and royalty, we determined that the decision-making process of the Prince Mahidol Foundation's Board evidenced "independent judgment." Mahidol Op. at 4 (also noting that "most of the funds for the Foundation do not come from the [Thai] government"). These same considerations concerning the exercise of independent judgment and financial autonomy are at least as present here.

In sum, determining whether an entity is an instrumentality of a foreign government is necessarily a fact-bound inquiry, *see Application of the Emoluments Clause of the Constitution and the Foreign Gifts and Decorations Act*, 6 Op. O.L.C. 156, 158 (1982) ("Each situation must . . . be judged on its facts."), and the weight of the evidence in light of this Office's consistent precedents—and as reinforced by the substantial historical practice—demonstrates that the awarding of the privately financed Peace Prize through the Nobel Committee does not constitute the conferral of a present or emolument by a "foreign State" for the purposes of the Emoluments Clause.

---

[9] Similarly, the Supreme Court has indicated that a government's appointment authority is not given dispositive weight in determining whether a nominally private entity is, in fact, "what the Constitution regards as the Government." *See Lebron v. National R.R. Passenger Corp.*, 513 U.S. 374, 392 (1995) (holding that Amtrak was a state actor subject to the First Amendment). That the federal government appointed a majority of Amtrak's directors was not considered to be of controlling importance. As the *Lebron* Court observed, the Consolidated Rail Corporation ("Conrail") was held "not to be a federal instrumentality, despite the President's power to appoint, directly or indirectly, 8 of its 15 directors." *Id.* at 399; *see also Regional Rail Reorganization Act Cases*, 419 U.S. 102, 152 (1974) ("Conrail is not a federal instrumentality by reason of the federal representation on its board of directors.").

**JA 221**

*Opinions of the Office of Legal Counsel in Volume 33*

### III.

Our reasoning regarding the Emoluments Clause is equally applicable to the Foreign Gifts and Decorations Act. The Act provides express consent for officials to accept "gifts and decorations" from "foreign government[s]" under certain limited circumstances not present here. *See* 5 U.S.C. § 7342(b) (2006) ("An employee may not . . . accept a gift or decoration, other than in accordance with the provisions of" the Act); *see also id.* § 7342(a)(1)(E) (providing that the President is subject to the Act). Section 7342(a)(2) defines the term "foreign government" as follows:

> "foreign government" means –
>> (A) any unit of foreign governmental authority, including any foreign national, State, local, and municipal government;
>> (B) any international or multinational organization whose membership is composed of any unit of foreign government described in subparagraph (A); and
>> (C) any agent or representative of any such unit or such organization, while acting as such.

While we do not necessarily assume that Congress intended the meaning of "foreign government" to be coextensive with the constitutional term "foreign State," we have recognized that the Act's reference to "any unit of foreign governmental authority" is likely narrower in scope than the Emoluments Clause. *See ACUS*, 17 Op. O.L.C. at 121 (recognizing that corporations owned or controlled by foreign States are arguably not "units of foreign governmental authority," although they are presumptively subject to the Emoluments Clause); *cf.* S. Rep. No. 95-194, at 29 (1977) (definition of "foreign government" intended to reach "foreign governmental subdivision(s)" and "quasi-government organizations"). For the reasons discussed in detail above, the Nobel Committee in choosing the recipients of the Peace Prize, like the Nobel Foundation in financing the Prize, operates as a private non-governmental organization and not as a "unit" of a foreign government. Moreover, given the Foundation's private nature and the facts that the Committee acts independently of any government and is not required to include any government officials on it, *see The Norwegian Nobel Committee, available at* http://nobelprize.org/prize_awarders/peace/committee.html (last visited Nov. 23, 2009) ("Although this is not a requirement, all committee members have been Norwegian nationals."), we conclude that neither is an "international or multinational organization" because neither is "composed of any unit of foreign government," let alone composed of units of more than one foreign government. 5 U.S.C. § 7342(a)(2)(B); *see also* Memorandum to the General Counsel, The Smithsonian Institution, from Daniel L. Koffsky, Acting Assistant Attorney General, *Re: Emoluments Clause and World Bank* (May 24, 2001), *available at* www.usdoj.gov/olc/opinions.htm (concluding that international organizations of which the United States is a member are not generally subject to the Emoluments Clause and observing that the Act's coverage of international organizations was likely "motivated by policy concerns as opposed to constitutional ones"). Nor is the Committee as a whole, or, by extension, the Nobel Foundation in financing the Prize, an "agent or representative" of any unit of a foreign government or any international organization for purposes of the Act. Although two members of the Committee continued to serve in the Storting before leaving their parliamentary seats,

*Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize*

we do not believe this limited tie between the Government of Norway and the Committee, affecting a minority of the Committee's members, transformed the Nobel Committee into an agent or representative of the Norwegian government. *Id.* § 7342(a)(2)(C). The countervailing indications of autonomy described above support that conclusion. Consequently, the Foreign Gifts and Decorations Act poses no bar to the President's receipt of the Peace Prize.

## IV.

For the reasons given above, we conclude that neither the Emoluments Clause nor the Foreign Gifts and Decorations Act prohibits the President from receiving the Nobel Peace Prize without congressional consent.

Please let us know if we may be of further assistance.

/s/

DAVID J. BARRON
Acting Assistant Attorney General

JA 223

**U.S. Department of Justice**

Office of Legal Counsel

Office of the Principal Deputy Assistant Attorney General          *Washington, D.C. 20530*

January 2, 2018

Alex Abdo
Jameel Jaffer
Knight First Amendment Institute at Columbia University
314 Low Library
535 West 116th Street
New York, NY 10027

## Re:    **Campaign for Accountability v. U.S. Department of Justice**

Dear Messrs. Abdo and Jaffer:

This letter further responds to the March 22, 2016 letter from your client, Campaign for Accountability ("CfA"), to the Principal Deputy Assistant Attorney General for the Office of Legal Counsel ("OLC"), as modified by the Amended Complaint filed in *Campaign for Accountability v. U.S. Dep't of Justice*, D.D.C. No. 1:16-cv-1068 (KBJ), ECF No. 22 (filed Oct. 27, 2017). Consistent with the District Court's recent Order, we "construe the amended complaint as a clarification of the demands that CfA articulated in its March 22, 2016 letter to OLC." Order Granting in Part Defendant's Motion to Stay Proceedings at 8, ECF No. 26 (filed December 1, 2017).

Your client's March 2016 letter requested that OLC "make available for public inspection and copying on an ongoing basis all unpublished OLC opinions that provide controlling legal advice to executive branch agencies and a general index of all such opinions OLC issued," citing 5 U.S.C. § 552(a)(2). It further stated that this request "at a minimum, encompasses the formal written opinions OLC has issued and will issue using the process outlined in a July 16, 2010 memorandum to OLC attorneys from then-Acting Assistant Attorney General David J. Barron" but that it further sought to cover "OLC opinions . . . memorialized in emails and other forms of writing."

The Amended Complaint has now narrowed the request: "[t]his lawsuit concerns only a single type [of opinions, memoranda, or advice]: formal written opinions issued to executive branch agencies or to executive branch officials other than the president." Amended Complaint, ¶ 33. The Amended Complaint also, for the first time, specifies five categories of records that you believe "are within the scope of the affirmative-disclosure provisions of FOIA even under [the District] Court's broad reading of *Electronic Frontier Foundation v. Department of Justice (EFF)*, 739 F.3d 1 (D.C. Cir. 2014)." *Id.* ¶ 34. These five categories are as follows:

1. "Opinions resolving interagency disputes" (¶¶ 35–38),
2. "Opinions issued to independent agencies" (¶¶ 39–40),
3. "Opinions interpreting non-discretionary legal obligations" (¶¶ 41–44),

4. "Opinions finding that particular statutes are unconstitutional and that therefore agencies need not comply with them" (¶¶ 45–46), and

5. "Opinions adjudicating or determining private rights" (¶¶ 47–49).

Within with each category, you have provided a citation to an unpublished document, cited in a published OLC opinion, that you believe meets these criteria (*i.e.*, that you believe is a "formal written opinion" in the given category). *Id.* ¶ 38 n.36, ¶ 40 n.38, ¶ 44 n.41, ¶ 46 n.43, ¶ 49 n.45.

We have carefully considered the categories you have described, and we are considering for discretionary release the five specific records you identified.  Of the cited records, we have so far determined that two are appropriate for release, in whole or in part, and we have enclosed them here.  We are continuing the process of reviewing the remaining three records, and may determine that some or all of those are appropriate for release as well, in which event we would supplement this response.

## I.   OLC's Function and Responsibilities

Before explaining our position with respect to the particular advice documents implicated by your request, we first clarify OLC's function and responsibilities within the Executive Branch.  As you know, this Office has discussed its role in various publicly available materials, including in the "Best Practices Memo" cited in the March 2016 letter and in declarations filed in FOIA litigation.

OLC's principal function is to assist the Attorney General in his role as legal adviser to the President of the United States and to departments and agencies of the Executive Branch. OLC provides advice and prepares opinions addressing a wide range of legal questions involving the operations of the Executive Branch.  OLC does not purport, and in fact lacks authority, to make policy decisions.  OLC's legal advice and analysis may inform the decision-making of executive branch officials on matters of policy, but OLC's legal advice is not itself dispositive with respect to any policy adopted.

As part of its regular practice, OLC reviews its formal legal opinions after they are issued to determine whether they may be appropriate for publication.  This process involves consultation with affected agencies or offices.  Similarly, as part of OLC's processing of FOIA requests, it considers whether to make discretionary releases of final legal analysis (again, after appropriate consultation with affected agencies or offices).

OLC's publication process and discretionary-release policy are separate from, and in addition to, any disclosure obligation imposed on OLC as a result of 5 U.S.C. § 552(a)(2).  As discussed in this Office's prior correspondence in response to CfA's March 2016 letter, if OLC were to conclude at any time that the Department had an obligation under section 552(a)(2) to make a particular advice document publicly available, we would do so at that time.

Although OLC publishes some opinions and makes discretionary releases of others, much of the Office's legal advice must be kept confidential.  One important reason OLC legal advice needs to stay confidential is that it often constitutes part of a larger deliberative process—a process that itself requires confidentiality to be effective.  The Supreme Court long ago recognized that "efficiency of Government would be greatly hampered if, with respect to legal

and policy matters, all Government agencies were prematurely forced to 'operate in a fishbowl.'" *Environmental Protection Agency v. Mink*, 410 U.S.73, 87 (1973) (quoting S. Rep. No. 89-813, at 9 (1965)). These concerns apply with particular force at OLC, where attorneys are often asked to provide advice and analysis with respect to difficult and unsettled issues of law. Such issues arise in connection with highly complex and sensitive operations of the Executive Branch on matters that can be quite controversial. In order to ensure the candor of internal deliberations, so that executive branch officials may continue to request and rely on legal advice from OLC about such sensitive matters, it is essential that those giving and receiving legal advice not be inhibited by concerns about public disclosure.

A second reason that OLC legal opinions may need to remain confidential is to protect the relationship of trust between OLC and the clients seeking its legal advice. As the Supreme Court has observed, "[t]he attorney-client privilege is the oldest of the privileges for confidential communications known to the common law. Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). The law generally protects the special relationship of trust between a client and an attorney when the one seeks and the other provides independent legal advice. When a request for advice is made in confidence, both the request and the resulting advice are protected from compelled disclosure. *Id.* at 390 ("[T]he privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice."). Protecting that relationship of trust is especially important in the governmental context, where a free and candid flow of information between agency decision-makers and their outside legal advisers promotes broad public interests in the rule of law and the administration of justice. *See In re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir. 1998) (citing *Confidentiality of the Attorney General's Communications in Counseling the President,* 6 Op. O.L.C. 481, 495 (1982) (opinion of Assistant Attorney General Theodore B. Olson)).

While executive branch agencies have traditionally treated OLC's legal opinions as "binding" in the sense that an opinion's conclusion is customarily treated as an authoritative interpretation of the law within the Executive Branch, that label does not change the fundamental nature of OLC's legal advice. OLC opinions provide legal advice regarding the overall legal framework within which policymakers act as a predecisional part of government deliberative processes, but the opinions do not compel the ultimate policy decision reached or adopted by any agency. OLC does not have direct supervisory authority over its clients. Like any other client, a department or agency receives the opinion of its counsel, but then must bear the responsibility for making the final decision.

Finally, the authoritative nature of OLC's legal advice is not unique. In our experience, many agencies treat legal advice from their Offices of General Counsel as "binding," at least as a matter of custom and practice. These norms—which appropriately encourage executive branch policymakers to seek legal advice, and then to follow that advice consistent with rule-of-law interests—do not diminish the generally privileged nature of that legal advice, particularly with respect to the deliberative process privilege, which is a uniquely governmental privilege.

## II. The Five Particular Categories Mentioned in the Amended Complaint

As discussed above, the Amended Complaint has narrowed CfA's March 2016 letter to seek only five categories of OLC advice documents. In light of the foregoing background principles, none of the five categories of advice documents generally or categorically falls within the disclosure obligation under section 552(a)(2).

As an initial matter, the Amended Complaint asserts that all five categories constitute both "final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases" and "those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register." 5 U.S.C. § 552(a)(2)(A), (B). As discussed in the defendant's prior filings in this case, however, the statute's description of "final opinions . . . made in the adjudication of cases" refers to final dispositions of adversarial disputes involving private parties, and its description of "statements of policy and interpretations which have been adopted by the agency" refers to actual policy decisions, made by policymaking agencies, in connection with their regulation of the public. OLC advice documents—like other legal advice documents—qualify as neither. *See Elec. Frontier Found. v. Dep't of Justice*, 739 F.3d 1, 9–10 (D.C. Cir.), *cert. denied*, 135 S. Ct. 356 (2014); *see also Vietnam Veterans of Am. v. Dep't of Navy*, 876 F.2d 164, 164–65 (D.C. Cir. 1989). We do not believe that any of the characteristics you identify render inapplicable the various privileges that apply to OLC documents providing legal advice. Nor do they render those documents subject to section 552(a)(2)'s provisions as a categorical or general matter.

### 1. Opinions Resolving Interagency Disputes

An opinion issued by OLC to resolve a legal disagreement between two executive branch agencies does not involve the "adjudication of [a] case[]." Rather, it concerns confidential legal advice provided to two agencies within the Executive Branch of the United States. OLC's opinion does not involve an adversarial dispute with a private party, does not determine the ultimate policy decisions facing the agencies requesting OLC's advice, and does not involve any circumstances that would waive the privileges otherwise applicable to OLC's advice.

For support, the Amended Complaint cites OLC's published opinion, *Payment of Back Wages to Alien Physicians Hired Under H-1B Visa Program*, 32 Op. O.L.C. 47 (Feb. 11, 2008). *See* Am. Compl. ¶ 37. That opinion concluded that the Department of Labor lacked certain authority with respect to the Department of Veterans Affairs. But the opinion did not purport to determine the rights of any private parties, nor did it determine either Department's ultimate policy on the situation. Indeed, the opinion specifically noted that the Department of Veterans Affairs could still voluntarily provide back wages to its former employees, and that the Department of Labor, even if it lacked one form of authority, might have other tools available to ensure that the Department of Veterans Affairs complied with the statute in the future. *See* 32 Op. O.L.C. at 54–55. Thus, it remained up to the agencies to determine their ultimate policy positions, consistent with the legal framework articulated by OLC.

The Amended Complaint also relies on OLC's published opinion, *The Authority of the Equal Employment Opportunity Commission To Order a Federal Agency To Pay a Monetary Award To Remedy a Breach of a Settlement Agreement*, 38 Op. O.L.C. __ (Aug. 13, 2014). *See*

**JA 227**

Am. Compl. ¶ 36.  But that opinion addressed only the scope of the EEOC's jurisdiction.  It did not purport to resolve a dispute with a private party, nor did it determine the EEOC's policy.  In fact, the opinion left open the possibility that the EEOC might be able to provide a remedy through alternate means.  *See* slip op. at *14 & n.9.

Accordingly, opinions of this type do not fall within the terms of section 552(a)(2)(A) or (B) and are generally exempted from disclosure by the deliberative process and attorney-client privileges.  To be sure, a policymaking agency might take certain actions that waive privilege or otherwise result in its becoming inapplicable (*e.g.*, if an agency expressly adopts an OLC opinion's conclusion and reasoning as its own statement of policy or interpretation).  At that point, of course, any obligation to publish the document would fall on the adopting agency.  At least as a general matter, however, the OLC documents are privileged and exempt from disclosure under FOIA.

## 2.   Opinions Issued to Independent Agencies

The Amended Complaint asserts that formal opinions issued to independent agencies must be disclosed because "OLC's practice is to require the agency to confirm in writing that the agency will conform its conduct to the OLC's conclusion."  Am. Compl. ¶ 39 (modifications omitted).  Contrary to the District Court's instruction, however, you have not explained how this fact changes the analysis—*i.e.*, how this "up-front commitment . . . amounts to anything more than a promise to treat OLC's opinion just as it would be treated by a non-independent executive agency."  ECF No. 19, at 37 n.13.  Because this upfront commitment is indeed nothing more than an agreement by the independent agency to treat OLC's advice as "binding" in the same way a non-independent executive agency would, that feature of OLC's advice does not render it subject to section 552(a)(2).

## 3.   Opinions Interpreting Non-Discretionary Legal Obligations

When OLC opines on the meaning of a statute that an agency is bound to implement, as is often the case, that does not determine an agency's policies nor does it adjudicate the rights of any private individuals.  The Amended Complaint refers to OLC's published opinion, *Whether the Defense of Marriage Act Precludes the Nonbiological Child of a Member of a Vermont Civil Union From Qualifying for Child's Insurance Benefits Under the Social Security Act*, 31 Op. O.L.C. 243 (Oct. 16, 2007).  *See* Am. Compl. ¶ 42.  That opinion did not impose any non-discretionary legal obligation on the Social Security Administration, but simply concluded that "[t]he Defense of Marriage Act would not prevent the non-biological child of a partner in a Vermont civil union from receiving child's insurance benefits under the Social Security Act."  31 Op. O.L.C. at 243.  Thus, the opinion did not itself entitle the child to any particular benefits.  The Social Security Administration was still free to make its own policy decision concerning the child's overall eligibility, provided that the decision did not conflict with OLC's advice.

The Amended Complaint also refers to OLC's published opinion, *Whether Postal Employees Are Entitled To Receive Service Credit, for Purposes of Their Retirement Annuity Under The Federal Employees' Retirement System, for Periods of Employment during which the United States Postal Service Has Not Made Its Required Employer Contributions*, 36 Op. O.L.C. __, slip op. (Nov. 1, 2011).  *See* Am. Compl. ¶ 43.  But again, that opinion concluded only that

one potential policy option was unavailable; it did not determine the Office of Personnel Management's ultimate policy regarding how to address the situation. *See* slip op. at \*16 ("We do not address the propriety of any other action OPM might take to address the Postal Service's failure to make the required contributions to the Fund."). Even when an OLC advice document sets the parameters within which policymakers must operate, that does not equate to determining the agency's ultimate policy decision.

Again, if any of the recipient agencies chose to adopt OLC's conclusion and reasoning as their own, that could alter the relevant privileges' applicability to the advice document. As a general matter, however, OLC advice documents remain privileged and not subject to disclosure under section 552(a)(2) even when they limit an agency's potential range of policy options.

### 4. Opinions finding that particular statutes are unconstitutional and that agencies therefore need not comply with them

The Amended Complaint asserts that OLC opinions involving constitutional questions should be treated differently from those involving solely statutory questions, but it does not provide a justification for that distinct treatment. *See* Am. Compl. ¶¶ 45–46. To the extent that OLC advises that the Constitution, rather than a statute, provides the operative legal principle, OLC is not providing any different kind of legal advice than when it seeks to reconcile a statute with the Constitution, or whether when it provides advice concerning a conflict between two particular statutes. In addition, when OLC opines that a particular statute conflicts with a particular constitutional provision, that advice does not dictate how the agency governed by the statute should address the situation; the agency might voluntarily comply with the statute, decline to comply with it on different grounds, or pursue a strategy of seeking repeal of the statute. Again, the legal advice is provided by OLC, but the ultimate policy decision remains the province of the client agency.

The Amended Complaint refers to OLC's published opinion, *Constitutionality of the Direct Reporting Requirement in Section 802(e)(1) of the Implementing Recommendations of the 9/11 Commission Act of 2007*, 32 Op. O.L.C. 27 (Jan. 29, 2008). *See* Am. Compl. ¶ 45. That opinion makes clear, however, that it does not determine an agency's policy, going so far as to note that, "*[i]f DHS establishes a policy* of declining to enforce section 802(e)(1) on the constitutional grounds set forth in this opinion, DHS should report that decision to Congress as required by statute." 32 Op. O.L.C. at 28–29 n.2 (emphasis added). In other words, the opinion belies the assertion that opinions of this type must be disclosed under FOIA.

### 5. Opinions adjudicating or determining private rights

As discussed above, OLC does not purport—nor does it have authority—to adjudicate or determine any private rights. Client agencies may rely upon OLC advice to assist *their* determinations about private rights. Ultimately though, OLC does not have any authority itself to make a decision determining private rights, and the client agencies bear responsibility for their decisions. At least as a general matter, therefore, OLC advice documents—even those prepared for agencies that must ultimately determine the rights of private individuals—do not themselves constitute "final opinions" or "statements of policy" covered by section 552(a)(2). Instead, they

JA 229

are quintessential legal advice documents that often remain privileged under the deliberative process and attorney-client privileges.

## III.  Five Specific Opinions Alleged Not to be Publicly Available

In addition to the five categories of opinions, the Amended Complaint identifies five specific documents that allegedly fall within the specified categories but have not been publicly disclosed.  We do not agree with your assumption that these documents actually fall within the categories you have identified, or even that they are all "formal written opinions OLC has issued . . . using the process outlined in" the Best Practices Memo, as stated in the March 2016 letter and in the Amended Complaint.  Nonetheless, OLC has reviewed each of the five documents for potential disclosure under section 552(a)(2) or OLC's discretionary-release policy.

We do not believe that section 552(a)(2) requires disclosure of any of the five documents. Nonetheless, OLC has determined that two are appropriate for discretionary release, in whole or in part, and we have enclosed them here.  Note that in making these discretionary releases, as in most cases of discretionary release, OLC has determined in consultation with its clients to waive the applicable privileges over the documents as a matter of discretion.  With respect to one of the documents, which was prepared by attorneys in the course of litigation, OLC has determined not to waive the protections of the attorney work product doctrine.  Accordingly, that document is enclosed with limited redactions.  OLC is continuing the process of reviewing and consulting about the three remaining records, and may determine that some or all of those are appropriate for discretionary release as well, in which event we would supplement this response.  Those opinions that we have not released remain protected by the deliberative process and attorney-client privileges.

<center>*     *     *</center>

As discussed above, we do not believe you have identified any categories of OLC advice documents plausibly subject to section 552(a)(2) as a general or categorical matter.  To the extent you identify specific opinions you contend have not been disclosed, however, we will continue to consider those records on an individual basis for disclosure, publication, or discretionary release based on the specific facts and circumstances of those documents.

I hope this information is helpful.

Sincerely,

Curtis E. Gannon
Principal Deputy Assistant Attorney General

cc:    Daniel Schwei, Trial Attorney
       Civil Division, Federal Programs Branch

# Memorandum



| | |
|---|---|
| **Subject** <br> Payment of Attorney's Fees under the Equal Access to Justice Act | **Date** <br> August 25, 1994 |

| | |
|---|---|
| **To** <br> Stephen R. Colgate <br> Assistant Attorney General <br> Justice Management Division | **From** <br> Richard Shiffrin <br> Deputy Assistant Attorney General <br> Office of Legal Counsel |

OLC was recently asked by the Civil Division to consider whether the Department of Justice, or some other agency, should be responsible for satisfying an award of attorney's fees and costs under the Equal Access to Justice Act ("EAJA") in the case of ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. The Department of Justice, on behalf of the United States, intervened in that case, as well as in five other cases raising the identical issue, to challenge the ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. In each case, the courts have upheld the constitutionality of the Act; the ▇▇▇▇ court has awarded ▇▇▇▇▇ in attorney's fees and costs and EAJA applications are pending in the other cases.[1] We have concluded, based on the unique circumstances presented by this case, that the Department is indeed responsible for paying the ▇▇▇▇ award.

The Equal Access to Justice Act provides that fees awarded to a party "shall be paid from the agency over which the party prevails from any funds made available to the agency by appropriation or otherwise." We would like to request your assistance in determining which Department funds should be used to satisfy this award. Should you conclude that the funds should be drawn from one or more of the components of the Department involved in the decision to litigate this case, rather than from some general departmental fund, we have been advised by the Civil Division that the Attorney General, the Solicitor General, the Office of Legal Counsel, and the Civil Division all participated in some form. For example, the Office of Legal Counsel advised that the Act was unconstitutional, the Solicitor General authorized intervention by the United States, and the Civil Division litigated the case. The Solicitor General also made the decision not to appeal the ▇▇▇▇ judgment. Given the respective roles of each of the components and JMD's fiscal expertise, it seems most

---

[1] We have been advised by the Civil Division that there is a strong possibility that attorney's fees will not be assessed against the United States in the other five cases.

appropriate that you resolve this matter.    If you have any
questions, please contact Jennifer Collins in the Office of Legal
Counsel at 514-4487 or Susan Rudy in the Civil Division at 514-
2071.

U.S. Department of Justice

Office of Legal Counsel

Office of the Assistant Attorney General       *Washington, D.C. 20530*

March 23, 2001

## MEMORANDUM FOR CHARLOTTE HARDNETT
### ACTING GENERAL COUNSEL
### SOCIAL SECURITY ADMINISTRATION

FROM:       Daniel L. Koffsky *ᎯᏃᏦ*
             Acting Assistant Attorney General

RE:          Applicability of 18 U.S.C. § 1913 to the Provision of Official Time to Employee
             Union Representatives to Lobby Congress on Representational Issues

      This memorandum responds to your office's request for our opinion whether the provision
of official time to employee union representatives for the purpose of allowing them to lobby
members of Congress on representational issues would violate 18 U.S.C. § 1913. The original
inquiry was supplemented, at our request, by a letter explaining your office's reasons for
questioning the conclusion of the Federal Labor Relations Authority ("FLRA") in *Social Security
Administration, Baltimore, Maryland and American Federation of Government Employees*, 54
F.L.R.A. 600 (1998) ("*SSA and AFGE*"), that the provision of official time for employee union
representatives to lobby Congress on representational matters has been expressly authorized by
Congress and therefore does not violate 18 U.S.C. § 1913 (1994).[1] *See* Letter for Beth Nolan,

---

    [1] It is not our practice to issue a formal opinion reviewing the legal conclusions of an agency within the
executive branch whose members are removable only for cause, such as the FLRA, when that agency has not
indicated it will adhere to our opinion. *See* 5 U.S.C. § 7104(b) (1994) (members of the FLRA may be removed by
the President "only for inefficiency, neglect of duty, or malfeasance in office"). Indeed, when a dispute arose in
1981 between the FLRA and the Civil Division of the Department of Justice regarding whether the FLRA had
independent authority to litigate in Freedom of Information Act cases, we declined to play a role in resolving the
dispute because of questions about requiring the FLRA to abide by our opinion. *Cf.* Exec. Order No. 12,146, § 1-4,
*reprinted in* 28 U.S.C. § 509 note (1994) (encouraging executive agencies to submit legal disputes to the Attorney
General but only requiring submission of certain legal disputes between agencies whose heads serve at the pleasure
of the President). In fact, the Commissioner of Social Security is removable only for cause and the Social Security
Administration ("SSA") has not formally agreed to be bound by our views. *See* 42 U.S.C. § 902(a)(3) (1994).
(Commissioner may be removed "only pursuant to a finding by the President of neglect of duty or malfeasance in
office").

    Nevertheless, the FLRA has given some indication that SSA should ask for our opinion. In *United States
Department of the Army Corps of Engineers, Memphis District, Memphis, Tennessee and National Federation of
Federal Employees Local 259*, 52 F.L.R.A. 920, 936 (1997) ("*Corps of Engineers*"), FLRA member Armendariz,
dissenting in part, suggested that the FLRA seek an advisory opinion from this Office on the precise issue your
office has raised. When declining to seek such an advisory opinion, the majority of the FLRA explained that it

Deputy Assistant Attorney General, Office of Legal Counsel, from Arthur J. Fried, General Counsel, Social Security Administration (Nov. 8, 1999) ("Fried-Nolan Letter").[2]

The Anti-Lobbying Act, 18 U.S.C. § 1913, provides:

> No part of the money appropriated by any enactment of Congress shall, *in the absence of express authorization by Congress,* be used directly or indirectly to pay for any personal service, advertisement, telegram, telephone, letter, printed or written matter, or other device, intended or designed to influence in any manner a Member of Congress, to favor or oppose, by vote or otherwise, any legislation or appropriation by Congress, whether before or after the introduction of any bill or resolution proposing such legislation or appropriation; but this shall not prevent officers or employees of the United States or of its departments or agencies from communicating to Members of Congress on the request of any Member or to Congress, through the proper official channels, requests for legislation or appropriations which they deem necessary for the efficient conduct of the public business.

(emphasis added).  Although the Anti-Lobbying Act has not been the basis of any prosecutions since its enactment in 1919, a violation requires removal from office after notice and a hearing and imposition of fines or imprisonment of up to a year.  *Id.*

In *SSA and AFGE*, the FLRA reaffirmed its earlier opinions finding that Congress has, within the meaning of 18 U.S.C. § 1913, given "express authorization" to agencies to grant official time to employee union representatives for representational lobbying of Congress and that the grant of official time for such purposes therefore does not violate the Anti-Lobbying Act. 54 F.L.R.A. at 607.  The FLRA's reasoning for this determination is set out most comprehensively in *Corps of Engineers*.  In *Corps of Engineers*, the FLRA pointed out that 5 U.S.C. § 7102 gives employees, acting in their representational capacities, the right to present the views of their labor organization to Congress.  52 F.L.R.A. at 932; *see* 5 U.S.C. § 7102(1) (1994) (each employee has the right "to act for a labor organization in the capacity of a representative and the right, in that capacity, to present the views of the labor organization to . . . the Congress").  The FLRA then turned to 5 U.S.C. § 7131(d), which provides:

---

would not be "either necessary or prudent to expend Government resources and delay the disposition of this case . . . , especially when [SSA] was capable of seeking such an opinion and chose not to do so." *Id.* at 932 n.12. In any event, because the issue is the interpretation of a criminal statute that the Department of Justice enforces, our opinion will have the conclusive effect of identifying whether the activity in question is within the criminal prohibition.

[2] Unfortunately, we did not receive the letter explaining your office's reasons for questioning the FLRA's decision in *SSA and AFGE*, which was dated November 8, 1999, until it was sent to us by facsimile on December 8, 2000.

Except as provided in the preceding subsections of this section [prohibiting use of official time for activities relating to the internal business of a labor organization] . . . in connection with any other matter covered by this chapter [which includes § 7102], any employee in an appropriate unit represented by an exclusive representative, shall be granted official time in any amount the agency and the exclusive representative involved agree to be reasonable, necessary, and in the public interest.

5 U.S.C. § 7131(d) (1994). Reading § 7131(d) and § 7102(1) together, the FLRA concluded that Congress expressly authorized "using Federal funds to grant official time to employees to lobby Congress on representational matters, in such amount as the employing Federal agency and the exclusive representative agree," 52 F.L.R.A. at 933, and that, because of Congress's express authorization, such use of appropriated funds does not violate the Anti-Lobbying Act. *Id.*

Your office questioned the FLRA's conclusion that § 7131(d) and § 7102(1), taken together, constitute an "express authorization" by Congress within the meaning of the Anti-Lobbying Act. Fried-Nolan Letter at 2. In your office's view, "the mandate contained in 18 U.S.C. § 1913 of an 'express authorization' is self-defining and requires a more definitive expression of Congressional intent, such that there can be no doubt that the activity in question is specifically excepted from the scope of 18 U.S.C. § 1913." *Id.* Your office also argued that 18 U.S.C. § 1913 is more specific than 5 U.S.C. §§ 7131(d) and 7102(1).

We agree with the FLRA that, when read together, § 7131(d) and § 7102(1) constitute an "express authorization" by Congress within the meaning of the Anti-Lobbying Act. These provisions are both "definitive" and clear: in § 7131(d) Congress explicitly authorized the use of official time by employee union representatives to engage in matters covered by the Labor-Management Relations chapter of title 5, which include lobbying Congress. *See* 5 U.S.C. § 7102(1). In addition, while there is little precedent regarding the meaning of the phrase "express authorization by Congress" in 18 U.S.C. § 1913, the administrative practice also supports this conclusion. On some occasions, this Office has taken the position that the continued appropriation of funds by Congress for positions held by executive branch officials whose duties historically have included seeking support for the Administration's legislative program constitutes "express authorization" by Congress for the lobbying activities of these officials and therefore their activities are exempt from § 1913. *See Constraints Imposed by 18 U.S.C. § 1913 on Lobbying Efforts*, 13 O.L.C. 300, 303 (1989); *Legal Constraints on Lobbying Efforts in Support of Contra Aid and Ratification of the INF Treaty*, 12 O.L.C. 30, 32-33 (1988). The authorization to grant official time to employee union representatives to lobby Congress in § 7131(d) and § 7102(1) is a more explicit authorization by Congress than the continued appropriation of funds for certain positions. Furthermore, we do not believe that 18 U.S.C.

-3-

JA 235

§ 1913 is more specific than the provisions of title 5.  The title 5 provisions specifically refer to lobbying Congress and, unlike 18 U.S.C. § 1913, specifically deal with the grant of official time for union activities.[3]

Finally, in *Granite State Chapter v. FLRA*, 173 F.3d 25 (1st Cir. 1999), the First Circuit shed some light on this issue when it examined whether section 8015 of the 1996 Department of Defense ("DoD") Appropriations Act precluded the use of official time by union officials to lobby Congress.[4]  The court concluded that the specific, unambiguous language of section 8015 prohibited the use of any funds made available by the DoD Appropriations Act for lobbying, but, in reaching that conclusion, assumed that absent § 8015 members of the union would have had a right under 5 U.S.C. § 7102 to lobby Congress on official time:  "§ 8015 repealed the Union's right to lobby Congress on official time as otherwise guaranteed by 5 U.S.C. § 7102."  173 F.3d at 28; *cf. Association of Civilian Technicians, Silver Barons Chapter v. FLRA*, 200 F.3d 590, 592 (9th Cir. 2000) (section 8015 expresses the unambiguous, clear intent of Congress to repeal § 7131 and § 7102 of title 5 "as they are read to allow DOD employees to use official time to lobby Congress").  This language suggests that, in the court's view, 18 U.S.C. § 1913 would not prohibit employee union representatives from being granted official time to lobby Congress on representational issues.

---

[3] Because we believe that Congress has given "express authorization" for the use of official time by employee union representatives to lobby Congress, we need not decide whether the lobbying activities engaged in by such representatives are exempt from the prohibition in 18 U.S.C. § 1913 on any other ground.

[4] Section 8015 provided that "[n]one of the funds made available by this Act shall be used in any way, directly or indirectly, to influence congressional action on any legislation or appropriation matters pending before Congress."  Pub. L. No. 104-61, 109 Stat. 636, 654 (1996).

-4-