NOT YET SCHEDULED FOR ORAL ARGUMENT

**Nos. 24-5163, 24-5170**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

————————————

Campaign for Accountability,

*Plaintiff–Appellee / Cross-Appellant*,

v.

U.S. Department of Justice,

*Defendant–Appellant / Cross-Appellee*.

————————————

On appeal from the United States District Court for the
District of Columbia — No. 1:16-cv-01068 (Cobb, J.)

**BRIEF FOR APPELLEE / CROSS-APPELLANT**

Alex Abdo
Anna Diakun
Jackson Busch
Jameel Jaffer
Knight First Amendment Institute at
  Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
alex.abdo@knightcolumbia.org

*Counsel for Plaintiff–Appellee / Cross-Appellant*

## Certificate as to Parties, Rulings, and Related Cases

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

**(A)    Parties and amici.** The appellee / cross-appellant is Campaign for Accountability. The appellant / cross-appellee is the U.S. Department of Justice. There have been no amici curiae or intervenors.

 **(B)    Rulings under review.** The rulings under review on the government's appeal are (1) the memorandum opinion and order issued by then-Judge Ketanji Brown Jackson on September 11, 2020, granting in part and denying in part the government's motion to dismiss, Joint Appendix ("JA") 237–76, and (2) the memorandum opinion and order issued by Judge Jia M. Cobb on April 19, 2024, denying the government's motion for summary judgment and granting Campaign for Accountability's cross-motion for summary judgment, JA 602–23. The first opinion is reported at 486 F. Supp. 3d 424 (D.D.C. 2020); the second does not yet have a reported citation.

The rulings under review on Campaign for Accountability's cross-appeal are (1) the memorandum opinion and order issued by then-Judge Jackson on October 6, 2017 and September 29, 2017, respectively, granting the government's motion to dismiss, JA 22–61; and (2) the September 11, 2020 memorandum opinion and order

mentioned in the paragraph above. The 2017 opinion is reported at 280 F. Supp. 3d 112 (D.D.C. 2017).

(C)   **Related cases.** The rulings on appeal have not previously been before this Court or any other appellate court. Counsel is not aware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

/s/ Alex Abdo
Alex Abdo

ii

## Rule 26.1 Corporate Disclosure Statement

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, undersigned counsel certifies that Campaign for Accountability has no parent corporation and that no publicly held corporation owns 10 percent or more of its stock. Campaign for Accountability is a nonpartisan, nonprofit § 501(c)(3) organization committed to promoting government transparency, educating the public about government activities, and ensuring the accountability of government officials.


/s/ Alex Abdo
Alex Abdo

# Table of Contents

Certificate as to Parties, Rulings, and Related Cases..................................i

Rule 26.1 Corporate Disclosure Statement..............................................iii

Table of Authorities ......................................................................vii

Glossary ......................................................................................xi

Statement of Jurisdiction................................................................. 1

Pertinent Statutes and Regulations...................................................... 1

Statement of Issues on Appeal ........................................................... 1

Statement of the Case...................................................................... 2

    I.    The OLC and its formal written opinions.................................... 4

    II.   Procedural history............................................................ 6

Summary of the Argument................................................................ 10

Argument .................................................................................. 14

    I.    FOIA's reading-room provision requires the OLC to proactively disclose at least three categories of its formal written opinions. ............ 14

        A.    The district court correctly held that the reading-room provision applies to OLC opinions resolving interagency disputes.......................................................... 15

            1.   These opinions are "final opinions . . . made in the adjudication of cases." ...................................... 15

            2.   These opinions are "statements of policy and interpretations which have been adopted by the agency." .............................................................. 26

B.    The district court erred in dismissing CfA's claim that the reading-room provision applies to OLC opinions issued in the adjudication of private rights.................................... 31

1.    These opinions are "final opinions . . . made in the adjudication of cases." ........................................ 32

2.    These opinions are "statements of policy and interpretations which have been adopted by the agency." ........................................................ 36

C.    The district court erred in dismissing CfA's claim that the reading-room provision applies to OLC opinions interpreting agencies' non-discretionary legal obligations. .......... 38

D.    *EFF* is not to the contrary. ........................................... 41

1.    *EFF* does not apply to § 552(a)(2)(A). .............................. 44

2.    Even with respect to § 552(a)(2)(B), *EFF* recognizes that the reading-room provision applies to OLC opinions that speak with authority on agency law or policy, and the opinions at issue here do just that.............. 46

3.    The government's interpretation of *EFF* cannot be reconciled with this Court's past precedent. ...................... 50

E.    Because these opinions fall within the reading-room provision, they cannot be withheld under Exemption 5's deliberative process and attorney–client privileges. .................... 55

II.    Requiring the disclosure of the opinions at issue would serve important rule-of-law values. ................................................. 58

III.    The OLC must provide an index of formal written opinions subject to affirmative disclosure. ......................................... 61

Conclusion ............................................................................. 61

Certificate of Compliance ........................................................ 62

Certificate of Service ................................................................................... 63

Addendum

# Table of Authorities

## Cases

*Am. C.L. Union v. Nat'l Sec. Agency*, 925 F.3d 576
(2d Cir. 2019)................................................................49, 50

*Am. Immigr. Laws. Ass'n v. Exec. Off. for Immigr. Rev.*, 830 F.3d 667 (D.C. Cir. 2016)...............................................21

*Brinton v. Dep't of State*, 636 F.2d 600 (D.C. Cir. 1980).......................................................................................46

*Bristol-Meyers Co. v. FTC*, 598 F.2d 18 (D.C. Cir. 1978)..........................................................................16, 21, 33

*Chambers v. Burwell*, 824 F.3d 141 (D.C. Cir. 2016)..........................................................................................1

*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.* (*CREW II*), 922 F.3d 480 (D.C. Cir. 2019)...................................................2, 8, 13, 43, 45, 47

*Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854 (D.C. Cir. 1980)......................................35, 46, 51

*Elec. Frontier Found. v. U.S. Dep't of Just.* (*EFF*), 739 F.3d 1 (D.C. Cir. 2014)..........................3, 11, 28, 29, 30, 42, 43, 44, 48, 49

*In re Subpoenas Duces Tecum*, 738 F.2d 1367 (D.C. Cir. 1984)...........................................................................58

*LeFande v. District of Columbia*, 841 F.3d 485 (D.C. Cir. 2016)...........................................................................1

*NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132 (1975)..............................9, 14, 16, 21, 25, 44, 55, 56, 60

*Pub. Citizen, Inc. v. Off. of Mgmt. & Budget*, 598 F.3d 865 (D.C. Cir. 2010)..........................................20, 24

*Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90 (D.C. Cir. 1986) ........................................................ 23

*Schlefer v. United States*, 702 F.2d 233 (D.C. Cir. 1983) ................................................ 27, 35, 37, 38, 46, 54

*Tax Analysts v. IRS* (*Tax Analysts I*), 117 F.3d 607 (D.C. Cir. 1997) .................................. 20, 34, 52, 55, 56, 57

*Tax Analysts v. IRS* (*Tax Analysts II*), 294 F.3d 71 (D.C. Cir. 2002) ............................................ 20, 46, 52, 53

*Tax'n with Representation Fund v. IRS*, 646 F.2d 666 (D.C. Cir. 1981) ........................................................ 50

*U.S. Dep't of Just. v. Tax Analysts*, 492 U.S. 136 (1989) ...................................................................... 31

## Statutes

28 U.S.C. § 512 ...................................................................... 15

5 U.S.C. § 551 ................................................................. 21, 33

5 U.S.C. § 552(a) .................................................................. 61

5 U.S.C. § 552(a)(2)(A) ........................... 2, 11, 14, 15, 21, 32, 45

5 U.S.C. § 552(a)(2)(B) ........................... 2, 11, 14, 15, 32, 44, 57

5 U.S.C. § 552(a)(2)(C) ............................................................ 24

## Other Authorities

*Administrative Assessment of Civil Penalties Against Federal Agencies Under the Clean Air Act*, 21 Op. O.L.C. 109 (1997) ............ 18, 20, 30

*Application of the Endangered Species Act of 1973 to the Sale of Sperm Whale Oil by the GSA* (O.L.C. Dec. 19, 1974) ................................ 17, 20

*Application of the Statutory Pay Cap on Administratively Determined Pay in 5 U.S.C. § 5373 to the National Science Foundation*, 47 Op. O.L.C. __ (2023) ........................................................................... 40, 41

*Authority of the Department of Labor to Control the Disclosure of Federal Employees' Compensation Act Records Held by the United States Postal Service*, 36 Op. O.L.C. 217 (2012) ..................... 18, 20, 30

*Authority of the Equal Employment Opportunity Commission to Impose Monetary Sanctions Against Federal Agencies for Failure to Comply With Orders Issued by EEOC Administrative Judges*, 27 Op. O.L.C. 24 (2003) .................................................................... 18, 21

*Disposition of Proceeds from the Sale of Government Buildings Acquired with Social Security Trust Funds*, 34 Op. O.L.C. 263 (2010) ............................................................................................. 18, 21

*EEOC Authority to Order Federal Agency to Pay for Breach of Settlement Agreement*, 38 Op. O.L.C. 22 (2014) .................................. 30, 34, 38

Exec. Order No. 12,146, 44 Fed. Reg. 42,657 (July 18, 1979) ........................ 15, 17

*Payment of Back Wages to Alien Physicians Hired Under H-1B Visa Program*, 32 Op. O.L.C. 47 (2008) ...................................................... 30, 34, 38

*Responsibility of Agencies to Pay Attorney's Fee Awards Under the Equal Access to Justice Act*, 31 Op. O.L.C. 229 (2007) .............................. 39, 40

*Service Credit for Retirement Annuities of USPS Employees When USPS Has Not Made Required Contributions*, 35 Op. O.L.C. 181 (2011) ....................................................................................................... 40

Trevor W. Morrison, *Stare Decisis in the Office of Legal Counsel*, 110 Colum. L. Rev. 1448 (2010) ................................................................... 4

*Whether Reservists Must Exhaust Available Leave Under 5 U.S.C. § 6323(b) Before Taking Leave Under 5 U.S.C. § 6323(a)*, 36 Op. O.L.C. 129 (2012) ....................................................................... 29, 30

*Whether the Defense of Marriage Act Precludes the Nonbiological Child of a Member of a Vermont Civil Union from Qualifying for*

ix

*Child's Insurance Benefits Under the Social Security Act*, 31 Op. O.L.C. 243 (2007)....................................................................... 34, 38, 40

*Whether the United States Postal Service Bears Responsibility for the Cost of Certain Civil Service Retirement Benefits Paid to Its Employees*, 48 Op. O.L.C. __, at 21 (2024)....................................................... 41

**Rules**

Fed. R. App. P. 4(a) ................................................................................... 1

**Glossary**

| | |
|---|---|
| APA | Administrative Procedure Act |
| CfA | Campaign for Accountability |
| CREW | Citizens for Responsibility & Ethics in Washington |
| DOD | Department of Defense |
| DOJ | Department of Justice |
| DOL | Department of Labor |
| EEOC | Equal Employment Opportunity Commission |
| EFF | Electronic Frontier Foundation |
| EPA | Environmental Protection Agency |
| FBI | Federal Bureau of Investigation |
| FECA | Federal Employees' Compensation Act |
| FOIA | Freedom of Information Act |
| GSA | General Services Administration |
| IRS | Internal Revenue Service |
| JA | Joint Appendix |
| NSF | National Science Foundation |
| OLC | Office of Legal Counsel |
| OPM | Office of Personnel Management |
| SSA | Social Security Administration |
| USPS | United States Postal Service |
| VA | Department of Veterans Affairs |

## Statement of Jurisdiction

The district court had jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 552(a)(4)(B). On April 19, 2024, it issued a final order denying the government's motion for summary judgment and granting Campaign for Accountability's cross-motion. Notice of Appeal [JA 623]. The government timely filed a notice of appeal on June 18, 2024, JA 624; *see* Fed. R. App. P. 4(a)(1)(B), and Campaign for Accountability ("CfA") then timely filed a notice of appeal on June 28, 2024, Notice of Cross-Appeal [JA 625–26]; *see* Fed. R. App. P. 4(a)(3).

Because the order granting summary judgment to CfA resolved the only remaining claim, it was a final decision, and this Court has jurisdiction under 28 U.S.C. § 1291. *See Chambers v. Burwell*, 824 F.3d 141, 143 (D.C. Cir. 2016). This Court also has authority to review the district court's September 29, 2017 and September 11, 2020 orders as "interlocutory orders that . . . merge[d] into the final decision." *LeFande v. District of Columbia*, 841 F.3d 485, 491 (D.C. Cir. 2016).

## Pertinent Statutes and Regulations

Pertinent statutes are reproduced in the addendum.

## Statement of Issues on Appeal

The "reading-room provision" of the Freedom of Information Act ("FOIA") requires federal agencies to proactively disclose "final opinions . . . made in the

1

adjudication of cases" and "those statements of policy and interpretations which have been adopted by the agency." 5 U.S.C. § 552(a)(2)(A)–(B).

The issue presented by the government's appeal is whether the district court was correct in holding that the reading-room provision requires the Office of Legal Counsel ("OLC") to proactively disclose opinions that resolve interagency disputes.

The issues presented by CfA's cross-appeal are (1) whether the reading-room provision requires the OLC to proactively disclose two additional categories of formal written opinions—opinions issued in the course of an agency's adjudication of private rights and opinions in which the OLC authoritatively interprets an agency's non-discretionary legal obligations, and (2) whether the reading-room provision also requires the OLC to disclose most or all of its other formal written opinions, other than those issued to the President.[1]

## Statement of the Case

Campaign for Accountability filed this suit under FOIA's reading-room provision to vindicate the public's right to access the Office of Legal Counsel's formal written opinions, which determine the law and policy of the executive branch on complex and often consequential issues. As originally filed, CfA's complaint

---

[1] CfA acknowledges that this Court resolved the second question presented by the cross-appeal, in *Citizens for Responsibility & Ethics in Washington v. U.S. Department of Justice* (*CREW II*), 922 F.3d 480, 487 (D.C. Cir. 2019), and so it includes it here solely to preserve it for possible later review.

sought all formal written opinions issued by the OLC to executive branch agencies or officials other than the President. Compl. ¶¶ 1, 31, 35 [JA 10, 17–18]. The district court dismissed CfA's original complaint, holding that this Court's decision in *Electronic Frontier Foundation v. U.S. Department of Justice* (*EFF*), 739 F.3d 1 (D.C. Cir. 2014), foreclosed the argument that FOIA's reading-room provision applies to *all* OLC opinions. First MTD Op. 3, 30–36 [JA 26, 53–59]. On the district court's invitation, *id.* at 38 [JA 61], CfA amended its complaint to identify categories of OLC opinions that fall within FOIA's reading-room provision even accepting the district court's interpretation of *EFF*. Am. Compl. ¶ 34 [JA 74].

This appeal now concerns three of the categories of OLC opinions that CfA's amended complaint identified. Specifically: (1) those resolving interagency disputes; (2) those issued in the adjudication of private rights; and (3) those interpreting non-discretionary legal obligations. As explained below, the district court granted the government's motion to dismiss with respect to the latter two categories, but it denied the government's motion with respect to the first category, holding that CfA had plausibly alleged that opinions resolving interagency disputes fall within both § 552(a)(2)(A) and § 552(a)(2)(B). After the parties cross-moved for summary judgment on a stipulated record, the district court held that OLC opinions resolving interagency disputes must indeed be proactively disclosed under § 552(a)(2)(A), but it declined to address whether they must also be disclosed under

§ 552(a)(2)(B). The government now appeals that grant of summary judgment, and CfA cross-appeals the district court's dismissal of its claims with respect to the other two categories of OLC opinions.

## I.      The OLC and its formal written opinions.

The OLC is a component of the Department of Justice ("DOJ") whose "core function . . . is to provide controlling legal advice" to executive agencies. Stip. ¶ 1 [JA 290]. But it "is not just any executive office. For decades, it has been the most significant centralized source of legal advice within the [e]xecutive [b]ranch." Trevor W. Morrison, *Stare Decisis in the Office of Legal Counsel*, 110 Colum. L. Rev. 1448, 1451 (2010). The OLC issues its formal written opinions on authority delegated by the Attorney General, Stip. ¶¶ 1–4 [JA 290–91], and the opinions are binding by custom and practice in the executive branch. MSJ Op. 3 [JA 604] (citing the government's briefing to note that the "OLC appears to concede . . . that [its] formal written opinions are legally binding"). Indeed, federal agencies have treated opinions issued by the OLC as binding since the office's inception. Am. Compl. ¶ 28 n.25 [JA 71 n.25]. Because the OLC "is frequently asked to opine on issues of first impression that are unlikely to be resolved by the courts," "[the] OLC's advice may effectively be the final word on the controlling law." Best Practices Memo 1 [JA 298].

The OLC's process for drafting its opinions is set out in detail in its "Best Practices Memo," which former OLC head (and now Judge) David Barron issued in 2010 to memorialize the "principles" and "practices" that guide the OLC's work. *Id.* [JA 298]. According to the memo, the office is "attentive to the particular facts and circumstances at issue," and it "avoid[s] issuing advice on abstract questions." *Id.* at 2 [JA 299]. It issues an opinion only when the requesting agency has a "practical need" for it. *Id.* at 3 [JA 300]. Before doing so, its "general practice" is to solicit a "detailed memorandum setting forth the agency's own analysis of the question"; it may also solicit other agencies' views "[w]hen appropriate and helpful." *Id.* [JA 300]. The OLC then "candidly and fairly addresses the full range of relevant legal sources and significant arguments on all sides of a question." *Id.* at 2 [JA 299]. The OLC treats the opinions it issues as precedent from which it does not depart without good reason. *Id.* [JA 299]. Despite the significance of these opinions in setting the law and policy of the executive branch, the OLC publishes only a subset of them. Stip. ¶¶ 18–21 [JA 295–96].

This appeal concerns three categories of the OLC's formal written opinions. The first category comprises opinions resolving interagency disputes, which are issued in the context of "a concrete and ongoing dispute between two or more executive agencies." Am. Compl. ¶ 35 [JA 74] (citation omitted). Agencies submit these disputes to the OLC for resolution pursuant to Executive Order 12,146. *Id.* [JA

74]. The second category comprises opinions issued when an agency is engaged in an adjudication of private rights and obtains an authoritative legal interpretation from the OLC to apply in that adjudication. *Id.* ¶¶ 47–49 [JA 80]. These opinions "define, at least in the first instance, the rights and liabilities of private individuals vis-à-vis the government," and "are similar in effect to administrative or judicial decisions concerning private rights." *Id.* ¶ 47 [JA 80]. The third category comprises opinions resolving agencies' non-discretionary legal obligations, which "have the effect of directly determining an agency's policies and practices[] because the agency is under a non-discretionary obligation to comply with the authority at issue." *Id.* ¶ 41 [JA 77].

The opinions in each of these categories resemble judicial decisions, dispassionately examining competing arguments, relying on or distinguishing past precedent as appropriate, and generally expressing their conclusions in mandatory language. *See* Best Practices Memo 1–4 [JA 298–301].

## II.    Procedural history.

CfA filed its original complaint on June 8, 2016, seeking proactive disclosure of all OLC opinions under FOIA's reading-room provision. *See* Compl. ¶ 1 [JA 10]. The district court granted the government's motion to dismiss the original complaint but permitted CfA to file an amended complaint "identif[ying] an ascertainable set

of OLC opinions that OLC has withheld from the public and that is also plausibly subject to the FOIA's reading-room requirement." First MTD Op. 3 [JA 26].

CfA then filed its amended complaint on October 27, 2017, identifying five specific categories of the OLC's formal written opinions that fall within the reading-room provision. Am. Compl. ¶¶ 34–49 [JA 74–80]. The government again moved to dismiss. Based on a clarification in the government's brief, CfA withdrew its claim with respect to the fifth category (opinions issued to independent agencies). *See* Second MTD Op. 8 n.4 [JA 244 n.4].

In resolving the second motion to dismiss, the district court rejected the government's argument that this Court's ruling in *EFF* foreclosed the application of the reading-room provision to OLC opinions categorically, concluding that "*EFF* plainly leaves open the possibility that a client agency (such as the FBI) can 'adopt' the OLC's legal advice such that the OLC opinion becomes that agency's working law, or that OLC might, in some cases, 'speak with authority' as to the client agency's policies and interpretations." *Id.* at 21 [JA 257] (citation omitted). The district court also rejected the government's assertion that FOIA's reading-room provision "extends only to agency records that pertain to the regulation of private entities." *Id.* at 14 [JA 250].

Turning to the specific categories of OLC opinions at issue, the district court held that the reading-room provision plausibly encompasses the first—opinions

resolving interagency disputes. It concluded that such opinions are plausibly "final opinions . . . made in the adjudication of cases[,]" *id.* at 3 [JA 239] (citing § 552(a)(2)(A)), explaining that "where two disputing agencies submit their disagreement to OLC for resolution consistent with Executive Order 12,146, it is at least plausible that OLC is 'speak[ing] authoritatively' with respect to the agencies' legal dispute," *id.* at 28 [JA 264] (citation omitted). The district court also concluded that opinions in this category are plausibly "statements of policy and interpretations" adopted by the agencies "*ex ante.*" *Id.* at 28–29 [JA 264–65] (citing § 552(a)(2)(B)). It determined that "CfA's allegations are significantly different from the circumstances presented in *EFF*," because "here, CfA plausibly alleges that, by virtue of a dispute-resolution system in which agencies submit contested legal issues to OLC for resolution, OLC *does* 'speak with authority' concerning those particular policies or legal interpretations." *Id.* at 29–30 [JA 265–66] (citation omitted).

The district court dismissed CfA's claims with respect to the remaining categories of opinions. *Id.* at 31–38 [JA 267–74]. Relying on *EFF* and this Court's decision in *Citizens for Responsibility & Ethics in Washington v. U.S. Department of Justice* (*CREW II*), 922 F.3d 480 (D.C. Cir. 2019), the district court held that CfA's amended complaint did not plausibly allege that those opinions fall within the reading-room provision. Second MTD Op. 31 [JA 267].

8

The parties proceeded to summary judgment on the category of OLC opinions that resolve interagency disputes. On April 19, 2024, the district court granted CfA's cross-motion for summary judgment and held that those opinions fall within FOIA's reading-room provision. MSJ Op. 11 [JA 612]. Judge Cobb, to whom the case had been assigned after then-Judge Jackson's confirmation to the D.C. Circuit, held that such opinions are "final opinions" that are "made in the adjudication of cases" and are thus covered by the plain text of § 552(a)(2)(A). *Id.* [JA 612]. The district court did not reach CfA's alternative argument that these opinions are also statements of policy and interpretations under § 552(a)(2)(B). *Id.* [JA 612].

After holding that the reading-room provision applies to opinions resolving interagency disputes, the district court rejected the government's invocation of Exemption 5. *Id.* at 20 [JA 621]. It relied on the Supreme Court's opinion in *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132 (1975), which held "that the deliberative process privilege and the reading-room provision are generally mutually exclusive." MSJ Op. 20 [JA 621].

The government timely appealed the district court's summary judgment order, Notice of Appeal [JA 624], and CfA timely cross-appealed the district court's earlier orders dismissing CfA's remaining claims, Notice of Cross-Appeal [JA 625–26]. CfA now seeks affirmative disclosure of three categories of OLC opinions under FOIA's reading-room provision: (1) those resolving interagency disputes; (2) those

issued in the adjudication of private rights; and (3) those interpreting non-discretionary legal obligations.[2]

## Summary of the Argument

This appeal concerns the question of whether FOIA's reading-room provision applies to three categories of the OLC's formal written opinions. Specifically: (1) opinions resolving interagency disputes; (2) opinions issued in the course of an agency's adjudication of private rights; and (3) opinions interpreting non-discretionary legal obligations. These opinions play an important role in determining the law and policy of the executive branch. Opinions in the first category settle ongoing legal disputes between agencies over their established policies, superseding the agencies' preexisting legal and policy positions. Opinions in the second category serve as the equivalent of appellate judicial determinations of law that will be applied by the receiving agencies in the administrative adjudications from which they arose. And opinions in the third category directly determine how agencies must act, by conclusively interpreting the agencies' non-discretionary legal obligations. These

---

[2] As noted above, *see supra* n.1, CfA preserves its broader claim that all or most of the OLC's formal written opinions must be proactively disclosed under FOIA's reading-room provision, but it concedes that *EFF* and *CREW II* foreclose it from arguing before this panel that the reading-room provision applies to the fourth category of opinions at issue in the district court—those finding that a statute is unconstitutional.

opinions "are not the ideas and theories which go into the making of the law, they are the law itself." *EFF*, 739 F.3d at 8 (citation omitted).

The district court correctly granted summary judgment to CfA with respect to the first category, holding that the reading-room provision reaches OLC opinions resolving interagency disputes. But the district court erred in dismissing CfA's claim that the other two categories of opinions must also be proactively disclosed. All of these opinions fall within FOIA's reading-room provision, because they are "final opinions . . . made in the adjudication of cases" within the meaning of § 552(a)(2)(A), or "statements of policy and interpretations which have been adopted by the agency" within the meaning of § 552(a)(2)(B).

This can be seen by examining some of the opinions that the OLC has published. For instance, one opinion (in the first category) arose from a dispute between the Commerce Department and the General Services Administration ("GSA") over the latter's contractual agreement to sell sperm-whale oil to private companies. The Commerce Department argued that federal law prohibited the sale; the General Services Administration disagreed; and the OLC conclusively ruled that federal law did indeed "prohibit GSA's sale of the whale oil." The OLC's opinion was final, and it adjudicated the case between the two agencies; it also displaced the agencies' own settled policies in favor of its own. Another opinion (in the second category) arose out of an administrative complaint filed by eleven physicians who

11

claimed that they had been underpaid by the Department of Veterans Affairs ("VA"). After the Department of Labor awarded the physicians $230,000 in back wages, the Department of Veterans Affairs appealed the matter to the OLC, which ruled that sovereign immunity foreclosed the award. This opinion was also final, and in issuing it, the OLC served as the equivalent of an appellate tribunal within the underlying administrative adjudication. Finally, another opinion (in the third category) arose when DOJ asked the OLC to determine which federal agency was responsible for paying a judicial award of $156,759.40 in attorney's fees. The OLC resolved the question by authoritatively interpreting the federal law at issue, which created a non-discretionary legal obligation ("shall be paid by . . .") that OLC determined fell on only one agency. This opinion directly determined agency policy, because it authoritatively interpreted a legal obligation that the receiving agency could not ignore.

These opinions and the categories they exemplify fall within the plain text of FOIA's reading-room provision, because they constitute final opinions made in the adjudication of cases (the first two categories) or statements of policy and interpretations that, given the circumstances of their solicitation and issuance, have been adopted by the soliciting agencies ex ante (all three categories).

The government has not seriously disputed that these categories of opinions fall within the text of FOIA's reading-room provision. Instead, it stakes its entire

case on the claim that this Court's decision in *EFF* categorically exempts *all* OLC opinions from disclosure under FOIA. As explained below, this argument applies at most to § 552(a)(2)(B), but even with respect to that provision, this Court has already—and properly—rejected the government's argument. In *CREW II*, this Court made clear that *EFF* is simply not a categorical bar to the application of the reading-room provision to OLC opinions. Instead, it held that requesters attempting to demonstrate that OLC opinions are "working law" under § 552(a)(2)(B) must do more than establish that the opinions "are 'controlling,' 'authoritative' and 'binding.'" *CREW II*, 922 F.3d at 488 (citation omitted). But in so holding, the Court expressly distinguished this very litigation on the ground that CfA had identified categories of opinions that may be working law even under *EFF*. *Id.* at 489. The government's argument also founders because the opinions that CfA seeks are nothing like the opinion in *EFF*. In *EFF*, it was determinative in the Court's view that the Federal Bureau of Investigation ("FBI") had solicited the opinion at issue to inform its ongoing policymaking process and that the OLC did not speak with authority on the FBI's policy in that process. The opinions at issue here, however, are not solicited as advisory inputs into a deliberative process, but to resolve concrete disputes over already established policy or to conclusively settle an agency's legal interpretations and obligations. For these opinions, the OLC does in fact speak with

authority, because there is no distance between its legal conclusions and the law and policy of the recipient agencies.

For these reasons, explained more fully below, the Court should affirm the district court's grant of summary judgment and reverse its partial grant of the government's motion to dismiss.

## Argument

## I.    FOIA's reading-room provision requires the OLC to proactively disclose at least three categories of its formal written opinions.

As relevant here, FOIA's reading-room provision requires federal agencies to proactively disclose "final opinions . . . made in the adjudication of cases" and "statements of policy and interpretations which have been adopted by the agency." 5 U.S.C. § 552(a)(2)(A)–(B). This provision, the Supreme Court has said, reflects "a strong congressional aversion to 'secret agency law,'" as well as "an affirmative congressional purpose to require disclosure of documents which have 'the force and effect of law.'" *Sears*, 421 U.S. at 153 (cleaned up). Since the Supreme Court's interpretation of the reading-room provision in *Sears*, this Court has repeatedly given effect to its command, ordering federal agencies to proactively disclose legal memoranda that fall within the text of § 552(a)(2), or that fall within the "working law" doctrine, which has emerged as a judicial guide to the application of § 552(a)(2)(B) and Exemption 5.

14

In this case, the district court correctly held on summary judgment that OLC opinions resolving interagency disputes fall within the reading-room provision. But it erred in granting the government's motion to dismiss with respect to the two other categories of OLC opinions at issue—opinions issued in the adjudication of private rights, and opinions interpreting non-discretionary legal obligations.

**A.    The district court correctly held that the reading-room provision applies to OLC opinions resolving interagency disputes.**

When two federal agencies have a legal dispute, they are generally required to submit their dispute to the OLC for resolution. *See* Exec. Order No. 12,146, § 1-4, 44 Fed. Reg. 42,657 (July 18, 1979). The OLC is then obligated to resolve the dispute, *see* 28 U.S.C. § 512, and it does so pursuant to a process now codified in the Best Practices Memo. The opinions issued at the conclusion of that process fall within FOIA's reading-room provision because they are both "final opinions . . . made in the adjudication of cases," 5 U.S.C. § 552(a)(2)(A), and "statements of policy and interpretations which have been adopted by the agency," *id.* § 552(a)(2)(B).

**1.    These opinions are "final opinions . . . made in the adjudication of cases."**

As the district court correctly held, OLC opinions resolving interagency disputes are "final opinions," and they are "made in the adjudication of cases."

15

**Final opinions.** Although FOIA does not define the phrase "final opinions," the Supreme Court in *Sears* explained that a memorandum that "explains the reasons for [a] 'final disposition' . . . plainly qualifies as an 'opinion'; and falls within 5 U.S.C. [§] 552(a)(2)(A)." *Sears*, 421 U.S. at 159. In that case, the Court held that Advice and Appeals Memoranda directing the dismissal of a charge were "final disposition[s]," because they were "created after consideration of 'prior advice determinations in similar or related cases' and contain[] 'instructions for the final processing of the case.'" *Id.* at 158–59. Similarly, this Court has explained that an "action taken by the responsible decisionmaker in an agency's decision-making process which has the practical effect of disposing of a matter before the agency is 'final' for purposes of FOIA." *Bristol-Meyers Co. v. FTC*, 598 F.2d 18, 25 (D.C. Cir. 1978). "If such action is accompanied by a written explanation of the decisionmaker's reasoning, that explanation constitutes a 'final *opinion*' and must be disclosed." *Id.* (emphasis added).

OLC opinions resolving interagency disputes meet this description: when the OLC issues such an opinion, it disposes of the interagency dispute before it, and it memorializes its reasoning in an opinion that establishes the executive branch's authoritative interpretation of the law. The stipulated record on summary judgment confirms this understanding. By executive order and practice, a primary duty of the OLC is to resolve disputes presented to it for resolution by other agencies. *See* Exec.

Order No. 12,146, § 1-4, 44 Fed. Reg. 42,657 (July 18, 1979); Stip. ¶ 7 [JA 292].

The OLC's opinions resolving those disputes are final because they dispose of the

disputes through "controlling legal advice to executive branch officials on questions

of law," Stip. ¶ 1 [JA 290], which the disputing agencies are required to accept, *see*

Best Practices Memo 1 [JA 298] (recognizing that its opinions may "constrain [the

executive branch's] pursuit of desired practices or policy objectives"). And they are

opinions because they memorialize the OLC's reasoning in resolving the disputes

before it. *See id.* at 4 [JA 301].

The OLC's published opinions also confirm that the opinions in this category

are final. For example, in one opinion, discussed briefly above, the OLC resolved an

interagency dispute between the Commerce Department and the General Services

Administration over whether the Endangered Species Act prohibited two specific

contracts in which the GSA sold sperm whale oil to private companies. *See*

*Application of the Endangered Species Act of 1973 to the Sale of Sperm Whale Oil*

*by the GSA* (O.L.C. Dec. 19, 1974) [hereinafter *Whale Oil Op.*] [JA 399–405]. The

GSA argued that the statute did not proscribe the two sales; the Commerce

Department argued otherwise; and the OLC resolved the dispute with its conclusion

that the statute "prohibit[s] GSA's sale of the whale oil." *Id.* at 2 [JA 400]. This

opinion is plainly "final." It authoritatively disposed of the disagreement between

the two agencies over the correct reading of the Endangered Species Act and its

application to two specific contracts. And it displaced the GSA's contrary legal interpretation, forcing it to accept the OLC's reading of the statute.[3]

The government's opening brief does not directly dispute that OLC opinions resolving interagency disputes are "final opinions." Its primary argument—dealt with at length below, *see* Part I.D—is that *EFF* places OLC opinions out of FOIA's reach categorically. In the district court, however, and perhaps indirectly in its appeal brief, *see* Gov't Br. 19, 26, the government also argued that OLC opinions resolving interagency disputes are not "final" in the relevant sense because they often leave

---

[3] The record includes many other OLC opinions that similarly resolve interagency disputes through "final opinions." *See Authority of the Department of Labor to Control the Disclosure of Federal Employees' Compensation Act Records Held by the United States Postal Service*, 36 Op. O.L.C. 217, 217–18 (2012) [hereinafter *Employee Records Op.*] [JA 450–51] (concluding that a statute authorizes the Department of Labor ("DOL") to limit disclosure of records held by the United States Postal Service ("USPS") and rejecting the USPS's contrary position); *Administrative Assessment of Civil Penalties Against Federal Agencies Under the Clean Air Act*, 21 Op. O.L.C. 109, 109 (1997) [hereinafter *Clean Air Penalties Op.*] [JA 481] (holding that the Clean Air Act authorizes the Environmental Protection Agency ("EPA") to assess civil penalties against other federal agencies and rejecting the contrary position of the Department of Defense ("DOD")); *Authority of the Equal Employment Opportunity Commission to Impose Monetary Sanctions Against Federal Agencies for Failure to Comply With Orders Issued by EEOC Administrative Judges*, 27 Op. O.L.C. 24, 24 (2003) [hereinafter *Monetary Sanctions Op.*] [JA 492] (agreeing with the Navy that the Equal Employment Opportunity Commission ("EEOC") could not "impose attorney's fees against federal agencies as a sanction for failure to comply with the orders of EEOC administrative judges"); *Disposition of Proceeds from the Sale of Government Buildings Acquired with Social Security Trust Funds*, 34 Op. O.L.C. 263, 263–64 (2010) [hereinafter *Building Proceeds Op.*] [JA 563–64] (rejecting the position of the Social Security Administration ("SSA") and concluding that the GSA could sell buildings acquired with Social Security trust fund money and keep the proceeds).

recipient agencies with a range of programmatic options. The district court correctly held that this argument "misses the mark," MSJ Op. 14 [JA 615], because § 552(a)(2)(A) "does not predicate affirmative disclosure on whether the agency's 'final opinions . . . made in the adjudication of cases' have a discernable policy impact," Second MTD Op. 28 [JA 264].

As the district court recognized, nothing in the language of § 552(a)(2)(A) suggests that the subsection is limited to opinions that establish an agency's policy or that resolve all downstream programmatic decisions. That the subsection applies to opinions issued in the adjudication of cases suggests that Congress anticipated that it would frequently (if not nearly always) apply to *legal* opinions, which often leave their recipients with a range of options. Moreover, the government's atextual proposal to limit § 552(a)(2)(A) to final *policy* decisions would render that subsection superfluous, as § 552(a)(2)(B) already requires the disclosure of an agency's "statements of *policy*." And the government's interpretation would exclude from § 552(a)(2)(A) even final opinions issued at the conclusion of formal administrative proceedings, because those opinions typically leave the parties with discretion in their later decisions. Of course, an agency's later discussions about subsequent policy decisions may well be deliberative; but their deliberative character does not apply retroactively to the final opinions that preceded them. As this Court has repeatedly held, legal opinions may be final even if they do not dictate the "final

19

programmatic decisions of the program officers who request them." *Tax Analysts v. IRS* (*Tax Analysts II*), 294 F.3d 71, 81 (D.C. Cir. 2002); *see also id.* ("It is enough that they represent [the agency's] final *legal* position . . . ."); *Pub. Citizen, Inc. v. Off. of Mgmt. & Budget*, 598 F.3d 865, 875 (D.C. Cir. 2010) ("[A]n agency's application of a policy to guide further decision-making does not render the policy itself predecisional."); *Tax Analysts v. IRS* (*Tax Analysts I*), 117 F.3d 607, 617 (D.C. Cir. 1997).

Even if § 552(a)(2)(A) were limited to final opinions that establish policy, these opinions do establish policy. When the OLC resolves an interagency legal dispute, its opinion settles the underlying policy disagreement. As can be seen in the example above involving the Commerce Department and the GSA, agency disputes that precipitate an OLC opinion are not deliberations over policy. They are conflicts over already settled policies, where the conflicts turn on legal disagreements that the OLC is tasked with adjudicating. *See e.g.*, *Whale Oil Op.*, slip op. at 1 [JA 399] ("Commerce asserts that the sales are prohibited; GSA asserts the contrary."). The same is apparent from the other examples in the record.[4]

---

[4] *See Employee Records Op.*, 36 Op. O.L.C. at 218 [JA 451] ("USPS . . . may not establish routine uses for FECA records that result in disclosures that would not be permitted under DOL's regulations."); *Clean Air Penalties Op.*, 21 Op. O.L.C. at 110–11 [JA 482–83] ("EPA presents a straightforward position that section 113(d) authorizes EPA to assess administrative penalties against federal agencies. . . . DOD argues that section 113(d) fails to provide clear and express authority for EPA to impose administrative penalties against Executive Branch agencies." (cleaned up));

**Made in the adjudication of cases.** OLC opinions resolving interagency disputes are also "made in the adjudication of cases." *See* 5 U.S.C. § 552 (a)(2)(A). The APA defines an "adjudication" as an "agency process for the formulation of an order," 5 U.S.C. § 551(7), and, in turn, it defines an "order" as "the whole or a part of a final disposition . . . in a matter other than rule making," *id.* § 551(6); *accord Bristol-Meyers Co.*, 598 F.2d at 26 n.13; *Sears*, 421 U.S. at 158–59. Although the statute does not define the term "case," this Court has held that § 552(a)(2)(A) encompasses "final opinions resulting from proceedings 'in which a party has a right to set the agency decision-making process in motion and obtain a determination concerning the statute or other laws the agency is charged with interpreting and administering.'" *Am. Immigr. Laws. Ass'n v. Exec. Off. for Immigr. Rev.*, 830 F.3d 667, 679 (D.C. Cir. 2016) (quoting *Skelton v. USPS*, 678 F.2d 35, 41 (5th Cir. 1982)).

The district court rightly held that the OLC's process for resolving interagency disputes fits squarely within these definitions. The OLC "functions like a neutral decisionmaker," and "the process by which the OLC researches, drafts, and finalizes its opinions that resolve interagency disputes is standardized, thorough, and bears

---

*Monetary Sanctions Op.*, 27 Op. O.L.C. at 25 [JA 493] ("The Navy contends that EEOC has exceeded its statutory authority. If that is the case—and we conclude that it is—EEOC has no power to impose monetary sanctions on federal agencies for failure to comply with [administrative judge] orders."); *Building Proceeds Op.*, 34 Op. O.L.C. at 263 [JA 563] ("SSA argues that any proceeds from the sale of the buildings should be credited to the Social Security Trust Funds. GSA contends that it is entitled to the funds[.]").

many of the hallmarks of adversarial adjudication." MSJ Op. 15 [JA 616]; *see also* Second MTD Op. 26–28 [JA 262–64].

The summary-judgment record confirms the district court's reasoning. The OLC's process for resolving interagency disputes is set in motion by a request from one or more agencies for a formal written opinion, which is often triggered by the dispute-resolution process set forth in Executive Order 12,146. The OLC then follows the procedures described in its Best Practices Memo to resolve the case presented. *See* Best Practices Memo 2–5 [JA 299–302] (describing the OLC's "careful and deliberate process" for preparing formal opinions). In this context, OLC attorneys act as adjudicators. They are obligated to "consider fully and address impartially the points raised on both sides" of the dispute and to address "the full range of relevant legal sources and significant arguments," including textual analysis, an evaluation of precedent and historical practice, and "traditional tools of construction." *Id.* at 2, 4 [JA 299, 301]. OLC attorneys typically request that each agency involved in the dispute submit "a detailed memorandum setting forth the agency's own analysis of the question" to the OLC and each other, much like parties file briefs when litigating a case in court. *Id.* at 3 [JA 300]; *see also* Stip. ¶ 17 [JA 295]. At the end of the process, the OLC issues an opinion deciding "the correct answer on the law." Best Practices Memo 4 [JA 301]. As this Court long ago recognized, when the OLC resolves interagency disputes, it functions as an "arbiter,"

*Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90, 92 & n.2 (D.C. Cir. 1986), and its process is clearly adjudicative. *See* Gov't Resp. to Pl.'s Statement of Material Facts ¶ 12 [JA 593] (quoting then–Attorney General William P. Barr: "Deciding among the positions being taken requires the Attorney General—or in most cases the Office of Legal Counsel—to function as a judge.").

The arguments the government makes in its brief on appeal are ones that the district court properly rejected. First, the government suggests that the OLC's dispute-resolution process is not "a true adjudicative process," because its opinions constitute "legal advice." Gov't Br. 28. As is obvious from the opinions in the record, however, *see supra* note 3, OLC opinions resolving interagency disputes are not mere "legal advice." They use mandatory language in arriving at binding resolutions of interagency disputes, and as the district court observed, it is the disputing agencies themselves that "seek an authoritative settlement . . . when they turn to OLC for an adjudication of their conflicting positions." Second MTD Op. 30 [JA 266]. For example, when the OLC resolved the disagreement between the Commerce Department and the GSA over the GSA's sale of sperm whale oil, it was not merely providing legal advice; it was adjudicating a live controversy over settled agency policies that were in conflict.[5]

---

[5] In the district court, the government also asserted that § 552(a)(2)(A) applies only to adjudications that are "formal" within the meaning of the APA. The

Second, the government argues that the reading-room provision applies only to "decisions that affect the public." Gov't Br. 29–30. Of course, all OLC opinions affect the public, because they establish the law that constrains those selected by the public to govern. The government presumably has a narrower conception of what it means to affect the public, but its argument is inconsistent with this Court's precedent. For example, in *Public Citizen*, it applied the "working law" doctrine to an agency's legislative and budgetary clearance policies, which do not directly affect the public. 598 F.3d at 867, 875. In any event, and as the district court held, the government's argument finds no support in FOIA's text or legislative history. *See* Second MTD Op. 14–20 [JA 250–56] (describing the argument as "perplexing"); MSJ Op. 17–19 [JA 618–20].

The text of § 552(a)(2) simply does not limit its reach to "decisions that affect the public." The closest textual reference to such decisions is in § 552(a)(2)(C), which requires agencies to affirmatively disclose "administrative staff manuals and instructions to staff that affect a member of the public." 5 U.S.C. § 552(a)(2)(C). But this hurts the government's cause. As the district court noted, the fact that Congress referred to members of the public in subsection (C) but not in subsection (A) implies that Congress did not mean for any such limitation to apply to subsection (A).

---

government does not pursue that argument on appeal, but the district court properly rejected it. *See* MSJ Op. 16–17 [JA 617–18].

Second MTD Op. 15 [JA 251]. The government argues that this limitation is implicit in § 552(a)(2)(A) and (B), but it does not identify any reason why Congress would have wanted to so narrowly circumscribe a disclosure provision aimed at eliminating "secret law," *Sears*, 421 U.S at 138, and it is difficult to imagine one. *See* MSJ Op. 18 [JA 619].

The government also points to language in § 552(a)(2) that precludes agencies from citing "against a party other than an agency" material that is subject to the reading-room provision but that has not been published. *See* Gov't Br. 28–29. This language prevents agencies from relying on improperly withheld records against private parties, but, as the district court observed, it "says nothing about whether the statutory list of [documents subject to affirmative disclosure] must be read to include only records that pertain to private parties." Second MTD Op. 16 [JA 252]. The government emphasizes the reference in § 552(a)(2)(A) to "concurring and dissenting opinions," Gov't Br. 28, but judges regularly issue concurring and dissenting opinions in cases that do not affect the public. Finally, the government cites FOIA's legislative history for the proposition that Congress intended to limit § 552(a)(2) to records that affect the public, Gov't Br. 30, but at most, the legislative history demonstrates Congress's special, not exclusive, concern with the use of undisclosed law against private parties. *See* Second MTD Op. 17 [JA 253].

## 2.    These opinions are "statements of policy and interpretations which have been adopted by the agency."

OLC opinions resolving interagency disputes are independently subject to affirmative disclosure under § 552(a)(2)(B) as "statements of policy" or "interpretations" of law that are "adopted" by the agencies involved in the dispute. In denying the government's motion to dismiss with respect to this claim, the district court correctly held that CfA had plausibly alleged that "the OLC opinion that results from the resolution of an interagency disagreement is a statement of policy and/or interpretation adopted by the client agencies *ex ante*." Second MTD Op. 29 [JA 265]. The district court declined to reach this argument on summary judgment because it was not necessary to do so, MSJ Op. 2 [JA 603], but it provides an independent basis on which this Court can affirm the district court's grant of summary judgment.

In the district court, the government did not meaningfully dispute that OLC opinions resolving interagency disputes are "statements of policy"—and it did not dispute at all that they are "interpretations"—within the meaning of § 552(a)(2)(B). Nor could it; when the OLC resolves an interagency dispute, it establishes the government's controlling interpretation of the law, and it also necessarily resolves the policy dispute that the agencies presented for review. The resulting opinions therefore amount to statements of policy or interpretations.

The only question, then, is whether the opinions are "adopted" within the meaning of § 552(a)(2)(B). As this Court explained in *Schlefer v. United States*,

26

records are "adopted" under that subsection when they are "authoritative . . .
decisions in the cases to which they are addressed" or when they "guide subsequent
. . . rulings." 702 F.2d 233, 244 (D.C. Cir. 1983). In that case, the Court held that
legal interpretations issued by the Chief Counsel of the Maritime Administration fell
within § 552(a)(2)(B) because the opinions were "written and received in
circumstances that establish them as definitive rulings on the legal questions they
decide," and because, "in practice, requesting officials always follow the advice
given." *Id.* at 237. The key consideration in the Court's analysis was not whether
requesting officials had formally or expressly adopted the decisions, but whether the
officials had, in practice, conformed their behavior to the decisions and treated them
as authoritative. *Id.* at 238 ("Our consideration looks beneath formal lines of
authority to the reality of the decisionmaking process in question."); *see also id.*
(holding that the opinions fell within § 552(a)(2)(B) even though the officials
requesting them "retain[ed] initial decisionmaking authority").

        As the district court correctly observed in denying the government's motion
to dismiss in relevant part, OLC opinions resolving interagency disputes are
"adopted" by the agencies "*ex ante*," because, in submitting their policy disputes to
the OLC, the agencies necessarily agree that their legal interpretations and policy
positions will be controlled by and conformed to the OLC's resolution. Second MTD
Op. 28–29 [JA 264–65]. As the district court explained, by seeking "an adjudication

27

of their conflicting positions," the agencies in a dispute agree to "adopt" the OLC's "authoritative settlement of their own interpretations." *Id.* at 30 [JA 266]. The OLC's resulting opinion provides the "correct answer on the law," Best Practices Memo 4 [JA 301], and disputing agencies must conform their interpretations to—that is, "adopt"—the OLC's view.

As the district court observed, this understanding of "adoption" within the meaning of § 552(a)(2)(B) is consistent with *EFF*. In *EFF*, this Court concluded that a particular OLC opinion was not working law because it "concern[ed] the *advisability* of a particular policy, but d[id] not authoritatively state or determine the agency's policy." 739 F.3d at 8. "[P]roperly understood," the district court explained, "*EFF* plainly leaves open the possibility that a client agency . . . can 'adopt' the OLC's legal advice" when the OLC opinion "'speak[s] with authority' as to the client agency's policies and interpretations." Second MTD Op. 21 (quoting *EFF*, 739 F.3d at 9) [JA 257]. The OLC speaks with this authority when it resolves interagency disputes because it acts "as an authoritative arbiter of legal disputes that are submitted to it." *Id.* at 30 [JA 266]. Therefore, the OLC's arbitration of interagency disputes is "quite unlike the circumstance [in *EFF*] in which a single agency elect[ed] to solicit OLC's views as the first step in an anticipated policy-making process." *Id.* [JA 266]. OLC opinions resolving interagency disputes are not preludes to policymaking that agencies are "free to decline to adopt." *EFF*, 739 F.3d

28

at 10. They are, instead, "an authoritative settlement of [the agencies'] own interpretations." Second MTD Op. 30 [JA 266].

Consider, for example, an OLC opinion resolving a dispute involving the VA, the DOD, and the Office of Personnel Management ("OPM"). *Whether Reservists Must Exhaust Available Leave Under 5 U.S.C. § 6323(b) Before Taking Leave Under 5 U.S.C. § 6323(a)*, 36 Op. O.L.C. 129 (2012) [hereinafter *Reservist Leave Op.*] [JA 407–30]. The VA asked the OLC whether a reservist who qualifies for leave under both 5 U.S.C. § 6323(b) and § 6323(a) could elect to take leave under either statutory provision. *Id.* at 129 [JA 407]. The agency did not issue this request in a vacuum, wanting to know about the "advisability" of different policy options at the beginning of its decision-making process. *Cf. EFF*, 739 F.3d at 8. Rather, the VA asked the OLC to decide the issue because the agency disagreed with the longstanding view of the OPM and the Comptroller General that exhaustion of § 6323(b) leave was statutorily required. *Reservist Leave Op.*, 36 Op. O.L.C. at 133, 135 [JA 411, 413]. The VA brought the OPM's contrary policy to the OLC's attention, arguing that the OPM's view was undermined by prior amendments to § 6323(b), was inconsistent with OPM's own regulations, and would force reservists to forfeit their accrued § 6323(a) leave. *Id.* at 135 [JA 413]. This is not the posture of an agency interested in tentative legal advice to inform deliberations over policy. This is the posture of an agency with a concrete conflict over existing policy that

hinges on differing, established legal interpretations. In response, the OLC did not offer equivocal advice; it spoke definitively on the question presented for resolution. *Id.* at 152 [JA 430] ("[W]e conclude that section 6323(b) does not contain an exhaustion requirement.").

This opinion is emblematic of this subset of OLC opinions, in which agencies in conflict come to the OLC for a controlling interpretation that will supersede their own. And these opinions are precisely the sort of opinions that *EFF* and *CREW II* left open as potential examples of working law: opinions that "speak with authority" on the agency's legal and policy positions. *EFF*, 739 F.3d at 9.[6]

The government argues that, even if OLC opinions resolving interagency disputes must be proactively published under § 552(a)(2)(B), only the agencies that request the opinions can be required to publish them. Gov't Br. 19. The government makes no attempt to reconcile this argument with the fact that the OLC claims the

---

[6] *See, e.g.*, *EEOC Authority to Order Federal Agency to Pay for Breach of Settlement Agreement*, 38 Op. O.L.C. 22, 22 (2014) [hereinafter *Settlement Breach Op.*] [JA 432] (reversing an award of monetary relief that the EEOC had ordered the SSA to pay for breach of a settlement agreement); *Employee Records Op.*, 36 Op. O.L.C. at 218 [JA 451] (preventing USPS from establishing routine uses for certain records that are inconsistent with the DOL's regulations); *Payment of Back Wages to Alien Physicians Hired Under H-1B Visa Program*, 32 Op. O.L.C. 47, 47 (2008) [hereinafter *Back Wages Op.*] [JA 471] (reversing an award of back wages that the DOL had ordered the VA to pay to eleven noncitizen physicians); *Clean Air Penalties Op.*, 21 Op. O.L.C. at 109 [JA 481] (rejecting the DOD's objection to the EPA's position that it possessed authority to assess civil penalties against other federal agencies); *see also* Krent Decl. ¶¶ 16–22 [JA 321–22] (collecting additional examples).

right to publish its opinions even over the objections of the soliciting agencies. Best Practices Memo 5–6 [JA 302–03]. In any event, the argument is flawed. It relies on the government's contention that OLC opinions can be adopted only later in time and not, as the district court properly held, ex ante. Opinions resolving interagency disputes are adopted—and thus fall within FOIA's reading-room provision—upon the moment of their issuance, and so the OLC must publish them. To the extent the burden of publication would fall to the OLC only if the OLC *also* adopted its opinions, it clearly does. As the Best Practices Memo explains, the OLC treats its opinions as a "system of precedent" from which it will "not lightly depart." *Id.* at 2 [JA 299]. For these reasons, the OLC cannot fob off on other agencies the responsibility of complying with the reading-room provision. It must do so itself. *Cf. U.S. Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 144–45 (1989) (explaining that FOIA applies to records "create[d] or obtain[ed]" by an agency (citation omitted)).

**B.    The district court erred in dismissing CfA's claim that the reading-room provision applies to OLC opinions issued in the adjudication of private rights.**

FOIA's reading-room provision also applies to OLC opinions issued in the adjudication of private rights. As former OLC lawyer and then-Judge Samuel A. Alito, Jr. acknowledged, "many of the questions on which OLC opines do involve private rights." Am. Compl. ¶ 47 [JA 80] (citation omitted). When an agency is in the midst of an administrative adjudication—either as the adjudicating body or as a

31

party to another agency's adjudication—it will sometimes turn to the OLC for an authoritative statement of the law that bears on the adjudication. *See infra* n.7. Although agencies "are not generally required to seek legal guidance" from the OLC in these circumstances, "when they do so, it is understood that the opinion provided will become the controlling view of the executive branch." Am. Compl. ¶ 26 (citation omitted) [JA 70]. In these cases, the OLC functions much like an appellate tribunal: The OLC issues an authoritative opinion on a question of law relevant to a case before an agency, the opinion travels downward to the agency, and the agency then applies that legal interpretation in adjudicating the relevant party's private rights.

These opinions fall within FOIA's reading-room provision both because they are "final opinions . . . made in the adjudication of cases," 5 U.S.C. § 552(a)(2)(A), and because they are "statements of policy and interpretations which have been adopted by the agency," *id.* § 552(a)(2)(B).

### 1.    These opinions are "final opinions . . . made in the adjudication of cases."

CfA has plausibly alleged that OLC opinions issued in the adjudication of private rights are "final opinions . . . made in the adjudication of cases." These opinions are "final opinions" within the meaning of § 552(a)(2)(A) because they involve an "action taken by the responsible decisionmaker in an agency's decision-making process which has the practical effect of disposing of a matter before the

32

agency," and because they are "accompanied by a written explanation of the decisionmaker's reasoning." *Bristol-Meyers Co.*, 598 F.2d at 25. And they are "made in the adjudication of cases" because they are part of the "agency process for the formulation of an order," 5 U.S.C. § 551(7)—in this case, an order that determines the private rights of individuals.

OLC opinions in this category are distinctive because, as noted above, they function like appellate judicial determinations of the law, which agencies solicit to apply in ongoing administrative proceedings. When an agency solicits an OLC opinion in this circumstance, it involves the OLC in the "decision-making process," making the OLC the "responsible decisionmaker," at least insofar as the question of law is concerned. The resulting OLC opinion constitutes the effective law of the case before the agency and is a critical part of the "agency process for the formulation of an order." 5 U.S.C. § 551(7).

The final and adjudicative nature of OLC opinions in this category can be seen clearly through the examples in the record. In one opinion, for instance, the SSA was adjudicating an application for child insurance benefits for a specific boy—Elijah—and it turned to the OLC for an authoritative settlement of the law that applied to his case. Am. Compl. ¶¶ 42, 48 [JA 77, 80]; *see Whether the Defense of Marriage Act Precludes the Nonbiological Child of a Member of a Vermont Civil Union from Qualifying for Child's Insurance Benefits Under the Social Security Act*, 31 Op.

O.L.C. 243, 243–44 (2007) [hereinafter *DOMA Op.*] [JA 142–43]. Elijah was the son of a same-sex couple who had entered into a civil union in Vermont. When Elijah's non-biological parent became eligible for disability benefits, she filed an application for child insurance benefits for Elijah. *Id.* at 244 [JA 143]. The SSA asked the OLC to determine "whether the Defense of Marriage Act . . . would prevent" the agency "from providing the non-biological child of one member of a Vermont civil union with social security benefits on account of that individual's relationship with the child." *Id.* at 243 [JA 142]. The OLC said no, *id.* at 247 [JA 146], and the agency was bound to apply that determination in adjudicating Elijah's case.[7]

This opinion and others like it in the record demonstrate that the OLC often operates as part of the agency process for adjudicating adversarial disputes. Its opinions are thus materially indistinguishable from other opinions that this Court has ordered disclosed under FOIA, where an agency official charged with enforcing the law seeks an authoritative interpretation of the law that applies in the enforcement proceedings at issue. *See, e.g.*, *Tax Analysts I*, 117 F.3d at 617 ("Although [the

---

[7] For other examples in the record, *see Back Wages Op.*, 32 Op. O.L.C. at 47–48 [JA 471–72] (explaining that the VA sought OLC review after "[t]he DOL Administrative Review Board ruled in the complainants' favor and ordered the VA to pay approximately $230,000 in back wages"); *Settlement Breach Op.*, 38 Op. O.L.C. at 26 [JA 436] (noting that the SSA sought OLC review after the EEOC ruled against it).

memoranda] may precede the field office's decision in a particular taxpayer's case, they do not precede the decision regarding the agency's legal position."); *Schlefer*, 702 F.2d at 236 (similar); *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 858–59, 868–69 (D.C. Cir. 1980).

The district court rejected CfA's claim under § 552(a)(2)(A) for three reasons, but none withstands scrutiny. First, the district court asserted that it is the soliciting agency rather than the OLC that ultimately adjudicates the case, Second MTD Op. 35 [JA 271], but that is irrelevant. The OLC's opinions are clearly "final opinions . . . made in the adjudication of cases," even though the OLC sits as the equivalent of an appellate tribunal rather than a trial court. When the D.C. Circuit issues a final opinion in this case, for example, that opinion will be a final opinion made in the adjudication of this case, even though the district court will bear the responsibility for conducting any further proceedings. And again, this Court has long recognized as much (in the cases cited immediately above), holding that the working-law doctrine applies to legal opinions, even if those opinions must later be applied to particular fact patterns by the officials who requested them.

Second, the district court asserted that CfA failed to allege "that any provision of law makes OLC the entity that conclusively determines the client agency's own interpretation regarding applicable law," Second MTD Op. 36 [JA 272], but this, too, was mistaken. The amended complaint clearly alleges that OLC opinions serve

as the law of the executive branch as a matter of law and custom. Am. Compl. ¶¶ 18–20 [JA 67–68]. To the extent the district court believed that this allegation does not distinguish *EFF*, *see* Second MTD Op. 36–37 [JA 272–73], it was incorrect for two reasons. As an initial matter, and as explained below, *see* Part I.D.1, *EFF* simply does not apply to § 552(a)(2)(A). *See also* MSJ Op. 14 [JA 615]. But even if it did, OLC opinions in this category speak with the kind of authority required by *EFF* by virtue of the circumstances of their solicitation and issuance—specifically, they are solicited in the course of an adjudication, not a deliberation, and they are issued to conclusively resolve a question of law material to that adjudication, not to provide tentative legal advice as an input to later policymaking. *See* Am. Compl. ¶¶ 47–48 [JA 80].

Finally, the district court attempted to distinguish this Court's prior caselaw by claiming that it "involved an agency's invocation of a higher authority *within the agency itself*," Second MTD Op. 37 [JA 273], but this was wrong for the reasons explained below. *See* Part I.D.3.

### 2.    These opinions are "statements of policy and interpretations which have been adopted by the agency."

OLC opinions issued in the adjudication of private rights also constitute "statements of policy and interpretations which have been adopted by the agency." These opinions are "statements of policy and interpretations" within the meaning of § 552(a)(2)(B) for the same reasons that OLC opinions resolving interagency

disputes are. *See* Part I.A.2. And they have been "adopted" by the agency—ex ante— based on circumstances of their solicitation and issuance.

This Court's analysis in *Schlefer* is, again, instructive. There, the Court addressed a claim under § 552(a)(2)(B) for legal opinions issued by the Chief Counsel of the Maritime Administration to enforcement officials who requested them to apply in agency adjudications. 702 F.2d at 235–37. Although the enforcement officials held "decisionmaking authority" with respect to the underlying adjudications, *id.* at 238, the Chief Counsel's authority to interpret the applicable law was superior, *id.* ("With respect to decisions that involve the interpretation of the three Acts of interest to Schlefer, however, the Chief Counsel and requesting officials ultimately occupy a superior–subordinate relationship."). On that basis, the Court concluded that the opinions at issue "are written and received in circumstances that establish them as definitive rulings on the legal questions they decide," *id.* at 237, and ultimately held that they "are 'statements of policy and interpretations which have been adopted by the agency,'" *id.* at 244.

So, too, here. When agencies adjudicating private claims ask the OLC for an authoritative statement of the law that applies to those claims, they do so for the purpose of applying that law to the cases pending before them. They are not seeking tentative legal advice to consider in deliberations over their legal position; they are asking the OLC to simply tell them what their legal position must be. There is no

distance, in other words, between the OLC's legal conclusions and the legal positions that the agencies will apply as their own in the underlying adjudications. As a result, these opinions provide authoritative legal positions—that is, "interpretations" and "statements of policy" under § 552(a)(2)(B)—for agencies to apply in the matters before them. *See e.g.*, Am. Compl. ¶ 47–48 [JA 80]; *DOMA Op.*, 31 Op. O.L.C. at 243 [JA 142]; *Back Wages Op.*, 32 Op. O.L.C. at 47 [JA 471]; *Settlement Breach Op.*, 38 Op. O.L.C. at 22 [JA 432].

The district court concluded that "this category of OLC opinions is not plausibly within the scope of section 552(a)(2)(B) of the FOIA" "unless and until . . . adoption occurs," Second MTD Op. 36 [JA 272], but it overlooked that, for this subset of opinions, adoption *has* already occurred—ex ante. This is so not just because "in practice, requesting officials always follow the advice given," *Schlefer*, 702 F.2d at 237, but because the requesting agencies solicit them specifically to establish the law that they will apply in their underlying adjudications.

**C.    The district court erred in dismissing CfA's claim that the reading-room provision applies to OLC opinions interpreting agencies' non-discretionary legal obligations.**

OLC opinions interpreting agencies' non-discretionary legal obligations likewise fall within FOIA's reading-room provision, because they are "statements of policy and interpretations which have been adopted by the agency" under § 552(a)(2)(B).

These opinions do not advise or recommend—they command. By interpreting an agency's non-discretionary legal obligations, they tell an agency how it *must* act, not merely how it *may* act. In this way, opinions in this category are distinct from opinions like the one at issue in *EFF*. They do not present a menu of policy options, suggest a course of action, or provide "candid advice." *See* Gov't Br. 21. Nor do they merely advise an agency that a policy it is considering is lawful, leaving the ultimate decision about whether to adopt that policy to the agency. Instead, these opinions set agency policy by conclusively interpreting the agencies' legal obligations. Because agencies are bound to conform their conduct to the OLC's conclusions, *see* Stip. ¶ 1 [JA 290]; MSJ Op. 3 [JA 604], agencies that solicit opinions in this category must necessarily adopt the OLC's interpretations of their legal obligations as their own. Opinions in this category thus fall within § 552(a)(2)(B), even if that provision applied only to legal opinions that leave the recipient officials with no discretion.

Consider one of the examples in the amended complaint. In *Responsibility of Agencies to Pay Attorney's Fee Awards Under the Equal Access to Justice Act*, a DOJ official asked the OLC to determine which agency was obligated to pay $156,759.40 in attorney's fees in a court case that the government lost. 31 Op. O.L.C. 229, 232–33 (2007) [JA 178–79]. A federal statute provided that the fees "shall be paid by any agency over which the party prevails." *Id.* at 233 [JA 179] (quoting 28

U.S.C. § 2412(d)(4)). But it was unclear which agency that was, because "[t]he plaintiffs did not sue any one agency but rather brought suit against the United States." *Id.* [JA 179]. DOJ's Civil Division sought an authoritative ruling on which agency was legally required to pay the fees, and the OLC determined that the "the award must come out of [Department of Housing and Urban Development ("HUD")] appropriations," *id.* at 242 [JA 188], because that agency administered the regulatory scheme at issue in the case, *id.* at 241 [JA 187]. The OLC's opinion set agency policy by requiring HUD—against its wishes—to pay the award from its own budget.[8]

Since the amended complaint was filed, the OLC has continued to issue opinions that bind agencies to a particular course of action. In *Application of the Statutory Pay Cap on Administratively Determined Pay in 5 U.S.C. § 5373 to the National Science Foundation*, 47 Op. O.L.C. __ (2023), https://perma.cc/FS6J-9UVV, the National Science Foundation ("NSF") asked the OLC whether a government-wide salary cap applied to its employees and, even if so, whether it could temporarily ignore the cap to ease the transition of its above-cap employees to

---

[8] The amended complaint cites several other examples of opinions that interpret non-discretionary legal obligations. *See DOMA Op.*, 31 Op. O.L.C. at 243 [JA 142] (holding that, notwithstanding the Defense of Marriage Act, the SSA must provide benefits to the children of same-sex couples if they are otherwise entitled to those benefits); *Service Credit for Retirement Annuities of USPS Employees When USPS Has Not Made Required Contributions*, 35 Op. O.L.C. 181, 182 (2011) [JA 520] (holding that the OPM "may not address the Postal Service's failure to make statutorily required contributions by denying its employees accrued service credit . . . during their periods of qualifying federal employment").

lower salaries. The OLC held that the cap applied and that the "NSF's authority stretches no further than taking the time necessary to implement the pay cap in an orderly fashion." *Id.* at 2. The opinion imposed a mandatory legal obligation on the NSF to comply with the cap as soon as practicable. *See also Whether the United States Postal Service Bears Responsibility for the Cost of Certain Civil Service Retirement Benefits Paid to Its Employees*, 48 Op. O.L.C. __, at 21 (2024), https://perma.cc/JT3R-597X ("We conclude that USPS is required to pay the full cost of . . . benefits attributable to USPS's actions to increase its employees' pay since July 1, 1971 . . . .").

The district court held that opinions in this category do not fall within § 552(a)(2)(B) because they do not "*necessarily* announce[] the client agency's working law from the moment [they are] issued." Second MTD Op. 33 [JA 269]. But they do so by definition—HUD was bound to pay the attorney's fees, NSF was required to reduce the salaries of its above-cap employees, and USPS was compelled to provide the retirement benefits. When the OLC interprets an agency's non-discretionary legal obligation, the agency must adopt the interpretation and resulting policy as its own.

### D.    *EFF is not to the contrary.*

For the reasons above, the three categories of OLC opinions at issue fall within the plain text of FOIA's reading-room provision. The government's brief hardly

engages with that text or with the district court's statutory analysis. Instead, it argues that this Court's decision in *EFF* categorically exempts all OLC opinions from disclosure under FOIA, and that the opinions CfA seeks are indistinguishable from the one at issue in *EFF*. *See* Gov't Br. 15–16.

In *EFF*, this Court considered a FOIA request for an OLC opinion that was, in many ways, unusual. The FBI solicited the opinion in determining how to respond to an inspector-general investigation into a practice—the use of "exigent letters" to compel the production of telephone records—that the FBI had abandoned years earlier. *EFF*, 739 F.3d at 4–5. That is, the FBI did not request a conclusive legal ruling meant to provide a legal foundation for ongoing or future conduct, but rather to help it respond to an internal investigation into a practice it had already ended. *See, e.g.*, *id.* at 5 ("[T]he OLC opinion did not in any way factor into the FBI's flawed practice of using exigent letters between 2003 and 2006[.]" (quoting FBI General Counsel Valerie Caproni)). According to the Court, the resulting opinion offered only policy advice. *Id.* at 10.

The requester in the case argued that the opinion nonetheless constituted "working law," *id.* at 9, but this Court rejected that argument in two steps. The Court first rejected the plaintiff's argument that the OLC opinion was working law solely by virtue of its controlling nature. On this question, the government had emphasized that the FBI sought the memo in deciding "how, if at all, to alter its investigatory

techniques," *id.* at 9, and that the decision about whether to do so "was the FBI's to make after consulting with OLC and any other parts of the government it chose to involve in its policy-making process," *id.* In other words, the FBI sought the memo solely as an advisory input. In light of these representations, the Court determined that the OLC did not "speak with authority on the FBI's policy" and that its opinion "merely examine[d] policy options available to the FBI." *Id.* at 9–10. The opinion was predecisional and deliberative, the Court concluded, because it concerned only "the *advisability* of a particular policy, but d[id] not authoritatively state or determine the agency's policy." *Id.* at 8; *see also CREW II*, 922 F.3d at 485. The Court next considered whether, even if the opinion was not working law by its very nature, it had become so through adoption. *EFF*, 739 F.3d at 10. The plaintiff argued that the FBI adopted the opinion by relying upon it in public statements, but the Court disagreed, pointing to evidence that the FBI had affirmatively disavowed any reliance on the opinion. *Id.* at 12.

The government claims that the Court's reasoning in *EFF* applies to all OLC opinions, including the categories of opinions that CfA seeks, but it is wrong for at least three reasons.

### 1.    *EFF* does not apply to § 552(a)(2)(A).

First, whatever the import of *EFF*, the case did not address the question of whether any categories of OLC opinions must be disclosed under § 552(a)(2)(A). It is therefore irrelevant to CfA's arguments under that subsection.

As the district court correctly recognized, "neither *EFF* nor *CREW II* were decided on the basis of § 552(a)(2)(A)." MSJ Op. 14 [JA 615]. Instead, the plaintiff in *EFF* claimed that the OLC opinion it sought constituted "working law," *EFF*, 739 F.3d at 9, and the Court's analysis focused on that question, *id.* at 9–10. While courts have used the phrase "working law" imprecisely at times, *accord* Gov't Br. 33, it is best understood as a guide to the application of Exemption 5 and § 552(a)(2)(B). The Supreme Court coined the term "working law" in its seminal decision in *Sears*, and it used the phrase exactly once—in explaining that "the reasons which did supply the basis for an agency *policy* actually *adopted*" are an agency's "working law" and are therefore "outside the protection of Exemption 5." *Sears*, 421 U.S. at 152–53 (emphasis added). That explanation makes sense in the context of § 552(a)(2)(B), because that provision applies to "statements of *policy* . . . which have been *adopted* by the agency." 5 U.S.C. § 552(a)(2)(B) (emphasis added).

But "Section 552(a)(2)(A) is different." MSJ Op. 14 [JA 615]. As Judge Cobb observed, that subsection "makes no mention of policy." *Id.* [JA 615]. And as then-Judge Jackson noted, that subsection "does not predicate affirmative disclosure on

whether [opinions] have a discernable policy impact." Second MTD Op. 28 [JA 264]. Nor does § 552(a)(2)(A) turn on the question of whether an agency has "adopted" an opinion. MSJ Op. 14 [JA 615] ("[T]he requirement that an agency 'adopt' an OLC opinion as its own was developed and has been applied only in the context of § 552(a)(2)(B)."). This Court recognized as much in *CREW II*, observing that "[a]n OLC opinion in the latter category [i.e., § 552(a)(2)(B)] qualifies as the 'working law' of an agency only if the agency has 'adopted' the opinion as its own." 922 F.3d at 486. In short, the applicability of § 552(a)(2)(A) does not in any way hinge on the questions central to the analysis in *EFF*—namely, whether the OLC speaks with authority on an agency's "policy" or whether an agency has "adopted" an OLC opinion as its own. It turns, instead, on whether the opinions are "final opinions . . . made in the adjudication of cases." 5 U.S.C. § 552(a)(2)(A). And as explained below, *see* Part I.E, both the Supreme Court and this Court have made clear that documents falling within the scope of § 552(a)(2)(A) may never be withheld under Exemption 5.

For this reason, if the Court agrees with CfA that two of the three categories of opinions it seeks—those resolving interagency disputes and those issued in the adjudication of private rights—are "final opinions" under § 552(a)(2)(A), then it is irrelevant whether those opinions also constitute "working law" within the meaning of *EFF* and *CREW II*, or have been "adopted" within the meaning of § 552(a)(2)(B).

2.    **Even with respect to § 552(a)(2)(B),** *EFF* **recognizes that the reading-room provision applies to OLC opinions that speak with authority on agency law or policy, and the opinions at issue here do just that.**

Second, even with respect to § 552(a)(2)(B), *EFF* is simply not a categorical bar to the application of FOIA to the OLC's opinions. This Court has made clear that whether a legal opinion is deliberative or, instead, constitutes working law that must be disclosed "is not amenable to a categorical formula." *Tax Analysts II*, 294 F.3d at 82. The distinction between the two turns on "the reality of the decisionmaking process in question." *Schlefer*, 702 F.2d at 238. Where there is significant distance between a legal opinion's conclusions and an eventual "statement of policy [or] interpretations," this Court has held that the opinion is deliberative. *See, e.g.*, *Brinton v. Dep't of State*, 636 F.2d 600, 605 (D.C. Cir. 1980) (observing that the legal opinions "bear no indicia of finality"). But where there is little distance between the two—that is, where a legal opinion effectively establishes an agency's policy or its interpretations of law—the Court has required its disclosure. *See, e.g.*, *Coastal States*, 617 F.2d at 868 (noting that the opinions sought "were not suggestions or recommendations"). Contrary to the government's claim, *EFF* did not exempt the OLC from this framework.

This Court said so itself in *CREW II*. In that case, the Court discussed *EFF* extensively, and it made clear that the case leaves open the possibility that particular

46

categories of OLC opinions—distinct from the single opinion addressed in *EFF*—must be disclosed under FOIA. The decision in *CREW II* faulted the plaintiff in the case for failing to plead facts distinguishing *EFF* and for relying only on the allegation that OLC opinions "are 'controlling,' 'authoritative' and 'binding.'" 922 F.3d at 488. Those characteristics, the Court held, are "insufficient" under *EFF* "to support a plausible claim that the opinions are the 'working law' of an agency." *Id.* Instead, the Court continued, a FOIA requester must "plead more than that the OLC's formal written opinions are 'controlling' to make out a plausible claim that the opinions are . . . subject to disclosure under FOIA's reading-room provision." *Id.* at 489. On that score, the Court cited this very litigation approvingly, because "CfA . . . amended its complaint" to identify "several subcategories of the OLC's formal written opinions" that must be disclosed even in light of *EFF*. *Id.* at 486. And it also credited the district court's "fair reading of *EFF*," which noted that "*EFF* '*suggests* that *many* of OLC's formal written opinions' are privileged," but not "that *all or virtually all*" of them are. *Id.* at 489 n.6.

For these reasons, then-Judge Jackson was correct when she observed that, "properly understood, . . . *EFF* plainly leaves open the possibility" that other categories of OLC opinions must be disclosed under FOIA. Second MTD Op. 21 [JA 257].

The critical question, then, is whether the opinions at issue here "speak with authority" on, *EFF*, 739 F.3d at 9, or "state or determine," *id.* at 10, agency law or policy. They do. For reasons specific to each category, there is no distance between the OLC's legal conclusions and the soliciting agencies' policies and interpretations.

For instance, when two agencies present their dispute to the OLC, neither is engaged in a deliberation over policy. Each agency has a settled policy, but those policies conflict, and the OLC has the legal responsibility to resolve the dispute. The agencies may of course decide to take some further action based on the OLC's resolution of the dispute, and the agencies' deliberations over those further actions may be exempt from disclosure. But the OLC's resolution would, itself, be authoritative and determinative of the dispute presented to it for resolution. *See* Part I.A.2 (more fully explaining why opinions resolving interagency disputes fall within § 552(a)(2)(B)). Moreover, requiring the disclosure of opinions in this category would not reveal any agency deliberations; it would reveal only that agencies had a dispute over settled policy positions and that the OLC resolved the dispute through an authoritative interpretation of law.

Similar reasoning applies to the other two categories of opinions that CfA seeks. When an agency is adjudicating an individual's claims and asks the OLC to conclusively resolve a legal question upon which the underlying adjudication turns, the resulting opinion is not an advisory input into a policy-making process. It is,

48

instead, a conclusive interpretation of law that the agency solicits to apply as its own in its adjudication of the individual's claims. *See* Part I.B.2. And when an agency asks the OLC to authoritatively interpret a non-discretionary legal obligation, there is no distance between the OLC's legal conclusion and the agency's policy, because the legal conclusion directly dictates what the agency must do. *See* Part I.C.

In other words, the opinions that CfA seeks "are not the ideas and theories which go into the making of the law, they are the law itself." *EFF*, 739 F.3d at 8 (citation omitted).

The government argues that an agency cannot be said to have "adopted" an OLC opinion unless it does so "expressly" or incorporates the opinion "by reference," *see* Gov't Br. 18, but it is mistaken. The key flaw in the government's reasoning is that it treats the doctrines of "express adoption" and "incorporation by reference" as exhaustive of the term "adopted" in § 552(a)(2)(B). But as the Second Circuit (relying on this Court's precedent) has explained, "'working law' describes a category of post-decisional material, and 'express adoption' and 'incorporation by reference' describe two methods by which pre-decisional material can become post-decisional." *Am. C.L. Union v. Nat'l Sec. Agency*, 925 F.3d 576, 593 (2d Cir. 2019); *see id.* at 594–98 (lengthy explanation). That is, "working law" refers to material that is "inherently post-decisional," *id.* at 594—including material that is "working law" upon issuance, or, as then-Judge Jackson described it, "adopted *ex ante*,"

Second MTD Op. 31 [JA 267]—without the need for a subsequent or express act of adoption. Records that are not inherently post-decisional can still become "working law," however, and the doctrines of express adoption and incorporation by reference provide two avenues through which "a document first drafted as legal or policy advice [can] *become* an agency's 'effective law and policy.'" *Am. C.L. Union*, 925 F.3d at 595; *see also Tax'n with Representation Fund v. IRS*, 646 F.2d 666, 678 (D.C. Cir. 1981) ("[A] document that is predecisional at the time of preparation may lose exempt status if 'adopted, formally or informally . . . .'" (quoting *Coastal States*, 617 F.2d at 866)).

The flaw in the government's argument is crucial here, because the OLC opinions that CfA seeks are inherently post-decisional. *Cf.* Second MTD Op. 30–31 [JA 266–67] (holding that CfA had plausibly alleged that OLC opinions resolving interagency disputes "have been adopted *ex ante* by the OLC's client agencies within the meaning" of § 552(a)(2)(B)). In other words, they do not begin as predecisional and deliberative in the way that the OLC opinion in *EFF* began. Upon their issuance, they are authoritative determinations of the law and policy of the recipient agencies.

### 3. The government's interpretation of *EFF* cannot be reconciled with this Court's past precedent.

Third, and finally, the government's interpretation of *EFF* cannot be reconciled with the decades of past precedent in which this Court has held that legal opinions may constitute working law. The unstated upshot of the government's brief

is that legal opinions can never be working law upon their issuance unless they dictate specific policies. But this Court has rejected that argument over and over— it is the "working *law*" doctrine, after all—and *EFF* could not and did not overrule that prior panel precedent.

In *Coastal States*, for example, the Court held that legal opinions issued by the Department of Energy's regional counsel to auditors in its field offices constituted working law. 617 F.2d at 858. Auditors, whose job it was to assure compliance with Department regulations, would solicit legal interpretations from the regional counsel on how the regulations applied to particular facts. *Id.* at 858–59. The facts could be "either real or hypothetical," and in response, the regional counsel would "interpret[] any applicable regulations in light of those facts, and often point[] out additional factors which might make a difference in the application of the regulation." *Id.* at 859. Although the interpretations that the regional counsel issued were not "formal" or "binding," *id.* at 859, "the advice was regularly and consistently followed," *id.* at 860. The Court had no trouble concluding that these opinions "represent interpretations of established policy," *id.* at 869, even though they did not dictate a specific policy outcome, observing that: "Characterizing these documents as 'predecisional' simply because they play into an ongoing audit process would be a serious warping of the meaning of the word." *Id.* at 868.

In *Tax Analysts I*, the Court relied on similar logic in holding that so-called Field Service Advice Memoranda of the Internal Revenue Service ("IRS") must be disclosed because they "constitute agency law." 117 F.3d at 617. The IRS's Office of Chief Counsel issued the memos in response to requests by field personnel for guidance, "usually with reference to the situation of a specific taxpayer." *Id.* at 609. Though "not formally binding," the memos "[were] held in high regard and [were] generally followed." *Id.* The Court's analysis mirrored its earlier analysis in *Coastal States*, *see id.* at 617–18, particularly its conclusion that the Field Service Advice Memoranda constitute agency law even though they did not direct—and might even conflict with—the requesting personnel's subsequent policy determinations, *id.* at 617. As the Court said: "FSAs are themselves statements of an agency's legal position and, as such, cannot be viewed as predecisional. Although FSAs may precede the field office's decision in a particular taxpayer's case, they do not precede the decision regarding the agency's legal position." *Id.* (citing *Coastal States*, 617 F.2d at 868).

And in *Tax Analysts II*, the Court extended its decision in *Tax Analysts I* to the IRS's "Technical Assistance" memoranda issued to program managers that reflected the Office of Chief Counsel's "considered legal conclusions." *Tax Analysts II*, 294 F.3d at 73. "It is not necessary," the Court said, "that the [memos] reflect the final *programmatic* decisions of the program officers who request them. It is enough

that they represent [the Office of Chief Counsel's] final *legal* position concerning the Internal Revenue Code, tax exemptions, and proper procedures." *Id.* at 81. In reaching this decision, the Court distinguished between different types of IRS memoranda, determining whether they constituted working law by carefully studying the role each played within the agency and, importantly, the direction in which they flowed. Some IRS memos "travel upward" from the Office of Chief Counsel to the Commissioner of Internal Revenue, "advising him on legal issues," and thus "may still be part of the agency's deliberative process." *Id.* (emphasis omitted). But the memoranda the Court ordered disclosed "travel[ed] horizontally." *Id.*

This Court has consistently recognized that legal opinions constitute working law when, given the circumstances of their solicitation and issuance, they conclusively determine the agency's legal position. While the Court has said that the "distinction between deliberative [memoranda] and [memoranda] that represent . . . considered legal conclusions is not amenable to a categorical formula," *Tax Analysts II*, 294 F.3d at 82, at least five factors emerge from *Sears, Coastal States, Tax Analysts I and II*, and *EFF*: whether the legal opinions (1) function as an agency's precedent, (2) are regularly and consistently followed, (3) are written in conclusive terms, (4) guide agency action prospectively, and (5) flow from those charged with interpreting the law to those charged with implementing it. Some OLC opinions do

not exhibit these characteristics. The one in *EFF*, for example, was retrospective rather than prospective in focus and offered only advice in examining policy options available to the agency. Many other OLC opinions flow up the chain of command to a superior interpretive authority—generally, the President—rather than to agency officials who have no authority to disregard the OLC's conclusions. But the three categories of opinions at issue in this case all exhibit the characteristics that have led the Court to hold in other cases that opinions "speak with authority" on agency law and policy and accordingly constitute working law.

The only distinction the government could perhaps draw between the cases cited above and this one is that the OLC sits outside of (most of) the agencies soliciting its legal opinions. But this argument makes the same mistake that the Court pinpointed in *Schlefer*, because it fails to "look[] beneath formal lines of authority to the reality of the decisionmaking process." 702 F.2d at 238. For the categories of opinions in question here, "the reality" is clear that the OLC speaks with authority on the legal and policy questions it resolves. Indeed, the explicit function of the OLC is to serve as "a singular legal expositor," with the "unique role of . . . issuing legal opinions for the executive branch as a whole." Am. Compl. ¶ 19 [JA 68]. Its interpretive authority thus supersedes that of an agency's general counsel and even that of an agency's head, and so the fact that the OLC sits outside of the agencies soliciting its opinions does not help the government. *See also Tax Analysts I*, 117

54

F.3d at 608–09 (holding that legal memos issued by the Office of Chief Counsel to the IRS qualify as working law even though the Office "is not part of the IRS" and "understands itself as independent from the IRS").

### E. Because these opinions fall within the reading-room provision, they cannot be withheld under Exemption 5's deliberative process and attorney–client privileges.

The government asserts that the deliberative process privilege shields all OLC opinions from disclosure, including the three categories of opinions at issue here. *See* Gov't Br. 15. In the district court, the government additionally argued that the attorney–client privilege separately shields two of the categories from disclosure.[9] The government's arguments are simply irreconcilable with controlling precedent.

The Supreme Court and this Court have both held that records that fall within FOIA's reading-room provision or the working law doctrine cannot be withheld under Exemption 5. In *Sears*, the Supreme Court wrote that courts "should be reluctant . . . to construe Exemption 5 to apply to the documents described in 5 U.S.C. § 552(a)(2)." 421 U.S. at 153. And this Court has since made clear that the Supreme Court's reasoning extends to both the deliberative process privilege, *see*

---

[9] Though the government originally asserted that the attorney–client privilege shielded all categories from disclosure, *see* Gov't Second MTD Br. 21–22, it later dropped this argument as to OLC opinions resolving interagency disputes, *see generally* Gov't MSJ Br. As a result, the government's argument as to the attorney–client privilege is live only with respect to CfA's cross-appeal.

*Tax Analysts I*, 117 F.3d at 617 ("[S]tatements of an agency's legal position . . . cannot be viewed as predecisional."), and the attorney–client privilege, *see id.* at 619 ("FOIA exemption 5 and the attorney–client privilege may not be used to protect this growing body of agency law from disclosure to the public.").

This is for good reason. As the Supreme Court explained, FOIA's affirmative-disclosure provision "represents a strong congressional aversion to 'secret (agency) law,'" *Sears*, 421 U.S. at 153 (citation omitted), and "an affirmative congressional purpose to require disclosure of documents which have 'the force and effect of law,'" *id.* (citation omitted). These animating principles are in harmony with Exemption 5, which, "properly construed, calls for disclosure of all opinions and interpretations which embody the agency's effective law and policy." *Id.* (citation omitted).

Because *Sears* involved the meaning of § 552(a)(2)(A), the Court was even more explicit with respect to that provision: Where records are "final opinions" within the meaning of that provision, "Exemption 5 can *never* apply." *Sears*, 421 U.S. at 153–54 (emphasis added). The Court explained that this was by definition: final opinions "invariably explain agency action already taken or an agency decision already made," *id.* at 153, whereas the deliberative process privilege protects "communications . . . prior to the time the decision is made." *Id.* at 151.

This logic applies equally to FOIA's other affirmative-disclosure provisions, including "statements of policy and interpretations which have been adopted by the

agency." *See* 5 U.S.C. § 552(a)(2)(B). In *Tax Analysts I*, this Court held that "statements of an agency's legal position . . . cannot be viewed as predecisional." 117 F.3d at 617. Though this Court acknowledged that the advice memoranda at issue "precede[d] the field office's decision in a particular taxpayer's case," it held that "they d[id] not precede the decision regarding the agency's legal position." *Id.* Likewise, the narrow categories of OLC opinions at issue in this case cannot be viewed as predecisional, and thus cannot be withheld under the deliberative process privilege.

In *Tax Analysts I*, this Court also held that records that fall within the working-law doctrine may not be withheld under the attorney–client privilege. *Id.* at 619. But even if they could, the privilege does not apply here because the OLC does not maintain an attorney–client relationship with the agencies seeking its formal written opinions. When the OLC issues its opinions, it does not prioritize the interests of its supposed clients, but rather the goal of promoting a uniform understanding of law throughout the executive branch. Best Practices Memo 1 [JA 298]. It often adjudicates disputes between agencies whose interests are adverse, sharing supposed confidences between adverse parties. *Id.* at 3 [JA 300]. And the OLC is not bound to respect the confidentiality of the agencies to which it provides opinions. Instead, the OLC's practice is to "make its significant opinions fully and promptly available to the public," and it is the OLC—not the agency—that makes the ultimate decision

to publish. *Id.* at 5 [JA 302]. By contrast, clients in an actual attorney–client relationship "own" the privilege and have ultimate say over the public disclosure of their confidences. *See, e.g.*, *In re Subpoenas Duces Tecum*, 738 F.2d 1367, 1369 (D.C. Cir. 1984). Ultimately, the problem with the government's theory is that—at least in regard to the opinions at issue here—the OLC is an arbiter, not an advocate.

The government's arguments to the contrary fail. First, the government argues that the district court "g[ave] precedence to the wrong statutory provision" when holding that documents falling within the reading-room provision could not be withheld under Exemption 5. Gov't Br. 25. But because the reading-room provision and Exemption 5 are "mutually exclusive," MSJ Op. 10 [JA 611] (citing *Sears*, 421 U.S. at 153), the order of the district court's analysis is of no moment, and in any event, the government ignores the controlling precedent rejecting its argument. Second, the government attempts to distinguish *Sears* by arguing that OLC opinions simply "provide legal advice" to agencies. Gov't Br. 26. But as explained above, this mischaracterizes the OLC's role and the decision-making process with respect to these three categories of OLC opinions.

## II. Requiring the disclosure of the opinions at issue would serve important rule-of-law values.

Requiring the OLC to disclose the opinions that CfA seeks would serve, not undermine, the rule-of-law values enshrined in FOIA and recognized by the Supreme Court in *Sears*.

58

The OLC has a singular role in interpreting the law and shaping government policy that affects the rights of millions of individuals. Pursuant to past OLC opinions, our government has tortured prisoners, determined whether insurance benefits apply to the children of same-sex couples, and prioritized the removal of some noncitizens from the country while deferring the removal of others. The public has an overriding interest in understanding how the executive branch interprets the law. That interest is only magnified with respect to the opinions CfA now seeks, because those opinions are especially likely to concern core questions of executive authority (category one), individual rights (category two), and the legal obligations of federal agencies (category three).

Recognizing that these categories of opinions must be disclosed would not impair the ability of government officials to seek confidential legal advice or compromise government decisionmaking, as the government has argued. *See* Gov't Br. 21. Though important for many reasons, these opinions account for only a small portion of the OLC's output. From 2010 to 2015, the OLC issued 81 formal written opinions, *see* Kadzik Letter 2 [JA 366], some of which fell within the three categories here. During the same period, it issued approximately 3,550 other forms of legal advice. *Id.* at 10 [JA 374]. CfA does not argue that those 3,550 other forms of advice constitute working law. Moreover, the reality that the government does not acknowledge is that, in most cases, agencies have control over whether to seek

59

opinions that have the character of working law. The reason they sometimes do is precisely because of their authoritative nature. Because the opinions at issue here authoritatively determine agency law and policy, they insulate agency decisionmaking from legal and public scrutiny in a way that deliberative advice does not. That agencies sometimes prefer opinions with these characteristics, however, only cuts against any interest in keeping them secret.

The Supreme Court's decision in *Sears* is edifying on this point. It acknowledged that disclosure of predecisional communications could hamstring policymaking, because "those who expect public dissemination of their remarks may well temper candor with a concern for appearances to the detriment of the decisionmaking process." *Sears*, 421 U.S. at 150–51 (cleaned up). But it explained that these concerns do not extend to the disclosure of an agency's working law, because working law comes "after the decision and [is] designed to explain it." *Id.* at 152.

The OLC opinions that CfA seeks fall within this second category. They constitute the law and policy of the executive branch, and they are precisely the sort of records that Congress set out through FOIA to expose to the light of day. Compelling their disclosure would enable democratic self-governance; it would temper overzealous executive officials; and it would foster accountability. If the

60

government believes otherwise, then its complaint is properly addressed to Congress, not to this Court.

**III.    The OLC must provide an index of formal written opinions subject to affirmative disclosure.**

Because the three categories of opinions identified above fall within FOIA's reading-room provision, the government must proactively disclose an index of those opinions, as well. *See* 5 U.S.C. § 552(a).

## Conclusion

For the reasons explained above, this Court should affirm the district court's judgment requiring disclosure of OLC opinions resolving interagency disputes and reverse the district court's dismissal of CfA's claims involving OLC opinions issued in the adjudication of private rights and OLC opinions interpreting agencies' non-discretionary legal obligations.

December 6, 2024                      Respectfully submitted,

  /s/ Alex Abdo
Alex Abdo
Anna Diakun
Jackson Busch
Jameel Jaffer
Knight First Amendment Institute at
  Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
alex.abdo@knightcolumbia.org

*Counsel for Appellee / Cross-Appellant*

61

**Certificate of Compliance**

This brief complies with the type-volume limitations of Fed. R. App. P. 28.1(e)(2) because it contains 15,269 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as calculated by the word-counting function.

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: December 6, 2024                    /s/ Alex Abdo
                                           Alex Abdo

**Certificate of Service**

I, Alex Abdo, certify that on December 6, 2024, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: December 6, 2024                    /s/ Alex Abdo
                                           Alex Abdo

# ADDENDUM

**5 U.S.C. § 552(a)(2)(A)–(B)**

Each agency, in accordance with published rules, shall make available for public inspection in an electronic format—

> (A) final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases;

> (B) those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register.

**5 U.S.C. § 552(a)(2)(E)**

Each agency shall also maintain and make available for public inspection in an electronic format current indexes providing identifying information for the public as to any matter issued, adopted, or promulgated after July 4, 1967, and required by this paragraph to be made available or published.

**5 U.S.C. § 552(b)(5)**

This section does not apply to matters that are—

> . . .

> (5) inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency, provided that the deliberative process privilege shall not apply to records created 25 years or more before the date on which the records were requested.