# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 11, 2025        Decided October 17, 2025

No. 24-5163

CAMPAIGN FOR ACCOUNTABILITY,
APPELLEE

v.

UNITED STATES DEPARTMENT OF JUSTICE,
APPELLANT

———

Consolidated with 24-5170

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:16-cv-01068)

———

*Daniel Tenny*, Attorney, U.S. Department of Justice, argued the cause for appellant/cross-appellee. With him on the briefs were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, at the time the brief was filed, *Brett A. Shumate*, Acting Assistant Attorney General, and *Michael S. Raab*, Attorney.

2

*Alex Abdo* argued the cause for appellee/cross-appellant. With him on the briefs were *Anna Diakun*, *Jackson Busch*, and *Jameel Jaffer*. *Stephanie Krent* entered an appearance.

Before: SRINIVASAN, *Chief Judge*, RAO and PAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PAN.

Opinion concurring in the judgment filed by *Circuit Judge* RAO.

PAN, *Circuit Judge*:  When Executive Branch officials need legal advice on matters of importance, they turn to the Office of Legal Counsel (OLC), a component of the Department of Justice (DOJ).  Since 1950, OLC has provided guidance to Presidents, Cabinet members, and myriad government agencies.  It has opined on a wide variety of critical issues — like whether the government may apply "enhanced interrogation techniques" to suspected terrorists; launch drone strikes to kill American citizens abroad; and extend federal benefits to children of same-sex couples.  *See infra* note 1.  As the Executive Branch's preeminent legal advisor, OLC helps the President and other government officers to "faithfully execute[]" the law.  U.S. Const. art. II, § 3.

When an agency or official submits a legal question to OLC for resolution, the Office researches and analyzes the matter, and may issue a formal, written opinion that answers the question presented.  As a matter of custom, Executive Branch agencies treat OLC's legal conclusions as binding.  Yet the public rarely sees those opinions:  OLC publishes only a chosen few.

Campaign for Accountability (CfA) is a non-profit watchdog group that "uses research, litigation, and

3

communications to expose misconduct and malfeasance in public life." Compl. ¶ 11 (J.A. 65).  It seeks to bring more of OLC's opinions into the daylight.  Invoking the Freedom of Information Act (FOIA), CfA sued the Justice Department, initially seeking disclosure of all OLC opinions.  After several rounds of litigation in the district court, only three categories of opinions remain in contention:  Opinions that (1) resolve interagency disputes, (2) concern the adjudication or determination of private rights, and (3) interpret non-discretionary legal duties.

The district court ruled in DOJ's favor as to CfA's requests for opinions concerning private rights and non-discretionary legal duties, holding that such opinions are not disclosable under FOIA.  But the court ruled for CfA on its claim that it is entitled to see opinions resolving interagency disputes.  Both parties appealed.  We conclude that FOIA does not require the disclosure of any of the OLC opinions that CfA seeks.  We therefore affirm in part and reverse in part the judgment of the district court.

## I.

### A.

"Under our system of government, Congress makes laws and the President, acting at times through agencies . . . , 'faithfully execute[s]' them." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 327 (2014) (alteration in original) (quoting U.S. Const. art. II, § 3).  In implementing federal laws and administering the day-to-day operations of the federal government, the President, Cabinet secretaries, and agencies of the Executive Branch often encounter challenging legal issues, such as whether proposed policies or actions conform with the requirements of the law.  Since 1789, Congress has tasked the Attorney General with providing advice about such legal

4

questions to the President and the heads of executive departments. *See* 28 U.S.C. §§ 511–512; Judiciary Act of 1789, ch. 20, § 35, 1 Stat. 73. The Attorney General has delegated that advisory role to an elite office within the Justice Department: OLC. *See* 28 C.F.R. § 0.25(a).

OLC provides formal and informal counsel to members of the Executive Branch. It routinely issues formal written opinions, which are a "particularly important form of controlling legal advice." Memorandum from David J. Barron, Acting Assistant Attorney General, to Attorneys of the Office of Legal Counsel 1 (July 16, 2010) (Best Practices Mem.) (J.A. 298). Often, OLC addresses "very difficult and unsettled issues of law." Stip. ¶ 6 (J.A. 291). Its advice can shift millions of dollars in federal funds, determine the viability of a regulation, or even decide matters of life and death.[1] Because OLC "frequently" weighs in "on issues of first impression that are unlikely to be resolved by the courts," its advice "may

---

[1]     *See* Disposition of Proceeds from the Sale of Government Buildings Acquired with Social Security Trust Funds, 34 Op. O.L.C. 263 (2010); Permissibility of Small Business Administration Regulations Implementing the Historically Underutilized Business Zone, 8(a) Business Development, and Service-Disabled Veteran-Owned Small Business Concern Programs, 2009 WL 2870163 (O.L.C. 2009); Memorandum from David J. Barron, Acting Assistant Att'y Gen., Re: Applicability of Federal Criminal Laws and the Constitution to Contemplated Lethal Operations Against Shaykh Anwar al-Aulaqi (July 16, 2010), https://perma.cc/DYT8-JWJ7; *see also* Memorandum from Jay S. Bybee, Assistant Att'y Gen., Interrogation of al Qaeda Operative (2002), https://perma.cc/2ZSR-N36W; Whether the Defense of Marriage Act Precludes the Nonbiological Child of a Member of a Vermont Civil Union from Qualifying for Child's Insurance Benefits Under the Social Security Act, 31 Op. O.L.C. 243 (2007).

5

effectively be the final word on the controlling law." Best Practices Mem. 1 (J.A. 298).

As a centralized legal adviser, OLC "occasionally" is called upon to resolve legal debates between different agencies within the Executive Branch. Stip. ¶ 7 (J.A. 292); *see also* Exec. Order No. 12,146, 44 Fed. Reg. 42657, 42658 (July 18, 1979) (encouraging agencies that "are unable to resolve a legal dispute between them . . . to submit the dispute to the Attorney General"). Exercising the Attorney General's authority, OLC "ask[s] each side to submit [] a memorandum" of its views, "take[s] care to consider fully and address impartially the points raised on both sides," and weighs both traditional legal authorities and its own precedents. Best Practices Mem. 2–4 (J.A. 299–301). As a matter of custom, the parties to an interagency dispute treat as dispositive an OLC opinion that settles their disagreement.

The Office also issues opinions in a range of other circumstances. As relevant to this case, OLC helps agencies understand their "non-discretionary legal obligations" by explaining to them what they are required to do by federal law, s*ee* Compl. ¶¶ 41–44 (J.A. 77–78); and the Office helps agencies determine the "private rights" of individuals who are affected by their policies, *see id.* ¶¶ 47–49 (J.A. 80). For example, one OLC opinion informed the Social Security Administration that the Defense of Marriage Act would not prevent the agency from providing benefits to the non-biological child of a same-sex civil union. *See* Whether the Defense of Marriage Act Precludes the Nonbiological Child of a Member of a Vermont Civil Union from Qualifying for Child's Insurance Benefits Under the Social Security Act, 31 Op. O.L.C. 243 (2007) (J.A. 142–46). That opinion explained to the agency how it should interpret a statute that it was

6

required to implement, while also guiding the agency's policy on the provision of benefits to certain individuals.

In preparing formal written opinions, OLC follows an "ordinary process" set forth in its Best Practices Memo. Stip. ¶ 13 (J.A. 293); *see* Best Practices Mem. (J.A. 298–303). Typically, the process begins with a request for advice from one or more agencies. OLC evaluates the request to ensure that "[t]he legal question presented [is] focused and concrete; OLC generally avoids providing a general survey of an area of law or issuing broad, abstract legal opinions." Best Practices Mem. 2–3 (J.A. 299–300). In addition, OLC's opinions "should address legal questions prospectively; OLC avoids opining on the legality of past conduct." *Id.* at 3 (J.A. 300). If OLC proceeds with formulating an opinion, it will solicit the views of interested agencies, research the issue, consult governing legal authorities and its own precedents, and issue a final, written opinion. *See id.* at 2–5 (J.A. 299–302). In arriving at its conclusions, OLC "must provide advice based on its best understanding of what the law requires — not simply an advocate's defense of the contemplated action or position proposed by an agency or the Administration." *Id.* at 1 (J.A. 298). At the same time, because OLC's "responsibilities also include facilitating the work of the Executive Branch and the objectives of the President, consistent with the law," "unlike a court, OLC will, where possible and appropriate, seek to recommend lawful alternatives to Executive Branch proposals that it decides would be unlawful." *Id.* at 2 (J.A. 299).

Executive Branch officials consider final OLC opinions to be "controlling legal advice." Best Practices Mem. 1 (J.A. 298). In practice, that means that agencies customarily accept OLC's guidance. *Id.*; *see also Elec. Frontier Found. v. Dep't of Just. (EFF)*, 739 F.3d 1, 9 (D.C. Cir. 2014) (noting that OLC opinions are "controlling (insofar as agencies customarily

7

follow OLC advice that they request)"). To ensure the requesting agency's adherence to that custom, OLC will "issue [its] opinion only if [it] ha[s] received in writing from that agency an agreement that it will conform its conduct to [OLC's] conclusion." Best Practices Mem. 3 (J.A. 300).[2]

OLC may publicly release its written opinions but usually declines to do so. It bases its decision to publish on the nature of the opinion, often considering whether the opinion is significant enough, whether it implicates national security, and whether publication would compromise the confidentiality of attorney-client information. Best Practices Mem. 5–6 (J.A. 302–03). Although mostly hidden from public view, OLC's opinions, together with those issued by the Attorneys General, may "comprise the largest body of official interpretation of the Constitution and statutes outside the volumes of the federal court reporters." Trevor W. Morrison, *Stare Decisis in the Office of Legal Counsel*, 110 Colum. L. Rev. 1448, 1451 (2010) (quoting John O. McGinnis, *Models of the Opinion Function of the Attorney General: A Normative, Descriptive, and Historical Prolegomenon*, 15 Cardozo L. Rev. 375, 376 (1993)).

**B.**

In 1966, Congress enacted FOIA, empowering "citizens to know what their Government is up to." *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 171 (2004) (cleaned up). Specifically, FOIA "provide[s] a statutory right of public access to documents and records held by agencies of the federal government." *Pratt v. Webster*, 673 F.2d 408, 413 (D.C. Cir.

---

[2]    OLC has clarified, and CfA does not dispute, that the Office enforces this requirement with respect to independent and non-independent Executive Branch agencies.

8

1982). The statute's "basic purpose . . . is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). In FOIA, Congress "sought to reach a workable balance between the right of the public to know and the need of the Government to keep information in confidence to the extent necessary without permitting indiscriminate secrecy." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (cleaned up).

A plaintiff may sue an agency for violating FOIA "upon a showing that an agency has (1) 'improperly'; (2) 'withheld'; (3) 'agency records.'" *Kissinger v. Reps. Comm. for Freedom of the Press*, 445 U.S. 136, 150 (1980) (quoting 5 U.S.C. § 552(a)(4)(B)). "An agency withholds its records 'improperly' if it fails to comply with one of FOIA's 'mandatory disclosure requirements.'" *Citizens for Resp. & Ethics in Washington v. Dep't of Just. (CREW II)*, 922 F.3d 480, 486 (D.C. Cir. 2019) (quoting *Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 150 (1989)).

FOIA requires agencies to disclose records in three ways, which are subject to certain exceptions or exclusions:

First, FOIA requires agencies to publish certain kinds of documents in the Federal Register. *See* 5 U.S.C. § 552(a)(1). These include, for example, "rules of procedure" and "substantive rules of general applicability adopted as authorized by law." *Id.* § 552(a)(1)(C)–(D).

Second, FOIA directs agencies to disclose and index certain records proactively, by making them "available for public inspection" in an electronic reading room. 5 U.S.C. § 552(a)(2). Subsection (A) of the so-called reading-room provision pertains to "final opinions . . . made in the

9

adjudication of cases." *Id.* § 552(a)(2)(A). And subsection (B) concerns "those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register." *Id.* § 552(a)(2)(B). Agencies must make all documents covered by either subsection available to the public, "even absent a specific request." *CREW II*, 922 F.3d at 484 (citing 5 U.S.C. § 552(a)(2)).

Third, the statute calls for agencies to disclose "all other records" "upon request." *Kennecott Utah Copper Corp. v. Dep't of Interior*, 88 F.3d 1191, 1202 (D.C. Cir. 1996) (citing 5 U.S.C. § 552(a)(3)). This is "FOIA's 'most familiar provision.'" *CREW II*, 922 F.3d at 484 (quoting *Citizens for Resp. & Ethics in Washington v. Dep't of Just. (CREW I)*, 846 F.3d 1235, 1240 (D.C. Cir. 2017)). The majority of our opinions interpreting FOIA address "FOIA requests" made by members of the public under subsection (a)(3).

An agency may withhold a document that is otherwise subject to disclosure under one of FOIA's nine exemptions. *See* 5 U.S.C. § 552(b)(1)–(9). As potentially relevant here, Exemption 5, *id.* § 552(b)(5), incorporates the deliberative process privilege, which shields from disclosure pre-decisional and deliberative "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated," *Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 267 (2021) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975)).

The deliberative process privilege does not protect from disclosure an agency's "working law," "i.e. the 'reasons which [supplied] the basis for an agency policy actually adopted.'" *EFF*, 739 F.3d at 7 (alteration in original) (quoting *Sears*, 421 U.S. at 152–53). To qualify as working law, the agency records

10

in question must "have the force and effect of law." *Sears*, 421 U.S. at 153 (cleaned up). Working law encompasses the documents that fall under subsection (A) and subsection (B) of the reading-room provision: "'final opinions . . . made in the adjudication of cases' and 'statements of policy and interpretations which have been adopted by the agency.'" *CREW II*, 922 F.3d at 486 (quoting 5 U.S.C. § 552(a)(2)(A)–(B)). Such documents are subject to disclosure under FOIA and generally do not fall under the deliberative process privilege because they reflect post-decisional, final agency determinations. *See Sears*, 421 U.S. at 153–54 ("We should be reluctant . . . to construe Exemption 5 to apply to the documents described in 5 U.S.C. § 552(a)(2); and with respect at least to 'final opinions,' which not only invariably explain agency action already taken or an agency decision already made, but also constitute 'final dispositions' of matters by an agency, we hold that Exemption 5 can never apply." (cleaned up)).

We have previously considered whether an OLC legal opinion that is prepared at the behest of a client agency is disclosable under FOIA. In *EFF*, we addressed whether OLC was required to disclose an opinion about the FBI's past information-gathering practices in response to a FOIA request under 5 U.S.C. § 552(a)(3), while in *CREW II*, we considered an argument that the reading-room provision required OLC to disclose all its formal written opinions. *See EFF*, 739 F.3d at 4; *CREW II*, 922 F.3d at 486. In *EFF*, OLC had failed to comply with subsection (a)(3), yet we held that the requested opinion was shielded from disclosure by the deliberative process privilege because it had not been adopted by the requesting agency as its working law. *See EFF*, 739 F.3d at 8–10. In *CREW II*, we built on *EFF* to conclude that OLC opinions are not categorically disclosable under the reading-room provision, even if they are generally considered

11

"controlling, authoritative and binding" within the Executive Branch. *CREW II*, 922 F.3d at 486 (cleaned up) (citing *EFF*, 739 F.3d at 9). As we explained in *EFF*, because OLC does not have "the authority to establish the 'working law' of [an agency]," its opinion cannot be the working law of an agency unless the agency "'adopt[s]' what OLC offer[s]." *EFF*, 739 F.3d at 8–10. In other words, "[a]n OLC opinion [that includes statements of policy and interpretations] qualifies as the working law of an agency only if the agency has adopted the opinion as its own." *CREW II*, 922 F.3d at 486 (cleaned up) (citing *EFF*, 739 F.3d at 9).

**C.**

In June 2016, CfA sued the Justice Department, seeking disclosure of all OLC's past and future formal written opinions under FOIA's reading-room provision, 5 U.S.C. § 552(a)(2). At that time, we had not yet issued our decision in *CREW II*, which addresses an identical claim. The district court relied on our holding in *EFF* to reject CfA's sweeping request and to dismiss its Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *See Campaign for Accountability v. Dep't of Just. (CfA I)*, 278 F. Supp. 3d 303, 320–23 (D.D.C. 2017).

CfA then filed a narrower Amended Complaint. *See* Amend. Compl. (Compl.) (J.A. 62–85). As relevant here, it asserted that three sets of OLC opinions are subject to disclosure: (1) "opinions resolving interagency disputes"; (2) "opinions interpreting non-discretionary legal obligations"; and (3) "opinions adjudicating or determining private rights." *Id.* ¶¶ 35–38, 41–44, 47–49 (J.A. 74–75, 77–78, 80) (cleaned up).

DOJ filed a new motion to dismiss, which the district court granted in part and denied in part. *Campaign for*

12

*Accountability v. Dep't of Just. (CfA II)*, 486 F. Supp. 3d 424, 426 (D.D.C. 2020). The district court dismissed CfA's claims concerning OLC opinions that concern non-discretionary obligations and private rights. *See id.* at 441–45. It held that such opinions are not subject to disclosure as "working law" because they cannot be classified as either "final opinions . . . made in the adjudication of cases" under subsection (A) of the reading-room provision, or "statements of policy and interpretations which have been adopted by the agency" under subsection (B). *See id.* at 437 (citing 5 U.S.C. § 552(a)(2)(A)–(B)). Specifically, the district court reasoned that opinions interpreting non-discretionary duties do not "*necessarily* announce[] the client agency's working law from the moment the opinion is issued." *Id.* at 442 (emphasis in original). Rather, an agency would "need[] to adopt OLC's legal interpretation by acting upon it in the context of its adjudication or policy development in order for that opinion to be plausibly considered the [agency's] working law." *Id.* (citing *EFF*, 739 F.3d at 9). The court also explained that opinions concerning private rights may, "[a]t most," be "plausibly conceived of as 'binding' and 'controlling' statements of relevant law that the client agency *may* adopt and apply to a particular case adjudicating private rights." *Id.* at 443 (emphasis in original) (quoting *EFF*, 739 F.3d at 9). Such opinions would become disclosable as working law only after the agency adopted the OLC's interpretation as its own. *Id.*

The district court took a different view about OLC opinions that resolve interagency disputes. It held that CfA had plausibly alleged that such opinions fall under the reading-room provision and must be disclosed. *CfA II*, 486 F. Supp. 3d at 426. First, the court concluded that such opinions are plausibly "final opinions . . . made in the adjudication of cases" under subsection (A) because OLC's "process for resolving such disputes is adjudicative in nature" and a "case" need not

13

"involve private parties." *Id.* at 439 (citing 5 U.S.C. § 552(a)(2)(A)). Second, the court ruled that interagency-dispute opinions are plausibly "'statements of policy and interpretations' that have been adopted *ex ante* by at least one of the disputing agencies." *Id.* at 426 (quoting 5 U.S.C. § 552(a)(2)(B)). Agencies may be viewed as adopting such opinions in advance, the court reasoned, because an agency must provide written assurance "that it will conform its conduct to [OLC's] conclusion" before OLC will issue an opinion. *Id.* at 440 (quoting Best Practices Mem. 3 (J.A. 300)).

After the district court ruled on the motions to dismiss, the case was transferred to a different district court judge. Proceeding on a stipulated record, the parties filed cross-motions for summary judgment concerning whether OLC opinions that resolve interagency disputes must be disclosed as working law under FOIA's reading-room provision. The district court granted summary judgment in favor of CfA, holding that such opinions must be disclosed. *See Campaign for Accountability v. Dep't of Just. (CfA III)*, 732 F. Supp. 3d 63 (D.D.C. 2024). The court ruled that OLC opinions that resolve interagency disputes are "final opinions . . . made in the adjudication of cases" under subsection (A) of the reading-room provision, essentially because OLC's resolution process "bears many of the hallmarks of adversarial adjudication." *Id.* at 70–76 (quoting 5 U.S.C. § 552(a)(2)(A)).

The district court rejected OLC's argument that the opinions are "categorically protected" by the deliberative process privilege, noting that the deliberative process privilege and the reading-room provision are "generally mutually exclusive." *CfA III*, 732 F. Supp. 3d at 71, 75–76 (citing *Sears*, 421 U.S. at 153). The court declined to reach whether opinions resolving interagency disputes also qualify as "statements of policy and interpretations which have been adopted by the

14

agency" under subsection (B) of the reading-room provision. *Id.* at 65 (citing 5 U.S.C. § 552(a)(2)(B)).

DOJ timely appealed the court's ruling that OLC must disclose opinions resolving interagency disputes; CfA timely cross-appealed the court's dismissal of its claims regarding opinions on non-discretionary duties and private rights. We have jurisdiction under 28 U.S.C. § 1291.

**II.**

**A.**

We "review[] *de novo* the dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted." *CREW II*, 922 F.3d at 486. The same goes for "decisions granting summary judgment in FOIA cases." *EFF*, 739 F.3d at 7. We also review *de novo* the district court's interpretation of FOIA. *See Jud. Watch, Inc. v. FBI*, 522 F.3d 364, 367 (D.C. Cir. 2008).

**B.**

Although OLC does not contest CfA's standing to bring this suit, "we have an independent obligation to assure ourselves of our jurisdiction." *Waterkeeper All., Inc. v. Regan*, 41 F.4th 654, 659 (D.C. Cir. 2022).

CfA has standing to challenge OLC's compliance with FOIA if it can "demonstrate (i) that [it] has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). An injury must be both "'concrete,' meaning that it must be real and not abstract" and "particularized," meaning it "must

15

affect 'the plaintiff in a personal and individual way' and not be a generalized grievance." *Id.* at 381 (cleaned up) (first quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021); then quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). Supreme Court precedents permit a plaintiff to establish standing based on a concrete and particularized "informational injury," which we have interpreted to mean that the plaintiff can show "(1) it has been deprived of information that a statute requires the government to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Nat'l Sec. Archive v. CIA*, 104 F.4th 267, 272 (D.C. Cir. 2024) (cleaned up); *see also TransUnion*, 594 U.S. at 441 (citing *FEC v. Akins*, 524 U.S. 11 (1998) and *Pub. Citizen v. Dep't of Justice*, 491 U.S. 440 (1989)).

Here, the standing question is straightforward because "the Supreme Court has held that an informational injury is sufficient to satisfy standing under FOIA." *Nat'l Sec. Archive*, 104 F.4th at 272 (citing *Pub. Citizen*, 491 U.S. at 449). A FOIA plaintiff need only show "that they sought and were denied specific agency records." *Pub. Citizen*, 491 U.S. at 449; *see also Zivotofsky ex rel. Ari Z. v. Sec'y of State*, 444 F.3d 614, 617 (D.C. Cir. 2006) (noting in the context of 5 U.S.C. § 552(a)(3) that "[a]nyone whose request for specific information has been denied has standing to bring an action"). CfA has made that showing: Its Amended Complaint alleges that CfA invoked FOIA to request the disclosure of the OLC opinions at issue, and that OLC denied the request.

We do not think the analysis changes because CfA relies on the reading-room provision, which makes certain records accessible to all, even absent a request for disclosure. Although we recognized in *Prisology, Inc. v. Federal Bureau of Prisons* that failure to publish records as required by the reading-room

16

provision is a "harm common to everyone" and cannot, by
itself, form the basis of standing, a plaintiff suing to enforce the
reading-room provision still has standing if the plaintiff "made
a request of the agency and the agency denied the request." 852
F.3d 1114, 1116–17 (D.C. Cir. 2017). *Prisology* specifically
acknowledged that standing was established in another case
where the plaintiff made a request under the reading-room
provision for OLC opinions and "claimed that the agency's
refusal to make documents available . . . harmed its 'core
programmatic activities,' which included research from public
government records." *Id.* at 1117 (quoting Amend. Compl.
¶¶ 6, 11, *Citizens for Resp. & Ethics in Washington v. Dep't of
Just.*, 164 F. Supp. 3d 145 (D.D.C. 2016) (No. 13-01291)).
CfA makes that precise claim here. Compl. ¶ 52 (J.A. 81–82)
(alleging that lack of disclosure "has harmed, and continues to
harm, CfA in carrying out its core programmatic activities,"
including researching government records).

We respectfully disagree with our concurring colleague,
who would hold that CfA lacks standing because it has failed
to demonstrate a particularized injury. In her view, when a
FOIA plaintiff requests (and is denied) access to OLC opinions,
the court's standing analysis differs based on the type of OLC
opinions at issue. If a plaintiff requests (and is denied) OLC
opinions under subsection (a)(3), the plaintiff has suffered an
"informational injury" that is sufficiently particularized. *See*
Concurring Op. 4 (citing *Prisology*, 852 F.3d at 1117 for the
proposition that "under the record request provision our
caselaw allows standing based on an agency's denial of a
request for records"). On that much we agree. But when a
plaintiff requests (and is denied) OLC opinions under the
reading-room provision, subsection (a)(2) — as is the case here
— our colleague believes that more is required. According to
our colleague, because a successful subsection (a)(2) request
would require OLC to make certain opinions "available for

17

*public* inspection" in an electronic reading room, 5 U.S.C. § 552(a)(2) (emphasis added), the plaintiff's injury is best understood as a "generalized grievance," Concurring Op. 5. In other words, because OLC has withheld the requested records from the *public* it has not withheld the requested records "*from the complainant*." *Id.* at 6 (emphasis in original) (citing 5 U.S.C. § 552(a)(4)(B)). Our colleague would therefore require CfA to show more than an "informational injury": She believes that CfA must also identify a "downstream" or "adverse" effect from OLC's failure to publish the requested opinions under subsection (a)(2). *Id.* at 5.

We disagree with our colleague's analysis for three reasons. First, as previously explained, *Prisology* did not turn on whether records are sought under subsection (a)(2) versus subsection (a)(3); rather, the pertinent inquiry was whether the plaintiff expressly requested (and was denied) access to the records. *Prisology*, 852 F.3d at 1117. Because the plaintiff in that case "made no request of the Bureau of Prisons before bringing suit and therefore received no denial from that agency," he had not suffered the type of "informational injury" that is necessary to establish standing. *Id.* (distinguishing the plaintiff's case from those in which "the plaintiff made a request of the agency and the agency denied the request").

Second, our colleague's contention that CfA has alleged a mere "public" or "generalized grievance" because subsection (a)(2) records must be made "available for *public* inspection" in an electronic reading room, 5 U.S.C. § 552(a)(2) (emphasis added), is incorrect. The fact that many people could be similarly injured does not render the claim an impermissible generalized grievance: "Where a harm is concrete, though widely shared, the Court has found injury in fact." *Akins*, 524 U.S. at 11 (cleaned up); *see also Pub. Citizen*, 491 U.S. at 449–50 ("The fact that other citizens or groups of citizens might

18

make the same complaint after unsuccessfully demanding disclosure . . . does not lessen [their] asserted injury."); *Massachusetts v. EPA*, 549 U.S. 497, 525 n.24 (2007) ("Standing is not to be denied simply because many people suffer the same injury." (cleaned up)).

And third, our colleague's reliance on *TransUnion* is misplaced. The plaintiffs in that case, like the plaintiff in *Prisology*, "did not allege that they failed to receive any required information." *TransUnion*, 594 U.S. at 441. Indeed, the Supreme Court specifically distinguished *TransUnion* from cases that "involve[] denial of information subject to *public-disclosure or sunshine laws* that entitle all members of the public to certain information" — *i.e.*, laws like FOIA. *Id.* (emphasis added). The Supreme Court has "never suggested that those requesting information under [FOIA] need show more than that they sought and were denied specific agency records. There is no reason for a different rule here." *Pub. Citizen*, 491 U.S. at 449–50.

Because CfA alleges that it asked for particular agency records under the reading-room provision, that OLC denied its request, and that the denial harms CfA's ability to carry out its "core programmatic activities," Compl. ¶ 52 (J.A. 81–82), it has established standing.

## C.

The district court dismissed CfA's claims that OLC was required to disclose its legal opinions related to the adjudication of private rights or the interpretation of non-discretionary duties; but it held that OLC must disclose opinions resolving interagency disputes. In our view, none of the documents requested by CfA are "working law" subject to disclosure under FOIA's reading-room provision.

19

As previously discussed, OLC opinions qualify as the working law of an agency under the relevant subsections of the reading-room provision if they take the form of "final opinions . . . in the adjudication of cases," or "statements of policy and interpretations which have been adopted by the agency." *CREW II*, 922 F.3d at 486 (alteration in original) (quoting 5 U.S.C. § 552(a)(2)(A)–(B)). Because none of the categories of opinions at issue here meet either of those requirements, CfA failed to adequately allege or show that OLC violated the reading-room provision when it withheld the requested documents.

1. <u>Subsection (A): "Made in the Adjudication of Cases"</u>

CfA contends that two of the three categories of OLC opinions at issue — those resolving interagency disputes and those involving private rights — are subject to disclosure because they encompass "final opinions . . . made in the adjudication of cases" under subsection (A) of FOIA's reading-room provision. 5 U.S.C. § 552(a)(2)(A). As to opinions that resolve interagency disputes, CfA argues that such opinions are "final" and essentially "adjudicat[e]" "cases" between agencies. Meanwhile, OLC opinions concerning private rights are final and made in the *client agency's* adjudication of the cases before it, according to CfA, because OLC's advice controls the agency's resolution of those cases. We disagree on both counts. OLC's process for issuing legal opinions to Executive Branch agencies and officials is not tantamount to an "adjudication of cases" because the opinion process generally involves no "final disposition," yields only prospective advice, and does not resolve a "case." *Id.*

The definition of "adjudication" under subsection (A) is found in the Administrative Procedure Act (APA), which

20

encompasses FOIA. *Sears*, 421 U.S. at 158; *Chiquita Brands Int'l Inc. v. SEC*, 805 F.3d 289, 295–96 (D.C. Cir. 2015). Under the APA, an "adjudication" is an "agency process for the formulation of an order." 5 U.S.C. § 551(7). In turn, an "order" is "the whole or a part of a final disposition . . . of an agency in a matter other than rule making but including licensing." *Id.* § 551(6).

The Supreme Court has held that a "final disposition" must "have some determinate consequences for the party to the proceeding." *Int'l Tel. & Tel. Corp. v. Loc. 134, Int'l Bhd. of Elec. Workers, AFL-CIO (ITT)*, 419 U.S. 428, 443 (1975). A decision that "did not finally decide anything" is not a "final disposition." *Sears*, 421 U.S. at 159 (citing *ITT*, 419 U.S. 428). For instance, an NLRB investigatory proceeding is not an "adjudication" because the resulting decision, "standing alone, binds no one" and at the conclusion of the proceeding, the agency "does not order anybody to do anything." *ITT*, 419 U.S. at 443–44. Nor does an "ordinary litigation decision," such as an agency's decision on how to respond to a subpoena, qualify as a final disposition. *Watts v. SEC*, 482 F.3d 501, 506 (D.C. Cir. 2007); *see also id.* (observing that an "internal agency process for reaching a decision . . . is not typically or comfortably described as an 'adjudication' (even given the broad scope of formal and informal adjudications under the APA)").

Here, DOJ acknowledges that "[e]very OLC opinion is . . . , by custom and practice of the Executive Branch, treated as controlling, authoritative, and binding." Gov't Reply 10. But OLC's control over an agency's legal interpretations does not give it authority to direct or implement the agency's policies. *See EFF*, 739 F.3d at 9–10. In short, OLC opinions are not "orders" — they do not "order anybody to do anything." *ITT*, 419 U.S. at 443. Instead, an OLC opinion offers advice. For

21

example, it might give a client agency a menu of lawful options, *see* Best Practices Mem. 2 (J.A. 299); or it might "describe[] the legal parameters of what the [agency] is permitted to do," but leave the agency "free to decline to adopt the [practice] deemed legally permissible in the OLC Opinion," *EFF*, 739 F.3d at 10 (emphasis omitted). One typical opinion, cited by CfA, concluded that the Environmental Protection Agency *may* assess civil penalties against federal agencies, but it did not *require* the agency to do so. *See* Clean Air Act Op., 21 Op. O.L.C. 109, 109 (J.A. 481). Because an OLC opinion is not a "final disposition" or an "order," it does not involve "adjudication."

Nor does an opinion that memorializes OLC's advice resolve any "case." In interpreting subsection (A), we have "emphasized that the ability of a third party to participate as a party and to obtain personal relief in a proceeding bears significantly on the determination whether, for purposes of FOIA's affirmative disclosure requirement, the proceeding amounts to an adjudication of a case culminating in a final order." *Am. Immigr. Laws. Ass'n v. Exec. Off. for Immigr. Rev.*, 830 F.3d 667, 679 (D.C. Cir. 2016) (cleaned up). When an agency seeks advice from OLC about a matter that affects the rights of private individuals, those third parties do not participate in OLC's decision-making process and they obtain no "personal relief" from it. *Id.* Nor can the agency itself be considered a party before OLC that obtains "personal relief." *Id.* (noting that the reading-room provision "refer[s] to final opinions resulting from proceedings in which a party has a right to set the agency decision-making process in motion and obtain a determination concerning the statute or other laws the agency is charged with interpreting and administering" (cleaned up)).

The prospective nature of OLC's advice confirms that it does not engage in the "adjudication of cases." One of the

22

"principal distinctions between rulemaking and adjudication"
is that "rulemaking governs only the future, whereas
adjudications 'immediately bind parties by retroactively
applying law to their past actions.'" *ITServe All., Inc. v. DHS*,
71 F.4th 1028, 1035 (D.C. Cir. 2023) (quoting *Safari Club Int'l
v. Zinke*, 878 F.3d 316, 333 (D.C. Cir. 2017) and citing *Bowen
v. Georgetown Univ. Hosp.*, 488 U.S. 204, 216 (1988) (Scalia,
J., concurring)).  Indeed, "it is black-letter administrative law
that adjudications are inherently retroactive."  *Cath. Health
Initiatives Iowa Corp. v. Sebelius*, 718 F.3d 914, 921 (D.C. Cir.
2013).  OLC's opinions, however, "address legal questions
prospectively; OLC avoids opining on the legality of past
conduct (though from time to time [it] may issue prospective
opinions that confirm or memorialize past advice or that
necessarily bear on past conduct in addressing an ongoing legal
issue)."  Best Practices Mem. 3 (J.A. 300).  OLC opinions
therefore are not "final opinions . . . made in the adjudication
of cases" under subsection (A) of the reading-room provision.

Consistent with the foregoing principles, the district court
correctly dismissed CfA's claims under subsection (A) with
respect to opinions that concern the adjudication of private
rights.  As the district court recognized, OLC lacks "*authority*
to 'adjudicat[e]' the rights of the private individuals whom
OLC's client agencies regulate."  *CfA II*, 486 F. Supp. 3d at 443
(alteration and emphasis in original) (quoting 5 U.S.C.
§ 552(a)(2)(A)).  Even if, as CfA argues, OLC is involved in
the agency's adjudicative process and even if its opinion
controls the agency's legal conclusion, the "responsible
decisionmaker in an agency's decision-making process"
remains the agency that, as a matter of law and fact, actually
carries out the adjudication. *Bristol-Meyers Co. v. FTC*, 598
F.2d 18, 25 (D.C. Cir. 1978).

23

The district court erred, however, when it concluded on summary judgment that OLC opinions that resolve interagency disputes must be disclosed because OLC's opinion process "bears many of the hallmarks of adversarial adjudication." *CfA III*, 723 F. Supp. 3d at 73.  The district court reasoned that (1) OLC issues "written opinions only for [interagency] disputes that are 'concrete and ongoing,'" and (2) "the process by which the OLC researches, drafts, and finalizes its opinions that resolve interagency disputes is standardized, thorough, and bears many of the hallmarks of adversarial adjudication." *Id.* (quoting Best Practices Mem. 3 (J.A. 300)).  In particular, the court noted that OLC "solicits a 'detailed' brief" from each party to the dispute, "functions like a neutral decisionmaker," applies both its own precedents and governing legal authorities, and then treats the final opinion as precedential. *Id.* (quoting Best Practices Mem. 3–5 (J.A. 300–02)).  But even if OLC's role and procedures bear some resemblance to "adversarial adjudication," OLC does not actually engage in the "adjudication of cases," as defined by the APA and our caselaw.

In sum, OLC opinions resolving interagency disputes or concerning private rights are not subject to disclosure as "final opinions . . . made in the adjudication of cases."  5 U.S.C. § 552(a)(2)(A).

## 2.   Subsection (B): "Adopted by the Agency"

 CfA also contends that all three categories of opinions at issue must be disclosed under subsection (B) of FOIA's reading-room provision because they are "statements of policy

24

and interpretations which have been adopted by" OLC's client agencies.  5 U.S.C. § 552(a)(2)(B).  We again disagree.[3]

In *CREW II* and *EFF*, we established that "[a]n OLC opinion [that includes statements of policy and interpretations] qualifies as the working law of an agency only if the agency has adopted the opinion as its own."  *CREW II*, 922 F.3d at 486 (cleaned up) (citing *EFF*, 739 F.3d at 9).  Because "OLC [does] not have the authority to establish the 'working law' of [agencies]," an OLC opinion "amounts to advice offered by OLC for consideration by officials of the" agency and "is not the law of an agency unless the agency adopts it."  *EFF*, 739 F.3d at 8.  Importantly, an OLC opinion is not adopted simply because it is "controlling," "authoritative," and "binding," as those qualities "do[] not overcome the fact that OLC does not speak with authority on the agency's policy."  *CREW II*, 922 F.3d at 486 (cleaned up) (quoting *EFF*, 739 F.3d at 9).  Rather, in considering whether an agency has adopted legal advice as its working law, courts focus on what the agency decisionmaker has done with that advice.  *See Sears*, 421 U.S. at 152–53 (observing that "the reasons which did supply the

---

[3]    The district court did not rely on subsection (B) when it concluded on summary judgment that OLC opinions resolving interagency disputes must be disclosed under the reading-room provision.  *See CfA III*, 732 F. Supp. 3d at 70 (citing 5 U.S.C. § 552(a)(2)(A)–(B)).  But CfA asks us to affirm on that ground.  *See Polm Fam. Found., Inc. v. United States*, 644 F.3d 406, 408 (D.C. Cir. 2011) ("A prevailing party may defend its judgment on any ground properly raised below whether or not that ground was relied upon, rejected, or even considered by the District Court." (cleaned up)).  CfA also asks us to reverse the district court's dismissal of its claims related to opinions concerning non-discretionary legal duties and the determination of private rights based on subsection (B).  *See CfA II*, 486 F. Supp. 3d at 441–45.

25

basis for an agency policy actually adopted . . . if expressed within the agency, constitute the 'working law' of the agency"). An agency adopts memoranda when "in practice, [the memoranda] are authoritative Agency decisions in the cases to which they are addressed and . . . in practice, [they] also guide subsequent Agency rulings." *Schlefer v. United States*, 702 F.2d 233, 244 (D.C. Cir. 1983) (citing 5 U.S.C. § 552(a)(2) and *Sears*, 421 U.S. at 149).

As a general matter, OLC opinions are not automatically "adopted by the agency" under subsection (B) of the reading-room provision. 5 U.S.C. § 552(a)(2)(B). Even though all OLC opinions are considered authoritative within the Executive Branch, the requesting agency does not necessarily adopt every opinion as its own working law. As already discussed, OLC opinions generally tell agencies what they can or cannot do, not what they must do. An agency does not adopt such an opinion until it actually takes action in accordance with OLC's advice. *See Schlefer*, 702 F.2d at 244. Only at that point could the opinion become the agency's working law.

Moreover, if OLC determines that an agency's proposed action is unlawful, it may "seek to recommend lawful alternatives." Best Practices Mem. 2 (J.A. 299). In one instance, OLC resolved an interagency dispute by concluding that EPA could permissibly choose between three interpretations of a particular statute. *See* Scope of the Environmental Protection Agency's Discretion to Adopt Any One of Three Alternative Interpretations of the Mitchell-Conte Amendment to the Clean Air Act, 13 Op. O.L.C. 105, 105 (1989). Such an opinion tells the agency only what it "is *permitted* to do" and does not control its policy. *EFF*, 739 F.3d at 10 (emphasis in original). That type of menu-of-choices memorandum cannot be adopted as the agency's working law without further agency action because it does not state a policy

26

that can "have the force and effect of law." *Sears*, 421 U.S. at 153. Thus, as a rule, no category of OLC opinions is automatically and always "adopted by the agency" under subsection (B) of the reading-room provision.

CfA's argument to the contrary draws on the district court's suggestion, made when ruling on the government's motion to dismiss, that opinions resolving interagency disputes might be adopted by the requesting agencies *ex ante* — *i.e.*, before the opinions are issued. *See CfA II*, 486 F. Supp. 3d at 440. CfA posits that OLC's practice of securing up-front commitments from the requesting agencies that they will treat OLC's advice as controlling serves to effectuate an *ex ante* adoption of any ensuing opinion.

We find CfA's theory unpersuasive. Legal advice does not become working law when it is solicited by the agency, even if the agency is supposed to follow the advice. *See Murphy v. Dep't of Army*, 613 F.2d 1151, 1153–54 & n.9 (D.C. Cir. 1979). Instead, the test is whether the agency ultimately applies the advice as its working law. *See Schlefer*, 702 F.2d at 244. That standard does not allow for *ex ante* adoption.

Indeed, our prior cases recognizing an agency's adoption of legal advice as working law focus on the agency's actions *after* the advice was given. For example, in *Taxation With Representation Fund v. IRS*, we held that the agency decisionmaker "transform[ed]" "merely advisory documents" from the agency's counsel into "documents that reflect the agency's current position on a given issue" by distributing them "to subordinate attorneys and other staff persons within

27

the agency to be used as interpretative guides and research tools." 646 F.2d 666, 683 (D.C. Cir. 1981).[4]

Moreover, the "*ex ante* adoption" theory conflicts with *EFF* by improperly focusing on the controlling, authoritative, or binding nature of OLC opinions. Even if the requesting agencies "necessarily agree that their legal interpretations and policy positions will be controlled by and conformed to the OLC's resolution," CfA Br. 27, that is just another way of saying that OLC's opinions are "controlling." We squarely held in *EFF* that a "controlling" or "authoritative" OLC opinion is not working law until the agency actually adopts the opinion. *See EFF*, 739 F.3d at 9. That is because OLC itself is not "authorized to make decisions about" the agency's policies. *Id.* For these reasons, OLC's opinions are not

---

[4]     *See also Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 869 (D.C. Cir. 1980) (holding that the deliberative process privilege does not extend to certain documents that "in practice represent interpretations of established policy on which the agency relies in discharging its regulatory responsibilities"); *Tax Analysts v. IRS (Tax Analysts I)*, 117 F.3d 607, 617 (D.C. Cir. 1997) (holding that "[t]he legal conclusions the [IRS] Office of Chief Counsel provides to field personnel constitute agency law, even if those conclusions are not formally binding," as the documents are "'routinely used' and relied upon by field personnel" (quoting *Coastal States*, 617 F.2d at 869)); *Tax Analysts v. IRS (Tax Analysts II)*, 294 F.3d 71, 81 (D.C. Cir. 2002) (reaching the same conclusion about similar advice memoranda that "simply explain and apply established policy" (quoting *Coastal States*, 617 F.2d at 869)); *Schlefer*, 702 F.2d at 244 (holding that opinions interpreting statutes administered by the agency are not subject to the deliberative process privilege because they "are authoritative Agency decisions in the cases to which they are addressed and . . . also guide subsequent Agency rulings").

28

categorically adopted, *ex ante* or otherwise, by OLC's client agencies.[5]

The district court correctly applied the foregoing principles when it rejected CfA's arguments that the remaining categories of OLC opinions constitute working law under subsection (B) of the reading-room provision. CfA nevertheless argues that (1) opinions interpreting non-discretionary legal duties "set agency policy by conclusively interpreting the agencies' legal obligations" such that "agencies that solicit opinions in this category must necessarily adopt the OLC's interpretations of their legal obligations as their own," CfA Br. 39; and (2) "[w]hen an agency asks the OLC to decide a legal issue relevant to an adjudication [of private rights], it effectively cedes to the OLC the decision-making authority over that aspect of the adjudication, and the agency then applies the resulting legal decision," CfA Reply 18. In our view, those are additional flavors of the "*ex ante* adoption" theory. Even if agencies believe that they "must necessarily" accept OLC's legal interpretations, they do not *categorically* adopt OLC opinions. To be sure, in individual instances, an agency might "in practice" treat an OLC opinion as "an authoritative Agency decision[] in the case[] to which [it is] addressed," and use it to "guide subsequent Agency rulings." *Schlefer*, 702 F.2d at 244. That would be an

---

[5]    CfA also contends, in passing, that OLC's opinions resolving interagency disputes are subject to disclosure because they are "statements of policy and interpretations which have been adopted" by *OLC itself*. *See* 5 U.S.C. § 552(a)(2)(B). Because that argument was not properly raised, we will not address it. *See Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) ("It is not enough to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.").

29

"adoption" of the opinion in the relevant sense, but it would occur only *after* the agency treated that individual opinion as its working law.

### 3.  Deliberative Process Privilege

Finally, the government asserts that the requested documents are exempt from disclosure under the deliberative process privilege embodied in FOIA Exemption 5.  We need not reach that issue.  In *CREW II*, we considered an assertion of the deliberative process privilege in the context of a FOIA request for documents under the reading-room provision.  We declined to consider whether the privilege applied where the plaintiff failed to meet the "antecedent requirement" of plausibly alleging that FOIA mandated the disclosure of the requested documents.  922 F.3d at 486, 487 (even if "FOIA places the burden 'on the agency to sustain its action,'" "the OLC's ultimate burden of proof does not alter the antecedent requirement that [the plaintiff] plead a plausible claim" (quoting 5 U.S.C. § 552(a)(4)(B))).

Thus, at the motion to dismiss stage, "regardless of the OLC's ultimate burden of proof, [the plaintiff] must first allege factual matter supporting a plausible claim that the OLC 'improperly' withheld its formal written opinions."  *CREW II*, 922 F.3d at 487 (quoting *Tax Analysts*, 492 U.S. at 150).  That requires the plaintiff to "allege sufficient factual material about the opinions that — if taken as true — would place them into one of § 552(a)(2)'s enumerated categories" that require disclosure.  *Id.* at 488.  "Then, and only then, would the OLC bear its burden to justify withholding its formal written opinions."  *Id*.  Because we conclude that the reading-room provision does not apply to the OLC opinions at issue here, and that CfA's claims therefore must be dismissed, we do not reach

30

the government's arguments regarding the deliberative process
privilege.

*   *   *

For the foregoing reasons, we reverse the district court's
entry of summary judgment in favor of CfA with respect to the
disclosure of opinions that resolve interagency disputes and
remand for the district court to dismiss that claim.  We affirm
the district court's judgment insofar as it granted OLC's motion
to dismiss CfA's claims regarding the adjudication or
determination of private rights and the interpretation of non-
discretionary legal duties.

*So ordered.*

R_AO, *Circuit Judge*, concurring in the judgment: I write separately to explain why Campaign for Accountability ("CfA") lacks standing to bring this suit. The Freedom of Information Act creates a *public* right to disclosure of certain records in an electronic reading room. CfA alleges that the Office of Legal Counsel ("OLC") is not following the law because it failed to make its legal opinions available in a reading room. To establish standing for an alleged reading room violation, CfA was required to demonstrate a particularized injury and some downstream, adverse impact from the agency's nondisclosure. *See Prisology, Inc. v. Fed. Bureau of Prisons*, 852 F.3d 1114, 1116–18 (D.C. Cir. 2017); *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2214 (2021).

CfA failed to demonstrate a particularized injury. CfA merely raised a generalized grievance that OLC is violating the law and only vaguely gestured at organizational injuries. We lack jurisdiction to entertain CfA's suit, which at bottom presents an undifferentiated interest in enforcement of the laws that is insufficient to invoke the Article III judicial power.

I.

The Office of Legal Counsel is a specialized component of the Department of Justice that provides legal advice and opinions to assist the President, the Attorney General, and Executive Branch agencies in the execution of the laws. OLC at times issues formal opinions of law, under authority delegated from the Attorney General, but more frequently OLC provides informal opinions and legal advice on constitutional, statutory, and regulatory matters. *See Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 922 F.3d 480, 483–84 (D.C. Cir. 2019).

CfA is a nonprofit organization that "uses research, litigation, and communications to expose misconduct and malfeasance in public life." J.A. 65. CfA requested OLC make

2

certain types of legal opinions publicly available in an electronic reading room. In its request for disclosure, CfA relied exclusively on the Freedom of Information Act ("FOIA") reading room provision, which requires that agencies "make available for public inspection in an electronic format" enumerated categories of records. 5 U.S.C. § 552(a)(2) (the "reading room provision"). CfA explicitly stated it was not making a FOIA request for particular agency "records." *See* 5 U.S.C. § 552(a)(3) (the "record request provision"). OLC denied the reading room request, asserting that none of its opinions were required to be disclosed under the reading room provision.

CfA brought suit to compel OLC to release the opinions. In its operative complaint, CfA claimed injury from OLC's refusal to provide the opinions in a reading room. CfA also alleged the denial harmed CfA's "core programmatic activities." The district court held that OLC must disclose opinions that resolve interagency disputes, but not the other categories of opinions sought by CfA.

II.

The majority holds that each of CfA's reading room claims fails on the merits. I find the majority's careful analysis persuasive, but I would decide this case at the jurisdictional threshold because CfA lacks standing to bring these claims.

A.

Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. Plaintiffs seeking to vindicate their rights in federal court must demonstrate standing, establishing they have suffered an injury in fact that is caused by the defendant and redressable by the court. *Lujan v. Defs. of Wildlife*, 504 U.S.

3

555, 560–61 (1992). This "irreducible constitutional minimum" ensures that a proper party is seeking relief that may be properly issued by a federal court. *See id.*; William Baude & Samuel L. Bray, *Proper Parties, Proper Relief*, 137 Harv. L. Rev. 153, 154–56 (2023).

As particularly relevant here, the Supreme Court has long held that the federal courts have no power to entertain suits based only on a plaintiff's general interest in enforcement of the laws. When a plaintiff sues the government, standing requirements ensure that federal courts do not "operate as an open forum for citizens to press general complaints" about violations of federal law. *FDA v. All. for Hippocratic Med.*, 144 S. Ct. 1540, 1554 (2024) (cleaned up); *see also Allen v. Wright*, 468 U.S. 737, 754 (1984); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 220–23 & n.13 (1974). The injury in fact element "screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *All. for Hippocratic Med.*, 144 S. Ct. at 1556.

Such general objections are not the business of the federal courts, which may decide only cases and controversies. Standing is a jurisdictional limit that marks the peculiar province of the judicial power, separate from the legislative and executive powers. The "generalized interest of all citizens" in enforcement of the laws does not suffice to establish standing. *Schlesinger*, 418 U.S. at 217. Courts may vindicate the private rights of plaintiffs who are harmed by the government, but "it would exceed Article III's limitations if … in the absence of any showing of concrete injury, we were to entertain citizen suits to vindicate the public's nonconcrete interest in the proper administration of the laws." *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009) (cleaned up). Standing ensures that courts stay within their proper constitutional sphere.

4

Put another way, federal courts must stay within Article III limits, lest they intrude on the powers of the political departments. "Vindicating the *public* interest (including the public interest in Government observance of the Constitution and laws) is the function of Congress and the Chief Executive." *Lujan*, 504 U.S. at 576; *see id.* at 574–76 (discussing cases). Courts cannot issue advisory opinions, and they must refrain from "exercis[ing] general legal oversight of the Legislative and Executive Branches." *TransUnion*, 141 S. Ct. at 2203. The constitutional responsibility for faithful execution of the laws belongs to the President, not the courts. *See* U.S. Const. art. II, §§ 1 and 3. Congress cannot "convert the undifferentiated public interest in executive officers' compliance with the law into an individual right vindicable in the courts" because that would grant courts "authority over the governmental acts of another and co-equal department." *Lujan*, 504 U.S. at 577 (cleaned up).

These bedrock standing principles have particular relevance to plaintiffs bringing suit under FOIA's reading room provision, which imposes a general obligation on agencies to disclose certain records in an electronic reading room. In *Prisology*, we held that an agency's failure to publish records in a reading room is a "harm common to everyone, a harm of the sort *Lujan* described as not stating an Article III case or controversy." *Prisology*, 852 F.3d at 1115–17. We described how the standing inquiry differed between the reading room provision and FOIA's more familiar record request provision. *See id.* at 1117 (recognizing that under the record request provision our caselaw allows standing based on an agency's denial of a request for records). Because an alleged reading room violation is a generalized grievance, a plaintiff seeking to establish standing must demonstrate a "particularized injury" and cannot merely point to the agency's failure to disclose the records. *Id.* at 1116–17.

5

Our standing analysis in *Prisology* was further reinforced by *TransUnion*, in which the Supreme Court recognized that an "informational injury that causes no adverse effects cannot satisfy Article III." 141 S. Ct. at 2214 (cleaned up); *see Grae v. Corr. Corp. of Am.*, 57 F.4th 567, 570–71 (6th Cir. 2023) (collecting cases recognizing this principle in the context of public disclosure laws). A plaintiff cannot invoke the jurisdiction of the federal courts unless he has identified some "'downstream consequences' from failing to receive the required information." *TransUnion*, 141 S. Ct. at 2214 (quoting *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 1004 (11th Cir. 2020)).

Under *TransUnion* and *Prisology*, a plaintiff suing to enforce FOIA's reading room provision must establish standing by demonstrating some downstream harm from an agency's failure to publish records in a public reading room.

B.

CfA alleges that OLC is in violation of FOIA's reading room provision and seeks a judicial order requiring OLC to publish certain categories of its formal written opinions. But a violation of the reading room provision alone is nothing more than a generalized grievance, and CfA has not identified a "downstream" or "adverse" effect from OLC's alleged failure to publish its opinions. *TransUnion*, 141 S. Ct. at 2214. CfA therefore lacks standing.

1.

As an initial matter, CfA's bare allegation of a reading room violation does not suffice for standing. The reading room provision states: "Each agency, in accordance with published rules, shall make available for *public* inspection in an electronic format" enumerated categories of records. 5 U.S.C. § 552(a)(2)

6

(emphasis added). This provision imposes a requirement on agencies to make the specified categories of records available to the public. It does not create an individual right, only a *general public* right to certain records. FOIA's judicial review provision states that district courts have jurisdiction "to order the production of any agency records improperly withheld *from the complainant*." 5 U.S.C. § 552(a)(4)(B) (emphasis added). Congress provided for judicial review when records were improperly withheld from a particular complainant, not from the public at large. Assuming the judicial review provision applies to private enforcement of the reading room provision, FOIA reflects the general principles of Article III standing because any alleged injury from a reading room violation must be particular to the plaintiff bringing suit.

CfA therefore cannot rely solely on OLC's refusal to disclose the opinions CfA requested under the reading room provision because this denial does not amount to a particularized injury. As explained above, CfA expressly disclaimed reliance on FOIA's record request provision, so any statutory entitlement to reading room records invoked by CfA's request is "common to everyone," and OLC's refusal to disclose is not, without more, a harm particular to CfA. *Prisology*, 852 F.3d at 1116–17 ("Even if we inferred an injury to Prisology from the Bureau's alleged failure to publish its records electronically, this would not differentiate Prisology from the public at large."). Without an adverse effect particular to CfA, any injury from nondisclosure "is plainly undifferentiated and common to all members of the public." *United States v. Richardson*, 418 U.S. 166, 176–77 (1974) (cleaned up).

My colleagues conclude that CfA has standing primarily because OLC denied CfA's request that certain OLC opinions be published in an electronic reading room. *See* Majority Op.

7

15–16. That conclusion, however, squarely conflicts with *Prisology*, which held that simply withholding records from a reading room is not sufficient to establish standing.[1] 852 F.3d at 1116–17. A generalized grievance about the "proper application" of a public disclosure law is insufficient to invoke the jurisdiction of the federal courts. *Lujan*, 504 U.S. at 573–74. CfA cannot establish standing by claiming nothing more than a generalized injury from OLC's alleged refusal to publish opinions pursuant to FOIA's reading room provision.

2.

Nor has CfA demonstrated that OLC's violation of the reading room provision caused a downstream, adverse effect particular to CfA. *See TransUnion*, 141 S. Ct. at 2214; *Prisology*, 852 F.3d at 1117.

While the Supreme Court has not yet explained what is needed to show an adverse effect, this court's standing precedents inform certain minimum requirements. First, the plaintiff must put forth particularized facts; "general averments

---

[1] By contrast, for suits under FOIA's record request provision, the Supreme Court has observed that the denial of a request for agency records suffices as an injury in fact. *See Pub. Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 449 (1989). *TransUnion* explicitly left in place precedents concerning informational injuries under FOIA's record request provision. 141 S. Ct. at 2214; *see also All. for Hippocratic Med.*, 144 S. Ct. at 1564 (indicating there may be informational injuries stemming from federal laws that require agencies "to disseminate … information upon request by members of the public"). Nonetheless, we have recognized that the reasoning of *TransUnion*—that plaintiffs alleging informational injury must show downstream, adverse effects—is in tension with cases allowing standing for the mere denial of a FOIA record request. *See Nat'l Sec. Archive v. CIA*, 104 F.4th 267, 272 & n.1 (D.C. Cir. 2024).

8

and conclusory allegations" are not enough. *Coubaly v. Cargill Inc.*, 144 F.4th 343, 348 (D.C. Cir. 2025). Second, when challenging the government's alleged noncompliance with a public disclosure law, a plaintiff must demonstrate concrete and particularized harms that go beyond the general public interest in ensuring that the government follows the law.[2] *See All. for Hippocratic Med.*, 144 S. Ct. at 1556; *TransUnion*, 141 S. Ct. at 2207, 2214; *id.* at 2217, 2219–20 (Thomas, J., dissenting) (explaining that a legal violation is insufficient for standing in the context of public rights because at the founding, the judicial power did not extend to a plaintiff seeking to enforce "a duty owed broadly to the community" absent a "showing of actual damages" to the plaintiff).

Here, because CfA relies on organizational standing, it must demonstrate "*discrete* programmatic concerns" that are "being *directly and adversely* affected" by nondisclosure; a "mere setback to the organization's abstract social interests is not enough." *Viasat, Inc. v. FCC*, 47 F.4th 769, 781 (D.C. Cir. 2022) (cleaned up). As other circuits have observed in applying *TransUnion* to public disclosure lawsuits, CfA must

---

[2] As I have observed in a different context, a plaintiff suing under a government disclosure law must show downstream harm that "has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Maloney v. Carnahan*, 45 F.4th 215, 222–23 (D.C. Cir. 2022) (Rao, J., dissenting from the denial of rehearing en banc). I do not further elaborate on the requirements of a downstream harm in this context because CfA fails to show downstream consequences even under a minimal conception of what that requires. Furthermore, I note that an injury in fact may be easier to establish when one private party is harmed by another party's unlawful action—a more traditional type of case than a suit to vindicate public rights of disclosure against the government. *See TransUnion*, 141 S. Ct. at 2214; *id.* at 2217, 2219–20 (Thomas, J., dissenting).

9

demonstrate "an interest in using the information beyond bringing [its] lawsuit."[3] *Grae*, 57 F.4th at 570–71 (quoting *Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 444 (2d Cir. 2022)); *see also Campaign Legal Ctr. v. Scott*, 49 F.4th 931, 938–39 (5th Cir. 2022).

Perhaps because the government never questioned CfA's alleged injury in fact, the summary judgment briefing is devoid of any demonstration of standing. Looking back to the complaint, CfA alleged it "uses research, litigation, and communications to expose misconduct and malfeasance in public life" and, here, OLC's nondisclosure "has harmed, and continues to harm, CfA in carrying out its core programmatic activities." J.A. 65, 81.

These allegations fall well short of stating downstream and adverse effects particular to CfA. CfA merely describes various activities in which it generally engages and asserts the legal conclusion of "harm" to its "core programmatic activities." It neither identifies which "discrete programmatic concerns" are at stake here, nor alleges how such concerns are "directly and adversely affected" by OLC's failure to provide the specified opinions in a public reading room. *Viasat*, 47 F.4th at 781. CfA's amended complaint lacks any factual allegations as to

---

[3] When considering standing in other contexts, this court has similarly looked at downstream or adverse effects for informational injuries. *See Animal Legal Def. Fund, Inc. v. Vilsack*, 111 F.4th 1219, 1229 (D.C. Cir. 2024) (finding concrete injury alleged by member of plaintiff association who desired the withheld information to "make an informed purchasing decision"); *cf. Frank v. Autovest, LLC*, 961 F.3d 1185, 1188 (D.C. Cir. 2020) (plaintiff failed to show "detrimental reliance" on misrepresentations that allegedly violated the Federal Debt Collection Practices Act).

10

how it has suffered downstream, adverse effects from OLC's nondisclosure.[4]

These requirements for standing should not present an insurmountable hurdle to plaintiffs that have suffered a concrete and particularized injury from an agency's alleged failure to comply with statutory requirements. But maintaining a case in federal court requires more than CfA's general statements of its organizational activities and conclusory allegations of harm to those activities.

\* \* \*

The Article III courts are not a forum for opining on "legal issues in response to citizens who might roam the country in search of governmental wrongdoing." *All. for Hippocratic Med.*, 144 S. Ct. at 1555 (cleaned up). Because CfA has failed to demonstrate standing, its suit must be dismissed for lack of jurisdiction. I therefore concur in the judgment dismissing CfA's claims.

---

[4] The majority relies on a district court case decided prior to *Prisology* to show that the court entertained reading room claims on allegations of harm similar to CfA's. *See* Majority Op. 16. But as we explained in *Prisology*, that case did "not discuss[] standing." 852 F.3d at 1117. This drive-by jurisdictional assumption cannot support CfA's standing.